UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA WOOD, *et al*., individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>     v.<br><br>MIKE BLOOMBERG 2020, INC.,<br><br>                 Defendant. | 20 Civ. 2489 (LTS)(GWG) |

**DEFENDANT MIKE BLOOMBERG 2020, INC.'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT ......................................................................................................................... 4

I.  NO NOTICE SHOULD BE SENT BECAUSE THE FAIR LABOR
    STANDARDS ACT DOES NOT APPLY TO THE CAMPAIGN. ................................... 4

    A.  The Campaign is Not a Covered Enterprise under the FLSA. ..................... 5

        1.  The Campaign Was Not Conducted for a "Business Purpose." ................. 5

        2.  The Campaign Did Not "Engage in Commerce." ...................................... 9

    B.  The Plaintiffs are Not Covered Individuals. ................................................ 12

        1.  Plaintiffs' Exercise of Rights to Political Speech Was Not in
            "Commerce." ............................................................................................ 12

        2.  Plaintiffs' Minimal Interstate Activity Was Too Tangential and
            Infrequent to Invoke the FLSA. ............................................................... 15

II.  PLAINTIFFS FAIL TO SHOW THAT THEY ARE SIMILARLY SITUATED
     TO THE PROPOSED COLLECTIVE. ............................................................................ 19

    A.  The FLSA Individual Coverage Analysis Varies From Person to
        Person and Cannot Be Determined on a Representative Basis. ................ 20

    B.  Plaintiffs Cannot Show That They Are Similarly Situated With
        Respect to Their Misclassification Claims. .................................................. 22

CONCLUSION ...................................................................................................................... 24

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Anderson v. Hearts with Hope Found.*,
713 F. App'x 278 (5th Cir. 2017) ............................................................6

*Boekemeier v. Fourth Universalist Soc'y in the City of N.Y.*,
86 F. Supp. 2d 280 (S.D.N.Y. 2000).......................................................18

*Bowrin v. Catholic Guardian Soc.*,
417 F. Supp. 2d 449 (S.D.N.Y. 2006)...................................................7, 17

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001)...............................................................................13, 14

*Colozzi v. St. Joseph's Hosp. Health Ctr.*,
595 F. Supp. 2d 200 (N.D.N.Y. 2009) .................................................4, 19

*Curry v. High Springs Family Practice & Diagnosis Ctr., Inc.*,
No. 08-cv-8 (MK) (AK), 2009 WL 3163221 (N.D. Fla. Sept. 30, 2009)................19

*Davis v. Patel*,
No. 14-cv-764, 2016 WL 4160967 (M.D. Tenn. Aug. 5, 2016)...............................17

*Divins v. Hazeltine Electronics Corp.*,
163 F.2d 100 (2d Cir. 1947)...................................................................15

*Dunlop v. Indus. Am. Corp.*,
516 F.2d 498 (5th Cir. 1975) ..................................................................13

*Guillen v. Marshalls of MA, Inc.*,
750 F. Supp. 2d 469 (S.D.N.Y. 2010)..................................................19, 20, 22

*Hines v. State Room, Inc.*,
665 F.3d 235 (1st Cir. 2011)...................................................................23

*Hoffman v. Sbarro, Inc.*,
982 F. Supp. 249 (S.D.N.Y. 1997)............................................................4

*In re: Prospect Mort., LLC, Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*,
987 F. Supp. 2d 1383 (J.P.M.L. 2013)...................................................23

*Jacobs v. N.Y. Foundling Hosp.*,
577 F.3d 93 (2d Cir. 2009)......................................................................6

*Johnson v. Trump for President, Inc.*,
   No. 19-cv-475, 2019 WL 2492122 (M.D. Fla. June 14, 2019) ............................................7, 8

*Joles v. Johnson Cty. Youth Serv. Bureau, Inc.*,
   885 F. Supp. 1169 (S.D. Ind. 1995) ....................................................................................7, 14

*Jones v. SCO Family of Servs.*,
   No. 15-cv-8733 (GBD), 2016 WL 7188152 (S.D.N.Y. Dec. 2, 2016) ....................................18

*Kirschbaum v. Walling*,
   316 U.S. 517 (1942) ..................................................................................................................13

*Kitchings v. Fla. United Methodist Children's Home, Inc.*,
   393 F. Supp. 2d 1282 (M.D. Fla. 2005) ........................................................................... passim

*Locke v. St. Augustine's Episcopal Church*,
   690 F. Supp. 2d 77 (E.D.N.Y. 2010) .................................................................................9, 17

*Lu v. Purple Sushi Inc.*,
   No. 19-cv-5828 (PGG) (KHP), 2020 WL 1303572 (S.D.N.Y. Mar. 19, 2020) ...............20, 22

*Malloy v. Ass'n of State & Territorial Solid Waste Mgmt. Officials*,
   955 F. Supp. 2d 50 (D.D.C. 2013) ............................................................................................7

*Martin v. Sprint/United Mgmt. Co.*,
   No. 15-cv-5237 (PAE), 2016 WL 30334 (S.D.N.Y. Jan. 4, 2016) .........................................20

*Mayo v. Jean Nicole Hair Salons, Inc.*,
   No. 15-cv-115, 2015 WL 4751202 (M.D. Fla. Aug. 11, 2015) ...............................................18

*McLeod v. Threlkeld*,
   319 U.S. 491 (1943) ..................................................................................................................17

*Mobile Republican Assembly v. U.S.*,
   353 F.3d 1357 (11th Cir. 2003) ...............................................................................................11

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
   111 F. Supp. 2d 493 (D.N.J. 2000) .........................................................................................23

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)......................................................................................................4

*Nikolaeva v.Home Attendant Servs. of Hyde Park*,
   No. 15-cv-6977 (NGG) (RER), 2018 U.S. Dist. LEXIS 197155 (E.D.N.Y.
   Nov. 16, 2018) ...........................................................................................................................7

*O'Donnell v. Robert Half Int'l, Inc.*,
   429 F. Supp. 2d 246 (D. Mass. 2006) ......................................................................................23

*Overstreet v. N. Shore Corp.*,
    318 U.S. 125 (1943).............................................................................................13

*Owusu v. Corona Tire Shop, Inc.*,
    No. 09-cv-3744 (NGG) (JO), 2013 WL 1680861 (E.D.N.Y. Apr. 17, 2013).........................19

*Reagor v. Okmulgee Cty. Family Resource Ctr., Inc.*,
    501 F. App'x 805 (10th Cir. 2012) ...................................................................7, 14

*Romero v. H.B. Auto. Grp., Inc.*,
    No. 11-cv-386 (CM), 2012 WL 1514810 (S.D.N.Y. May 1, 2012) .......................................20

*Rusis v. Int'l Bus. Machines Corp.*,
    No. 18-cv-8434 (VEC), 2020 WL 1151322 (S.D.N.Y. Mar. 10, 2020) .................................20

*Sanchez v. JMP Ventures, LLC*,
    No. 13-cv-7264 (KBF), 2014 WL 465542 (S.D.N.Y. Jan. 27, 2014)....................................20

