UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA WOOD, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MIKE BLOOMBERG 2020, INC.,<br><br>Defendant. | 20 Civ. 2489 (LTS) (GWG)<br><br>**DECLARATION OF DANIEL KANNINEN** |

I, Daniel Kanninen, hereby depose and state:

1. I served as the States Director of Mike Bloomberg 2020, Inc. (the "Campaign"). I make this declaration on personal knowledge of the facts below.

2. As States Director, I was responsible for overseeing Campaign operations in each of the states and territories in which Michael Bloomberg campaigned to become President of the United States.

3. Each state or territory I oversaw implemented its own organizing strategy. Like most national presidential campaigns, the Campaign did not apply a one-size fits all approach to organizing in each state or territory. Instead, different states or territories required different organizing strategies.

4. Organizing strategies for each state or territory were dictated by a variety of factors, including: (i) geography; (ii) voter demographics; (iii) population density; (iv) local politics; (v) the number of delegates at stake; and (vi) the date of a state or territory's primary election. These factors varied between different states or territories. These same factors also often varied within a single state or territory.

5.  The Campaign hired a State Director and an Organizing Director to oversee organizing activities for each individual state or territory. Each State Director and Organizing Director was responsible for tailoring an organizing strategy appropriate for his or her state or territory, based upon the strategic factors above and subject to a national strategy that was set by Campaign headquarters. State Directors and Organizing Directors had autonomy to implement and execute that strategy at the state and congressional district levels.

6.  The Campaign hired Field Organizers ("FOs") and Regional Organizing Directors ("RODs") to engage in grassroots campaign organizing activities within their individual states and territories. FOs' primary job duties were to engage voters, recruit and manage volunteers, persuade likely voters to vote for Michael Bloomberg for president, and perform "get out the vote" activities in order to garner support for Michael Bloomberg's candidacy for president. RODs' primary job duties were to supervise approximately six to eight FOs within a particular geographic region of one state. They supervised FOs' job performances, helped FOs set goals for voter contact, and monitored FOs' activities and reporting. In the event of a poorly performing FO, the ROD would assist in the Campaign's employment actions, including the creation of a performance improvement plan or, if appropriate, recommendations for terminating a FO's employment.

7.  Both FOs and RODs worked exclusively within the state or territory to which they were assigned. The purpose of their jobs was to develop voter support for the Campaign within the single state/territory where they were working. There were only a couple of limited exceptions. First, in the days before Super Tuesday, March 3, 2020, when some FOs from some states or territories with later primary elections were asked to support a get-out-the-vote effort for the Super Tuesday states. In order to do so, these FOs made interstate phone calls or sent text

messages to voters, or canvassed in, Super Tuesday states during those few days prior to Super Tuesday. This limited exception did not apply to all FOs. For example, the FOs who were already assigned to Super Tuesday states focused solely on directing their get-out-the-vote and voter persuasion efforts within their same states. Additionally, if the Campaign hosted a significant event for Michael Bloomberg in one state, on occasion some FOs in neighboring states were asked to help crowd build for the event.

8. All FOs and RODs always physically performed their job duties from within the state or territory to which they were assigned. Other than the limited exceptions addressed in paragraph 7, above, to my knowledge they never traveled across state lines for the Campaign and did not contact voters outside of their state or territory.

9. FOs and RODs were invited to two campaign-wide calls per week – one on Tuesdays and one on Fridays.

10. On Tuesdays, I held a call to which all campaign staff were invited. My deputy States Director, Cassie Henry, occasionally held the Tuesdays calls on my behalf. These calls usually lasted approximately 15 to 30 minutes. The agenda for these calls varied, but in general the Tuesday calls were used to inform staff about campaign priorities and upcoming events. At the end of some Tuesday calls, the leader would identify certain staffers who demonstrated particularly strong work in a particular week, and in some cases one or two of those staffers were invited to speak for approximately one minute about their accomplishments.

11. On Fridays, the Campaign's headquarters team held a call to which all campaign staff were invited. The purpose of the calls was to provide information from senior campaign staff, to celebrate weekly campaign-wide accomplishments, and to generate enthusiasm amongst the staff. Generally, only Campaign leaders and surrogates in New York spoke during the

Fridays calls; no other attendees—including FOs and RODs—spoke on such calls and all other participants were muted. The Friday calls typically lasted approximately 30 to 45 minutes.

