UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA WOOD, *et al*., individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>   v.<br><br>MIKE BLOOMBERG 2020, INC.,<br><br>              Defendant. | 20 Civ. 2489 (LTS) (GWG)<br><br>**DECLARATION OF JAMES MITCHELL** |

      I, JAMES MITCHELL, hereby depose and state:

      1.     I served as the North Carolina State Director for Mike Bloomberg 2020, Inc. (the "Campaign"). I make this declaration on personal knowledge of the facts below.

      2.     As the Campaign's North Carolina State Director, I was responsible for overseeing all Campaign activities within the State of North Carolina, including state-wide organizing activities. Organizing activities included hosting community events, organizing office opening events, canvassing and door knocking, phone calling, volunteer recruitment, and similar voter outreach activities intended to promote grassroots and voter support for the Campaign's candidate, Michael Bloomberg.

      3.     In this role, I supervised the Campaign's Organizing Director, Field Organizers ("FOs"), and Regional Organizing Directors ("RODs") within the State of North Carolina. I have personal knowledge of the facts in this declaration based upon my performance of my job duties for the Campaign from within the State of North Carolina.

      4.     One of my responsibilities was designing and implementing a strategy to generate support and win delegates for Michael Bloomberg, including an organizing strategy tailored to

the specific characteristics of North Carolina.  Different states often required different organizing strategies.

5. In order to implement our organizing strategy, the Campaign hired approximately 90 FOs and RODs within North Carolina.  FOs' primary job duties were to engage local voters, recruit and manage volunteers, and perform "get out the vote" activities in order to garner support for Michael Bloomberg's candidacy for president.  RODs' primary job duties were to supervise approximately six to eight FOs within a specific geographic region of North Carolina.  They supervised FOs' job performances, helped FOs set goals for voter contact, and monitored FOs' activities and reporting.  In the event of a poorly performing FO, the ROD would assist in our employment actions, including the creation of a performance improvement plan, or if appropriate, recommendations for terminating an FO's employment.

6. Each FO and ROD was assigned to a specific region within North Carolina.  Their assigned region was often referred to as their "turf."

7. Both FOs and RODs worked exclusively within North Carolina.  The purpose of their jobs was to develop local voter support for the Campaign within their turf and generally throughout North Carolina. FOs and RODs never traveled across state lines for the Campaign nor made interstate phone calls to voters.

8. FOs and RODs were invited to two campaign-wide calls per week – one on Tuesdays and one on Fridays.

9. On Tuesdays, Dan Kanninen held a call to which all North Carolina campaign staff were invited.  Occasionally, deputy States Director, Cassie Henry held the Tuesdays calls on Dan Kanninen's behalf.  These calls usually lasted approximately 15 to 30 minutes.  The agenda for these calls varied, but in general the Tuesday calls were used to inform staff about

campaign priorities and upcoming events. At the end of some Tuesday calls, the leader would identify certain staffers who demonstrated particularly strong work in a particular week, and in some cases one or two of those staffers were invited to speak for approximately one minute about their accomplishments.

10. On Fridays, the Campaign's headquarters team held a call to which all campaign staff were invited. The purpose of the calls was to provide information from senior campaign staff, to celebrate weekly campaign-wide accomplishments, and to generate enthusiasm amongst the staff. Only Campaign leaders and surrogates in New York spoke during the Fridays calls; no other attendees—including FOs and RODs—spoke on such calls and all other participants were muted. The Friday calls typically lasted approximately 30 to 45 minutes.

11. All Campaign staff were also invited to periodic policy calls, where campaign leadership would highlight important campaign policy platforms that were going to be announced to the press. During such calls, only campaign leadership would speak. All other participants—including FOs and RODs—were muted. The policy calls typically lasted approximately 45 minutes to 1 hour.

12. None of the FOs or RODs in North Carolina were engaged in any business or commercial activity. All of their work assignments were for a single, non-commercial purpose – increasing voter support for Michael Bloomberg's candidacy. Merchandise sales were conducted exclusively online, and none of the FOs or RODs in North Carolina had any involvement in those sales, nor were they ever asked to promote such sales. Any merchandise that FOs or RODs in North Carolina distributed to volunteers was distributed for free.

13. Necessary equipment, such as laptops, phones, and computers were purchased centrally by Campaign headquarters, not by individual state offices. Campaign materials (lawn

signs, flyers, and similar materials) were sometimes acquired centrally and at other times purchased locally, from in-state sources.

14. FOs in North Carolina were typically paid $6,000 per month; RODs in North Carolina were typically paid $8,000 per month.  These amounts were approximately twice as much as other presidential campaigns were reportedly paying their staff.

15. In order to tailor the Campaign's organizing strategies within North Carolina, the Campaign considered a number of factors, such as: (i) geography; (ii) voter demographics; (iii) population density; (iv) local politics; (v) the number of delegates at stake; and (vi) the date of North Carolina's primary election.

16. FOs in North Carolina were responsible for knowing their turf.  They were often local residents of their assigned geographic regions who were already aware of the public policy issues most important to local voters.  If they had moved residences to begin work for the Campaign, a FO was expected to quickly learn about the local political issues for the area of North Carolina to which they were assigned.  The Campaign relied on their knowledge of their communities.

17. FOs often planned and organized campaign events in North Carolina, such as field office openings, Black History Month events, Women's March events, meetings with key democratic influencers, outdoor rallies, ice cream socials, barbeques, house parties, debate and candidate appearance watch parties, and other gatherings.  FOs were responsible for planning, hosting, promoting, and organizing their own community events.  FOs were also instrumental in organizing logistics and recruiting and managing volunteers for candidate appearance events.  These responsibilities included, among other things, publicizing the event to their local

communities and engaging necessary vendors for catering services, tenting services, or event space, among other things.

18. Using their knowledge of their local communities, FOs in North Carolina had discretion to determine which types of community events were most appropriate for their assigned geographic region. FOs in North Carolina planned their community events based upon the specific interests of the voters within their assigned geographic regions. The discretion afforded to FOs for planning community events was an important part of the Campaign's organizing strategy. If a FO in North Carolina believed a particular public policy issue was important to the voters within his or her assigned geographic region, the FO was expected to design, organize, and host a community event tailored to that particular public policy issue, and with an eye toward local customs, foods, and community offerings.

19. The level of discretion afforded each FO in North Carolina for organizing community events depended upon a number of factors, such as skillset, prior campaign experience, geographic region, the timing at which the FO joined the Campaign, and management style of their individual ROD.

20. Once the community events were underway, FOs in North Carolina were responsible for recruiting and engaging new volunteers, and discussing policy issues with voters and volunteers. After the sign-up process was complete, FOs would perform outreach to volunteers in order to provide them training, phone banking, and canvassing opportunities on behalf of the Campaign.

21. In addition to the duties above, FOs in North Carolina made in-state phone calls and sent text messages to voters in an effort to promote support for Michael Bloomberg's

candidacy. To further connect with voters, some FOs in North Carolina also canvassed and knocked on doors in their local assigned geographic regions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Charlotte, North Carolina
May 28, 2020

_____
JAMES MITCHELL