# Exhibit B

**A** Neutral
As of: March 1, 2021 9:27 PM Z

# *Hallett v. Stuart Dean Co.*

United States District Court for the Southern District of New York

February 5, 2021, Decided; February 5, 2021, Filed

20-cv-3881 (JSR)

**Reporter**
2021 U.S. Dist. LEXIS 23025 *; __ F. Supp. 3d __; 2021 WL 405831

BRUCE HALLETT, Plaintiff, -v- STUART DEAN CO., et al., Defendants.

**Prior History:** *Hallett v. Stuart Dean Co., 2020 U.S. Dist. LEXIS 154643, 2020 WL 5015417 (S.D.N.Y., Aug. 25, 2020)*

## Core Terms

terminated, employment agreement, bonus, defendants', negotiate, emailed, annual bonus, promise, summary judgment motion, parties, reasons, board meeting, summary judgment, Declaration, amended complaint, good faith, failure to provide, long-term, allegations, without cause, pretextual, counterstatement, authentication, documents, covenant, terms, wages, employees, recommend, damages

**Counsel:  [*1]** For Bruce Hallett, Plaintiff: Tracy Anne Warren, Buchalter, A Professional Corporation, San Diego, CA; Lauren M. Paxton, Calcagni & Kanefsky LLP, Newark, NJ.

For Stuart Dean Co., Inc, Adriene Bailey, individually, Thomas Brown, individually, Margaret Cullen, individually, Scott Day, individually, Chris Degan, individually, Cathleen Degan-Nikas, individually, Scott Halstead, individually, Timothy Shea, individually, Kristen Schorp, individually, Defendants: Michael Alan Jakowsky, LEAD ATTORNEY, Jackson Lewis LLP (WPlns), White Plains, NY; Lauren Alyssa Parra, Jackson Lewis P.C., New York, NY.

**Judges:** JED S. RAKOFF, United States District Judge.

**Opinion by:** JED S. RAKOFF

## Opinion

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.

Defendant Stuart Dean, a New York corporation, specializes in the restoration and maintenance of architectural surfaces. In 2018, Stuart Dean hired plaintiff Bruce Hallett, who was then serving on Stuart Dean's Board of Directors, as its new CEO. Stuart Dean terminated Hallett in March 2020. Thereafter, Hallett filed this lawsuit against Stuart Dean and the members of its Board of Directors. The lawsuit principally concerns whether Hallett was provided all the incentive compensation to which he was entitled **[*2]** and whether his termination comported with the parties' employment agreement.

Now before the Court is defendants' motion for summary judgment. On January 29, 2021, by bottom-line order, the Court denied the motion for summary judgment with respect to Counts One (breach of contract--wrongful termination) and Six (breach of the implied covenant of good faith and fair dealing) and granted the motion for summary judgment dismissing all other claims. This Opinion explains the reasons for that ruling and directs the parties to take the steps necessary to move what remains of this case forward to trial.

2021 U.S. Dist. LEXIS 23025, *2

Before turning to the summary judgment motion, the Court sets forth the applicable legal standard, rules upon Hallett's evidentiary objections, and summarizes the undisputed facts in the record.

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury [*3] could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012)* (internal quotation marks omitted). The Court must "draw[] all reasonable inferences in favor of [the] non-movant." *Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)*. If "no reasonable trier of fact could find in favor of that party," then "summary judgment is proper." Id.

Because a summary judgment motion turns on whether factual disputes exist, the Court must consider the factual assertions propounded by each party and the evidence proffered by each party to support those assertions. The Court does not, and usually could not, review the entire factual record. Instead, the moving party must identify the undisputed facts and the evidence that supports them. To that end, the Southern and Eastern Districts of New York have adopted *Local Rule 56.1*, which requires the moving party to provide "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." *Local Civ. R. 56.1(a)*. The non-moving party must provide a correspondingly numbered counterstatement, id. *R. 56.1(b)*, and each paragraph in the movant's statement "will be deemed to be admitted for purposes of the motion unless specifically controverted" in the counterstatement, [*4] id. *R. 56.1(c)*. Each numbered statement or counterstatement "must be followed by citation to evidence which would be admissible, set forth as required by *Fed. R. Civ. P. 56(c)*." Id. *R. 56.1(d)*.

*Federal Rule of Civil Procedure 56*, in turn, provides that a movant for summary judgment may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," but an opposing party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Fed. R. Civ. P. 56(c)(1)-(2)*.

## PLAINTIFF'S EVIDENTIARY OBJECTIONS

In addition to filing a memorandum of law, a *Rule 56.1* counterstatement, and supporting declarations and evidence, Hallett, through his counsel, Tracy A. Warren, separately filed a document titled "Evidentiary Objections." Pls' Evidentiary Objections, ECF No. 77 ("Evid. Obj."). The Evidentiary Objections are voluminous, spanning 83 pages, largely because Hallett reiterates the same objections with respect to almost every piece of evidence offered by the defendants. The volume is matched, moreover, by the frivolous [*5] nature of most (though not quite all) of the objections.

Specifically, Hallett objects to most of defendants' evidence on six grounds: the best evidence rule, improper "counsel testimony," "failure to provide a pertinent citation," hearsay, lack of authentication, and relevance. The Court considers each of these objections generally, before addressing a few objections specific to certain pieces of evidence.

### A. Best Evidence Rule

Defendants' exhibits are all attached to a more or less standard declaration by defendants' counsel, Michael A. Jakowsky. Decl. of Michael A. Jakowsky in Support of Mot. for Summ. J., ECF No. 67 ("Jakowsky Decl."). The Jakowsky Declaration is largely non-substantive. Jakowsky identifies himself and the purpose of the declaration. Id. ¶¶ 1, 3. He declares, "The following statements are true based upon my own knowledge, review of pertinent documents, and information and belief." Id. ¶ 2. From there, the declaration is simply an index; a typical paragraph follows this formula: "Attached as Exhibit [A] is a true and correct copy of [document], produced by [party] to [party] during discovery as [Bates range]."

Hallett objects to the Jakowsky Declaration, citing the [*6] best evidence rule. He argues that the documents speak for themselves and that counsel's summary of a document's contents (e.g., describing a document as "the Employment Agreement entered into between Mark Parrish and Defendant Stuart Dean on January 29, 2011") is inadmissible.

2021 U.S. Dist. LEXIS 23025, *6

While such titling of documents is not only conventional but also harmless, the Court agrees that as a technical matter the documents speak for themselves. Therefore, this objection is sustained in part, and the Court does not rely upon Jakowsky's characterization of any document except insofar as Jakowsky describes each document as a "a true and correct copy" of a document produced or obtained in discovery -- an issue addressed immediately below.

### B. "Counsel Testimony"

Relatedly, Hallett objects that "[c]ounsel is not a disclosed witness; he lacks personal knowledge to establish facts in this action. Counsel admits he makes his declaration 'on information and belief.'" E.g., Evid. Obj. 3. However, as noted above, the Court relies only on Jakowsky's representation that each document is a "true and correct copy" of a document produced or obtained in discovery. And on that issue defense counsel is competent to testify **[*7]** because of his involvement in this litigation. Indeed, as already noted, Jakowsky's Declaration is the standard way of attaching documents to a summary judgment motion or response. This objection is therefore overruled.

### C. "Failure to Provide Pertinent Citation"

Hallett objects no fewer than 63 times that the Jakowsky Declaration fails to provide pinpoint citations, contravening the "purpose of *Local Rule 56.1*[, which] is 'to streamline the consideration of summary judgment motions.'" E.g., Evid. Obj 2 (quoting *Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001))*. Hallett is mistaken. Defendants' *Local Rule 56.1* statement provides pinpoint citations. There is no need for the Jakowsky Declaration also to provide pinpoint citations. This objection, which once again borders on the frivolous (if not outrageous), is overruled.

### D. Hearsay

Hallett argues that many of defendants' cited documents are inadmissible hearsay. At summary judgment, however, the moving party need only show that the proffered evidence "can[] be presented in a form that would be admissible in evidence." *Fed. R. Civ. P. 56(c)(2)*. The Court sees no reason why each cited document could riot be introduced in evidence by an author or declarant, and Hallett offers none. This objection is overruled.

### E. Lack of Authentication

Hallett **[*8]** objects that Jakowsky lacks personal knowledge sufficient to lay an adequate foundation for documents produced by defendants to plaintiffs during discovery. Evidence is authenticated if its proponent provides sufficient evidence to demonstrate that it "is what its proponent claims." *Fed. R. Evid. 901(a)*. A district court "has broad discretion in determining whether an item of evidence has been properly authenticated." *United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001)*; see also *Scotto v. Brady, 410 Fed. Appx. 355, 361 (2d Cir. 2010)* (summary order) (applying the same reasoning in a civil case). "This requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States v. Pluta, 176 F.3d 43, 49 (2d Cir. 1999)* (cleaned up). The proponent need not "rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." Id.

Arguably, attorneys could obviate this objection by including a brief description of their clients' document collection and production processes in their declarations supporting summary judgment. Jakowsky did not do this, but the Court **[*9]** nevertheless finds that each of the cited documents is reasonably likely to be that which the defendants claim it to be. The documents were produced by defendants to plaintiff in this litigation, and Hallett offers no specific reason to doubt any document's authenticity. Judge Stein has reasoned that "the act of production implicitly authenticate[s] [a] document[]." *John Paul Mitchell Sys. v. Quality King Distributors, Inc., 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000)*; see also *United States v. Brown, 688 F.2d 1112, 1116 (7th Cir. 1982)* ("Just as [the defendant] could have identified the records by oral testimony, his very act of production was implicit authentication.") For summary judgment purposes, this Court agrees. Therefore, this objection is overruled.

### F. Relevance

Hallett objects that many of the cited exhibits are inadmissible because they are irrelevant. See *Fed. R. Evid. 401, 402*. The Court does not rely upon all the cited exhibits in resolving this summary judgment motion, but the Court finds that every exhibit on which the Court does rely is relevant. Therefore, the objection is overruled.

