# Exhibit C

 Neutral

As of: March 1, 2021 9:30 PM Z

## *Joshi v. Trs. of Columbia Univ. in N.Y.*

United States District Court for the Southern District of New York

January 25, 2021, Decided; January 25, 2021, Filed

17-cv-4112 (JGK)

### Reporter

2021 U.S. Dist. LEXIS 14344 *; __ F. Supp. 3d __; 2021 WL 236032

SHAILENDRA JOSHI, Plaintiff, - against - THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, and COLUMBIA UNIVSERSITY COLLEGE OF PHYSICIANS AND SURGEONS, Defendants.

**Prior History:** *Joshi v. Trs. of Columbia Univ, 2018 U.S. Dist. LEXIS 89280, 2018 WL 2417846 (S.D.N.Y., May 28, 2018)*

## Core Terms

misconduct, retaliation, promotion, funding, non-clinical, Policies, appointment, external, emailed, lab, alleges, compliance, fair dealing, Stmt, summary judgment, disclaimers, reputation, clinical, faculty, protected activity, promissory estoppel, undisputed evidence, promise, adverse employment action, good faith, defendants', protections, contracts, undisputed material fact, covenant of good faith

## Case Summary

### Overview

HOLDINGS: [1]-The defendants were entitled to summary judgment as to plaintiff's breach of contract claim because there was no basis to conclude that defendants retaliated against plaintiff or failed to protect him from retaliation in the form of denial of his promotion to Full Professor rather the promotion process was delayed due to his unwillingness to participate in the process by declining to meet with Division Chief and had nothing to do with his complaint of research misconduct against Division Chief; [2]-The defendants were entitled to summary judgment dismissing plaintiff's claim under *N.Y. Not-for-Profit Corporation Law § 715-b* because defendants adopted relevant policies to protect whistleblowers and diligently implemented them such as conducting an investigation of plaintiff's claims against Division Chief and offering to protect plaintiff against retaliation.

### Outcome

Motion for summary judgment granted.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

2021 U.S. Dist. LEXIS 14344, *14344

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

**HN1**[ ] **Summary Judgment, Burdens of Proof**

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*; The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

**HN2**[ ] **Entitlement as Matter of Law, Appropriateness**

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Summary judgment is improper if any evidence in the record from any source would enable a reasonable inference to be drawn in favor of the nonmoving party. If the moving party meets its burden, the nonmoving party must produce evidence in the record showing the existence of a genuine issue of material fact and may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.

Business & Corporate Compliance > ... > Education Law > Administration & Operation > Employment Regulations & Rules

Labor & Employment Law > ... > At Will Employment > Exceptions > Implied Contracts

Labor & Employment Law > Wrongful Termination > Breach of Contract > Implied Contracts

**HN3**[ ] **Education, Employment Regulations & Rules**

Under New York law, a plaintiff can bring a breach of contract action where the plaintiff can show that the employer made its employee aware of an express written policy limiting the employer's ability to take adverse employment actions, and the employee detrimentally relied on that policy in accepting employment. Accordingly, workplace policies, including university policies that relate to a university's relationship with its faculty can create binding and actionable contracts. Such policies can form part of the essential employment understandings between a member of the Faculty and the University and can have the force of contract.

Business & Corporate Compliance > ... > Contract Formation > Consideration > Detrimental Reliance

Labor & Employment Law > Wrongful Termination > Breach of Contract > Employer Handbooks

Labor & Employment Law > Employment Relationships > Employment Contracts > Formation & Letter Agreements

Labor & Employment Law > ... > At Will Employment > Exceptions > Implied Contracts

Labor & Employment Law > ... > At Will Employment > Exceptions > Express Contracts

2021 U.S. Dist. LEXIS 14344, *14344

## HN4[↓] Consideration, Detrimental Reliance

Routinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements, and that the plaintiff must establish that the plaintiff detrimentally relied on that policy in accepting employment. Indeed, a plaintiff must allege that the plaintiff was aware of the relevant policy prior to being hired and relied on the policy in accepting the offer of employment.

Evidence > Inferences & Presumptions > Inferences

## HN5[↓] Inferences & Presumptions, Inferences

An employee seeking to rely on a provision arguably creating a promise must also be held to reliance on the disclaimer. A clear disclaimer can prevent the creation of a contract and negate any protection a plaintiff can infer from such a policy.

Evidence > Inferences & Presumptions > Inferences

Labor & Employment
Law > Discrimination > Retaliation

## HN6[↓] Inferences & Presumptions, Inferences

When the alleged adverse employment action began before the protected activity, the timing does not lead to an inference of retaliation.

Civil Procedure > Judgments > Summary
Judgment > Burdens of Proof

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > Nonmovant
Persuasion & Proof

## HN7[↓] Summary Judgment, Burdens of Proof

Speculation alone is insufficient to defeat a motion for summary judgment.

Labor & Employment
Law > ... > Retaliation > Elements > Adverse
Employment Actions

## HN8[↓] Elements, Adverse Employment Actions

Alleged adverse employment action cannot be retaliatory if it occurred before the protected conduct.

Labor & Employment Law > ... > Employment
Practices > Adverse Employment
Actions > Reassignments & Transfers

## HN9[↓] Adverse Employment Actions, Reassignments & Transfers

Merely changing someone's job duties does not automatically qualify as an adverse employment action when the changed duties were within the position description and there is no evidence that these duties were inferior or less prestigious than the plaintiff's old job duties. Under circumstances, a change in duties—even from a job that the plaintiff cherished—does not constitute an adverse employment action. Subjective dissatisfaction with assignments does not constitute adverse employment action.

Labor & Employment
Law > ... > Retaliation > Elements > Causation

## HN10[↓] Elements, Causation

In a retaliation claim, even shorter gaps in time between protected activity and adverse employment action have been found to sever the causal relation.

Business & Corporate
Compliance > ... > Breach > Breach of Contract
Actions > Elements of Contract Claims

## HN11[↓] Breach of Contract Actions, Elements of Contract Claims

Under New York law, the inability to prove damages is fatal to a breach of contract claim. A plaintiff must prove that a defendant's breach directly and proximately caused his or her damages. Damages to reputation generally are not recoverable in a breach of contract action under New York law.  To obtain contract damages for damage to reputation, vague assertions will not suffice and specific business opportunities lost as a result of the plaintiff's diminished reputation are necessary.

faith.

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

*HN12*[⤓] **Contract Interpretation, Good Faith & Fair Dealing**

Implicit in every contract is a covenant of good faith and fair dealing which encompasses any promise that a reasonable promisee would understand to be included. Even if a party is not in breach of its express contractual obligations, it may be in breach of the implied duty of good faith and fair dealing when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit or benefit of its bargain. The covenant of good faith and fair dealing embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

*HN13*[⤓] **Contract Interpretation, Good Faith & Fair Dealing**

Absent the existence of a contract, a claim alleging breach of the implied covenant of good faith and fair dealing is legally unavailing.

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Evidence > Burdens of Proof > Allocation

*HN14*[⤓] **Contract Interpretation, Good Faith & Fair Dealing**

A party to a contract violates the covenant of good faith and fair dealing when the party directly violates an obligation that may be presumed to have been intended by the parties. The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship. Because there is a presumption that all parties act in good faith, the party alleging a breach of the covenant of good faith and fair dealing has the burden to prove the absence of good

Business & Corporate Compliance > ... > Contract Formation > Consideration > Detrimental Reliance

Contracts Law > ... > Affirmative Defenses > Estoppel > Statute of Frauds

Real Property Law > ... > Contracts of Sale > Enforceability > Statute of Frauds

Business & Corporate Compliance > ... > Contract Formation > Consideration > Promissory Estoppel

*HN15*[⤓] **Consideration, Detrimental Reliance**

In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the plaintiff. The doctrine of promissory estoppel can be invoked to enforce a promise, absent consideration, where there has been detrimental reliance, or to enforce a contract otherwise barred by the Statute of Frauds.

Business & Corporate Compliance > ... > Whistleblower Protection Act > Scope & Definitions > Protected Activities

Business & Corporate Law > Nonprofit Corporations & Organizations > Management Duties & Liabilities

*HN16*[⤓] **Whistleblower Protection Act, Protected Activities**

*N.Y. Not-For-Profit Corporation Law §715-b(a)* provides that certain non-for-profit corporations must adopt a whistleblower policy to protect from retaliation persons who report suspected improper conduct. *N.Y. Not-For-Profit Corporation Law § 715-b(a)*.

Business & Corporate Law > Nonprofit Corporations & Organizations > Management Duties & Liabilities

*HN17*[⤓] **Nonprofit Corporations & Organizations, Management Duties & Liabilities**

*N.Y. Not-For-Profit Corporation Law § 715-b* creates a private right of action for employees who are retaliated

against or subjected to an adverse employment action.

Business & Corporate Law > Nonprofit Corporations & Organizations > Management Duties & Liabilities

**HN18[↓] Nonprofit Corporations & Organizations, Management Duties & Liabilities**

*N.Y. Not-For-Profit Corporation Law § 715-b* requires the boards of nonprofits to adopt, and oversee the implementation of, and compliance with the whistleblower policy, *N.Y. Not-for-Profit Corp. Law § 715-b(a)*.

**Counsel: [*1]** For Shailendra Joshi, Plaintiff: Bruce Alden Langer, Janet Cohn Neschis, Jonathan Robert Jeremias, LEAD ATTORNEYS, Steven J. Hyman, McLaughlin and Stern, LLP, New York, NY.

For The Trustees of Columbia University in the City of New York, Columbia University in the City of New York, Columbia University College of Physicians and Surgeons, Defendant: Andrew William Schilling, LEAD ATTORNEY, Brian Jeffrey Wegrzyn, Buckley Sandler LLP, New York, NY.

