# Exhibit D

No *Shepard's* Signal™
As of: March 1, 2021 9:31 PM Z

# *Wolet Capital Corp. v. Walmart Inc.*

United States District Court for the Southern District of New York

January 25, 2021, Decided; January 25, 2021, Filed

18-cv-12380 (LJL)

**Reporter**
2021 U.S. Dist. LEXIS 13406 *; 2021 WL 242297

WOLET CAPITAL CORP., Plaintiff, -v- WALMART INC. and FLIPKART PRIVATE LTD., Defendants.

## Core Terms

statute of frauds, acquisition, allegations, writings, negotiation, compensate, domination, quantum meruit, non-disclosure, assurance, oral agreement, parties, promise, gratuitous, arrange, promissory estoppel, unjust enrichment, fails, meetings, broker, target, terms, business opportunity, motion to dismiss, subject matter, subsidiary, documents, obligated, purported, valuation

**Counsel:** [*1] For Wolet Capital Corporation, Plaintiff: Gregory Zimmer, Mohegan Lake, NY.

For Walmart Inc., Defendant: Chad J. Doellinger, Greenberg Traurig, P.A, Chicago, IL; Daniel Friedman, Greenberg Traurig, LLP (NYC), New York, NY; Harold S. Shaftel, Greenberg Traurig, LLP (NY), New York, NY.

For Flipkart Private Limited, Defendant: Harold S. Shaftel, LEAD ATTORNEY, Greenberg Traurig, LLP (NY), New York, NY; Chad J. Doellinger, Greenberg Traurig, P.A, Chicago, IL.

**Judges:** LEWIS J. LIMAN, United States District Judge.

**Opinion by:** LEWIS J. LIMAN

## Opinion

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants Walmart Inc. ("Walmart") and Flipkart Private, Ltd. ("Flipkart") (together, "Defendants") move pursuant to *Fed. R. Civ. P. 12(b)(6)* to dismiss the second amended complaint, Dkt. No. 33 ("SAC" or "Complaint"), filed against them by Plaintiff Wolet Capital Corp. ("Plaintiff" or "WCC"), Dkt. No. 46.

**BACKGROUND**

Plaintiff WCC brings this lawsuit to obtain an investment advisory or finder's fee in connection with Defendant Flipkart's acquisition of a third party, Upstream Commerce, Ltd. ("Upstream"). The following facts are drawn from the Complaint and accepted as true for purposes of the instant motion.

WCC is a New York-based advisory [*2] firm that specializes in U.S.-Indian cross-border investment. SAC ¶¶ 3, 9. It regularly provides M&A and financial advisory and related services to clients in the United States and India. *Id.* ¶ 11. Flipkart is India's largest e-commerce marketplace with more than 100,000 sellers and 100,000,000 registered users. *Id.* ¶ 12. At all relevant times, Sankalp Gupta ("Gupta") was Flipkart's Senior Director of Corporate Development and Aakash Goyal ("Goyal") was a senior executive in Flipkart's Corporate Development Group. *Id.* ¶¶ 28, 45.

On August 25, 2017, Goyal, with the approval and authorization of Gupta, wrote to Adam Larkey ("Larkey"), the principal of WCC, to ask WCC to explore its contacts to attempt to identify potential acquisition targets for Flipkart working in the space of dynamic

price optimization and competitive price intelligence. *Id.* ¶¶ 45, 46. WCC "identified a number of potential targets, then narrowed that group down to two candidates that were potentially good fits for Flipkart," before determining that one of the candidates was not viable and turning its focus "primarily to Upstream." *Id.* ¶¶ 19-20.

Thereafter, in September 2017, Plaintiff alleges that it took a number of **[*3]** actions "at the direction of Goyal and/or Gupta and/or with their knowledge and approval and/or the knowledge and approval of others at Flipkart." *Id.* ¶¶ 32-37, 39-42. In particular, WCC alleges that it:

• Negotiated on behalf of Flipkart and secured a non-disclosure agreement ("NDA") between Flipkart and Upstream. *Id.* ¶ 32.

• Obtained and provided to Flipkart financial, operational and market information concerning Upstream to assist Flipkart in evaluating Upstream as a potential target, including information concerning Upstream's investors, equity and debt funding structure, revenues and employees. *Id.* ¶ 33.

• Discussed valuation issues with Upstream and provided Flipkart with information concerning a potential valuation of Upstream. *Id.* ¶ 34.

• Arranged and participated in meetings with Upstream to discuss valuation and projections for Upstream's future performance. *Id.* ¶ 35.

• Arranged for product demonstrations by Upstream to allow Flipkart to review and asses Upstream's capabilities. *Id.* ¶ 36.

• Used its connections and reputation to verify to Upstream management that Flipkart was a serious and appropriate potential acquirer and to convince Upstream to entertain serious discussions **[*4]** with Flipkart. *Id.* ¶ 37.

• Used its reputation and standing in the e-commerce industry to persuade Upstream to engage in negotiations with Flipkart and to entertain an acquisition offer from Flipkart. *Id.* ¶ 38.

• Acting as Flipkart's agent, met with Upstream's CEO in New York to discuss a potential transaction. *Id.* ¶ 39.

• Provided Upstream favorable information about Flipkart at Flipkart's request. *Id.* ¶ 40.

• Introduced Flipkart to Upstream's advisors as part of the process of putting together a potential transaction. *Id.* ¶ 41.

• Made presentations to Upstream (including directly to Upstream's CEO in a meeting at Upstream's New York offices) regarding, among other subjects, the benefits of accepting Flipkart stock as part of the consideration for an acquisition by Flipkart. *Id.* ¶ 42.

Discussions concerning a potential acquisition of Upstream "subsided for a period, but in a series of writings from December 22 through December 26, 2017, Flipkart sought from WCC information that could potentially revive discussions concerning a potential acquisition of Upstream, and Gupta arranged a telephone call with Larkey to discuss that information, which information was provided by WCC on the call." **[*5]** *Id.* ¶ 61.

On September 25, 2018, a year after WCC's alleged services were performed in September 2017, Flipkart's acquisition of Upstream closed. *Id.* ¶ 104.

WCC alleges a number of writings that were made or sent in the provision of the services referenced above:

• In a series of signed writings on September 6, 2017, from Goyal, Flipkart "directed and authorized WCC to arrange for the execution of a non-disclosure agreement between Flipkart and Upstream" and "provided WCC with a proposed non-disclosure agreement and directed WCC to negotiate with Upstream such that Upstream and Flipkart would execute Flipkart's preferred form of non-disclosure agreement." *Id.* ¶¶ 47-48.

• On September 7, 2017, "Flipkart directed WCC with respect to revisions of the proposed non-disclosure agreement proposed by Upstream to the draft non-disclosure agreement, requested WCC's advice with respect to certain proposed revisions, proposed additional revisions to the non-disclosure agreement and directed WCC to engage in further negotiations with Upstream regarding the non-disclosure agreement." *Id.* ¶ 49. On September 11, 2017, Flipkart provided the executed non-disclosure agreement to WCC for transmission to Upstream. **[*6]** *Id.* ¶ 50

• Thereafter, from September 12, 2017 to

September 26, 2017, there were a series of writings in which Flipkart "directed WCC" to arrange for a demonstration to Flipkart of Upstream's capabilities, "thanked WCC" for obtaining "certain diligence information and documents from Upstream" and "company and market information regarding Upstream," and "directed WCC to engage in discussions with Upstream regarding a potential valuation range for Upstream to be used in connection with the acquisition." *Id.* ¶¶ 51-59.

