# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA WOOD, CAELAN DOHERTY, MAX GOLDSTEIN, BRIDGET LOGAN, JAMES KYLE NEWMAN, ~~ZIA ORAM~~LAKISHA WATSON-MOORE, ALAN ROBINSON, ALEXANDRA MARIE WHEATLEY-DIAZ, ROBIN CEPPOS, NICK COKER, individually and on behalf all others similarly situated, and CHERYL BALDWIN, JONATHAN BARRIO, DESMOND BATTS, GARRETT BECKENBAUGH, COCHIESE BOWERS, MILES CEPLECHA, ~~ROBIN CEPPOS,~~ MELINDA CIRILO, JANE CONRAD, ROBERT CORDOVA, JR., CHRISTINE DOCZY, RACHEL DOUGLAS, THERESA EDWARDS, ELIZA FINK, JASON FINKELSTEIN, ILSE MENDEZ FRAGA, JOSH FREDRICKSON, MARIA GONZALEZ, NATHANIEL ROBERT GROH, BRANDI HARRIS, PETER KAMARA, MACK KENNEDY, MADISON OLIVER MAYS, PATRICK MCHUGH, FRIDA MICHELLE NARANJO, PAUL MONTEROSSO, REY MURPHY, JOSEPH NESTOR, LUKE NICHOLAS, JOSEPHINE OLINGER, ALEC SILVESTER, DANIEL SMITH, CHRIS SOTH, AUDRA TELLEZ, CARLOS TORRES, ELLIOTT TRICOTTI, GLORIA TYLER, ~~LAKISHA WATSON-MOORE,~~ JESSE WEINBERG, CLEM WRIGHT, ANOOSH YARAGHCHIAN, and JESUS ZAMORA, individually,<br><br>                          Plaintiffs,<br><br>       v.<br><br>MIKE BLOOMBERG 2020, INC.,<br><br>                          Defendant. | **No. 20 Civ. 2489 (LTS) (GWG)**<br><br>~~SECOND~~THIRD **AMENDED CLASS AND COLLECTIVE ACTION** AND PAGA **COMPLAINT**<br><br>**Jury Trial Demanded** |

**INTRODUCTION**

Plaintiffs Donna Wood, Caelan Doherty, Max Goldstein, Bridget Logan, James Kyle

Newman, ~~Zia Oram~~Lakisha Watson-Moore, Alan Robinson, Alexandra Marie Wheatley-Diaz,

Robin Ceppos, and Nick Coker (collectively, "Representative Plaintiffs"), individually and on

behalf of all others similarly situated, and Cheryl Baldwin, Jonathan Barrio, Desmond Batts,

Garrett Beckenbaugh, Cochiese Bowers, Miles Ceplecha, ~~Robin Ceppos,~~ Melinda Cirilo, Jane

Conrad, Robert Cordova Jr., Christine Doczy, Rachel Douglas, Theresa Edwards, Eliza Fink,

Jason Finkelstein, Ilse Mendez Fraga, Josh Fredrickson, Maria Gonzalez, Nathaniel Robert Groh,

Brandi Harris, Peter Kamara, Mack Kennedy, Madison Oliver Mays, Patrick McHugh, Paul

Monterosso, Rey Murphy, Frida Michelle Naranjo, Joseph Nestor, Luke Nicholas, Josephine

Olinger, Alec Silvester, Daniel Smith, Chris Soth, Audra Tellez, Carlos Torres, Elliott Tricotti,

Gloria Tyler, ~~Lakisha Watson-Moore,~~ Jesse Weinberg, Clem Wright, Anoosh Yaraghchian, and

Jesus Zamora, individually (collectively, with Representative Plaintiffs, "Plaintiffs"), by their

attorneys, Shavitz Law Group, P.A. and Outten & Golden LLP, upon personal knowledge as to

themselves and upon information and belief as to other matters, allege as follows:

**NATURE OF THE ACTION**

**The Campaign's False Promises Injured Thousands of Former Employees.**

1.      On November 24, 2019, Mike Bloomberg announced his candidacy for President

of the United States in the 2020 Presidential Election.

2.      In or around January 2020, Mike Bloomberg 2020, Inc. (the "Campaign") began hiring Campaign Field Organizers ("FOs")[1] and other Campaign employees, including but not limited to Regional Organizing Directors and Deputy Organizing Directors (collectively, with FOs, "Field Employees") throughout the United States.

3.      Because Mr. Bloomberg was late to enter the election, to attract employees to the FO and other Field Employee positions, the Campaign unambiguously and falsely promised to employ and/or provide them with the opportunity to work on the primary and general elections to support the Democratic presidential nominee, pay them wages, and provide healthcare and other benefits through November 2020.

4.      Due to Mr. Bloomberg's very late entry into the Democratic primary, Mr. Bloomberg knew that it would be difficult or impossible to successfully hire the thousands of FOs and other Field Employees necessary to running a campaign operation.

5.      In order to launch his late campaign, Mr. Bloomberg falsely promised prospective employees, including Plaintiffs, that they would have guaranteed employment, the opportunity to work on the primary and general elections, pay, and benefits through November 2020.

6.      Accordingly, the Campaign had a clear motive to make these false promises— without them, Mr. Bloomberg's presidential ambition would never get off the ground.

7.      Through Mr. Bloomberg, senior officials, and other agents, the Campaign repeatedly promised prospective employees orally and in writing that their employment opportunities were guaranteed through November 2020 and/or the Campaign would provide them with the opportunity to work on the primary and general elections to support the

---

[1]      FOs also include similar job titles, including but not limited to, State Directors of Outreach to the LGBTQ Community and State Directors of Outreach to the Latino Community.

Democratic nominee because, even if Mr. Bloomberg ended his own candidacy, he would

continue his campaign operation—including all staffing, field offices, and other resources—in

support of the Democratic nominee.

8.      Upon information and belief, the Campaign knew the promises to be false and had

the undisclosed intent of not performing the promises at the time the promises were made.  For

this reason, the statements were fraudulent.

9.      The Campaign was well-positioned to carry out its fraudulent promises because,

among other reasons, it advertised open positions nationally and publicly disseminated the false

promises through its extensive media presence.

10.     As a longtime politician and national figure, Mr. Bloomberg possessed trust and

authority that provided him with the opportunity to carry out the false promises that he and the

Campaign made.

11.     For example, on or about December 15, 2019, Mr. Bloomberg publicly stated to

employees at an event to mark the opening of the Campaign's Charlotte, North Carolina office

that the employees would remain employed through November 2020.

12.     The Campaign repeatedly made these promises through Mr. Bloomberg's own

statements, as well those of senior officials, such as Campaign Manager Kevin Sheekey, in

public statements and media interviews.

13.     For example, Mr. Sheekey stated in an interview: "And I guess I would argue,

Mike is doing things for the right reasons.  He got into this campaign to remove Donald Trump.

He's the last person who has to say, 'Hey, this is all about arrogance.  I'll just take my ball and

go home.'  Mike has been very clear that he's in this for the long term.  That was Mike's idea.

'All those leases, sign them through November.  Hire those people through November and if

- 4 -

they're working for us, that's going to be great, and if they're not, they're still going to be working towards what I've said is the most important thing to me this year.'"[2]

14.     Additionally, Tim O'Brien, a Senior Advisor of the Campaign, stated that the Campaign is "building a machine to support Mike Bloomberg's candidacy. . . .  But if he's ultimately not the nominee, everything that we're building we're going to put into service for whoever the Democratic nominee is."[3]

15.     On multiple occasions, Mr. O'Brien and other high-ranking employees of the Campaign publicly reiterated that the Campaign guaranteed jobs for FOs other Field Empoyees Employees through the November election.[4]  Mr. O'Brien stated: "But, you know, for us—and we've said this a lot publicly now—we're hiring people for a year.  This office is going

---

[2]     Joe Hagan, *"We're Going to Spend Trump Out of Office": Bloomberg's Campaign Manager on Why Mike is Still the Democratic Savior*, Vanity Fair (Feb. 24, 2020), https://www.vanityfair.com/news/2020/02/bloombergs-campaign-manager-on-why-mike-is-still-the-democratic-savior.

[3]     Yvonne Wingett Sanchez & Ronald J. Hansen, *Michael Bloomberg Campaign Opens Arizona Offices, Making Year-Long Hires to Help Democrats*, AZCentral (Jan. 11, 2020, 3:16 PM), https://www.azcentral.com/story/news/politics/arizona/2020/01/10/michael-bloomberg-campaign-opens-arizona-offices/4433194002.

[4]     *Id.*; Lizzie Widdicombe, *Does the Bloomberg Superfan Exist?*, New Yorker (Feb. 20, 2020), https://www.newyorker.com/news/campaign-chronicles/does-the-bloomberg-superfan-exist ("Bloomberg has promised his staffers jobs through November, whether or not he's still in the race."); Dan Solomon, *Mike Bloomberg's Pitch to Turn Texas Blue in November Sounds Too Good to Be True—And It Might Be*, TexasMonthly (Feb. 25, 2020), https://www.texasmonthly.com/politics/mike-bloomberg-turn-texas-blue ("He's also made the unusual promise that . . . field organizers will keep their jobs through the election in November, whether or not Bloomberg ends up securing the nomination."); Marty Johnson, *Bloomberg Pledges to Help Fund Democratic Nominee Even If It Isn't Him*, The Hill (Jan. 10, 2020, 10:15 AM), https://thehill.com/homenews/campaign/477670-bloomberg-pledges-to-help-fund-democratic-nominee-even-if-it-isnt-him; Lisa Lerer, *Michael Bloomberg Is Open to Spending $1 Billion to Defeat Trump*, N.Y. Times (Jan. 11, 2020), https://www.nytimes.com/2020/01/11/us/politics/michael-bloomberg-spending.html; Tarini Parti, *Michael Bloomberg to Open New Hampshire Campaign Office—After Primary*, Wall Street J. (Feb. 12, 2020, 5:00 AM), https://www.wsj.com/articles/michael-bloomberg-to-open-new-hampshire-campaign-officeafter-primary-11581501601.

to be open till November.  Everybody is being hired through the election."[5]  When questioned

about whether all campaign employees would be guaranteed employment, Mr. O'Brien affirmed

the promise, stating, "In every state.  *Every* state.  Full time.  We're paying twice as much as

most campaigns pay for our team.  And we're signing them on for a year. . . .  Because we're

building this big political machine that Mike wants to put at the service of the party, or ultimately

whoever the nominee is.  Because first and foremost he wants to see Trump beaten, and that's

really what informed his decision to jump in the race."[6]

16.     Dan Kanninen, the States Director for the Campaign, publicly stated that, "This

commitment to employing organizers through November is an extension of that.  It's another

way for us, in everything we do, to ensure that it's in service of not just making Mike the

nominee but beating Donald Trump and helping Democrats."[7]

17.     Mr. Kanninen also sent an email to all Campaign employees on or about January

13, 2020 stating, "We will have folks on the ground talking to voters every single day from now

to November 3, 2020."

18.     A campaign spokesperson for Defendant also confirmed the promise stating, "The

official line from the campaign is that field operations that Mike Bloomberg 2020 has put in

place will roll into the general election whether he's the nominee or not."[8]

---

[5]      Dan Solomon, *Bloomberg Promised His Texas Staff Jobs Till November, Then Fired
Them All Anyway*, TexasMonthly (Mar. 10, 2020),
https://www.texasmonthly.com/politics/bloomberg-promised-texas-staff-jobs-till-november-
then-fired-them-all-anyway.
[6]      *Id.*
[7]      Chris Smith, *"Bloomberg is Paying Organizers $70 or $80k": Bloomberg Spends Huge
on Ground Game—Through November, Even if He's Out*, Vanity Fair (Dec. 16, 2019),
https://www.vanityfair.com/news/2019/12/bloomberg-spends-huge-on-ground-game-through-
november.
[8]      *Id.*

19.    The Campaign also expressly directed in writing that its regional managerial employees and other agents make these promises while interviewing and recruiting prospective employees as well as after hire during onboarding.

20.    For example, the Campaign's interview notes template included the following: "Employment through November 2020 with Team Bloomberg (not guaranteed location you are at now)."

21.    The Campaign's interview notes template even included the statement "This will be a long primary season" in its list of questions.

22.    The Campaign instructed interviewers to communicate these statements to prospective employees.

23.    The Campaign's director-level employees and managers, at the direction of the Campaign, communicated these false promises consistently to employees across the country.

24.    Director-level individuals that made such false statements include, but are not limited to: Adam Lachman, on or about January 8, 2020; Amol Jethwani, Regional Organizing Director, on or about March 4, 2020 and, upon information and belief, in Florida; Austin Fuller, on or about February 18, 2020; Brendan Keelen, on or about January 8, 2020; Bret Broesder, State Director, on or about February 18, 2020 and, upon information and belief, in Connecticut; Brittany Buford, Deputy Organizing Director, on or about January 15, 2020 and, upon information and belief, in Florida; Carla Collier, on or about January 24, 2020 and, upon information and belief, in Texas; Catherine Whelan, HR Recruiter, on or about January 13, 2020; Chauncey Alexander, Regional Organizing Director, on or about February 4, 2020 and, upon information and belief, in Illinois; Cristina Coleman, Deputy Organizing Director, on or about February 15, 2020 and, upon information and belief, in New York; Daniel Otto, Deputy

- 7 -

Organizing Director, on or about March 4, 2020 and, upon information and belief, in Florida;
Daniel Cha, Recruiting Team Lead, on or about December 30, 2019; Francesca Polemeni,
Recruiter, on or about December 30, 2019; Daniel Hedstrom, State Operations Director, on or
about February 14, 2020 and, upon information and belief, in Minnesota; Daniel Kanninen,
States Director, on or about January 15, 2020; David Allard, Organizing Director, on or about
December 23, 2019 and, upon information and belief, in New York; Diana Hinojosa, Recruiting
Specialist, on or about January 6, 2020; Dominique Davis, Regional Organizing Director, on or
about January 27, 2020 and, upon information and belief, in Texas; Ella Wodin, Assistant to the
National Organizing Director, on or about December 28, 2019; Emily Nyguen, State Director, on
or about February 11, 2020 and, upon information and belief, in Minnesota; Harrison Louis,
Regional Organizing Director, on or about January 23, 2020 and, upon information and belief, in
Washington; Heidi Walker, Director of Operations, on or about January 16, 2020 and, upon
information and belief, in North Carolina; Jacob Field, Deputy Organizing Director, on or about
January 13, 2020 and, upon information and belief, in Florida; Jacob Gunther, on or about
January 15, 2020; Jamarah Hayner, Senior Advisor for Los Angeles, on or about January 20,
2020 and, upon information and belief, in California; James Mitchell, State Director, on or about
January 21, 2020 and, upon information and belief, in North Carolina; Jasmine Webb,
Organizing Director, on or about March 20, 2020 and, upon information and belief, in Illinois;
Jay Hines-Shah, Deputy State Director, on or about February 10, 2020 and, upon information
and belief, in Illinois; Jess Montgomery, State Organizing Director, on or about December 31,
2019 and, upon information and belief, in Florida; Jonathan Salvador, Deputy Organizing
Director, on or about January 21, 2020 and, upon information and belief, in California; Jose
Moreno, on or about February 28, 2020; Joshua Dellaquila, Deputy Organizing Director, on or

about January 13, 2020 and, upon information and belief, in Wisconsin; Josh Sande, on or about

January 25, 2020; Julie Kaviar, Director of Communications, on or about January 15, 2020 and,

upon information and belief, in Illinois; Justin Myers, on or about January 15, 2020; Justin

Vollmer, Senior Advisor, on or about January 22, 2020 and, upon information and belief, in

North Carolina; Kara Highfill, State Director, on or about January 15, 2020 and, upon

information and belief, in Illinois; Karen Ingle, on or about December 20, 2019; Katie

Humphrey, State Political Director, on or about February 4, 2020; Kelly Zimmerman, Field

Director, on or about February 17, 2020 and, upon information and belief, in Pennsylvania;

Kerry Billings, Regional Organizing Director, on or about January 24, 2020 and, upon

information and belief, in Texas; Lindsay Bubar, on or about January 14, 2020; Mark Blakeney,

on or about January 20, 2020; Matthew Taudien, Regional Organizing Director, on or about

January 24, 2020 and, upon information and belief, in Florida; Matthew Carter, on or about

January 15, 2020; Melissa Gallahan, State Director, on or about January 15, 2020 and, upon

information and belief, in Virginia; Michelle Moffit, Organizing Director, on or about January

15, 2020 and, upon information and belief, in Virginia; Nikki Block, on or about January 22,

2020; Patrick Eisenhauer, Central States Organizing Director, on or about December 23, 2019;

Patrick Manglano, Regional Organizing Director, on or about January 31, 2020; Patrick

McDonald, on or about January 19, 2020; Adrianne Vestal, Regional Organizing Director, on or

about January 14, 2020; Faye Mathis, Regional Organizing Director, on or about January 19,

2020; Rob Diamond, East Coast States Director, on or about January 22, 2020; Terry Bermea,

Deputy State Director, on or about February 12, 2020 and, upon information and belief, in

Texas; Tom Bowen, Senior Advisor, on or about March 1, 2020 and, upon information and

belief, in Illinois; Tre Temperilli, Campaign Hiring Manager, on or about January 10, 2020;

- 9 -

Veronica Milliken, on or about February 10, 2020 and, upon information and belief, in Pennsylvania; Winslow Wise, on or about January 17, 2020 and, upon information and belief, in Florida; Zach Bernstein, on or about February 10, 2020; Zachary Sabin, Organizing Director, on or about January 17, 2020.

25.     Plaintiffs, other FOs, and other Field Employees reasonably relied on the promised opportunity to work on the primary and general election campaigns.

26.     Plaintiffs did so because, among other things, Mr. Bloomberg repeatedly pointed to his vast wealth to demonstrate that he had the resources to carry out this promise.

27.     Mr. Bloomberg is one of the 10 wealthiest people in the world.

28.     Reasonably relying on the Campaign's promises, Plaintiffs, other FOs, and other Field Employees took actions to their detriment, including resigning from their then-current employment, relocating, and/or forfeiting other opportunities to work for the Campaign.

29.     Plaintiffs', other FOs', and other Field Employees' actions in reliance on these promises benefitted the Campaign in a concrete way because it enabled the Campaign to pursue Mr. Bloomberg's bid for the nation's highest office.

