# Exhibit 1

Page 1

1         UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

4     --------------------------------x

5     DONNA WOOD, et al, individually

6     and on behalf of all others

7     similarly situated,

8              Plaintiffs,

9         vs.        20 Civ. 2489(LTS)(GWG)

10    MIKE BLOOMBERG 2020, INC.,

11             Defendant.

12    --------------------------------x

13

14         VIDEOTAPE DEPOSITION OF

15          ALEXANDRA WHEATLEY-DIAZ

16       VIA ZOOM VIDEOCONFERENCE

17           November 11, 2022

18            7:16 a.m. PST

19

20

21

22

23

24    Reported by:

25    Maureen Ratto, RPR, CCR

1                ALEXANDRA WHEATLEY-DIAZ
2      to be a reason as to why we had to work
3      more than 40 hours.
4           Q.    And you had to get that
5      approved in order to get paid; is that
6      your testimony?
7           A.    No. We had to get approved in
8      order to work more than 40 hours.
9           Q.    And during the time that you
10     worked for the Bloomberg Campaign, you
11     continued to work for Genex; is that
12     right?
13          A.    That is correct.
14          Q.    And how many hours a week did
15     you work for Genex while you were working
16     for the Campaign?
17          A.    I can't confirm the amount of
18     time, but it was a good portion of my day
19     -- or a good -- incorrect to say that.
20               It was -- I can't -- I can't
21     recall the exact amount of time but it
22     was certainly five hours -- about
23     approximately anywhere from five hours a
24     day, sometimes more, depending on how --
25     when I had to be at the Bloomberg office.

ALEXANDRA WHEATLEY-DIAZ

1

2     times, 50 times.  I couldn't give you a
3     number to the exact amount but it was
4     certainly a lot.
5          Q.    What did you do at home?
6          A.    Primarily phone banking and
7     most -- and sometimes the text messages.
8          Q.    Now, you understand that you
9     are being offered as a class
10    representative in this case; is that
11    right?
12         A.    That is right.
13         Q.    What does that mean to you?
14         A.    That means that I represent a
15    group of people in the State of
16    California.
17         Q.    And what do you understand
18    your responsibilities to be as a class
19    representative?
20         A.    That I am available, that I am
21    cooperative and that I have the time and
22    willingness to be a part of this case.
23         Q.    There was a period of time
24    during the pendency of this case when you
25    had indicated that you no longer wanted

                                              Page 70

1                  ALEXANDRA  WHEATLEY-DIAZ

2        to be a class representative; is that

3        correct?

4                     MS.  COLE-CHU:   Objection to

5             form.

6             A.     That is incorrect.

7             Q.     What's incorrect about my

8        question?

9             A.     It was not that I did not want

10       to be a part of, it was that I was unable

11       to.

12            Q.     And why were you unable to?

13            A.     I spoke with my lawyer or my

14       attorneys in regards to this and it was

15       discussed that I should not proceed at

16       that time.

17            Q.     And what was the reason that

18       you should not proceed?

19                   MS.  COLE-CHU:   Objection. I'm

20            just going to caution the witness

21            not to disclose any confidential

22            communications that she had with

23            her attorneys.

24            Q.     To be clear, I'm not asking

25       you to tell me what you spoke to about

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2      attorneys about.
 3                  What I am asking you for,
 4      though, is the reason why you believed
 5      you were unable to continue as a class
 6      representative?
 7                  MS. COLE-CHU:  Objection. I'm
 8          going to caution the witness not to
 9          disclose any confidential
10          communications that happened
11          between her and her attorneys.
12                  To the extent that you're able
13          to provide any reasons that are not
14          confidential or privileged, you
15          may.
16          A.    I just -- I began a new job.
17          Q.    When did you begin that job?
18          A.    In May of 2020 -- 2021. Sorry.
19          Q.    And what was that job?
20          A.    VanRein Compliance as an
21      account manager.
22          Q.    What was it about that job
23      that you thought made you unable to
24      continue as a class representative?
25          A.    It wasn't necessarily the job,
```

