# EXHIBIT H

Page 1

1      UNITED STATES DISTRICT COURT

2      SOUTHERN DISTRICT OF NEW YORK

3

4      -------------------------------x

5      DONNA WOOD, et al, individually

6      and on behalf of all others

7      similarly situated,

8            Plaintiffs,

9         vs.      20 Civ. 2489(LTS)(GWG)

10     MIKE BLOOMBERG 2020, INC.,

11           Defendant.

12     -------------------------------x

13

14         VIDEOTAPE DEPOSITION OF

15         ALEXANDRA WHEATLEY-DIAZ

16     VIA ZOOM VIDEOCONFERENCE

17         November 11, 2022

18         7:16 a.m. PST

19

20

21

22

23

24     Reported by:

25     Maureen Ratto, RPR, CCR

1          ALEXANDRA WHEATLEY-DIAZ

2     it looked like to take this position on

3     and if this was a good idea for me in my

4     life, just because I had just moved to

5     California and I was trying to get

6     settled in.

7          Q.    Had you worked for Genex in

8     Florida before you moved to California?

9          A.    That is correct.

10         Q.    And was it their decision or

11    your decision for you to move to

12    California?

13         A.    It was my decision.

14         Q.    And you continued to work for

15    them after you moved; is that right?

16         A.    That is right.

17         Q.    And what was the position that

18    you held immediately prior to starting

19    with the Campaign for Genex?

20         A.    I worked for Jamar

21    Enlightenment Center.

22         Q.    And that was in Florida?

23         A.    That was in Florida, correct.

24         Q.    So at Genex, at the time that

25    you applied or at the time that you got

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2     the job offer for the Bloomberg Campaign,
 3     your job was as an insurance scheduler;
 4     is that right?
 5          A.     Correct.
 6          Q.     And how were you paid in that
 7     job?
 8          A.     I was paid a direct deposit.
 9          Q.     Were you hourly or salaried or
10     something else?
11          A.     I was hourly.
12          Q.     And how many hours a week did
13     you work?
14          A.     Every week was different,
15     depending on the time but it was a
16     full-time position, so between 40 hours
17     and some weeks it would be more but at
18     minimum, 40 hours.
19          Q.     And did you get overtime for
20     hours over 40?
21          A.     We did, as long as it was
22     approved.
23          Q.     What does that mean?
24          A.     That means that you couldn't
25     just work 50 hours every week. There had
```

ALEXANDRA WHEATLEY-DIAZ

1
2    to be a reason as to why we had to work
3    more than 40 hours.
4         Q.    And you had to get that
5    approved in order to get paid; is that
6    your testimony?
7         A.    No. We had to get approved in
8    order to work more than 40 hours.
9         Q.    And during the time that you
10   worked for the Bloomberg Campaign, you
11   continued to work for Genex; is that
12   right?
13        A.    That is correct.
14        Q.    And how many hours a week did
15   you work for Genex while you were working
16   for the Campaign?
17        A.    I can't confirm the amount of
18   time, but it was a good portion of my day
19   -- or a good -- incorrect to say that.
20             It was -- I can't -- I can't
21   recall the exact amount of time but it
22   was certainly five hours -- about
23   approximately anywhere from five hours a
24   day, sometimes more, depending on how --
25   when I had to be at the Bloomberg office.

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2         Q.    And did you continue to be
 3    paid on an hourly basis by Genex?
 4         A.    I was.
 5         Q.    During the time that you were
 6    also working for the Campaign did you get
 7    paid any overtime by Genex?
 8         A.    I did not.
 9         Q.    When you worked for Genex what
10    office or offices did you work out of?
11              MS. COLE-CHU:  Objection to
12         form.
13         A.    Can you repeat the question or
14    rephrase it?
15         Q.    What is it about the question
16    that you don't understand?
17         A.    You asked if I worked at the
18    office.  Are you specifying if I worked
19    anywhere other than my home, since I was
20    a work-from-home employee?
21         Q.    Okay. Thank you. So when you
22    were working for Genex you worked from
23    your home; is that correct?
24         A.    That is correct.
25         Q.    And how did you keep track of
```

Page 41

1      ALEXANDRA WHEATLEY-DIAZ

2

3

4

5          Q.     Do you have any records of the

6     number of hours that you worked for Genex

7     during the time that you were working for

8     the Bloomberg Campaign?