*Scarpinato v. E. Hampton Point Mgmt. Corp.*,
    No. 12-cv-3681 (JFB) (GRB), 2013 WL 5202656 (E.D.N.Y. Sept. 13, 2013) ......................23

*Stocker v. Marjakaj*,
    No. 14-cv-13386, 2015 WL 13861151 (E.D. Mich. 2015)....................................................18

*Thorne v. All Restoration Servs. Inc.*,
    448 F.3d 1264 (11th Cir. 2006) .............................................................................17

*Tony & Susan Alamo Foundation v. Secretary of Labor*,
    471 U.S. 290 (1985)............................................................................................6, 11

*Walling v. Jacksonville Paper Co.*,
    317 U.S. 564 (1943).............................................................................................14

*Wirtz v. Columbian Mut. Life Ins. Co.*,
    380 F.2d 903 (6th Cir. 1967) ..................................................................................6

## STATUTES

26 U.S.C. § 527.................................................................................................... passim

29 U.S.C. § 202.............................................................................................................1

29 U.S.C. § 203......................................................................................................5, 7, 9

29 U.S.C. § 206..................................................................................................1, 5, 12

29 U.S.C. § 207.....................................................................................................1, 12

29 U.S.C. § 215.............................................................................................................1

Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ............................................................... passim

Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.*. ...............................................................................13

**OTHER AUTHORITIES**

29 C.F.R. § 1.527-3(e) ...........................................................................................................10

29 C.F.R. § 776.10(b) ..................................................................................................... passim

29 C.F.R. § 779.214 ...............................................................................................................6

29 C.F.R. § 779.258 ...............................................................................................................9

S. Rep. No. 1744, 86th Cong., 2d Sess., 28 (1960) ...................................................................8, 9

U.S. Dept. of Labor, Opinion Letter FLSA2008-8 ...............................................................8, 10, 11

## INTRODUCTION

The most fundamental requirement of a collective action under the Fair Labor Standards Act ("FLSA") is evidence of an employer's unlawful policy that uniformly affected a group of employees.  There is, after all, no justification for sending notice of a claim challenging a lawful policy.  Yet that is what the Plaintiffs attempt here, because as a matter of law the FLSA does not apply to the Defendant, Mike Bloomberg 2020, Inc. (the "Campaign").

Congress enacted the Fair Labor Standards Act to regulate labor conditions in "industries engaged in commerce or in the production of goods for commerce," so as to prevent "unfair method[s] of competition" and employment practices that "burden[ ] commerce and the free flow of goods in commerce" and "interfere[ ] with the orderly and fair marketing of goods in commerce."  29 U.S.C. § 202.  The statute prescribes minimum wages and overtime requirements for such "industries," and makes it unlawful for any person to "ship, deliver, or sell in commerce, . . . any goods" produced in violation of those requirements.  29 U.S.C. §§ 206, 207, 215.

The Campaign is not such an enterprise.  It is a tax-exempt, nonprofit political advocacy organization.  The Campaign did not engage in any "industry" or the "marketing of goods in commerce," nor engage in "competition" with any businesses; it was formed for the sole purpose of advocating for the election of Michael Bloomberg to the Presidency.  Plaintiffs, who were Field Organizers ("FO") and other organizing employees of the Campaign's various state operations, were responsible for carrying that message to individual voters at the most grassroots level: engaging local voters, recruiting and managing volunteers, and performing "get out the vote" activities, including knocking on doors, posting yard signs, and making phone calls within their state, to share Mr. Bloomberg's ideas and philosophy and to urge his election to the Presidency.

Plaintiffs now propose conditionally to certify a nationwide collective of FOs[1] under the FLSA, implicitly characterizing the Campaign as a business engaged in an "unfair method of competition" and interfering with "commerce" by paying them $6,000 per month – roughly double the usual salary – rather than hourly with overtime.  To warrant that relief, Plaintiffs must show that they were subject to a policy that violated the FLSA.  They cannot do so, as a matter of law, because the FLSA does not apply to political campaign organizations.  There is no justification for sending notice of a claim against an organization that is not subject to the statute, and Plaintiffs' motion therefore should be denied.

Even if the Campaign were a commercial enterprise subject to the FLSA, Plaintiffs' demand for conditional certification would turn on fact-intensive, person-by-person inquiries, and Plaintiffs could not show that those claims can be resolved on a representative basis.  Plaintiffs' motion should be denied for that independent reason as well.

## STATEMENT OF FACTS

The Campaign was organized on November 8, 2019, as a nonprofit corporation under Delaware law and pursuant to 26 U.S.C. § 527, governing tax-exempt political organizations.  (*See* Declaration of Hayden Horowitz ("Horowitz Decl.") ¶ 2 & Exs. A, B.)  It was also registered with the Federal Election Commission ("FEC") as a principal campaign committee, to support the election of Michael Bloomberg to the Presidency.  (*See id.*)

---

[1] Plaintiffs' proposed collective includes "Field Organizers and other exempt-classified analogous positions." (Doc. 63-1.) They do not seek to include individuals in the role of Regional Organizing Director ("ROD"), which is not a similar position.  RODs supervised approximately six to eight FOs within a particular geographic region of one state, and were responsible for FOs' job performance, helped them set goals for voter contact, and monitored their activities and reporting.  (*See* Declaration of Daniel Kanninen ("Kanninen Decl.") ¶ 6; Declaration of James Mitchell ("Mitchell Decl.") ¶ 5; and Declaration of Scott Kosanovich ("Kosanovich Decl.") ¶ 5.)

The Campaign was funded entirely by Mr. Bloomberg; it did not accept donations from any other source.  (*Id*. ¶ 3.)  As part of its advocacy efforts, the Campaign sold merchandise – hats, t-shirts, and so forth – on its website, but those items were sold at cost to the Campaign, and when shipping and other costs are factored in, the Campaign actually lost money on such sales.  (*Id*. ¶ 4.[2])  The sole purpose of those sales was to communicate about, and generate enthusiasm for, Mr. Bloomberg's candidacy, not to raise money.  (*Id*.)  As a matter of law those merchandise sales constituted political contributions, and not revenue from the sale of goods.  (*Id*.)

Though it operated nationally, and had a central headquarters in New York, the Campaign was largely carried out through separate organizations in each state or territory.  (*See* Kanninen Decl. ¶¶ 3-5; Kosanovich Decl. ¶¶ 2-5; Mitchell Decl. ¶¶ 2-5.)  Each was headed by a State Director and an Organizing Director, who determined the particular strategy for the state or territory based on a variety of factors.  (Kanninen Decl. ¶¶ 4-5; Kosanovich Decl. ¶¶ 2-4, 17; Mitchell Decl. ¶¶ 2-4, 15.)  Working under these state-level directors were RODs, who oversaw the work of the FOs who are the members of Plaintiffs' proposed collective.  (Kanninen Decl. ¶ 6; Kosanovich Decl. ¶¶ 3, 5; Mitchell Decl. ¶¶ 3, 5.)