12. All Campaign staff were also invited to periodic calls including policy updates, where campaign leadership and other senior headquarters staff would highlight important campaign policy platforms that were going to be announced to the press, important Campaign moments such as after the Iowa caucuses, and to address negative Campaign press coverage. During such calls, only campaign leadership and other senior headquarters staff would speak. All other participants—including FOs and RODs—were muted. The calls typically lasted approximately 30 minutes to 1 hour.

13. Neither FOs nor RODs were engaged in any business or commercial activity. All of their work assignments were for a single, non-commercial purpose – increasing voter support for Michael Bloomberg's candidacy. Merchandise sales were conducted exclusively online, and neither FOs nor RODs had any involvement in those sales, nor were they ever asked to promote such sales. Any merchandise that FOs or RODs distributed to volunteers in their state or territory was distributed for free.

14. Necessary equipment, such as laptops, phones, and computers were purchased centrally by Campaign headquarters, not by individual state offices. Campaign materials (lawn signs, flyers, and similar materials) were sometimes acquired centrally and at other times purchased locally, from in-state sources.

15. FOs were typically paid $6,000 per month; RODs were typically paid $8,000 per month. These amounts were approximately twice as much as other presidential campaigns were reportedly paying their staff.

16. FOs' job duties varied based on the strategic organizing plan of their individual state or territory, and the local public policy issues most important to the voters in their geographic region. FOs had to determine which methods of communication would be most effective in their region to reach voters, whether it be hosting a community event, phone calling, or text messaging. They also had to determine what type of community events would be the most appropriate in a particular state or territory. For example, an outdoor rally about anti-gun violence policies could energize supporters in one area, whereas designing a community event related to civil rights policies or immigration policies might be more appropriate in other states or territories.

17. Organizing strategy also varied based upon the primary election schedule for a particular state or territory. Organizing activities in Super Tuesday states and territories were very different than organizing activities in states or territories with primaries much later in the calendar. For example, FOs in a Super Tuesday state or territory might have initially focused on recruiting and managing volunteers and community engagement, but quickly would have shifted to voter persuasion, get out the vote, and vote by mail campaigns. In contrast, FOs in a non-Super Tuesday state organizing strategy would have been primarily focused on recruiting and managing volunteers to generate enthusiasm for the Campaign, as well as generating "earned media" or free media coverage for the Campaign.

18. FOs often planned and organized campaign events, such as field office openings, outdoor rallies, ice cream socials, barbeques, house parties, debate and candidate appearance watch parties, and other gatherings. FOs were responsible for planning, hosting, promoting, and organizing their own community events. FOs were also instrumental in organizing logistics and

recruiting and managing volunteers for candidate appearance events. These responsibilities included, among other things, publicizing the event to their local communities.

19.  Once the community events were underway, FOs were responsible for recruiting and engaging new volunteers, and discussing policy issues with voters and volunteers. After new volunteers were engaged, FOs were responsible for managing their activities, and would provide them training, event participation, phone banking, and canvassing opportunities on behalf of the Campaign.

20.  FOs were often residents of the state in which they were hired.  As such, they were expected to already be familiar with local politics and issues upon the start of employment. When a FO was not a local resident of the state or region in which they were hired, they were expected to quickly learn about the local politics relevant to their assigned community.  The Campaign relied on FOs' local connections, ability to connect with voters, and knowledge of local political issues germane to voters within their assigned geographic regions to persuade voters to support Michael Bloomberg's candidacy.

21.  Using their knowledge of their local communities, FOs had discretion to determine which types of community events were most appropriate for their assigned geographic region.  FOs planned their community events based upon the specific interests of the voters within their assigned geographic regions.  The discretion afforded to FOs for planning community events was an important part of the Campaign's organizing strategy.  If a FO believed a particular public policy issue was important to the voters within his or her assigned geographic region, the FO was expected to design, organize, and host a community event tailored to that particular public policy issue, and with an eye toward local customs, foods, and community offerings.

22. The level of discretion afforded each FO for organizing community events depended upon a number of factors, such as skillset, prior campaign experience, geographic region, the timing at which the FO joined the Campaign, and the particular ROD supervising the FO.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
May 31, 2020

DocuSigned by:
AD7BCADCB2934A9...
Daniel Kanninen

- 7 -