### G. Renewal of Preserved Objections at Depositions

The Court now turns to more specific objections. Hallett

2021 U.S. Dist. LEXIS 23025, *9

requests that insofar as the Court relies upon any deposition testimony, the Court rule upon any objections preserved on the record. That is, he relies on his **[*10]** objections to form, since those are the only objections properly stated at a deposition. (He, of course, preserves all other objections other than as to form, without having to state them on the record; but here he does not specify any such objection other than those already dealt with above.)

## H. Admissibility of the Amended Complaint

The Jakowsky Declaration attaches, and defendants' *Local Rule 56.1* statement often cites, Hallett's Amended Complaint. Hallett identifies authority for the proposition that "a complaint is inadmissible hearsay and cannot be properly cited for the truth of its contents in a 56.1 Statement." *Brown v. City of New York, No. 16-CV-1919 (ALC), 2018 U.S. Dist. LEXIS 135478, 2018 WL 3821620, at *6 (S.D.N.Y. Aug. 10, 2018)*.

But that, obviously, only applies (as in *Brown*) to a party's reliance on its own pleadings as evidence. Here, defendants cite their adversary's Amended Complaint. When defendants choose not to dispute an allegation in Hallett's Amended Complaint, which is tantamount to an adversary's admission. See *Fed. R. Civ. P. 56(c)(1)*. This objection is overruled.

## I. Admissibility of this Court's prior Opinion & Order

Plaintiff objects that this Court's prior Opinion & Order, ECF No. 50, is not evidence. The Court agrees and sustains the objection to an evidentiary use defendants purport to make of the Court's Opinion **[*11]** & Order.

## UNDISPUTED FACTS

Pursuant to *Local Rule 56.1*, defendants filed with their summary judgment motion a 350-paragraph statement of undisputed facts, Hallett filed a counterstatement, and defendants filed a reply. The Court considers these filings and the evidence cited therein. See Defts' Statement of Undisputed Facts, ECF No. 69, Pls' Counterstatement of Disputed Facts, ECF No. 76, Defts' Reply to Pls' Counterstatement, ECF No. 87 ("SOF");[1] Jakowsky Decl.; Decl. of E. Bruce Hallett in Opp. to Summ. J., ECF No. 75; Decl. of Tracy A. Warren in Opp. to Summ. J., ECF No. 78 ("Warren Decl.").; Errata

to Warren Decl., ECF No. 84.

Hallett argues that most of the proffered facts are disputed, unsupported by the cited evidence, and/or incomplete because of some further fact. The Court addresses these issues, as needed, in a footnote alongside each citation. Often, however, the Court does not address Hallett's argument regarding a proffered fact, for one of the following reasons. First, when Hallett's *Rule 56.1* Counterstatement raises issues also covered by his separately filed Evidentiary Objections, the Court does not address those objections again. See supra Evidentiary Objections. Second, Hallett often interposes **[*12]** boilerplate objections to every fact on a given topic. In such cases, the Court addresses the boilerplate objection once; the Court's ruling upon that boilerplate objection applies also to other invocations of the same boilerplate objection. Third, sometimes the Court only considers one aspect of a numbered paragraph, such as the fact that a quoted statement was made. In those instances, the Court does not address Hallett's objections to other aspects of that numbered paragraph. Finally, Hallett sometimes offers a counterstatement of fact that is slightly narrower or slightly different from defendants' stated fact. See, e.g., SOF ¶ 22 (conceding Hallett "assisted in the preparation of Mark Parrish's Employment Agreement" but disputing that he "participated in the drafting of then CEO Mark Parrish's Employment Agreement"). In such circumstances, unless otherwise stated, the Court adopts Hallett's version for purposes of this motion.

The following facts are not subject to genuine dispute.

## A. Background

Hallett has served in several executive capacities over the past 25 years. He was president of Time Magazine,[2] president of Sports Illustrated,[3] CEO of Murdoch Books,[4] and president of MyPublisher. **[*13]** [5]

Hallett's prior employment gave him some experience with executive compensation. When Hallett was president of Sports Illustrated, he was compensated through a combination of salary, bonus, and a long-term

---

[1] Citations of the form "SOF ¶ 1" reference ECF No. 87, which contains each proffered fact, plaintiff's response, and defendants' reply.

[2] SOF ¶ 3.

[3] SOF ¶ 4.

[4] SOF ¶ 15.

[5] Id.

incentive plan ("LTIP").[6] Hallett's employment agreement with Sports Illustrated specifically stated the terms of his incentive compensation, including that his LTIP could be triggered, based on performance, over a three-year vesting period.[7]

Hallett joined Stuart Dean's Board of Directors in 2011 or 2012.[8] Hallett worked on executive compensation issues, serving on the Board's Compensation Committee for at least part of the period between 2011 and 2018 and reviewing bonuses and LTIPs provided to key employees at the firm.[9] While on that committee, Hallett participated in the creation of an employment agreement for Stuart Dean's CEO, Mike Parrish.[10]

Parrish's employment agreement stated that Parrish "shall be eligible to participate in the Company's [LTIP] substantially in the form attached hereto as Exhibit A. The terms of the LTIP are subject to annual review by the Board."[11] Parrish's employment agreement also provided that Parrish would receive a pro rata share of LTIP compensation in **[*14]** the event of death or disability, but not if he were terminated.[12] The LTIP component of Parrish's employment agreement was amended on November 9, 2012,[13] and the amended agreement again stated that any LTIP award would be forfeited if Parrish resigned or was terminated with or without cause.[14]

After Parrish's tenure, Jim Degan took over as CEO of Stuart Dean.[15] Jim Degan and Stuart Dean did not execute an LTIP for Jim Degan prior to the end of Jim Degan's tenure as CEO.[16]

B. Hallett's Employment Agreement

In early 2018, Michael Degan, the Chairman of the Stuart Dean Board, approached Hallett about taking over the position of CEO.[17] Hallett and Michael Degan discussed compensation; Michael Degan told Hallett "the salary of the previous CEO, which was . . . $425,000, would be [Plaintiff's] salary. And that [Plaintiff] would have a bonus opportunity with the company of $175,000, which was a little different than . . . Jim Degan's."[18] Michael Degan also mentioned an LTIP; Hallett testified that "Michael would have told me . . . that the Board or the company intended to put in place an LTIP for me as part of my Employment Agreement."[19] Hallett understood Michael Degan's statement to be a promise that Hallett **[*15]** would receive an LTIP.[20]

Following Hallett's conversations with Michael Degan, Stuart Dean provided Hallett a draft employment agreement on March 12, 2018.[21] Plaintiff began serving as CEO, and by May he had signed the agreement, which is attached as Exhibit 1 to the Amended Complaint.[22] ECF No. 57-1 ("Employment Agreement"). Hallett testified that he did not discuss the Employment Agreement with a lawyer but understood the terms in the Employment Agreement prior to signing it.[23] Tim Shea, who took over from Degan as Chairman of the Board of Directors around March 2018,[24] signed the Employment Agreement for Stuart Dean.[25]

The Employment Agreement contains an "Entire Agreement" provision, which states:

> This Agreement contains the entire understanding of the parties with respect to the employment of Executive by the Company. There are no restrictions, agreements, promises, warranties, covenants or undertakings between the parties with respect to the subject matter herein other than those expressly set forth herein. This Agreement may not be altered, modified, or amended except

---

[6] SOF ¶ 5.

[7] SOF ¶¶ 6-12.

[8] SOF ¶ 17.

[9] SOF ¶¶ 18-19.

[10] SOF ¶¶ 22-23.

[11] SOF ¶ 26.

[12] SOF ¶ 29.

[13] SOF ¶ 35.

[14] SOF ¶ 37.

[15] SOF ¶ 43.

[16] SOF ¶ 46.

[17] SOF ¶ 47.

[18] SOF ¶ 51 (quoting Jakowsky Decl. Ex. A, Hallett Dep., 60:12-20).

[19] SOF ¶ 52.

[20] SOF ¶ 53.

[21] SOF ¶ 54.

[22] SOF ¶ 56.

[23] SOF ¶¶ 57-58.

[24] SOF ¶ 55.

[25] Employment Agreement 14.

by written instrument signed by the parties hereto.[26]

It also contains a "Prior Agreements" provision, which states:

> This Agreement [*16] supersedes all prior agreements and understandings (including verbal agreements) between Executive and the Company and/or its affiliates regarding the terms and conditions of Executive's employment with the Company and/or its affiliates.[27]

The Employment Agreement provides for several forms of compensation:

• Hallett would receive base salary of $425,000, which could not be decreased ("Base Salary").[28]

• Hallett "shall be eligible to earn an annual bonus award . . . with a target payout of $175,000, or 40% of Base Salary, whichever is greater, based upon the achievement of annual targets under a weighted plan comprising three components, i.e., profit, growth, and Board Specified Special objectives according to a 50-25-25 allocation thereof, subject to the terms and conditions of the Bonus Plan to be reviewed and approved annually by the Board" (the "Annual Bonus").[29]

• Hallett "shall be eligible to participate in the Company's Long Term Incentive Plan (the 'LTIP') which will be mutually agreed by the Company and Executive"? [sic] The terms of the LTIP are subject to annual review by the Board."[30]

## C. Evidence Concerning the Annual Bonus Provision

With respect to the Annual Bonus, Hallett [*17] testified that he understood from the Employment Agreement that "there may be circumstances under which a bonus is not earned."[31] Specifically, an employee would receive no bonus when "the intended recipient had [] not achieved any of the goals that were outlined; that is . . . insufficient profit growth, profit growth below expectations, revenue growth below expectations, and a failure to achieve any of the specific special

objectives."[32] In 2019, Hallett did not meet the profit target or the revenue target for a bonus.[33] The parties do not identify evidence regarding Hallett's "specified special objectives" for that year.[34]

Hallett was involved in setting bonus thresholds for Stuart Dean senior leadership and in submitting recommendations regarding whether to award bonuses to his direct reports. In a March 5, 2019 email chain regarding bonus thresholds for senior leadership in 2019, Hallett wrote to Scott Halstead, the head of the Board's Compensation Committee, "In the case of a catastrophe, it is always within the Board's prerogatives to deny bonuses to senior executives. These are always discretionary bonuses at that level."[35]

Karishma Israni, Stuart Dean's Director of Human Resources, resigned [*18] in February 2020, and Hallett did not recommend that she receive a bonus for 2019. Hallett testified that "it was not necessary for me to make a bonus recommendation for her to be paid in 2020 because she had left the company by that time. ... I felt no responsibility to make a bonus recommendation on her because she had left the company."[36]

## D. Continued Negotiations Regarding an LTIP

Hallett testified that he understood that Section 7 of the Employment Agreement "means that there will be a [long-term incentive] plan but the exact terms of it . . . would be subject to discussion."[37] When Hallett signed the Employment Agreement, the LTIP he contemplated receiving was the LTIP which had been provided to Parrish.[38]

---

[26] Id. § 14(b).