**Judges:** John G. Koeltl, United States District Judge.

**Opinion by:** John G. Koeltl

# Opinion

## OPINION AND ORDER

### JOHN G. KOELTL, District Judge:

Dr. Shailendra Joshi, an anesthesiologist at Columbia University College of Physicians and Surgeons ("CUCPS"), an affiliate of Columbia University in the City of New York (the "University"), brings this action against

CUCPS, the University, and the Trustees of the University (together with CUCPS and the University, the "defendants"). After this Court's Opinion and Order on the defendants' motion to dismiss, ECF No. 38, there are four remaining causes of action for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) promissory estoppel, and (4) violation of *Section 715-b of the New York Non-Profit Revitalization Act of 2013* **[*2]** , *N.Y. Not-for-Profit Corp. Law § 715-b*. Dr. Joshi alleges that the defendants retaliated against him or otherwise failed to protect him from retaliation because he made an allegation of research misconduct against a distinguished colleague. The plaintiff initiated this case by filing a complaint on June 1, 2017, which he amended on August 31, 2017. On May 29, 2018, this Court granted in part and denied in part the defendants' motion to dismiss. The plaintiff then moved for a temporary restraining order and a preliminary injunction to prevent the defendants from closing his lab. This Court denied the motions for a temporary restraining order and preliminary injunction on July 23, 2020 and August 31, 2020 respectively. The defendants now move for summary judgment dismissing all the remaining causes of action pursuant to *Federal Rule of Civil Procedure 56*. For the following reasons, the defendants' motion for summary judgment is **granted**.

## I. BACKGROUND

### A. Events Prior to the Research Misconduct Allegation

#### 1. Employment at the University

Dr. Joshi joined the University in 1997 as an Assistant Professor of Anesthesiology in the Department of Anesthesia (the "Department") in the Neuroanesthesiology Division. See Defs.' 56.1 Stmt. ¶ 1. Upon accepting his initial **[*3]** offer of employment, Dr. Joshi signed an employment agreement, but he did not enter into any other agreements. Id. ¶¶ 2-3; Wegrzyn Decl. Ex. B, Joshi Tr. 13. Dr. Joshi's appointment is evaluated for renewal every two years. See Joshi Decl. ¶ 2.

Dr. Joshi's initial offer of employment provided that Dr. Joshi would have "teaching, research and administrative duties" as well as "professional clinical services incident

to [his] employment." Wegrzyn Decl. Ex. A. Part of his remuneration as an Assistant Professor was for "clinical supplement[s]" in addition to his "base salary." Id. Throughout his time as a professor at the University, Dr. Joshi has made clear that he believes his clinical assignments interfere with his research. One such assignment was administration of anesthesia to patients receiving electroconvulsive therapy ("ECT"). The amount of clinical assignments for a professor in the Department traditionally is tied to the amount of external funding that a professor has for research. See Wegrzyn Decl. Ex. N, Division Chief Tr. 49.

Faculty members who received funding through a research grant were guaranteed a specified amount of non-clinical time that they could devote to research. [*4] Id. This is also known as protected research time. The Department covers the cost of non-clinical time that is not supported by external funding. See Defs.' 56.1 Stmt. ¶ 9. From March 2001 to February 2006, Dr. Joshi had a K08 grant from the National Institute of General Medical Sciences that guaranteed him 75% protected research time. Wegrzyn Decl. Ex. C; Defs.' 56.1 Stmt. ¶ 10. He had two R01 grants from the National Cancer Institute from September 2008 to July 2014 and April 2011 to March 2017, each of which guaranteed him 30% protected research time. Wegrzyn Decl. Ex. C; Defs.' 56.1 Stmt. ¶ 11. From November 2013 to July 2018, Dr. Joshi submitted seven grant proposals to the National Cancer Institute or the National Institutes of Health, but he did not receive funding from any of those proposals, although one remains pending. Id. Therefore, Dr. Joshi's external funding guaranteed him 75% protected research time from March 2001 to February 2006, 60% protected research time from April 2011 through July 2014, and 30% protected research time from August 2014 through March 2017. See Defs.' 56.1 Stmt. ¶¶ 10, 13. Based on external funding, Dr. Joshi was not guaranteed any non-clinical [*5] time after March 2017 because he did not secure external funding. Id. ¶ 13. Dr. Joshi never was given less non-clinical time than the amount guaranteed by his external funding. See Wegrzyn Decl. Ex. B, Joshi Tr. 178; Wegrzyn Decl. Ex. O at Exs. A & B. The plaintiff contends that, despite the amounts of protected research time he was owed as a function of his external funding, there was a Department practice of providing for more non-clinical time in addition to the amount strictly guaranteed by external funding. See Joshi Decl. ¶ 30. The defendants contend that Dr. Joshi was not entitled to any non-clinical time beyond the protected research time he was guaranteed from external grants.

Soon after joining the Department, Dr. Joshi expressed his disagreement with the former Division Chief and became engulfed in interpersonal conflicts with the Division Chief in various contexts.[1] For example, in 2001, Dr. Joshi emailed the Division Chief claiming that the Division Chief unfairly allocated non-clinical time, and in July 2005, Dr. Joshi sent 2 emails accusing the Division Chief of lying and poor leadership. See Wegrzyn Decl. Exs. E, F, G; Defs.' 56.1 Stmt. ¶¶ 16-17. In 2009, Dr. Joshi sent [*6] several emails to the Division Chief and then-Chair of the Department, Dr. Margaret Wood, alleging that the Division Chief had made "repeated threats of firing" Dr. Joshi as a form of "intimidation for protesting the misallocation of [his] K08 time." Wegrzyn Decl. Ex. H. The Division Chief responded that the Division Chief "never threatened to fire [Dr. Joshi]" to which Dr. Joshi replied "YOU ARE WRONG YOU SAID IT IN 2004, in 2006 and in CORROL [sic] HIRSCHMAN'S OFFICE WHERE YOU SAID THAT 'I HAD DUG MY GRAVE', 'I SHOULD SEEK ANOTHER JOB' AND 'THAT MY ACADEMIC CARRER [sic] IS OVER.'" Id. To resolve any dispute about non-clinical time, in 2009, the Division Chief told Dr. Joshi that the Division Chief "would like to sit down with [Dr. Joshi]" in order to "discuss [Dr. Joshi's] non-clinical time." Wegrzyn Decl. Ex. I. Dr. Joshi declined the offer to discuss the non-clinical time and told the Division Chief he was "fed up with lies and half truthe [sic] deception and spin." Id.; Wegrzyn Decl. Ex. B, Joshi Tr. 298. In January 2011, Dr. Joshi emailed a colleague that the Department's actions "fit[] into the pattern of ongoing discrimination against my research an [sic] continued denial of [*7] opportunities," whether they are lab space, research time, departmental funds, promotion, tenure, access to medical student, fellows and residents, teaching and administrative opportunities" that has been "very destructive to my career." Wegrzyn Decl. Ex. J. This rancorous interpersonal conflict between Dr. Joshi and the Division Chief predated Dr. Joshi's allegation of research misconduct against the Division Chief, which happened years later.

## 2. Clinical Time and ECTs

When Dr. Joshi's K08 grant was in effect, Dr. Joshi had 75% protected research time and did not perform ECTs.

---

[1] Due to the nature of Dr. Joshi's allegation of research misconduct against the Division Chief, this Opinion and Order refers to this individual only as the "Division Chief."

See Defs.' 56.1 Stmt. ¶ 26. In February 2006, when the K08 grant lapsed, Dr. Joshi no longer had protected research time and resumed ECTs. Id. ¶ 27. When possible, the Department accommodated Dr. Joshi's request not to be assigned to ECTs. Id. ¶ 29. However, performing ECTs was a responsibility of the physicians in the Neuroanesthesia Division. See Wegrzyn Decl. Ex. K, Wood Tr. at 105. In or around the time Dr. Joshi received his two R01 grants, he had protected research time and the Department stopped assigning him ECTs. See Defs.' 56.1 Stmt. ¶¶ 30-31; Wegrzyn Decl. Ex. B, Joshi Tr. 179, 184. At one point in 2012, [*8] Dr. Joshi came to an agreement with the Department to limit his assignments to ECTs, but Dr. Wood emailed that "under no circumstances" would she "guarantee" more non-clinical time than was guaranteed by Dr. Joshi's external funding. Jeremias Decl. Ex. 9.

**3. Promotion to Associate Professor**

Dr. Wood and others in the Department repeatedly approached Dr. Joshi to encourage him to prepare his promotion materials. For example, in June 2011, Dr. Wood emailed Dr. Joshi to set up a meeting to "move ahead with [his] promotion." Wegrzyn Decl. Ex. R. Dr. Joshi declined to meet with Dr. Wood regarding his promotion because Dr. Joshi allegedly believed the promotion process would be "an unfair and hostile process." Wegrzyn Decl. Ex. S. By August 2011, Dr. Joshi withdrew himself from consideration for promotion. See Wegrzyn Decl. Ex. B, Joshi Tr. 246; Wegrzyn Decl. Ex. S. In June 2014, members of the Department again encouraged Dr. Joshi to apply for a promotion, and the Vice Chair of Research in the Department, Dr. Emala, agreed to "attend every meeting" relating to Dr. Joshi's promotion. Wegrzyn Decl. Ex. T. However, Dr. Joshi told Dr. Emala to "just forget it" and that Dr. Joshi would put the [*9] promotion "in the back burner" because Dr. Joshi believed it would be "exceedingly painful to go to someone like Wood who is morally bankrupt and dishonest, basically I see her as pure evil." Id.