• In a signed writing dated September 29, 2017, Flipkart "directed WCC to arrange an introduction and call including Flipkart with the bankers to discuss potential valuations for an acquisition." *Id.* ¶ 60.

Tellingly, WCC does not attach any of these writings to its complaint or quote the contents of any of them. None of these specific communications are alleged to include mention of compensation for WCC's services.

The Complaint alleges that following its identification of Upstream as a potential acquisition target, WCC "initiated discussions concerning payment terms for its [s]ervices" and that "Flipkart initially requested that WCC inquire of Upstream whether Upstream would [*7] compensate WCC for putting a deal together." *Id.* ¶ 21. WCC did approach Upstream with this inquiry, but Upstream declined. *Id.* ¶¶ 23-24. WCC informed Flipkart of Upstream's position and stated that it would perform "Services only if Flipkart agreed to compensate it for the Services." *Id.* ¶ 25.[1] The Complaint then contains the following paragraph: "Flipkart instructed WCC in writing and verbally to continue to pursue the transaction on Flipkart's behalf and assured WCC that if a transaction closed WCC would be compensated for the Services." *Id.* ¶ 27. The Complaint alleges "[s]pecifically, Gupta . . . assured WCC in or about September 2017 that Flipkart would compensate WCC for its work in connection with any Upstream transaction that closed and gave other assurances that WCC would be paid for the Services at a standard market rate if a transaction between Flipkart and Upstream closed," *id.* ¶ 28, although the Complaint does not allege that such assurance was made in writing. WCC alleges that it would not have performed "the extensive Services" if it did not have "assurance from Flipkart that it would be paid if a transaction closed" and that after receiving "Flipkart's promise to compensate [*8] WCC if a transaction closed with Upstream, WCC continued to act as WCC's agent for purposes of pursuing a potential transaction and provided the Services." *Id.* ¶¶ 30-31.

In May 2018, Walmart and Flipkart began discussions about Walmart's acquisition of Flipkart. *Id.* ¶ 90. Walmart's acquisition of Flipkart closed on or about August 18, 2018. *Id.* ¶ 102.

WCC has received no payment from Flipkart or Walmart and alleges claims for breach of contract, quantum meruit, unjust enrichment, and promissory estoppel.

**PROCEDURAL HISTORY**

WCC filed its first complaint against Walmart and Flipkart on December 31, 2018. Dkt. No. 1. On July 3, 2019, the Court entered an order directing Defendants to file their motion to dismiss by July 31, 2019. Dkt. No. 27. On August 21, 2019, WCC filed a first amended complaint. Dkt. No. 28. On December 13, 2019, WCC filed a proposed second amended complaint, Dkt. No. 33, and on January 17, 2020, WCC filed its motion for leave to file the second amended complaint, Dkt. No. 39. Defendants opposed that motion. Dkt. No. 42. On February 5, 2020, the case was reassigned to the undersigned. WCC filed a reply memorandum in support of its motion for leave to file the second [*9] amended complaint on February 7, 2020. Dkt. No. 43. On April 15, 2020, the Court granted WCC leave to file the second amended complaint, now the operative Complaint in this action. Dkt. No. 44.

On May 15, 2020, Defendants filed a motion to dismiss. Dkt. No. 46. On June 16, 2020, Plaintiff filed an opposition brief. Dkt. Nos. 50, 51. On June 29, 2020, Defendants filed their reply brief. Dkt. No. 52.

**STANDARD OF REVIEW**

To survive a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting

---

[1] "Services" is a term defined by WCC for purposes of the complaint as "merger and acquisition ('M&A') and financial advisory and other related services performed by WCC (the 'Services') in connection with the acquisition of Upstream Commerce, Ltd. ('Upstream')." SAC ¶ 2. It is not alleged to appear in any of the writings. Elsewhere, WCC admits "[t]here was no set scope of work or any defined list of Services to be performed by WCC in connection with Flipkart's search for an acquisition target." *Id.* ¶ 64.

*Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly, 550 U.S. at 555, 557*. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw **[*10]** on its judicial experience and common sense." *Id. at 679*. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly, 550 U.S. at 556*; see also *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 46, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011)*.

"[C]onsideration of the Statute of Frauds is appropriate on a motion to dismiss." *Ridenhour v. Bryant, 2020 U.S. Dist. LEXIS 55772, 2020 WL 1503626 at *3 (Mar. 29, 2020)* (quoting *Rosbach v. Indus. Trading Co., Inc., 81 F. Supp. 2d 522 (S.D.N.Y. Feb. 4, 2000))*; see *Knapp v. Maron, 2015 U.S. Dist. LEXIS 67372, 2015 WL 2452409 (S.D.N.Y. May 22, 2015)* ("A motion to dismiss may be granted if, drawing all reasonable inferences from the complaint in favor of plaintiff, defendant has a valid Statute of Frauds defense to plaintiff's claims.") (quoting *Messner Vetere Berger McNamee Schmetterer EURO RSCG Inc. v. Aegis Grp. PLC, 974 F. Supp. 270, 273 (S.D.N.Y. 1997)*, aff'd, *186 F.3d 135 (2d Cir. 1999))*.

## DISCUSSION

### A. Plaintiff has failed to state any claims against Walmart

For each of its causes of action, Plaintiff makes the identical allegation that "by virtue of its acquisition of Flipkart, Walmart is required to satisfy Flipkart's obligation to compensate WCC for the Services." See SAC ¶¶ 145, 161, 175, 193. The Complaint does not allege any dealings between Walmart and WCC, however. Instead, it bases its claims against Walmart on a theory that because Walmart acquired Flipkart, it is liable for Flipkart's alleged violations of New York law. WCC specifically alleges that: in May 2018, Walmart and Flipkart began discussions about Walmart's acquisition of Flipkart, **[*11]** *id.* ¶ 90; Walmart "engaged in due diligence with respect to the ongoing negotiation of the pending acquisition of Upstream by Flipkart," *id.* ¶ 92; Walmart was aware or reasonably should have been aware of the services provided by WCC for Flipkart, *id.* ¶¶ 97-98; "upon information and belief, the negotiation and closing of the Upstream acquisition was delayed at Walmart's direction until Walmart's acquisition of Flipkart was complete," *id.* ¶ 101; Walmart closed on a deal to acquire Flipkart on or about August 18, 2018, *id.* ¶ 102; and "[a]fter Walmart acquired Flipkart . . . the Upstream acquisition closed," *id.* ¶ 104. The SAC also makes various allegations that Walmart exercises control over Flipkart, for example by "assigning" its own management and personnel "to positions at Flipkart," and by exerting "total control over Flipkart's board of directors." See *id.* ¶¶ 108-116.

These allegations are insufficient to establish that Walmart bears any liability with respect to Flipkart's alleged dealings with WCC regarding the acquisition of Upstream. "A breach of contract claim that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to **[*12]** dismissal, and a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *Mercator Corp. v. Windhorst, 159 F. Supp. 3d 463, 469 (S.D.N.Y. 2016)* (internal quotation marks and citation omitted); see *Crabtree v. Tristar Auto. Grp., Inc., 776 F. Supp. 155, 166 (S.D.N.Y. 1991)* ("It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract."). Moreover, "[g]enerally, 'a parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both.'" *S.M. v. Oxford Health Plans (N.Y.), Inc., 94 F. Supp. 3d 481, 498 (S.D.N.Y. 2015)* (quoting *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 26 (2d Cir. 1993))*; see also *Celi v. Canadian Occidental Petroleum Ltd., 804 F. Supp. 465, 468 (E.D.N.Y. 1992)* ("In New York, there is a 'presumption of separateness' to related corporations.") (citation omitted).