30.     Upon information and belief, by fraudulently inducing Plaintiffs, other FOs, and other Field Employees to rely on its promises, the Campaign was also able to lure prospective staffers from the campaigns of Mr. Bloomberg's competitors in the primary election, including Joe Biden's.

31.     Plaintiffs, other FOs, and other Field Employees were provided little to no time to begin working on the Campaign after hire.

32.     Many Plaintiffs were urged to pack up and move to new work locations immediately.

33.     Plaintiffs were pressured to act very quickly in beginning to work on the Campaign.

34.     Many Plaintiffs had already begun working, including receiving work-related emails, prior to their official "start date."

35.     Once employed, the Campaign made additional false promises to Plaintiffs, other FOs, and other Field Employees that the Campaign would provide employment and the opportunity to work on both the primary and general election presidential campaigns, pay, and health insurance, and other benefits through November 2020.

36.     For example, the Campaign promised to provide benefits, including full, employer-paid healthcare benefits to Plaintiffs, other FOs, and other Field Employees, and to their spouses, partners, and children.

37.     Additionally, the Campaign promised Plaintiffs, other FOs, and other Field Employees that, even if Mr. Bloomberg did not win the Democratic nomination, the Campaign would continue to provide employment opportunities to work on both the primary and general election presidential campaigns, pay, and benefits to Plaintiffs, other FOs, and other Field Employees through November 2020 to support the Democratic nominee.

38.     Reasonably relying on these promises, Plaintiffs, other FOs, and other Field Employees forwent pursuing other employment opportunities and leaving the Campaign.

39.     Because the Campaign repeatedly promised to provide its staffers with the opportunity to work on the primary and general election campaigns even if Mr. Bloomberg did not become the nominee, Plaintiffs, other FOs, and other Field Employees forwent such opportunities, even after Mr. Bloomberg dropped out of the 2020 presidential race on March 4, 2020.

40.     The Campaign even encouraged Plaintiffs, FOs, and other Field Employees to incorporate the employment promise in their talking points to prospective employees, in order to increase support for Mr. Bloomberg.

41.     In contravention of its promise of continued employment through November 2020, and in the face of a worldwide pandemic and likely global recession, beginning on or about March 9, 2020, the Campaign terminated Plaintiffs, as well as the vast majority of its other FOs and other Field Employees.

42.     The Campaign knew that its promises of guaranteed employment through November 2020 and the opportunity to work on the primary and general election presidential campaign were false when it made them.

43.     The Campaign laid off its entire staff almost immediately after Mr. Bloomberg dropped out of the primary.

44.     The Campaign laid off its entire staff just weeks after hiring some Plaintiffs and other staffers.

45.     The fact that the Campaign laid off its entire staff so quickly strongly demonstrates that the Campaign knew its promises were false when it made them.

46.     The swift and abrupt mass layoff of staffers demonstrates that the Campaign never intended to employ them for the remainder of the primary and general election.

47.     The Campaign's termination of Plaintiffs, other FOs, and other Field Employees deprived them of promised income, healthcare and other benefits, and the meaningful opportunity to work on the primary and general election campaign, leaving them without a source of income and their families potentially uninsured in the face of a global pandemic.

- 12 -

48.     The Campaign repeatedly made promises and false statements to Plaintiffs, other FOs, and other Field Employees about the material fact that the Campaign would provide employment and the opportunity to work on both the primary and general presidential elections, pay and healthcare and other benefits to Plaintiffs, other FOs and other Field Employees through November 2020.

49.     Upon information and belief, the Campaign fraudulently made these promises and false statements knowing—and/or with reckless disregard as to whether they were true—that they would imminently layoff Plaintiffs, other FOs, and other Field Employees.

50.     The Campaign directly told Plaintiffs and other Campaign staffers that they would be guaranteed employment and have the opportunity to work on the primary and general presidential elections, and receive compensation and benefits, through November 2020, and also directed state Directors, Regional Organizing Directors, and others to communicate this guarantee to FOs before and after hiring them.

51.     Upon information and belief, the Campaign made these false statements in order to induce Plaintiffs, other FOs, and other Field Employees to accept positions on the Campaign and continue to work on the Campaign until the Campaign decided to terminate them.

52.     Plaintiffs, other FOs, and other Field Employees relied on the Campaign's promises.

53.     The Campaign's promises of continued employment through November 2020, the opportunity to work on both the primary and general election presidential campaigns, pay, and benefits were material facts that directly influenced Plaintiffs, other FOs, and other Field Employees to accept employment with the Campaign and forgo other opportunities.

54.     Plaintiffs, other FOs, and other Field Employees were injured by relying on the Campaign's promises of employment and opportunities to work on the primary and general election campaigns.

55.     Both before and after the Campaign hired Plaintiffs, other FOs, and other Field Employees, the Campaign reasonably expected its unambiguous promise of employment, pay, and healthcare and other benefits to induce Plaintiffs, other FOs, and other Field Employees to work for the Campaign and forgo other opportunities.

56.     Plaintiffs, other FOs, and other Field Employees reasonably relied on these promises and worked for the Campaign, forgoing other opportunities to their detriment.

57.     Plaintiffs, other FOs, and other Field Employees were injured by the Campaign's conduct where they worked and/or resided.  Upon information and belief, these locations include, but are not limited to, Arizona, California, Colorado, Florida, Georgia, Illinois, Massachusetts, Michigan, Minnesota, New Jersey, New York, North Carolina, Pennsylvania, Texas, Virginia, Wisconsin.

58.     Injustice can only be avoided by requiring the Campaign to comply with its promises.

**The Campaign Misclassified Field Organizers and Failed to Pay Them Overtime.**

59.     As part of Bloomberg's nationwide Campaign efforts, Plaintiffs' and other FOs' primary duties included calling prospective voters to promote Mr. Bloomberg's candidacy for president, door-to-door canvassing, and recruiting volunteers.

60.     On at least a weekly basis, the Campaign required Plaintiffs and other FOs nationwide to participate in all-state conference calls led by its New York City Headquarters office.

- 14 -

61.     Campaign leaders from the New York City Headquarters office frequently visited field offices.

62.     Plaintiffs and other FOs regularly worked in excess of 40 hours per workweek.

63.     The Campaign uniformly classified Plaintiffs' and other FOs' as exempt from overtime pay and did not pay Plaintiffs and other FOs overtime wages.

64.     The Campaign paid Plaintiffs and other FOs approximately $6,000 a month.

65.     The primary duties of Plaintiffs and other FOs do not fall under any of the exemptions to the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA") or the wage and hour laws of New York, California, Michigan, Wisconsin, Illinois, Minnesota, and North Carolina.

66.     This lawsuit seeks to recover overtime compensation for Plaintiffs and similarly situated individuals who have worked as exempt-classified FOs for the Campaign between November 24, 2019 and the present ("Relevant Period").

67.     Representative Plaintiffs bring this action on behalf of themselves and similarly situated current and former employees who elect to opt in to this action pursuant to the FLSA, specifically, the collective action provision of 29 U.S.C. § 216(b), to remedy violations of the wage-and-hour provisions of the FLSA by the Campaign that have deprived Plaintiffs and others similarly situated of their lawfully earned wages.

68.     Plaintiffs, FOs, and other Field Employees used email to communicate daily across state lines with Campaign officials in the Campaign's New York headquarters through email blasts and other messages.

69.     Plaintiffs, FOs, and other Field Employees used telephones (shipped to them from locations in other states) to communicate multiple times a week with Campaign officials in the Campaign's New York headquarters through nationwide telephone conference calls.

70.     Plaintiffs, FOs, and other Field Employees regularly used telephones to communicate across state lines with prospective voters as part of their job duties.

71.     The Campaign required Plaintiffs, FOs, and other Field Employees to use an auto-dialer system as part of their daily job duties.

72.     This auto-dialer regularly connected them with prospective voters across state lines, to contribute to the Campaign's efforts in other states.

73.     In the course of their daily job duties, Plaintiffs, FOs, and other Field Employees used campaign materials, including literature, signs, merchandise, office supplies, and computers that were shipped to their offices across state lines.

74.     Plaintiff Caelan Doherty ("Plaintiff Doherty" or "the Illinois Plaintiff") also brings this action on behalf of herself and similarly situated FOs in Illinois pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") to remedy violations of the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and its implementing regulations.

75.     Plaintiff Max Goldstein ("Plaintiff Goldstein" or "the New York Plaintiff") also brings this action on behalf of himself and similarly situated FOs in New York pursuant to Rule 23 to remedy violations of the New York Labor Law ("NYLL") Article 6, §§ 190 *et seq.*, and Article 19, §§ 650 *et seq.*, and supporting New York State Department of Labor regulations.

76.     Plaintiff Bridget Logan ("Plaintiff Logan" or "the Minnesota Plaintiff") also brings this action on behalf of herself and similarly situated FOs in Minnesota pursuant to Rule

23 to remedy violations of the Minnesota Fair Labor Standards Act ("MFLSA") §§ 177.23, 177.25, and Minn. R. 5200 *et seq.*

77.      Plaintiff James Kyle Newman ("Plaintiff Newman" or "the North Carolina Plaintiff") also brings this action on behalf of himself and similarly situated FOs in North Carolina pursuant to Rule 23 to remedy violations of the North Carolina Wage and Hour Act, N.C. Gen. Stat. Ann. § 95-25.1 *et seq.* ("NCWHA").  Plaintiff Newman brings the NCWHA claims in the alternative to the FLSA claims.

78.      Plaintiff ~~Zia Oram~~Lakisha Watson-Moore ("Plaintiff ~~Oram~~Watson-Moore" or "the Michigan Plaintiff") also brings this action on behalf of himself and similarly situated FOs in Michigan pursuant to Rule 23 to remedy violations of the Michigan Workforce Opportunity Wage Act ("MWOWA"), Mich. Comp. Laws § 408.414a *et seq.*, and Mich. Comp. Laws § 408.412 *et seq.*  Plaintiff ~~Oram~~Watson-Moore brings the MWOWA claims in the alternative to the FLSA claims.

79.      Plaintiff Alan Robinson ("Plaintiff Robinson" or "the Wisconsin Plaintiff") also brings this action on behalf of himself and similarly situated FOs in Wisconsin pursuant to Rule 23 to remedy violations of the Wisconsin Statute §§ 103 and 104 *et seq.*, and Wis. Admin. Code § DWD 274.03.

80.      ~~Plaintiff~~Plaintiffs Alexandra Marie Wheatley-Diaz ("Plaintiff Wheatley-Diaz~~"~~ ~~or"),~~ Robin Ceppos ("Plaintiff Ceppos") and Nick Coker ("Plaintiff Coker")  (collectively "the California ~~Plaintiff~~Plaintiffs") also ~~brings~~bring this action on behalf of ~~herself~~themselves and similarly situated FOs in California pursuant to Rule 23 to remedy violations of the California Labor Code, Cal. Lab. Code §§ 204, 210, 218.5, 226, 226.7, 510, 512, 1174, 1174.5, 1194, 1198, & 2802, California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, ~~and~~

California Wage Order Nos. 4-2001 & 7-2001, and the California Private Attorneys General Act ("PAGA"), Cal. Lab. Code, § 2698 *et seq*.

81.  For a period of 178 days, between April 6, 2020 and October 1, 2020, California courts tolled the statute of limitations for all civil actions due to the COVID-19 pandemic. *See* Rule 9(a), App'x I, Emergency Rules Related to COVID-19, https://www.courts.ca.gov/documents/appendix_I.pdf.

82.  On May 18, 2021, the parties agreed that no statute of limitations on the PAGA claims would run against the California Plaintiffs.

## THE PARTIES

*Representative Plaintiffs*

**Plaintiff Donna Wood**

81.83.  Plaintiff Donna Wood is a resident of North Miami Beach, Florida.  Plaintiff Wood worked as a FO for the Campaign in the Miami, Florida office from approximately January 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Wood left her job as a courier, which she had held for three years.  After Plaintiff Wood was employed by the campaign, Plaintiff Wood relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

82.84.  While employed by the Campaign, Plaintiff Wood regularly worked approximately 70 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Wood $6,000 a month and she received health insurance

- 18 -

and other employee benefits.  Plaintiff Wood is a covered employee within the meaning of the FLSA.

**Plaintiff Robin Ceppos**

85.     Plaintiff Robin Ceppos is a resident of Los Angeles, California.  Plaintiff Ceppos worked as an FO for the Campaign in the downtown Los Angeles office and, later, in the Pasadena office from approximately late January 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Ceppos left her employment as a public relations representative in Washington, D.C. and moved across the country to California.  After Plaintiff Ceppos was employed by the Campaign, Plaintiff Ceppos relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

86.     While employed by the Campaign, Plaintiff Ceppos regularly worked approximately 65 hours a week or more, including the week of February 24, 2020.  Plaintiff Ceppos also routinely worked more than eight hours per day.  The Campaign did not, however, list the number of hours that she worked during a pay period on her wage statements.  The Campaign did not provide Plaintiff Ceppos with adequate meal or rest breaks and did not reimburse her for all necessary expenditures that she incurred in the discharge of her duties, such as travel expenses.  The Campaign paid Plaintiff Ceppos $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Ceppos is a covered employee within the meaning of the FLSA and California state law.

**Plaintiff Nick Coker**

87.    Plaintiff Nick Coker is a resident of Bonita, California.  Plaintiff Coker worked as an FO for the Campaign in the San Diego office from approximately late January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Coker relocated from Rosarito, Mexico to San Diego, California.  After Plaintiff Coker was employed by the Campaign, Plaintiff Coker relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

88.    While employed by the Campaign, Plaintiff Coker regularly worked approximately 70 hours a week or more, including the week of February 10, 2020.  Plaintiff Coker also routinely worked more than eight hours per day.  The Campaign did not, however, list the number of hours that he worked during a pay period on his wage statements.  The Campaign did not provide Plaintiff Coker with adequate meal or rest breaks and did not reimburse him for all necessary expenditures that he incurred in the discharge of her duties, such as travel expenses.  The Campaign paid Plaintiff Coker $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Coker is a covered employee within the meaning of the FLSA and California state law.

**Plaintiff Caelan Doherty**

83.89.  Plaintiff Caelan Doherty is a resident of Burlington, Massachusetts.  Plaintiff Doherty worked as an FO for the Campaign in the Chicago Northside office in Illinois from approximately January 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Doherty planned to take leave from college for at least a semester.

- 20 -

After Plaintiff Doherty was employed by the Campaign, Plaintiff Doherty relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

84.90.  While employed by the Campaign, Plaintiff Doherty regularly worked approximately 70 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Doherty $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Doherty is a covered employee within the meaning of the FLSA and Illinois state law.

**Plaintiff Max Goldstein**

85.91.  Plaintiff Max Goldstein is a resident of New York, New York.  Plaintiff Goldstein worked as an FO for the Campaign in the New York, New York office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Goldstein left his job at Royal Media, which he had held for two years.  After Plaintiff Goldstein was employed by the Campaign, Plaintiff Goldstein relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

86.92.  While employed by the Campaign, Plaintiff Goldstein regularly worked approximately 70 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Goldstein $6,000 a month and he received health insurance and other employee benefits.  When the Campaign hired Plaintiff Goldstein, it failed to provide him with a written notice that included his hourly rate or rates of pay and overtime rate of rates of pay, in violation of NYLL.  The Campaign also failed to provide Plaintiff Goldstein

with wage statements with his overtime rate.  At his time of hire, Plaintiff Goldstein is a covered employee within the meaning of the FLSA and the NYLL.

**Plaintiff Bridget Logan**

87.93.  Plaintiff Bridget Logan is a resident of Plymouth, Minnesota.  Plaintiff Logan worked as a FO for the Campaign in the St. Anthony, Minnesota office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Logan her job with Minnetuka Title Company, which she had held for six years. After Plaintiff Logan was employed by the Campaign, Plaintiff Logan relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.  Plaintiff Logan relied on the Campaign's continued promise of employment through November 2020 and did not pursue different employment.

88.94.  While employed by the Campaign, Plaintiff Logan regularly worked approximately 50 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Logan $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Logan is a covered employee within the meaning of the FLSA and Minnesota state law.

**Plaintiff James Kyle Newman**

89.95.  Plaintiff James Kyle Newman is a resident of Winston-Salem, North Carolina. Plaintiff Newman worked as an FO for the Campaign in the Winston-Salem, North Carolina office from approximately late January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits

through November 2020, Plaintiff Newman turned down other potential employment opportunities.  After Plaintiff Newman was employed by the Campaign, Plaintiff Newman relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

90.96.  While employed by the Campaign, Plaintiff Newman regularly worked approximately 65 hours a week or more, including the week of February 24, 2020.  The Campaign paid Plaintiff Newman $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Newman is a covered employee within the meaning of the FLSA and/or North Carolina state law.

**Plaintiff Zia Oram**

91.    Plaintiff Zia Oram is a resident of Farmington, Michigan.  Plaintiff Oram worked as a FO for the Campaign in the Oakland County, Michigan office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary through November 2020, Plaintiff Oram agreed to work for the Campaign over other job opportunities.  After Plaintiff Oram was employed by the Campaign, Plaintiff Oram relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary through November 2020 and did not pursue different employment.  Plaintiff Oram has a baby due in July 2020 and was relying on his continued employment with the Campaign to support his family.

92.    While employed by the Campaign, Plaintiff Oram regularly worked approximately 60 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Oram $6,000 a month which he needed to support him

and his family.  Plaintiff Oram is a covered employee within the meaning of the FLSA and/or Michigan state law.

**Plaintiff Alan Robinson**

93.97.  Plaintiff Alan Robinson is a resident of Madison, Wisconsin.  Plaintiff Robinson worked as a FO for the Campaign in the Madison, Wisconsin office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Robinson left his job at NORML Wisconsin.  After Plaintiff Robinson was employed by the Campaign, Plaintiff Robinson relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

94.98.  While employed by the Campaign, Plaintiff Robinson regularly worked approximately 60 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Robinson $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Robinson is a covered employee within the meaning of the FLSA and Wisconsin state law.