```
1              ALEXANDRA WHEATLEY-DIAZ
2         Q.    And what was it that made you
3    think that you were able to resume as a
4    class representative?
5         A.    I understood what was needed
6    and I knew that I could, based on where
7    I'm at in my position in my life, that I
8    could show up and represent this class in
9    the way that it needed and deserved.
10        Q.    Now, do you still have the job
11   at -- VanRein, did you call it?
12        A.    The company is called VanRein
13   Compliance.  And yes, I do still have
14   that position.
15        Q.    Has your position changed at
16   all?
17        A.    I've been given more
18   responsibility but not necessarily has it
19   changed in its -- in its -- I mean, the
20   company is always changing, the position
21   is always changing, so that's a pretty
22   broad question, but the position that I
23   currently hold is still the same, yes.
24        Q.    But you said you've been given
25   more responsibility; is that right?
```

```
                   ALEXANDRA WHEATLEY-DIAZ
 1
 2          this date for identification.)
 3               MS. COLE-CHU:  Elise, we've
 4          been going more than an hour.  When
 5          you reach a convenient stopping
 6          place, if we could take a break.
 7               MS. BLOOM:  I'm going to ask
 8          her about the exhibit and when I'm
 9          done then we can take a break.
10          That would be fine.
11               CONCIERGE:  Wheatley 3 has
12          been marked.
13               MS. BLOOM:  And you can
14          publish it on the screen also,
15          please.
16          Q.   Let me know when you've had a
17     chance to review it.
18          A.   I've had a chance to review
19     it.
20          Q.   If you can go to the top of
21     Exhibit 3, please. Outten & Golden, those
22     are your lawyers in this case, correct?
23          A.   Correct.
24          Q.   And this letter is dated
25     October 19th of 2020, correct?
```

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2        A.     Correct.
 3        Q.     And do you see my name on
 4   there, Proskauer Rose, that was a letter
 5   that was sent to me by your lawyers on
 6   October 19th of 2020, correct?
 7        A.     Correct.
 8        Q.     And I'd like to direct your
 9   attention to the second paragraph on the
10   first page. It says, "Plaintiffs write to
11   notify Defendant that they intend to
12   amend the Complaint.  First, Plaintiffs
13   plan to substitute the California class
14   representative currently Alexandra Marie
15   Wheatley-Diaz with Robbins Ceppos." Do
16   you see that?
17        A.     Yes.
18        Q.     So on October of 2020 we were
19   informed that you -- that your counsel
20   was going to substitute you out as a
21   class representative.
22             What was it in October of 2020
23   that caused you not to want to continue
24   as a class rep?
25             MS. COLE-CHU:  Objection.
```

```
1              ALEXANDRA WHEATLEY-DIAZ
2         A.    I don't recall at that time,
3    that specific time.
4         Q.    But it clearly wasn't the
5    position that you got at VanRein in May
6    of 2021; isn't that right?
7              MS. COLE-CHU:  Objection,
8         objection to form.
9         A.    I don't feel -- I'm going to
10   have to pause on that. Do I have to
11   respond at this moment in time? Can I
12   come back to that?
13        Q.    You do. You need to respond.
14        A.    Like I said before, it was
15   just decided at that time between my
16   attorneys and I that it was not the right
17   time for me to keep moving forward. I
18   thought it was my position, like, this
19   was two years ago, two, three years ago,
20   so that -- I was under the understanding
21   that that was the reason why at that time
22   but those conversations were between my
23   attorney and I at that time.
24        Q.    You said that you wanted to
25   come back to this question. What was it
```

```
                                            Page 80
 1              ALEXANDRA  WHEATLEY-DIAZ
 2    that you were going to do to try to
 3    refresh your memory so you can refresh
 4    your memory?
 5              MS. COLE-CHU:  Objection to
 6         form.
 7         A.    I just needed a minute to kind
 8    of comprehend or bring myself back to
 9    that timeframe to answer.
10         Q.    Okay. So I'm -- have you
11    brought yourself back to October of 2020
12    now?
13              MS. COLE-CHU:  Objection.
14         A.    That was such a long time ago.
15    Yeah, I just want to stick with that
16    statement, that my attorneys and I
17    discussed me being able to proceed and --
18    or -- I'm sorry, my attorneys and I
19    discussed whether or not I had the time
20    to be the class representative at that
21    time and it was decided that I -- I
22    didn't have the time to give to this.
23         Q.    But it wasn't the new job at
24    VanRein which you got in May of 2021,
25    correct?
```