9          A.     I don't have that.

10         Q.     I assume they would have that,

11    though, correct?

12         A.     They should.

13                MS. COLE-CHU:   Objection to

14         form.

15         Q.     Do you have your pay stubs or

16    any record of your -- what your pay from

17    Genex during the time period that you

18    working for the Campaign?

19         A.     I do not have that currently.

20    Although, I do believe I might have

21    submitted that when we originally began.

22         Q.     When you say when you

23    originally began, originally began what?

24         A.     When we originally -- when

25    this case began.

Page 62

1         ALEXANDRA WHEATLEY-DIAZ

2         Q.    You understood that your

3    status was as an exempt employee?

4         A.    I did not know what that meant

5    at that time, so I didn't -- so I would

6    say that I didn't know that that -- I

7    didn't know the extent to what that meant

8    at that time.

9         Q.    You understood that you

10   wouldn't get overtime, though, correct?

11        A.    I did not understand that.

12             MS. COLE-CHU:   Objection to

13        form.

14        Q.    Sorry?

15        A.    I did not understand that.

16        Q.    So did you think you would be

17   paid money over and above $3,000

18   semi-monthly?

19        A.    I did not -- I did not know --

20   how do I say this? I was not aware of --

21   I wasn't aware that that would even be

22   necessary based on not knowing that I

23   would be working the hours to the extent

24   that I was.

25        Q.    Did you tell your other

Page 63

1              ALEXANDRA WHEATLEY-DIAZ
2      employer that you were taking another
3      job?
4           A.    I told my immediate boss, yes.
5           Q.    What did you tell your
6      immediate boss?
7           A.    When or what?
8           Q.    What?
9           A.    What.  I told my other boss
10     that I would be working for the Campaign.
11          Q.    Did you tell your boss how
12     many hours a week you'd be working for
13     the Campaign?
14          A.    It did not come up in
15     conversation.
16          Q.    What was the conversation?
17     Tell me in as much detail as you can
18     recall.
19          A.    I spoke with my immediate boss
20     about taking a second job so that I could
21     support myself.
22          Q.    Did you ask for any reduction
23     in the number of hours that you were
24     working for Genex in order to take the
25     second job?

```
                                          Page 64
 1              ALEXANDRA WHEATLEY-DIAZ
 2         A.    I did not ask for -- I did not
 3    ask for that.
 4         Q.    Now, going back to Exhibit 2,
 5    there is also a Confidentiality
 6    Non-Interference and Invention Assignment
 7    Agreement that you signed on page
 8    P008652; is that right?  That is your
 9    signature?
10         A.    That is, yes.
11         Q.    And you dated this on or about
12    January 16th of 2020?
13         A.    That is correct.
14         Q.    And above your signature it
15    says, "I, Alexandra Wheatley, have
16    executed this Confidentiality,
17    Non-Interference and Invention Assignment
18    Agreement on the date set forth below."
19    Correct?
20         A.    Correct.
21         Q.    And included in this packet on
22    P008653 to P008655 is also a Code of
23    Conduct, correct?
24         A.    Correct.
25         Q.    And on page P008655 you signed
```

Page 69

ALEXANDRA WHEATLEY-DIAZ

1
2    times, 50 times.  I couldn't give you a
3    number to the exact amount but it was
4    certainly a lot.
5         Q.    What did you do at home?
6         A.    Primarily phone banking and
7    most -- and sometimes the text messages.
8         Q.    Now, you understand that you
9    are being offered as a class
10   representative in this case; is that
11   right?
12        A.    That is right.
13        Q.    What does that mean to you?
14        A.    That means that I represent a
15   group of people in the State of
16   California.
17        Q.    And what do you understand
18   your responsibilities to be as a class
19   representative?
20        A.    That I am available, that I am
21   cooperative and that I have the time and
22   willingness to be a part of this case.
23        Q.    There was a period of time
24   during the pendency of this case when you
25   had indicated that you no longer wanted