Because of this state-by-state organization of the Campaign, and their grassroots responsibilities, FOs worked exclusively within a particular state: calling voters in that state, knocking on doors there, and organizing events in the local community where they were assigned. (*See* Kanninen Decl. ¶¶ 6-8; Kosanovich Decl. ¶¶ 5-7; Mitchell Decl. ¶¶ 5-7.)  That was their function: to engage local voters one on one.  There was no need for FOs to engage in any interstate activity, because the Campaign engaged FOs in every state in which Mr. Bloomberg campaigned

---

[2] Merchandise was only sold online, through the Campaign's website; when merchandise was provided at campaign events, it was given away.  (Horowitz Decl. ¶ 5; Kanninen Decl. ¶ 13; Kosanovich Decl. ¶ 14; Mitchell Decl. ¶ 12.)

for the very purpose of creating local, personal interactions between voters and organizers who lived in their community.  (*See generally* Kanninen Decl. ¶¶ 16-18, 20-21; Kosanovich Decl. ¶¶ 7, 18-20; Mitchell Decl. ¶¶ 7, 16-18.)

Accordingly, the FOs engaged in very little interstate activity.  They were invited to all-hands conference calls twice a week, and occasional other calls, during which they listened but did not participate (Kanninen Decl. ¶¶ 9-12; Kosanovich Decl. ¶¶ 10-13; Mitchell Decl. ¶¶ 8-11), and some FOs in states whose primaries were not on Super Tuesday made some interstate calls into Super Tuesday states in the few days before those primaries (Kanninen Decl. ¶ 7; Kosanovich Decl. ¶ 8).  Otherwise, their work was entirely intrastate.  (Kanninen Decl. ¶ 8; Kosanovich Decl. ¶ 9; Mitchell Decl. ¶ 7.)  In addition to canvassing, in person and on the phone, FOs also designed and organized campaign events, and had discretion to determine the most appealing events and agendas for those events in their respective communities.  (Kanninen Decl. ¶¶ 18-21; Kosanovich Decl. ¶¶ 19-23; Mitchell Decl. ¶¶ 17-21.)

## ARGUMENT

## I.   NO NOTICE SHOULD BE SENT BECAUSE THE FAIR LABOR STANDARDS ACT DOES NOT APPLY TO THE CAMPAIGN.

Not every similarity among the members of a proposed collective contributes to a finding that those individuals are "similarly situated" under the FLSA.  As the Second Circuit has held, plaintiffs must show that they and the proposed collective "together were victims of a common policy or plan *that violated the law*."  *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (emphasis added) (quoting *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (Sotomayor, J.))  "The similarly situated analysis, then, centers upon the features which make the particular policy or practice unlawful."  *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200, 207 (N.D.N.Y. 2009).

To justify a nationwide notice, therefore, Plaintiffs must at the barest minimum establish that they are within the legal scope of the FLSA – particularly to the extent that that question presents an issue purely of law, requiring no assessment of competing facts or the sufficiency of the allegations in the Second Amended Complaint.  Even under the "low burden" that they contend applies here, Pl. Mem. at 9, they must at least establish that the statute applies to them in the first place.

It does not.  The FLSA extends only to certain commercial enterprises that do business, and that do so at a certain scale, and also to employees of non-covered enterprises who nevertheless individually engage in such commerce.  29 U.S.C. §§203(r), 203(s), 206(a).  Neither the Campaign nor its employees engaged in any "commerce" with a "business purpose"; the Campaign was not a business and its employees had no products or services to buy or sell.  Its mission was not to earn a profit but to elect a candidate, and Plaintiffs' responsibilities were to advocate, to spread ideas, to share a political philosophy, and to persuade voters.  The FLSA simply does not cover political campaigns, and the futile act of conditional certification here would be a waste of resources.[3]

A.      THE CAMPAIGN IS NOT A COVERED ENTERPRISE UNDER THE FLSA.

1.      The Campaign Was Not Conducted for a "Business Purpose."

At the very threshold, the FLSA simply does not apply to organizations that lack a business purpose – the buying and selling of goods or services.  The statute defines a covered enterprise as the sum of "related activities performed (either through unified operation or common control) by any person or persons for a common *business purpose* . . . ."  29 U.S.C. §203(r)(1) (emphasis added).  As a result, nonprofit organizations, founded for some purpose other than to conduct

---

[3] Also, because the FLSA does not apply to the Campaign, notifying former employees of a potential claim would only be confusing, suggesting to them that they may have a cause of action that, as a matter of law, they do not.

business, are not subject to the FLSA, except to the extent that they engage in activities that "compete in the marketplace with ordinary commercial enterprises." 29 C.F.R. §779.214; *see also Anderson v. Hearts with Hope Found.*, 713 F. App'x 278, 280 (5th Cir. 2017) (per curiam) (nonprofit organizations "are generally exempt" from enterprise coverage); *Jacobs v. N.Y. Foundling Hosp.*, 577 F.3d 93, 97 (2d Cir. 2009) ("Generally, non-profit organizations that do not 'engage in ordinary commercial activities' . . . operate without a 'business purpose' and therefore are not enterprises"); *Wirtz v. Columbian Mut. Life Ins. Co.*, 380 F.2d 903, 907 (6th Cir. 1967) (noting that "a company's nonprofit activities do not fall within the 'common business' requirement").

Thus, for example, in *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 292 (1985), the defendant was a nonprofit religious enterprise that, in addition to significant charitable work, derived income from service stations, retail clothing and grocery stores, and candy production and distribution, manufacturing, and other activities.  The Supreme Court held the Foundation's activities to be subject to the FLSA only to the extent that they "serve the general public in competition with ordinary commercial enterprises." *Id*. at 299.  Paying "substandard wages" in those commercial activities would give the Foundation an unfair advantage as compared to other service stations, grocery stores, and other commercial businesses that had to pay workers the statutory minimum wage and overtime, and that unfair competition warranted inclusion of the Foundation's commercial activities (and therefore the employees who worked specifically in those commercial businesses) within the scope of the FLSA.  *Id*.  The Court went on to note, however, that because the FLSA's requirements extend only to "commercial activities undertaken with a 'business purpose,'" the statute would have "no impact on petitioners' own evangelical activities or on individuals engaged in volunteer work for other religious organizations." *Id*. at 305; *see also*

- 6 -

*Malloy v. Ass'n of State & Territorial Solid Waste Mgmt. Officials*, 955 F. Supp. 2d 50, 55 (D.D.C. 2013) ("In determining whether a non-profit entity operates with a business purpose, courts examine 'whether the non-profit is primarily engaging in competition in the public with commercial enterprises'"); *Reagor v. Okmulgee Cty. Family Resource Ctr., Inc.*, 501 F. App'x 805, 810 (10th Cir. 2012) ("Generally, activities of nonprofits 'are not considered to be conducted for a common business purpose unless they engage in commercial activity.'") (quoting *Bowrin v. Catholic Guardian Soc.*, 417 F. Supp. 2d 449, 459 (S.D.N.Y. 2006)).[4]