[27] Id. § 14(i).

[28] Id. § 3.

[29] Id. § 4.

[30] Id. § 7.

[31] SOF ¶¶ 64.

---

[32] SOF ¶ 72.

[33] SOF ¶¶ 117-120.

[34] A May 17, 2019 memorandum from the Compensation Committee to the Board appears to indicate that Hallett's 2019 special objectives were "updated strategies for the National Marketing Group and the Smaller Offices." Exhibit U to the Jakowsky Declaration, at D000288. However, given that the parties did not cite this passage or brief this issue, the Court declines to consider it and deems any material fact relating to Hallett's "special objectives" for 2019 to be genuinely disputed.

[35] SOF ¶ 66. Plaintiff disputes the implications of this assertion, but he does not dispute that this email exchange occurred.

[36] SOF ¶¶ 68-69.

[37] Hallett Dep. 88:19-23.

[38] SOF ¶ 85.

2021 U.S. Dist. LEXIS 23025, *18

From May 2018 to November 2019, Shea, Halstead, Hallett, and others corresponded on numerous occasions regarding a potential LTIP. The discussions remained preliminary through summer 2018. In May 2018, Shea, the Chairman of the Board, reported to the Board that Hallett had "signed a contract consistent with market-based compensation offered to the former CEO" and that "an update on the LTIP [would be provided] at the August Board Meeting."[39] That same month, when Halstead became the head of the **[*19]** Board's Compensation Committee, he was aware that the Board "w[as] going to put an LTIP in place for Mr. Hallett."[40]

Beginning in summer 2018, the Board requested from management information that would be relevant to the creation of an LTIP. For instance, on July 18, 2018, Halstead emailed Shea, noting that Hallett and Robert Cook, the Stuart Dean CFO, were collecting information to begin to evaluate the framework for an LTIP; Halstead also informed Shea that he had contacted an executive compensation firm, Pay Governance, regarding the planned LTIP.[41] The next month, in an update to the Board, Halstead explained that the LTIP was still "in the preliminary stages."[42] In October 2018, Halstead emailed Cook, stating in part, "we want to finalize the LTIP at the March [2019] meeting."[43] Hallett testified that he based this desired schedule on his belief that "there was outstanding information" he wanted in order to prepare the LTIP.[44] On January 16, 2019, Halstead sent an email to Hallett stating that they were to discuss the "Long-Term Compensation, if necessary."[45]

On February 28, 2019, Halstead sent an email to the Compensation Committee, copying Plaintiff, outlining topics of discussion for a Compensation **[*20]** Committee call scheduled for the next day; regarding an LTIP, Halstead wrote, "both Bruce [Hallett] and I feel

that we aren't ready yet to do this AND importantly this is not holding us back from achievement."[46] There is no evidence that Hallett disagreed or otherwise responded. On March 7, 2019, Halstead emailed Hallett and the Compensation Committee a Compensation Committee Report for the Board meeting the following day, which stated:

> Management and the Compensation Committee have continued discussions regarding a long-term Incentive Plan for targeted individuals supporting the Company. Management is still contemplating its long-term plan including financial projections. The Committee will consider (re)instituting a long-term incentive plan once the long-term plan has been vetted by the Committee and the full Board.[47]

Hallett testified that, as of March 2019, a business development was "fundamentally altering the outlook for the next three to five years," so management "had not provided a long term financial projection[]" to the Board.[48]

In May 2019, the Compensation Committee recommended to the Board that for 2019, in lieu of an LTIP, a one-time incentive payment should be provided to Hallett. **[*21]** [49] The Committee also reported that the effort to discuss and design an LTIP "continues in the planning stage and will not be in place for 2019."[50]

On June 6, 2019, Hallett emailed Halstead and Shea a copy of Parrish's LTIP.[51] Shea responded, attaching the

---

39 SOF ¶ 128.

40 SOF ¶¶ 129-130.

41 SOF ¶ 132. Contrary to plaintiff's contention, this fact is not disputed. Plaintiff's contrary contention is that "no LTIP was ever created for Plaintiff by Pay Governance []," but that is a separate issue unresponsive to the defendants' statement of fact. Therefore, SOF ¶ 132 is deemed admitted.

42 SOF ¶ 135.

43 SOF ¶ 138.

44 SOF ¶ 140.

45 SOF ¶ 143.

---

46 SOF ¶¶ 145-146. Hallett disputes SOF ¶ 146 but not the fact that the document contains this quotation.

47 SOF ¶¶ 149-150. Hallett disputes SOF ¶ 150 but not the quotation contained therein.

48 SOF ¶ 154; Hallett Dep. 200:23-24, 201:8-9.

49 SOF ¶¶ 156-157; Jakowsky Decl. Ex. U. Plaintiff claims that SOF ¶ 157 is disputed, but his arguments regarding why the fact is disputed (e.g., because "Mr. Shea admitted no LTIP was ever created for Plaintiff by Pay Governance's John Sinkular") are not responsive to the stated fact. In any event, this fact is plainly demonstrated by Exhibit U to the Jakowsky Declaration, and no reasonable factfinder could conclude otherwise.

50 SOF ¶ 158.

51 SOF ¶ 160. Plaintiff claims that this fact is disputed because Hallett testified that he did not recall sending this email, but Hallett's memory lapse fails to create a genuine dispute. Hallett offers no reason to doubt that he sent this email. The email was produced as part of discovery in this action, and the Court finds it to be authenticated for summary judgment

Compensation Committee's discussions from 2017 regarding a potential LTIP for prior CEO Jim Degan.[52] On November 1, 2019, Shea emailed Hallett, "It might not have been clear to you in last board meeting that the next step is to give Jon Sinkular [of Pay Governance] the three year plan (to be done for the next board meeting) and the LTIP would be generated using this and market information to be approved at the first board meeting in 2020. "[53] On the same day, Hallett emailed Shea indicating that he wanted to discuss the LTIP and Hallett's successor.[54] On November 10, 2019, Halstead emailed Sinkular of Pay Governance, writing "To date, we (Committee and Board) have received no information related to 3-5 year plan from Management."[55]

Shea emailed the Board on December 3, 2019, stating that Hallett intended to leave the company by March 2021 and outlining a CEO succession plan.[56] LTIP discussions appear to have ceased at that time. On [*22] March 2, 2020, Hallett emailed Halstead and others to inquire about the status of the LTIP, and Halstead responded, "there is no reason to create an LTIP (that would have at least a 3 year and probably a 5 year outlook) with your announced intention not to be CEO past next March."[57] He further wrote,

> The [Compensation Committee] is prepared to propose an[ ] 'in lieu of LTIP' incentive similar to the 2019 where a pool of money can be set aside for over performance in 2020. Similar to 2019, if you want to propose that this portions of this amount be distributed to other members of the team, the [Committee] is open to this.[58]

On March 4, 2020, Hallett responded, asserting that Stuart Dean breached the Employment Agreement by not providing an LTIP.[59]

E. Negotiations with Pritchard Industries

In fall 2019, Hallett was told that non-party Pritchard Industries ("Pritchard") had approached Stuart Dean about the possibility that Pritchard might acquire Stuart Dean, and Hallett met with a Pritchard employee.[60] In the days that followed, Hallett informed Shea that he had been approached by a potential buyer, but he did not name the entity.[61] Hallett attended three or four in-person meetings with one or more [*23] Pritchard employees between October 2019 and March 2020, and he disclosed to Pritchard "an indication" of Stuart Dean's gross margins.[62]

On November 22, 2019, after entering Executive Session, the Board discussed acquisition activity and decided upon certain directives to convey to management.[63] On November 24, 2019, Shea emailed Hallett and Cook, asking if they could prepare a confidential slide for each Board meeting "identifying any activity/contacts/discussions in acquisitions by [Stuart Dean] or acquirers interested in [Stuart Dean]," including "name of company, contact, [and] general outcome of contact."[64] Hallett responded, "no way."[65] On November 27, 2019, Shea replied: "Let's talk next week . . . it would be better if I could communicate your reason for refusing to keep the board informed of acquisition activity and inquiries."[66]

---

purposes. See supra Evidentiary Objections.

[52] SOF ¶¶ 162-163.

[53] SOF ¶¶ 174-175.

[54] SOF ¶ 185.

[55] SOF ¶ 180. Plaintiff claims that this fact is disputed, but plaintiff's counterstatement simply offers additional, materially unrelated facts (e.g., that Pay Governance never provided an LTIP) that do not call SOF ¶ 180 into doubt.

[56] SOF ¶ 187.

[57] SOF ¶¶ 189, 191. Plaintiff claims that these facts are disputed because he never formally gave 90 days' notice, as provided in the Employment Agreement. However, formal notice aside, Hallett does not deny that he informally indicated his intent to leave by March 2021. The fact is deemed admitted.

[58] SOF ¶ 194. Plaintiffs' objections go to the significance of the

fact that Hallett sent such an email, not to whether he did so.

[59] SOF ¶ 195.

[60] SOF ¶¶ 240, 241.

[61] SOF ¶ 242. Hallett objects that the proffered fact is incomplete, but he does not dispute the veracity of the specific stated fact.

[62] SOF ¶ 245-246.

[63] SOF ¶ 241, 257. Some of Hallett's objections to SOF ¶ 247 are relevant; however, they do not call into question the undisputed facts that the Board entered Executive Session on this date or that it decided upon directives to convey to management.

[64] SOF ¶ 249.

[65] SOF ¶ 250. Hallett responds that he was prepared to identify a bidder if he received a serious enough offer; this does not call into doubt the fact that Hallett sent the referenced email.

[66] SOF ¶ 252.