In March 2015, Dr. Joshi emailed Dr. Wood requesting a promotion, noting that his previous grant proposal denials were in part because he had not received a promotion. See Wegrzyn Decl. Ex. U; Wegrzyn Decl. Ex. B, Joshi Tr. 306. However, Dr. Joshi never sought an in-person meeting with Dr. Wood. See Wegrzyn Decl. Ex. B, Joshi Tr. 321. In fact, over two years later in October 2017, when asked why he was still at the Assistant Professor rank, Dr. Joshi admitted to a colleague in an email that Dr. Joshi "never applied for a

promotion as [he] was very uncomfortable with the ethics of [the] previous [C]hair." Wegrzyn Decl. Ex. V.

**B. Dr. Joshi's Report of Research Misconduct**

**1. University Policies**

The two relevant policies at issue in this case are Columbia's Research Misconduct Policy, and Columbia's Non-Retaliation Policy (together, the "Policies").

The Columbia University Institutional Policy on Misconduct in Research (the "Research Misconduct Policy") is contained in the Columbia University Faculty [*10] Handbook. See Kestler Decl. Ex. E. The relevant version of the Research Misconduct Policy was issued in February 2006. Joshi Decl. Ex. B. Dr. Joshi received a copy of the printed version of the Columbia University Faculty Handbook when he was first hired, and he keeps a copy of it in his office. See Defs.' 56.1 Stmt. ¶ 95. In addition to the hard copy version, there are online versions of the Research Misconduct Policy available. See Jeremias Decl. Ex. 74; Joshi Decl. ¶ 16 & Ex. B. The third page of the hard copy version of the Columbia University Faculty Handbook contains a disclaimer under a heading entitled "Reservation of University's Rights" that reads, in part:

> This Faculty Handbook is intended only to provide information for the guidance of Columbia University faculty and officers of research . . . . Anyone who needs to rely on any particular matter is advised to verify it independently. The information is subject to change from time to time, and the University reserves the right to depart without notice from any policy or procedure referred to in this Handbook. The Handbook is not intended to and should not be regarded as a contract between the University and any faculty member [*11] or other person. Kestler Decl. Ex. E.

The Research Misconduct Policy sets forth procedures related to allegations of research misconduct and provides safeguards for the parties and witnesses. Id. The policy states that the University shall ensure that the complainant is treated "fairly and reasonably" and that "all reasonable and practical efforts are made to protect the Complainant from potential or actual retaliation." Id. The complainant also has various

procedural rights and rights of notice pursuant to the policy. Id. The policy provides for a general timeline of a misconduct inquiry, but also provides that "one or more reasonable extensions" are permissible if "necessary or appropriate." Id.

Pursuant to the Research Misconduct Policy, "research misconduct" is defined as "any Fabrication, Falsification or Plagiarism in proposing, performing or reviewing Research or reporting Research results." Id. The policy encourages individuals to resolve potential issues informally prior to beginning a formal research misconduct inquiry. Id. If an individual is unable to resolve informally the individual's concerns, he or she can make a formal allegation in writing and deliver it to the relevant **[*12]** body. Id.

The Columbia University Non-Retaliation Policy (the "Non-Retaliation Policy") was issued in March 2014. See Kestler Decl. Ex. A. The Non-Retaliation Policy is part of Columbia's "Essential Policies" that can be found on the University's website. Kestler Decl. ¶ 5 & Ex. B. The Essential Policies contain the following disclaimers:

> Information presented here is subject to change, and the University reserves the right to depart without notice from any policy or procedure referred to in this online reference. These Essential Policies are not intended to and should not be regarded as a contract between the University and any student or other person. Kestler Decl. Ex. B.

The Non-Retaliation Policy prohibits retaliation against any person who files a compliance report, cooperates with an investigation, or seeks guidance on compliance. See Kestler Decl. ¶ 4 & Ex. A. The Non-Retaliation Policy defines "retaliation" as "any action, statement, or behavior that is designed to punish an individual for filing a compliance report, cooperating with a compliance investigation, seeking guidance regarding a compliance concern or to deter one from taking such action." Kestler Decl. Ex. A. The term **[*13]** "retaliation" also includes "intimidation, adverse action against an employee regarding the terms and conditions of employment, such as termination, demotion, or suspension, as well as related threats of such actions." Id.

## 2. Dr. Joshi's Allegation

In December 2014, Dr. Joshi learned that the Division Chief received a Departmental research award for best clinical paper. See Defs.' 56.1 Stmt. ¶ 77. That month, Dr. Joshi emailed Dr. Emala, stating that Dr. Joshi

noticed inconsistencies in the data set used in connection with the paper. See Wegrzyn Decl. Ex. W. Dr. Emala responded that Dr. Joshi and Dr. Emala should discuss the issue in person. Id. Dr. Joshi responded that Dr. Emala should "[f]orget this" and that Dr. Joshi was "obviously pissed with [the Division Chief] for threatening my job, insulting me in 2007 and then lying about it and so I see all his actions in that light." Id. Dr. Joshi continued that the Division Chief "might just be sloppy in writing up his papers" and that "[t]his is a distraction." Id. Dr. Joshi concluded the email by telling Dr. Emala that he "[doesn't] have to do anything." Id.

Nonetheless, on December 19, 2014, Dr. Joshi emailed the Division Chief about **[*14]** the alleged data inconsistency. See Wegrzyn Decl. Ex. X. A few hours later, the Division Chief responded, "Happy to discuss with you." Id. Dr. Joshi replied that "[t]here is no discussion here, it either [sic] yes or no..isnt [sic] it!" Id. (ellipses in original). Then, on December 24, 2014, Dr. Joshi emailed Dr. Emala to tell him that the Division Chief "has not yet given me a direct answer" about the data inconsistency. Wegrzyn Decl. Ex. Y. Dr. Emala responded that he would be happy to meet with Dr. Joshi alone or together with the Division Chief to discuss Dr. Joshi's concerns. Id. Instead of meeting with Dr. Emala and the Division Chief, a few days later, Dr. Joshi emailed several members of the Department saying: "I just want[ed] to give all the example of the BS that [the Division Chief] is up to...Whether it is teaching, mentoring, fellowship position, administrative experience, denying academic opportunities and overt harassment and verbal abuse." Wegrzyn Decl. Ex. Z (ellipses in original). Dr. Joshi continued that the Division Chief "is not an inert entity but an active participant in destroying people's carriers [sic] and work" and that "[p]eople do not know the dark side **[*15]** of [the Division Chief] that I do." Id.

A few months later, on April 3, 2015, Dr. Joshi wrote a letter to Naomi Schrag, the Vice President for Research Compliance, Training, and Policy regarding his concerns of research misconduct. See Schrag Decl. ¶ 2. Shortly thereafter, Ms. Schrag and Dr. Strauss, the Chair of the Standing Committee on the Conduct of Research (the "Standing Committee"), met with Dr. Joshi. Id. ¶ 3. Ms. Schrag, Dr. Strauss, and Dr. Joshi agreed to try to resolve the issue informally. Id. ¶¶ 3-4. Ms. Schrag and Dr. Strauss engaged a biostatistician to review the data in question and they also had several meetings and phone calls with the Division Chief in response to Dr. Joshi's concerns. Id. ¶ 4. In December 2015, Ms. Schrag, Dr. Strauss, and Dr. Joshi met again,

Case 1:20-cv-02489-LTS-GWG   Document 180-3   Filed 03/02/21   Page 10 of 21

Page 9 of 20
2021 U.S. Dist. LEXIS 14344, *15

at which point Dr. Joshi notified them that he wished to move forward with a formal allegation of research misconduct. Id. ¶ 5. After the December 2015 meeting, Ms. Schrag's office commenced a formal research misconduct inquiry. Id. ¶ 6.

Pursuant to the Research Misconduct Policy, Dr. Joshi was given notice from the Chair of the Standing Committee when the formal investigation was initiated. See Defs.' 56.1 [*16] Stmt. ¶ 134. On April 21, 2016, Dr. Joshi was given an opportunity to meet with the Inquiry Committee to explain the bases for his allegation. Id. ¶ 135. Dr. Joshi was given portions of the draft Inquiry Report and provided his comments on them. Id. ¶ 136. In February 2017, Dr. Joshi was given notice that the investigation would proceed to the formal Investigation Phase and that an Ad Hoc Committee would be appointed. Id. ¶ 137. Dr. Joshi met with the Ad Hoc Committee to explain his allegation. Id. ¶ 138. In September 2019, Dr. Joshi was notified of the final results of the investigation. See Schrag Decl. ¶ 13.

While the Ad Hoc Committee found that the Division Chief recklessly overstated the completeness of his data, the Standing Committee concluded that a finding of research misconduct against the Division Chief was not warranted. See Jeremias Decl. Ex. 93. The Standing Committee also reminded Dr. Joshi that the University would ensure that diligent efforts are made to protect the reputation of Dr. Joshi, as the complainant, and directed Dr. Joshi to contact Ms. Schrag if he would like any steps to be taken in that regard. Id.