In order to overcome the presumption that a parent company is not liable for a claim in breach of contract against its subsidiary and to hold the parent liable for the breach, "[a] party . . . [must] establish[] that the parent corporation 'exercised complete domination of [the subsidiary] corporation in respect to the transaction

attacked; and . . . that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury.'" [*13] *Banks v. Corr. Servs. Corp., 475 F. Supp. 2d 189, 196 (E.D.N.Y. 2007)* (quoting *Morris v. N.Y. State Dep't of Taxation and Fin., 82 N.E.2d 135, 623 N.E.2d 1157, 603 N.Y.S.2d 807, 810 (1993))*; see *American Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997)*.

In determining whether a parent exercised "complete domination" over its subsidiary for the purposes of this analysis, courts consider such factors as:
> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 404 (S.D.N.Y. 2009)* (quoting *Freeman v. Complex Computing Co., 119 F.3d 1044, 1053 (2d Cir. 1997))*.

Plaintiff plainly fails to allege that Walmart exercised "complete domination" over Flipkart with respect to its alleged agreement with Upstream. Most significantly, all of the writings and representations that WCC alleges form the basis of Flipkart's obligations to it occurred in August and September 2017, nearly a year before Walmart is alleged to have begun exploring an acquisition of Flipkart in the May 2018 and closed the deal [*14] in August 2018. This belies any argument that Walmart exercised "complete domination" over Flipkart "in respect to the transaction attacked." *Banks, 475 F. Supp. 2d at 196 (E.D.N.Y. 2007)*. Moreover, WCC fails to allege any factual material, accepted as true, that demonstrates Walmart's "complete domination" over Flipkart even after its acquisition. The SAC alleges Walmart "appointed a majority of members to Flipkart's board of directors," SAC ¶ 108, and that "[s]enior Walmart management and personnel routinely are assigned to positions at Flipkart," *id.* ¶ 111; see *id.* ¶¶ 112-14 (providing examples). Appointing management and board members are the ordinary activities of a corporate parent, and these alone are not sufficient to establish "complete domination" such that Walmart should assume Flipkart's liabilities. See *Beck v. Consol. Rail Corp., 394 F. Supp. 2d 632, 638 (S.D.N.Y. 2005)* ("[D]ominion and control is not established through a mere showing that one corporation is a wholly-owned subsidiary of the parent or that the parent owns a controlling interest in the shares of the subsidiary."). WCC makes the unexceptional allegation that Walmart "consolidates and reports Flipkart's financial results with its own," which would be true of most if not all parent corporations with respect to a wholly-owned [*15] subsidiary and, without more, fails to establish intermingling of funds or treatment of the corporations as non-independent profit centers, such as might support a claim for holding Walmart liable for Flipkart's obligations. Taken together, these allegations fail to address a majority of the relevant factors. See *Freeman, 119 F.3d at 1053*.

WCCs remaining allegations of domination are entirely conclusory and must be disregarded. *See, e.g.*, SAC ¶ 119 ("Upon information and belief, Walmart exercised complete domination and control over Flipkart with respect to approval and closing of the Upstream acquisition."); *id.* ¶ 146 ("Upon information and belief, Walmart dominates and controls Flipkart's board of directors and did so with respect to Flipkart's acquisition of Upstream and Flipkart's refusal to compensate WCC for the Services."); *id.* ¶ 147 ("Upon information and belief, Walmart dominates, controls and directs Walmart's management and did so with respect to Flipkart's acquisition of Upstream and Flipkart's refusal to compensate WCC for the Services."); see also *Chanel, Inc. v. WGACA, LLC, 2018 U.S. Dist. LEXIS 158077, 2018 WL 4440507, at *5 (S.D.N.Y. Sept. 14, 2018)* ("[I]t is well established that purely conclusory allegations cannot suffice to state a claim based on veil-piercing.") (citation omitted); *In re Verestar, Inc., 343 B.R. 444, 460 (Bankr. S.D.N.Y. 2006)* ("[C]onclusory [*16] allegations of control are not sufficient to state a claim for alter ego liability or piercing the corporate veil.").

Plaintiff fails to allege that Walmart exercised any domination over Flipkart, let alone domination with respect to any particular dealings between Flipkart and Upstream. It also fails to allege that such domination was used to commit a fraud or wrong against WCC resulting in injury to WCC. Thus, the claims against Walmart are dismissed in their entirety.

**B. Plaintiff has failed to state a claim for breach of contract**

Plaintiff's breach of contract claim is barred by New York's statute of frauds. The New York statute of frauds provides that "[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking . . . [i]s a contract to pay compensation for services rendered in negotiating ... the purchase . . . of a business." *N.Y. Gen. Obl. L. § 5-701(a)(10)* ("Statute of Frauds"). "The primary function of the Statute of Frauds is an evidentiary one: it is intended to 'guard against the peril of perjury' and 'prevent the enforcement of unfounded [*17] fraudulent claims' by limiting the range of evidence permitted to prove the existence of an agreement that lacks a formal writing." *Zhi Zhong Qiu v. Diamond, 2020 U.S. Dist. LEXIS 34745, 2020 WL 978352, at *4 (S.D.N.Y. Feb. 27, 2020)* (quoting *Springwell Corp. v. Falcon Drilling Co., 16 F. Supp. 2d 300, 304 (S.D.N.Y. 1998)* (Sotomayor, J.)); see *Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 245 N.E.2d 712, 297 N.Y.S.2d 947, 952 (1969)*. "In short, the purpose of the Statute of Frauds is simply to prevent a party from being held responsible, by oral, and perhaps false, testimony, for a contract that the party claims never to have made." *William J. Jenack Estate Appraisers & Auctioneers, Inc. v. Rabizadeh, 22 N.Y.3d 470, 982 N.Y.S.2d 813, 818, 5 N.E.3d 976 (2013)* (quoting *73 Am. Jur. 2d, Statute of Frauds § 403*)).