**Plaintiff Lakisha Watson-Moore**

99.     Plaintiff Lakisha Watson-Moore is a resident of Horn Lake, Mississippi.  Plaintiff Watson-Moore worked as an FO for the Campaign in the Oakland County, Michigan office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Watson-Moore left her employment at the University of Memphis. After Plaintiff Watson-Moore was employed by the Campaign, Plaintiff Watson-Moore relied on

- 24 -

the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

100.    While employed by the Campaign, Plaintiff Watson-Moore regularly worked approximately about 80 hours a week, including the week of February 24, 2020.  The Campaign paid Plaintiff Watson-Moore $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Watson-Moore is a covered employee within the meaning of the FLSA and/or Michigan state law.

**Plaintiff Alexandra Marie Wheatley-Diaz**

95.101.        Plaintiff Alexandra Marie Wheatley-Diaz is a resident of Manhattan Beach, California.  Plaintiff Wheatley-Diaz worked as a FO for the Campaign in the Los Angeles, California office from approximately January 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Wheatley-Diaz reduced her hours at her job with an insurance firm by nearly half.  After Plaintiff Wheatley-Diaz was employed by the Campaign, Plaintiff Wheatley-Diaz relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

96.102.        While employed by the Campaign, Plaintiff Wheatley-Diaz regularly worked approximately 65 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  Plaintiff Wheatley-Diaz also routinely worked more than eight hours per day.  The Campaign paid Plaintiff Wheatley-Diaz $6,000 a month and she received health insurance and other employee benefits.  The Campaign, however, did not timely pay Plaintiff Wheatley-Diaz – although she started with the Campaign in mid-January, she did not receive her first

- 25 -

paycheck until mid-February.  Additionally, the Campaign did not list the number of hours that she worked during a pay period on her wage statements.  The Campaign also failed to provide Plaintiff Wheatley-Diaz with adequate meal or rest breaks and failed to reimburse her for all necessary expenditures that she incurred in the discharge of her duties, including gas, routine car maintenance, parking, and insurance.  Plaintiff Wheatley-Diaz is a covered employee within the meaning of the FLSA and California state law.

***Individual Plaintiffs***

**Plaintiff Cheryl Baldwin**

97.103.        Plaintiff Cheryl Baldwin is a resident of Morrow, Georgia.  Plaintiff Baldwin worked as an FO for the Campaign in the Tallahassee, Florida and Jacksonville, Florida offices from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Baldwin turned down another employment opportunity that would have been closer to her home, leased her home in Georgia, moved to Florida, and canceled her Medicare insurance benefits.  After Plaintiff Baldwin was employed by the Campaign, Plaintiff Baldwin relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

98.104.        While employed by the Campaign, Plaintiff Baldwin regularly worked approximately over 80 hours a week, including the week of February 24, 2020.  The Campaign paid Plaintiff Baldwin $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Baldwin is a covered employee within the meaning of the FLSA.

**Plaintiff Jonathan Barrio**

99.105.        Plaintiff Jonathan Barrio is a resident of Charlotte, North Carolina.

Plaintiff Barrio worked as the Campaign's North Carolina Director for LGBTQ issues.  Plaintiff

Barrio worked out of the Charlotte, North Carolina office from approximately February 2020

until March 2020, when the Campaign terminated him.  Plaintiff Barrio's job duties included:

state-wide outreach on LGBTQ issues such as meetings with stake holders and interfacing with

LGBTQ people throughout North Carolina.  He got his talking points on these issues from

Campaign headquarters in New York.  Plaintiff Barrio did not hire or fire any Field Employees

and did not supervise anyone employed by the Campaign.  Plaintiff Barrio performed all of his

job duties pursuant to instructions from the Campaign's headquarters.  Relying on the

Campaign's promise of employment and/or guaranteed salary and benefits through November

2020, Plaintiff Barrio left his job at Equality North Carolina, where he was a development

director.  After Plaintiff Barrio was employed by the Campaign, Plaintiff Barrio relied on the

Campaign's continued and repeated promise of employment and/or guaranteed salary and

benefits through November 2020 and turned down other job opportunities.

100.106.        While employed by the Campaign, Plaintiff Barrio regularly worked

approximately over 60 hours a week, including the week preceding March 3, 2020, which was

Super Tuesday.  The Campaign paid Plaintiff Barrio $10,000 a month and he received health

insurance and other employee benefits.  Plaintiff Barrio is a covered employee within the meaning

of the FLSA and/or North Carolina state law.

**Plaintiff Desmond Batts**

101.107.        Plaintiff Desmond Batts is a resident of Tampa, Florida.  Plaintiff Batts

worked as a Regional Organizing Director for the Campaign in the Tampa, Florida office from

approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on

- 27 -

the Campaign's promise of employment and/or guaranteed salary and benefits through

November 2020, Plaintiff Batts resigned from another job.  After Plaintiff Batts was employed

by the Campaign, Plaintiff Batts relied on the Campaign's continued and repeated promise of

employment and/or guaranteed salary and benefits through November 2020 and did not pursue

different employment.  Plaintiff Batts performed all of his job duties pursuant to instructions and

direction from the Campaign's headquarters.

102.108.      While employed by the Campaign, Plaintiff Batts regularly worked

approximately 70 hours a week or more, including during the week of February 25, 2020.  The

Campaign paid Plaintiff Batts $8,000 a month and he received health insurance and other

employee benefits.  Plaintiff Batts is a covered employee within the meaning of the FLSA.

**Plaintiff Garrett Beckenbaugh**

103.109.      Plaintiff Garrett Beckenbaugh is a resident of Orlando, Florida.  Plaintiff

Beckenbaugh worked as an FO for the Campaign in the Orlando, Florida office from

approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on

the Campaign's promise of employment and/or guaranteed salary and benefits through

November 2020, Plaintiff Beckenbaugh left his employment, which he would not have done

without the promise of compensation through November.  After Plaintiff Beckenbaugh was

employed by the Campaign, Plaintiff Beckenbaugh relied on the Campaign's continued and

repeated promise of employment and/or guaranteed salary and benefits through November 2020

and did not pursue different employment.

104.110.      While employed by the Campaign, Plaintiff Beckenbaugh regularly

worked approximately 70-80 hours a week, including working approximately 70 hours the week

of February 24, 2020.  The Campaign paid Plaintiff Beckenbaugh $6,000 a month and he

received health insurance and other employee benefits.  Plaintiff Beckenbaugh is a covered employee within the meaning of the FLSA.

**Plaintiff Cochiese Bowers**

~~105.~~111.      Plaintiff Cochiese Bowers is a resident of Atlanta, Georgia.  Plaintiff Bowers worked as an FO for the Campaign in Atlanta, Georgia office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Bowers gave up his job at a non-profit working for schools.  After Plaintiff Bowers was employed by the Campaign, Plaintiff Bowers relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

~~106.~~112.      While employed by the Campaign, Plaintiff Bowers regularly worked approximately about 80 hours a week, including the week of February 24, 2020.  The Campaign paid Plaintiff Bowers $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Bowers is a covered employee within the meaning of the FLSA.

**Plaintiff Miles Ceplecha**

~~107.~~113.      Plaintiff Miles Ceplecha is a resident of St. Paul, Minnesota.  Plaintiff Ceplecha worked as an FO for the Campaign in the St. Anthony, Minnesota office from approximately January 13, 2020 to March 13, 2020, when the Campaign terminated him. Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Ceplecha stopped taking on contract work and did not move forward with other job opportunities when he decided to join the Campaign. After Plaintiff Ceplecha was employed by the Campaign, Plaintiff Ceplecha relied on the Campaign's

- 29 -

continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

108.114.    While employed by the Campaign, Plaintiff Ceplecha regularly worked approximately 60 to 80 hours a week.  During the first three weeks of his employment, he worked about 5 days a week and 12-hour days.  After that, he worked seven days per week and between 70 to 80 hours a week.  During the week of February 3, 2020, Plaintiff Ceplecha worked seven days and about 80 hours.  The Campaign paid Plaintiff Ceplecha $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Ceplechais a covered employee within the meaning of the FLSA and Minnesota state law.

**Plaintiff Robin Ceppos**

109.1.   Plaintiff Robin Ceppos is a resident of Los Angeles, California.  Plaintiff Ceppos worked as an FO for the Campaign in the downtown Los Angeles office and, later, in the Pasadena office from approximately late January 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Ceppos left her employment as a public relations representative in Washington, D.C. and moved across the country to California.  After Plaintiff Ceppos was employed by the Campaign, Plaintiff Ceppos relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

110.1.   While employed by the Campaign, Plaintiff Ceppos regularly worked approximately 65 hours a week or more, including the week of February 24, 2020.  Plaintiff Ceppos also routinely worked more than eight hours per day.  The Campaign did not, however, list the number of hours that she worked during a pay period on her wage statements.  The

- 30 -

Formatted: Level 1, Indent: First line:  0.5"

~~Campaign did not provide Plaintiff Ceppos with adequate meal or rest breaks and did not reimburse her for all necessary expenditures that she incurred in the discharge of her duties, such as travel expenses.  The Campaign paid Plaintiff Ceppos $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Ceppos is a covered employee within the meaning of the FLSA and California state law.~~

**Plaintiff Melinda Cirilo**

~~111.~~115.      Plaintiff Melinda Cirilo is a resident of San Antonio, Texas.  Plaintiff Cirilo worked as an FO for the Campaign in the San Antonio, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Cirilo left her employment where she was a temporary employee and gave up the opportunity to become a permanent employee.  After Plaintiff Cirilo was employed by the Campaign, Plaintiff Cirilo relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

~~112.~~116.      While employed by the Campaign, Plaintiff Cirilo regularly worked approximately about 80 hours a week, including the week of February 17, 2020.  The Campaign paid Plaintiff Cirilo $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Cirilo is a covered employee within the meaning of the FLSA.

**Plaintiff Jane Conrad**

~~113.~~117.      Plaintiff Jane Conrad is a resident of Richmond, Minnesota.  Plaintiff Conrad worked as a Regional Organizing Director for the Campaign in the St. Paul, Minnesota office from approximately February 2020 until March 2020, when the Campaign terminated her.

Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Conrad took a leave of absence from her job at a union until the end of 2020.  After Plaintiff Conrad was employed by the Campaign, Plaintiff Conrad relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.  Plaintiff Conrad performed all of her job duties pursuant to instructions from the Campaign's headquarters.

114.118.	The Campaign paid Plaintiff Conrad $8,000 a month and she received health insurance and other employee benefits.

**Plaintiff Robert Cordova, Jr.**

115.119.	Plaintiff Robert Cordova, Jr. is a resident of Tampa, Florida.  Plaintiff Cordova worked as a FO for the Campaign in the Tampa, Florida office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Cordova left his employment.  After Plaintiff Cordova was employed by the Campaign, Plaintiff Cordova relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

116.120.	While employed by the Campaign, Plaintiff Cordova regularly worked approximately 84 hours a week, including the week of February 24, 2020.  The Campaign paid Plaintiff Cordova $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Cordova is a covered employee within the meaning of the FLSA.

**Plaintiff Christine Doczy**

117.121.       Plaintiff Christine Doczy is a resident of Venice, Florida.  Plaintiff Doczy

worked as an FO for the Campaign in the Sarasota, Florida office from approximately February

2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise

of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Doczy

turned down several other employment opportunities.  After Plaintiff Doczy was employed by

the Campaign, Plaintiff Doczy relied on the Campaign's continued and repeated promise of

employment and/or guaranteed salary and benefits through November 2020 and did not pursue

different employment.

118.122.       While employed by the Campaign, Plaintiff Doczy regularly worked

approximately about 70 hours a week, including the week of February 25, 2020.  The Campaign

paid Plaintiff Doczy $6,000 a month and she received health insurance and other employee

benefits.  Plaintiff Doczy is a covered employee within the meaning of the FLSA.

**Plaintiff Rachel Douglas**

119.123.       Plaintiff Rachel Douglas is a resident of Los Angeles, California.  Plaintiff

Douglas worked as an FO for the Campaign in the Downtown Los Angeles office and, later, the

Pasadena, California office from approximately February 2020 until March 2020, when the

Campaign terminated her.  Relying on the Campaign's promise of employment and/or

guaranteed salary and benefits through November 2020, Plaintiff Douglas stopped providing

full-time care for her disabled son and hired additional help to provide for his care.  After

Plaintiff Douglas was employed by the Campaign, Plaintiff Douglas relied on the Campaign's

continued and repeated promise of employment and/or guaranteed salary and benefits through

November 2020 and did not pursue different employment.

- 33 -

120.124.     While employed by the Campaign, Plaintiff Douglas regularly worked approximately about 70 hours a week, including the week of February 24, 2020.  Plaintiff Douglas also routinely worked more than eight hours per day.  The Campaign did not, however, list the number of hours that she worked during a pay period on her wage statements.  The Campaign did not provide Plaintiff Douglas with adequate meal or rest breaks and did not reimburse her for all necessary expenditures that she incurred in the discharge of her duties, such as travel expenses.  The Campaign paid Plaintiff Douglas $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Douglas is a covered employee within the meaning of the FLSA and California state law.

**Plaintiff Theresa Edwards**

121.125.     Plaintiff Theresa Edwards is a resident of Cedar Park, Texas.  Plaintiff Edwards worked as an FO for the Campaign in the Boca Raton, Florida office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Edwards left her employment.  After Plaintiff Edwards was employed by the Campaign, Plaintiff Edwards relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

122.126.     While employed by the Campaign, Plaintiff Edwards regularly worked approximately about 50 to 60 hours a week, including 55 hours the week of March 2, 2020.  The

- 34 -

Campaign paid Plaintiff Edwards $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Edwards is a covered employee within the meaning of the FLSA.

**Plaintiff Eliza Fink**

123.127.      Plaintiff Eliza Fink is a resident of West Hartford, Connecticut.  Plaintiff Fink worked as an FO for the Campaign in the Milford, Connecticut office from approximately February 17, 2020 to March 9, 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Fink left her employment and decided to join the Campaign. After Plaintiff Fink was employed by the Campaign, Plaintiff Fink relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

124.128.      While employed by the Campaign, Plaintiff Fink regularly worked approximately 65 to 70 hours a week, including the week of February 24, 2020.  The Campaign paid Plaintiff Fink $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Fink is a covered employee within the meaning of the FLSA.

**Plaintiff Jason Finkelstein**

125.129.      Plaintiff Jason Finkelstein is a resident of Aventura, Florida.  Plaintiff Finkelstein worked as an FO for the Campaign in the Miami North Dade office approximately from January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Finkelstein quit his job and turned down two other employment opportunities. After Plaintiff Finkelstein was employed by the Campaign, Plaintiff Finkelstein relied on the

- 35 -

Campaign's continued and repeated promise of employment and/or guaranteed salary and
benefits through November 2020 and did not pursue different employment.

126.130.      While employed by the Campaign, Plaintiff Finkelstein regularly worked
approximately over 70 hours a week, including working approximately 70 hours the week of
February 24, 2020.  The Campaign paid Plaintiff Finkelstein $6,000 a month and he received
health insurance and other employee benefits.  Plaintiff Finkelstein is a covered employee within
the meaning of the FLSA.

**Plaintiff Ilse Mendez Fraga**

127.131.      Plaintiff Ilse Mendez Fraga is a resident of Laredo, Texas.  Plaintiff Fraga
worked as an FO for the Campaign in the Laredo, Texas office from approximately February
2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise
of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Fraga
left her employment at the local school district.  After Plaintiff Fraga was employed by the
Campaign, Plaintiff Fraga relied on the Campaign's continued and repeated promise of
employment and/or guaranteed salary and benefits through November 2020 and did not pursue
different employment.

128.132.      While employed by the Campaign, Plaintiff Fraga regularly worked
approximately about 80 hours a week, including the week of February 24, 2020.  The Campaign
paid Plaintiff Fraga $6,000 a month and she received health insurance and other employee
benefits.  Plaintiff Fraga is a covered employee within the meaning of the FLSA.

**Plaintiff Josh Fredrickson**

129.133.      Plaintiff Josh Fredrickson is a resident of Chicago, Illinois.  Plaintiff
Fredrickson worked as a Regional Organizing Director for the Campaign in the Chicago, Illinois

- 36 -

office from approximately January 2020 until March 2020, when the Campaign terminated him. Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Fredrickson left a job on a state senate campaign and lost prospective employment from that race.  After Plaintiff Fredrickson was employed by the Campaign, Plaintiff Fredrickson relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.  Plaintiff Frederickson performed all of his job duties pursuant to instructions from the Campaign's headquarters.

130.134.      The Campaign paid Plaintiff Fredrickson $8,000 a month and he received health insurance and other employee benefits.

**Plaintiff Maria Gonzalez**

131.135.      Plaintiff Maria Gonzalez is a resident of Hollywood, Florida.  Plaintiff Gonzalez worked as an FO for the Campaign in the Gainesville, Florida office starting on approximately January 23, 2020, and was then promoted to a District Organizer position, which she held from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Gonzalez resigned from her prior employment.  After Plaintiff Gonzalez was employed by the Campaign, Plaintiff Gonzalez relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

132.136.      While employed by the Campaign as an FO, Plaintiff Gonzalez regularly worked approximately over 70 hours a week, including 70 hours the week of January 27, 2020. The Campaign paid Plaintiff Gonzalez $6,000 a month for the FO position and $8,000 a month

- 37 -

for the District Organizer position and she received health insurance and other employee benefits.  Plaintiff Gonzalez is a covered employee within the meaning of the FLSA.

**Plaintiff Nathaniel Robert Groh**

133.137.      Plaintiff Nathaniel Robert Groh is a resident of Palatine, Illinois.  Plaintiff Groh worked as a Regional Organizing Director for the Campaign in the Rockford, Illinois office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Groh left a job with State Representative Mark Walker.  After Plaintiff Groh was employed by the Campaign, Plaintiff Groh relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.  Plaintiff Groh performed all of his job duties pursuant to instructions from the Campaign's headquarters.

134.138.      The Campaign paid Plaintiff Groh $8,000 a month and he received health insurance and other employee benefits.

**Plaintiff Brandi Harris**

135.139.      Plaintiff Brandi Harris is a resident of Houston, Texas.  Plaintiff Harris worked as an FO for the Campaign in the San Antonio, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Harris relocated from Houston to San Antonio.  After Plaintiff Harris was employed by the Campaign, Plaintiff Harris relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

136.140.      While employed by the Campaign, Plaintiff Harris regularly worked approximately about 80 hours a week, including the week of February 25, 2020.  The Campaign paid Plaintiff Harris $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Harris is a covered employee within the meaning of the FLSA.