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2                  MS. COLE-CHU:  Objection to
 3         form.
 4         A.    At that time I was still
 5    looking for other positions. We were in
 6    the height of COVID and I don't believe
 7    that I -- I did not have the time to give
 8    to this case that it deserves.
 9         Q.    Well, I just want to make sure
10    I understand the timeframe clearly. You
11    didn't start working at VanRein until May
12    of 2021, correct?
13         A.    Correct.
14         Q.    And in October of 2020 you
15    were still working for Genex, correct?
16         A.    I was.
17                  MS. COLE-CHU:  Objection to
18         form.
19         Q.    And the position was still a
20    remote position, correct?
21         A.    It was, yes.
22         Q.    Do you know Robin Ceppos?
23         A.    I know who she is, yes.
24         Q.    How do you know her?
25         A.    I met her working at the
```

1          ALEXANDRA WHEATLEY-DIAZ

2               In terms of the hours that you

3     devoted, that you spent on the Campaign

4     when you were working as a field

5     organizer in the month of January, how

6     many hours a week did you work for the

7     Campaign?

8          A.    In January I worked every day.

9     I'd have to sit with a calculator to

10    measure the time but it was well over

11    right away 40 hours. I worked all day

12    Saturday and Sunday and I worked

13    generally between 10 to 12 Monday through

14    Friday ending at about 9:00.

15         Q.    I'm sorry. You said you worked

16    between 10 to 12 Monday through Friday?

17         A.    I usually got to the office

18    when the office opened. The opening of

19    the office varied, so that some days it

20    was 10, 11 or 12. It just depended on

21    when the office opened, it depended on if

22    we had a meeting that day and it depended

23    on my job -- my other job as well. So it

24    was generally between 10 and 12 that I

25    got to the office.

Page 151

1              ALEXANDRA WHEATLEY-DIAZ
2          Q.    Okay. And how many hours in
3      January per week were you working for
4      your other job?
5          A.    I cannot say for certain the
6      amount of hours but anywhere between -- I
7      cannot -- I couldn't say for certain on
8      the record the amount of hours.
9          Q.    Well, approximately how many?
10         A.    Maybe, approximately, like, 30
11     hours, 35.
12         Q.    35 hours a week?
13         A.    Approximately.
14         Q.    And how many hours a week for
15     the Campaign during that time?
16         A.    Like I said, if I got there to
17     the office between 10 and 11 --
18     generally, it was between 11 or 12 and
19     then I would leave around 9, 8, 9,
20     sometimes 10, depending on the day.  Like
21     Fridays and then on weekends it was
22     typically in the morning all the way to
23     the nighttime on Saturday and Sunday.
24         Q.    And it's your testimony that
25     you worked every Saturday and Sunday for

Page 152

1                    ALEXANDRA WHEATLEY-DIAZ
2        the Campaign in January?
3             A.    In the month of January when I
4        was hired, from when I was hired I did
5        work those weekends. And if I -- I'd have
6        to look at a calendar to see for sure
7        what weekends those were and when I
8        actually began, because that is something
9        that I don't necessarily recall the exact
10       date, so...
11            Q.    And there were some weekends
12       that you couldn't work because of your
13       other job, correct?
14                  MS. COLE-CHU:  Objection to
15            form.
16            A.    That's not correct. I did not
17       ever not work a weekend.
18            Q.    Could you ever not work a
19       weekend day, meaning Saturday or Sunday,
20       when you worked for the Campaign?
21            A.    No, I worked every Saturday
22       and Sunday for the Campaign.
23            Q.    Okay. In February and March
24       also?
25            A.    Correct, yeah.

Page 153

1          ALEXANDRA WHEATLEY-DIAZ
2          Q.    Okay. And it's your testimony
3    here today that you never, during the
4    entire time you worked for the Campaign,
5    you worked every single Saturday and
6    Sunday?
7          A.    To the best of my knowledge,
8    that is true, that I remember, and that I
9    recall. I do not recall ever not working
10   those weekends and I'm also uncertain of
11   when we stopped working in March.  So
12   depending on when the last day was in
13   March and when the first day was that I
14   started working in January, and to the
15   best of my knowledge, I recall working
16   all those weekends.
17         Q.    In the month of February how
18   many hours a week did you work for the
19   Campaign?
20         A.    It was the same that I worked
21   in January. I'd have to get a calculator
22   to calculate the amount of time but, like
23   I said, if we were on the latter side,
24   between 12 every day, you know, 10 --
25   generally between 12, leaving the office

Page 155

1         ALEXANDRA WHEATLEY-DIAZ

2         Q.    And in the month of February,

3    how many hours a week did you work for

4    Genex?

5         A.    I would say it was the same. I

6    can't -- I can't state for certain the

7    amount of hours.

8         Q.    So about 35 hours a week, is

9    that your testimony?

10        A.    That's my testimony.

11        Q.    And when you were working for

12   Genex, did you ever do any of that work

13   when you were at the Bloomberg Campaign?

14        A.    There were instances where I

15   was allowed to come to the office to --

16   and I was allowed to work my other job so

17   I could immediately start working the

18   Bloomberg job at a specified time.

19        Q.    And do you have any records of

20   that?

21        A.    That was just a verbal

22   agreement given by my ROD and me.

23        Q.    And I assume that Genex would

24   have records of the hours that you worked

25   and how much you were paid, correct?

Page 156

ALEXANDRA WHEATLEY-DIAZ

1
2          A.     I cannot say for certain.

3                 MS. COLE-CHU:  Objection to

4          form.

5          Q.     And in March, how many hours a

6     week did you work for Genex?

7          A.     I would say it was the same

8     amount.

9          Q.     And for the Campaign?

10         A.     It was -- I can't say for

11    certain because I don't recall, like,

12    when things ended or, like, when the

13    company -- when we stopped being

14    employed, but it was -- there was

15    definitely an increase in how much we

16    were working in March.

17         Q.     And you still were working

18    your 35 hours a week for Genex?

19         A.     That I recall, that is

20    correct.

21                MS. BLOOM: If we can show the

22         witness what's under tab 72 and

23         mark it as Exhibit 11? It's

24         P008132.

25                (Wheatley Exhibit 11, email

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2         back on the record. The time is
 3         12:33 p.m.
 4    EXAMINATION BY MS. COLE-CHU:
 5         Q.    Ms. Wheatley, what were your
 6    primary job duties as a field organizer
 7    for the Mike Bloomberg Campaign?
 8         A.    My primary duties were to
 9    canvass when asked and to phone bank and
10    to work events when necessary.
11         Q.    So looking specifically at
12    canvassing and phone banking, what
13    percentage of your overall job duties,
14    while employed by the Mike Bloomberg
15    Campaign as a field organizer, were you
16    canvassing and phone banking?
17         A.    It depended on the month but
18    in the month of January and February we
19    were primarily phone banking, with the
20    occasional canvassing at a rate of about
21    20%. When March hit we were approximately
22    -- it was pretty 50/50, like half the day
23    would be, depending on the day,
24    canvassing and the other half would be
25    phone banking. Some days it would
```