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2    to be a class representative; is that
 3    correct?
 4              MS. COLE-CHU:  Objection to
 5         form.
 6         A.    That is incorrect.
 7         Q.    What's incorrect about my
 8    question?
 9         A.    It was not that I did not want
10    to be a part of, it was that I was unable
11    to.
12         Q.    And why were you unable to?
13         A.    I spoke with my lawyer or my
14    attorneys in regards to this and it was
15    discussed that I should not proceed at
16    that time.
17         Q.    And what was the reason that
18    you should not proceed?
19              MS. COLE-CHU:  Objection. I'm
20         just going to caution the witness
21         not to disclose any confidential
22         communications that she had with
23         her attorneys.
24         Q.    To be clear, I'm not asking
25    you to tell me what you spoke to about
```

```
 1              ALEXANDRA  WHEATLEY-DIAZ
 2      your attorneys.  I'm asking you to tell
 3      me what the reason was you were not able
 4      to proceed as a class rep.
 5           A.    The reason was discussed
 6      between my attorneys and I.
 7                 MS. BLOOM:  Hannah, I think
 8           she can answer the question. I'm
 9           not asking about discussions with
10           you but I'm entitled to know the
11           reason.
12                 MS. COLE-CHU:  Objection. Just
13           one moment. I'm objecting to the
14           question. I think that you are
15           seeking confidential work product
16           and privileged information and
17           you're asking about conversations
18           that happened between the witness
19           and her attorneys and she can't
20           speak about those.
21                 MS. BLOOM:  I'm not -- sorry.
22           Go ahead.
23           Q.    I'm not -- I want to be really
24      really clear.  I am not asking you to
25      disclose what you talked to your
```

Page 72

1              ALEXANDRA WHEATLEY-DIAZ
2    attorneys about.
3              What I am asking you for,
4    though, is the reason why you believed
5    you were unable to continue as a class
6    representative?
7              MS. COLE-CHU:  Objection. I'm
8         going to caution the witness not to
9         disclose any confidential
10        communications that happened
11        between her and her attorneys.
12             To the extent that you're able
13        to provide any reasons that are not
14        confidential or privileged, you
15        may.
16        A.   I just -- I began a new job.
17        Q.   When did you begin that job?
18        A.   In May of 2020 -- 2021. Sorry.
19        Q.   And what was that job?
20        A.   VanRein Compliance as an
21    account manager.
22        Q.   What was it about that job
23    that you thought made you unable to
24    continue as a class representative?
25             A.   It wasn't necessarily the job,

```
 1            ALEXANDRA WHEATLEY-DIAZ
 2    it was merely -- it was -- it wasn't the
 3    job, it was merely I had began a new
 4    position and that was it.
 5         Q.    So it was the fact of
 6    beginning a new position, not what you
 7    were doing at the job?  Am I
 8    understanding your testimony correctly?
 9              MS. COLE-CHU:  Objection to
10         form.
11         A.    Just that I started a new
12    position.
13         Q.    And what was it about starting
14    the new position that made you believe
15    that you couldn't be a class
16    representative?
17         A.    I wasn't aware of what the new
18    position would ask of me and that was the
19    extent to it.
20         Q.    And did you change your mind
21    at some point and decide that you could
22    be a class representative?
23         A.    Not that I could, but that I
24    was able to.
25         Q.    What does that mean?
```

Page 75

ALEXANDRA WHEATLEY-DIAZ

1

2         Q.     And what was it that made you
3    think that you were able to resume as a
4    class representative?

5         A.     I understood what was needed
6    and I knew that I could, based on where
7    I'm at in my position in my life, that I
8    could show up and represent this class in
9    the way that it needed and deserved.

10        Q.     Now, do you still have the job
11   at -- VanRein, did you call it?

12        A.     The company is called VanRein
13   Compliance.  And yes, I do still have
14   that position.

15        Q.     Has your position changed at
16   all?

17        A.     I've been given more
18   responsibility but not necessarily has it
19   changed in its -- in its -- I mean, the
20   company is always changing, the position
21   is always changing, so that's a pretty
22   broad question, but the position that I
23   currently hold is still the same, yes.

24        Q.     But you said you've been given
25   more responsibility; is that right?

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2                  MS. COLE-CHU:  Objection to
 3          form.
 4          A.     Yes.
 5          Q.     What types of additional
 6      responsibilities?
 7          A.     I've been asked to travel,
 8      I've been asked to help higher clients or
 9      take care of bigger projects, that's the
10      extent.  So not necessarily more in time,
11      but just greater responsibility in terms
12      of trust.
13          Q.     When did you get the job at
14      VanRein?
15          A.     I got that job in May of 2021.
16                  MS. BLOOM:  I'm going to ask
17          the court reporter to mark as
18          Exhibit 3 the document that appears
19          under tab 14 and I'm going to ask
20          the witness to review the document
21          and let me know when you've had a
22          chance to review it.
23                  (Wheatley Exhibit 3, letter
24          dated October 19, 2020 from Outten
25          & Golden was received and marked on
```