The Campaign did not engage in "business," nor did it "compete" with any "ordinary commercial enterprises." It did not operate any grocery stores or retail clothing shops. It existed, of course, solely to advocate on behalf of Mr. Bloomberg's candidacy for president, not to engage in commerce. Like any advocacy organization, its stock in trade was not commercial goods or services but expression, ideas, a core First-Amendment-protected effort to persuade voters, and nothing more. To the extent the Campaign "competed" at all, it competed with other political campaigns for attention to and endorsement of Mike Bloomberg's ideas and policy proposals, not with any commercial enterprise. *See, e.g.*, *Johnson v. Trump for President, Inc.*, No. 19-cv-475, 2019 WL 2492122 (M.D. Fla. June 14, 2019) (rejecting enterprise coverage for a political

---

[4] Many other courts have similarly excluded non-profit organizations from enterprise coverage where the organization does not compete with ordinary businesses. *See, e.g. Nikolaeva v. Home Attendant Servs. of Hyde Park*, No. 15-cv-6977 (NGG) (RER), 2018 U.S. Dist. LEXIS 197155, at *7 (E.D.N.Y. Nov. 16, 2018) (relevant inquiry in enterprise analysis is whether the organization is in competition with "ordinary commercial enterprises"); *Reagor*, 501 F. App'x at 809 ("But the question is whether the non-profit is primarily engaging in competition in the public with commercial enterprises..."); *Kitchings v. Fla. United Methodist Children's Home, Inc.*, 393 F. Supp. 2d 1282, 1294 (M.D. Fla. 2005) ("Thus, the test is an 'economic reality test,' where the focus is on whether 'the enterprise is primarily engaged in competition in the public with ordinary commercial enterprises.'") *Joles v. Johnson Cty. Youth Serv. Bureau, Inc.*, 885 F. Supp. 1169, 1175 (S.D. Ind. 1995) ("Unless it engages in commercial activities in competition with private entrepreneurs or qualifies as one of the organization[s] listed in 29 U.S.C. §203(r)(2), a non-profit charitable organization is not an 'enterprise' under §203(r) because it is not conducted for a 'business purpose.'").

campaign, and questioning whether a campaign could ever be a covered enterprise because of a lack of "business purpose"). Thus the Second Amended Complaint's suggestion that "raising revenue, collecting voter data, and marketing the Campaign" are "commercial purposes," SAC ¶ 186, ignores the substantial difference between political advocacy and commerce.

Federal law specifically recognizes that political campaigns are not conducted for a "business purpose." As the Second Amended Complaint admits, ¶ 183, the Campaign was organized as a political organization under Section 527 of the Internal Revenue Code, 26 U.S.C. §527. (Horowitz Decl. ¶ 2 & Ex. A.) That section establishes political organizations as tax-exempt with respect to their activity "influencing or attempting to influence the selection, nomination, election, or appointment of any individual" to public office, including the Presidency. 26 U.S.C. §527(e)(1), (e)(2). Congress adopted this exemption because it recognized that "political activity (including the financing of political activity) as such *is not a trade or business* which is appropriately subject to tax." S. Rept. 93-1357 (1974) (emphasis added); *see also* U.S. Dept. of Labor, Opinion Letter FLSA2008-8, at 2 ("Enterprise coverage . . . typically does not extend to the eleemosynary . . . or similar activities of [nonprofit] organizations . . . where such activities are not in substantial competition with other businesses").

Plaintiffs attempt to avoid this failure of their claim by alleging that the Campaign "did not operate with any charitable, educational, or religious purpose." (SAC ¶ 184.) That inconsequential distinction misunderstands the law; charitable institutions are excluded from FLSA coverage not because they are charitable or religious, but because they lack a business purpose. As the Senate Committee Report on the 1961 amendments explained in discussing the "common business purpose" requirement:

> [the] definition would not include eleemosynary, religious, or educational organizations not operated for profit. The key word in the definition which supports

this conclusion is the word "business." Activities of organizations for the type
referred to, if they are not operated for profit, are not activities performed for a
"business" purpose.

S. Rep. No. 1744, 86th Cong., 2d Sess., 28 (1960).  The Campaign acted with no more of a business

purpose than any tax-exempt organization, and therefore falls outside the statute.

### 2.    The Campaign Did Not "Engage in Commerce."

Further, even organizations that qualify as "enterprises" – that is, pursuing a "common

business purpose" in "compet[ition] . . . with ordinary commercial enterprises" – still fall outside

the FLSA unless they also "engage in commerce," which the statute defines as having employees

who are directly engaged in commerce or handle material that has moved in commerce, and having

gross annual sales or business done exceeding $500,000.  29 U.S.C. § 203(s)(1)(A).  The Campaign

had no such employees, as described further in Part B below.  In any case, the Campaign had no

"sales" or "business," as a matter of law, and so Plaintiffs' attempt to establish enterprise coverage

fails for this independent reason.

The terms "gross annual sales or business done," again, refer to the buying and selling of

goods and services, "the gross dollar volume of the sales . . . which [the entity] makes, as measured

by the price paid by the purchaser for the property or service . . . and the gross dollar volume of

any other business activity in which the enterprise engages which can be similarly measured on a

dollar basis."  29 C.F.R. § 779.258 (quoting S. Rept. No. 1487, 89th Congress, 2nd session, at 7-

8).  Thus, the mere receipt of money in excess of $500,000 annually is not sufficient; the revenue

must be generated through commercial activity.  *See, e.g.*, *Locke v. St. Augustine's Episcopal

Church*, 690 F. Supp. 2d 77, 89 (E.D.N.Y. 2010) (church's income from charitable contributions

is "not included in this calculation," and so is not relevant to enterprise coverage, even though it

exceeded $500,000; its "commercial income" did not exceed the threshold); *Kitchings v. Fla.

United Methodist Children's Home, Inc.*, 393 F. Supp. 2d 1282, 1294 n.28 (M.D. Fla. 2005) ("The

fact that an eleemosynary organization receives income in the form of fees or gifts does not itself render it a 'for profit' or 'business' enterprise.  Obviously, the organization will have expenses which must be offset by revenues from some source."); U.S. Dept. of Labor, Opinion Letter FLSA2008-8, at 2 ("it has long been our position that income derived from eleemosynary activity should not be included as sales made or business done").

The Campaign did not engage in *any* such commercial activity, let alone $500,000 worth. The only funds it received were campaign contributions from Mr. Bloomberg personally, and contributions from those who purchased, at cost, merchandise like hats or t-shirts communicating political messages.  (Horowitz Decl. ¶¶3-4).[5]  Those merchandise sales were not "commercial income," however; they were nontaxable campaign contributions.  Again, federal law specifically so provides, as the Second Amended Complaint admits.  (SAC ¶ 206.)  Under 26 U.S.C. § 527, a political organization's income is exempt from tax to the extent it arises from an "exempt function," which the statute defines to include, among other things, "a contribution of money or other property" and "proceeds from the sale of campaign materials, *which are not received in the ordinary course of any trade or business*."  26 U.S.C. §527(c)(3) (emphasis added).   The regulations further clarify the exemption:

> Proceeds from the sale of political memorabilia, bumper stickers, campaign buttons, hats, shirts, political posters, stationery, jewelry, or cookbooks are related to such a political activity [and are therefore exempt] where such items can be identified as relating to distributing political literature or organizing voters to vote for a candidate for public office.