2021 U.S. Dist. LEXIS 23025, *23

At a December 13, 2019 Board meeting, the Board discussed with Hallett the directives that the Board had adopted during Executive Session on November 22, 2019.[67] The Board's meeting minutes state, in part:

> Number One Focus is to Improve the Financial Performance of Stuart Dean . . . [and] No Initiatives to Sell or Acquire Companies. The message for everyone is clear: **[*24]** "Stuart Dean is not for sale." Bruce Hallett will keep a tally of all inquiries and report same to the Board of Directors.[68]

Hallett likewise testified that during this Board meeting, Shea said in an "outburst" that "Stuart Dean is not for sale."[69] Despite these directives, Hallett did not disclose Pritchard's identity.[70]

In a series of follow-up emails, certain Board members reiterated a desire for the company to represent to the market that Stuart Dean was not for sale; meanwhile, in separate email conversations around the same date, members of Stuart Dean management expressed a desire to continue to listen to incoming sales-related inquiries.[71] In mid-December 2019, Hallett called Shea, saying he wanted Stuart Dean to enter a non-disclosure agreement with a prospective acquiror (i.e., Pritchard) so that Hallett could share confidential information.[72] Shea asked for the interested party's name, and Hallett refused to provide it.[73] Shea told Hallett that the Board had told Hallett he could not have such discussions, but Shea offered to schedule a Board meeting at which Hallett could ask for permission.[74] No such Board meeting occurred, but Hallett continued to meet with

Pritchard.[75] Pritchard eventually **[*25]** provided Hallett with a specific valuation for Stuart Dean,[76] but Hallett still did not provide Pritchard's name to the Board; indeed, he never did so.[77]

F. _Hallett's Termination_

Section 10 of the Employment Agreement provides that it "exclusively govern Executive's rights upon termination of employment with the Company and its affiliates."[78] It describes two mechanisms for Stuart Dean to terminate Hallett: with and without cause. It defines "cause" to include, among other things, "dishonesty in the performance of [Hallett's] duties hereunder" and "willful malfeasance or willful misconduct in connection with [Hallett's] duties hereunder or any act or omission which is materially injurious to the financial condition or business reputation of the Company."[79] The Employment Agreement provides that, if terminated for cause, Hallett "shall be entitled to receive" the following (collectively, the "Accrued Rights"):

- his Base Salary through the date of termination,
- certain benefits through the date of termination, and
- reimbursement of business expenses incurred through the date of termination.[80]

If Hallett was terminated without cause, he "shall be entitled to receive" those same Accrued Rights as well as a continuation **[*26]** of his Base Salary for six months and COBRA health insurance premiums for twelve months.[81] Besides these rights, following termination with or without cause, Hallett "shall have no

---

[67] SOF ¶ 257.

[68] Jakowsky Decl. Ex. RRR.; SOF ¶ 261. Plaintiff purports to dispute this fact, without basis; the Board's meeting minutes speak for themselves, and they are consistent with Hallett's own testimony.

[69] SOF ¶ 260. Plaintiff's counterstatement is unrelated to the stated fact; the stated fact quotes from plaintiff's own deposition testimony.

[70] SOF ¶ 259.

[71] SOF ¶¶ 263-268, 270-271.

[72] SOF ¶ 274. Hallett claims that this fact is disputed because it is "not the complete proffered fact." This objection is unintelligible and fails to genuinely dispute the truth of the proffered fact.

[73] SOF ¶¶ 275-276.

[74] SOF ¶ 277.

[75] SOF ¶¶ 278, 281-282. There is a genuine dispute regarding the timing of these meetings, but plaintiff offers no evidence to call into doubt that at least one such meeting occurred in 2020 prior to Hallett's termination.

[76] SOF ¶ 283-284.

[77] SOF ¶ 287. Plaintiff claims that this fact is disputed because "[e]ngaging with a private equity group is not the same [as] selling the company." This arguably calls into question whether Pritchard can be properly identified as "a potential buyer," defendants' chosen phrase, but it does not create a material factual dispute.

[78] Employment Agreement § 10.

[79] Id. § 10(a)(2).

[80] Id. § 10(a)(3).

[81] Id. § 10(c)(3).

further rights to any compensation or any other benefits under this Agreement."[82]

The Board began discussing disciplining or terminating Hallett after Israni, the director of Human Resources at Stuart Dean, left the company effective February 14, 2020.[83] Board members conducted her exit interview on that date.[84] Israni alleged that Hallett decided not to conduct legally required harassment training and that he was not treating employees fairly and objectively.[85] On March 5, 2020, the Executive Board met to discuss these allegations and subsequent allegations from conversations with employees, along with a variety of other grievances about Hallett, including his continued acquisition-related discussions and his refusal to identify an entity that had made sales-related inquiries (i.e., Pritchard) to Shea, among other issues.[86] The Board considered three options: terminating Hallett without cause, writing to him about his performance, or doing nothing about the alleged performance issues but fast-tracking the **[*27]** hiring of a new CEO.[87]

On March 7, 2020, Shea called Hallett and offered him two options: to resign or to be terminated without cause.[88] Hallett told Shea, again, that an entity might be

––––––––––––––––––––––––––––––

[82] Id. §§ 10(a)(3), 10 (c)(3).

[83] SOF ¶ 289.

[84] SOF ¶ 292.

[85] SOF ¶¶ 297-299.

[86] SOF ¶ 301.

[87] SOF ¶ 302. Plaintiff offers many arguments regarding the implications of the cited fact (e.g., "The Board never provided anything in writing to Plaintiff about his performance deficiencies"; "Defendants also did not bother interviewing Plaintiff in the course of their rushed investigation into these vague, but supposedly very serious, 'concerns,' nor did they tell Plaintiff he was being fired because of the alleged investigation's findings"; "Plaintiff smelled something fishy, called their bluff and refused to help Defendants turn their without-cause termination into one for cause."). However, Hallett offers no reason to call into doubt the stated fact itself, i.e., that the Executive Board discussed these three possible responses to Hallett's alleged misconduct.

[88] SOF ¶ 308. Plaintiff objects that the "citation does not support the cited fact." Plaintiff is mistaken. Defendants cite Shea's deposition and Jakowsky Decl. Ex. ZZ, an email sent by Shea to the Board; these citations do support the cited fact. Hallett also raises legal arguments, like the validity of the act of termination, but these arguments do not genuinely dispute the cited fact, i.e., that Shea indicated that Hallett could either

interested in acquiring Stuart Dean, and Hallett disclosed that he expected to receive an Indication of Interest in the next week; when Shea asked him to name the entity, Hallett again refused.[89] On March 8, 2020, the Board voted to terminate Hallett's employment in accordance with a draft letter presented to them.[90] The letter stated that Hallett's employment "is terminated as of today, March 8, 2020" and that " [i]f the Company determines that there is no cause for your termination pursuant to Section 10 of the Employment Agreement, you will be provided with a Separation Agreement and General Release pursuant thereto."[91] The Board minutes indicate that Hallett was terminated "as outlined in the letter."[92]

On March 9, 2020, Cook emailed Stuart Dean employees and shareholders, stating, in part:[93]

> This letter is to inform you that Bruce Hallett, CEO, will step down from his position effective immediately . . . The Board would like to thank Bruce for his service first as a Director and then later **[*28]** as CEO and to wish him all the best in his future endeavors.[94]

(It should be noted that defendants claim that the Board terminated Hallett on March 8, 2020 for cause.[95] This claim is not supported by the contemporaneous record. Neither the March 8 letter from Shea to Hallett nor the

––––––––––––––––––––––––––––––

resign or be terminated without cause.

[89] SOF ¶¶ 309-311.

[90] There is no genuine dispute that the Board voted to terminate Hallett's employment on this date, as stated in the Board minutes. Jakowsky Decl. Ex. AAA, at D000964.

[91] Id.

[92] See id. at D000963-964 ("A motion was made by Kristen Schorp that the Stuart Dean Board of Directors terminate Bruce Hallett as President & CEO of Stuart Dean Co., Inc. as outlined in the letter of March 8, 2020 and terminate Bruce Hallett as a member of the Stuart Dean Board of Directors. Adriene Bailey seconded. Motion passed unanimously.")

[93] SOF ¶ 319. Plaintiff responds that it is " [u]ndisputed that this document was produced," but does not otherwise respond to this stated fact. Given plaintiff's failure to substantively respond, this fact is deemed admitted.

[94] SOF ¶ 320. Hallett responds by pointing out a typographical error in the Bates number provided by the defendants, but plaintiff does not genuinely dispute that the letter contained the quoted language; in any event, the document speaks for itself.

[95] See SOF ¶ 318.

Board meeting minutes state that Hallett was terminated for cause.[96] )

On March 13, 2020, Stuart Dean sent Hallett a second letter, asserting that Stuart Dean had terminated Hallett for cause: "The Company believes that you have engaged in acts of willful misconduct in connection with your duties as CEO as it relates to unapproved and prohibited negotiations with a potential business partner thereby warranting termination under Section 10(a)(ii)(D)," i.e., for cause.[97] At the same time, the March 13 letter promised Hallett one form of compensation to which he only would have been entitled if he had been fired without case: COBRA health insurance premiums for a year.[98] The letter also said that "the Company [will] [is willing] to construe your termination as without cause under Section 10, Subsection C [if you sign an Agreement and General Release]."[99]

### G. Procedural History

In May of 2020, Hallett filed this suit against Stuart Dean and the members **[*29]** of its Board. Defendants moved to dismiss eight of the nine counts of the complaint. On August 25, 2020, the Court granted that motion in part and denied it in part, dismissing certain counts of the Complaint without prejudice. Opinion & Order, ECF No. 50.

The original Case Management Order in this case provided that all discovery had to be completed by October 15, 2020. ECF No. 33. On October 9, 2020, following a joint telephone call convened pursuant to this Court's Individual Rules, the Court extended the close-of-discovery date to November 14, 2020. Dkt. Entry Dated Oct. 9, 2020. During an October 15, 2020 telephone application, Hallett sought leave to amend his Complaint, and the Court granted leave. Dkt. Entry Dated Oct. 15, 2020. Hallett filed the operative Amended Complaint on October 26, 2020, ECF No. 57 ("Am. Compl."), and defendants filed an Answer on November 9, 2020, ECF No. 63. Defendants moved for summary judgment on December 2, 2020. ECF No. 66.