## 3. Dr. Joshi Alleges Retaliation

In or around August 2015, [*17] about 4 months after Dr. Joshi first wrote to Ms. Schrag, Dr. Joshi emailed Ms. Schrag and others in the University administration alleging retaliation by members of the Department for his raising the research misconduct allegation against the Division Chief. See Wegrzyn Decl. Ex. MM. At that point, Dr. Joshi's grievances generally concerned his clinical workload and assignments to ECTs. See Wegrzyn Decl. Ex. MM. In response to the allegation of retaliation in Dr. Joshi's email, Ms. Schrag met with the Vice Dean for Academic Affairs, Anne Taylor, and they exchanged several emails regarding Dr. Joshi's allegation. See Wegrzyn Decl. Exs. NN, PP, QQ, RR, SS. Ms. Schrag also discussed Dr. Joshi's assignment to ECTs with Dr. Emala and met with Dr. Joshi to address his concerns. See Wegrzyn Decl. Exs. TT & UU. Dr. Joshi subsequently retained counsel to pursue

his retaliation claims, at which point Columbia's Office of the General Counsel ("OGC") assumed responsibility for corresponding with Dr. Joshi and conducting the investigation. See Wegrzyn Decl. Exs. OO, WW, XX. In April 2016, OGC informed Dr. Joshi that none of Dr. Joshi's claims of retaliation had been "substantiated by the facts." [*18] Wegrzyn Decl. Ex. YY. OGC reviewed Dr. Joshi's non-clinical time and his ECT assignments and acknowledged that Dr. Joshi's non-clinical time had decreased from 57% in the 2014-2015 academic year to 44% in the 2015-2016 academic year, but noted that he was only guaranteed 30% non-clinical time during those years. Id.

## C. Events After Dr. Joshi's Report of Research Misconduct

### 1. Dr. Joshi's Lab

In July 2016, Dr. Wood retired and Dr. Ansgar Brambrink became the new Chair of the Department. See Defs.' 56.1 stmt. ¶ 141. Dr. Brambrink was not employed by the University before his position as Chair of the Department. Shortly after starting as Chair of the Department, Dr. Brambrink met with all researchers in the Department to discuss their research and funding, and Dr. Brambrink met with Dr. Joshi for the first time about Dr. Joshi's research and funding in August 2016. Id. ¶¶ 145-46. At that time, Dr. Joshi was on a "no-cost extension" from the National Institutes of Health on his R01 grant, which allowed him to use his remaining funds until March 2017. Id. ¶ 147.

In September 2016, Dr. Joshi wrote to Dr. Emala that Dr. Joshi was "thinking of shutting down [his] lab," and that Dr. Joshi thought [*19] Dr. Brambrink was "not only unfair but highly biased and arrogant." Wegrzyn Decl. Ex. EE. Nevertheless, Dr. Brambrink and Dr. Joshi initially agreed that the Department would fund Dr. Joshi's lab through July or August 2017 after his external funding was exhausted in March 2017. Wegrzyn Decl. Ex. GG. In November 2016, Dr. Brambrink also emailed Dr. Joshi that Dr. Brambrink was "committed to supporting [Dr. Joshi] as much as needed until Summer 2017," and that support "can also be an increased departmental support of more [Non-Clinical Days]." Id.

After March 2017, Dr. Joshi's external funding lapsed and Dr. Joshi relied on bridge funding from the

Department to keep his lab open. See Wegrzyn Decl. Ex. B, Joshi Tr. 35-36. The decision to give bridge funding is at the discretion of the Chair. Id. at 34. The Department continued to fund the lab well after July 2017. On December 20, 2019, while the lab was still open and operating due to Departmental bridge funding, Dr. Emala and Dr. Brambrink met with Dr. Joshi to establish an "action plan" to keep the lab open. Wegrzyn Decl. Ex. AAA. Under that plan, Dr. Joshi had until March 31, 2020 to secure external funding or the physical lab space would close **[*20]** by June 30, 2020. Id. The lab has remained open through at least August 31, 2020, when this Court denied Dr. Joshi's motion for a preliminary injunction to keep the lab open. See ECF No. 110. Since March 2017, Dr. Joshi never secured external funding and the Department provided bridge funding for Dr. Joshi's lab. See Wegrzyn Dec. Exs. C & B, Joshi Tr. 35-36.

## 2. Dr. Joshi's Promotion

Shortly after becoming Chair, Dr. Brambrink encouraged Dr. Joshi to apply for a promotion to Associate Professor. Wegrzyn Decl. Exs. HH & II. Although it did not prove to be feasible, Dr. Brambrink also agreed to explore the possibility of giving Dr. Joshi a two-step promotion to Full Professor, which was unusual in the Department. Wegrzyn Decl. Ex. BBB. The Dean's office told Dr. Emala and Dr. Brambrink that the two-step promotion was not possible. Schilling Decl. Ex. D, Emala Tr. 155-56. Dr. Brambrink wrote a letter of recommendation to support Dr. Joshi's promotion from Assistant Professor to Associate Professor. Wegrzyn Decl. Ex. JJ. On May 21, 2018, Dr. Joshi officially was promoted to Associate Professor, effective July 1, 2018. Wegrzyn Decl. Ex. KK.

## 3. Selection of New Chief of the Neuroanesthesia Division [*21]

In April 2017, Dr. Joshi emailed Dr. Brambrink asking to be considered for the Division Chief position. Wegrzyn Decl. Ex. LL. In selecting a new Division Chief, Dr. Brambrink sought to hire someone who was external to the Department and who would bring a new line of externally funded research. Wegrzyn Decl. Ex. FF, Brambrink Tr. 136. Dr. Brambrink hired Dr. Paul Garcia, who was a researcher from outside the Department who had external funding. Id. at 135. Dr. Joshi thought that Dr. Garcia was qualified for the position and a "talented guy." Wegrzyn Decl. Ex. B, Joshi Tr. 70.

## 4. Joint Appointment to the Division of Neurosurgery

In early 2015, Dr. Joshi sought a joint appointment with the Neurosurgery Department. Wegrzyn Decl. Ex. B, Joshi Tr. 363. Dr. Joshi first approached Dr. Solomon, the Chair of the Neurosurgery Department, to inquire about the possibility of a joint appointment. Defs.' 56.1 Stmt. ¶ 63. Dr. Solomon "immediately dismissed the possibility of granting Dr. Joshi a joint appointment" because Dr. Joshi did not have any significant grant, research, or clinical collaborations with members of the Neurosurgery Department. Solomon Decl. ¶¶ 5-6. Such joint appointments are rare, and between **[*22]** 1997 and 2016, Dr. Solomon only approved three joint appointments. Id. ¶ 4. At the time Dr. Joshi requested the joint appointment, Dr. Solomon was not aware of Dr. Joshi's research misconduct allegation. Id. ¶ 8. Dr. Solomon advised Dr. Joshi that the formal request should be initiated by the Chair of Dr. Joshi's home department, in this case Dr. Wood. Id. ¶ 5.

Dr. Joshi raised the issue of his joint appointment in the same March 2015 email to Dr. Wood in which he requested a promotion. Wegrzyn Decl. Ex. U. Dr. Wood sought to meet with Dr. Joshi in person to discuss the joint appointment, but that meeting never happened. Wegrzyn Decl. Ex. K, Wood Tr. 137. Dr. Wood discussed the prospect of a joint appointment with Dr. Solomon, but she never made a formal request to begin the process of granting Dr. Joshi the joint appointment. See Defs.' 56.1 Stmt. ¶ 74; Wegrzyn Decl. Ex. K, Wood Tr. 139-40. Even though there was no formal request for the joint appointment, Dr. Solomon stated in his declaration that he would not have approved the joint appointment, even if Dr. Wood had made a formal request. Solomon Decl. ¶ 7.

## 5. Clinical Time and ECTs

In February 2015, the Department had ECT staffing **[*23]** shortages due to a faculty member's maternity leave and another faculty member's vacation. Wegrzyn Decl. Ex. O at Ex. A; Wegrzyn Decl. Ex. P; Wegrzyn Decl. Ex. K, Wood Tr. at 104-05. To accommodate the staffing shortage, the Division Chief requested that Dr. Joshi reinstate his privileges with the New York State Psychiatric Institute to begin to perform ECTs again. Wegrzyn Decl. Ex. P. At that time, Dr. Joshi only had one active R01 grant, and therefore, he was entitled to only 30% protected research time.

Wegrzyn Decl. Ex. C. From July 2015 to December 2016, Dr. Joshi was assigned to, at most, four days of ECTs per month, and for all but two of the months in that range, three or fewer days, which was among the lightest ECT loads of the Neuroanesthesiology Division. Wegrzyn Decl. Ex. O at Ex. A. After he expressed his displeasure about his reassignment to ECTs, Dr. Joshi was told that doing ECTs was "part of being on the neuro[anesthesiology] team." Wegrzyn Decl. Ex. L.

## II. LEGAL STANDARD

The standard for granting summary judgment is well established. *HN1*[⬆] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is **[*24]** entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; see also *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)*.[2] "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo, 22 F.3d at 1224*. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323*. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

*HN2*[⬆] In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; see also *Gallo, 22 F.3d at 1223*. Summary judgment is improper if any evidence in the record from any source would enable a reasonable inference to be drawn in favor of the nonmoving party. See *Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994)*.

If the moving party meets its burden, the nonmoving party must produce evidence in the record showing the existence of a genuine issue **[*25]** of material fact and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993)*.

## III. DISCUSSION

The four remaining causes of action in this case are for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) promissory estoppel, and (4) violation of *Section 715-b* of the New York Non-Profit Revitalization Act of 2013, *N.Y. Not-for-Profit Corp. Law § 715-b*. Dr. Joshi's underlying theory in all causes of action is that the defendants retaliated against him or failed to protect him from retaliation because of his research misconduct allegation against the Division Chief. The defendants move for summary judgment dismissing all causes of action.

### A. Breach of Contract

The plaintiff alleges that the defendants breached contracts set forth in the Research Misconduct Policy and the Non-Retaliation Policy. The defendants argue that the Policies cannot be interpreted as contracts because they were not in effect when Dr. Joshi initially signed his employment contract, that they contained sufficient disclaimers, and that in any event, the defendants did not breach the obligations contained in the Policies.

### 1. The Research Misconduct and Non-Retaliation **[*26]** Policies

The defendants first argue that the Research Misconduct Policy and the Non-Retaliation Policy are not contracts.