The law expressly provides that "'[n]egotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." *N.Y. Gen. Obl. L. § 5-701(a)(10)*. "[T]he contracts required to be evidenced by writing include a contract or agreement for the compensation of a business broker for acting as a 'finder,' 'originator' or 'introducer,' or for assisting in the negotiation or consummation of the transaction." *Springwell Corp., 16 F. Supp. 2d at 304* (quoting statutory note to September 27, 1964 amendment to *N.Y. Gen. Obl. L. § 5-701(a)(10)*). If services are "performed as part of or in furtherance of negotiation," they are "rendered in negotiating" for purposes of *section 5-701(a)(10)*. *JF Cap. Advisors, LLC v. Lightstone Grp., LLC, 25 N.Y.3d 759, 16 N.Y.S.3d 222, 226, 37 N.E.3d 725 (2015)*. "The following services fall within the scope of *section 5-701(a)(10)*: performing due diligence and financial analysis for a transaction covered by *section 5-701(a)(10)*, seeking out and interacting with potential sources of financing, [*18] preparing presentations for potential investors, and developing a general negotiating strategy for accomplishing any proposed transactions." *Chardan Cap. Mkts., LLC v. Nw. Biotherapeutics, Inc., 2018 U.S. Dist. LEXIS 131867, 2018 WL 3733948, at *4 (S.D.N.Y., Aug. 6, 2018)* (citing *Ely v. Perthuis, 2013 U.S. Dist. LEXIS 14952, 2013 WL 411348, at *3-4 (S.D.N.Y. Jan. 29, 2013))*; see *GEM Advisors, Inc. v. Corporacion Sidenor, S.A., 667 F. Supp. 2d 308, 324 n.5 (S.D.N.Y. 2009)*; *Zeising v. Kelly, 152 F. Supp. 2d 335, 343 (S.D.N.Y. 2001)*; *ATG Cap. LLC v. MGT Cap. Invs., Inc., 2018 U.S. Dist. LEXIS 45141, 2018 WL 1406917, at *9 (S.D.N.Y. Mar. 19, 2018)* ("Negotiating a business opportunity includes providing services such as: (1) identifying and analyzing the business opportunity; (2) identifying and analyzing potential business partners; (3) and being a major contributor to the eventual formation of the [business opportunity].") (internal quotation marks and citation omitted). The law thus presumes that there may be circumstances in which one party identifies a business opportunity for another and requires the parties, if they want to ensure that the identification is not gratuitous, to put their agreement in writing.

The services WCC allegedly performed for Flipkart, including identifying Upstream as a target, transmitting and negotiating a non-disclosure agreement, arranging for a presentation and a call to discuss potential valuation for a transaction, and relaying due diligence and company and market materials, fall squarely within *section 5-701(a)(10)*. See *CMC Transaction Servs., LLC v. IDEX Corp., 2019 U.S. Dist. LEXIS 129083, 2019 WL 3496643, at *4 (S.D.N.Y. Aug. 1, 2019)* (holding Statute of Frauds applied to a broker who soughts commission for introducing potential buyers, arranging meetings and participating [*19] in business negotiations); *IntertexTrading Corp. v. Ixtaccihautl SA de CV, 754 F. Supp. 2d 610, 614-16 & n.3 (S.D.N.Y. 2010)* (holding Statute of Frauds applied to a broker who introduced buyers and sellers and arranged meetings); *Goldmark Assocs., Inc. v. Tech. Erectors, Inc., 1990 U.S. Dist. LEXIS 7323, 1990 WL 89369, at *4-5 (S.D.N.Y. June 18, 1990)* (holding a plaintiff who provided services, including coordinating bidding projects, transmitting documents and specifications, and negotiating purchase orders, "[fell] squarely within the scope of the [Statute of Frauds] as a 'finder' or 'broker'").

WCC does not dispute that its activities fall within the Statute of Frauds. It relies on two distinct propositions of law to argue that it has satisfied the Statute of Frauds. First, it claims that the various written communications referenced in its Complaint satisfy the Statute of Frauds' requirement that there be a writing containing all material terms of the alleged contract. Second, it argues

that breach of contract claims may be pursued despite the Statute of Frauds if the plaintiff has performed acts "unequivocally referable" to an oral agreement in reliance on its existence. Neither argument is persuasive here.

"While a series of writings 'may be read together to satisfy the Statute of Frauds provided that they clearly refer to the same subject matter or transaction,' the combination of writings still **[*20]** must 'contain substantially the whole agreement and all its material terms and conditions.'" *Ridenhour v. Bryant, 2020 U.S. Dist. LEXIS 55772, 2020 WL 1503626, at \*6 (S.D.N.Y. Mar. 29, 2020)* (*quoting KJ Roberts & Co., Inc. v. MDC Partners, Inc., 2014 U.S. Dist. LEXIS 34740, 2014 WL 1013828, at \*7 (S.D.N.Y. Mar. 14, 2014))*. It is a "well-established rule that in a contract action a memorandum sufficient to meet the requirements of the Statute of Frauds must contain expressly or by reasonable implication all the material terms of the agreement, including the rate of compensation if there has been agreement on that matter." *Morris Cohon & Co., 297 N.Y.S.2d at 953*. Thus, "[c]ourts interpreting *Section 5-701(a)* have imposed four threshold requirements on adequacy. In short, the writing must on its face (1) be subscribed to by the party charged; (2) designate the parties to the agreement; (3) identify and describe the subject matter; and (4) establish, either expressly or by reasonable implication, all the essential terms of the agreement." *Zhi Zhong Qiu, 2020 U.S. Dist. LEXIS 34745, 2020 WL 978352, at \*3*; s*ee DeRosis v. Kaufman, 219 A.D.2d 376, 641 N.Y.S.2d 831, 833 (1st Dept. 1996)* ("To be considered a sufficient memorandum within the ambit of the Statute of Frauds, a writing must designate the parties, identify and describe the subject matter and state *all* the essential or materials terms of the contract.") (internal quotation marks and citation omitted).

The Complaint does not identify any writing or combination of writings that would satisfy those requirements. Accepting its allegations as **[*21]** true and drawing all reasonable inferences in favor of Plaintiff, the Complaint alleges that in late August 2017, Flipkart asked WCC to help it identify potential acquisition candidates; that subsequently, in September 2017, WCC performed a number of discrete tasks to collect information from Flipkart and to arrange meetings with Flipkart and a banker and to obtain a non-disclosure agreement; and that, again, over a discrete few days in December 2017, Flipkart sought from WCC the information that could potentially revive discussions concerning a potential acquisition of Upstream.

These allegations fall far short of what is necessary to establish the existence of a contract in satisfaction of the Statute of Frauds. The writings plainly lack "all the essential terms" of the purported agreement. *Zhi Zhong Qiu, 2020 U.S. Dist. LEXIS 34745, 2020 WL 978352, at \*3*. For one thing, the alleged writings do not define the scope of the services that WCC was allegedly obligated to render—a fact the Complaint itself admits. See SAC ¶ 64 ("There was no set scope of work or any defined list of [s]ervices to be performed by WCC in connection with Flipkart's search for an acquisition target."); *id.* ¶ 68 ("[T]here were no concrete deal terms to document at the outset **[*22]** of Flipkart's engagement of WCC except that WCC would use its best efforts and judgment and perform [s]ervices it determined were necessary and/or appropriate to achieve Flipkart's objective . . ."). Additionally, the alleged writings do not allege any purported duration of the services: were each of these one-offs or did they imply that WCC was contractually bound to provide continuing services, and until when? Moreover, and critically, the Complaint does not set forth any writing establishing what consideration Flipkart was obligated to render under the alleged contract. Nor, indeed, does it allege that Flipkart itself made any commitment at all in writing to compensate WCC for the services described. To the contrary, it makes only the generalized, non-specific allegation that Flipkart "instructed WCC in writing and verbally to continue to pursue the transaction on Flipkart's behalf and assured WCC that it a transaction closed WCC would be compensated for its Services." *Id.* ¶ 27. These conclusory allegations—which are not even explicit that the "assur[ance]" that WCC would be compensated was a message conveyed in writing, or whether the only written message was the "instruct[ion]" **[*23]** to WCC to "continue to pursue the transaction"—are not sufficient to establish a writing memorializing Flipkart's commitment to pay WCC for whatever work it performed in connection with the potential acquisition of Upstream. Nor do any of the other writings alleged—including alleged directives and authorizations by Flipkart for WCC to negotiate and execute a non-disclosure agreement, *id.* ¶¶ 48-50, coordinate presentations and the provision of due diligence, *id.* ¶¶ 51-53, 56-60, and discuss valuation, *id.* ¶¶ 54-55—contain any mention of compensation, much less the terms of compensation.