**Plaintiff Peter Kamara**

137.141.      Plaintiff Peter Kamara is a resident of Fridley, Minnesota.  Plaintiff Kamara worked as an FO for the Campaign in the Blaine, Minnesota office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Kamara resigned from his job.  After Plaintiff Kamara was employed by the Campaign, Plaintiff Kamara relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

138.142.      While employed by the Campaign, Plaintiff Kamara regularly worked approximately over 75 hours a week, including working approximately 75 hours the week of January 20, 2020.  The Campaign paid Plaintiff Kamara $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Kamara is a covered employee within the meaning of the FLSA and Minnesota state law.

**Plaintiff Mack Kennedy**

139.143.      Plaintiff Mack Kennedy is a resident of Gainesville, Florida.  Plaintiff Kennedy worked as an FO for the Campaign in the Gainesville, Florida office from

approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on

the Campaign's promise of employment and/or guaranteed salary and benefits through

November 2020, Plaintiff Kennedy left his employment, which he had held for at least a year.

After Plaintiff Kennedy was employed by the Campaign, Plaintiff Kennedy relied on the

Campaign's continued and repeated promise of employment and/or guaranteed salary and

benefits through November 2020 and did not pursue different employment.

140.144.      While employed by the Campaign, Plaintiff Kennedy regularly worked

approximately 50 to 55 hours a week, including the week of February 17, 2020.  The Campaign

paid Plaintiff Kennedy $6,000 a month and he received health insurance and other employee

benefits.  Plaintiff Kennedy is a covered employee within the meaning of the FLSA.

**Plaintiff Madison Oliver Mays**

141.145.      Plaintiff Madison Oliver Mays is a resident of Huntersville, North

Carolina.  Plaintiff Mays worked as a FO for the Campaign in the Tampa, Florida office from

approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on

the Campaign's promise of employment and/or guaranteed salary and benefits through

November 2020, Plaintiff Mays relocated from North Carolina to Florida.  After Plaintiff Mays

was employed by the Campaign, Plaintiff Mays relied on the Campaign's continued and repeated

promise of employment and/or guaranteed salary and benefits through November 2020 and did

not pursue different employment.

142.146.      While employed by the Campaign, Plaintiff Mays regularly worked

approximately 70 hours a week or more, including approximately 84 hours the week of February

24, 2020.  The Campaign paid Plaintiff Mays $6,000 a month and she received health insurance

- 40 -

and other employee benefits.  Plaintiff Mays is a covered employee within the meaning of the FLSA and/or North Carolina law.

**Plaintiff Patrick McHugh**

~~143.~~147.      Plaintiff Patrick McHugh is a resident of Lake Worth, Florida.  Plaintiff McHugh worked as an FO for the Campaign in the West Palm Beach and Boca Raton, Florida offices from approximately January 2020 until March 2020, when the Campaign terminated him. Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff McHugh turned down other job opportunities.  After Plaintiff McHugh was employed by the Campaign, Plaintiff McHugh relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

~~144.~~148.      While employed by the Campaign, Plaintiff McHugh regularly worked approximately over 70 hours a week, including working approximately 84 hours the week of February 18, 2020.  The Campaign paid Plaintiff McHugh $6,000 a month and he received health insurance and other employee benefits.  Plaintiff McHugh is a covered employee within the meaning of the FLSA.

**Plaintiff Paul Monterosso**

~~145.~~149.      Plaintiff Paul Monterosso is a resident of North Palm Beach, Florida. Plaintiff Monterosso worked as a FO for the Campaign in the West Palm Beach, Florida office from approximately January 2020 until March 2020, when the Campaign terminated him. Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Monterosso quit his job as an estimator with a contracting firm.  After Plaintiff Monterosso was employed by the Campaign, Plaintiff Murphy relied on the

Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

146.150.    While employed by the Campaign, Plaintiff Monterosso regularly worked approximately 70 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Monterosso $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Monterosso is a covered employee within the meaning of the FLSA.

**Plaintiff Rey Murphy**

147.151.    Plaintiff Rey Murphy is a resident of Tucson, Arizona.  Plaintiff Murphy worked as a FO for the Campaign in the Tucson, Arizona office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Murphy forwent another job opportunity.  After Plaintiff Murphy was employed by the Campaign, Plaintiff Murphy relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

148.152.    While employed by the Campaign, Plaintiff Murphy regularly worked approximately 80 hours a week, including the week preceding March 3, 2020, which was Super Tuesday.  The Campaign paid Plaintiff Murphy $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Murphy is a covered employee within the meaning of the FLSA.

**Plaintiff Frida Michelle Naranjo**

149.153.    Plaintiff Christine Naranjo is a resident of McAllen, Texas.  Plaintiff

- 42 -

Naranjo worked as an FO for the Campaign in the McAllen, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her. Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Naranjo left her employment. After Plaintiff Naranjo was employed by the Campaign, Plaintiff Naranjo relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

150.154.    While employed by the Campaign, Plaintiff Naranjo regularly worked approximately about 80 hours a week, including the week of February 25, 2020. The Campaign paid Plaintiff Naranjo $6,000 a month and she received health insurance and other employee benefits. Plaintiff Naranjo is a covered employee within the meaning of the FLSA.

**Plaintiff Joseph Nestor**

151.155.    Plaintiff Joseph Nestor is a resident of Tampa, Florida. Plaintiff Nestor worked as a Regional Organizing Director for the Campaign in the Florida from approximately January 20, 2020 until March 20, 2020, when the Campaign terminated him. Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Nestor turned down jobs which he would handle for his consulting companies and also rejected interviews for other jobs. After Plaintiff Nestor was employed by the Campaign, Plaintiff Nestor relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment. Plaintiff Nestor performed all of his job duties pursuant to instructions from the Campaign's headquarters.

152.156.    The Campaign paid Plaintiff Nestor $8,000 a month and he received

- 43 -

health insurance and other employee benefits.

**Plaintiff Luke Nicholas**

~~153.~~157.      Plaintiff Luke Nicholas is a resident of Stafford, Virginia.  Plaintiff

Nicholas worked as an FO for the Campaign in the Manassas, Virginia office from

approximately the first week of February until approximately March 2020, when the Campaign

terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary

and benefits through November 2020, Plaintiff Nicholas left his undergraduate program and quit

his job.  After Plaintiff Nicholas was employed by the Campaign, Plaintiff Nicholas relied on the

Campaign's continued and repeated promise of employment and/or guaranteed salary and

benefits through November 2020 and did not pursue different employment.

~~154.~~158.      While employed by the Campaign, Plaintiff Nicholas regularly worked

approximately over 60 hours a week, including working approximately 80 hours the week of

February 24, 2020.  The Campaign paid Plaintiff Nicholas $6,000 a month and he received

health insurance and other employee benefits.  Plaintiff Nicholas is a covered employee within the

meaning of the FLSA.

**Plaintiff Josephine Olinger**

~~155.~~159.      Plaintiff Josephine Olinger is a resident of Spring, Texas.  Plaintiff

Olinger worked as an FO for the Campaign in the San Marcos, Texas office from approximately

February 2020 until March 2020, when the Campaign terminated her.  Relying on the

Campaign's promise of employment and/or guaranteed salary and benefits through November

2020, Plaintiff Olinger turned down another employment opportunity that would have been

closer to her home and moved to San Marcos, Texas.  After Plaintiff Olinger was employed by

the Campaign, Plaintiff Olinger relied on the Campaign's continued and repeated promise of

- 44 -

employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

156.160.      While employed by the Campaign, Plaintiff Olinger regularly worked approximately 70-75 hours a week or more, including the week of February 24, 2020.  The Campaign paid Plaintiff Olinger $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Olinger is a covered employee within the meaning of the FLSA.

**Plaintiff Alec Silvester**

157.161.      Plaintiff Alec Silvester is a resident of Tallahassee, Florida.  Plaintiff Silvester worked as an FO for the Campaign in the Tallahassee, Florida office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Silvester delayed applying to and enrolling in law school.  After Plaintiff Silvester was employed by the Campaign, Plaintiff Silvester relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

While employed by the Campaign, Plaintiff Silvester regularly worked approximately over 70 hours a week, including during the week of February 4, 2020.  The Campaign paid Plaintiff Silvester $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Silvester is a covered employee within the meaning of the FLSA.

**Plaintiff Daniel Smith**

158.162.      Plaintiff Daniel Smith is a resident of Detroit, Michigan.  Plaintiff Smith worked as a FO for the Campaign in the Detroit, Michigan and Westland, Michigan offices from approximately December 2019 until March 2020, when the Campaign terminated him.  Relying

- 45 -

on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Smith forewent other opportunities. After Plaintiff Smith was employed by the Campaign, Plaintiff Smith relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

159. 163.    While employed by the Campaign, Plaintiff Smith regularly worked approximately 65 to 70 hours a week, including the week preceding March 3, 2020, which was Super Tuesday. The Campaign paid Plaintiff Smith $6,000 a month and he received health insurance and other employee benefits. Plaintiff Smith is a covered employee within the meaning of the FLSA and/or Michigan state law.

**Plaintiff Chris Soth**

160. 164.    Plaintiff Chris Soth is a resident of Minneapolis, Minnesota. Plaintiff Soth worked as an FO for the Campaign in the Blaine, Minnesota office from approximately January 2020 until March 2020, when the Campaign terminated him. Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Soth left his employment. After Plaintiff Soth was employed by the Campaign, Plaintiff Soth relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

161. 165.    While employed by the Campaign, Plaintiff Soth regularly worked approximately 40 to 60 hours a week, if not more, including working approximately 90 hours the week of February 25, 2020. The Campaign paid Plaintiff Soth $6,000 a month and he received

- 46 -

health insurance and other employee benefits.  Plaintiff Soth is a covered employee within the meaning of the FLSA and Minnesota state law.

**Plaintiff Audra Tellez**

162.166.      Plaintiff Audra Tellez is a resident of Clinton, Texas.  Plaintiff Tellez worked as an FO for the Campaign in the El Paso, Texas office from approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Tellez left her employment.  After Plaintiff Tellez was employed by the Campaign, Plaintiff Tellez relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

163.167.      While employed by the Campaign, Plaintiff Tellez regularly worked seven days a week and 12-hour days.  She worked approximately 75 to 80 hours a week, including the week of February 17, 2020.  The Campaign paid Plaintiff Tellez $6,000 a month and she received health insurance and other employee benefits.  Plaintiff Tellez is a covered employee within the meaning of the FLSA.

**Plaintiff Carlos Torres**

164.168.      Plaintiff Carlos Torres is a resident of Fort Lauderdale, Florida.  Plaintiff Torres worked as an FO for the Campaign in the Miami, Florida office from approximately January 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Torres left his employment with a Medicare insurance agency.  After Plaintiff Torres was employed by the Campaign, Plaintiff Torres relied on the Campaign's continued and

- 47 -

repeated promise of employment and/or guaranteed salary and benefits through November 2020
and did not pursue different employment.

165.169.      While employed by the Campaign, Plaintiff Torres regularly worked
approximately over 75 hours a week, including during the week of February 25, 2020.  The
Campaign paid Plaintiff Torres $6,000 a month and he received health insurance and other
employee benefits.  Plaintiff Torres is a covered employee within the meaning of the FLSA.

**Plaintiff Elliot Tricotti**

166.170.      Plaintiff Elliot Tricotti is a resident of Austin, Texas.  Plaintiff Tricotti
worked as an FO for the Campaign in the Laredo and Austin, Texas offices from approximately
February 2020 until March 2020, when the Campaign terminated him.  Relying on the
Campaign's promise of employment and/or guaranteed salary and benefits through November
2020, Plaintiff Tricotti dropped clients from his consulting business.  After Plaintiff Tricotti was
employed by the Campaign, Plaintiff Tricotti relied on the Campaign's continued and repeated
promise of employment and/or guaranteed salary and benefits through November 2020 and did
not pursue different employment.

167.171.      While employed by the Campaign, Plaintiff Tricotti regularly worked
approximately over 80 hours a week, including working approximately 90 hours the week of
February 18, 2020.  The Campaign paid Plaintiff Tricotti $6,000 a month and he received health
insurance and other employee benefits.  Plaintiff Tricotti is a covered employee within the
meaning of the FLSA.

**Plaintiff Gloria Tyler**

168.172.      Plaintiff Gloria Tyler is a resident of Waller, Texas.  Plaintiff Tyler
worked as an FO for the Campaign in the San Antonio, Texas office from approximately

- 48 -

February 2020 until March 2020, when the Campaign terminated her.  Relying on the

Campaign's promise of employment and/or guaranteed salary and benefits through November

2020, Plaintiff Tyler relocated from California.  After Plaintiff Tyler was employed by the

Campaign, Plaintiff Tyler relied on the Campaign's continued and repeated promise of

employment and/or guaranteed salary and benefits through November 2020 and did not pursue

different employment.

169.173.　　　While employed by the Campaign, Plaintiff Tyler regularly worked

approximately about 80 hours a week, including the week of February 25, 2020.  The Campaign

paid Plaintiff Tyler $6,000 a month and she received health insurance and other employee

benefits.  Plaintiff Tyler is a covered employee within the meaning of the FLSA.

**Plaintiff Lakisha Watson-Moore**

170.1.   Plaintiff Lakisha Watson-Moore is a resident of Horn Lake, Mississippi.  Plaintiff

Watson-Moore worked as an FO for the Campaign in the Oakland County, Michigan office from

approximately February 2020 until March 2020, when the Campaign terminated her.  Relying on

the Campaign's promise of employment and/or guaranteed salary and benefits through

November 2020, Plaintiff Watson-Moore left her employment at the University of Memphis.

After Plaintiff Watson-Moore was employed by the Campaign, Plaintiff Watson-Moore relied on

the Campaign's continued and repeated promise of employment and/or guaranteed salary and

benefits through November 2020 and did not pursue different employment.

171.1.   While employed by the Campaign, Plaintiff Watson-Moore regularly worked

approximately about 80 hours a week, including the week of February 24, 2020.  The Campaign

paid Plaintiff Watson-Moore $6,000 a month and she received health insurance and other

- 49 -

employee benefits.  Plaintiff Watson-Moore is a covered employee within the meaning of the FLSA and/or Michigan state law.

**Plaintiff Jesse Weinberg**

172.174.     Plaintiff Jesse Weinberg is a resident of Chicago, Illinois.  Plaintiff Weinberg worked as an FO for the Campaign in the Rockford, Illinois office from approximately February 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Weinberg left his prior employment as a political strategist.  After Plaintiff Weinberg was employed by the Campaign, Plaintiff Weinberg relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

173.175.     While employed by the Campaign, Plaintiff Weinberg regularly worked approximately 60 to 70 hours or more a week, including working approximately 60 to 70 hours the week of February 25, 2020.  The Campaign paid Plaintiff Weinberg $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Weinberg is a covered employee within the meaning of the FLSA and Illinois state law.

**Plaintiff Clem Wright**

174.176.     Plaintiff Clem Wright is a resident of Memphis, Tennessee.  Plaintiff Wright worked as a FO for the Campaign in the Detroit, Michigan office from approximately February 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November

2020, Plaintiff Wright left his IT job and relocated from Memphis, Tennessee to Detroit, Michigan.  After Plaintiff Wright was employed by the Campaign, Plaintiff Wright relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

175.177.    While employed by the Campaign, Plaintiff Wright regularly worked seven days per week and 12-hour shifts per day, including the week preceding March 3, 2020, which was Super Tuesday, when he worked about 80 hours.  The Campaign paid Plaintiff Wright $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Wright is a covered employee within the meaning of the FLSA and/or Michigan state law.

**Plaintiff Anoosh Yaraghchian**

176.178.    Plaintiff Anoosh Yaraghchian is a resident of Rancho Palos Verdes, California.  Plaintiff Yaraghchian worked as an FO for the Campaign in the Los Angeles, California office from approximately February 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Yaraghchian forewent other potential employment opportunities.  After Plaintiff Yaraghchian was employed by the Campaign, Plaintiff Yaraghchian relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

177.179.    While employed by the Campaign, Plaintiff Yaraghchian regularly worked approximately over 65 hours a week, including working approximately 70 hours the week of February 17, 2020.  Plaintiff Yaraghchian also routinely worked more than eight hours per day.  The Campaign did not permit Plaintiff Yaraghchian to take any meal or rest breaks and did not

- 51 -

reimburse him for all necessary expenditures that she incurred in the discharge of his duties, including travel expenses.  The Campaign paid Plaintiff Yaraghchian $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Yaraghchian is a covered employee within the meaning of the FLSA and California state law.

**Plaintiff Jesus Zamora**

178.180.      Plaintiff Jesus Zamora is a resident of Houston, Texas.  Plaintiff Zamora worked as an FO for the Campaign in the Houston office from approximately February 2020 until March 2020, when the Campaign terminated him.  Relying on the Campaign's promise of employment and/or guaranteed salary and benefits through November 2020, Plaintiff Zamora left his prior employment.  After Plaintiff Zamora was employed by the Campaign, Plaintiff Zamora relied on the Campaign's continued and repeated promise of employment and/or guaranteed salary and benefits through November 2020 and did not pursue different employment.

179.181.      While employed by the Campaign, Plaintiff Zamora regularly worked approximately 70-80 hours a week, including working approximately 80 hours the week of February 25, 2020.  The Campaign paid Plaintiff Zamora $6,000 a month and he received health insurance and other employee benefits.  Plaintiff Zamora is a covered employee within the meaning of the FLSA.

***Defendant Mike Bloomberg 2020, Inc.***

180.182.      The Campaign is a Delaware corporation with its headquarters in New York.  The Campaign maintained offices nationwide, over which it had substantial control.

181.183.      The Campaign employed Plaintiffs and similarly situated employees in states across the country within the meaning of the FLSA and the state laws of New York, California, Michigan, Wisconsin, Illinois, Minnesota, and North Carolina.  The Campaign had

substantial control over Plaintiffs' working conditions and the unlawful policies and practices alleged herein.

182.184.     The Campaign is a covered employer within the meaning of the FLSA and the state laws of New York, California, Michigan, Wisconsin, Illinois, Minnesota, and North Carolina and, at all times relevant, employed and/or jointly employed Plaintiff and similarly situated FOs.  Plaintiffs reported to the Campaign's worksites.