1              ALEXANDRA WHEATLEY-DIAZ
2      primarily just be phone banking.  And
3      when I say phone banking I also mean text
4      messages and the auto-dial.
5          Q.    When you look at those job
6      duties combined, canvassing and phone
7      banking, as a percentage of your overall
8      job duties while working for the
9      Campaign, what percentage of your overall
10     job duties were canvassing and phone
11     banking?
12         A.    I would say 98% of it.
13         Q.    We looked at an email. Do you
14     mind pulling up Exhibit 12 and taking a
15     look at that with me?
16         A.    Oh, yes.
17             MS. BLOOM:  Can you put it on
18         the screen, please? Could the
19         Concierge put that on the screen?
20         Thanks.
21         Q.    Do you have the exhibit in
22     front of you, Ms. Wheatley?
23         A.    I do.
24         Q.    This is Exhibit 12, an email
25     sent by you to Jonathan Salvador and the

Page 255

```
 1              C E R T I F I C A T E
 2              I, MAUREEN M. RATTO, a
 3      Registered Professional Reporter, do
 4      hereby certify that prior to the
 5      commencement of the examination,
 6      ALEXANDRA WHEATLEY-DIAZ was sworn by me
 7      to testify the truth, the whole truth
 8      and nothing but the truth.
 9              I DO FURTHER CERTIFY that the
10      foregoing is a true and accurate
11      transcript of he proceedings as taken
12      stenographically by and before me at
13      the time, place and on the date
14      hereinbefore set forth.
15              I DO FURTHER CERTIFY that I am
16      neither a relative nor employee nor
17      attorney nor counsel of any of the
18      parties to this action, and that I am
19      neither a relative nor employee of such
20      attorney or counsel, and that I am not
21      financially interested in this action.
22
23
24      MAUREEN M. RATTO, RPR
25      License No. 817125
```