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2        A.     Correct.
 3        Q.     And do you see my name on
 4   there, Proskauer Rose, that was a letter
 5   that was sent to me by your lawyers on
 6   October 19th of 2020, correct?
 7        A.     Correct.
 8        Q.     And I'd like to direct your
 9   attention to the second paragraph on the
10   first page. It says, "Plaintiffs write to
11   notify Defendant that they intend to
12   amend the Complaint.  First, Plaintiffs
13   plan to substitute the California class
14   representative currently Alexandra Marie
15   Wheatley-Diaz with Robbins Ceppos." Do
16   you see that?
17        A.     Yes.
18        Q.     So on October of 2020 we were
19   informed that you -- that your counsel
20   was going to substitute you out as a
21   class representative.
22               What was it in October of 2020
23   that caused you not to want to continue
24   as a class rep?
25               MS. COLE-CHU:  Objection.
```

1          ALEXANDRA WHEATLEY-DIAZ
2          A.    I don't recall at that time,
3    that specific time.
4          Q.    But it clearly wasn't the
5    position that you got at VanRein in May
6    of 2021; isn't that right?
7               MS. COLE-CHU:   Objection,
8          objection to form.
9          A.    I don't feel -- I'm going to
10   have to pause on that. Do I have to
11   respond at this moment in time? Can I
12   come back to that?
13         Q.    You do. You need to respond.
14         A.    Like I said before, it was
15   just decided at that time between my
16   attorneys and I that it was not the right
17   time for me to keep moving forward. I
18   thought it was my position, like, this
19   was two years ago, two, three years ago,
20   so that -- I was under the understanding
21   that that was the reason why at that time
22   but those conversations were between my
23   attorney and I at that time.
24         Q.    You said that you wanted to
25   come back to this question. What was it

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2      that you were going to do to try to
 3      refresh your memory so you can refresh
 4      your memory?
 5                  MS. COLE-CHU:  Objection to
 6          form.
 7          A.    I just needed a minute to kind
 8      of comprehend or bring myself back to
 9      that timeframe to answer.
10          Q.    Okay. So I'm -- have you
11      brought yourself back to October of 2020
12      now?
13                  MS. COLE-CHU:  Objection.
14          A.    That was such a long time ago.
15      Yeah, I just want to stick with that
16      statement, that my attorneys and I
17      discussed me being able to proceed and --
18      or -- I'm sorry, my attorneys and I
19      discussed whether or not I had the time
20      to be the class representative at that
21      time and it was decided that I -- I
22      didn't have the time to give to this.
23          Q.    But it wasn't the new job at
24      VanRein which you got in May of 2021,
25      correct?
```

```
                                           Page 81
 1              ALEXANDRA  WHEATLEY-DIAZ
 2                  MS.  COLE-CHU:   Objection  to
 3         form.
 4         A.     At  that  time  I  was  still
 5    looking  for  other  positions.  We  were  in
 6    the  height  of  COVID  and  I  don't  believe
 7    that  I  --  I  did  not  have  the  time  to  give
 8    to  this  case  that  it  deserves.
 9         Q.     Well,  I  just  want  to  make  sure
10    I  understand  the  timeframe  clearly.  You
11    didn't  start  working  at  VanRein  until  May
12    of  2021,  correct?
13         A.     Correct.
14         Q.     And  in  October  of  2020  you
15    were  still  working  for  Genex,  correct?
16         A.     I  was.
17                  MS.  COLE-CHU:   Objection  to
18         form.
19         Q.     And  the  position  was  still  a
20    remote  position,  correct?
21         A.     It  was,  yes.
22         Q.     Do  you  know  Robin  Ceppos?
23         A.     I  know  who  she  is,  yes.
24         Q.     How  do  you  know  her?
25         A.     I  met  her  working  at  the
```