29 C.F.R. §1.527-3(e).

---

[5] The Campaign did not accept donations or contributions from voters or other third parties. (Horowitz Decl. ¶ 3; *see also* SAC ¶ 201 (alleging that "The Campaign did not accept individual donations.").)

Indeed, the FEC specifically required the Campaign to treat the funds received from its sales of merchandise as contributions, rather than as income from any trade or business.  Because the Campaign sold these items at cost and earned no profit on them, the Campaign initially reported the sales to the FEC as part of "other receipts," describing them as "sales of merchandise at cost."[6] (Horowitz Decl. ¶ 4, Ex. C.)  In response the FEC instructed the Campaign to disclose the merchandise sales as "contributions from individuals" rather than as "other receipts."  (*Id.*, Ex. D).  The Campaign accordingly amended its reports to show the merchandise sales as contributions.  (*Id.*, Ex. E.)  The FEC thus instructed the Campaign to designate receipts from the sale of merchandise as tax-exempt, and not as income arising from any "trade or business."  *See* 26 U.S.C. §527(c)(3)(C); *Mobile Republican Assembly v. U.S.*, 353 F.3d 1357, 1359 (11th Cir. 2003) ("Congress enacted 26 U.S.C. §527 in 1975 in order to shield contributions to political organizations from taxation as income.").

For the same reason, it makes no difference that other online sellers also offered items related to Mr. Bloomberg's candidacy, as the Second Amended Complaint alleges.  SAC ¶¶ 192-200.  Because the Campaign's merchandise sales were noncommercial campaign contributions, the resulting revenue was not received "in the ordinary course of any trade or business," as was the grocery store revenue in *Alamo Foundation*; as a matter of law, the political contributions that the merchandise sales represent are akin to the charitable contributions in *Locke*, *Kitchings*, and DOL Opinion Letter FLSA2008-8 that were held not to arise from commercial activity.  More

---

[6] The sole purpose of the sale of merchandise was to communicate messages concerning Michael Bloomberg's candidacy for the Presidency and energize his supporters, not to generate revenue.  (Horowitz Decl. ¶¶ 4, 6.)  In fact, the Campaign lost money on the merchandise sales; the revenue received covered only the cost of the items to the Campaign, not shipping costs.  (*Id.* ¶ 4; *see also* SAC ¶¶ 207-208 (alleging that the Campaign spent $2.5 million "to create online merchandise" and collected $890,000 in sales of that merchandise).)  That lack of any net revenue further confirms the lack of any business purpose for these sales.

practically speaking, the Campaign was not competing with any other sellers of merchandise; it had no interest in outselling anyone else; it lost money on every sale, and if a voter bought a hat or t-shirt from another seller, the Campaign's sole mission – to raise awareness of and encourage support for Mr. Bloomberg's candidacy – was accomplished.  (*See* Horowitz Decl. ¶¶ 4, 6.)  The Campaign did not engage in commerce, and is not an "enterprise" subject to the FLSA.

> ### B. THE PLAINTIFFS ARE NOT COVERED INDIVIDUALS.

Plaintiffs' alternative route to FLSA coverage, through the "individual coverage" provision, requires evidence that they, and those to whom they propose to send notice, were subject to a common policy that required them to be "engaged in commerce or in the production of goods for commerce."  29 U.S.C. §§ 206(a) (minimum wage), 207(a)(1) (overtime).  Plaintiffs have no hope of making that showing, because they do not contend (nor could they) that they were engaged in "the production of goods," and as a matter of law they were not engaged in "commerce," as described in Part B.1 below.  Even if their political activity were misread as "commerce," in fact, the claim still would fail because Plaintiffs were not engaged in that activity on an interstate basis with the regularity and frequency the law requires, as described in Part B.2 below.

> ### 1. Plaintiffs' Exercise of Rights to Political Speech Was Not in "Commerce."

Just as the FLSA's enterprise coverage provisions extend only to entities conducting commercial activity with a "business purpose" in competition with other businesses, the individual provisions extend coverage only to employees who are "engaged in commerce."  None of the FOs are alleged to have had such job duties, and the FLSA therefore does not apply to them.

In its effort to satisfy the individual-coverage requirements for campaign employees whose predominant work was entirely within a single state, the Second Amended Complaint alleges only that the Plaintiffs participated in some telephone calls or emails, either with the Campaign's New

York headquarters about the status of the campaign, or calling voters in other states, mainly in the few days before Super Tuesday, to urge them to turn out and vote for Mr. Bloomberg.  (*See* SAC ¶¶ 68-73.)  As a matter of law, however, these interstate communications cannot satisfy the FLSA's requirement that the individual be "engaged in commerce," because the indisputable purpose of the communications was to advance the campaign, not to conduct business.  For example, Plaintiffs allege that their jobs included "making phone calls nationwide to potential voters to promote Mr. Bloomberg's candidacy for President of the United States and to recruit volunteers to aid in phone banking and canvassing efforts for Mr. Bloomberg's Campaign."  (SAC ¶ 224.)  Taking that allegation as true for these purposes, none of those calls was "commercial"; it was work performed in the course of providing tax-exempt political advocacy for a candidate, and that non-commercial activity falls outside the scope of the FLSA.

Congress's limitation of covered employees to those "engaged in commerce," rather than those whose work activities "affect" or "involve" commerce, has long been interpreted to mean that "Congress did not choose to exert its power to the full."  *Overstreet v. N. Shore Corp.*, 318 U.S. 125, 128 (1943); *Dunlop v. Indus. Am. Corp.*, 516 F.2d 498, 500 (5th Cir. 1975) ("the 'engaged in commerce' language was far short of the reach of federal power under the Commerce Clause").[7]  The Supreme Court has similarly interpreted the phrase in the Federal Arbitration Act, 9 U.S.C. §§1, *et seq.*, which uses both the "engaged in commerce" phrase in describing exceptions from the Act, and "involving commerce" in describing the reach of the Act.  *See, e.g.*, *Circuit City*

---

[7] *See also Kirschbaum v. Walling*, 316 U.S. 517, 522-23 (1942) ("The history of the [FLSA] leaves no doubt that Congress chose not to enter areas which it might have occupied. . . . [T]he scope of the Act is not coextensive with the limits of the power of Congress over commerce"); *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 570 (1943) ("In this connection we cannot be unmindful that Congress in enacting this statute plainly indicated its purpose to leave local business to the protection of the states. Moreover as we stated in [*Kirschbaum Co.*], Congress did not exercise in this Act the full scope of the commerce power.").

*Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) ("the general words 'in commerce' and the specific phrase 'engaged in commerce' are understood to have a more limited reach" than the terms "affecting" or "involving" commerce).  An incidental or passing effect on commerce, accordingly, is not enough; Plaintiffs must show that they are directly engaged in commerce.  As the court explained in *Joles v. Johnson County Youth Service Bureau, Inc*., 885 F. Supp. 1169, 1178 (S.D. Ind. 1995): "For an employee to be 'engaged in commerce' she must be either directly participating in the actual movement of persons or things in interstate commerce or doing work directly supporting the movement of goods in interstate commerce."  Political advocacy does not come close to meeting that definition.