On December 11, 2020, more than a week after defendants had moved for summary judgment and

nearly a month after the close of discovery, the parties convened another telephone application during which plaintiffs sought leave to **[*30]** file a further amended complaint. Finding Hallett's request to be untimely, the Court denied it. Dkt. Entry Dated Dec. 11, 2020.

Defendants' summary judgment motion has now been fully briefed and argued. See Mem. in Support of Mot. for Summ. J., ECF No. 66 ("MSJ"); Opp. to Mot. for Summ. J., ECF No. 74 ("Opp."); Reply in Support of Sum. J., ECF No. 88.

## ANALYSIS

The Court now turns to defendants' motion for summary judgment, addressing it claim by claim. The Court begins with claims that the Court previously dismissed without prejudice and that Hallett is trying to renew. The Court then turns to Hallett's remaining claims for bonus compensation, which sound in contract, statute, tort, and quasi-contract. Finally, the Court addresses Hallett's claims for wrongful termination.

## I. Reasserted LTIP Claims

Several of Hallett's causes of action seek damages for Stuart Dean's failure to provide him with an LTIP. The Court begins with two LTIP claims that the Court previously dismissed.

### A. Breach of Contract for Failure to Provide an LTIP (Unpleaded)

Hallett's original complaint alleged that Stuart Dean breached the Employment Agreement by failing to provide Hallett with two forms of compensation: **[*31]** a 2019 Annual Bonus and an LTIP. On defendants' motion to dismiss, the Court addressed these forms of compensation separately. Regarding the LTIP,

> after weighing all the relevant factors together, even when drawing all reasonable inferences in Hallett's favor, the Court f[ound] as a matter of law that Hallett ha[d] not plausibly alleged that the parties intended that the Employment Agreement would bind Stuart Dean to make LTIP payments to Hallett. Rather, the contract is plain that the parties contemplated further negotiations that would ultimately lead to an LTIP, and an agreement to agree is not a binding contract under New York law.

Opinion & Order, ECF No. 50, at 16. Therefore, the Court dismissed the LTIP aspect of Count Two without prejudice.

---

[96] Jakowsky Decl. Ex. AAA, at D000963.

[97] ECF No. 57-3.

[98] Id.

[99] ECF No. 57-3 (all brackets in original).

When Hallett filed the Amended Complaint on October 26, 2020, he chose not to replead Count Two by adding further allegations to support his LTIP claim; instead, he acquiesced in the dismissal of the LTIP aspect of Count Two, dropping references to the LTIP from that count. But the, as noted, Hallett sought to reverse course almost a month after the close of discovery, but the Court denied as untimely his request to further amend his complaint. **[\*32]** In his opposition to defendants' motion to dismiss, Hallett effectively asks the Court to reconsider that ruling, arguing that Hallett should be able to recover for breach of contract for Stuart Dean's failure to provide him with an LTIP.

Hallett's failure to include this claim in his Amended Complaint, standing alone, precludes recovery. Nevertheless, the Court also denies Hallett's request for the independent reason that Hallett's opposition brief offers no additional material allegations beyond those included in Hallett's original Complaint. Thus, any amendment would be futile.

The Employment Agreement states that "[d]uring the Employment Term, Executive shall be eligible to participate in the Company's Long Term Incentive Plan (the 'LTIP') which <u>will be mutually agreed</u> by the Company and Executive"? [sic] The terms of the LTIP are subject to annual review by the Board." Employment Agreement § 7 (emphasis added). The Employment Agreement's references to a future "mutual[] agree[ment]" demonstrates that at the time of execution, the parties did not intend to be bound to a specific LTIP. Applying the test that the Second Circuit has applied in this context, this Court previously found **[\*33]** that the parties' reference to a future agreement did not create a binding obligation to provide Hallett an LTIP. Opinion & Order, ECF No. 50, at 11-16; see *Winston v. Mediafare Entm'l Corp., 777 F.2d 78, 80 (2d Cir. 1985)*.

Hallett invites the Court to reconsider its legal reasoning, arguing that even if the parties did not intend to be bound to a specific LTIP, they intended to be bound <u>to negotiate</u> an LTIP. Courts have held that parties can enter into a binding agreement to negotiate in good faith to try to reach a further agreement; such an agreement to negotiate in good faith has been termed a "Type II agreement." Type II agreements "do[] not commit the parties to their ultimate contractual objective but [they do commit the parties] to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework." *Brown v. Cara, 420 F.3d 148, 153 (2d. Cir. 2005)*. However, the Employment Agreement provides no

"agreed framework" for subsequent negotiation regarding an LTIP.

Consider, by contrast, former CEO Parrish's employment agreement. It stated that Parrish "shall be eligible to participate in the Company's [LTIP] substantially in the form attached hereto as Exhibit A." SOF ¶ 26. Parrish's agreement thereby articulated a framework for negotiation. **[\*34]** Hallett's Employment Agreement did not, so it did not create a binding Type II agreement any more than it created a traditional Type I agreement.

Finally, even if Hallett's claim were timely included within his Amended Complaint and even if the parties had executed a binding Type II agreement to negotiate for an LTIP in good faith -- neither of which is true -- the Court would still grant summary judgment for defendants. For reasons stated below in connection with the implied, covenant of good faith and fair dealing, Stuart Dean negotiated in good faith regarding Hallett's potential LTIP, and there is no genuine dispute of material fact on that issue. <u>See infra</u> Part V.C.

For all these reasons, Hallett cannot recover on a claim for breach of contract for failure to provide an LTIP, and the claim is dismissed with prejudice.

## B. Unlawful Deduction of Wages (Count Three): Failure to Provide an LTIP

New York Labor Law protects employees against unlawful "deductions" from their "wages." *New York Labor Law ("NYLL") § 193*. Like Count Two, Count Three claims two forms of withheld wages, the 2019 Annual Bonus and LTIP compensation. The Court dismissed Count Three without prejudice insofar as Hallett **[\*35]** sought LTIP compensation, finding that the alleged LTIP payments would not have been "wages" under New York law. Opinion & Order, ECF No. 50, at 28-33.

Despite the Court's ruling, the Amended Complaint made no amendments to Count Three. <u>Compare</u> Compl., ECF No. 1, ¶¶ 79-87 <u>with</u> Am. Compl. ¶¶ 78-86. This failure alone is fatal to plaintiff's claim. The Court adheres to its prior ruling and now dismisses Count Three with prejudice, insofar as it seeks LTIP payments, for failure to state a claim.

## C. Retaliation Under NYLL *§ 215* (Count Four)

On March 4, 2020, Hallett wrote to certain of the defendants that Stuart Dean's failure to provide him with an LTIP violated his Employment Agreement. Hallett argues that, because failing to provide him an LTIP was an unlawful "deduction" from his "wages," he was complaining about a violation of New York Labor Law. Stuart Dean fired him because of that complaint, Hallett claims, which constitutes retaliation in violation of *New York Labor Law § 215*.

Hallett does not claim that he complained about Stuart Dean's failure to pay him a 2019 Annual Bonus prior to his termination; his retaliation claim depends entirely on his complaint about failure to provide him with LTIP payments. However, **[*36]** as noted, the alleged LTIP payments would not have been "wages." Thus, Hallett was not complaining about a violation of New York Labor Law, so his retaliation claim fails as a matter of law. This Court so held at the motion to dismiss stage. Opinion & Order, ECF No. 50, at 33-35.

As with Count Three, despite the Court's ruling, Hallett made no amendments to Count Four. Compare Compl. ¶¶ 88-99 with Am. Compl. ¶¶ 87-98. Once again, this failure is fatal to plaintiff's claim. The Court adheres to its prior ruling and now dismisses Count Four with prejudice for failure to state a claim.

## II. Reasserted Defamation Claim (Count Ten)

Count Ten alleges that defendants defamed Hallett by publishing a letter and email "indicating that Hallett intended to step down from his position as CEO, which did or had the tendency to expose Hallett to disgrace." Am. Compl. ¶ 131.

To prevail on a defamation claim under New York law, Hallett must show that the defendants made "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard[;] and [the statement] must either [have] cause[d] special harm or constitute defamation **[*37]** per se." *Dillon v. City of New York, 261 A.D.2d 34, 38, 704 N.Y.S.2d 1 (1st Dep't 1999)*. The Court previously dismissed Hallett's defamation claim because the Complaint failed to allege that the defendants had published the allegedly defamatory statements to third parties. The Amended Complaint cures that issue.

However, defendants now move for summary judgment on other bases, arguing that the statements were not false, harmful, or defamatory per se. Under New York law, a statement is per se defamatory if it "(i) charg[es] plaintiff with a serious crime; (ii) . . . tend[s] to injure [plaintiff] in his or her trade, business or profession; (iii) [represents] that plaintiff has a loathsome disease; or (iv) imput[es] unchastity to a woman." *Liberman v. Gelstein, 80 N.Y.2d 429, 435, 605 N.E.2d 344, 590 N.Y.S.2d 857 (1992)*. Hallett alleges that Cook's letter caused him special damages and constitutes defamation per se because it implied that he had been fired because of misconduct, which tends to injure him in his profession.

There is no genuine dispute of material fact regarding the existence of the allegedly defamatory letter or its contents. The letter reads:

> To all Employees and Shareholders of Stuart Dean Co., Inc.:
>
> This letter is to inform you that Bruce Hallett, CEO, will step down from his position effective immediately. At the Board's request, **[*38]** Robert Cook will serve as interim CEO until the Board appoints a successor. An ad-hoc committee chaired by Adriene Bailey has been appointed to begin the search for a new CEO. With leadership of Bob Cook, the Executive team coupled with the depth of experience and commitment at every level of the organization, there will be sufficient time to conduct a thorough search and choose the right person to lead Stuart Dean into the future[.]
>
> The Board of Directors will communicate further with all of the company's stakeholders as soon as is practicable after a regularly scheduled Board meeting in New York on Friday, March 13th.
>
> The Board would like to thank Bruce for his service first as a Director and then later as CEO and to wish him all the best in his future endeavors.

Jakowsky Decl. Ex. CCC; SOF ¶¶ 319-320.