*HN3*[⬆] Under New York law, a plaintiff can bring a breach of contract action where the plaintiff can show that the employer made its employee aware of an express written policy limiting the employer's ability to take adverse employment actions, and the employee detrimentally relied on that policy in accepting employment. See *Lobosco v. N.Y. Tel. Company/NYNEX, 96 N.Y.2d 312, 751 N.E.2d 462, 465, 727 N.Y.S.2d 383 (N.Y. 2001)*; see also *Monaco v. New*

---

[2] Unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

York Univ., 145 A.D.3d 567, 43 N.Y.S.3d 328, 329 (App. Div. 2016); O'Neill v. New York Univ., 97 A.D.3d 199, 944 N.Y.S.2d 503, 511-13 (App. Div. 2012); Mulder v. Donaldson, Lufkin & Jenrette, 208 A.D.2d 301, 623 N.Y.S.2d 560, 564 (App. Div. 1995). Accordingly, workplace policies, including university policies that relate to a university's relationship with its faculty can create binding and actionable contracts. See O'Neill, 944 N.Y.S.2d at 512-13 (reinstating a professor's action alleging breach of contract based on a retaliation theory because the university's Code of Ethics, Code of Conduct, Non-Retaliation Policy, and Research Misconduct Policy evidenced a promise not to retaliate for reporting research misconduct). Such policies can "form part of the essential employment understandings between a member of the Faculty and the University" and can "have the force of contract." Monaco, 43 N.Y.S.3d at 329.

The defendants rely on Lobosco for the proposition that "[HN4[↑]] r]outinely issued employee manuals, handbooks and policy statements should [*27] not lightly be converted into binding employment agreements," and that the plaintiff must establish that the plaintiff "detrimentally relied on that policy in accepting employment." Lobosco, 751 N.E.2d at 465. Indeed, courts have found that a plaintiff must allege that the plaintiff was aware of the relevant policy prior to being hired and relied on the policy in accepting the offer of employment. Kelley v. New York State Martin Luther King Jr. Comm'n & Inst. for Nonviolence, 229 A.D.2d 629, 644 N.Y.S.2d 862, 864 (App. Div. 1996). Thus, courts have rejected breach of contract claims where the relevant policy was issued after the plaintiff accepted the offer of employment or the record establishes that the plaintiff did not review the policy before accepting an offer of employment. See, e.g., Waddell v. Boyce Thompson Inst. For Plant Rsch., Inc., 92 A.D.3d 1172, 940 N.Y.S.2d 331, 332 (App. Div. 2012); La Duke v. Hepburn Med. Ctr., 239 A.D.2d 750, 657 N.Y.S.2d. 810, 813 (App. Div. 1997); Novinger v. Eden Park Health Servs., Inc., 167 A.D.2d 590, 563 N.Y.S.2d 219, 221 (App. Div. 1990); Brown v. Gen. Elec. Co., 144 A.D.2d 746, 534 N.Y.S.2d 743, 745 (App. Div. 1988).

In this case, it is undisputed that Dr. Joshi did not rely on the Policies when he first joined Columbia in 1997. The version of the Research Misconduct Policy at issue in this case was not adopted by the University until February 2006. Moreover, Dr. Joshi testified that he did not read the Research Misconduct Policy until 2007. Columbia did not issue the Non-Retaliation Policy until

March 2014.

However, it also is undisputed that Dr. Joshi renewed his employment with the University every two years, at which point the University issues a new appointment [*28] letter. See Joshi Decl. ¶ 2. Therefore, Dr. Joshi accepted the renewal of his employment while the Policies were in existence. In any event, "[t]he salient and necessary prerequisite of law . . . is the reliance alleged by the plaintiff." O'Neill, 944 N.Y.S.2d at 512 (quoting Mulder, 623 N.Y.S.2d at 564). In this case, as in O'Neill, a reasonable person "can infer [Dr. Joshi's] reliance on [the Policies]" from Dr. Joshi's "compliance with those policies by reporting his concerns of suspected research misconduct." O'Neill, 944 N.Y.S.2d at 512-13. To the extent that Dr. Joshi's reliance on the Policies is a disputed material fact, the matter cannot be decided against Dr. Joshi on this motion for summary judgment.

The defendants also argue that even if the Policies can, in theory, form the basis of a contract, the disclaimers prevent the creation of a contract. HN5[↑]] "An employee seeking to rely on a provision arguably creating a promise must also be held to reliance on the disclaimer." Lobosco, 751 N.E.2d at 465. A clear disclaimer can "prevent[] the creation of a contract and negate[] any protection" a plaintiff can infer from such a policy. Id.; see also Baron v. Port Auth. of New York & New Jersey, 271 F.3d 81, 86-87 (2d Cir. 2001).

In this case, as this Court has already held, whether Dr. Joshi relied on versions of the Policies that contained a sufficiently clear and conspicuous [*29] disclaimer is a disputed issue of fact. See ECF No. 38, at 17-18. The question of whether the disclaimer is ambiguous is a question of law, see W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440 (N.Y. 1990), but in this case, the operative question is which version of the Policies the plaintiff allegedly relied on in making his research misconduct allegation and accepting the terms of his employment each year. While the defendants point to versions of the Policies that contain explicit disclaimers, Dr. Joshi points to standalone versions of those same Policies that do not contain the disclaimers. Dr. Joshi contends that the standalone versions, without the disclaimers, are the versions upon which he relied in making his research misconduct allegation and accepting his renewed employment. Therefore, the ultimate issue of whether there are clear and conspicuous disclaimers on the Policies upon which Dr. Joshi relied remains a disputed issue of material fact, precluding summary judgment on

that point.

## 2. The Defendants' Conduct

The defendants next argue that, even if the Policies could be the basis of a contract, and the disclaimers did not, as a matter of law, extinguish any contractual effect of the Policies, the undisputed facts demonstrate that **[\*30]** the defendants did not breach the obligations set forth in the Policies. The plaintiff's breach of contract claim is based on the following conduct: (1) the defendants' failure to promote Dr. Joshi to Full Professor, (2) the defendants' failure to promote Dr. Joshi to Division Chief, (3) the defendants' failure to offer Dr. Joshi a joint appointment in the Department of Neurosurgery, (4) the increase of Dr. Joshi's clinical workload and assignments to ECTs, (5) threats to close Dr. Joshi's lab, and (6) the damage to Dr. Joshi's reputation.

Under the Research Misconduct Policy, the University must ensure that "all reasonable and practical efforts are made to protect the Complainant from potential or actual retaliation." Kestler Decl. Ex. E. The Non-Retaliation Policy prohibits "any action, statement, or behavior that is designed to punish an individual for filing a compliance report, cooperating with a compliance investigation, seeking guidance regarding a compliance concern or to deter one from taking such action" and such prohibited actions include "intimidation, adverse action against an employee regarding the terms and conditions of employment, such as termination, demotion, or suspension, **[\*31]** as well as related threats of such actions." Kestler Decl. Ex. A.

The Research Misconduct Policy affords protections to a person who makes an "Allegation," which is defined as a formal allegation of research misconduct submitted to the Committee on the Conduct of Research. The protections also apply when a complainant tries to resolve the alleged research misconduct issue informally by notifying the "Responsible Academic Officer" who is defined as, "with respect to any Respondent, the Chair, Dean or Director of the Department, School, Institute, Center or equivalent unit at the University of which such Respondent is a member." Kestler Decl. Ex. E. The Chair of the Department at the time of the Allegation was Dr. Wood.

The Non-Retaliation Policy protects a person who (1) files a compliance report, (2) cooperates with a compliance investigation, or (3) "seek[s] guidance regarding a compliance concern[.]" Kestler Decl. Ex. A.

As an initial matter, the parties dispute when the Policies' protections began. The defendants state the earliest date that Dr. Joshi engaged in any protected activity is April 3, 2015, the date when Dr. Joshi submitted a letter to Ms. Schrag. The plaintiff argues that **[\*32]** Dr. Joshi came under the protection of the Policies on December 17, 2014, when Dr. Joshi emailed Dr. Emala about his "serious data questions." Alternatively, on December 19, 2014, Dr. Joshi wrote to the Division Chief, asking about the data used, without alleging misconduct. The December 17 and December 19 emails arguably notified Dr. Emala and the Division Chief about an issue of research misconduct. However, neither Dr. Emala nor the Division Chief were the Chair of the Department. Under the Research Misconduct Policy, the protections apply to the complainant when the complainant attempts to resolve the issue informally by "notify[ing] the appropriate Responsible Academic Officer, who will use his or her good faith efforts to resolve such individual's concerns informally." Kestler Decl. Ex. E. Therefore, under the terms of the Research Misconduct Policy, Dr. Joshi's December 17, 2014 email to Dr. Emala did not trigger the protections of the policy. Dr. Joshi never contacted Dr. Wood in an attempt to resolve informally his research misconduct concerns. Therefore, because Dr. Joshi did not properly invoke his protections through the "informal" process, the protections offered by the **[\*33]** Research Misconduct Policy were not triggered until Dr. Joshi's April 3, 2015 letter to Ms. Schrag, the Vice President for Research, Compliance, Training, and Policy. Indeed, it was his April 3 letter to Ms. Schrag that started the informal process before a formal Allegation was made. Therefore, Dr. Joshi's earliest protected activity, triggering the protection of the Policies, was April 3, 2015. In any event, even if Dr. Joshi could be said to have come under the protection of the Policies on December 17, 2014, the undisputed material facts still demonstrate that the defendants did not breach their obligations pursuant to the Policies.

## 3. Failure to Promote Dr. Joshi to Full Professor

Dr. Joshi alleges that he was denied a promotion to Full Professor in retaliation for his research misconduct allegation. The undisputed evidence plainly demonstrates that he was not denied a promotion in retaliation for his allegation.