The absence of any writing or series of writings that contains the essential terms—including scope of services, duration, price term, and an unambiguous statement of Flipkart's obligation to compensate WCC—is fatal to Plaintiff's claim for breach of contract under the Statute of Frauds. *See, e.g., Foros Advisors LLC v.*

Case 1:20-cv-02489-LTS-GWG   Document 180-4   Filed 03/02/21   Page 9 of 15

Page 8 of 14
2021 U.S. Dist. LEXIS 13406, *23

*Digital Globe, Inc.*, 333 F. Supp. 3d 354, 364 (S.D.N.Y. 2018) (alleged writing "[does] not include a price term or the type of advisory role [plaintiff] would play in the transaction or the scope of [plaintiff's] responsibilities. Accordingly, it fails to satisfy the Statute of Frauds"); *Vioni v. Am. Cap. Strategies Ltd.*, 2009 U.S. Dist. LEXIS 4664, 2009 WL 174937, at *3 (S.D.N.Y. Jan. 23, 2009) ("Compensation is a material term of a finder's fee agreement . . . and absent a [*24] 'meeting of the minds' on this term, a contract is unenforceable.") (citations omitted); *Chapman, Spira & Carson, LLC v. Helix BioPharma Corp.*, 115 A.D.3d 526, 982 N.Y.S.2d 93, 95 (1st Dept. 2014) (emails between the parties "fail to make any reference to payment terms, and accordingly fail to satisfy the statute of frauds as to the contract claim"). In short, there is no document "establishing the basic, underlying contractual commitment" allegedly made by Flikpart, as is required for a confluence of memoranda to constitute a contract that satisfies the Statute of Frauds. *Transition Invs., Inc. v. The Allen O. Dragge, Jr. Family Tr.*, 2012 U.S. Dist. LEXIS 70777, 2012 WL 1848875, at *8 (S.D.N.Y. May 21, 2012) (quoting *O'Keeffe v. Bry*, 456 F. Supp. 822, 829 (S.D.N.Y. 1978)); *see also Foros Advisors LLC*, 333 F. Supp. 3d at 360 ("It is well settled that for a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty. Even if the parties believe that they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract.") (quoting *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982)); *Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 74 N.Y.2d 475, 548 N.E.2d 203, 548 N.Y.S.2d 920, 923 (1989) ("[U]nless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy . . . [T]he requirement of definiteness [*25] assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement.").

WCC's second argument is no more successful. By this argument, Plaintiff seeks refuge under the principle that "[a]n agreement which violates the statute of frauds may nonetheless be enforceable where there has been part performance 'unequivocally referable' to the contract by the party seeking to enforce the agreement." *Barretti v. Detore*, 95 A.D.3d 803, 944 N.Y.S.2d 166, 169 (2d Dept. 2012) (internal quotation marks and citation omitted); *see Anostario v. Vicinanzo*, 59 N.Y.2d 662, 450 N.E.2d 215, 463 N.Y.S.2d 409, 410 (1983) ("The doctrine of part performance may be invoked only if plaintiff's actions can be characterized as 'unequivocally referable' to the agreement alleged."). The Complaint alleges that Gupta orally assured WCC that it would be paid for its work and that thereafter, and in reliance on that assurance, WCC performed various tasks for Flipkart. WCC argues that "it was entirely reasonable for WCC to rely on assurances from Flipkart that WCC would be paid for its Services without a single, comprehensive written contact" and that therefore its conduct in performing the activities for Flipkart are explainable only with reference to the oral agreement. SAC ¶ 11.

In the first instance, it is not clear [*26] that under New York law the part performance doctrine applies to overcome a Statute of Frauds challenge brought pursuant to N.Y. Gen. Obl. L. § 5-701(a)(10). *See Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Grp. PLC*, 93 N.Y.2d 229, 711 N.E.2d 953, 689 N.Y.S.2d 674, 677 n.1 (1999) (stating that the New York Court of Appeals had "not . . . adopted [the] proposition" that there is "judicially-created part performance exception to (General Obligations Law) § 5-701"); *Transition Invs.*, 2012 U.S. Dist. LEXIS 70777, 2012 WL 1848875, at *9 n.11 ("Section 5-701(a)(10) does not expressly provide a partial performance exception, and the New York Court of Appeals has firmly stated that there is no such exception.") (quoting *Belotz v. Jefferies & Co., Inc.*, 213 F.3d 625 (2d Cir. May 22, 2000) (unpublished opinion) (citing *Aegis Grp. PLC*, 689 N.Y.S.2d at 677 n.1)); *see also Valentino v. Davis*, 270 A.D.2d 635, 703 N.Y.S.2d 609, 611 (3d Dept. 2000) (holding that "the doctrine of part performance cannot save contracts governed by General Obligations Law § 5-701").

Even if it did apply, to establish that Plaintiff's actions are "unequivocally referrable" to an agreement, "[i]t is not sufficient . . . that the oral agreement gives significance to plaintiff's actions. Rather, the actions alone must be 'unintelligible or at least extraordinary,' explainable only with reference to the oral agreement." *Anostario*, 463 N.Y.S.2d at 410. WCC's allegations fail to satisfy that high bar. It is irrelevant whether WCC says today that it acted reasonably in reliance on the purported oral promises or whether its conduct was consistent with those oral promises having been made. [*27] To hold otherwise would presuppose that there were oral promises of compensation—the very

type of allegation the New York Court of Appeals has held is subject to the "peril of perjury." *Morris Cohon & Co., 297 N.Y.S.2d at 952*. "The primary function of the Statute of Frauds . . . to 'guard against [such risks and to] prevent the enforcement of unfounded fraudulent claims' by limiting the range of evidence permitted to prove the existence of an agreement that lacks a formal writing," *Zhi Zhong Qiu, 2020 U.S. Dist. LEXIS 34745, 2020 WL 978352, at *4* (citation omitted), would be frustrated if a plaintiff could avoid its requirements by pleading it took action in reasonable reliance on an oral representation. It must allege conduct that is inexplicable absent reference to the purported oral agreement. *See Barretti, 944 N.Y.S.2d at 169*. That is not so here. All of the conduct WCC is alleged to have undertaken is easily explicable without reference to there having been any agreement that it would be paid. It is entirely plausible that a company in the position of WCC would perform the alleged services (i.e., transmitting and "negotiating" a non-disclosure agreement, obtaining due diligence information from the target, and setting up calls and meetings) gratuitously in the hope—but without any assurance—that the party it **[*28]** was serving would be persuaded to retain it on a contractual basis should that party decide to pursue a transaction. The writings do not establish any obligation of the putative acquiror of a business to hire the finder. Thus, "[w]hile the agreement alleged provides a possible motivation for plaintiff's actions, the performance is equivocal, for it is reasonable explained by the possibility of other expectations," including that plaintiff took "preparatory steps . . . with a view toward consummation of an agreement in the future." *Anostario, 463 N.Y.S.2d at 410*; *see also Multi-Juice, S.A. v. Snapple, 2006 U.S. Dist. LEXIS 66913, 2006 WL 2683429, at *6 (S.D.N.Y. Sept 18, 2006)* (dismissing claim where plaintiff's conduct was explainable without reference to the purported oral agreement).