183.185.     As stated in the Campaign's Certificate of Incorporation, the Campaign had the following purposes: "To solicit and accept contributions, *to make expenditures and disbursements*, and to engage in any activities related to federal elections or issues of public importance that are authorized by and are consistent with Section 527 of the Internal Revenue Code."

184.186.     The Campaign did not operate with any charitable, educational, or religious purpose.

185.187.     Instead, the Campaign's primary purpose was to promote the private interests of Michael Bloomberg.

186.188.     The Campaign engaged in commercial activities, including the sale of branded merchandise, with the business purposes of raising revenue, collecting voter data, and marketing the Campaign.

187.189.     The Campaign used the instrumentalities of interstate commerce to engage in its commercial transactions, including the internet and methods of interstate shipping and delivery.

188.190.     The Campaign engaged in commercial activities resulting in sales exceeding $500,000.

- 53 -

189.191.      The Campaign operated as a commercial seller of branded merchandise.

190.192.      The Campaign sold products including t-shirts, hats, bumper stickers, tote bags, mugs, pins, socks, sweatshirts, and various other items.

191.193.      The Campaign charged up to $50.95 per item for its merchandise.

192.194.      The Campaign competed in a commercial marketplace for political campaign merchandise.

193.195.      For example, other online sellers sell Bloomberg merchandise on websites including but not limited to https://www.zazzle.com/s/bloomberg and https://www.teepublic.com/t-shirts?query=bloomberg.

194.196.      The Campaign competed with these other online sellers.

195.197.      The Campaign also sold merchandise marketed to individuals who disfavor President Trump.

196.198.      For example, the Campaign sold matches featuring President Trump's image with the words "You're Fired" and t-shirts featuring a likeness of President Trump's hair on a globe with the words "Clear the Hair."

197.199.      The Campaign charged up to $19.81 for these items.

198.200.      The Campaign competed in a commercial marketplace for merchandise marketed to individuals who disfavor President Trump.

199.201.      For example, other online sellers sell such merchandise on websites including, but not limited to, http://www.zazzle.com and http://www.teepublic.com.

200.202.      The Campaign competed with these other online sellers.

201.203.      The Campaign did not accept individual donations.

202.204.      The Campaign's website did not provide a button or link to donate to the

Campaign.

203.205.      However, the Campaign's website prominently featured a link to "shop" at

its online store, as pictured here:



204.206.      The Campaign reported to the Federal Election Commission ("FEC") that

it took in $890,000 from individuals.

205.207.      The Campaign took in these funds despite not accepting individual

donations.

206.208.      Federal election law requires amounts paid for campaign merchandise to

be reported to the FEC as individual contributions.

207.209.      Accordingly, upon information and belief, most or all of the reported

$890,000 reflects purchases of merchandise sold through the Campaign's store.

208.210.      Based on FEC filings, the Campaign spent $2.5 million to create online

merchandise for its commercial sales.

209.211.      Plaintiffs were instructed to direct attendees at events to the Campaign's

online store to purchase merchandise.

210.212.      The sale of merchandise is an integral part of the Campaign's generation

of revenue and promotion of the interests of Michael Bloomberg.[9]

---

[9]      *See* Wash. Post Staff, *Merch Madness: The 2020 Presidential Campaigns' Battle Over*

211.213.	At all times relevant, the Campaign maintained control, oversight and direction over Plaintiffs and similarly situated FOs and other Field Employees, including timekeeping, payroll, and other employment practices that applied to them.

212.214.	The Campaign applied the same employment policies, practices, and procedures to all FOs and other Field Employees during the Relevant Period.

## JURISDICTION AND VENUE

213.215.	This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  The Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332.

214.216.	In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

215.217.	This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

216.218.	Venue is proper in the Southern District of New York pursuant to

---

*Branding*, Wash. Post (Feb. 28, 2020), https://www.washingtonpost.com/graphics/2020/politics/2020-campaign-merchandise-candidate-strategy ("Sales of official merchandise are considered campaign contributions, and these items have played a big role in the presidential candidates' fundraising."); Zachary Small, *How the Political Merchandising Industry Has Shaped the Primary*, New York Mag. (Mar. 2, 2020), https://nymag.com/intelligencer/2020/03/has-2020-election-primary-merchandise-mattered.html ("Over the last few decades, political marketing has become a multibillion-dollar industry, and campaign managers have increasingly looked to merchandise as a powerful branding tool capable of conveying a politician's platform."); Mihr Zaveri & Alan Yuhas, *Where Does All the Swag Go After Campaigns Fail? Everywhere*, N.Y. Times (last updated Mar. 5, 2020), https://www.nytimes.com/2020/02/25/us/politics/leftover-campaign-shirts-hats-mugs.html ("For decades, American presidential campaigns have churned out enormous quantities of swag—$5 buttons, $15 mugs, $75 guacamole bowls—to promote candidates, fill campaign coffers and gather sophisticated data about supporters.").

**Formatted:** Font color: Auto

28 U.S.C. § 1391(a).  The Campaign is based in this District and transacts business here.  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in New York, New York.

### COLLECTIVE-WIDE FACTUAL ALLEGATIONS

217.219.      Representative Plaintiffs bring the First Cause of Action, pursuant to FLSA, 29 U.S.C. § 216(b), on behalf of themselves and all similarly situated persons who work or have worked for the Campaign as FOs during the Relevant Period (the "FLSA Collective").

218.220.      All of the work that Representative Plaintiffs and the FLSA Collective have performed has been assigned by the Campaign and/or the Campaign has been aware of all of the work that Representative Plaintiffs and the FLSA Collective have performed.

219.221.      As part of its regular business practice, during the Relevant Period, the Campaign engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Representative Plaintiffs and the FLSA Collective.  This policy and pattern or practice includes, but is not limited to:

> a.      failing to pay Representative Plaintiffs and the members of the FLSA Collective overtime wages for hours that they worked in excess of 40 hours per workweek; and
>
> b.      misclassifying Representative Plaintiffs and the members of the FLSA Collective as exempt from the protections of the FLSA.

220.222.      The Campaign is aware or should have been aware that federal law required them to pay employees performing non-exempt duties, including Representative Plaintiffs and members of the FLSA Collective, an overtime premium for hours worked in excess of 40 per workweek.

221.223.      Representative Plaintiffs and the FLSA Collective all perform or performed the same or similar primary duty – making campaign telephone calls.

- 57 -

222.224.    Throughout their employment with the Campaign, Representative Plaintiffs and the members of the FLSA Collective consistently worked more than 40 hours per week.

223.225.    The Campaign failed to pay Representative Plaintiffs and the members of the FLSA Collective any overtime compensation for any of the hours worked over 40 in a workweek.

224.226.    Representative Plaintiffs and the FLSA Collective's primary duty was not management but rather non-exempt job duties such as making phone calls nationwide to potential voters to promote Mr. Bloomberg's candidacy for President of the United States and to recruit volunteers to aid in phone banking and canvassing efforts for Mr. Bloomberg's Campaign.

225.227.    Representative Plaintiffs and the FLSA Collective did not exercise a meaningful degree of independent discretion with respect to the exercise of their duties and were required to follow the policies, practices, and procedures set by the Campaign.  Representative Plaintiffs and the FLSA Collective did not have any independent discretionary authority to deviate from these policies, practices, and procedures.

## CLASS-WIDE ALLEGATIONS

226.228.    Representative Plaintiffs bring the Causes of Action for Claims Sixteen and Seventeen as a class action pursuant to Rule 23(a), (b)(3) and/or (c)(4).

227.229.    The putative class that Plaintiffs seek to represent is defined as:

The Campaign's FOs and other Field Employees throughout the United States who were terminated on or after March 4, 2020 (the "Class").

228.230.    To the extent the Court applies different state laws to Claims Sixteen and Seventeen depending on the states where Class Members reside and/or where Class Members

experienced harms, the Class should be divided into subclasses, as follows:

The Campaign's FOs and other Field Employees employed in Illinois who were terminated on or after March 4, 2020 (the "Illinois Subclass");

The Campaign's FOs and other Field Employees employed in Minnesota who were terminated on or after March 4, 2020 (the "Minnesota Subclass");

The Campaign's FOs and other Field Employees employed in North Carolina who were terminated on or after March 4, 2020 (the "North Carolina Subclass");

The Campaign's FOs and other Field Employees employed in Michigan who were terminated on or after March 4, 2020 (the "Michigan Subclass");

The Campaign's FOs and other Field Employees employed in Wisconsin who were terminated on or after March 4, 2020 (the "Wisconsin Subclass");

The Campaign's FOs and other Field Employees employed in California who were terminated on or after March 4, 2020 (the "California Subclass");

The Campaign's FOs and other Field Employees employed in Florida who were terminated on or after March 4, 2020 (the "Florida Subclass");

The Campaign's FOs and other Field Employees employed in Texas who were terminated on or after March 4, 2020 (the "Texas Subclass");

The Campaign's FOs and other Field Employees employed in Pennsylvania who were terminated on or after March 4, 2020 (the "Pennsylvania Subclass");

The Campaign's FOs and other Field Employees employed in Virginia who were terminated on or after March 4, 2020 (the "Virginia Subclass");

The Campaign's FOs and other Field Employees employed in Georgia who were terminated on or after March 4, 2020 (the "Georgia Subclass");

The Campaign's FOs and other Field Employees employed in Colorado who were terminated on or after March 4, 2020 (the "Colorado Subclass");

The Campaign's FOs and other Field Employees employed in Massachusetts who were terminated on or after March 4, 2020 (the "Massachusetts Subclass");

The Campaign's FOs and other Field Employees employed in Arizona who were terminated on or after March 4, 2020 (the "Arizona Subclass");

The Campaign's FOs and other Field Employees employed in New York who were terminated on or after March 4, 2020 (the "New York Subclass"); and

The Campaign's FOs and other Field Employees employed in New Jersey who were terminated on or after March 4, 2020 (the "New Jersey Subclass").

229.231.    Numerosity:  Upon information and belief, the Campaign employed thousands of FOs and other Field Employees.  The number of putative Class Members are therefore far too numerous to be individually joined in this lawsuit.

230.232.    Upon information and belief, there are more than 40 members of each subclass identified above.

231.233.    Existence and Predominance of Common Questions:  There are questions of law and fact common to Plaintiffs and putative Class Members that predominate over any questions affecting only individual members of the Class.  These common questions of law and fact include, without limitation:

    a.    Whether the Campaign unambiguously promised Class Members to provide employment and the opportunity to work on the primary and general elections, pay, and benefits through November 2020;

    b.    Whether the Campaign reasonably expected or foresaw that Class Members would act in reliance on that promise;

    c.    Whether Class Members acted in reliance on the Campaign's repeated promises of employment, pay, and insurance through November 2020 by accepting the Campaign's job offer and continuing to work for the Campaign;

    d.    Whether Defendant failed to provide employment and opportunities, pay and benefits to Class Members as promised through November 2020;

    e.    Whether Class Members were injured by the Campaign's refusal to perform its promise of employment, pay, and benefits through November 2020;

    f.    Whether injustice can only be avoided by enforcement of the promise;

- 60 -

g.      Whether the Campaign made a false statement concerning the
material fact that Class Members would be employed, paid, and
have benefits through November 2020;

h.      Whether the Campaign had knowledge that the statement was false,
and/or it acted in reckless disregard as to whether it was true;

i.      Whether the Campaign made the false statement with the intent that
it be acted upon by Class Members;

j.      Whether Class Members acted in reliance on the false statement;
and

k.      Whether Class Members suffered injury by acting in reliance on the
false statement.

232.234.      These same questions of law and fact are present for each subclass

identified above.

233.235.      Typicality:  Representative Plaintiffs' claims are typical of the claims of the

Class they seek to represent.  Representative Plaintiffs relied on the Campaign's false promises

when they agreed to work for the Campaign.  Representative Plaintiffs and the putative Class

Members sustained the same or similar injuries and damages of loss of other opportunities,

income, health insurance, and other benefits.  Representative Plaintiffs' claims are thereby

representative of and co-extensive with the claims of the Class they seek to represent.

234.236.      Plaintiffs' claims are typical of the members of each subclass identified

above.

235.237.      Adequacy:  Representative Plaintiffs will fairly and adequately represent

and protect the interests of the Class that they seek to represent because Representative Plaintiffs'

interests do not conflict with the interests of the members of the Class they seek to represent.

Representative Plaintiffs have retained counsel competent and experienced in complex class action

litigation on behalf of employees and intends to prosecute this action vigorously.  Representative

Plaintiffs and their Counsel will fairly and adequately protect the interests of the Class.

236.238.     Plaintiffs and their Counsel will adequately represent and protect the interests of members of each subclass identified above.

237.239.     Superiority:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Class Members is not practicable, and questions of law and fact common to Representative Plaintiffs and putative Class Members predominate over any questions affecting only individual members of the Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

238.240.     A class action is superior for the adjudication of the claims for each subclass identified above.

239.241.     The claims are appropriate for certification under Rule 23(b)(3) for the reasons pleaded above, and further because each member of the Class, or separate Subclasses, is entitled to a recovery because of the Campaign's common, uniform actions, and additionally is unlikely to have a sufficient amount of individual damages to justify pursuing an individual federal court action or to obtain counsel to pursue an individual litigation.

240.242.     The claims are also appropriate for certification under Rule 23(c)(4) because there are particular, common issues of fact and law that may be adjudicated on behalf of the Class and/or Subclasses.

241.243.     In the alternative, the Class may be certified because the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, and, in turn, would establish

- 62 -

incompatible standards of conduct for the Campaign.

242.244.        Class treatment will allow those similarly situated persons to litigate their

claims in the manner most efficient and economical for the Parties and the judicial system.

243.245.        Representative Plaintiffs know of no difficulty that would be encountered in

the management of this litigation that would preclude its maintenance as a class action.

### NEW YORK CLASS ALLEGATIONS

244.246.        The New York Plaintiff brings this claim as a class action pursuant to Rule

23.

245.247.        The putative class that the New York Plaintiff seeks to represent is a class of

FOs who worked in New York during the relevant period (the "New York Class").

246.248.        Numerosity:  Upon information and belief, the number of FOs employed by

the Campaign in New York exceeds forty.  The number of putative New York Class Members are

therefore far too numerous to be individually joined in this lawsuit.

247.249.        Existence and Predominance of Common Questions:  There are questions of

law and fact common to the New York Plaintiff and putative New York Class Members that

predominate over any questions affecting only individual members of the New York Class.  These

common questions of law and fact include, without limitation:

    a.      Whether the Campaign failed to pay the New York Plaintiff and the
            members of the New York Class overtime wages for hours that they
            worked in excess of 40 hours per workweek;

    b.      Whether the Campaign misclassified the New York Plaintiff and the
            members of the New York Class as exempt from the protections of the
            NYLL;

    c.      Whether the Campaign failed to furnish the New York Plaintiff and the
            members of the New York Class with an accurate statement of wages that
            included the hourly rate or rates of pay and overtime rate of rates of pay,
            as required by the Wage Theft Prevention Act;

    d.    Whether the Campaign failed to furnish the New York Plaintiff and the
          members of the New York Class with an accurate notice at the time of hire,
          which included overtime rates, as required by the Wage Theft Prevention
          Act; and

    e.    Whether the Campaign failed to furnish the New York Plaintiff and the
          members of the New York Class with an accurate annual notice, as
          required by the Wage Theft Prevention Act.

248.250.    Typicality:  The New York Plaintiff's claims are typical of those claims

which could be alleged by any New York Class Member, and the relief sought is typical of the

relief which would be sought by each New York Class Member in separate actions.

    249.251.    Adequacy:  The New York Plaintiff will fairly and adequately represent and

protect the interests of the New York Class that he seeks to represent because the New York

Plaintiff's interests do not conflict with the interests of the members of the New York Class he

seeks to represent.  The New York Plaintiff has retained counsel competent and experienced in

complex class action litigation on behalf of employees and intends to prosecute this action

vigorously.  The New York Plaintiff and his Counsel will fairly and adequately protect the interests

of the New York Class.

    250.252.    Superiority:  A class action is superior to other available means for the fair

and efficient adjudication of this controversy.  Individual joinder of all putative New York Class

Members is not practicable, and questions of law and fact common to the New York Plaintiff and

putative New York Class Members predominate over any questions affecting only individual

members of the New York Class.  Individualized litigation increases the delay and expense to all

parties and the Court.  By contrast, class action treatment will allow those similarly situated

persons to litigate their claims in the manner that is most efficient and economical for the parties

and the judicial system.

    251.253.    In the alternative, the New York Class may be certified because the

prosecution of separate actions by the individual members of the New York Class would create a risk of inconsistent or varying adjudication with respect to individual members of the New York Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

252.254.    Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

253.255.    The New York Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

**CALIFORNIA CLASS ALLEGATIONS**

254.256.    The California Plaintiff brings Plaintiffs bring this claim as a class action pursuant to Rule 23.

255.257.    The putative class that the California Plaintiff seeks Plaintiffs seek to represent is a class of FOs who worked in California during the relevant period (the "California Class").

256.258.    Numerosity:  Upon information and belief, the number of FOs employed by the Campaign in California exceeds forty.  The number of putative California Class Members are therefore far too numerous to be individually joined in this lawsuit.

257.259.    Existence and Predominance of Common Questions:  There are questions of law and fact common to the California Plaintiff Plaintiffs and putative California Class Members that predominate over any questions affecting only individual members of the California Class. These common questions of law and fact include, without limitation:

    a.    Whether the Campaign unlawfully failed to pay the California Class Members overtime compensation owed, in violation of the California Labor Code and related regulations;

    b.    Whether California Class members were non-exempt employees entitled to overtime compensation for overtime hours worked under California

- 65 -

law;

 c. Whether the Campaign unlawfully failed to keep and furnish the California Class Members with timely, accurate, and itemized records of hours worked in violation of Cal. Labor Code §§ 226 and 1174;

 d. Whether the Campaign unlawfully failed to furnish the California Class members with proper meal and rest periods, in violation Cal. Lab. Code §§ 226.7, 512 and applicable wage orders;

 e. Whether the Campaign failed to reimburse the California Class Members for reasonable and necessary business expenses in violation of Cal. Labor Code § 2802; and

 f. Whether the Campaign failed to timely pay wages to the California Class Members in violation of Cal. Lab. Code §§ 204, 210.