ALEXANDRA WHEATLEY-DIAZ

1

2      A.     I believe that was the extent
3   to it.
4      Q.     And what conversations have
5   you had with Rachel about the claims in
6   this case?
7      A.     I don't recall the extent to
8   the conversation, other than speaking
9   about the case, not in detail, but just
10   that there was one, and our experiences
11   with -- at the different places that we
12   worked at.
13      Q.     Whose decision was it that you
14   were going to become a class
15   representative again?
16           MS. COLE-CHU:  Objection.
17      A.     It was my decision.
18      Q.     I'm sorry? I didn't hear your
19   answer.
20      A.     It was my decision.
21      Q.     And why did you -- what
22   prompted you to make that decision?
23      A.     I spoke with my attorneys and
24   that decision -- and then that decision
25   was made.

Page 86

1              ALEXANDRA WHEATLEY-DIAZ

2         Q.    Was it -- did you initiate the

3    conversation about becoming a class rep

4    again or was it initiated by somebody

5    else?

6              MS. COLE-CHU:   Objection.

7         A.    I don't recall who initiated

8    that. I just know that the conversation

9    was discussed between my attorneys and I.

10              MS. BLOOM:   Okay. We can take

11         ten minutes if you want.

12              MS. COLE-CHU:   Thank you.

13              VIDEOGRAPHER:   All right. We

14         are going off the record. The time

15         is 8:52 a.m.

16              (Recess is taken.)

17              VIDEOGRAPHER:   We are going

18         back on the record. The time is

19         9:04 a.m.

20              MS. BLOOM:   Can you mark the

21         document that's under tab 8, which

22         is P007945 to P007946. And I think

23         we're up to Exhibit 4.

24              (Wheatley Exhibit 4, email

25         dated October 6, 2020, Bates

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2        Q.    Okay. And how many hours in
 3   January per week were you working for
 4   your other job?
 5        A.    I cannot say for certain the
 6   amount of hours but anywhere between -- I
 7   cannot -- I couldn't say for certain on
 8   the record the amount of hours.
 9        Q.    Well, approximately how many?
10        A.    Maybe, approximately, like, 30
11   hours, 35.
12        Q.    35 hours a week?
13        A.    Approximately.
14        Q.    And how many hours a week for
15   the Campaign during that time?
16        A.    Like I said, if I got there to
17   the office between 10 and 11 --
18   generally, it was between 11 or 12 and
19   then I would leave around 9, 8, 9,
20   sometimes 10, depending on the day.  Like
21   Fridays and then on weekends it was
22   typically in the morning all the way to
23   the nighttime on Saturday and Sunday.
24        Q.    And it's your testimony that
25   you worked every Saturday and Sunday for
```

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2              So if you think I missed it
 3         and if you can send me the Bates
 4         numbers, that would be great but,
 5         otherwise, we ask that you look for
 6         that and I can follow up in
 7         writing.
 8              MS. COLE-CHU:  Thank you.
 9              (Request for expense
10         documentation.)
11         Q.   Your job at Genex, what
12    specifically was that job? And when I say
13    what was that job, I'm talking about the
14    time you worked for the Campaign, what
15    did you do?
16         A.   I had different
17    responsibilities. In the morning I was
18    asked to do medical records. And then in
19    the afternoon I was asked to -- or like
20    in the later half of the day I was asked
21    to be available for calls that would come
22    in after a certain time.
23         Q.   So what does it mean "to do
24    medical records"?
25         A.   Medical records -- oh, my God.
```

```
 1              ALEXANDRA WHEATLEY-DIAZ
 2    Umm, how do I say this? I would pull
 3    medical records for the independent
 4    medical exams that the clients -- that
 5    the patients were going to be
 6    participating in and put them in a
 7    document or put them in a folder and I
 8    had to do several different things to
 9    those documents in order for them to be
10    liable for the nurse practitioner. So
11    essentially, I was preparing documents
12    for someone to look over in regards to
13    that patient.
14          Q.    And you did that remotely?
15          A.    I did that remotely.
16          Q.    Your resumé says that you were
17    a scheduler. Did you do scheduling?
18          A.    Yes.  When I was originally
19    hired I was hired as a scheduler.
20          Q.    At the time that you were
21    working for the Bloomberg Campaign were
22    you doing scheduling?
23          A.    I was not.
24          Q.    And when you said you had to
25    be available to field calls, calls from
```