For these reasons, where facilities of interstate commerce are used to further a non-commercial mission, the FLSA does not apply.  In *Kitchings*, for example, the plaintiffs were "houseparents" who cared for abused or neglected children at a non-profit center.  393 F. Supp. 2d at 1285-86.  Their work was performed intrastate, and their only use of interstate communications was accessing the Internet to assist the children with homework assignments.  *Id*. at 1286.  The court rejected their claim to individual FLSA coverage, because their use of the Internet for non-commercial purposes to assist them in their charitable work was not sufficiently commercial.  *Id*. at 1292.  Similarly, in *Reagor*, the court held that the plaintiff, a worker at a domestic violence shelter, could not establish individual coverage through her work in helping the shelter's residents obtain or upgrade cellular telephone service, because she "provided that help as part of the charitable activities of [the center], not as a competitor in the cellular telephone business."  501 F. App'x at 810.   The same reasoning applies here: any interstate calls, emails, or other communications were entirely to further the non-commercial activities of the Campaign.

More broadly, in *Divins v. Hazeltine Electronics Corp.*, 163 F.2d 100 (2d Cir. 1947), the plaintiffs' employer contracted with the U.S. Navy to recruit and train field engineers to install and repair radar equipment on Navy ships.  The Court held that the FLSA did not extend to their work on most ships, because they were "war vessels operated . . . in the prosecution of the war," and therefore were "instrumentalities of war, not of commerce."  *Id*. at 102.  While the ships occasionally were used for transportation of personnel or the transmission of messages, activities that "literally satisf[y] the statutory definition of commerce," the work still was not covered by the FLSA because "such transportation or communication is merely incidental to the war purpose for which the vessel is actually being used."  *Id*.[8]

The Campaign was no more in commerce than the warships in *Divins*, and Plaintiffs' efforts to persuade voters to favor Mr. Bloomberg's candidacy fall outside the FLSA's individual coverage provisions.  Plaintiffs' motion should be denied.

## 2. Plaintiffs' Minimal Interstate Activity Was Too Tangential and Infrequent to Invoke the FLSA.

Even if Plaintiffs' political advocacy were misinterpreted as "commerce," Plaintiffs' claim to individual coverage still would fail, because it was both too tangentially related to interstate commerce and too infrequent to qualify.  The FLSA extends only to employees "whose work is an essential part of the stream of interstate or foreign commerce," and who engage in such commerce "as a regular and recurrent part of [their] duties."  29 C.F.R. §776.10(b).  Plaintiffs' few nominally interstate activities – even as newly expanded in the Second Amended Complaint – do not satisfy these requirements.

---

[8] The court remanded the matter because certain other ships, including "armed cargo transports" and "armed transports," appeared to be use more for commercial purposes "even though the goods or persons they transport will be devoted to the war effort after arrival at destination."  *Id*.

Plaintiffs were hired as campaign staff in a particular state, under the supervision of state campaign officials, with the primary duties of advocating for Mr. Bloomberg among voters in that state, turning out the vote in that state, and recruiting volunteers to engage in similar activity in that state. (Kanninen Decl. ¶ 6; Kosanovich Decl. ¶ 5; Mitchell Decl. ¶ 5.) Each state had its own State Director and Organizing Director, with a staff whose primary mission was to conduct advocacy and voter turnout initiatives in that state. (Kanninen Decl. ¶¶ 5-6.) The State Directors had substantial autonomy in designing the campaign activities that they thought would be most effective in their respective territory, and Plaintiffs had no need to communicate with voters in other states or to travel to other states, where other teams were in place; their job was to be the local representatives of the Campaign. (*See id.* ¶¶ 5, 7-8; Kosanovich Decl. ¶¶ 2, 4-7; Mitchell Decl. ¶ 2, 4-7.) For nearly all of their tenure, Plaintiffs were engaging local voters, recruiting and managing volunteers, and performing other "get out the vote" activities including knocking on doors, posting yard signs, and making local phone calls in the state where they worked. (Kanninen Decl. ¶ 6; Kosanovich Decl. ¶¶ 5, 23; Mitchel Decl. ¶¶ 5, 21.)

Amid all of this hyper-local activity, the only even nominally interstate activity common to the proposed collective was two weekly calls with Campaign headquarters staff and periodic policy calls. (Kanninen Decl. ¶¶ 9-12; Kosanovich Decl. ¶¶ 10-13; Mitchell Decl. ¶¶ 8-11; *see also* SAC ¶¶ 68-69.) The weekly calls each lasted about 15-45 minutes total of the 80 hours or more that Plaintiffs claim to have worked every week,[9] and the Plaintiffs did not participate in the calls; they merely attended and listened. (Kanninen Decl. ¶¶ 10-11; Kosanovich Decl. ¶¶ 11-12; Mitchell Decl. ¶¶ 9-10.) The periodic policy calls were even less frequent. (Kanninen Decl. ¶ 11;

---

[9] That is .003125-.009375 of many of the Plaintiffs' typical claimed 80 hour work week, less than a fraction of a percent of their time allegedly worked each week.

Kosanovich Decl. ¶ 13; Mitchell Decl. ¶ 11.)  This mere attendance for a splinter of the workweek,

does not qualify Plaintiffs to assert FLSA claims.  To assert individual coverage, it is not enough

to be engaged in activities that merely affect commerce; instead, Plaintiff's activities must

"constitut[e]" interstate commerce.  *Thorne v. All Restoration Servs. Inc.*, 448 F.3d 1264, 1266

(11th Cir. 2006) (citing *McLeod v. Threlkeld*, 319 U.S. 491 (1943)).  Put another way, for

individual coverage to attach, "[t]he employee must be 'so closely related to the movement of the

commerce as to be a part of it,' as opposed to simply performing activities that 'affect or indirectly

relate to interstate commerce.'" *Locke*, 690 F. Supp. 2d at 90 (quoting *McLeod*, 319 U.S. at 497);

*see also Kitchings*, 393 F. Supp. 2d at 1292-93 & nn.25, 26.

Passively listening to a short telephone call does not constitute interstate commerce.  In

*Bowrin v. Catholic Guardian Society*, 417 F. Supp. 2d 449 (S.D.N.Y. 2006), the Court noted that

"the DOL does not consider '*any* use . . . [of] channels of communication' to implicate individual

coverage"; instead,

> typically it is the use of the interstate mails and ***placement*** of out-of-state phone
> calls occurring in the course of conducting an organization's clerical or
> administrative business that appear to trigger individual coverage, if "regular and
> recurrent" and a "substantial part" of the employee's work.