The Court first considers whether the letter is truthful. The only questionable statement is that Hallett "will step down," which is ambiguous. It could be read to imply that Hallett resigned, when in truth he was terminated. However, it is also accurate to say that someone "will step down" because they were fired and have no choice in the matter. Given this ambiguity, the letter was not **[*39]** demonstrably false, and no reasonable factfinder could so find.

Summary judgment is also proper for a second reason. No reasonable jury could find that the letter was harmful to Hallett or constituted defamation per se. Recognizing

unfavorable case law, Hallett concedes that "a statement that an employee was terminated 'carries no imputation of dishonesty or lack of professional capacity[,]'" but he argues that "'when the publication contains an insinuation that the dismissal was for some misconduct . . . it becomes defamatory.'" Opp. 21 (quoting Nichols v. Item Publishers, 309 N.Y. 596, 601, 132 N.E.2d 860 (1956)). Here, however, Cook's polite, circumspect letter did not contain any such insinuation. If anything, by saying that Hallett "will step down" rather than saying that he was terminated, Cook's letter implied that Hallett's departure was amicable. And Cook went out of his way to thank Hallett for his service and to wish him well. This is not the sort of "imputation" or "insinuation" of malfeasance that demonstrates defamation per se.

When a company terminates its CEO, it must obviously tell its employees and shareholders. This letter fulfills that obligation without suggesting any wrongdoing by Hallett. Hallett may have suffered reputational harm [*40] because he was terminated, but not because of this letter. For these reasons, the Court grants summary judgment to defendants on Count Ten, dismissing that claim with prejudice.

### III. Breach of Contract for Failure to Provide an Annual Bonus (Count Two)

The Court now turns to claims that were not previously dismissed, starting with Hallett's breach of contract claim for an Annual Bonus for 2019 (Count Two).

New York courts have held that employees cannot sue under a contract for a "discretionary" bonus. See, e.g., Namad v. Salomon Inc., 74 N.Y.2d 751, 753, 543 N.E.2d 722, 545 N.Y.S.2d 79 (1989) (breach of contract claim for bonus properly dismissed where "the bonus clause [had] unambiguously vest[ed] discretion regarding the amount of bonus compensation to be awarded in defendants' management"). On the other hand, New York courts "may enforce an agreement to pay an annual bonus made at the onset of the employment relationship where such bonus constitutes an integral part of Plaintiff's compensation package," Mirchel v. RMJ Securities Corp., 205 A.D.2d 388, 390, 613 N.Y.S.2d 876 (1st Dep't 1994) (internal quotation marks omitted), and where "there exists a reasonable basis for calculating the bonus due," Thomson v. Saatchi & Saatchi Holdings, 958 F. Supp. 808, 825 (W.D.N.Y. 1997).

In defendants' view, the Board had complete discretion to decide whether to pay Hallett a bonus following termination, but the Employment Agreement [*41] is ambiguous on this point. On the one hand, it states that Hallett "shall be eligible to earn" an Annual Bonus and provides a basis for calculating one, which is tied directly to the calendar year; this tends to constrain Stuart Dean's discretion and to suggest that entitlement to a bonus, if any, vests at the end of the calendar year. On the other hand, Section 10 of the Employment Agreement provides that, other than rights explicitly enumerated therein -- which do not include an Annual Bonus -- Hallett "shall have no further rights to any compensation or any other benefits under this Agreement" following termination. See Employment Agreement §§ 10(a)(3), 10(c)(3).

Section 10 is more specific than Section 4, so defendants' contractual interpretation is the better one. Nevertheless, given this ambiguity and drawing all inferences in favor of Hallett, the Court found at the motion to dismiss stage that it was plausible that Hallett had accrued a contractual right to an Annual Bonus at the end of 2019 and that Stuart Dean lacked authority to withhold the bonus. Opinion & Order, ECF No. 50, at 18.

At the summary judgment stage, the Court must still draw inferences in favor of Hallett, but it may now look beyond the four corners of the [*42] contract to interpret its ambiguous terms. Defendants offer several pertinent pieces of undisputed evidence.

The most persuasive piece of evidence is that Israni, the director of Human Resources, resigned in February 2020, and Hallett chose not to recommend that she receive a 2019 bonus. Hallett testified that he "felt no responsibility to make a bonus recommendation on [Israni] because she had left the company." SOF ¶¶ 68-69. Defendants also point out, more generally, that Hallett recognized that "[i]n the case of a catastrophe, it is always within the Board's prerogatives to deny bonuses to senior executives. These are always discretionary bonuses at that level." SOF ¶ 66. Although this statement did not relate directly to Hallett's Employment Agreement, it offers useful additional context and tends to show Hallett's baseline understanding that executive bonuses are usually discretionary.

These undisputed facts resolve the Employment Agreement's ambiguity: although Hallett was eligible to earn an Annual Bonus, the contract did not guarantee him such a bonus if he was terminated before the bonus

was paid. New York law does not permit plaintiffs to recover discretionary bonuses, so Hallett **[\*43]** cannot recover on a breach of contract claim for the 2019 Annual Bonus.[100]

For these reasons, the Court grants defendants' motion for summary judgment on Count Two, and dismisses that claim with prejudice.

## IV. Unlawful Deduction of Wages (Count Three): Failure to Provide an Annual Bonus

The Court now turns to Hallett's New York Labor Law claim for unlawful deduction of wages in relation to the 2019 Annual Bonus.

This claim fails for two independent reasons. First, it fails for the same reason as Count Two: Hallett was not contractually entitled to a 2019 Annual Bonus. See supra Part III.

Separately, Hallett's claim is not cognizable under *Section 193* because his Annual Bonus would not have constituted "wages." As the Court explained in denying the motion to dismiss, there are "three principles that New York courts apply to determine whether incentive compensation qualifies as 'wages' for purposes of *Section 193*, i.e., whether the incentive compensation was (1) tied to personal productivity or the performance of the company; (2) guaranteed or discretionary; and (3) vested or contingent." Opinion & Order, ECF No. 50, at 31; see id. at 28-30 (surveying New York state cases).

The Court previously found that the first factor did **[\*44]** not strongly favor either party because Hallett's Annual Bonus was calculated based on both company performance and personal achievements; the Court adheres to that finding. On the second and third factors, the Court previously drew inferences in favor of Hallett based on ambiguities in the Employment Agreement and found that Hallett had plausibly alleged that his Annual Bonus was non-discretionary and had vested at the end of 2019. For reasons already stated, however, the Court now reaches the opposite conclusion.

Extrinsic evidence, such as Hallett's testimony regarding his decision not to recommend a bonus for Israni, resolves the ambiguity in the Employment Agreement, demonstrating that the Annual Bonus was discretionary and contingent on Hallett's continued employment at Stuart Dean. Therefore, based on the undisputed facts, a reasonable factfinder would conclude that Hallett's 2019 Annual Bonus was not "wages" under *Section 193*.

For these reasons, the Court grants summary judgment for the defendants on Count Three, and dismisses that claim with prejudice.

## V. Quasi-Contract and Tort Claims for Failure to Provide Bonus Compensation

Hallett raises many quasi-contract and tort claims, mostly as **[\*45]** alternative bases to recover for Stuart Dean's failure to provide him with an LTIP. The Court first addresses one global argument, before addressing each claim in turn.

### A. Statute of Frauds

Defendants argue that all of Hallett's quasi-contract and tort claims are barred by the Statute of Frauds. See *N.Y. Gen. Oblig. Law § 5-701(a)(1)*. The Statute of Frauds prohibits enforcement of an oral agreement if the agreement "is incapable of full performance within a year." *Komlossy v. Faruqi & Faruqi, LLP, No. 15-cv-9316 (KPF), 2017 U.S. Dist. LEXIS 25490, 2017 WL 722033, at \*9 (S.D.N.Y. Feb. 23, 2017)*.

To be sure, it is extraordinarily unlikely that an LTIP-related agreement would have been fully performed within one year; LTIPs are, by definition, "long term." Nevertheless, the Statute of Frauds does not turn on probabilities; it bars only those agreements which "have absolutely no possibility in fact and law of full performance within one year." *Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362, 366, 694 N.E.2d 56, 670 N.Y.S.2d 973 (1998)*. Complete performance within one year of an LTIP-related agreement, while unlikely, was possible. Hallett, Halstead, and Shea might have sat down and negotiated all day, finalizing the terms of an LTIP not long after executing the Employment Agreement. That LTIP might have included a change-of-control provision, by which Hallett's rights under the LTIP would have **[\*46]** vested immediately if the company were sold. And then the company might have been sold

---

[100] Defendants also point out that Stuart Dean did not make the profit or revenue growth targets for 2019. Hallett concedes this, and these categories together accounted for 75% of Hallett's Annual Bonus eligibility. That said, the Court cannot grant complete summary judgment on this basis because of the remaining 25%. The parties' briefs and **Rule 56.1** statements provide no indication of what the "Board Specified Special objectives" were for 2019 or whether Hallett met them.

within a year. This chain of events is unlikely, but it is possible, so the Statute of Frauds does not bar Hallett's claims.

## B. Promissory Estoppel (Count Five)

To recover on a promissory estoppel claim under New York law, Hallett must prove (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance on that promise, and (3) injury to Hallett resulting from that reliance. *Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000)*.

Defendants seek summary judgment on the promissory estoppel claim on several grounds. Defendants first argue that New York does not recognize promissory estoppel in the employment context. This Court previously rejected that claim, yet defendants' renewed argument is unresponsive to the Court's ruling. Defendants have still offered no New York state court case showing that promissory estoppel is categorically unavailable in the employment context. The Court adheres to its ruling.

Defendants next argue that Hallett has not pointed to any clear and unambiguous promise. Hallett's Opposition Brief makes defendants' case for them:

> Although Plaintiff may have not been promised a specific LTIP, he was promised (including **[*47]** in writing) that the Board on behalf of the Company intended to establish an LTIP as part of Plaintiff's Employment Agreement, and Plaintiff has testified that the LTIP he expected and treated as a promise (especially after Defendants circulated Parrish's LTIP as a reference point during negotiations with Plaintiff) was his predecessor Mark Parrish's LTIP.