First, the delay of Dr. Joshi's promotion from Assistant Professor predated his allegation of research misconduct. *HN6*[⬆] When the alleged adverse

employment action began before the protected activity, the timing does not lead to an inference of retaliation. _Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001)_. In June 2011, Dr. **[*34]** Wood emailed Dr. Joshi to set up a meeting to move forward with Dr. Joshi's promotion. Nevertheless, Dr. Joshi declined to meet with Dr. Wood because he believed he would not get "a fair or credible review" and that his promotion "has been delayed for many years and at considerable harm to [him]." Wegrzyn Decl. Ex. R. Dr. Joshi emailed Dr. Emala about a "pattern of ongoing discrimination" against him, including the continued delay of his promotion. Wegrzyn Decl. Ex. J. By August 2011, Dr. Joshi withdrew from the promotion process. Wegrzyn Decl. Ex. S.

In June 2014, Dr. Emala encouraged Dr. Joshi to apply for a promotion and offered to attend every meeting Dr. Joshi would have with Dr. Wood. However, Dr. Joshi responded that he felt "conflicted" about applying for a promotion because it would "give legitimacy to a totally idiosyncratic, dishonest and a sham process." Wegrzyn Decl. Ex. T. Dr. Joshi told Dr. Emala to "just forget it" and to put the promotion on "the back burner" because it would be "exceedingly painful" to ask Dr. Wood for promotion, who Dr. Joshi described as "morally bankrupt and dishonest" and "pure evil[.]" _Id._ These events occurred before Dr. Joshi's research misconduct **[*35]** allegation, and therefore cannot be said to be retaliatory. Rather, these events show that the promotion process had been delayed for years due to Dr. Joshi's unwillingness to participate in the process and had nothing to do with his complaint of research misconduct against the Division Chief.

Dr. Joshi once again sought to initiate the process of getting a promotion in March 2015, but then too, he withdrew from the promotion process. Ultimately, Dr. Joshi never completed the promotion process during Dr. Wood's tenure as the Chair of the Department. Dr. Joshi admitted in an October 2017 email that he "never applied for a promotion" under Dr. Wood because he was "very uncomfortable with [her] ethics[.]" Wegrzyn Decl. Ex. V. And during Dr. Joshi's deposition, he admitted that he never sought an in-person meeting with Dr. Wood after initially inquiring about a promotion in March 2015.

In contrast, when Dr. Joshi applied for a promotion under Dr. Brambrink during the period after Dr. Joshi's research misconduct allegation, Dr. Joshi was given the promotion. Nonetheless, Dr. Joshi asserts that the fact that he was not given a two-step promotion under Dr.

Brambrink further evidences retaliation. **[*36]** But two-step promotions were exceedingly rare, and Dr. Brambrink actually did support Dr. Joshi's two-step promotion until the dean's office informed Dr. Brambrink and Dr. Emala that the two-step promotion was not feasible. Dr. Brambrink still supported his promotion to Assistant Professor and wrote a letter of recommendation on his behalf. After fully participating in the promotion process, Dr. Joshi was promoted to Assistant Professor in a timely fashion.

Accordingly, the undisputed material facts demonstrate that Dr. Joshi was not denied a promotion in retaliation for his research misconduct allegation.

### 4. Failure to Promote Dr. Joshi to Division Chief

Dr. Joshi alleges that the decision not to appoint him as the new Division Chief was in retaliation for his complaint of research misconduct against the former Division Chief. The undisputed evidence refutes this allegation.

First, Dr. Brambrink, not Dr. Wood or the former Division Chief, filled the vacancy. Dr. Joshi alleges that Dr. Wood passed on her alleged retaliatory animus toward Dr. Joshi to Dr. Brambrink, but Dr. Joshi fails to point to any evidence showing that Dr. Brambrink fostered retaliatory intent. _HN7_[⬆] "[S]peculation alone **[*37]** is insufficient to defeat a motion for summary judgment." _McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 n.4 (2d Cir. 2006)_.

Second, Dr. Brambrink stated that he had two criteria for hiring a new division chief: (1) that the candidate be from outside of the University, and (2) that the candidate would bring new external funding to the Department. Those are clear, non-retaliatory, and reasonable criteria. Dr. Joshi did not satisfy either criterion. The candidates most seriously considered satisfied the criteria, and the person ultimately hired, Dr. Garcia, came from outside the University and brought substantial external funding. Dr. Joshi even acknowledged that Dr. Garcia was a "talented guy" and qualified for the position. Dr. Joshi failed to point to any evidence that the completely legitimate criteria for a new Division Chief were pretextual or that the person hired to fill the vacancy was unqualified or less qualified than Dr. Joshi. See _Boise v. New York University, 201 F. App'x 796, 797 (2d Cir. 2006)_ (affirming grant of summary judgment in favor of the university because "mere speculation was insufficient to permit a reasonable inference that NYU's

proffered reasons for [the plaintiff's adverse employment actions] were illegitimate or, otherwise, pretexts").

### 5. Failure to Give Dr. Joshi a Joint Appointment [*38] with the Department of Neurosurgery

Dr. Joshi alleges that his failure to obtain a joint appointment with the Department of Neurosurgery was in retaliation for his research misconduct allegation. The undisputed evidence shows that the decision not to offer Dr. Joshi a joint appointment was not retaliatory.

In early 2015, Dr. Joshi inquired with the Chair of Neurosurgery, Dr. Solomon, about the possibility of a joint appointment. Dr. Solomon told Dr. Joshi that joint appointments were only appropriate where the faculty member had significant research or clinical collaborations with members of the department to which the faculty member seeks a joint appointment. Dr. Joshi did not have such collaborations. Dr. Solomon told Dr. Joshi that the Chair of his home department, Dr. Wood, would have to make a formal request to begin the process. Dr. Joshi emailed Dr. Wood about the prospect of the joint appointment. Dr. Wood replied that she would be happy to discuss a joint appointment in person, but Dr. Joshi did not meet with her. Dr. Solomon "immediately dismissed the possibility of granting Dr. Joshi a joint appointment" as futile, Solomon Decl. ¶ 5, and Dr. Wood never began the formal process. [*39] Dr. Solomon stated in his declaration that he would not have approved the joint appointment, even if Dr. Wood had initiated the formal process. Dr. Solomon was not aware of Dr. Joshi's research misconduct allegation when Dr. Joshi inquired about the joint appointment. Thus, because Dr. Solomon's actions could not have been influenced by Dr. Joshi's protected activity, there is no basis to claim retaliation. Moreover, Dr. Wood expressed her willingness to engage in the joint appointment process and offered to discuss the matter in person, but Dr. Joshi declined to meet with her.

Dr. Joshi could have received the joint appointment only if he had the support of the Chairs of both departments. However, he did not have the support of Dr. Solomon, who was not aware of Dr. Joshi's protected activity, and Dr. Joshi refused to meet with Dr. Wood regarding the joint appointment. Therefore, the undisputed evidence shows that the joint appointment process stalled because Dr. Joshi failed to participate fully in the process, and that even if he had fully participated, he still would not have received the joint appointment

because of legitimate and non-retaliatory reasons.

### 6. Non-Clinical Time and [*40] ECTs

Dr. Joshi alleges that the reduction in his non-clinical time was in retaliation for his claim of research misconduct. The undisputed material facts show that the Dr. Joshi's reduction in clinical time and the Department's decision to ask Dr. Joshi to resume ECT assignments were not retaliatory.

With respect to Dr. Joshi's non-clinical time, Dr. Joshi alleges that the Department began reducing his non-clinical time in February 2015, which was two months before his protected activity. Moreover, since at least 2011, Dr. Joshi had asserted that the fact that the Department did not give him more non-clinical time "fits into the pattern of ongoing discrimination against [his] research." Wegrzyn Decl. Ex. J. That Dr. Joshi first began to express displeasure at the amount of his non-clinical time years before his protected activity undermines his suggestion that his clinical assignments were causally related to the protected activity. See *Risco v. McHugh, 868 F. Supp. 2d 75, 114 (S.D.N.Y. 2012)*. In fact, in December 2008, in response to Dr. Joshi's complaints that he was not receiving sufficient non-clinical time, Dr. Wood emailed to Dr. Taylor that "[u]nder no circumstances" would she "guarantee" more non-clinical time to Dr. Joshi than was [*41] guaranteed by external funding. Jeremias Decl. Ex. 9.

In addition, the evidence demonstrates that the Department did not substantially cut Dr. Joshi's non-clinical time after his protected activity. And to the extent that the Department did reduce Dr. Joshi's non-clinical time, that small reduction was consistent with the fact that Dr. Joshi lost external funding and thereby had less protected research time.

From August 2014 through March 2017, Dr. Joshi was guaranteed 30% non-clinical time because of his single R01 grant. From around April 2011 through July 2014, Dr. Joshi had two R01 grants, which entitled him to 60% non-clinical time. Therefore, on an annualized basis, Dr. Joshi was entitled to more non-clinical time in 2014 than in 2015. The plaintiff's allegation that the Department gave Dr. Joshi less non-clinical time in 2015, as compared to 2014, does not suggest retaliation. Rather, it simply reflects that he was in fact entitled to less non-clinical time.

The Department never gave Dr. Joshi less non-clinical time than the amount to which he was entitled. Apart

from when Dr. Joshi was on vacation, it is uncontested that he never received less than 30% non-clinical time. For most **[*42]** of 2015 and 2016, Dr. Joshi received 50% or more non-clinical time. For the three months in 2017 where Dr. Joshi had funding from the R01 grant, he received a minimum of 65% non-clinical time. The Department always provided Dr. Joshi with at least the amount of non-clinical time he was guaranteed, and most of the time, the Department provided him non-clinical time in excess of the amount to which he was entitled. Therefore, it is plain that the defendants did not retaliate against Dr. Joshi by assigning him less non-clinical time.