The cases cited by WCC do not support but rather undermine its claim. In *Coudert v. Hokin, 2017 U.S. Dist. LEXIS 227044, 2017 WL 10221323 (S.D.N.Y. Aug 23, 2017)*, a plaintiff sued her ex-husband for breach of contract arising out of an alleged oral agreement pursuant to which she allegedly relinquished an appeal of a state court decision relieving her husband of any obligation to pay monthly maintenance in exchange for his agreement to pay the maintenance and mortgage on an apartment during plaintiff's lifetime. *See 2017 U.S. Dist. LEXIS 227044, [WL] at *1-2*. Twenty years after defendant began paying maintenance, during which time plaintiff resided in the apartment, **[*29]** defendant stopped contributing to monthly maintenance and mortgage charges. *Id.* The court held that the oral agreement did not fall within the exception to the Statute of Frauds for partial performance because plaintiff's conduct was not unequivocally referable to the agreement alleged; the conduct was consistent with the defendant having agreed to loan the funds to plaintiff. *2017 U.S. Dist. LEXIS 227044, [WL] at *3*. The court likewise rejected a partial performance claim in *Multi-Juice, S.A., 2006 U.S. Dist. LEXIS 66913, 2006 WL 2683429*. There, plaintiffs alleged that they spent approximately $300,000 in connection with a beverage distribution business and commenced operations in reasonable and foreseeable reliance on defendant's oral agreement that plaintiff would be defendant's exclusive distributor in Greece. *2006 U.S. Dist. LEXIS 66913, [WL] at *5*. The court rejected the claim that such conduct took the oral agreement outside the Statute of Frauds. Plaintiffs' conduct and expenditures were explicable on the theory that they made the expenditures and commenced operations "pursuant to and anticipation of finalizing [a] written distribution agreement." *2006 U.S. Dist. LEXIS 66913, [WL] at *6*; *see also Knapp, 2015 U.S. Dist. LEXIS 67372, 2015 WL 2452409, at *4* (Statute of Frauds exception for partial performance did not apply where plaintiff's conduct could be explainable as preparatory steps "taken with a view toward **[*30]** consummation of an agreement in the future") (internal citation and quotations omitted); *Barretti, 944 N.Y.S.2d at 170* (dismissing partial performance claim where plaintiff's conduct did not constitute requisite unequivocal acts relating to purported oral agreement).

**C. Plaintiff has failed to state a claim for quantum meruit and unjust enrichment**

Plaintiff argues that even if the complaint does not allege a claim for breach of contract, it is entitled to compensation under the theories of quantum meruit or unjust enrichment. These claims fail for similar reasons that Plaintiff's breach of contract claim fails.

"Under New York law, quantum meruit and unjust enrichment claims are analyzed together as a single quasi-contract claim." *Nat'l Util. Serv., Inc. v. Tiffany & Co., 2009 U.S. Dist. LEXIS 23386, 2009 WL 755292, at *9 (S.D.N.Y. Mar. 20, 2009)* (citing *Mid—Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir.2005))*; *see also Snyder v. Bronfman, 13 N.Y.3d 504, 921 N.E.2d 567, 893 N.Y.S.2d 800, 802 (2009)* ("Unjust enrichment and quantum meruit are, in this context, essentially identical

claims, and both are claims under a contract implied . . . in law to pay reasonable compensation.") (quoting *N.Y. General Obligations Law 5-701(a)(10)*). Generally, "[t]o prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Old Republic Nat'l Title Ins. Co. v. Luft, 52 A.D.3d 491, 859 N.Y.S.2d 261, 262 (2d Dept. 2008)*. Generally, **[*31]** "[t]o recover in quantum meruit, the plaintiff must show '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Foros, 333 F. Supp. 3d at 364* (quoting *Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000))*.

*N.Y. General Obligations Law § 5-701(a)(10)* adds an additional layer to the allegations and proof a plaintiff must offer to pursue a claim either in quantum meruit or for unjust enrichment. By its plain language, the requirement in the Statute of Frauds that every "agreement, promise or undertaking" be in writing, or else it is void, applies equally "to a contract *implied in fact or in law* to pay reasonable compensation." *N.Y. General Obligations Law § 5-701(a)(10)* (emphasis added). The "'implied in fact or in law' language was added to the statute in 1964 to make clear that the statute of frauds applies to quantum meruit claims." *Snyder v. Bronfman, 893 N.Y.S.2d at 802* (citation omitted); see *Chardan Cap. Mkts., 2018 U.S. Dist. LEXIS 131867, 2018 WL 3733948, at *3* ("The New York Court of Appeals has made clear that *section 5-701(a)(1)* applies to claims for quantum meruit and unjust enrichment"). Accordingly, both breach of contract and quasi-contract claims based upon a purported agreement to pay compensation for the negotiation of a corporate acquisition will fail if they do not satisfy the Statute of Frauds.

This **[*32]** result ensures that a disappointed purveyor of services cannot circumvent the writing requirement of the Statute of Frauds and save a breach of contract claim that fails the statute of frauds by the contrivance of pleading its claim in quasi contract. See *Morgenweck v. Vision Cap. Advisors, LLC, 410 F. App'x 400, 402 n.1 (2d Cir. 2011)* ("It is well settled that under New York law a plaintiff may not escape the Statute of Frauds by attaching the label 'quantum meruit' or 'unjust enrichment' or 'promissory estoppel' to the underlying contract claim.") (citing cases). Accordingly, an adequate pleading of the elements of a quasi-contract claim, including a reasonable "expectation of compensation," must be founded on a written document executed by the defendant. *Foros, 333 F. Supp. 3d at 364* (quoting *Revson, 221 F.3d at 69*). The rule exists as much to benefit the would-be volunteer of gratuitous services as it does to protect the recipient of such services. It facilitates the ability of the "finder" to convey acquisition ideas to the recipient, in the hope that if the ideas are good ones it will be hired, by giving the "finder" the ability to convey to the recipient the assurance, enforceable in law, that if the recipient hears the information and decides later to pursue the business opportunity, the "finder" will not **[*33]** be able to, after the fact, turn around and argue that the recipient bears liability to it that neither party intended based on some oral communication that the finder now remembers. It requires such communications to be in writing, with content that reflects the expectation of compensation. In that way, the law promotes commerce, certainty of contracting, and the transmission of information in the interests of both parties.