~~258.~~260. **Typicality**:  The California ~~Plaintiff's~~Plaintiffs' claims are typical of those claims which could be alleged by any California Member, and the relief sought is typical of the relief which would be sought by each California Class Member in separate actions.

~~259.~~261. **Adequacy**:  The California ~~Plaintiff~~Plaintiffs will fairly and adequately represent and protect the interests of the California Class that she seeks to represent because the California ~~Plaintiff's~~Plaintiffs' interests do not conflict with the interests of the members of the California Class ~~she seeks~~they seek to represent.  The California ~~Plaintiff has~~Plaintiffs have retained counsel competent and experienced in complex class action litigation on behalf of employees and ~~intends~~intend to prosecute this action vigorously.  The California ~~Plaintiff~~Plaintiffs and ~~her~~ their Counsel will fairly and adequately protect the interests of the California Class.

~~260.~~262. **Superiority**:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative California Class Members is not practicable, and questions of law and fact common to the California ~~Plaintiff~~Plaintiffs and putative California Class Members predominate over any questions affecting only individual members of the California Class.  Individualized litigation increases the delay and

expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

261.263.      In the alternative, the California Class may be certified because the prosecution of separate actions by the individual members of the California Class would create a risk of inconsistent or varying adjudication with respect to individual members of the California Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

262.264.      Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

263.265.      The California Plaintiff knowsPlaintiffs know of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

**MICHIGAN CLASS ALLEGATIONS**

264.266.      The Michigan Plaintiff brings this claim as a class action pursuant to Rule 23.

265.267.      The putative class that the Michigan Plaintiff seeks to represent is a class of FOs who worked in Michigan during the relevant period (the "Michigan Class").  The Michigan Class is brought in the alternative to the FLSA Collective.

266.268.      Numerosity:  Upon information and belief, the number of FOs employed by the Campaign in Michigan exceeds forty.  The number of putative Michigan Class Members are therefore far too numerous to be individually joined in this lawsuit.

267.269.      Existence and Predominance of Common Questions:  There are questions of law and fact common to the Michigan Plaintiff and putative Michigan Class Members that

predominate over any questions affecting only individual members of the Michigan Class.  These common questions of law and fact include, without limitation:

  a.  Whether the Campaign failed to pay the Michigan Plaintiff and the members of the Michigan Class overtime wages for hours that they worked in excess of 40 hours per workweek; and

  b.  Whether the Campaign misclassified the Michigan Plaintiff and the members of the Michigan Class as exempt from the protections of the MWOWA.

268.270.    Typicality:  The Michigan Plaintiff's claims are typical of those claims which could be alleged by any Michigan Class Member, and the relief sought is typical of the relief which would be sought by each Michigan Class Member in separate actions.

269.271.    Adequacy:  The Michigan Plaintiff will fairly and adequately represent and protect the interests of the Michigan Class that he seeks to represent because the Michigan Plaintiff's interests do not conflict with the interests of the members of the Michigan Class he seeks to represent.  The Michigan Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The Michigan Plaintiff and his Counsel will fairly and adequately protect the interests of the Michigan Class.

270.272.    Superiority:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Michigan Class Members is not practicable, and questions of law and fact common to the Michigan Plaintiff and putative Michigan Class Members predominate over any questions affecting only individual members of the Michigan Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

271.273.      In the alternative, the Michigan Class may be certified because the prosecution of separate actions by the individual members of the Michigan Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Michigan Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

272.274.      Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

273.275.      The Michigan Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## WISCONSIN CLASS ALLEGATIONS

274.276.      The Wisconsin Plaintiff brings this claim as a class action pursuant to Rule 23.

275.277.      The putative class that the Wisconsin Plaintiff seeks to represent is a class of FOs who worked in Wisconsin during the relevant period (the "Wisconsin Class").

276.278.      Numerosity:  Upon information and belief, the number of FOs employed by the Campaign in Wisconsin exceeds forty.  The number of putative Wisconsin Class Members are therefore far too numerous to be individually joined in this lawsuit.

277.279.      Existence and Predominance of Common Questions:  There are questions of law and fact common to the Wisconsin Plaintiff and putative Wisconsin Class Members that predominate over any questions affecting only individual members of the Wisconsin Class.  These common questions of law and fact include, without limitation:

a. Whether the Campaign failed to pay the Wisconsin Plaintiff and the members of the Wisconsin Class overtime wages for hours that they worked in excess of 40 hours per workweek; and

b. Whether the Campaign misclassified the Wisconsin Plaintiff and the members of the Wisconsin Class as exempt from the protections of the Wisconsin state law.

- 69 -

278.280.     Typicality:  The Wisconsin Plaintiff's claims are typical of those claims which could be alleged by any Wisconsin Class Member, and the relief sought is typical of the relief which would be sought by each Wisconsin Class Member in separate actions.

279.281.     Adequacy:  The Wisconsin Plaintiff will fairly and adequately represent and protect the interests of the Wisconsin Class that he seeks to represent because the Wisconsin Plaintiff's interests do not conflict with the interests of the members of the Wisconsin Class he seeks to represent.  The Wisconsin Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The Wisconsin Plaintiff and his Counsel will fairly and adequately protect the interests of the Wisconsin Class.

280.282.     Superiority:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Wisconsin Class Members is not practicable, and questions of law and fact common to the Wisconsin Plaintiff and putative Wisconsin Class Members predominate over any questions affecting only individual members of the Wisconsin Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

281.283.     In the alternative, the Wisconsin Class may be certified because the prosecution of separate actions by the individual members of the Wisconsin Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Wisconsin Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

282.284.     Class treatment will allow those similarly situated persons to litigate their

claims in the manner most efficient and economical for the Parties and the judicial system.

~~283.~~285.        The Wisconsin Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## ILLINOIS CLASS ALLEGATIONS

~~284.~~286.        The Illinois Plaintiff brings this claim as a class action pursuant to the Rule 23.

~~285.~~287.        The putative class that the Illinois Plaintiff seeks to represent is a class of FOs who worked in Illinois during the relevant period (the "Illinois Class").

~~286.~~288.        Numerosity:  Upon information and belief, the number of FOs employed by the Campaign in Illinois exceeds forty.  The number of putative Illinois Class Members are therefore far too numerous to be individually joined in this lawsuit.

~~287.~~289.        Existence and Predominance of Common Questions:  There are questions of law and fact common to the Illinois Plaintiff and putative Illinois Class Members that predominate over any questions affecting only individual members of the Illinois Class.  These common questions of law and fact include, without limitation:

      a.    Whether the Campaign failed to pay the Illinois Plaintiff and the members of the Illinois Class overtime wages for hours that they worked in excess of 40 hours per workweek; and

      b.    Whether the Campaign misclassified the Illinois Plaintiff and the members of the Illinois Class as exempt from the protections of the IMWL.

~~288.~~290.        Typicality:  The Illinois Plaintiff's claims are typical of those claims which could be alleged by any Illinois Class Member, and the relief sought is typical of the relief which would be sought by each Illinois Class Member in separate actions.

~~289.~~291.        Adequacy:  The Illinois Plaintiff will fairly and adequately represent and protect the interests of the Illinois Class that she seeks to represent because the Illinois Plaintiff's

interests do not conflict with the interests of the members of the Illinois Class she seeks to represent.  The Illinois Plaintiff has retained counsel competent and experienced in complex class action litigation on behalf of employees and intends to prosecute this action vigorously.  The Illinois Plaintiff and her Counsel will fairly and adequately protect the interests of the Illinois Class.

290.292.      Superiority:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Illinois Class Members is not practicable, and questions of law and fact common to the Illinois Plaintiff and putative Illinois Class Members predominate over any questions affecting only individual members of the Illinois Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

291.293.      In the alternative, the Illinois Class may be certified because the prosecution of separate actions by the individual members of the Illinois Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Illinois Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

292.294.      Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

293.295.      The Illinois Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## MINNESOTA CLASS ALLEGATIONS

294.296.      The Minnesota Plaintiff brings this claim as a class action pursuant to Rule

23.

~~295.~~297.    The putative class that the Minnesota Plaintiff seeks to represent is a class

of FOs who worked in Minnesota during the relevant period (the "Minnesota Class").

~~296.~~298.    Numerosity:  Upon information and belief, the number of FOs employed by

the Campaign in Minnesota exceeds forty.  The number of putative Minnesota Class Members are

therefore far too numerous to be individually joined in this lawsuit.

~~297.~~299.    Existence and Predominance of Common Questions:  There are questions of

law and fact common to the Minnesota Plaintiff and putative Minnesota Class Members that

predominate over any questions affecting only individual members of the Minnesota Class.  These

common questions of law and fact include, without limitation:

    a.    Whether the Campaign failed to pay the Minnesota Plaintiff and the members of the Minnesota Class overtime wages for hours that they worked in excess of 40 hours per workweek; and

    b.    Whether the Campaign misclassified the Minnesota Plaintiff and the members of the Minnesota Class as exempt from the protections of the MFLSA.

~~298.~~300.    Typicality:  The Minnesota Plaintiff's claims are typical of those claims

which could be alleged by any Minnesota Class Member, and the relief sought is typical of the

relief which would be sought by each Minnesota Class Member in separate actions.

~~299.~~301.    Adequacy:  The Minnesota Plaintiff will fairly and adequately represent and

protect the interests of the Minnesota Class that she seeks to represent because the Minnesota

Plaintiff's interests do not conflict with the interests of the members of the Minnesota Class she

seeks to represent.  The Minnesota Plaintiff has retained counsel competent and experienced in

complex class action litigation on behalf of employees and intends to prosecute this action

vigorously.  The Minnesota Plaintiff and her Counsel will fairly and adequately protect the

interests of the Minnesota Class.

300.302.     Superiority:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Minnesota Class Members is not practicable, and questions of law and fact common to the Minnesota Plaintiff and putative Minnesota Class Members predominate over any questions affecting only individual members of the Minnesota Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

301.303.     In the alternative, the Minnesota Class may be certified because the prosecution of separate actions by the individual members of the Minnesota Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Minnesota Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

302.304.     Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

303.305.     The Minnesota Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

**NORTH CAROLINA CLASS ALLEGATIONS**

304.306.     The North Carolina Plaintiff brings this claim as a class action pursuant to Rule 23.

305.307.     The putative class that the North Carolina Plaintiff seeks to represent is a class of FOs who worked in North Carolina during the relevant period (the "North Carolina Class").  The North Carolina Class is brought in the alternative to the FLSA Collective.

306.308.     Numerosity:  Upon information and belief, the number of FOs employed by

the Campaign in North Carolina exceeds forty. The number of putative North Carolina Class

Members are therefore far too numerous to be individually joined in this lawsuit.

307.309. **Existence and Predominance of Common Questions:** There are questions of

law and fact common to the North Carolina Plaintiff and putative North Carolina Class Members

that predominate over any questions affecting only individual members of the North Carolina

Class. These common questions of law and fact include, without limitation:

     a.     Whether the Campaign failed to pay the North Carolina Plaintiff and the members of the North Carolina Class overtime wages for hours that they worked in excess of 40 hours per workweek; and

     b.     Whether the Campaign misclassified the North Carolina Plaintiff and the members of the North Carolina Class as exempt from the protections of the NCWHA, N.C. Gen. Stat. § 95-25.1 *et seq.*

308.310. **Typicality:** The North Carolina Plaintiff's claims are typical of those

claims which could be alleged by any North Carolina Class Member, and the relief sought is

typical of the relief which would be sought by each North Carolina Class Member in separate

actions.

309.311. **Adequacy:** The North Carolina Plaintiff will fairly and adequately represent

and protect the interests of the North Carolina Class that he seeks to represent because the North

Carolina Plaintiff's interests do not conflict with the interests of the members of the North Carolina

Class he seeks to represent. The North Carolina Plaintiff has retained counsel competent and

experienced in complex class action litigation on behalf of employees and intends to prosecute this

action vigorously. The North Carolina Plaintiff and his Counsel will fairly and adequately protect

the interests of the North Carolina Class.

310.312. **Superiority:** A class action is superior to other available means for the fair

and efficient adjudication of this controversy. Individual joinder of all putative North Carolina

Class Members is not practicable, and questions of law and fact common to the North Carolina

Plaintiff and putative North Carolina Class Members predominate over any questions affecting only individual members of the North Carolina Class.  Individualized litigation increases the delay and expense to all parties and the Court.  By contrast, class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

311.313.      In the alternative, the North Carolina Class may be certified because the prosecution of separate actions by the individual members of the North Carolina Class would create a risk of inconsistent or varying adjudication with respect to individual members of the North Carolina Class, and, in turn, would establish incompatible standards of conduct for the Campaign.

312.314.      Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

313.315.      The North Carolina Plaintiff knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

**FIRST CAUSE OF ACTION**
**Fair Labor Standards Act – Unpaid Overtime**
**(Brought on behalf of Plaintiffs and the FLSA Collective)**

314.316.      Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

315.317.      The Campaign engaged in a widespread pattern and practice of violating the FLSA, as described in this Collective and Class Action Complaint.

316.318.      Plaintiffs have consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b).

317.319.    At all relevant times, Plaintiffs and other similarly situated former employees were engaged in commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

318.320.    The overtime wage provisions set forth in §§ 201 *et seq.* of the FLSA apply to the Campaign.

319.321.    The Campaign is an employer engaged in commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

320.322.    At all times relevant, Plaintiffs were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

321.323.    The Campaign failed to pay Plaintiffs and other similarly situated former FOs the overtime wages to which they were entitled under the FLSA.

322.324.    The Campaign has not made a good faith effort to comply with the FLSA with respect to its compensation of Plaintiffs and other similarly situated former FOs.

323.325.    As a result of the Campaign's violations of the FLSA, Plaintiffs and all other similarly situated FOs have suffered damages by being denied overtime wages in accordance with 29 U.S.C. §§ 201 *et seq.*

324.326.    As a result of the unlawful acts of the Campaign, Representative Plaintiffs and other similarly situated former FOs have been deprived of overtime compensation and other wages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**NYLL - Unpaid Overtime**
**NYLL Article 6, § 190 *et seq.* and Article 19, § 650 *et seq.***
**(Brought by the New York Plaintiff on Behalf of Himself and the New York Class)**

325.327.    The New York Plaintiff, on behalf of himself and all members of the New

York Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

326.328.    The foregoing conduct, as alleged, violates the NYLL.

327.329.    At all relevant times, the Campaign has been an "employer" within the meaning of N.Y. Lab. Law §§ 190, 651.

328.330.    At all relevant times, the Campaign employed employees, including the New York Plaintiff and each of the members of the New York Class, within the meaning of N.Y. Lab. Law §§ 190, 651.

329.331.    NYLL requires an employer, such as the Campaign, to pay overtime compensation to all non-exempt employees.  The New York Plaintiff and all members of the New York Class are not exempt from overtime pay requirements under NYLL.

330.332.    At all relevant times the Campaign had a policy and practice of failing and refusing to pay overtime pay to the New York Plaintiff and members of the New York Class for their hours worked in excess of forty (40) hours per workweek.

331.333.    By failing to pay wages earned and due to the New York Plaintiff and members of the New York Class for their hours worked in excess of forty hours per workweek, the Campaign has violated N.Y. Labor Law Article 6, §190 *et seq.*, Article 19, § 650 *et seq.*, and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.  These violations were willful within the meaning of N.Y. Labor Law §§ 198, 663.

332.334.    The New York Plaintiff, on behalf of himself and members of the putative New York Class, seeks damages in the amount of the respective unpaid wages earned and due at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a workweek, as provided by N.Y. Labor Law Article 6, §190 *et seq.*, Article 19, § 650 *et seq.*, and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2, and such other

- 78 -

legal and equitable relief as this Court deems just and proper.

333.335.       The New York Plaintiff, on behalf of himself and members of the New

York Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign

as provided by N.Y. Lab. Law §§ 198, 663.

**THIRD CAUSE OF ACTION**
**NYLL – Failure to Provide Wage Notices**
**(Brought by the New York Plaintiff on Behalf of Himself and the New York Class)**

334.336.       The New York Plaintiff, on behalf of himself and all members of the New

York Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

335.337.       The Campaign has willfully failed to supply the New York Plaintiff and the

members of the New York Class with wage notices at the time of their hire, as required by the NYLL,

Article 6, § 195(1), in English or in the language identified as their primary language, containing

their hourly rate or rates of pay and overtime rate of rates of pay, if applicable.

336.338.       Through its knowing or intentional failure to provide the New York Plaintiff

and the New York Class Members with the wage notices required by the NYLL, the Campaign has

willfully violated NYLL, Article 6, §§ 190 *et seq.*, and the supporting New York State Department of

Labor Regulations.

337.339.       Due to the Campaign's willful violations of NYLL, Article 6, § 195(1), the

New York Plaintiff and New York Class Members are entitled to statutory penalties of $50 for each

workday that the Campaign failed to provide them with wage notices, or up to a total of $5,000,

reasonable attorneys' fees, costs, and injunctive and declaratory relief, as provided for by the NYLL,

Article 6, § 198(1-b).

**FOURTH CAUSE OF ACTION**
**NYLL – Failure to Provide Accurate Wage Statements**
**(Brought by Plaintiff Goldstein on Behalf of Himself and the New York Class)**

338.340.     The New York Plaintiff, on behalf of himself and all members of the New

York Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

339.341.     The Campaign has willfully failed to supply New York Plaintiff and New York

Class with accurate statements of wages as required by the NYLL, Article 6, § 195(3), containing the

tip allowance claimed as part of the minimum wage.

340.342.     Through their knowing or intentional failure to provide the New York Plaintiff

and New York Class with the accurate wage statements required by the NYLL, the Campaign has

willfully violated NYLL, Article 6, §§ 190 *et seq.*, and the supporting New York State Department of

Labor Regulations.

341.343.     Due to the Campaign's willful violations of NYLL, Article 6, § 195(3), after

2015, the New York Plaintiff and New York Class are entitled to statutory penalties of $250 for each

workweek that the Campaign failed to provide them with accurate wage statements, or a total of up to

$5,000, reasonable attorneys' fees, costs, and injunctive and declaratory relief, as provided for by the

NYLL, Article 6, § 198(1-d).