1                  ALEXANDRA WHEATLEY-DIAZ

2       whom?

3              A.    Patients, like after hours.

4       Since the company was an East Coast

5       company, I was working East Coast times.

6              Q.    So during what hours would you

7       have to be available to field calls?

8              A.    Generally around 11 and 12.

9              Q.    Until when?

10             A.    Well, that's until then, like,

11      I would have the calls forwarded to my

12      cellphone, I was just available but that

13      never really occurred.

14             Q.    This is what I'm not

15      understanding. You're saying until 11 or

16      12 Pacific Time?  Is that your testimony?

17             A.    Yes.

18             Q.    And you said it was after

19      hours on the East Coast, so that would be

20      two or three o'clock on the East Coast?

21             A.    Correct. Because we're talking

22      in reference to, like, a doctor's office.

23             Q.    So you are claiming that a

24      doctor's office closes at two o'clock?

25             A.    I'm not claiming anything. I'm

```
 1           ALEXANDRA WHEATLEY-DIAZ
 2     just stating what the company considers
 3     after hours is.
 4           Q.    And when did you -- what was
 5     the time period? I know you said it ended
 6     at 11 or 12.  When did it start?
 7           A.    I mean, I was available to
 8     take calls all day, but it wasn't
 9     necessarily a start or end time to that.
10     Sorry. It wasn't necessarily a start time
11     to that. My apologies.
12           Q.    So I'm just trying to
13     understand what the commitment was.
14                 When you say you were
15     available to take calls all day, what
16     does that mean? Tell me the hours.
17           A.    The hours varied. My -- I was
18     just available to take a call if it was
19     after hours, which generally ended around
20     12, but it would be understood too that
21     it could be up until, like, 2 p.m.
22     Pacific Standard Time, but that never
23     actually occurred during the time that I
24     was employed or that I was working but it
25     was, like, I was available if I had to
```

Page 195

1        ALEXANDRA WHEATLEY-DIAZ
2    have a call. And Bloomberg was aware of
3    that, yeah.
4        Q.    So you had to be available; is
5    that right?
6        A.    I -- I wouldn't say I had to
7    be, it was just that I was if I needed to
8    be.
9        Q.    Did you get paid for being
10   available?
11       A.    I did get paid for being
12   available, yes.
13       Q.    And how did you -- so if you
14   would be available all day, how many
15   hours would you get paid for for being
16   available?
17       A.    I can't give you an accurate
18   number for that, but I would keep track
19   of that on, like, on a timesheet. Like I
20   said, the hours that I was working for
21   the Campaign varied as to when I needed
22   to be in the office, so it varied on
23   that. It was based on that.
24       Q.    I just want to make sure I
25   understand your testimony completely.

```
 1              ALEXANDRA  WHEATLEY-DIAZ
 2              So you said that you'd be in
 3    the Bloomberg office working for the
 4    Campaign and you would simultaneously be
 5    available to take calls for your job at
 6    Genex; is that correct?
 7         A.    That's incorrect. I stated
 8    that we -- that I was available if I
 9    needed to be for Genex for customer
10    service if I had to be for after hours.
11    However, that depended when I needed to
12    be in the office for the Campaign and it
13    differentiated on the date but there were
14    circumstances where I was allowed to,
15    depending on when they needed me to be in
16    the office, I was allowed to work --
17    like, work my previous job there, so that
18    I can just immediately start working for
19    the Campaign when they needed me to start
20    working.
21         Q.    Did you ever get paid by Genex
22    and by the Campaign for the same hour?
23              MS. COLE-CHU:  Objection to
24         form.
25         A.    I can't confirm or -- I can't
```

1           ALEXANDRA WHEATLEY-DIAZ

2    recall because that was two years ago.