*Id*. at 468 (emphasis added) (quoting 29 C.F.R. §776.10).  The court held that answering calls from

interstate callers was not sufficient.  Similarly, in *Davis v. Patel*, No. 14-cv-764, 2016 WL 4160967

(M.D. Tenn. Aug. 5, 2016), plaintiffs alleged that they regularly answered calls from out-of-state,

but never initiated them, and the court held that that passive activity was not sufficient to qualify

for individual FLSA coverage.  *See id*. at *5, *8-*9.  Plaintiffs here did not place the weekly calls

to Campaign headquarters, much less contribute to them; indeed, they did not even answer the

phone, as the plaintiffs in *Bowrin* and *Davis* did.  Nor were these brief calls a "substantial part" of

Plaintiffs' work.  In short, in attending an all-hands meeting for a brief call, Plaintiffs were not

"directly engaged in the work of 'communication' between the State and places outside the State."
29 C.F.R. §776.10(b).

Apart from these brief weekly calls, the only other limited interstate activity involved FOs
in states that did not have primary elections on Super Tuesday. Some of those individuals – only
in non-Super Tuesday states, and not all of them – were asked to make interstate calls to voters or
canvass in Super Tuesday states for approximately 3-4 days total. (Kanninen Decl. ¶ 7;
Kosanovich Decl. ¶ 8); *cf.* SAC ¶¶70-72. Additionally, if the Campaign hosted a significant event
for Michael Bloomberg in one state, on occasion some FOs in neighboring states were asked to
help crowd build for the event. *Id.* These activities do not justify certification either, because they
were too infrequent to satisfy the FLSA.

The Super Tuesday voter outreach and occasional crowd building events were neither
"regular" nor "recurrent," nor a "substantial part" of the Plaintiffs' work over the course of their
employment. Cases finding this element of individual FLSA coverage to be satisfied invariably
involve interstate work that is a consistent, repeated component of the plaintiffs' duties during a
typical workweek. *See, e.g.*, *Stocker v. Marjakaj*, No. 14-cv-13386, 2015 WL 13861151, at *7-*8
(E.D. Mich. 2015); *Boekemeier v. Fourth Universalist Soc'y in the City of N.Y.*, 86 F. Supp. 2d
280 (S.D.N.Y. 2000). Similarly, cases finding too little interstate activity to satisfy the "regular
and recurrent" and "substantial part" requirements also look at the degree to which the interstate
activity was a standard, ongoing element of the plaintiff's work. *See, e.g.*, *Jones v. SCO Family
of Servs.*, No. 15-cv-8733 (GBD), 2016 WL 7188152, at *3-4 (S.D.N.Y. Dec. 2, 2016) (100
interstate communications and six interstate trips during 7½-year employment insufficient); *Mayo
v. Jean Nicole Hair Salons, Inc.*, No. 15-cv-115, 2015 WL 4751202, at *2-3 (M.D. Fla. Aug. 11,
2015) (interstate communications at least once per week insufficient); *Owusu v. Corona Tire Shop,*

*Inc.*, No. 09-cv-3744 (NGG) (JO), 2013 WL 1680861, at *3-4 (E.D.N.Y. Apr. 17, 2013) (use of interstate communications for credit card charges once or twice per day insufficient); *Curry v. High Springs Family Practice & Diagnosis Ctr., Inc.*, No. 08-cv-8 (MK) (AK), 2009 WL 3163221 (N.D. Fla. Sept. 30, 2009) (29 interstate calls in 2½ months insufficient).  Plaintiffs were hired to conduct political activities in a single state, and that is overwhelmingly what they did.  Any interstate voter outreach to address the one-time demands of Super Tuesday or an occasional significant campaign event did not change the local character of their work, let alone on a "regular" or "recurrent" basis.  Even if some Plaintiffs could show greater involvement in interstate commerce, moreover, those unusual facts would merely create an individualized issue precluding certification, as discussed in Part II.A below.

## II.   PLAINTIFFS FAIL TO SHOW THAT THEY ARE SIMILARLY SITUATED TO THE PROPOSED COLLECTIVE.

Even if the FLSA applied to the claims Plaintiffs assert as a matter of law, conditional certification still should be rejected because Plaintiffs have not made a sufficient factual showing that they and the potential opt-in plaintiffs are similarly situated, and the Campaign's evidence submitted in opposition demonstrates that there is no such commonality between Plaintiffs and the group they hope to represent.  A court must "take a measured approach when addressing a request for collective action certification, mindful of the potential burden associated with defending against an FLSA claim involving a broadly defined collective group of plaintiffs."  *Colozzi*, 595 F. Supp. 2d at 207.

To show that they are "similarly situated" to the thousands of other former employees in the proposed collective, Plaintiffs must demonstrate that the facts determining the legality of those employees' exempt classification do not differ materially among those thousands of individuals. While only a "modest factual showing" is required, the burden on a plaintiff "is not non-existent

and the factual showing, even if modest, must still be based on some substance." *Guillen v. Marshalls of MA, Inc*., 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010) (internal citations omitted); *see Sanchez v. JMP Ventures, LLC*, No. 13-cv-7264 (KBF), 2014 WL 465542, at *1 (S.D.N.Y. Jan. 27, 2014) (quoting *Romero v. H.B. Auto. Grp., Inc*., No. 11-cv-386 (CM), 2012 WL 1514810, at *10 (S.D.N.Y. May 1, 2012) (explaining that "while a plaintiff's 'burden of proof is low, it is not non-existent [and] certification is not automatic'")).  "There must be a 'factual nexus' that binds Plaintiffs and the other putative collective members 'together as victims of a common unlawful practice.'" *Lu v. Purple Sushi Inc*., No. 19-cv-5828 (PGG) (KHP), 2020 WL 1303572, at *2 (S.D.N.Y. Mar. 19, 2020) (quoting *Martin v. Sprint/United Mgmt. Co*., No. 15-cv-5237 (PAE), 2016 WL 30334, at *5 (S.D.N.Y. Jan. 4, 2016)).  That burden includes an obligation to show that the proposed collective is defined so as to ensure that all of the proposed members were subject to the same unlawful requirements.  *See, e.g.*, *Rusis v. Int'l Bus. Machines Corp*., No. 18-cv-8434 (VEC), 2020 WL 1151322, at *3 (S.D.N.Y. Mar. 10, 2020) ("The universe of former employees to which Plaintiffs wish to provide notice might contain within it one or even several groups of former employees who are similarly situated to each other, but Plaintiffs have not met their burden of tying all former employees who are in their proposed collective to a common policy or plan.").  Plaintiffs have failed to do so here.

### A.   THE FLSA INDIVIDUAL COVERAGE ANALYSIS VARIES FROM PERSON TO PERSON AND CANNOT BE DETERMINED ON A REPRESENTATIVE BASIS.

As shown in Part I, the FLSA does not apply to the Campaign on an enterprise basis or to Plaintiffs or the proposed collective on an individual basis, as a matter of law.  The Court's analysis can end there.  Even if Plaintiffs' political advocacy was a commercial activity governed by the FLSA, however, and even if there were some factual question about whether particular collective members were sufficiently engaged in interstate commerce "as a regular and recurrent part of

[their] duties," 29 C.F.R. §776.10(b), the need to demonstrate that each member of the collective satisfies that threshold test for FLSA coverage precludes certification.  The extent to which Plaintiffs and the proposed collective regularly participated in interstate commerce was – at best for the Plaintiffs – not uniform across the proposed collective, and so Plaintiffs have failed to show that they are all similarly situated with respect to this threshold issue.