Opp. 12-13 (emphasis added). That said, while Hallett's brief fails to articulate a clear and unambiguous promise, his *Rule 56.1* counterstatement is more precise: "Michael Degan promised him an LTIP if he accepted the Stuart Dean CEO position." See SOF ¶ 53. This is a specific promise, but it raises other issues. Hallett cannot show reasonable, detrimental reliance on such a promise.

The Court recognizes that the reasonableness of one's reliance is generally an issue for the trier of fact. However, there are exceptions. Hallett is an experienced executive, and "when experienced businessmen and lawyers are told explicitly and clearly that a major and complex agreement will be binding only

when put in writing, then they should be rather cautious about assuming anything different." *R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 71 (2d Cir. 1984)*. This Employment Agreement contained Entire Agreement and Prior **[*48]** Agreement provisions that precluded a seasoned executive's reasonable reliance on an oral promise -- especially one, like Michael Degan's alleged promise, that predated the Employment Agreement. See *Bader v. Wells Fargo Home Mortg., Inc., 773 F. Supp. 2d 397, 415 (S.D.N.Y. 2011)* ("[P]arties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract.") (quoting *NCC Sunday Inserts, Inc. v. World Color Press, Inc., 759 F. Supp. 1004, 1011 (S.D.N.Y. 1991)*). This is especially true because Hallett participated in preparing Parrish's employment agreement, which explicitly included an LTIP framework and guaranteed Parrish an LTIP in accordance with that framework.

Hallett also cannot show damages. Hallett claims that "the LTIP he expected and treated as a promise . . . was his predecessor Mark Parrish's LTIP." Opp. 13. The LTIP component of Parrish's employment agreement provided that any LTIP award would be forfeited if Parrish resigned or was terminated, with or without cause. SOF ¶ 37. Hallett was terminated before he would have been entitled to any compensation under the Parrish LTTP, so no reasonable factfinder could find that Hallett has proved damages.

For all the foregoing reasons, the Court grants defendants' motion for summary judgment on Count Five, and dismisses that claim with prejudice.

## C. Breach of **[*49]** the Implied Covenant of Good Faith and Fair Dealing (Count Six): LTIP Negotiations

Under New York law, contracts include an implied covenant of good faith and fair dealing. One can breach the implied covenant without breaching the contract itself by failing to honor "an implied promise [that] was 'so interwoven in the whole writing' of a contract as to be necessary for effectuation of the purposes of the contract." *M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)* (quoting *Havel v. Kelsey-Hayes Co., 83 A.D.2d 380, 384, 445 N.Y.S.2d 333, 336 (4th Dep't 1981)*). Hallett argues that the defendants violated the implied covenant of good faith and fair dealing in two ways: by failing to negotiate in good faith regarding an LTIP and by terminating him pretextually.

Hallett's first argument is that the parties agreed to

2021 U.S. Dist. LEXIS 23025, *49

negotiate an LTIP, but that in conducting such negotiations "Defendants acted in bad faith." Opp. 15. The Court disagrees. Even drawing all reasonable inferences in Hallett's favor, no factfinder reasonably could find that the LTIP negotiations were conducted in bad faith.

Shea, Halstead, and the Compensation Committee corresponded with one another, with Pay Governance, and with Hallett regarding a potential LTIP on many occasions from, at least, May 2018 through November 2019. These discussions are described **[*50]** in more detail above, see supra Background Section D, but the Court sets out an abbreviated summary here:

• May 2018: Shea reported to the Board that "an update on the LTIP [would be provided] at the August Board Meeting." SOF ¶ 128.

• July 2018: Halstead emailed Shea, noting that Halstead had contacted Pay Governance, and that Hallett and Bob Cook, the Stuart Dean CFO, were pulling together information to begin to evaluate the framework for an LTIP. SOF ¶ 132.

• August 2018: Halstead described LTIP discussions to the Board as "in the preliminary stages." SOF ¶ 135.

• October 2018: Halstead emailed Cook requesting certain long-term financial planning information and stating in part, "we want to finalize the LTIP at the March [2019] meeting." SOF ¶ 138.

• January 2019: Halstead emailed Plaintiff stating that they were to discuss the "Long-Term Compensation, if necessary." SOF ¶ 143.

• February 2019: Halstead emailed the Compensation Committee, copying Plaintiff, and stated with regard to an LTIP, "both Bruce [Hallett] and I feel that we aren't ready yet to do this AND importantly this is not holding us back from achiev[e]ment." SOF ¶¶ 145-146. Hallett has identified no evidence that he contradicted **[*51]** Halstead's assertion.

• March 2019: A Compensation Committee Report for a Board meeting stated: "Management is still contemplating its long-term plan including financial projections." SOF ¶¶ 149-150. Hallett testified that management "had not provided a long term financial projection[]" as of March 2019. SOF ¶ 154; Hallett Dep. 200:23-24, 201:8-9.

• May 2019: The Compensation Committee unanimously recommended to the Board that for 2019, in lieu of an LTIP, a one-time incentive payment should be provided to Hallett. SOF ¶ 157; Jakowsky Decl. Ex. U. The Committee also

reported that the effort to discuss and design an LTIP "continues in the planning stage and will not be in place for 2019." SOF ¶ 158.

• June 2019: Hallett emailed Halstead and Shea a copy of Parrish's LTIP. SOF ¶ 160. Shea responded, attaching the Compensation Committee's discussions from 2017 regarding a potential LTIP for prior CEO Jim Degan. SOF ¶¶ 162-163.

• November 2019: Shea emailed Hallett, "It might not have been clear to you in last board meeting that the next step is to give Jon Sinkular [of Pay Governance] the three year plan (to be done for the next board meeting) and the LTIP would be generated using this and **[*52]** market information to be approved at the first board meeting in 2020." SOF ¶¶ 174-175.

• December 2019: Shea emailed the Board, stating that Hallett intended to leave the company by March 2021; LTIP negotiations ceased. SOF ¶ 187.

In sum, substantial record evidence demonstrates that Board members worked to consider a potential LTIP. Hallett responds by claiming that the Board's requests for a long-term strategic plan were pretextual delaying tactics. He points out that nothing in his Employment Agreement specified that he would need to provide a long-term strategic plan before the Board would vote on an LTIP, and he notes that other CEOs, like Parrish, were not required to provide such information. However, Hallett was in a materially different circumstance from these other CEOs because Hallett was already CEO at the time the company was preparing an LTIP. The company reasonably could have expected its CEO to do his job by providing a long-term strategic plan and other information that could *assist* the Board in evaluating an LTIP. The Board's request for such information, and its decision to delay preparing an LTIP because such information was not yet available, do not support a reasonable **[*53]** inference that the Board acted in bad faith.

Hallett's only other evidence of bad faith is that Stuart Dean treated him worse than other CEOs: Parrish received an LTIP immediately, as part of his Employment Agreement, and soon after Hallett was terminated, the Board allocated $15,000 to prepare an LTIP to offer new CEO candidates. These gripes may show that Hallett should have negotiated for a particular LTIP as a guaranteed part of his Employment Agreement, but this differential treatment alone does not support a reasonable inference of bad faith.

2021 U.S. Dist. LEXIS 23025, *53

Plaintiff has not shown a genuine dispute of material fact. Even drawing all reasonable inferences in his favor, a factfinder could not reasonably conclude that defendants failed to negotiate in good faith. Therefore, the Court grants partial summary judgment on Count Six, with respect to Hallett's claim for LTIP compensation.[101] The Court takes up Hallett's remaining argument, pretextual termination, in connection with Count One, below.

### D. Fraudulent Inducement (Count Seven)

To prevail on a claim for fraudulent inducement, Hallett must demonstrate by clear and convincing evidence that defendants (1) made a material misrepresentation, (2) knowing [*54] of its falsity, (3) intending to defraud; (4) that plaintiff reasonably relied on the misrepresentation; and (5) that plaintiff suffered damage as a result. *National Union Fire Ins. Co. of Pittsburgh v. Worley, 257 A.D.2d 228, 690 N.Y.S.2d 57, 60 (1999)*. However, a claim for failure to perform a contract sounds only in breach of contract, not in fraudulent inducement. "Simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim." *Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001)*.

As noted, Hallett claims that when he was being recruited to be CEO, Michael Degan, the Chairman of the Board, promised him compensation resembling Parrish's, including an LTIP. He alleges that this representation was fraudulent because Michael Degan and Stuart Dean never intended that he would receive an LTIP.

This claim is not remotely colorable. First, as already noted in connection with promissory estoppel, Hallett cannot show reasonable reliance and damages. See supra Part V.B.

---

[101] Defendants also argue that claims for breach of the implied covenant of good faith and fair dealing require "an affirmative act, not merely a failure to act." *Phx. Racing, Ltd. v. Lebanon Valley Auto Racing Corp., 53 F. Supp. 2d 199, 216 (N.D.N.Y. 1999)*; see *H.S.W. Enterprises, Inc. v. Woo Lae Oak, Inc., 171 F. Supp. 2d 135, 141 (S.D.N.Y. 2001)*. Federal courts have so held, relying upon Second Circuit dicta. However, this Court is aware of no New York state court case categorically requiring proof of an affirmative act rather than an omission, so the Court declines to rely upon this ground for summary judgment.

Separately, Hallett has not shown that a reasonable factfinder could find fraudulent intent by clear and convincing evidence. It is true that circumstantial evidence may suffice, see *Century Pac., Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 222-223 (S.D.N.Y. 2007)*, but for reasons already [*55] stated, Hallett's claim finds no reasonable basis in the evidence, circumstantial or otherwise.

For these reasons, the Court grants defendants' motion for summary judgment on Count Seven, and dismisses that claim with prejudice.

### E. Negligent Misrepresentation (Count Eight)

To recover on a negligent misrepresentation claim, Hallett must show that (1) due to a special relationship, defendants owed a duty to give correct information to the plaintiff; (2) defendants made a false representation that they should have known was false; (3) they knew that the information was desired by plaintiff for a serious purpose; (4) plaintiff intended to rely and act upon it; and (5) he did rely upon it, reasonably, to his detriment. *Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000)*.

This claim, like the last, is not remotely colorable. First, as a matter of law, Hallett has not demonstrated the existence of a special relationship. The special relationship must be in the nature of a "fiduciary" relationship. See *Stewart v. Jackson & Nash, 976 F.2d 86, 90 (2d Cir. 1992)*. Courts have held that "[t]he employer-employee relationship is not fiduciary in nature." *Kwon v. Yun, 606 F. Supp. 2d 344, 369 (S.D.N.Y. 2009)*. Plaintiff offers no response to this point and fails to explain why the employer-employee relationship constitutes a special relationship for purposes of [*56] negligent misrepresentation.