Likewise, the decision to have Dr. Joshi resume ECTs was not retaliatory. First, the decision to ask Dr. Joshi to reactivate his privileges to conduct ECTs was in February 2015, two months before his protections were triggered under the Policies. *HN8*[↑] Alleged adverse employment action cannot be retaliatory if it occurred before the protected conduct. See *Risco, 868 F. Supp. 2d at 114*; see also *Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)*.

Second, there is compelling evidence that the Department needed to have Dr. Joshi perform ECTs because the Department was short-staffed. One doctor who regularly performed ECTs was to be on maternity leave, and others would be away. Moreover, Dr. Joshi's reassignment to ECTs occurred when he was guaranteed **[*43]** less protected research time by virtue of his external funding. In addition, when Dr. Joshi was added back into the ECT schedule, he was given one of the lightest ECT loads of the Neuroanesthesiology Division.

Third, assignment to ECTs was not an adverse employment action. Dr. Joshi regularly had been assigned ECTs, and then in 2012, the Department agreed to accommodate his preference not to perform ECTs to the extent possible, but Dr. Joshi never was guaranteed that he did not have to perform ECTs. In March 2015, he was reminded that being assigned to ECTs was a "part of being on the neuro team." *HN9*[↑] "Merely changing someone's job duties does not automatically qualify as an adverse employment action" when the changed duties "were within the position description" and there is "no evidence that these duties were inferior or less prestigious than [the plaintiff's] old job duties." *Morrison v. Potter, 363 F. Supp. 2d 586, 590 (S.D.N.Y. 2005)*. Under circumstances such as these, "courts have repeatedly held that a change in duties—

even from a job that the plaintiff cherished—does not constitute an adverse employment action." Id. (collecting cases); see also *Johnson v. Morrison & Foerster LLP, No. 14-cv-428, 2015 U.S. Dist. LEXIS 24008, 2015 WL 845723, at *5 (S.D.N.Y. Feb. 26, 2015)* ("It is well established, however, that subjective **[*44]** dissatisfaction with assignments does not constitute adverse employment action.").

## 7. Closing the Lab

Dr. Joshi alleges that the defendants' threat to close his lab was in retaliation for his research misconduct allegation. The undisputed evidence refutes that contention.

First, Dr. Joshi's lab lost external funding in March 2017, yet it remained open through at least August 2020. If the lab were to close after August 2020, that would be over 5 years after his protected conduct. Even the December 2019 meeting at which Dr. Brambrink and Dr. Emala told Dr. Joshi he needed to secure external funding by the following March to keep his lab open was years after Dr. Joshi's protected conduct. Such a large temporal gap undermines any claim of retaliation. Indeed, *HN10*[↑] even shorter gaps in time between protected activity and adverse employment action have been found to sever the causal relation. See, e.g., *Viruet v. City of New York, No. 16-cv-8327, 2019 U.S. Dist. LEXIS 75159, 2019 WL 1979325, at *12 (S.D.N.Y. May 3, 2019)* ("There is no temporal proximity because almost a year separated the events."); *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 973 F. Supp. 2d 386, 409 (S.D.N.Y. 2013)* ("[I]t is plain that the passage of almost two years between the May 2008 complaint and the April 2010 denial of tenure is too great to support a causal relationship."), **[*45]** aff'd, *586 F. App'x 739 (2d Cir. 2014)*.

Second, the undisputed evidence shows that the Department had funding concerns regarding Dr. Joshi's lab for years. He was given multiple warnings to secure external funding but failed to do so. The Department also provided him bridge funding, so that he could find external funding, for a longer period of time than was common practice. After providing Dr. Joshi with bridge funding for an unusually long period of time, the Department gave Dr. Joshi several opportunities to secure external funding. The Department made clear that if Dr. Joshi failed to secure external funding, it would have to close his lab. Despite the prolonged time he had to apply for external funding, he failed to secure

any external funding. The decision to begin closing Dr. Joshi's lab therefore was justified based on legitimate funding concerns.

Third, Dr. Wood did not close Dr. Joshi's lab. It was Dr. Brambrink that notified Dr. Joshi that the Department would close his lab if he did not secure outside funding, and Dr. Joshi subsequently was unsuccessful in securing such funding. However, Dr. Brambrink was not even employed by the University when Dr. Joshi made his research misconduct allegation. And apart **[\*46]** from speculation, Dr. Joshi does not point to any evidence that Dr. Brambrink acted with retaliatory intent toward Dr. Joshi.

Accordingly, the undisputed record shows that the Department had funding concerns for years about Dr. Joshi's lab. Dr. Joshi was given notice and an opportunity to secure additional funding but failed to do so. And his lab remained open for years after his protected activity. There is no basis to find that the decision to close Dr. Joshi's lab could have been in retaliation for his research misconduct complaint.

## 8. Damage to Reputation

Lastly, Dr. Joshi asserts that the defendants damaged his reputation in retaliation for his research misconduct allegation. However, the undisputed evidence reflects that the defendants did not damage his reputation in retaliation for his allegation, and that Dr. Joshi does not allege any cognizable damages on that claim.

*HN11*[⬆] Under New York law, the inability to prove damages is "fatal" to a breach of contract claim. *LNC Invs., Inc. v. First Fid. Bank, N.A. New Jersey, 173 F.3d 454, 465 (2d Cir. 1999).* "[A] plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004).* "Damages to reputation generally are not recoverable in a breach of contract action under New York law." *Smith v. Positive Prods., 419 F. Supp. 2d 437, 453 (S.D.N.Y. 2005)* (collecting **[\*47]** cases). To obtain contract damages for damage to reputation, "vague assertions will not suffice" and "specific business opportunities lost as a result of [the plaintiff's] diminished reputation" are necessary. Id.

In this case, the plaintiff does not allege any specific business opportunities lost as a result of his allegedly damaged reputation. Instead, Dr. Joshi claims a more general diminution of his reputation. Such a claim is insufficient to obtain damages on a breach of contract claim.

Moreover, the evidence demonstrates that members of the Department and the defendants did not tarnish Dr. Joshi's reputation as a result of his research misconduct allegation. Even before the allegation, Dr. Joshi was engulfed in several interpersonal conflicts with other members of the Department. He often refused to speak to the Chair in person, and he had bitter conflicts with the Division Chief before Dr. Joshi's allegation of research misconduct. The fact that Dr. Joshi had such interpersonal conflicts with members of the Department does not automatically convert such conflicts into retaliation after protected activity when the conflicts predated the protected conduct. Moreover, Dr. Joshi acknowledged **[\*48]** that only a few people outside the University Office of Research Integrity knew about his research misconduct allegation.

Dr. Joshi raises several examples of his colleagues making disparaging remarks about him. However, there is no evidence that those remarks were in retaliation for his research misconduct allegation. Rather, those exchanges evidence the continuing interpersonal conflicts between Dr. Joshi and his colleagues. The examples that Dr. Joshi cites reflect critical opinions of present and former colleagues about Dr. Joshi's personality and mental status. Jeremias Decl. Exs. 118, 119, 120, 122. For example, Dr. Emala emailed a colleague that Dr. Joshi had made repeated misconduct allegations over fifteen years that proved baseless and that Dr. Joshi "is consumed by this history and attempts to bring those around him into the same melancholy." Jeremias Decl. Ex. 122. The comments do nothing to demonstrate a pattern of retaliation, but rather show that Dr. Joshi has been embroiled in conflict before the allegations at issue in this case and had engendered critical opinions about himself. Because these conflicts predated his research misconduct allegation against the Division **[\*49]** Chief and very few people actually knew about that allegation, there is no basis to conclude that the defendants retaliated against Dr. Joshi or failed to protect him from retaliation in the form of damage to his reputation.

Accordingly, the undisputed evidence supports dismissal of his breach of contract claim on a damage to reputation theory.

## B. Breach of Covenant of Good Faith and Fair Dealing

Dr. Joshi also alleges that the defendants breached the

covenant of good faith and fair dealing by failing to protect Dr. Joshi from retaliation and by failing to meet the investigation deadlines provided by the Research Misconduct Policy.

HN12[↑] "Implicit in every contract is a covenant of good faith and fair dealing which encompasses any promise that a reasonable promisee would understand to be included." *Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc., 97 A.D.3d 781, 949 N.Y.S.2d 115, 118 (App. Div. 2012)*. "Even if a party is not in breach of its express contractual obligations, it may be in breach of the implied duty of good faith and fair dealing . . . when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit (or benefit) of its bargain." Id. The covenant of good faith and fair dealing "embraces a pledge [*50] that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 773 N.E.2d 496, 500, 746 N.Y.S.2d 131 (N.Y. 2002)*.

The defendants first argue that the plaintiff cannot prove a breach of the covenant of good faith and fair dealing because the Policies are not contracts. See *Keefe v. N.Y. Law School, 71 A.D.3d 569, 897 N.Y.S.2d 94, 95 (App. Div. 2010)* ("HN13[↑] Absent the existence of a contract, a claim alleging breach of the implied covenant of good faith and fair dealing is legally unavailing.") However, because there are disputed material facts about whether the Policies are contracts, summary judgment is inappropriate on that ground.

The defendants next argue that, even if the Policies were contracts, the defendants did not breach the covenant of good faith and fair dealing in effectuating those contracts. HN14[↑] A party to a contract violates the covenant of good faith and fair dealing when the party "directly violate[s] an obligation that may be presumed to have been intended by the parties." *Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407-08 (2d Cir. 2006)*. "The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship." *Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 663 N.E.2d 289, 291-92, 639 N.Y.S.2d 977 (N.Y. 1995)*. Because there is a presumption that all parties [*51] act in good faith, the party alleging a breach of the covenant of good faith and fair dealing has the burden to prove the absence of good faith. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007)*.