Thus, to plead a claim in quasi-contract for services rendered in the negotiation of the acquisition of a business, the plaintiff must plead more than the existence of some writings between it and the defendant made in the rendering of services. Few services are provided in the negotiation of a business opportunity without there being a writing. The writing need not reflect "an agreement on the rate of compensation." *Morris Cohon & Co., 297 N.Y.S.2d at 953*. However, it must "evidence the fact of plaintiff's employment by defendant to render the alleged services." *Id*; see *Chapman, Spira & Carson, LLC, 982 N.Y.S.2d at 95* ("Here . . . the emails . . . fail to make any reference to payment terms, and accordingly fail to satisfy the statute of frauds as to the contract claim. However, they suffice to show that [defendant] employed plaintiff, and are therefore **[*34]** enough to satisfy the statute for purposes of plaintiff's quantum meruit claim."). Where the writing does not reflect the "rate of compensation," "[t]he obligation of the defendant to pay reasonable compensation for the services is then implied." *Morris Cohon, 297 N.Y.S.2d at 953*. In order to evidence an employment relationship, there must at a minimum be a writing signed by the defendant that identifies the parties to the transaction, "the fact of plaintiff's employment, . . . [and] the subject matter of the transaction," *id.*, and that writing must either expressly acknowledge that the plaintiff will be paid or request services that, based on the pleaded facts, a "reasonable juror could conclude . . . [were] unlikely to be [requested] if the parties contemplated 'the gratuitous rendition of services,

*Learning Annex Holdings, LLC v. Rich Glob., LLC, 2011 U.S. Dist. LEXIS 76081, 2011 WL 2732550, at *5 (S.D.N.Y. July 11, 2011)* (quoting *Davis & Mamber, Ltd. v. Adrienne Vittadini, Inc., 212 A.D.2d 424, 622 N.Y.S.2d 706, 707 (1995))*; see *Davis & Mamber, 622 N.Y.S.2d at 707* (sustaining a claim for quantum meruit only where letters from the defendant authorized plaintiff to perform services on its behalf, and the letters "could hardly have been an authorization contemplating gratuitous services"); *Shapiro v. Dictaphone Corp., 66 A.D.2d 882, 411 N.Y.S.2d 669, 673 (1978)* ("To sustain a claim for quantum meruit, writings must reflect that the parties reasonably expected that [the requested] services were not to be performed gratuitously").

Thus, [*35] for example, courts have sustained claims in quantum meruit where the plaintiff has produced writings from the defendant reflecting that it was retained to perform services of a specified scope and where the defendant promised that "if a deal is consummated, [it would be] compensated accordingly," even when a specific rate of pay was not reduced to writing, *Vioni, 2009 U.S. Dist. LEXIS 4664, 2009 WL 174937, at *5* (sustaining quantum meruit claim where plaintiff was retained to make a business introduction), and where the defendant agreed to retain the plaintiff on a project of defined scope and the plaintiff agreed that it was obligated and promised its performance, see *Learning Annex, 2011 U.S. Dist. LEXIS 76081, 2011 WL 2732550, at *5* (sustaining quantum meruit claim on the basis of letters, *inter alia*, "expressly authoriz[ing] [plaintiff] 'to develop and conduct . . . seminars with follow-up courses in the United States and Canada'" and reflecting plaintiff's promise to "take the brand to levels they never even dreamed of"); see also *Shapiro, 411 N.Y.S.2d at 673* (sustaining claims for breach of contract and quantum meruit where "the subject matter, plaintiff's role, and the fact that plaintiff's services were never intended to be gratuitously furnished, all are set forth in written matter herein"). "[C]ourts have dismissed quantum [*36] meruit claims under the Statute of Frauds where the writings relied upon failed to establish that the defendant actually agreed to pay a finder's fee, or where the writings left ambiguity as to whether the agreement's terms covered the transaction upon which a fee was claimed." *Springwell Corp., 16 F. Supp. 2d at 305-06* (collecting cases).[2]

Measured against these standards, the Complaint fails to allege writings that evidence an employment relationship, and therefore fails to satisfy the Statute of Frauds. The bulk of the writings alleged in the Complaint are of the type that would be made and executed in the rendering of gratuitous services. They consist of transmitting and relaying comments on a draft NDA, transmitting diligence documents, and setting up calls and meetings. From the pleadings, there is no discussion in any of them that could reasonably be understood to engage WCC in a project of a defined scope or duration or that would imply, expressly or implicitly, that WCC would be paid for its services. To the contrary, Plaintiff admits "[t]here was no set scope of work or any defined list of Services to be performed by WCC in connection with Flipkart's search [*37] for an acquisition target." SAC ¶ 64. Nor is there any writing alleged in which Flipkart acknowledges any obligation to compensate WCC or that it had engaged WCC in an employment relationship.

The closest WCC comes to stating a viable claim is in paragraph 27 of the Complaint, where it alleges "Flipkart instructed WCC in writing and verbally to continue to pursue the transaction on Flipkart's behalf and assured WCC that if a transaction closed WCC would be compensated for the Services," and in the paragraphs characterizing Flipkart's correspondence with it as containing directions. SAC ¶¶ 27, 47-61. But those paragraphs fail to "nudge . . . across the line from conceivable to plausible" WCC's claim that it entered into an employment relationship with Flipkart. *Twombly, 550 U.S. at 570*. For one, as noted, the paragraphs conspicuously do not allege that the assurance that Flipkart would be compensated was in writing. Nor do

---

[2] As then-Judge Sotomayor explained in *Springwell Corp.*, *Cohon* "leaves some ambiguity" about precisely what writings must contain to sustain a claim for quantum meruit. **16 F. Supp. 2d at 305**; see also *Transition Invs., 2012 U.S. Dist. LEXIS 70777, 2012 WL 1848875, at *10*. Some courts in this District have interpreted *Cohon* and its progeny as requiring that writings contain all material terms *except* a particular rate of compensation, see, e.g., *Koch v. Multipan, Inc., 2001 U.S. Dist. LEXIS 2142, 2001 WL 210004, at *5 (S.D.N.Y. Feb. 16, 2001)* (*Cohon* articulates an "all but the compensation standard"), while others have interpreted it as requiring less, see *Learning Annex, 2011 U.S. Dist. LEXIS 76081, 2011 WL 2732550, at *5* (sustaining a claim where writings did not "reflect all material terms" but did evidence an employment relationship) (citation omitted). However, then-Judge Sotomayor explained, in order to "evidence the fact of plaintiff's employment by defendant to render the alleged services," *Morris Cohon & Co., 297 N.Y.S.2d at 953*, "courts have, at a minimum, required the writing relied upon to establish clearly the existence of the alleged . . . agreement and its subject matter," **Springwell Corp., 16 F. Supp. 2d at 305**.

they describe "Services" of defined scope or duration—the word "Services" is Plaintiff's defined term apparently only for purposes of this litigation. *See supra* at 4 n.1. It is not contained in the writings alleged. For another, the paragraphs contain characterizations, "labels and conclusions," and "naked **[*38]** assertion[s]", *Twombly, 550 U.S. at 555, 557*, rather than "factual content," *Iqbal, 556 U.S. at 678*. As Plaintiff admitted at oral argument, it is in possession of the underlying writings that are the basis of its allegations. Those underlying documents, if they had been attached by Plaintiff to its Complaint or even quoted, would either support or, more likely, defeat Plaintiff's claim. It is well established that the underlying documents rather than the Plaintiff's description of them gofvern on a motion to dismiss under *Rule 12(b)(6)*. *See Gray v. Wesco Aircraft Holdings, Inc., 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020)* ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."); (citation omitted); *see also In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004)* ("The court need not accept as true an allegation that is contradicted by the documents on which the complaint relies."). Yet, Plaintiff has eschewed to even quote language from them in an apparent effort to prevent the Court from examining them for their factual content and to determine whether they would state a claim or not. Particularly when the documents are in possession of Plaintiff and integral to the complaint, Plaintiff's conduct is precisely the type of conduct *Twombly* **[*39]** and *Iqbal* condemns.³