**FIFTH CAUSE OF ACTION**
**California Wage Laws – Overtime Wages**
**California Wage Order Nos. 4-2001 & 7-2001; Cal. Lab. Code §§ 510, 1194, 1198**
**(Brought by the California PlaintiffPlaintiffs on Behalf of HerselfThemselves and the**
**California Class)**

342.344.     The California PlaintiffPlaintiffs, on behalf of herselfthemselves and all

members of the California Class, reallegesreallege and incorporatesincorporate by reference all

allegations in all preceding paragraphs.

343.345.     The foregoing conduct, as alleged, violates California Wage Laws.

- 80 -

344.346.      At all relevant times, the Campaign has been an "employer" within the meaning of California Wage Laws.

345.347.      At all relevant times, the Campaign employed employees, including the California ~~Plaintiff~~Plaintiffs and each of the members of the California Class.

346.348.      The California Wage Laws require an employer, such as the Campaign, to pay overtime compensation to all non-exempt employees for hours worked over forty per workweek or over eight per day.  The California ~~Plaintiff~~Plaintiffs and all members of the California Class are not exempt from overtime pay requirements under California Wage Laws.

347.349.      At all relevant times the Campaign had a policy and practice of failing and refusing to pay overtime pay to the California ~~Plaintiff~~Plaintiffs and members of the California Class for their hours worked in excess of eight hours per day and forty hours per workweek.

348.350.      As a direct and proximate result of Defendant's unlawful conduct, as set forth herein, the California Plaintiffs and California Class members sustained damages, including loss of earnings for hours of overtime worked for the benefit of Defendant in an amount to be established at trial, prejudgment interest, and costs and attorneys' fees, pursuant to statute and other applicable law.

### SIXTH CAUSE OF ACTION
**California Wage Laws – Record-Keeping Violations**
**California Wage Order Nos. 4-2001 & 7-2001; Cal. Lab. Code §§ 226, 1174, & 1174.5**
**(Brought by the California ~~Plaintiff~~Plaintiffs on Behalf of ~~Herself~~Themselves and the California Class)**

349.351.      The California ~~Plaintiff~~Plaintiffs, on behalf of ~~herself~~themselves and all members of the California Class, ~~realleges~~reallege and ~~incorporates~~incorporate by reference all allegations in all preceding paragraphs.

- 81 -

350.352. The Campaign knowingly and intentionally failed to provide timely, accurate, itemized wage statements including, *inter alia*, hours worked, to the California Plaintiff Plaintiffs and California Class Members in accordance with California Wage Order Nos. 4-2001 and 7-2001 and California Labor Code § 226(a). Such failure caused injury to the California Plaintiff Plaintiffs and the California Class, by, among other things, impeding them from knowing the amount of wages to which they were entitled. The Campaign failed to maintain accurate records of hours worked by the California Plaintiff Plaintiffs and California Class Members as required under Labor Code § 1174(d).

351.353. The California Plaintiff Plaintiffs and California Class Members are entitled to and seek injunctive relief requiring the Campaign to comply with California Labor Code §§ 226(a) and 1174(d), and further seek the amount provided under California Labor Code §§ 226(e) and 1174.5, including the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period.

**SEVENTH CAUSE OF ACTION**
**California Wage Laws – Meal and Rest Period Provisions**
**Cal. Wage Order Nos. 4-2001 & 7-2001; Cal. Lab. Code §§ 218.5, 226.7, & 512**
**(Brought by the California Plaintiff Plaintiffs on Behalf of Herself Themselves and the California Class)**

352.354. The California Plaintiff Plaintiffs, on behalf of herself themselves and all members of the California Class, realleges reallege and incorporates incorporate by reference all allegations in all preceding paragraphs.

353.355. The California Plaintiff Plaintiffs and the California Class members regularly work and/or have worked in excess of five-hour shifts without being afforded at least a half-hour meal break during which they were relieved of all duty, and more than ten-

- 82 -

hour shifts without being afforded a second half-hour meal break in which they were relieved

of all duty, as required by California Labor Code §§ 226.7 and 512 and Wage Order Nos. 4-

2001 and 7-2001, § 11.

354.356.    The California PlaintiffPlaintiffs and the California Class members

regularly work and/or have worked in excess of three and one-half hours without being

authorized and permitted to take rest periods at the rate of ten minutes net rest time per four

hours or major fraction thereof, as required by California Labor Code § 226.7 and Wage

Order Nos. 4-2001 and 7-2001, § 12.

355.357. As a result of the Campaign's failure to afford proper meal and rest periods,

the Campaign is liable to the California PlaintiffPlaintiffs and California Class members for

one hour of additional pay at the regular rate of compensation for each workday that the proper

meal or rest periods were not provided, pursuant to California Labor Code § 226.7 and Wage

Order Nos. 4-2001 and 7-2001, §§ 11-12.

**EIGHTH CAUSE OF ACTION**
**California Wage Laws – Business Expenses**
**Cal. Lab. Code § 2802; Cal. Wage Order Nos. 4-2001 & 7-2001**
**(Brought by the California PlaintiffPlaintiffs on Behalf of HerselfThemselves and the**
**California Class)**

356.358.    The California PlaintiffPlaintiffs, on behalf of herselfthemselves and all

members of the California Class, reallegesreallege and incorporatesincorporate by reference all

allegations in all preceding paragraphs.

357.359.    California Labor Code § 2802 provides that "[a]n employer shall

indemnify his or her employee for all necessary expenditures or losses incurred by the employee

in direct consequence of the discharge of his or her duties."

- 83 -

358.360.    The Campaign failed to indemnify and reimburse the California

Plaintiff Plaintiffs and the California Class Members for necessary expenditures, including but

not limited to travel expenses, that they incurred as a direct result of the duties they performed

for the Campaign benefit and/or at the Campaign's direction.

359.361.    As a result, the California Plaintiff seeks Plaintiffs seek unreimbursed

expenses, penalties, interest, costs incurred, and attorneys' fees pursuant to California Labor

Code § 2802(b).

**NINTH CAUSE OF ACTION**
**California Wage Laws – Untimely Payment of Wages**
**Cal. Labor Code §§ 204, 210**
**(Brought by the California Plaintiff Plaintiffs on Behalf of Herself Themselves and the**
**California Class)**

360.362.    The California Plaintiff Plaintiffs, on behalf of herself themselves and all

members of the California Class, realleges reallege and incorporates incorporate by reference all

allegations in all preceding paragraphs.

361.363.    Under Labor Code § 204, labor performed between the 1st and 15th days

of any calendar month will be paid for between the 16th and the 26th of that month, and that

labor performed between the 16th and the last day of any calendar month will be paid for

between the 1st and the 10th day of the following month.  Other payroll periods such as weekly,

biweekly (every two weeks) or semimonthly (twice per month), when the earning period is

something other than between the 1st and 15th, and 16th and last day of the month, must be paid

within seven calendar days of the end of the payroll period within which the wages were earned.

362.364.    During the Relevant Period, the Campaign failed to pay the California

Plaintiff Plaintiffs and California Class Members in a timely manner all of their wages earned, in

violation of Cal. Lab. Code § 204.

- 84 -

363.365.     The California ~~Plaintiff~~Plaintiffs and California Class Members are

entitled to and seek injunctive relief requiring the Campaign to comply with Cal. Lab. Code §

204, and statutory damages under Cal. Lab. Code § 210(a), which provides that persons who fail

to pay wages as provided in Section 204 are subject to the following statutory penalties: "(1) For

any initial violation, one hundred dollars ($100) for each failure to pay each employee; (2) For

each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for

each failure to pay each employee, plus 25 percent of the amount unlawfully withheld."

**TENTH CAUSE OF ACTION**
**California Wage Laws – Unfair Competition**
**California Business & Professions Code §§ 17200** *et seq.*
**(Brought by the California ~~Plaintiff~~Plaintiffs on Behalf of ~~Herself~~Themselves and the**
**California Class)**

364.366.     The California ~~Plaintiff~~Plaintiffs, on behalf of ~~herself~~themselves and all

members of the California Class, ~~realleges~~reallege and ~~incorporates~~incorporate by reference all

allegations in all preceding paragraphs.

365.367.     The foregoing conduct, as alleged, violated the California Unfair

Competition Law ("UCL").  The UCL prohibits unfair competition by prohibiting, *inter alia*,

any unlawful or unfair business acts or practices.

366.368.     Beginning at a date unknown to the California ~~Plaintiff~~Plaintiffs, but at

least as long ago as January 1, 2020, the Campaign committed acts of unfair competition, as

defined by the UCL, by, among other things, engaging in the acts and practices described

herein.  The Campaign's conduct as alleged herein injured the California ~~Plaintiff~~Plaintiffs

and the California Class Members by wrongfully denying them earned wages, and therefore

was substantially injurious to them.

- 85 -

367.369.   The Campaign engaged in unfair competition in violation of the UCL by violating, *inter alia*, each of the following laws.  Each of these violations constitutes an independent and separate violation of the UCL:

  a.   FLSA, 29 U.S.C. §§ 201 *et seq.*;

  b.   Cal. Lab. Code §§ 201-204;

  c.   Cal. Lab. Code § 1194;

  d.   Cal. Lab. Code § 226;

  e.   Cal. Lab. Code § 1174;

  f.   Cal. Lab. Code § 510; and

  g.   Cal. Lab. Code § 2802.

368.370.   The Campaign's course of conduct, acts, and practices in violation of the California laws mentioned in the above paragraph constitute a separate and independent violation of the UCL.  The Campaign's conduct described herein violated the policy or spirit of such laws or otherwise significantly threatens or harms competition.

369.371.   The unlawful and unfair business practices and acts of the Campaign, described above, injured the California PlaintiffPlaintiffs and California Class Members.

370.372.   The California PlaintiffPlaintiffs, on behalf of herselfthemselves and the California Class, seeksseek recovery of attorneys' fees and costs of this action to be paid by the Campaign, as provided by the UCL and California Labor Code §§ 218, 218.5, and 1194.

371.373.   The California PlaintiffPlaintiffs, on behalf of herselfthemselves and the California Class, seeksseek restitution in the amount of the respective unpaid wages earned and due, at a rate not less than one and one-half times the regular rate of pay for work performed in

excess of 40 hours in a workweek, or 8 hours in a day, and double the regular rate of pay for work performed in excess of 12 hours per day.

### ELEVENTH CAUSE OF ACTION
**Michigan Wage Law - Overtime**
**MWOWA, Mich. Comp. Laws §§ 408.414a; 408.412**
**(Brought by the Michigan Plaintiff on Behalf of Himself and the Michigan Class)**

~~372.~~374.     The Michigan Plaintiff, on behalf of himself and all members of the Michigan Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

~~373.~~375.     The foregoing conduct, as alleged, violates the MWOWA, Mich. Comp. Laws §§ 408.414a; 408.412, and their implementing regulations.

~~374.~~376.     At all relevant times, the Campaign has been an "employer" within the meaning of MWOWA, Mich. Comp. Laws §§ 408.414a; 408.412.

~~375.~~377.     At all relevant times, the Campaign employed employees, including the Michigan Plaintiff and each of the members of the Michigan Class, within the meaning of Mich. Comp. Laws §§ 408.414a; 408.412.

~~376.~~378.     The MWOWA requires an employer, such as the Campaign to pay overtime compensation to all non-exempt employees.  The Michigan Plaintiff and all members of the Michigan are not exempt from overtime pay requirements under MWOA.

~~377.~~379.     At all relevant times, the Campaign had a policy and practice of failing and refusing to pay overtime pay to the Michigan Plaintiff and members of the Michigan Class for their hours worked in excess of forty (40) hours per workweek.

~~378.~~380.     By failing to pay wages earned and due to the Michigan Plaintiff and members of the Michigan Class for their hours worked in excess of forty hours per workweek, the Campaign has violated Mich. Comp. Laws § 408.414a.   These violations were willful.

379.381.      The Michigan Plaintiff, on behalf of himself and members of the putative

Michigan Class, seeks damages in the amount of the respective unpaid wages earned and due at a

rate of not less than one and one-half times the regular rate of pay for work performed in excess

of forty hours in a workweek, as well as liquidated damages in an amount equal to the amount of

unpaid wages due, as provided by Mich. Comp. Laws §§ 408.414a, 408.419(1)(a), and such

other legal and equitable relief as this Court deems just and proper.

380.382.      The Michigan Plaintiff, on behalf of himself and members of the Michigan

Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign as

provided by Mich. Comp. Laws § 408.419(1)(a).

### TWELFTH CAUSE OF ACTION
**Wisconsin Wage Law - Overtime**
**Wis. Stat. §§ 103 and 104, and Wis. Admin. Code § DWD 274.03**
**(Brought by the Wisconsin Plaintiff on Behalf of Himself and the Wisconsin Class)**

381.383.      The Wisconsin Plaintiff, on behalf of himself and all members of the

Wisconsin Class, realleges and incorporates by reference all allegations in all preceding

paragraphs.

382.384.      The foregoing conduct, as alleged, violates Wis. Stat. § 103 and Wis.

Admin. Code § DWD 274.03.

383.385.      At all relevant times, the Campaign has been an "employer" within the

meaning of Wis. Stat. § 103 and Wis. Admin. Code § DWD 274.03.

384.386.      At all relevant times, the Campaign has employed employees, including

the Wisconsin Plaintiff and each of the members of the Wisconsin Class, within themeaning of

Wis. Stat. §103 and Wis. Admin. Code § DWD 274.03.

385.387.      Wis. Stat. §103 and Wis. Admin. Code § DWD 274.03 require an

employer, such as the Campaign, to pay overtime compensation to all non-exempt employees.

The Wisconsin Plaintiff and all members of the Wisconsin Class are not exempt from overtime

pay requirements under Wis. Stat. §103 and Wis. Admin. Code § DWD 274.03.

386.388.    At all relevant times, the Campaign had a policy and practice of failing

and refusing to pay overtime pay to the Wisconsin Plaintiff and members of the Wisconsin Class

for their hours worked in excess of forty (40) hours per workweek.

387.389.    By failing to pay wages earned and due to the Wisconsin Plaintiff and

members of the Wisconsin Class for their hours worked in excess of forty hours per workweek,

the Campaign has violated Wis. Stat. §103 and Wis. Admin. Code § DWD 274.03.

388.390.    The Wisconsin Plaintiff, on behalf of himself and members of the putative

Wisconsin Class, seeks damages in the amount of the respective unpaid wages earned and due at

a rate of not less than one and one-half times the regular rate of pay for work performed in excess

of forty hours in a workweek, as provided by Wis. Stat. §103, and such other legal and equitable

relief as this Court deems just and proper, including liquidated damages pursuant to Wis. Stat.

§ 109.11(2)(a).

389.391.    The Wisconsin Plaintiff, on behalf of himself and members of the

Wisconsin Class, seeks recovery of attorneys' fees and costs of this action to be paid by the

Campaign, as provided by Wis. Stat. §109.03(6).

**THIRTEENTH CAUSE OF ACTION**
**Illinois Wage Law - Overtime**
**IMWL, 820 ILCS 105/1 *et seq.*,**
**(Brought by the Illinois Plaintiff on Behalf of Herself and the Illinois Class)**

390.392.    The Illinois Plaintiff, on behalf of herself and all members of the Illinois

Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

391.393.    The foregoing conduct, as alleged, violates the IMWL, 820 ILCS 105/1 *et*

*seq.*, and their implementing regulations.  At all relevant times, the Campaign has been an

- 89 -

"employer" within the meaning of 820 ILCS 105/3(c).  At all relevant times, the Campaign has

employed employees including the Illinois Plaintiff and each of the members of the Illinois

Class, within the meaning of 820 ILCS 105/3(d).

392.394.      The Illinois wage and hour laws require an employer, such as Defendant

the Campaign, to pay overtime compensation to all non-exempt employees.  The Illinois Plaintiff

and all members of the Illinois Class are not exempt from overtime pay requirements under

Illinois law.

393.395.      At all relevant times, the Campaign had a policy and practice of failing

and refusing to pay overtime pay to the Illinois Plaintiff and members of the Illinois Class for

their hours worked in excess of forty (40) hours per workweek.

394.396.      By failing to pay wages earned and due to the Illinois Plaintiff and

members of the Illinois Class for their hours worked in excess of forty hours per workweek, the

Campaign has violated 820 ILCS 105/4a.

395.397.      The Illinois Plaintiff, on behalf of herself and members of the putative

Illinois Class, seeks damages in the amount of the respective unpaid wages earned and due at a

rate of not less than one and one-half times the regular rate of pay for work performed in excess

of forty hours in a workweek, as provided by 820 ILCS 105/4a; and other damages, including

damages of 5% of the amount of underpayments for each month the wages remain unpaid, and

treble damages on all unpaid overtime wages pursuant to 820 ILCS 105/12(a); and such other

legal and equitable relief as this Court deems just and proper.

396.398.      The Illinois Plaintiff, on behalf of herself and members of the Illinois

Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign, as

provided by 820 ILCS 105/12(a).

**FOURTEENTH CAUSE OF ACTION**
**Minnesota - Overtime**
**MFLSA §§ 177.23, 177.25 and Minn. R. 5200 *et seq.***
**(Brought by the Minnesota Plaintiff on Behalf of Herself and the Minnesota Class)**

~~397.~~399.      The Minnesota Plaintiff, on behalf of herself and all members of the Minnesota Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

~~398.~~400.      The foregoing conduct, as alleged, violates the MFLSA, Minn. Stat. §§ 177.23, 177.25 and its implementing regulations.

~~399.~~401.      At all relevant times, the Campaign has been an "employer" within the meaning of MFLSA, Minn. Stat. §§ 177.23, 177.25.

~~400.~~402.      At all relevant times, the Campaign employed employees, including the Minnesota Plaintiff and each of the members of the Minnesota Class, within the meaning of MFLSA, Minn. Stat. §§ 177.23, 177.25.

~~401.~~403.      The MFLSA requires an employer, such as the Campaign, to pay overtime compensation to all non-exempt employees.  The Minnesota Plaintiff and all members of the Minnesota Class are not exempt from overtime pay requirements under MFLSA.

~~402.~~404.      At all relevant times, the Campaign had a policy and practice of failing and refusing to pay overtime pay to the Minnesota Plaintiff and members of the Minnesota Class for their hours worked in excess of forty-eight (48) hours per workweek.

~~403.~~405.      By failing to pay wages earned and due to the Minnesota Plaintiff and members of the Minnesota Class for their hours worked in excess of forty-eight hours per workweek, the Campaign has violated MFLSA, Minn. Stat. § 177.25 and Minn. R. 5200 *et seq.* These violations were willful.