3           Q.    Okay. But presumably Genex

4    would have records that would show us

5    that, right?

6           A.    I don't know, to be certain.

7               MS. BLOOM:  Okay. Can we show

8          the witness what is under tab 10

9          and mark it as Exhibit 17, please?

10             (Wheatley Exhibit 17, letter

11         dated March 31, 2020 from Outten &

12         Golden re: PAGA Notice was received

13         and marked on this date for

14         identification.)

15             CONCIERGE:  Wheatley 17 is

16         marked.

17          Q.    Ms. Wheatley, I'm going to ask

18    you if you've seen the document that's

19    been marked as Exhibit 17 before?

20          A.    Yes, I have seen this.

21          Q.    And do you recognize that as

22    the PAGA letter that was filed on your

23    behalf?

24          A.    I do.

25          Q.    And when did you see this for

Page 237

1          ALEXANDRA WHEATLEY-DIAZ

2     to that, at which are very detailed and

3     I'd have -- I am aware of them but do not

4     -- I mean, there's technical terms that I

5     do not feel comfortable, like, stating on

6     the record what they are.

7          Q.     If you can look at page 22 of

8     Exhibit 23, there is a couple of

9     paragraphs that deal with you

10    specifically and I had one or two

11    questions about those.

12               It says in paragraph 95 that

13    you reduced your hours at your insurance

14    firm by nearly half.  Is that an accurate

15    statement?

16         A.     That is an accurate statement.

17         Q.     Did your total amount of

18    compensation increase or decrease during

19    the time that you were working for the

20    Bloomberg Campaign?

21               MS. COLE-CHU:  Objection to

22         form.

23         A.     I don't -- I don't -- I cannot

24    state for certain if they increased,

25    decreased or stayed the same.

```
                                              Page 239

 1              ALEXANDRA WHEATLEY-DIAZ

 2      insurance company, correct?

 3           A.    Correct.

 4           Q.    If you look at the next page

 5      in paragraph 96, it says that you

 6      regularly worked approximately 65 hours a

 7      week for the Campaign. Is that a true

 8      statement?

 9           A.    It is a true statement of

10      which varied based on the week. That's

11      why the word "approximately" is

12      important.

13           Q.    What was the range?

14           A.    It could have been 50, could

15      have been 65, could have been 70,

16      honestly. That's why the word

17      "approximately" I think is really

18      important in that statement because it

19      was around that amount of hours.

20           Q.    Was it ever less than 40?

21           A.    No.

22           Q.    So assuming it was 65 hours a

23      week, and that you were working 35 hours

24      a week for the insurance company, is it

25      your testimony here today that you would
```

1          ALEXANDRA WHEATLEY-DIAZ

2     have been working 100 hours a week?

3          A.    I cannot make that testimony,

4     nor do I feel confident in making that

5     statement. I would just simply say that I

6     worked approximately a certain amount of

7     hours at the -- at Genex and I worked a

8     significant amount more at the Campaign

9     working every single day up until I was

10    let go.

11         Q.    And sitting here today, can

12    you tell me if there was any overlap in

13    the hours, meaning that you were working

14    for both entities at the same time?

15         A.    I cannot recall during that

16    timeframe if that occurred or not.

17         Q.    If that did occur, then you

18    would have been getting paid from both of

19    them simultaneously?

20              MS. COLE-CHU:   Objection.

21         A.    I cannot -- I cannot -- I -- I

22    don't -- I don't believe that that's a

23    fair -- I don't believe that that

24    statement is accurate because I was not

25    being paid hourly from the Campaign. I