Although the Second Amended Complaint, with the Campaign's motion to dismiss in mind, expanded the allegations concerning interstate communications, *see* SAC ¶¶ 68-73, Plaintiffs submitted no new declarations to substantiate the new allegations, much less to demonstrate that practices with respect to interstate communications were uniform across the collective.  And the existing declarations have nothing to say about interstate communications other than the phone calls discussed in Part I.B.2 above, apart from a conclusory assertion about email.  (*See, e.g.*, Wood Decl. ¶15 ("I frequently received emails from officials in the Campaign's New York headquarters."); Bowers Decl. ¶ 15 (identical).)

The full record demonstrates that practices varied with respect to interstate communications apart from the all-hands calls discussed in Part I above.  Some FOs in non-Super-Tuesday states, but not all of them, made some number of interstate calls for a few days before those primaries in an effort to get out the vote.  (Kanninen Decl. ¶ 7; Kosanovich Decl. ¶ 8.)  Some, but not all, canvassed in Super Tuesday states.  (*Id.*)  Some may have used some campaign materials that had been printed out of state, *cf.* SAC ¶ 73, but others may have only used materials printed locally.  (Kanninen Decl. ¶ 14; Kosanovich Decl. ¶ 15; Mitchell Decl. ¶ 13.)

Thus, even if the FOs' campaign activities fell within the coverage of the FLSA as a categorical matter – which they do not, as discussed in Part I above – the determination of whether the limited interstate aspects of those activities were sufficiently "regular and recurrent" to satisfy

the FLSA's threshold requirement would vary from individual to individual.  *See, e.g.*, *Lu*, 2020 WL 1303572 (conditionally certifying a collective of delivery persons but declining to include other workers because plaintiffs failed to present evidence that the other jobs were similarly situated).  Similarly, in *Guillen*, the plaintiffs presented evidence that they performed non-exempt duties and so were misclassified as exempt, and extrapolated from their own experience to allege that assistant store managers across the country must also have been misclassified.  The Court rejected that argument because of the lack of evidence "that could plausibly lead to the inference that ASMs nationwide are performing non-exempt tasks."  841 F. Supp. 2d 797, 800 (S.D.N.Y. 2012); *see id.* at 801 ("We reject this argument because it ignores the requirement that plaintiff show he is similarly situated *to the employees he proposes to include in the collective action* with respect to his claim that he performed non-exempt duties.") (original emphasis).  Here, there is even less evidence, because Plaintiffs' declarations do not even go as far as the Second Amended Complaint in detailing the interstate aspects of the FOs' work.  Individual FLSA coverage is, at best, an individual proposition, and the collective cannot be certified.

### B.   PLAINTIFFS CANNOT SHOW THAT THEY ARE SIMILARLY SITUATED WITH RESPECT TO THEIR MISCLASSIFICATION CLAIMS.

Even if the FLSA applied to the Campaign or the members of the proposed collective as a threshold matter, Plaintiffs still would have the burden to demonstrate that those individuals are similarly situated as to their overtime claims, as in any case claiming that a group of employees was misclassified as exempt.  Plaintiffs' burden here is higher than in some FLSA cases, because the legality of exempt classification inherently requires individualized analysis, as courts regularly recognize: "Under the FLSA, the question of whether an employee is properly exempted involves a fact-intensive inquiry into his/her job responsibilities and autonomy, the management style of the employee's supervisor and whether that employee worked over 40 hours per week."

*O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 250 (D. Mass. 2006); *see also Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498, (D.N.J. 2000) ("To determine which employees are entitled to overtime compensation under the FLSA depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria.").[10]

FOs had a mix of non-exempt and exempt duties.  On one hand, they were responsible for calling voters on the telephone and knocking on doors; but on the other hand, they also were expected, to varying degrees, to design and organize campaign events in their local communities: determining which events to hold, deciding on and carrying out all of the logistical details, deciding which public policy issues would be most resonant, and then tailoring the agenda for the event to those issues.  (*See* Kanninen Decl. ¶¶ 16-22; Kosanovich Decl. ¶¶ 18-23; Mitchell Decl. ¶¶ 16-21.)  Such event planning responsibilities – even without the component of selecting issues for the agenda – are exempt duties.  *See, e.g.*, *Hines v. State Room, Inc.*, 665 F.3d 235 (1st Cir. 2011) (affirming summary judgment decision finding event planners satisfied the requirements of the FLSA's administrative exemption); *Scarpinato v. E. Hampton Point Mgmt. Corp.*, No. 12-cv-3681 (JFB) (GRB), 2013 WL 5202656, at *12 (E.D.N.Y. Sept. 13, 2013) ("the description of [plaintiff's] role in managing events provided by defendants exemplifies a level of managerial discretion well within the purview of the administrative exemption").

The mix of event organizing and more mundane tasks varied from state to state based on the campaign strategy selected by each state's State and Organizing Directors.  (Kanninen Decl.

---

[10] *See also In re: Prospect Mort., LLC, Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*, 987 F. Supp. 2d 1383 (J.P.M.L. 2013) (refusing to consolidate misclassification cases because "[i]ndividualized factual disputes . . . will predominate in this litigation, which is likely to focus on the applicability of certain exemptions to individual plaintiffs . . . .  Discovery and motion practice as to these issues will be overwhelmingly plaintiff-specific.").

¶¶ 4-5; Kosanovich Decl. ¶¶ 4, 17; Mitchell Decl. ¶¶ 4, 15.)  It also varied from one FO to another, based on that individual's campaign experience, skill set, and other factors.  (Kanninen Decl. ¶ 22; Kosanovich Decl. ¶ 21; Mitchell Decl. ¶ 19.)  Plaintiffs do not acknowledge any responsibilities relating to events, *see, e.g.*, Wood Decl. ¶¶ 9, 12, but accepting those allegations as true, they only distinguish the Plaintiffs from other FOs whom they include in the collective, who did have such responsibilities.

A determination as to whether or not the FOs Plaintiffs seek to represent qualify for the administrative exemption will be based on an analysis of the discretion and autonomy they exercised on a day-to-day basis.  The extent to which and manner in which the FOs exercised that discretion and autonomy varied from state to state, from manager to manager, and from individual FO to individual FO.  The current record does not permit a conclusion, even under a lenient standard, that the collective Plaintiffs seek to represent is similarly situated, and the motion for conditional certification accordingly should be denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for conditional certification should be denied.

Dated: New York, New York
        June 1, 2020

By: */s/ Elise M. Bloom*

Elise M. Bloom
Rachel S. Philion
Pinchos Goldberg
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
ebloom@proskauer.com
rphilion@proskauer.com
pgoldberg@proskauer.com

Mark W. Batten*
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9850
mbatten@proskauer.com
*motion for pro hac vice admission pending*

Nicholas M. Reiter
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
(212) 370-6296
nmreiter@venable.com

*Attorneys for Defendant*
MIKE BLOOMBERG 2020, INC.