The claim also fails because "[n]o action for negligent misrepresentation lies where the alleged misrepresentation is promissory rather than factual." *U.S. West Fin. Servs. v. Tollman, 786 F. Supp. 333, 344 (S.D.N.Y. 1992)*. Here, the alleged misrepresentation was that Stuart Dean would provide Hallett an LTIP, which is a promissory representation, not a factual one.

Finally, as a third independent basis for summary judgment, for the reasons stated above in connection with promissory estoppel, Hallett cannot demonstrate reliance and damages. See supra Part V.B.

For all these reasons, the Court grants defendants'

motion for summary judgment on Count Eight, and dismisses that claim with prejudice.

### F. Breach of Fiduciary Duty (Count Nine)

The Amended Complaint adds a new claim against Shea, Halstead, Adrienne Bailey, and Chris Degan for breach of fiduciary duty. Hallett alleges that these defendants, as members of the Board of Directors, breached their fiduciary duties by manufacturing pretextual reasons to fire Hallett.

The individual defendants argue that they owed no fiduciary duty to Hallett, and they are correct. E.g., *Rather v. CBS, 68 A.D.3d 49, 55, 886 N.Y.S.2d 121 (1st Dept 2009)* ("The law . . . enunciated in every reported appellate-division-level case . . . is that employment relationships **[*57]** do not create fiduciary relationships."). Hallett responds that they owed a fiduciary duty to the company and its shareholders, Opp. 20-21, but this is a non sequitur because Hallett seeks to recover damages he allegedly suffered; he is not suing on behalf of Stuart Dean.

Because the individual defendants owed no fiduciary duty to Hallett, the Court grants defendants' motion for summary judgment on Count Nine, and dismisses that claim with prejudice.

### G. Quantum Meruit/Unjust Enrichment (Count Eleven)

The Amended Complaint includes a new claim for quantum meruit, also known as unjust enrichment. Hallett alleges that Stuart Dean was unjustly enriched by his performance as CEO.

To prevail on his unjust enrichment claim, Hallett must prove (1) that defendants benefitted (2) at Hallett's expense, and (3) that equity and good conscience require restitution. *Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)*. The quasi-contractual remedy of quantum meruit or unjust enrichment protects those without contracts. When an employee enters into an employment agreement and receives a salary, courts will not permit him to claim that the employment agreement unjustly enriches his employers. See, e.g., *Levion v. Societe Generale, 822 F. Supp. 2d 390 (S.D.N.Y. 2011)*. In particular, "New York courts have refused to **[*58]** permit litigants to use a quasi-contractual theory as a backdoor to enforce an unenforceable oral bonus promise." *Buckman v. Calyon Securities (USA) Inc., 817 F. Supp. 2d 322, 339*

*(S.D.N.Y. 2011)*.

Because Hallett had an Employment Agreement and was paid his Base Salary, Hallett has not stated a claim for unjust enrichment, and the Court grants defendants' motion for summary judgment on Count Eleven, and dismisses that claim with prejudice.

## VI. Wrongful Termination (Counts One and Six)

Finally, the Court Lurns to Hallett's claims for wrongful termination: a claim for breach of contract (Count One) and a claim for breach of the implied covenant of good faith and fair dealing (Count Six). The Court takes up these claims together because they are closely intertwined. They are not entirely duplicative, however, because Hallett might prevail under the implied covenant claim but not the breach of contract claim if the company had the authority to terminate him for cause but did so for pretextual reasons. See *Thompson v. Advanced Armament Corp., LLC, 614 F. App'x 523, 525 (2d Cir. 2015)* (summary order) (affirming in pertinent part judgment against employer that pretextually fired employee for cause).

Hallett claims that after he refused to step down, he was fired wrongfully and/or pretextually for cause, in violation of the Employment Agreement. If **[*59]** Hallett had been terminated without cause, he would have been entitled to six additional months of base salary. The Court concludes that a reasonable factfinder could find that Hallett was not properly terminated for cause, for at least three reasons: (1) failure to provide proper notice, (2) a lack of evidence that the Board ever formally considered the issue of "cause," and (3) evidence to support a reasonable inference that Hallett was terminated for reasons other than those offered.

First, the Employment Agreement required that if the Board terminated Hallett, it do so by a written notice "which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of employment under the provision so indicated." Employment Agreement § 10(d). However, defendants provided no such reasonably detailed notice when they terminated Hallett on March 8, 2020.

The evidence tends to show that the Board began considering disciplining Hallett in late February 2020 after Israni, the outgoing director of Human Resources, complained about Hallett. Following an investigation by

the **[*60]** Executive Board, at a March 5, 2020 meeting the Board decided to let Hallett resign or to terminate him without cause. On March 7, 2020, Shea spoke with Hallett to convey this offer. During the conversation, Hallett again told Shea that he had been in conversations with a potential buyer, and again refused to name that entity. Hallett told Shea that he would not resign, and the Board voted on March 8, 2020, to terminate him.

Defendants allege that, after Shea spoke with Hallett on March 7, they

> reconsidered whether they would move forward with their original plan to terminate Plaintiff without cause, or if they would vote to terminate Plaintiff with cause. Ultimately, this new information made it clear that Plaintiff's termination could only be for cause. Accordingly, on March 8, 2020, pursuant the express wording of Plaintiff's Employment Agreement, Defendant Stuart Dean chose to terminate Plaintiff for cause due to his dishonesty by failing to inform the Board of his sales related activities and for continuing to engage in such activities notwithstanding the Board's clear prior directives.

MSJ 37 (internal quotation marks, citations, and brackets omitted). Specifically, defendants' **[*61]** brief claims that they "terminated Plaintiff under Section 10(a)(ii)(B), 'dishonesty in the performance of Executive's duties hereunder.'" Id. at 36. But this "dishonesty" explanation, as far as the Court can tell, is a post hoc rationale not grounded in the contemporaneous evidence. The company did not offer this as the basis for Hallett's termination at the time he was terminated. And when they purported to justify terminating him for cause five days later, they offered a different rationale.

Specifically, Shea's March 13, 2020 letter to Hallett wrote that the Board had terminated him for cause because of "acts of willful misconduct in connection with your duties as CEO as it relates to unapproved and prohibited negotiations with a potential business partner thereby warranting termination under Section 10(a)(ii)(D)." ECF No. 57-3. Perhaps this belated Notice of Termination was enough to satisfy Section 10, but a reasonable factfinder could conclude otherwise.

Moreover, the contemporaneous record evidence tends to suggest that the Stuart Dean Board did not formally vote to terminate Hallett for cause, at all. Shea's March 8, 2020 letter terminating Hallett equivocates. Jakowsky

Decl. Ex. AAA, at D000963 ("If the Company determines that there **[*62]** is no cause for your termination pursuant to Section 10 of the Employment Agreement, you will be provided with a Separation Agreement and General Release pursuant thereto."). The Board's formal motion to terminate Hallett incorporated that letter by reference. Id. at D000964 ("A motion was made by Kristen Schorp that the Stuart Dean Board of Directors terminate Bruce Hallett as President & CEO of Stuart Dean Co., Inc. as outlined in the letter of March 8, 2020 . . . . Motion passed unanimously.") (emphasis added). This evidence creates a genuine dispute regarding whether the Board ever formally terminated Hallett for cause.

Finally, even if Stuart Dean's termination of Hallett facially complied with the Employment Agreement, a reasonable factfinder could infer that the company's explanations for his termination were pretextual. Defendants argue that Hallett wrongfully refused to name Pritchard in his March 7, 2020 conversation with Shea, and perhaps his decision to do so, despite the Board's explicit directive, constituted "willful misconduct." But the Board was aware of Hallett's behavior months earlier. Even after the Board decided in November 2019 that its message to the world was "Stuart **[*63]** Dean is not for sale," and even after it conveyed that message to Hallett in unambiguous terms at the December 2019 Board meeting, Hallett again called Shea, saying he wanted Stuart Dean to enter a non-disclosure agreement with a prospective acquiror so that Hallett could share confidential information. SOF ¶ 274. Shea asked for the interested party's name, and Hallett refused to provide it. SOF ¶¶ 275-276. Did Shae respond by seeking to have Hallett terminated? No.

A reasonable juror might wonder, if Stuart Dean viewed Hallett's continued discussions with Pritchard and/or his refusal to name the prospective buyer as "dishonest" or "willful misconduct," then why did it wait until March 2020 to terminate him? That juror might notice that the Board began considering discipline not because of Hallett's months of negotiations with Pritchard, but rather because of Israni's allegations. Defendants have never contended that those allegations would have permitted the company to fire Hallett for cause. A reasonable juror could, thus, infer that Hallett's refusal to identify Pritchard on March 7 offered a useful excuse to terminate Hallett for cause, but that the real impetus for termination **[*64]** was Israni's allegations.

Because a reasonable factfinder could conclude that Hallett was wrongfully or pretextually terminated, the

Court denies defendants' motion for summary judgment as to Count One and as to Count Six, insofar as Count Six seeks damages for pretextual termination.

For the foregoing reasons, the Court hereby orders:

1. Defendants' motion for summary judgment, ECF No. 66, is granted as to Counts Two through Five and Seven through Eleven.

2. Defendants' motion for summary judgment is denied as to Count One (breach of contract--wrongful termination).

3. Defendants' motion for summary judgment is granted in part and denied in part as to Count Six (breach of the implied covenant of good faith and fair dealing). Specifically, the Court grants summary judgment for defendants on Count Six insofar as Hallett claims damages for failure to award him bonus compensation. The Court denies summary judgment on Count Six insofar as Hallett claims damages for pretextual termination.

4. The parties shall jointly call Chambers by February 8, 2021 to set a date for trial.

5. The Clerk of Court is respectfully directed to close docket entry number 66.

SO ORDERED.

Dated: New York, NY

February 5, **[*65]**  2021

/s/ Jed S. Rakoff

JED S. RAKOFF, U.S.D.J

---

*End of Document*