The undisputed material facts demonstrate that the defendants did not breach the covenant of good faith and fair dealing in their implementation of the Policies.

First, as described above, the defendants did not fail to protect Dr. Joshi from retaliation. After Dr. Joshi made his allegation of research misconduct, he subsequently notified Ms. Schrag that he believed he was being retaliated against for making the research misconduct allegation. The defendants undertook a comprehensive investigation of Dr. Joshi's allegation of retaliation. After Dr. Joshi emailed Ms. Schrag, Vice Dean Taylor, and Jeffery Kestler about potential retaliation, those individuals took the appropriate actions to investigate Dr. Joshi's allegations of retaliation. Dean Taylor and Ms. Schrag discussed his non-clinical time and ECTs. Dean Taylor also investigated whether Dr. Joshi's salary or funding status had changed, and she contacted Dr. Solomon to investigate Dr. Joshi's requested joint appointment to Neurosurgery. Ms. Schrag separately discussed Dr. Joshi's assignment [*52] to ECTs with Dr. Emala, and she met with Dr. Joshi personally to discuss his allegations. After these preliminary steps, the defendants placed OGC in charge to conclude the investigation. OGC investigated the allegations and sent a letter to Dr. Joshi's counsel explaining its conclusion on each individual allegation of retaliation raised by Dr. Joshi. Based on all these actions, the undisputed material facts demonstrate that the University took Dr. Joshi's allegation of retaliation seriously and conducted an appropriate investigation. That Dr. Joshi does not agree with the University's conclusions does not, without more, lead to a possible inference of the breach of the covenant of good faith and fair dealing.

Second, the defendants diligently complied with the provisions set forth in the Research Misconduct Policy. Dr. Joshi asserts that the defendants took far longer to investigate Dr. Joshi's claim of research misconduct than provided for by the Research Misconduct Policy. However, the Research Misconduct Policy does not set forth a specific timeline in the form of "an obligation that may be presumed to have been intended by the parties." See *Thyroff, 460 F.3d at 407-08*. Instead, the Research Misconduct Policy [*53] provides for general estimated timelines for the various phases of the investigation, and explicitly permits "one or more reasonable extensions" to those timelines. The explicit provision for extensions demonstrates that the general timeline was not an obligation that can be presumed to have been intended by the parties.

In this case, each extension to the general timeline in the investigation of Dr. Joshi's allegation of research misconduct was duly authorized by the Standing Committee and by the Office of Research Integrity, as required by the Research Misconduct Policy. That the investigation took longer than Dr. Joshi anticipated is not sufficient to infer a breach of the covenant of good faith and fair dealing, especially because the undisputed evidence confirms that each extension to the investigation was authorized. The plaintiff does not cite to any evidence of bad faith with respect to the timeline of the investigation, except the fact that it took longer than he expected and that there were duly authorized extensions, as contemplated by the Research Misconduct Policy. Moreover, the plaintiff does not cite to any evidence that he suffered any cognizable injury due to the length **[*54]** of the investigation of his allegation of research misconduct.

Accordingly, the undisputed material facts demonstrate that the defendants did not breach the covenant of good faith and fair dealing.

## C. Promissory Estoppel

Dr. Joshi alleges that he has suffered injury based on his detrimental reliance on the promises of the defendants. However, the undisputed material facts show that the Dr. Joshi did not suffer any injury as a result of a promise by the defendants. *HN15*[⬆] In New York, "promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by [the plaintiff]." *Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995)* (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989))*. The doctrine of promissory estoppel can be invoked to enforce a promise, absent consideration, where there has been detrimental reliance, or to enforce a contract otherwise barred by the Statute of Frauds. See *Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 824 (2d Cir. 1994)*; *Ripple's of Clearview, Inc. v. Le Havre Assoc., 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (App. Div. 1982)*; see also *Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39 (2d Cir. 1995)*.

Dr. Joshi seeks to invoke promissory estoppel as a substitute for consideration. However, Dr. Joshi also contends that there is consideration for the contracts formed by the Policies, namely his continued employment. Therefore, because he contends that the Policies form binding contracts, **[*55]** the doctrine of promissory estoppel is inappropriate in this context because it is duplicative of the breach of contract claim. See, e.g., *Gas Nat., Inc. v. Iberdrola, S.A., 33 F. Supp. 3d 373, 386 (S.D.N.Y. 2014)* (dismissing promissory estoppel claim because it was duplicative of a breach of contract claim); *Simpri v. City of New York, 00-cv-6712, 2003 U.S. Dist. LEXIS 23266, 2003 WL 23095554, at *8 (S.D.N.Y. Dec. 30, 2003)* (same); *Four Finger Art Factory, Inc. v. Dinicola, No. 99-cv-1259, 2000 U.S. Dist. LEXIS 1221, 2000 WL 145466, at *8 (S.D.N.Y. Feb. 9, 2000)* ("[T]o the extent that the plaintiff's claim for promissory estoppel is based on promises that are consistent with the undertakings contained in the contract, the claim is that the defendants did not perform their obligations under the contract and therefore the claim should be dismissed as duplicative of the breach of contract claim.").[3]

Moreover, the plaintiff's promissory estoppel cause of action independently fails because there is no cognizable injury. The Department kept Dr. Joshi's lab open for years after his research misconduct allegation, and it even provided him with funding and non-clinical time when it was under no obligation to do so. The fact that Dr. Joshi did not get as much funding or as much non-clinical time as he would have liked does not suffice to show that he was injured as a result of a promise made by the defendants. With **[*56]** respect to Dr. Joshi's failed attempts at various promotions, he never was entitled to those promotions and provided no evidence that could be construed as a breach of a promise with respect to those promotions or the process for selecting individuals hired for those positions. And for the other reasons articulated above, the undisputed material facts demonstrate that Dr. Joshi did not suffer an injury in the form of retaliation against him for his research misconduct allegation against the Division Chief.

Accordingly, the defendants are entitled to summary judgment on the plaintiff's promissory estoppel claim.

## D. *Section 715-b of the New York Not-for-Profit*

---

[3] The defendants separately argue that the promissory estoppel claim fails because the disclaimers demonstrate that the plaintiff could not have reasonably relied on any promises contained within the Policies. However, because there is a factual dispute as to whether Dr. Joshi viewed the versions of the Policies with the disclaimers, summary judgment on that theory is inappropriate.

2021 U.S. Dist. LEXIS 14344, *56

*Corporation Law*

Dr. Joshi alleges that the defendants violated **HN16**[↑] *Section 715-b of the New York Not-For-Profit Corporation Law*, which provides that certain non-for-profit corporations must "adopt a whistleblower policy to protect from retaliation persons who report suspected improper conduct." *N.Y. Not-for-Profit Corp. Law § 715-b(a)*.

As this Court noted in the Opinion and Order on the motion to dismiss, New York courts have been divided as to whether *Section 715-b* implies a private right of action. Recently, the Appellate Division for the Second Department held that **HN17**[↑] *Section 715-b* does create a private right of action for employees who are retaliated against or subjected to an adverse employment action. *Ferris v. Lustgarten Found., 2020 N.Y. App. Div. LEXIS 7540, 2020 WL 7233682, at *3 (App. Div. Dec. 9, 2020)*. This Court [*57] likewise found the authority implying a private right of action to be more persuasive. See ECF No. 38, at 29-33.

However, summary judgment should be granted dismissing this cause of action because the undisputed material facts show that the defendants complied with the statute. The University did have the relevant policies to protect whistleblowers and diligently implemented and adhered to those policies. As contemplated by the statute, the University adopted the required whistleblower protection policy and Dr. Joshi has pointed to no evidence that the University's Board failed to oversee its whistleblower policy. **HN18**[↑] *Section 715-b* requires the boards of nonprofits to "adopt, and oversee the implementation of, and compliance with" the whistleblower policy, *N.Y. Not-for-Profit Corp. Law § 715-b(a)*, but Dr. Joshi has presented no evidence that the University failed to comply with the statute.

To the contrary, the defendants have pointed to undisputed evidence that the defendants implemented appropriate whistleblower protections, diligently complied with those policies at all steps of the relevant investigations, and did not retaliate against Dr. Joshi. See Kestler Decl. ¶¶ 2-4. The defendants have presented undisputed evidence that the defendants [*58] adopted the relevant whistleblower policies, and that OGC periodically reported to the Board with regard to compliance issues, including with respect to substantiated reports of compliance issues, such that the Board "oversee[s] the implementation of, and compliance with" the relevant policies See *N.Y. Not-for-Profit Corp. Law § 715-b(a)*. Dr. Joshi has not

presented evidence as to noncompliance with the statute in general or in his case in particular. He has not shown why the defendants' actions could be construed as insufficient under *Section 715-b*. In particular, the defendants have shown that the University conducted a thorough investigation of his claims against the Division Chief, offered to protect him against retaliation, and then investigated his claims that he was the subject of retaliation. The University found no evidence that he was the victim of retaliation and the summary judgment record supports that conclusion. No reasonable jury could find a violation of *Section 715-b*.

Accordingly, the defendants are entitled to summary judgment dismissing the plaintiff's claim under *Section 715-b*.

**CONCLUSION**

The Court has considered all the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. [*59] For the reasons explained above, the defendants' motion for summary judgment is **granted**. The Clerk is directed to enter judgment dismissing this case with prejudice. The Clerk is also directed to close all pending motions and to close this case.

**SO ORDERED**.

**Dated: New York, New York**

**January 25, 2021**

**/s/ John G. Koeltl**

**John G. Koeltl**

**United States District Judge**

_____

**End of Document**