In these respects, this case is distinguishable from *Davis & Mamber*, the most closely analogous case Plaintiff is able to cite. There, the defendant, a company engaged in fashion design, had sent writings to the plaintiff whose entire business was in "brokering licensing agreements between fashion designers and manufacturer-marketers" that first "authorized plaintiff to approach four manufacturers" for plaintiff's products and then "authorized plaintiff to approach three other companies." *622 N.Y.S.2d at 707*. The writings thus defined a subject matter on which plaintiff was employed that was of a defined scope. The plaintiff alleged that the defendants orally agreed to pay plaintiff 15% of royalties brokered by plaintiff. Based on the plaintiff's performance of its brokering services, the court sustained the claim in quantum meruit. It reasoned that a "letter to an entity in the business of brokering licensing agreements which letter authorized that entity to approach certain manufacturers, could hardly have been an authorization contemplating gratuitous services." *Id.*

By contrast here, Plaintiff has not produced a writing by which Defendants agreed to employ it, that defines a **[*40]** subject matter or duration or scope of employment, or that conveys explicitly or implicitly a commitment that Plaintiff would be paid for its services. Nor has it alleged facts that the services it did provide would be understood to be provided only if Plaintiff were compensated. The transmission of an NDA and the arrangement of telephone calls and meetings are not alleged to constitute the entirety of the business of a company such as WCC, which is engaged in the M&A advisory business. Moreover, although Plaintiff alleges "[i]t was reasonable for WCC to perform the [s]ervices in reliance on Flipkart's written and verbal promises to pay market compensation for the [s]ervices without a single, comprehensive written contract," the Complaint conspicuously does not allege facts supporting the proposition that the services it performed—relating to the NDA, the setting up of meetings, and the transmission of information—would be performed by someone in its industry only if it were paid.

In sum, the Complaint contains no well-pled allegation of a writing establishing that WCC had an employment relationship with Flipkart. The allegations of the Complaint reflect a commonplace arrangement whereby **[*41]** WCC agreed to perform activities to assist Flipkart in the hope that Flipkart would agree to retain WCC. Therefore, the Complaint does not allege in satisfaction of the Statute of Frauds that WCC did not provide its preliminary services gratuitously. *See Shapiro, 411 N.Y.S.2d at 673*.

---

³ At least as a matter of New York law, "[a] sworn statement that a writing sufficient to satisfy the statute of frauds exists, is not enough to defeat a motion to dismiss under rule 107(8) of the Rules of Civil Practice. It is incumbent upon the party opposing such a motion to produce the writing or explain the failure so to do." *Webb & Knapp v. United Cigar-Whelan Stores Corp., 276 A.D. 583, 96 N.Y.S.2d 359, 360 (1st Dept. 1950)* (per curiam) (holding that "Plaintiffs in this case failed in that respect and as a consequence the motion to dismiss was properly granted."); *see Mendelsohn v. Levine, 24 A.D.2d 1007, 265 N.Y.S.2d 979, 980-81 (1965)* ("We note . . . that no writing sufficient to satisfy the Statute of Frauds has been produced, nor has the failure to produce one been explained by plaintiff; this is required to defeat a motion to dismiss based on the Statute of Frauds.").

### D. Plaintiff fails to state a claim for promissory estoppel

Plaintiff has a high hurdle to surmount in seeking to recover on a promissory estoppel theory for work performed pursuant to an understanding that does not satisfy the Statute of Frauds. Under New York law, "promissory estoppel has three elements: [1] a clear and unambiguous promise; [2] a reasonable and foreseeable reliance by the party to whom the promise is made[;] and [3] an injury sustained by the party asserting the estoppel by reason of the reliance." Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995) (internal citation and quotation marks omitted; *see* CMC Transaction Servs., LLC v. IDEX Corp., 2019 U.S. Dist. LEXIS 129083, 2019 WL 3496643, at *4 (S.D.N.Y. Aug. 1, 2019). "Where a plaintiff's claim for promissory estoppel relies on a writing that does not satisfy the Statute of Frauds, she must demonstrate that the defendant's actions caused her to suffer an 'unconscionable' injury." Vioni, 2009 U.S. Dist. LEXIS 4664, 2009 WL 174937, at *5; *see* Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 826 (2d Cir. 1994) ("To invoke the power that equity possesses to trump the Statute of Frauds, plaintiff must demonstrate 'unconscionable' injury, i.e., injury beyond [*42] that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement."). Such an injury is "one that is both predictable and, to a certain degree, the consequences of the Plaintiff's own choices," Robins v. Zwirner, 713 F. Supp. 2d 367, 377 (S.D.N.Y. 2010), and "courts have continually held [that unconscionable injury] requires more than just a showing of economic harm." Vioni, 2009 U.S. Dist. LEXIS 4664, 2009 WL 174937, at *5. "Thus, in the absence of 'egregious' circumstances, courts have consistently rejected promissory estoppel claims when the alleged injuries consisted of lost profits, lost fees, forgone business opportunities or damage to business reputation." Darby Trading Inc. v. Shell Int'l Trading & Shipping Co., 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008); *see* Philo Smith & Co. v. USLIFE Corp., 554 F.2d 34, 36 (2d Cir. 1977) (affirming district court's dismissal of promissory estoppel claim barred by the Statute of Frauds because plaintiff's injury, the loss of a finder fee commission, was "solely a result of the non-performance of a void agreement" and "not the kind of injury contemplated by New York law" that falls within the unconscionability exception). It is proper to dismiss the cause of action due to lack of an unconscionable injury on the pleadings alone. *See, e.g.,* Komlossy v. Faruqi & Faruqi, LLP, 2017 U.S. Dist. LEXIS 25490, 2017 WL 722033, at *8 (S.D.N.Y. Feb. 23, 2017), aff'd, 714 F. App'x 11 (2d Cir. 2017) (granting defendant's motion to dismiss a claim for unpaid finder fee commission under alleged oral finder fee agreement because [*43] alleged injury did not demonstrate an unconscionable injury).

Plaintiff has not alleged unconscionable injury. The damages it does allege, "while perhaps significant to Plaintiff, are most aptly described as the expectation damages of [the defendant's] non-performance of the unenforceable oral agreement." Darby Trading Inc., 568 F. Supp. 2d at 341. Because such an injury is "solely a result of the non-performance of a void agreement," Philo Smith & Co., 554 F.2d at 36, it does not fall within the unconscionability exception to a promissory estoppel claim otherwise based upon an agreement barred by the Statute of Frauds. The claim is dismissed.

### E. Plaintiff is permitted leave to re-plead

"The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Such leave should not be granted "in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)). There are no allegations of undue delay, bad faith, or dilatory motive. The relevant consideration in this case is "repeated failure to cure deficiencies by amendments previously allowed." *Id.* Plaintiff is now on its third complaint. However, discovery is stayed, and Defendants admitted [*44] at argument that there is no "hidden prejudice" here, apart from the delay caused by the now-lengthy pre-discovery motions practice. Up to this point Plaintiff has made only conclusory allegations. But because Plaintiff claims to have readily available the communications that would give its allegations cognizable meaning, the Court will grant the Plaintiff one final opportunity to amend its Complaint, within thirty (30) days, if it so choses.

### CONCLUSION

For the forgoing reasons, the motion to dismiss is GRANTED without prejudice to the Plaintiff filing an amended complaint within thirty (30) days of this Opinion.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 46.

SO ORDERED.

Dated: January 25, 2021

New York, New York

/s/ Lewis J. Liman

LEWIS J. LIMAN

United States District Judge

---

**End of Document**