~~404.~~406.      The Minnesota Plaintiff, on behalf of herself and members of the putative

- 91 -

Minnesota Class, seeks damages in the amount of the respective unpaid wages earned and due at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty-eight hours in a workweek, as provided by MFLSA, Minn. Stat. § 177.27(8), and such other legal and equitable relief as this Court deems just and proper.

405.407.     The Minnesota Plaintiff, on behalf of herself and members of the Minnesota Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign as provided by MFLSA, Minn. Stat. § 177.27(8).

**FIFTEENTH CAUSE OF ACTION**
**North Carolina Wage Law - Overtime**
**NCWHA, N.C. Gen. Stat. Ann. § 95-25.1 *et seq.***
**(Brought by the North Carolina Plaintiff on Behalf of Himself and the North Carolina Class)**

406.408.     The North Carolina Plaintiff, on behalf of himself and all members of the North Carolina Class, realleges and incorporates by reference all allegations in all preceding paragraphs.

407.409.     The foregoing conduct, as alleged, violates the NCWHA, N.C. Gen. Stat. Ann. § 95-25.1 *et seq.*

408.410.     At all relevant times, the Campaign has been an "employer" within the meaning of N.C. Gen. Stat. Ann. § 95-25.2.

409.411.     At all relevant times, the Campaign has employed employees, including the North Carolina Plaintiff and each of the members of the North Carolina Class, within the meaning of N.C. Gen. Stat. Ann. § 95-25.2.

410.412.     The NCWHA requires an employer, such as the Campaign, to pay overtime compensation to all non-exempt employees.  The North Carolina Plaintiff and all

- 92 -

members of the North Carolina Class are not exempt from overtime pay requirements under the NCWHA.

411.413.    At all relevant times, the Campaign had a policy and practice of failing and refusing to pay overtime pay to the North Carolina Plaintiff and members of the North Carolina Class for their hours worked in excess of forty (40) hours per workweek.

412.414.    By failing to pay wages earned and due to the North Carolina Plaintiff and members of the North Carolina Class for their hours worked in excess of forty hours per workweek, the Campaign has violated the NCWHA, N.C. Gen. Stat. Ann. §95-25.1 *et seq.* These violations were willful and were not made in good faith.

413.415.    The North Carolina Plaintiff, on behalf of himself and members of the putative North Carolina Class, seeks damages in the amount of the respective unpaid wages earned and due at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a workweek, as provided by NCWHA, N.C. Gen. Stat. Ann. § 95-25.1 *et seq.*, and such other legal and equitable relief as this Court deems just and proper.

414.416.    The North Carolina Plaintiff, on behalf of himself and members of the North Carolina Class, seeks recovery of attorneys' fees and costs of this action to be paid by the Campaign, as provided by N.C. Gen. Stat. Ann. § 95-25.22

**SIXTEENTH CAUSE OF ACTION**
**Fraudulent Inducement**
**(Brought on behalf of Plaintiffs and the Class)**

415.417.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

416.418.    The Campaign made a misrepresentation of material fact by repeatedly

stating, both verbally and in writing, that FOs and other Field Employees would be employed by the Campaign through November 2020.  Specifically, the Campaign promised paid employment with family, employer-paid healthcare, and other benefits, to FOs and other Field Employees through November 2020.

417.419.       The Campaign made this misrepresentation in order to induce employees to quit their then-current employment or forgo other opportunities, move, and work for the Campaign.

418.420.       The Campaign intended that its false promises would induce Plaintiffs, FOs, and Field Employees to take these actions.

419.421.       Upon information and belief, the Campaign intended that FOs and other Field Employees rely on its promises in order to attract employees to the Campaign.

420.422.       Employees reasonably relied on the Campaign's representations, to their economic peril, in leaving their jobs and working for the Campaign.  In addition, based on the Campaign's fraudulent representations about their length of employment, field employees are left with potentially no healthcare in the face of a worldwide pandemic.

421.423.       But for the Campaign's misrepresentation, Field Employees would not have accepted employment with the Campaign.

422.424.       In contravention of its promise, the Campaign terminated the FOs and other Field Employees.

423.425.       Field Employees have been damaged by losing their jobs with the Campaign approximately eight months early, losing their income, and losing their healthcare and other benefits.

424.426.       The Campaign's conduct amounts to such gross, wanton or willful fraud,

dishonest and intentional non-disclosure of material facts as to involve a high degree of moral culpability, making it appropriate to deter the Campaign from engaging in similar conduct in the future.

425.427.    For the foregoing reasons, the Court should award Plaintiffs and the Class compensatory damages, costs, interests, punitive damages, exemplary damages, and attorneys' fees.

**SEVENTEENTH CAUSE OF ACTION**
**Promissory Estoppel**
**(Brought on behalf of Plaintiffs and the Class)**

426.428.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

427.429.    The Campaign clearly, unambiguously, and repeatedly promised both verbally and in writing, that FOs and other Field Employees would be employed by the Campaign through November 2020 and have the opportunity to work on the primary and general election presidential campaigns.  Specifically, the Campaign promised paid employment with benefits including employer-paid healthcare benefits to FOs and other Field Employees and their families through November 2020.

428.430.    FOs and other Field Employees reasonably relied on the Campaign's promise of continuous employment through November 2020 and benefits, including employer-paid healthcare benefits by, *inter alia*, resigning or taking leaves of absence from their then-current employment and relocating to different cities and/or states in order to work for the Campaign.

429.431.    The Campaign should have reasonably expected and foreseen that its promises would induce employees to take these actions.

430.432.      FOs and other Field Employees reasonably and foreseeably relied on the
Campaign's promise of continuous employment through November 2020 and employer-paid
healthcare and other benefits.

431.433.      As a direct result of their reasonable reliance on the Campaign's promises,
FOs and other Field Employees suffered damages.

432.434.      Plaintiffs and the Class are entitled to damages to be proven at trial, pre-
judgment interest, and attorneys' fees.

**EIGHTEENTH CAUSE OF ACTION**
**California Private Attorney General Act of 2004 ("PAGA")**
**Cal. Labor Code §§ 2698 *et seq.***
**(Brought by the California Plaintiffs and All Aggrieved Employees)**

435.    The California Plaintiffs, on behalf of themselves and all "aggrieved employees,"
as defined herein, reallege and incorporate by reference all allegations in all preceding
paragraphs.

436.    Under PAGA, an aggrieved employee, on behalf of herself and other former
employees as well as the general public, may bring a representative action as a private attorney
general to recover penalties for an employer's violations of the California Labor Code and IWC
Wage Orders.  These civil penalties are in addition to any other relief available under the
California Labor Code, and must be allocated 75% to California's Labor and Workforce
Development Agency ("LWDA") and 25% to the aggrieved employee, pursuant to California
Labor Code § 2699.

437.    The California Plaintiffs are "aggrieved employees" under PAGA, as they were
employed by Bloomberg during the applicable statutory period and suffered one or more
California Labor Code violations, as set forth in this Third Amended Complaint.  Accordingly,

the California Plaintiffs seek to recover, on behalf of themselves and all aggrieved employees, the civil penalties provided by PAGA, plus reasonable attorneys' fees and costs.

438.    This violation entitles the California Plaintiffs, as private attorney general, to recover the applicable civil penalties on her own behalf, on behalf of all aggrieved employees, and on behalf of the general public.

439.    California Labor Code § 2699(a), which is part of PAGA, provides in pertinent part:

> Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of themselves or herself and other current or former employees pursuant to the procedures specified in § 2699.3.

440.    California Labor Code § 2699(f), which is part of PAGA, provides in pertinent part:

> For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions, as follows: . . . (2) If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.

441.    The California Plaintiffs, on behalf of themselves and all aggrieved employees, are entitled to civil penalties, to be paid by Defendant and allocated as PAGA requires, pursuant to California Labor Code § 2699(a) for Defendant's violations of the California Labor Code for which violations a civil penalty is already specifically provided by law.

442.    The California Plaintiffs, on behalf of themselves and all aggrieved employees, are also entitled to civil penalties, to be paid by Defendant and allocated as PAGA requires,

pursuant to California Labor Code § 2699(f) for Defendant's violations of the California Labor Code for which violations a civil penalty is not already specifically provided.

443.    On March 31, 2020, Plaintiff Wheatley-Diaz provided notice to the LWDA of the legal claims and theories of this case.  On June 21, 2022, Plaintiffs Ceppos and Nick Coker provided notice to the LWDA of the legal claims and theories of the case.  Plaintiffs simultaneously provided a copy of those notices by certified mail to Defendant.  The LWDA did not provide notice within 65 calendar days of the filing dates of the notices, so the California Plaintiffs are entitled to assert this claim.  Cal. Labor Code § 2699.3(a)(2).

**PRAYER FOR RELIEF**

**WHEREFORE**, Representative Plaintiffs, individually and on behalf of all other similarly situated persons, and Plaintiffs, individually, seek the following relief:

A.    Certify this action as a collective action under the FLSA pursuant to 29 U.S.C. § 216(b) (First Cause of Action);

B.    At the earliest time possible, allow Representative Plaintiffs to give notice of this collective action, or that the Court issue such notice, to all members of the FLSA Collective. Such notice should inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit, among other things;

C.    A declaratory judgment that Defendant has violated the FLSA;

D.    Designate Representative Plaintiffs as representatives of the Collective;

E.    Designate Plaintiffs' Counsel as Counsel for the Collective;

F.    Unpaid overtime pay and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor's regulations.

G.    A reasonable service award to compensate the Representative Plaintiffs for the

time they have spent and will spend attempting to recover wages for the FLSA Collective and for the risks they took in doing so;

      H.     Attorneys' fees and costs of suit;

      I.     Prejudgment and post-judgment interest, as provided by law; and

      J.     Such other relief as the Court may deem just and proper.

**WHEREFORE**, Representative Plaintiffs, individually and on behalf of all other similarly situated persons, and Plaintiffs, individually, seek the following relief:

      A.     Certify the case as a class action on behalf of the proposed Class of FOs and other Field Employees on the fraudulent inducement and promissory estoppel claims (Sixteenth and Seventeenth Causes of Action);

      B.     Designate Representative Plaintiffs as representatives of the Class;

      C.     Designate Plaintiffs' Counsel as Class Counsel;

      D.     Find that the Campaign is liable to the Representative Plaintiffs and the proposed Class of ~~FOs~~Fos and other Field Employees for fraudulent inducement and promissory estoppel;

      E.     Order the Campaign to pay compensatory and punitive damages to proposed Class of ~~FOs~~Fos and other Field Employees and award attorneys' fees and costs; and

      F.     Such other injunctive and equitable relief as this Court shall deem just and proper.

**WHEREFORE**, the New York Plaintiff, on behalf of himself and all members of the New York Class, seeks the following relief:

      A.     Certification of this case as a class action pursuant to Rule 23;

      B.     Designation of the New York Plaintiff as the representative of the New York Class and counsel of record as Class Counsel;

      C.     Issuance of a declaratory judgment that the practices complained of in this

Complaint are unlawful under the NYLL, Article 6, §§ 190 *et seq.*, NYLL, Article 19, § 650 *et seq.*, and the supporting New York State Department of Labor Regulations;

  D. An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

  E. Appropriate statutory penalties;

  F. Appropriate equitable and injunctive relief to remedy the Campaign's violation of New York law, including but not limited to an order enjoining the Campaign from continuing its unlawful practices;

  G. Penalties, as provided by law;

  H. A reasonable service award to compensate the New York Plaintiff for the time he has spent and will spend attempting to recover wages for the FLSA Collective and/or New York Class Members and for the risks he took in doing so;

  I. Attorneys' fees and costs of suit;

  J. Prejudgment and post-judgment interest, as provided by law; and

  K. Such other relief as the Court may deem just and proper.

  **WHEREFORE**, the California ~~Plaintiff~~Plaintiffs, on behalf of ~~herself~~themselves and all members of the California Class, seeks the following relief:

  A. Certification of this case as a class action pursuant to Rule 23;

  B. Designation of the California ~~Plaintiff~~Plaintiffs as the ~~representative~~representatives of the California Class and counsel of record as Class Counsel;

  C. An award of damages, liquidated damages, and restitution to be paid by Defendant according to proof;

  D. Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      ~~A reasonable~~Reasonable service ~~award~~awards to compensate the California ~~Plaintiff~~Plaintiffs for the time ~~she has~~they have spent and will spend attempting to recover wages for the FLSA Collective and/or California Class Members and for the risks ~~she~~they took in doing so;

G.      Attorneys' fees and costs of suit;

H.      Prejudgment and post-judgment interest, as provided by law; and

I.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the Michigan Plaintiff, on behalf of himself and all members of the Michigan Class, seeks the following relief:

A.      Certification of this case as a class action pursuant to Rule 23;

B.      Designation of the Michigan Plaintiff as the representative of the Michigan Class and counsel of record as Class Counsel;

C.      An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

D.      Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      A reasonable service award to compensate the Michigan Plaintiff for the time he has spent and will spend attempting to recover wages for the FLSA Collective and/or Michigan Class Members and for the risks he took in doing so;

G.      Attorneys' fees and costs of suit;

H.      Prejudgment and post-judgment interest, as provided by law; and

I.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the Wisconsin Plaintiff, on behalf of himself and all members of the Wisconsin Class, seeks the following relief:

A.     Certification of this case as a class action pursuant to Rule 23;

B.     Designation of the Wisconsin Plaintiff as the representative of the Wisconsin Class and counsel of record as Class Counsel;

C.     An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

D.     Appropriate statutory penalties;

E.     Appropriate equitable and injunctive relief to remedy violations;

F.     A reasonable service award to compensate the Wisconsin Plaintiff for the time he has spent and will spend attempting to recover wages for the FLSA Collective and/or Wisconsin Class Members and for the risks he took in doing so;

G.     Attorneys' fees and costs of suit;

H.     Prejudgment and post-judgment interest, as provided by law; and

I.     Such other relief as the Court may deem just and proper.

**WHEREFORE**, the Illinois Plaintiff, on behalf of herself and all members of the Illinois Class, seeks the following relief:

A.     Certification of this case as a class action pursuant to Rule 23;

B.     Designation of the Illinois Plaintiff as the representative of the Illinois Class and counsel of record as Class Counsel;

C.     An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

D.     Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      A reasonable service award to compensate the Illinois Plaintiff for the time she has spent and will spend attempting to recover wages for the FLSA Collective and/or Illinois Class Members and for the risks she took in doing so;

G.      Attorneys' fees and costs of suit;

H.      Prejudgment and post-judgment interest, as provided by law; and

I.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the Minnesota Plaintiff, on behalf of herself and all members of the Illinois Class, seeks the following relief:

A.      Certification of this case as a class action pursuant to Rule 23;

B.      Designation of the Minnesota Plaintiff as the representative of the Minnesota Class and counsel of record as Class Counsel;

C.      An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

D.      Appropriate statutory penalties;

E.      Appropriate equitable and injunctive relief to remedy violations;

F.      A reasonable service award to compensate the Minnesota Plaintiff for the time she has spent and will spend attempting to recover wages for the FLSA Collective and/or Minnesota Class Members and for the risks she took in doing so;

G.      Attorneys' fees and costs of suit;

H.      Prejudgment and post-judgment interest, as provided by law; and

I.      Such other relief as the Court may deem just and proper.

**WHEREFORE**, the North Carolina Plaintiff, on behalf of himself and all members of

- 103 -

the North Carolina Class, seeks the following relief:

 A. Certification of this case as a class action pursuant to Rule 23;

 B. Designation of the North Carolina Plaintiff as the representative of the North Carolina Class and counsel of record as Class Counsel;

 C. An award of damages, liquidated damages, and restitution to be paid by the Campaign according to proof;

 D. Appropriate statutory penalties;

 E. Appropriate equitable and injunctive relief to remedy violations;

 F. A reasonable service award to compensate the North Carolina Plaintiff for the time he has spent and will spend attempting to recover wages for the FLSA Collective and/or North Carolina Class Members and for the risks he took in doing so;

 G. Attorneys' fees and costs of suit;

 H. Prejudgment and post-judgment interest, as provided by law; and

Such other relief as the Court may deem just and proper.

 **WHEREFORE**, the California Plaintiffs, on behalf of themselves and all members of the California Class, seeks the following relief:

 A. Civil penalties pursuant to PAGA;

 B. Attorneys' fees pursuant to Labor Code § 2699(g)(1) and all other bases for fees in the Labor Code;

 C. Costs of suit, including expert fees and costs; and

 D. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

- 104 -

Dated: New York, NY

~~May 18, 2020~~September XX, 2022

Respectfully submitted,



_____

Justin M. Swartz
Michael C. Danna
Theanne Liu*
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: 212-245-1000
Facsimile: 646-509-2060
jms@outtengolden.com
mdanna@outtengolden.com

~~Sally J. Abrahamson~~
tliu@outtengolden.com

Hannah Cole-Chu*
**OUTTEN & GOLDEN LLP**
601 Massachusetts Avenue NW, Ste 200W
Washington, D.C. 20001
Telephone: 202-847-4400
Facsimile: 202-847-4410
~~sabrahamson@outtengolden.com~~
hcolechu@outtengolden.com

Gregg I. Shavitz*
Tamra Givens*
**SHAVITZ LAW GROUP, P.A.**
951 Yamato Road, Suite 285
Boca Raton, FL 33431
Telephone: (561) 447-8888
Facsimile: (561) 447-8831
gshavitz@shavitzlaw.com
tgivens@shavitzlaw.com

Michael Palitz
**SHAVITZ LAW GROUP, P.A.**
800 3rd Avenue, Suite 2800
New York, NY 10022
Telephone: (800) 616-4000
Facsimile: (561) 447-8831
mpalitz@shavitzlaw.com

*Attorneys for Plaintiffs and the Putative Collective*

- 105 -

***and Classes***

*admitted *pro hac vice*

**<u>CERTIFICATION OF SERVICE</u>**

I hereby certify that on ~~September 13, 2022,~~September XX, 2022, the above document

was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice

of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system and by mail to anyone unable to accept electronic filing as indicated on the Notice of

Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


By:  *<u>/s/ Justin M. Swartz</u>*
Justin M. Swartz

**Formatted:** Font color: Black

- 107 -