**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

DONNA WOOD, ET AL., individually and on
behalf of those similarly situated,

                Plaintiffs,

     v.

MIKE BLOOMBERG 2020, INC.,

                Defendant.

No. 20 Civ. 2489 (LTS) (GWG)

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

PROCEDURAL HISTORY....................................................................................... 2

STATEMENT OF FACTS ........................................................................................ 3

    I.    Field Organizers Performed the Same Primary Duties........................................... 3

        A.    The Primary Duty of the Field Organizer Position Was to Speak to Voters and Potential Volunteers .................................................. 3

        B.    Bloomberg Set and Carefully Tracked Field Organizers' Work ............. 10

        C.    The "Entry-Level" Field Organizer Job Is the Lowest Position in the Campaign's Hierarchy ..................................................... 15

        D.    Field Organizers' Job Duties Uniformly Overlap With Those of Unpaid Volunteers ..................................................... 19

    II.    Bloomberg Classified All Field Organizers Categorically as Exempt and Required Significant Overtime Work ................................................. 20

ARGUMENT ........................................................................................................... 22

    I.    Legal Standard .................................................................................. 22

    II.    Field Organizers' Overtime Claims Are Well Suited for Class Adjudication...... 22

    III.    Plaintiffs Meet All of the Rule 23(a) Requirements ........................................... 23

        A.    Rule 23(a)(1): Class Members Are Sufficiently Numerous Such That Joinder Is Impracticable ..................................................... 23

        B.    Rule 23(a)(2): Commonality Is Satisfied ................................................. 24

        C.    Rule 23(a)(3): Typicality Is Satisfied Because Plaintiffs' Claims Are Identical to Those of the Class ................................................. 29

        D.    Rule 23(a)(4), (g): Plaintiffs and Their Counsel Are Adequate............... 30

    IV.    Plaintiffs Meet the Rule 23(b)(3) Requirements.................................................. 31

        A.    Common Questions of Law and Fact Predominate ................................... 31

        B.    A Class Action Is the Superior Mechanism to Any Alternative............... 34

CONCLUSION........................................................................................................ 35

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page(s)**

*Alves v. Affiliated Care of Putnam, Inc.*,
   No. 16 Civ. 1593, 2022 U.S. Dist. LEXIS 59122 (S.D.N.Y. Mar. 30, 2022) ........... 26-27, 33

*Baffa v. Donaldson*,
   222 F.3d 52 (2d Cir. 2000) ................................................................................................. 30

*Catholic Health Care W. v. U.S. Foodserv.*,
   729 F.3d 108 (2d Cir. 2013) ......................................................................................... 23, 35

*Cruz v. Hook-Superx, LLC*,
   No. 09 Civ. 7717, 2010 U.S. Dist. LEXIS 81021 (S.D.N.Y. Aug. 5, 2010) ........................ 35

*Clem v. Keybank, N.A.*,
   No. 13 Civ. 789, 2014 U.S. Dist. LEXIS 42426 (S.D.N.Y. Mar. 27, 2014) ........................ 31

*Consol. Rail Corp. v. Town of Hyde Park*,
   47 F.3d 473 (2d Cir. 1995) ................................................................................................. 23

*Cruz v. Lawson Software, Inc.*,
   764 F. Supp. 2d 1050 (D. Minn. 2011) ................................................................................ 25

*Damassia v. Duane Reade, Inc.*,
   250 F.R.D. 152 (S.D.N.Y. 2008) ........................................................................ 26, 27, 28, 32

*Davis v. J.P. Morgan Chase & Co.*,
   587 F.3d 529 (2d Cir. 2009) ............................................................................................... 25

*Dial Corp. v. News Corp.*,
   314 F.R.D. 108 (S.D.N.Y. 2015) ......................................................................................... 29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ................................................................................................. 29

*Gortat v. Capala Bros.*,
   949 F. Supp. 2d 374 (E.D.N.Y. 2013) .............................................................................. 23-24

*Grenawalt v. AT&T Mobility, LLC*,
   No. 11 Civ. 2664, 2014 U.S. Dist. LEXIS 139179 (S.D.N.Y. Sept. 29, 2014) ..................... 34

*Hecker v. Petco Animal Supplies, Inc.*,
   No. 16 Civ. 10857, 2017 U.S. Dist. LEXIS 87016 (N.D. Ill. June 7, 2017) ........................ 25

*Heckle v. Matrix Absence Mgmt., Inc.*,
   No. 21 Civ. 1463, 2022 U.S. Dist. LEXIS 225514 ................................................. 27, 28, 32

*Hicks v. T.L. Cannon Corp.*,
   35 F. Supp. 3d 329 (W.D.N.Y. 2014) .................................................................................. 34

*Hill v. City of N.Y.*,
   136 F. Supp. 3d 304 (E.D.N.Y. Sept. 28, 2015) .................................................... 30

*Hoffmann-La Roche Inc. v. Sperling*,
   493 U.S. 165 (1989) ........................................................................................... 22

*Jackson v. Bloomberg, L.P.*,
   298 F.R.D. 152, 164 (S.D.N.Y. 2014) .................................................................. 32

*Jacob v. Duane Reade, Inc.*,
   289 F.R.D. 408 (S.D.N.Y. 2013) ............................................................... *passim*

*Long v. HSBC USA Inc.*,
   No. 14 Civ. 6233, 2015 U.S. Dist. LEXIS 122655 (S.D.N.Y. Sept. 11, 2015) ..................... 23

*Lopez v. Setauket Car Wash & Detail Ctr.*,
   314 F.R.D. 26 (E.D.N.Y. 2016) .......................................................................... 29

*Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*,
   471 F.3d 24 (2d Cir. 2006) .................................................................................. 23

*Moreira v. Sherwood Landscaping, Inc.*,
   No. 13 Civ. 2640, 2015 U.S. Dist. LEXIS 43919 (E.D.N.Y. Mar. 31, 2015) ...................... 34

*Myers v. Hertz Corp.*,
   624 F.3d 537, 549 (2d Cir. 2010) ................................................................ 24, 27

*Nerland v. Caribou Coffee Co.*,
   564 F. Supp. 2d 1010 (D. Minn. 2007) ............................................................... 25

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) .......................................................................... 35

*Perez v. Allstate Ins. Co.*,
   No. 11 Civ. 1812, 2014 U.S. Dist. LEXIS 130214 (E.D.N.Y. Sept. 16, 2014) .... 22, 28, 29, 32

*Porter v. MooreGroup Corp.*,
   No. 17 Civ. 7405, 2021 U.S. Dist. LEXIS 151187 (E.D.N.Y. Aug. 11, 2021) ..................... 27

*Ramos v. Baldor Specialty Foods, Inc.*,
   687 F.3d 554 (2d Cir. 2012) ............................................................................... 25

*Rivera v. Harvest Bakery Inc.*,
   312 F.R.D. 254 (E.D.N.Y. 2016) ........................................................................ 23

*Ross v. RBS Citizens, N.A.*,
   667 F.3d 900 (7th Cir. 2012) ........................................................................ 27-28

*Saginaw Firefighters Ass'n, Local 422, etc. v. Saginaw*,
   137 Mich. App. 625, 357 N.W.2d 908 (Mich. 1984) ........................................... 25

*Salim Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
   659 F.3d 234 (2d Cir. 2011) ............................................... 22

*Schear v. Food Scope Am., Inc.*,
   297 F.R.D. 114 (S.D.N.Y. 2014) ........................................ 34

*Scott v. Chipotle Mexican Grill, Inc.*,
   954 F.3d 502 (2d Cir. 2020) ................................................. *passim*

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) .......................................... 29

*Strauch v. Computer Scis. Corp.*,
   322 F.R.D. 157 (D. Conn. 2017) ......................................... 31

*Town of New Castle v. Yonkers Contracting Co., Inc.*,
   131 F.R.D. 38 (S.D.N.Y. 1990) .......................................... 23

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ........................................................ 24, 31

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................ 24

*Youngblood v. Family Dollar Stores, Inc.*,
   No. 09 Civ. 3176, 2011 U.S. Dist. LEXIS 115389 (S.D.N.Y. Oct. 4, 2011) .................. 27, 28

**Statutes**

N.C. Gen. Stat. § 95-25.14 ........................................... 25

Wis. Admin. Code § 274.04 .......................................... 25

**Rules**

Fed. R. Civ. P. 23 ........................................................ *passim*

## PRELIMINARY STATEMENT

The Court should certify seven state law classes of Field Organizers—the lowest level job title in Mike Bloomberg 2020, Inc.'s ("Bloomberg's") organizational structure—so that Plaintiffs and other Field Organizers can pursue their claims for unpaid overtime in a single, efficient, cost-effective proceeding.

Field Organizers were paid campaign workers, tasked with the routine, repetitive work of contacting potential voters and volunteers by phone or door-to-door. As confirmed in the consistent deposition testimony and declarations of forty-five Field Organizers and four Regional Organizing Directors, testimony from Bloomberg's high-level leadership, and Bloomberg's uniform job description and other documents, the primary job duty of the Field Organizer position was to deliver a uniform and consistent message to voters using scripts and pre-determined talking points that Bloomberg created and provided. Field Organizers worked long hours, often over 70 per week, attempting to meet the voter-contact metrics that Bloomberg's leadership set. As "entry level" employees, they played no role in setting or planning Campaign policy, strategy, operations, or budgets. They played no role in hiring, firing, supervising, or disciplining other Campaign employees. In fact, they spent the vast majority of their time performing the same duties as unpaid Campaign volunteers.

This is precisely the type of case where class certification is appropriate: the employer uniformly classified the job title as exempt from overtime, consistently required the workers to work substantial overtime hours, and assigned the class members similar, repetitive work under close oversight and in accordance with the employer's procedures. Just as Bloomberg made one single decision to determine that the Field Organizer position would be exempt nationwide, without any individualized analysis, so too can a jury determine whether Bloomberg has met its burden to prove that the decision was lawful. A jury will hear evidence that the Field Organizer

job entails a mix of low-level job duties, none of which qualify Field Organizers as administrators or executives, as Bloomberg must prove. Because it would be more efficient and practical to try this matter as a single class action rather than to burden the court with hundreds of individual, identical lawsuits, the Court should certify the classes.

## PROCEDURAL HISTORY

Plaintiffs allege that Bloomberg failed to pay Field Organizers overtime, in violation of the Fair Labor Standards Act ("FLSA") and state laws of California, New York, Illinois, North Carolina, Michigan, Wisconsin, Minnesota (the "Class States"). ECF No. 296 (Third Am. Compl.), Claims 1, 2, 5, 11-15. Plaintiffs additionally bring class claims under New York law for inaccurate wage statements and under California law for inaccurate wage statements, late payment of wages, and unfair business practices, all stemming from Bloomberg's common exemption decision for Field Organizers. *Id.*, Claims 3, 6, 9, 10. Bloomberg raises the same affirmative defenses with respect to Plaintiffs and all Field Organizers nationwide—including that they are exempt administrators or executives. *See* ECF No. 287 (Answer), Second, Eighteenth Affirmative Defenses.

The parties have engaged in discovery since 2020. Decl. of Justin M. Swartz ("Swartz Decl.") ¶ 14. Plaintiffs responded to 32 total sets of requests for production, 23 sets of interrogatories, and 19 sets of requests for admission, and produced 3,982 documents in total. *Id.* ¶ 15. Plaintiffs deposed four Bloomberg employees in this matter and in a related matter. Bloomberg responded to 5 sets of requests for production, 2 sets of interrogatories, and 1 set of requests for admission, produced 60,509 documents, and deposed 20 Plaintiffs and opt-in Plaintiffs. *Id.* ¶ 16. Pre-certification fact discovery has closed. *Id.* ¶ 17.

# STATEMENT OF FACTS

## I.     Field Organizers Performed the Same Primary Duties.

### A.     The Primary Duty of the Field Organizer Position Was to Speak to Voters and Potential Volunteers.

Field Organizers in the Class States and across the country performed the same primary

job duties: contacting potential voters and volunteers by phone or in person to promote Michael

Bloomberg's candidacy for President.[1] Bloomberg's uniform job description and job posting,

which Bloomberg admits did not vary for any states, reflected these duties.[2] Bloomberg

determined who each Field Organizer must call and connected them using an auto-dialer system

or with a call sheet.[3] Bloomberg dictated most of what each Field Organizer would say, requiring

---

[1]     *See* **California:** Ex. 54 (Ceppos Tr.) at 109:4-111:23, 114:5-9, 132:14-22, 170:13-22; Ex. 55 (Coker Tr.) at 59:14-61:21, 80:25-81:9; Ex. 56 (Summers Tr.) at 58:14-59:13, 97:7-20 (phone calls and canvassing were "the vast majority of what I did on a daily basis"); Ex. 57 (Wheatley-Diaz Tr.) at 108:24-111:14, 246:5-247:12; Ex. 83 (Castillo Decl.) ¶¶ 4, 9; Ex. 93 (Kim Decl.) ¶¶ 4, 9; Ex. 90 (Jones Decl.) ¶¶ 4, 9; Ex. 105 (Alva Decl.) ¶¶ 4, 9; **New York:** Ex. 58 (Goldstein Tr.) at 69:8-71:9, 88:23-89:25; Ex. 67 (Kelly Decl.) ¶¶ 9-10; Ex. 84 (Reilly Decl.) ¶¶ 5, 10; Ex. 89 (Munoz Decl.) ¶¶ 5, 10; Ex. 98 (Shawn Decl.) ¶¶ 4, 9; Ex. 95 (Nazario Decl.) ¶¶ 4, 9; Ex. 103 (Stone Decl.) ¶ 8; **Illinois:** Ex. 31 (Feb. 28, 2020 Email from J. Webb, MB2020_Wood_00173284) (describing "core responsibility" of FOs as "voter contact and volunteer recruitment"); Ex. 59 (Doherty Tr.) at 38:17-39:9, 44:19-45:14, 114:23-116:23; Ex. 99 (Doherty Decl.) ¶ 9; Ex. 73 (Benigni Decl.) ¶¶ 5, 10; Ex. 76 (Bush Decl.) ¶¶ 4, 9; Ex. 81 (Adams Decl.) ¶¶ 4, 9; Ex. 96 (Bowman Decl.) ¶¶ 4, 9; **North Carolina:** Ex. 60 (Newman Tr.) at 36:10-36:18, 113:6-114:16, 147:12-149:2; Ex. 61 (Morton Tr.) at 77:11-80:6, 92:12-93:24, 157:17-158:4; Ex. 100 (Newman Decl.) ¶ 9; Ex. 69 (Smith Decl.) ¶¶ 4, 9; Ex. 72 (Braden Decl.) ¶¶ 4, 9; Ex. 78 (Walthour Decl.) ¶ 5, 10; Ex. 97 (Patel Decl.) ¶¶ 4, 9; **Michigan:** Ex. 62 (Watson-Moore Tr.) at 74:17-24 ("The most important part [of the job] was signing up volunteers, making phone calls, and knocking on doors."); Ex. 102 (Watson-Moore Decl.) ¶ 9; Ex. 68 (Oram Decl.) ¶¶ 9-10; Ex. 80 (Washington Decl.) ¶¶ 5, 10; Ex. 82 (Harrison Decl.) ¶ 4, 9; Ex. 85 (Defoe Decl.) ¶¶ 4, 9; Ex. 92 (Hill Decl.) ¶¶ 4, 9; Ex. 94 (Almahameed Decl.) ¶¶ 4, 9; **Wisconsin:** Ex. 63 (Angulo Tr.) at 94:13-23; Ex. 86 (Jackson-Brown Decl.) ¶¶ 5, 10; Ex. 87 (Beard Decl.) ¶¶ 4, 9; Ex. 88 (Tribble Decl.) ¶¶ 4, 9; Ex. 91 (Hall Decl.) ¶¶ 5, 10; **Minnesota:** Ex. 64 (Logan Tr.) at 102:15-105:2, 189:2-11; Ex. 65 (Jaramillo Tr.) at 204:18-206:2; Ex. 66 (Waylett Decl.) ¶ 9, 10; Ex. 71 (Soth Decl.) ¶ 4, 9; Ex. 70 (Cusick Decl.) ¶ 4, 9; Ex. 74 (Conrad Decl.) ¶ 8; Ex. 75 (Muskovitz Decl.) ¶ 8; Ex. 77 (Eugene Decl.) ¶ 7; Ex. 79 (Butler Decl.) ¶¶ 4, 9; Ex. 104 (Anderson Decl.) ¶¶ 4, 9.

[2]     Ex. 6 (FO Job Description, MB2020_Wood_00089188) (listing "making phone calls, knocking on doors, and sending text messages to voters"); Ex. 48 (RFA Resps.) at Requests 1-4 (admitting job description did not vary by state); Ex. 52 (Sayers Tr.) at 22:15-21 (Bloomberg's national head of Human Resources testifying that Bloomberg maintained one job description for all organizers nationwide); Ex. 50 (Simpson Tr.) at 160:9-13.

[3]     *See* Ex. 45 (Making Calls with ThruTalk, MB2020_Wood_00186822); Ex. 53 (Sinclair 30(b)(6) Tr.) at 27:24-28:3 (organizers and volunteers "are picking up the phone and calling into a list either of prospective voters or perhaps prospective volunteers"); **California:** Ex. 54 (Ceppos Tr.) at 205:25-207:8; Ex. 56 (Summers Tr.) at 60:12-18, 61:5-10, 63:5-64:2, 80:16-24; Ex. 57 (Wheatley-Diaz Tr.) at 108:24-109:20; Ex. 106 (Ceppos Decl.) ¶ 12; Ex. 83 (Castillo Decl.) ¶¶ 11-12; Ex. 93 (Kim Decl.) ¶¶ 11-12; Ex. 90 (Jones Decl.) ¶¶ 11-12; Ex. 105 (Alva Decl.) ¶¶ 11-12; **New York:** Ex. 58 (Goldstein Tr.) at 73:4-74:7; Ex. 67 (Kelly Decl.) ¶¶ 11-12; Ex. 84 (Reilly Decl.) ¶¶ 12-13; Ex. 89 (Munoz Decl.) ¶¶ 12-13; Ex. 98 (Shawn Decl.) ¶¶ 11-12; Ex. 95 (Nazario Decl.) ¶¶ 11-12; **Illinois:** Ex. 59 (Doherty Tr.) at 115:3-116:23; Ex. 99 (Doherty Decl.) ¶ 12; Ex. 73 (Benigni Decl.) ¶ 12-13; Ex. 76 (Bush Decl.) ¶¶ 11-12; Ex. 81 (Adams Decl.) ¶¶ 11-12; Ex. 96 (Bowman Decl.) ¶¶ 11-12; **North Carolina:** Ex. 61

a common script and set of talking points.[4] When Field Organizers canvassed door-to-door,

Bloomberg instructed them which general areas or neighborhoods to go to, and gave them all the

same script and talking points, which were also pre-loaded in the NGP VAN phone application

used by Field Organizers.[5] The script instructed Field Organizers that if a potential voter was a

(Morton Tr.) at 160:13-16; Ex. 100 (Newman Decl.) ¶ 12; Ex. 69 (Smith Decl.) ¶ 11-12; Ex. 72 (Braden Decl.) ¶¶ 11-12; Ex. 78 (Walthour Decl.) ¶¶ 12-13; Ex. 97 (Patel Decl.) ¶ 11-12; **Michigan:** Ex. 62 (Watson-Moore Tr.) at 96:25-98:18 (discussing autodialer); Ex. 102 (Watson-Moore Decl.) ¶ 12; Ex. 68 (Oram Decl.) ¶ 12; Ex. 80 (Washington Decl.) ¶¶ 12-13; Ex. 82 (Harrison Decl.) ¶¶ 11-12; Ex. 85 (Defoe Decl.) ¶¶ 11-12; Ex. 92 (Hill Decl.) ¶¶ 11-12; Ex. 94 (Almahameed Decl.) ¶¶ 11-12; **Wisconsin:** Ex. 63 (Angulo Tr.) at 99:15-100:8; Ex. 86 (Jackson-Brown Decl.) ¶¶ 12-13; Ex. 87 (Beard Decl.) ¶¶ 11-12; Ex. 88 (Tribble Decl.) ¶¶ 11-12; Ex. 91 (Hall Decl.) ¶¶ 12-13; **Minnesota:** Ex. 65 (Jaramillo Tr.) at 98:7-99:2 (discussing phone banking assignments, call lists); Ex. 101 (Logan Decl.) ¶ 12; Ex. 71 (Soth Decl.) ¶¶ 11-12; Ex. 70 (Cusick Decl.) ¶¶ 11-12; Ex. 79 (Butler Decl.) ¶¶ 11-12; Ex. 104 (Anderson Decl.) ¶¶ 11-12.

[4]   *See* Ex. 4 (Voter Contact Script, MB2020_Wood_00042524); Ex. 3 (Persuasion GOTV Training Template, MB2020_Wood_00042498) at 42503, 42504; Ex. 18 (Persuasion GOTV Phone/Canvass Script, MB2020_Wood_00158784); Ex. 46 (Talking Points, MB2020_Wood_00186888); Ex. 50 (Simpson Tr.) at 221:23-222:4 (National Organizing Director testifying that she wrote the Campaign's call scripts); Ex. 50 (Simpson Tr.) at 208:17-209:4 (noting that when there was a change in campaign strategy, headquarters updated voter call scripts); **California:** Ex. 54 (Ceppos Tr.) at 67:6-69:16, 207:9-209:7; Ex. 55 (Coker Tr.) at 58:11-59:13; Ex. 56 (Summers Tr.) at 98:25-99:22, 137:21-138:25; Ex. 57 (Wheatley-Diaz Tr.) at 115:5-121:4; 144:10-146:22; Ex. 106 (Ceppos Decl.) ¶ 14; Ex. 83 (Castillo Decl.) ¶¶ 5-7, 15-16; Ex. 93 (Kim Decl.) ¶¶ 5-7, 15-16; Ex. 90 (Jones Decl.) ¶¶ 5-7, 15-16; Ex. 105 (Alva Decl.) ¶ 5-7, 15-16; **New York:** Ex. 58 (Goldstein Tr.) at 105:2-107:6, 103:5-104:11; Ex. 67 (Kelly Decl.) ¶ 14; Ex. 84 (Reilly Decl.) ¶ 6-8, 16-17; Ex. 89 (Munoz Decl.) ¶ 6-8, 16-17; Ex. 98 (Shawn Decl.) ¶ 5-7, 15-16; Ex. 95 (Nazario Decl.) ¶¶ 5-7, 15-16; Ex. 103 (Stone Decl.) ¶ 13; **Illinois:** Ex. 59 (Doherty Tr.) at 44:19-45:14, 47:4-19, 110:17-111:16; Ex. 99 (Doherty Decl.) ¶ 14; Ex. 73 (Benigni Decl.) ¶ 6-8, 16-17; Ex. 76 (Bush Decl.) ¶¶ 5-7, 15-16; Ex. 81 (Adams Decl.) ¶¶ 5-7, 15-16; Ex. 96 (Bowman Decl.) ¶¶ 5-7, 15-16; **North Carolina:** Ex. 60 (Newman Tr.) at 44:3-47:6, 152:5-21, 159:6-160:2, 160:23-161:10, 163:10-166:18, 241:24-242:16; Ex. 61 (Morton Tr.) at 48:16-25, 50:25-51:13, 57:10-61:3, 61:21-64:11, 66:25-68:9, 73:13-15, 156:25-157:22; Ex. 100 (Newman Decl.) ¶ 14; Ex. 69 (Smith Decl.) ¶¶ 5-7, 15-16; Ex. 72 (Braden Decl.) ¶¶ 5-7, 15-16; Ex. 78 (Walthour Decl.) ¶¶ 6-8, 16-17; Ex. 97 (Patel Decl.) ¶¶ 5-7, 15-16; **Michigan:** Ex. 62 (Watson-Moore Tr.) at 64:14-66:21, 89:2-90:22, 96:25-98:18 (discussing autodialer script); Ex. 102 (Watson-Moore Decl.) ¶ 14; Ex. 68 (Oram Decl.) ¶ 14; Ex. 80 (Washington Decl.) ¶ 6-8, 16-17; Ex. 82 (Harrison Decl.) ¶¶ 5-7, 15-16; Ex. 85 (Defoe Decl.) ¶¶ 5-7, 15-16; Ex. 92 (Hill Decl.) ¶¶ 5-7, 15-16; Ex. 94 (Almahameed Decl.) ¶¶ 5-7, 15-16; **Wisconsin:** Ex. 63 (Angulo Tr.) at 103:21-104:22; Ex. 86 (Jackson-Brown Decl.) ¶¶ 6-8, 16-17; Ex. 87 (Beard Decl.) ¶¶ 5-7, 15-16; Ex. 88 (Tribble Decl.) ¶¶ 5-7, 15-16; Ex. 91 (Hall Decl.) ¶¶ 6-8, 16-17; **Minnesota:** Ex. 64 (Logan Tr.) at 114:5-11, 127:25-128:6; Ex. 65 (Jaramillo Tr.) at 58:9-59:3, 121:14-123:3, 123:20-124:8; Ex. 101 (Logan Decl.) ¶ 14; Ex. 66 (Waylett Decl.) ¶ 14; Ex. 71 (Soth Decl.) ¶¶ 5-7, 15-16; Ex. 70 (Cusick Decl.) ¶¶ 5-7, 15-16; Ex. 74 (Conrad Decl.) ¶¶ 12-14, 19; Ex. 75 (Muskovitz Decl.) ¶¶ 12-14, 19; Ex. 77 (Eugene Decl.) ¶¶ 11-13, 18; Ex. 79 (Butler Decl.) ¶¶ 5-7, 15-16; Ex. 104 (Anderson Decl.) ¶¶ 5-7, 15-16.

[5]   *See* Ex. 18 (Persuasion GOTV Phone/Canvass Script, MB2020_Wood_00158784) (describing ▮▮▮▮▮▮▮); Ex. 11 (Canvassing Toolkit, MB2020_Wood_00097256) at 97257 (instructing FOs and volunteers to ▮▮▮▮▮▮); **California:** Ex. 54 (Ceppos Tr.) at 67:6-69:16 (script used when canvassing), 80:9-20, 90:2-95:23; Ex. 55 (Coker Tr.) at 76:15-77:4 (Plaintiff Coker was told by supervisors where to go canvass); Ex. 57 (Wheatley-Diaz Tr.) at 142:21-143:25 (canvassing assignments were decided by Regional Organizing Directors), 221:6-222:12 (Bloomberg provided FOs list of places to canvass); Ex. 83 (Castillo Decl.) ¶¶ 5-6, 11; Ex. 93 (Kim Decl.) ¶¶ 5-6, 11; Ex. 90 (Jones Decl.) ¶¶ 5-6, 11; Ex. 105 (Alva Decl.) ¶¶ 5-6, 11; **New York:** Ex. 58 (Goldstein Tr.) at 105:17-106:9 (script prompts in MiniVAN/VAN and ThruTalk); Ex. 67 (Kelly Decl.) ¶¶ 9, 12; Ex. 84 (Reilly Decl.) ¶¶ 6-7, 12; Ex. 89 (Munoz Decl.) ¶¶ 6-7, 12; Ex. 98 (Shawn Decl.) ¶¶ 5-6, 11; Ex. 95 (Nazario Decl.) ¶¶ 5-6, 11; Ex. 103 (Stone Decl.) ¶ 13; **Illinois:** Ex. 59

Bloomberg supporter, they should ask the potential voter to volunteer for Bloomberg as well.[6]

Once the Field Organizer finished a call or in-person conversation, they logged the results of the

voter interaction in Bloomberg's data system, and proceeded to the next one.[7] Every Field

---

(Doherty Tr.) at 55:17-56:8 (ROD created canvassing lists), 110:5-111:16 (discussing questions in VAN canvassing app used for collecting data and talking points); Ex. 99 (Doherty Decl.) ¶ 12; Ex. 73 (Benigni Decl.) ¶¶ 6-7, 12; Ex. 76 (Bush Decl.) ¶¶ 5-6, 11; Ex. 81 (Adams Decl.) ¶¶ 5-6, 11; Ex. 96 (Bowman Decl.) ¶¶ 5-6, 11; **North Carolina:** Ex. 60 (Newman Tr.) at 133:8-134:8 (turf assignments "provided by the campaign"), 155:3-157:10, 158:8-160:2, 241:24-242:16 (scripts used for both canvassing and phone banking sought "the same information" from prospective voters and volunteers); Ex. 61 (Morton Tr.) at 60:12-61:3 (scripts for door knocking); Ex. 100 (Newman Decl.) ¶ 12; Ex. 69 (Smith Decl.) ¶¶ 5-6, 11; Ex. 72 (Braden Decl.) ¶¶ 5-6, 11; Ex. 78 (Walthour Decl.) ¶¶ 6-7, 12; Ex. 97 (Patel Decl.) ¶¶ 5-6, 11; **Michigan:** Ex. 62 (Watson-Moore Tr.) at 143:12-25 (Bloomberg cut turf for FOs and sent them to areas to canvass); Ex. 102 (Watson-Moore Decl.) ¶ 12; Ex. 68 (Oram Decl.) ¶ 12; Ex. 80 (Washington Decl.) ¶¶ 6-7, 12; Ex. 82 (Harrison Decl.) ¶¶ 5-6, 11; Ex. 85 (Defoe Decl.) ¶¶ 5-6, 11; Ex. 92 (Hill Decl.) ¶¶ 5-6, 11; Ex. 94 (Almahameed Decl.) ¶¶ 5-6, 11; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶¶ 6-7, 12; Ex. 87 (Beard Decl.) ¶¶ 5-6, 11; Ex. 88 (Tribble Decl.) ¶¶ 5-6, 11; Ex. 91 (Hall Decl.) ¶¶ 6-7, 12; **Minnesota:** Ex. 64 (Logan Tr.) at 61:22-62:6 (Bloomberg directed Plaintiff Logan to work out of certain offices and canvass the weekend before the primary); Ex. 65 (Jaramillo Tr.) at 91:10-93:24 (canvassing assignments made "based on campaign needs, based on strategic determinations, either by regional directors or state directors"), 106:7-107:6; Ex. 66 (Waylett Decl.) ¶¶ 9, 11-12; Ex. 71 (Soth Decl.) ¶¶ 5-6, 11, 15-16; Ex. 70 (Cusick Decl.) ¶¶ 5-6, 11, 15-16; Ex. 74 (Conrad Decl.) ¶¶ 8, 12-13, 19; Ex. 75 (Muskovitz Decl.) ¶¶ 8, 12-13, 19; Ex. 77 (Eugene Decl.) ¶¶ 7, 11-12, 18; Ex. 79 (Butler Decl.) ¶¶ 5-6, 11, 15-16; Ex. 104 (Anderson Decl.) ¶¶ 5-6, 11, 15-16.

[6]     *See* Ex. 11 (Canvassing Toolkit, MB2020_Wood_00097256) at 97259; Ex. 3 (Persuasion GOTV Training Template, MB2020_Wood_00042498) at 42508 (volunteer recruitment script); **California:** Ex. 54 (Ceppos Tr.) at 109:12-18 (Plaintiff Ceppos asked people to volunteer for phone banks because the talking points required her to ask); **North Carolina:** Ex. 60 (Newman Tr.) at 50:4-51:14 ("Hard ask" to voters included asking them to volunteer, and were part of script), 85:7-86:8, 161:11-20 ("The last question on the script [was] 'Would you be interested in volunteering or hearing more about the campaign?'"); Ex. 61 (Morton Tr.) at 78:24-79:18; **Michigan:** Ex. 62 (Watson-Moore Tr.) at 65:18-66:21 (Plaintiff Watson-Moore attempted to get precinct delegate to volunteer by using Bloomberg-provided talking points); **Minnesota:** Ex. 65 (Jaramillo Tr.) at 113:17-21 ("I can recall as part of like phone banking and canvassing scripts that the volunteer ask was a piece."), 120:7-121:4, 144:10-20 (when recruiting volunteers, FOs had "pretty specific scripts for phone banking or door knocking where [they] would typically make those volunteer asks").

[7]     *See* Ex. 12 (Phonebanking Toolkit, MB2020_Wood_00097271) at 97272 (stating to ████████████████████████ ████████████████████████████████████████); Ex. 50 (Simpson Tr.) at 236:24-237:14, 238:10-14 (confirming that Bloomberg instructed Field Organizers to record the data that they collected from voters), 76:11-77:14 (█████████████████████████ ███████), 77:15-78:13 (███████████████████████████████████████████████████████████); **California:** Ex. 55 (Coker Tr.) at 61:25-62:16 (Plaintiff Coker updated voter information with data collected about their age, party, address, and phone number); Ex. 56 (Summers Tr.) at 98:25-99:22 (when canvassing, opt-in Plaintiff Summers asked voters "survey questions" and the app tracked voter responses), 137:21-138:8 ("survey questions" were the scripts provided by Bloomberg); Ex. 83 (Castillo Decl.) ¶ 17; Ex. 93 (Kim Decl.) ¶ 17; Ex. 90 (Jones Decl.) ¶ 17; Ex. 105 (Alva Decl.) ¶ 17; **New York:** Ex. 25 (Jan. 25, 2020 Email from M. Glassman, MB2020_Wood_00165282) ("███████████████████████████████████████████████████████████████████"); Ex. 58 (Goldstein Tr.) at 70:11-20, 70:25-71:9, 73:4-74:7; Ex. 84 (Reilly Decl.) ¶ 18; Ex. 89 (Munoz Decl.) ¶ 18; Ex. 98 (Shawn Decl.) ¶ 17; ; Ex. 95 (Nazario Decl.) ¶ 17; Ex. 103 (Stone Decl.) ¶ 13; **Illinois:** Ex. 59 (Doherty Tr.) at 110:5-16 (Plaintiff Doherty was required to enter data into VAN); Ex. 73 (Benigni Decl.) ¶ 18; Ex. 76 (Bush Decl.) ¶ 17; Ex. 81 (Adams Decl.) ¶ 17; Ex. 96 (Bowman Decl.) ¶ 17; **North Carolina:** Ex. 60 (Newman Tr.) at 243:6-244:13 (Plaintiff Newman input data after going to each door and after every call, and updated data in real time through NGP VAN or VoteBuilder); Ex. 61 (Morton Tr.) at 158:5-161:11 (discussing entering data); Ex. 69 (Smith Decl.) ¶ 17; Ex. 72 (Braden Decl.) ¶ 17; Ex. 78 (Walthour Decl.) ¶ 18; Ex. 97 (Patel Decl.) ¶ 17; **Michigan:** Ex. 80 (Washington Decl.) ¶ 18; Ex. 82 (Harrison Decl.) ¶ 17; Ex. 85 (Defoe Decl.) ¶ 17; Ex. 92 (Hill Decl.) ¶ 17; Ex. 94

Organizer performed these same repetitive tasks, with the same script, throughout their

employment. Particularly given the large number of calls and interactions required of Field

Organizers—often as many as hundreds a day[8]— most voter calls or interactions were very

brief—usually just a couple minutes.[9]

Bloomberg also occasionally required Field Organizers to connect with potential voters or

volunteers in-person by attending Bloomberg's pre-planned events such as volunteer phone banks,

volunteer canvassing, or occasionally by planning such an event.[10] At such "events," the state's

---

(Almahameed Decl.) ¶ 17; **Wisconsin:** Ex. 43 (WI Organizing Onboarding, MB2020_Wood_00181153) at 181193
("███████████████"); Ex. 86 (Jackson-Brown Decl.) ¶ 18; Ex. 87 (Beard Decl.) ¶ 17; Ex. 88
(Tribble Decl.) ¶ 17; Ex. 91 (Hall Decl.) ¶ 18; **Minnesota:** Ex. 64 (Logan Tr.) at 189:12-195:2 (Plaintiff Logan input
data about voters while phone banking and canvassing); Ex. 65 (Jaramillo Tr.) at 205:8-210:7 (data collected on
voters was integrated into the script in NGP VAN or autodialer software); Ex. 71 (Soth Decl.) ¶¶ 5-7, 16, 17; Ex. 70
(Cusick Decl.) ¶¶ 5-7, 16, 17; Ex. 74 (Conrad Decl.) ¶ 13; Ex. 75 (Muskovitz Decl.) ¶ 13; Ex. 77 (Eugene Decl.)
¶ 12; Ex. 79 (Butler Decl.) ¶¶ 5-7, 16, 17; Ex. 104 (Anderson Decl.) ¶¶ 5-7, 16, 17.

[8]     *See, e.g.*, Ex. 23 (Jan. 24, 2020 Email from S. Pierre, MB2020_Wood_00165180) (NY State Director
stating ██████████████).

[9]     *See* Ex. 11 (Canvassing Toolkit, MB2020_Wood_00097256) ("████████████████████"); Ex. 12
(Phonebanking Toolkit, MB2020_Wood_00097271) ("███████████████████"); **California:** Ex. 83
(Castillo Decl.) ¶¶ 6-8, 16; Ex. 93 (Kim Decl.) ¶¶ 6-8, 16; Ex. 90 (Jones Decl.) ¶¶ 6-8, 16; Ex. 105 (Alva Decl.)
¶¶ 6-8, 16; **New York:** Ex. 84 (Reilly Decl.) ¶¶ 7-9, 17; Ex. 89 (Munoz Decl.) ¶¶ 7-9, 17; Ex. 98 (Shawn Decl.)
¶¶ 6-8, 16; Ex. 95 (Nazario Decl.) ¶¶ 6-8, 16; **Illinois:** Ex. 73 (Benigni Decl.) ¶¶ 7-9, 17; Ex. 76 (Bush Decl.) ¶¶ 6-8,
16; Ex. 81 (Adams Decl.) ¶¶ 6-8, 16; Ex. 96 (Bowman Decl.) ¶¶ 6-8, 16; **North Carolina:** Ex. 69 (Smith Decl.)
¶¶ 6-8, 16; Ex. 72 (Braden Decl.) ¶¶ 6-8, 16; Ex. 78 (Walthour Decl.) ¶¶ 7-9, 17; Ex. 97 (Patel Decl.) ¶¶ 6-8, 16;
**Michigan:** Ex. 80 (Washington Decl.) ¶¶ 7-9, 17; Ex. 82 (Harrison Decl.) ¶¶ 6-8, 16; Ex. 85 (Defoe Decl.) ¶¶ 6-8,
16; Ex. 92 (Hill Decl.) ¶¶ 6-8, 16; Ex. 94 (Almahameed Decl.) ¶¶ 6-8, 16; **Wisconsin:** Ex. 86 (Jackson-Brown
Decl.) ¶¶ 7-9, 17; Ex. 87 (Beard Decl.) ¶¶ 6-8, 16; Ex. 88 (Tribble Decl.) ¶¶ 6-8, 16; Ex. 91 (Hall Decl.) ¶¶ 7-9, 17;
**Minnesota:** Ex. 71 (Soth Decl.) ¶¶ 6-7, 16, 16; Ex. 70 (Cusick Decl.) ¶¶ 6-7, 16, 16; Ex. 74 (Conrad Decl.) ¶¶ 11,
15; Ex. 75 (Muskovitz Decl.) ¶¶ 11, 15; Ex. 77 (Eugene Decl.) ¶¶ 10, 14; Ex. 79 (Butler Decl.) ¶¶ 6-7, 16; Ex. 104
(Anderson Decl.) ¶¶ 6-7, 16.

[10]     *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 135:25-137:17 (canvassing, phone banking, or text banking are "the
top three" events involving volunteers and "the term 'event' . . . mean[s] a convening of volunteers"); **California:**
Ex. 55 (Coker Tr.) at 55:4-56:3 (Plaintiff Coker attended public outreach events more often than he ever planned
them), 56:4-16 ("closest thing to planning an event" Plaintiff Coker did was having neighbors at his home to hear
about Bloomberg and get pamphlets and yard signs, and passing out campaign literature at a bar), 56:17-57:19 (most
events Plaintiff Coker attended were planned by higher-level Bloomberg staff), 78:16-80:21 (ROD requested
Plaintiff Coker to attend event "and be backup there and answer questions for people"), 90:2-91:17 (Plaintiff Coker
was told to attend a gun safety event and helped to set up and break down event; this kind of role at events happened
frequently); Ex. 57 (Wheatley-Diaz Tr.) at 111:19-112:13 (FOs were asked to attend events as guests, and Plaintiff
Wheatley-Diaz does not recall speaking at an event), 247:13-254:23 (Plaintiff Wheatley-Diaz proposed various
events but did not attend most events, and at most dropped off campaign literature one time); Ex. 83 (Castillo Decl.)
¶¶ 12, 14; Ex. 93 (Kim Decl.) ¶¶ 12, 14; Ex. 90 (Jones Decl.) ¶¶ 12, 14; (Alva Decl.) ¶¶ 12, 14; **New York:** Ex. 58
(Goldstein Tr.) at 83:4-85:12 (Plaintiff Goldstein recruited college students with another FO at a pizza restaurant and
used a script or went over a script with his ROD); Ex. 84 (Reilly Decl.) ¶¶ 13, 15; Ex. 89 (Munoz Decl.) ¶¶ 13, 15;
Ex. 98 (Shawn Decl.) ¶¶ 12, 14; Ex. 95 (Nazario Decl.) ¶¶ 12, 14; Ex. 103 (Stone Decl.) ¶ 9; **Illinois:** Ex. 59
(Doherty Tr.) at 81:13-83:25 (Plaintiff Doherty attended "Pizza and Policy" event with Loyola Democrats and if

leadership created call lists or walk lists for the volunteers, and provided the necessary technology tools, signs, literature, and talking points.[11]

Bloomberg considered all Field Organizers to be "entry level" workers and did not require them to have any specialized education, training, or experience.[12] Bloomberg also

---

specific policy points arose, she would respond with Bloomberg's talking points), 87:5-88:3 (Plaintiff Doherty attended protest wearing a Bloomberg t-shirt, but did not speak at protest); Ex. 73 (Benigni Decl.) ¶¶ 13, 15; Ex. 76 (Bush Decl.) ¶¶ 12, 14; Ex. 81 (Adams Decl.) ¶¶ 12, 14; Ex. 96 (Bowman Decl.) ¶¶ 12, 14; **North Carolina:** Ex. 60 (Newman Tr.) at 127:19-128:12, 145:20-147:11; Ex. 61 (Morton Tr.) at 80:7-22 (visited New Bern Democratic office to meet and recruit volunteers, and "brought literature for the Bloomberg campaign to put on the tables that they had in the building because . . . other candidates had their literature as well."), 80:23-82:9 (attending events was job requirement as FO, and ROD would provide FOs with list of events to attend); Ex. 69 (Smith Decl.) ¶ 12, 14; Ex. 72 (Braden Decl.) ¶¶ 12, 14; Ex. 78 (Walthour Decl.) ¶¶ 13, 15; Ex. 97 (Patel Decl.) ¶¶ 12, 14; **Michigan:** Ex. 62 (Watson-Moore Tr.) at 76:4-77:6 (Bloomberg Campaign asked Plaintiff Watson-Moore to contact local Democratic parties to speak at their events and ask them to volunteer), 86:17-89:19 (Plaintiff Watson-Moore responded to questions at Waterford Democrats event with information provided by Bloomberg, because she "[didn't] want to go off script or anything like that."); Ex. 80 (Washington Decl.) ¶¶ 13, 15; Ex. 82 (Harrison Decl.) ¶¶ 12, 14; Ex. 85 (Defoe Decl.) ¶¶ 12, 14; Ex. 92 (Hill Decl.) ¶¶ 12, 14; Ex. 94 (Almahameed Decl.) ¶¶ 12, 14; **Wisconsin:** Ex. 63 (Angulo Tr.) at 108:22-109:14 (Plaintiff Angulo tabled at a coffee shop to connect with potential voters, and set up table with campaign materials), 109:17-110:14 (part of job duties included identifying community events and attending them), 117:16-118:4 (Plaintiff Angulo would try to recruit volunteers for Bloomberg-planned weekends of actions, but had no role in planning the weekends of action events); Ex. 86 (Jackson-Brown Decl.) ¶¶ 13, 15; Ex. 87 (Beard Decl.) ¶¶ 12, 14; Ex. 88 (Tribble Decl.) ¶¶ 12, 14; Ex. 91 (Hall Decl.) ¶¶ 13, 15; **Minnesota:** Ex. 64 (Logan Tr.) at 133:16-134:25 (attending Bloomberg-hosted events, such as debate watch parties); Ex. 65 (Jaramillo Tr.) at 129:18-137:13 (discussing coffee event that Jaramillo planned because other FOs had planned similar event before; Jaramillo then needed Bloomberg approval for event and then brought Campaign literature, merchandise, and sign-in sheet to event); Ex. 66 (Waylett Decl.) ¶¶ 9, 12; Ex. 71 (Soth Decl.) ¶¶ 4, 6, 12, 14; Ex. 70 (Cusick Decl.) ¶¶ 4, 6, 12, 14; Ex. 74 (Conrad Decl.) ¶¶ 9-10; Ex. 75 (Muskovitz Decl.) ¶¶ 9-10; Ex. 77 (Eugene Decl.) ¶¶ 8-9; Ex. 79 (Butler Decl.) ¶¶ 4, 6, 12, 14; Ex. 104 (Anderson Decl.) ¶¶ 4, 6, 12, 14.

[11]    *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 135:6-18 (events such as canvassing and phone banks are "the type of events most typical . . . that an organizer might encounter"), 135:22-138:17 (state data team provided call lists and walk lists), 150:15-25 (Bloomberg gave Field Organizers tools such as scripts, signage, and literature).

[12]    *See* Ex. 6 (FO Job Description, MB2020_Wood_00089188) (listing requirements); Ex. 50 (Simpson Tr.) at 66:20-24 (confirming that the FO role is an "entry-level job"), 157:7-24 (confirming that FOs did not need any particular prior employment experience or education for the job); Ex. 53 (Sinclair 30(b)(6) Tr.) at 92:23-93:4, 93:22-94:15 (prior political experience not "attribute[] that we need fundamentally" and organizer could "do a good job for the campaign" with no prior experience); **California:** Ex. 54 (Ceppos Tr.) at 95:97:20 (Plaintiff Ceppos denying that her background made her a better FO than others); Ex. 57 (Wheatley-Diaz Tr.) at 54:21-55:10 (Plaintiff Wheatley-Diaz did not think anything in her background made her more or less qualified for the FO position, and she did not even interview for position); Ex. 106 (Ceppos Decl.) ¶ 13; Ex. 83 (Castillo Decl.) ¶ 13; Ex. 93 (Kim Decl.) ¶ 13; Ex. 90 (Jones Decl.) ¶ 13; Ex. 105 (Alva Decl.) ¶ 13; **New York:** Ex. 58 (Goldstein Tr.) at 41:8-23 (Plaintiff Goldstein worked on campaign because he "wanted campaign experience"); Ex. 67 (Kelly Decl.) ¶ 13; Ex. 84 (Reilly Decl.) ¶ 14; Ex. 89 (Munoz Decl.) ¶ 14; Ex. 98 (Shawn Decl.) ¶ 13; Ex. 95 (Nazario Decl.) ¶ 13; Ex. 103 (Stone Decl.) ¶ 11; **Illinois:** Ex. 34 (Feb. 16, 2020 Email from N. Groh, MB2020_Wood_00173497) (ROD indicating that ███████████████████████████████████); Ex. 99 (Doherty Decl.) ¶ 13; Ex. 73 (Benigni Decl.) ¶ 14; Ex. 76 (Bush Decl.) ¶ 13; Ex. 81 (Adams Decl.) ¶ 13; Ex. 96 (Bowman Decl.) ¶ 13; **North Carolina:** Ex. 100 (Newman Decl.) ¶ 13; Ex. 61 (Morton Tr.) at 45:8-15; Ex. 69 (Smith Decl.) ¶ 13; Ex. 72 (Braden Decl.) ¶ 13; Ex. 78 (Walthour Decl.) ¶ 14; Ex. 97 (Patel Decl.) ¶ 13; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶ 13; Ex. 68 (Oram Decl.) ¶ 13; Ex. 80 (Washington Decl.) ¶ 14; Ex. 82 (Harrison Decl.) ¶ 13; Ex. 85 (Defoe Decl.) ¶ 13; Ex. 92 (Hill Decl.) ¶ 13; Ex. 94 (Almahameed Decl.) ¶ 13; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶ 14;

provided standard guidance for training Field Organizers.[13] Soon after hiring Field Organizers,

Bloomberg required them to attend a mandatory orientation, where Bloomberg provided all

necessary training, which covered Bloomberg's Get Out the Vote ("GOTV") strategy and

practices, including topics like how to canvass, how to speak with voters, and how to recruit

volunteers.[14] Bloomberg also trained Field Organizers on how to use VoteBuilder, Bloomberg's

system for assigning, logging, and monitoring Field Organizers' GOTV efforts.

Bloomberg dictated Field Organizers' work through specific metrics, instructions, scripts,

and talking points that it "created all the time."[15] According to Bloomberg's Rule 30(b)(6)

---

Ex. 87 (Beard Decl.) ¶ 13; Ex. 88 (Tribble Decl.) ¶ 13; Ex. 91 (Hall Decl.) ¶ 14; **Minnesota:** *See* Ex. 64 (Logan Tr.) at 33:9-39:17 (discussing Plaintiff Logan's background without specialized experience); Ex. 65 (Jaramillo Tr.) at 56:21-58:8 (FO job "is to really execute on the messaging and strategy developed by either the communications team or otherwise by people in campaign management."); Ex. 101 (Logan Decl.) ¶ 13; Ex. 66 (Waylett Decl.) ¶ 13; Ex. 71 (Soth Decl.) ¶ 13; Ex. 70 (Cusick Decl.) ¶ 13; Ex. 74 (Conrad Decl.) ¶ 17; Ex. 75 (Muskovitz Decl.) ¶ 17; Ex. 77 (Eugene Decl.) ¶ 16; Ex. 79 (Butler Decl.) ¶ 13; Ex. 104 (Anderson Decl.) ¶ 13.

[13]  *See* Ex. 17 (Feb. 17, 2020 Email from M. Simpson, MB2020_Wood_00110781) (National Organizing Director sending ███████████████████); Ex. 50 (Simpson Tr.) at 239:3-240:7; Ex. 49 (Kanninen Tr.) at 106:22-107:4; Ex. 75 (Muskovitz Decl.) ¶ 24; Ex. 74 (Conrad Decl.) ¶ 24.

[14]  *See* **California:** Ex. 106 (Ceppos Decl.) at ¶ 13; Ex. 83 (Castillo Decl.) ¶ 13; Ex. 93 (Kim Decl.) ¶ 13; Ex. 90 (Jones Decl.) ¶ 13; **New York:** Ex. 58 (Goldstein Tr.) at 77:4-17; Ex. 67 (Kelly Decl.) ¶ 13; Ex. 84 (Reilly Decl.) ¶ 14; Ex. 89 (Munoz Decl.) ¶ 14; Ex. 98 (Shawn Decl.) ¶ 13;  **Illinois:** Ex. 59 (Doherty Tr.) at 50:19-51:11; Ex. 99 (Doherty Decl.) ¶ 13; Ex. 73 (Benigni Decl.) ¶ 14; Ex. 76 (Bush Decl.) ¶ 13; Ex. 81 (Adams Decl.) ¶ 13; Ex. 96 (Bowman Decl.) ¶ 13; **North Carolina:** Ex. 60 (Newman Tr.) at 149:18-152:4; Ex. 61 (Morton Tr.) at 54:7-57:9; Ex. 100 (Newman Decl.) ¶ 13; Ex. 69 (Smith Decl.) ¶ 13; Ex. 72 (Braden Decl.) ¶ 13; Ex. 78 (Walthour Decl.) ¶ 14; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶ 13; Ex. 68 (Oram Decl.) ¶ 13; Ex. 80 (Washington Decl.) ¶ 14; Ex. 82 (Harrison Decl.) ¶ 13; Ex. 85 (Defoe Decl.) ¶ 13; Ex. 92 (Hill Decl.) ¶ 13; **Wisconsin:** Ex. 43 (WI Organizing Onboarding, MB2020_Wood_00181153); Ex. 63 (Angulo Tr.) at 85:16-86:12; Ex. 86 (Jackson-Brown Decl.) ¶ 14; Ex. 87 (Beard Decl.) ¶ 13; Ex. 88 (Tribble Decl.) ¶ 13; Ex. 91 (Hall Decl.) ¶ 14; **Minnesota:** Ex. 64 (Logan Tr.) at 68:15-69:14; Ex. 65 (Jaramillo Tr.) at 164:4-19; Ex. 101 (Logan Decl.) at 13; Ex. 66 (Waylett Decl.) ¶ 13; Ex. 71 (Soth Decl.) ¶ 13; Ex. 70 (Cusick Decl.) ¶ 13; Ex. 79 (Butler Decl.) ¶ 13; Ex. 104 (Anderson Decl.) ¶ 13.

[15]  Ex. 53 (Sinclair 30(b)(6) Tr.) at 118:5-119:18, *see id.* at 113:8-14; *see* Ex. 12 (Phonebanking Toolkit, MB2020_Wood_00097271) (instructing FOs to "███████████████"); Ex. 44 (Hustle 101, MB2020_Wood_00186820) at 186821 (describing ██████████████████████); Ex. 45 (Making Calls with ThruTalk, MB2020_Wood_00186822) (describing ██████████████████████████); Ex. 39 (Feb. 22, 2020 Email from T. Orabuena, MB2020_Wood_00175611) (requesting ██████████████████████); Ex. 6 (FO Job Description, MB2020_Wood_00089188) ("accountable for reaching individual goals and metrics outlines in the field plan by Regional Organizing Directors"); **California:** Ex. 57 (Wheatley-Diaz Tr.) at 115:22-116:12 (talking points varied because talking points and scripts changed frequently), 130:5-132:9 (Plaintiff Wheatley-Diaz reviewing sample script, and stating that she received many different scripts to follow); Ex. 106 (Ceppos Decl.) ¶¶ 9, 14; Ex. 83 (Castillo Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; Ex. 93 (Kim Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; Ex. 90 (Jones Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; Ex. 105 (Alva Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; **New York:** Ex. 58 (Goldstein Tr.) at 105:17-107:6 (various scripts on VAN, ThruTalk, and scripts covered different policies and issues); Ex. 67 (Kelly Decl.) ¶¶ 9-10, 12, 14, 17; Ex. 84 (Reilly Decl.) ¶¶ 5-6, 8, 10, 13, 17, 29; Ex. 89 (Munoz Decl.) ¶¶ 5-6, 8, 10, 13, 17, 29; Ex. 98 (Shawn Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; Ex.

witness, it was important to Bloomberg to have consistent messaging on campaign issues, which it ensured through the use of common talking points.[16] Bloomberg did not want Field Organizers to "riff on what was a carefully considered policy position" when talking to potential voters, and expected "adherence" to scripts and talking points.[17] While Bloomberg required use of its scripts, it simply advised Field Organizer not to "█████████████████" when doing so.[18] Bloomberg required Field Organizers to use the script to enable collection of data on each voter interaction.[19]

---

95 (Nazario Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; Ex. 103 (Stone Decl.) ¶ 3; **Illinois:** Ex. 59 (Doherty Tr.) at 56:16-57:20 (describing metrics); Ex. 99 (Doherty Decl.) ¶¶ 9, 14; Ex. 73 (Benigni Decl.) ¶¶ 5-6, 8, 10, 13, 17, 29; Ex. 76 (Bush Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; Ex. 81 (Adams Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; Ex. 96 (Bowman Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; **North Carolina:** Ex. 60 (Newman Tr.) at 42:16-23 (campaign set metrics), 162:14-166:18, 182:12-183:12 (discussing goals), 241:24-242:16; Ex. 61 (Morton Tr.) at 57:10-61:3, 83:23-85:3; Ex. 100 (Newman Decl.) ¶¶ 9, 11-12, 14, 17; Ex. 69 (Smith Decl.) ¶¶ 4-5, 7, 9, 12, 16, 28; Ex. 72 (Braden Decl.) ¶¶ 4-5, 7, 9, 12, 15-16, 28; Ex. 78 (Walthour Decl.) ¶¶ 5-6, 8, 10, 13, 16-17, 29; Ex. 97 (Patel Decl.) ¶¶ 4-5, 7, 9, 12, 15-16, 28; **Michigan:** Ex. 62 (Watson-Moore Tr.) at 89:13-19 (did not want to "go off script"), 90:16-22, 97:8-98:3, 175:14-176:7 (state leadership monitoring goals); Ex. 102 (Watson-Moore Decl.) ¶¶ 9, 14; Ex. 68 (Oram Decl.) ¶¶ 9-10, 12, 14, 17; Ex. 80 (Washington Decl.) ¶¶ 5-6, 8, 10, 13, 16-17, 29; Ex. 82 (Harrison Decl.) ¶¶ 4-5, 7, 9, 12, 15-16, 28; Ex. 85 (Defoe Decl.) ¶¶ 4-5, 7, 9, 12, 15-16, 28; Ex. 92 (Hill Decl.) ¶¶ 4-5, 7, 9, 12, 15-16, 28; Ex. 94 (Almahameed Decl.) ¶¶ 4-5, 7, 9, 12, 15-16, 28; **Wisconsin:** Ex. 63 (Angulo Tr.) at 103:21-104:1 (Plaintiff Angulo used a script when making phone calls); Ex. 86 (Jackson-Brown Decl.) ¶¶ 5-6, 8, 10, 13, 16-17, 29; Ex. 87 (Beard Decl.) ¶¶ 4-5, 7, 9, 12, 15-16, 28; Ex. 88 (Tribble Decl.) ¶¶ 4-5, 7, 9, 12, 15-16, 28; Ex. 91 (Hall Decl.) ¶¶ 5-6, 8, 10, 13, 16-17, 29; **Minnesota:** Ex. 64 (Logan Tr.) at 126:9-128:8 (Plaintiff Logan used talking points to address specific topics with caucus attendees); Ex. 65 (Jaramillo Tr.) at 113:17-24, 120:7-124:8 (discussing scripts and talking points); Ex. 101 (Logan Decl.) ¶¶ 11-12, 14, 17; Ex. 66 (Waylett Decl.) ¶¶ 9-10, 12, 14, 17; Ex. 71 (Soth Decl.) ¶¶ 4-5, 7, 11-12, 16, 19-22, 28; Ex. 70 (Cusick Decl.) ¶¶ 4-5, 7, 11-12, 16, 19-22, 28; Ex. 74 (Conrad Decl.) ¶¶ 5, 7, 11-16, 18-20, 22-23; Ex. 75 (Muskovitz Decl.) ¶¶ 5, 7, 11-16, 18-20, 22-23; Ex. 77 (Eugene Decl.) ¶¶ 4, 6, 10-15, 17-19, 21-22; Ex. 79 (Butler Decl.) ¶¶ 4, 5, 7, 11-12, 16, 19-22, 28; Ex. 104 (Anderson Decl.) ¶¶ 4, 5, 7, 11-12, 16, 19-22, 28.

16      *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 115:8-117:16; 127:5-23; *see also* Ex. 50 (Simpson Tr.) at 214:19-215:2; 230:3-231:9.

17      Ex. 53 (Sinclair 30(b)(6) Tr.) at 121:17-18; *see id.* at 121:25-122:7; *see also* Ex. 50 (Simpson Tr.) at 220:10-18 (inappropriate for FOs to give information inconsistent with Campaign talking points).

18      Ex. 11 (Canvassing Toolkit, MB2020_Wood_00097256) at 97257; Ex. 12 (Phonebanking Toolkit, MB2020_Wood_00097271) at 97272 (instructing FOs and volunteers to "████████████" and "███████").

19      *See* Ex. 12 (Phonebanking Toolkit, MB2020_Wood_00097271) at 97272 (instructing FOs and volunteers to "████████████" and "██████████"); Ex. 53 (Sinclair 30(b)(6) Tr.) at 123:16-125:18; Ex. 50 (Simpson Tr.) at 236:4-237:14 (collecting data was how "we were able to collect the work they were doing"), 81:4-18; **California:** Ex. 55 (Coker Tr.) at 61:25-62:16 (Plaintiff Coker updated voter information with data collected about their age, party, address, and phone number); Ex. 56 (Summers Tr.) at 98:25-99:22 (when canvassing, opt-in Plaintiff Summers asked voters "survey questions" and the app tracked voter responses), 137:21-138:8 ("survey questions" were the scripts provided by Bloomberg); Ex. 83 (Castillo Decl.) ¶¶ 16-17; Ex. 93 (Kim Decl.) ¶¶ 16-17; Ex. 90 (Jones Decl.) ¶¶ 16-17; Ex. 105 (Alva Decl.) ¶¶ 16-17; **New York:** Ex. 58 (Goldstein Tr.) at 70:11-20, 73:4-74:7; 108:4-110:16; Ex. 67 (Kelly Decl.) ¶ 14; Ex. 84 (Reilly Decl.) ¶¶ 17-18; Ex. 89 (Munoz Decl.) ¶¶ 17-18; Ex. 98 (Shawn Decl.) ¶¶ 16-17; Ex. 95 (Nazario Decl.) ¶¶ 16-17; **Illinois:** Ex. 59 (Doherty Tr.) at 110:5-16 (Plaintiff Doherty ████████████████); Ex. 73 (Benigni Decl.) ¶¶ 17-18; Ex. 76 (Bush Decl.) ¶¶ 16-17; Ex. 81 (Adams Decl.) ¶¶ 16-17; Ex. 96 (Bowman Decl.) ¶¶ 16-17; **North Carolina:** Ex. 60 (Newman Tr.) at 243:6-244:13 (Plaintiff Newman input data after going to each door and after every call, ██████████████████████████████████████████████); Ex. 61 (Morton Tr.) at 158:5-161:11; Ex. 69 (Smith

## B.      Bloomberg Set and Carefully Tracked Field Organizers' Work.

Consistent with the uniform job description, Bloomberg dictated how Field Organizers

performed their jobs by setting daily and weekly goals and metrics, including the numbers of

voters called, doors knocked, and volunteers recruited.[20] The goals were mandatory for Field

---

Decl.) ¶¶ 16-17; Ex. 72 (Braden Decl.) ¶¶ 16-17; Ex. 78 (Walthour Decl.) ¶¶ 17-18; Ex. 97 (Patel Decl.) ¶¶ 16-17;
**Michigan:** Ex. 80 (Washington Decl.) ¶¶ 17-18; Ex. 82 (Harrison Decl.) ¶¶ 16-17; Ex. 85 (Defoe Decl.) ¶¶ 16-17;
Ex. 92 (Hill Decl.) ¶¶ 16-17; Ex. 94 (Almahameed Decl.) ¶¶ 16-17; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.)
¶¶ 17-18; Ex. 87 (Beard Decl.) ¶¶ 16-17; Ex. 88 (Tribble Decl.) ¶¶ 16-17; Ex. 91 (Hall Decl.) ¶¶ 17-18; **Minnesota:**
Ex. 64 (Logan Tr.) at 189:12-195:1 (Plaintiff Logan input data about voters while phone banking and canvassing);
Ex. 65 (Jaramillo Tr.) at 205:8-210:7 (███████
███████████████); Ex. 71 (Soth Decl.) ¶¶ 15-17; Ex. 70 (Cusick Decl.) ¶¶ 15-17; Ex. 74 (Conrad Decl.) ¶¶ 12-14;
Ex. 75 (Muskovitz Decl.) ¶¶ 12-14; Ex. 77 (Eugene Decl.) ¶¶ 11-13; Ex. 79 (Butler Decl.) ¶¶ 15-17; Ex. 104
(Anderson Decl.) ¶¶ 15-17.
[20]       *See* Ex. 6 (FO Job Description, MB2020_Wood_00089188) (describing required "individual goals and
metrics"); Ex. 2 (Feb. 22, 2020 Email from L. Gonzales, MB2020_Wood_00020742) (describing ████████
██████████████████████████); Ex. 53 (Sinclair 30(b)(6) Tr.) at 81:20-82:9; Ex. 50
(Simpson Tr.) at 85:9-21, 160:23-161:14 (testifying that "the organizing leadership and states" determined the
metrics FOs were required to meet); **California:** Ex. 47 (Feb. 14, 2020 Update, P000235) (dictating percentage
breakdown of FO time, with "60 hour work week"); Ex. 21 (Feb. 15, 2020 Email from L. Bubar,
MB2020_Wood_00163809) (stating that ███████████████████████
██████████████████); Ex. 54 (Ceppos Tr.) at 67:6-69:16, 181:18-182:22 (discussing metrics for
phone calls and canvassing that ROD tracked); Ex. 56 (Summers Tr.) at 100:25-101:13 (discussing metrics for
phone calls); (Ceppos Decl.) ¶ 9; Ex. 83 (Castillo Decl.) ¶ 4; Ex. 93 (Kim Decl.) ¶ 4; Ex. 90 (Jones Decl.) ¶ 4; Ex.
105 (Alva Decl.) ¶ 4; **New York:** Ex. 22 (Jan. 25, 2020 Email from D. Allard, MB2020_Wood_00165002) (██████
██████████████ stating ██████████████████); Ex. 23 (Jan. 24, 2020 Email from S.
Pierre, MB2020_Wood_00165180) (████████████████████████████████); Ex. 24 (Jan. 22, 2020 Email
from S. Olcese, MB2020_Wood_00165244) (stating ████████████████████████); Ex. 1 (Feb. 18, 2020
Email from C. Coleman, MB2020_Wood_00018293) (███████████████████████████
████████████); Ex. 67 (Kelly Decl.) ¶ 9; Ex. 84 (Reilly Decl.) ¶ 5; Ex. 89 (Munoz Decl.) ¶ 5; Ex. 98 (Shawn Decl.)
¶ 4; Ex. 95 (Nazario Decl.) ¶ 4; Ex. 103 (Stone Decl.) ¶¶ 5, 13; **Illinois:** Ex. 32 (Feb. 4, 2020 Email from J. Webb,
MB2020_Wood_00173373) (describing █████████████████████████████████████
████████████); Ex. 33 (Feb. 14, 2020 Email from J. Webb, MB2020_Wood_00173423) (describing ██████████
████████████); Ex. 36 (Feb. 17, 2020 Email from J. Web, MB2020_Wood_00173576) █████████████████
███████████████████████████████████████; Ex. 35
(Feb. 2, 2020 Email from M. Elem, MB2020_Wood_00173527) (describing ████████████████); Ex. 59
(Doherty Tr.) at 56:16-25 (describing metrics); Ex. 99 (Doherty Decl.) ¶ 9; Ex. 73 (Benigni Decl.) ¶ 5; Ex. 76 (Bush
Decl.) ¶ 4; Ex. 81 (Adams Decl.) ¶ 4; Ex. 96 (Bowman Decl.) ¶ 4; **North Carolina:** Ex. 40 (Feb. 4, 2020 Email
from R. Briendel, MB2020_Wood_00175799) at 175800 (reporting ████████████████████); Ex. 100 (Newman
Decl.) ¶ 9; Ex. 61 (Morton Tr.) at 83:23-85:3; Ex. 60 (Newman Tr.) at 42:16-23 ("The campaign set metric goals
across the board."); Ex. 69 (Smith Decl.) ¶ 4; Ex. 72 (Braden Decl.) ¶ 4; Ex. 78 (Walthour Decl.) ¶ 5; Ex. 97 (Patel
Decl.) ¶ 4; **Michigan:** Ex. 28 (Feb. 29, 2020 Email from D. DeFoe, MB2020_Wood_00165942) (describing ████
████████████████████████████████████████); Ex. 27 (Feb. 28, 2020 Email from
K. Lopes, MB2020_Wood_00165602) (describing ████████████████████████████████████
██████████); Ex. 102 (Watson-Moore Decl.) ¶ 9; Ex. 68 (Oram Decl.) ¶ 9; Ex. 80 (Washington Decl.) ¶ 5; Ex. 82
(Harrison Decl.) ¶ 4; Ex. 85 (Defoe Decl.) ¶ 4; Ex. 92 (Hill Decl.) ¶ 4; Ex. 94 (Almahameed Decl.) ¶ 4; **Wisconsin:**
Ex. 38 (Feb. 26, 2020 Email from M. Tracy, MB2020_Wood_00175108-09) (reporting ████████████████████
████████████); Ex. 63 (Angulo Tr.) at 147:15-148:4 (describing set goals for canvassing, volunteer
recruitment calls); Ex. 86 (Jackson-Brown Decl.) ¶ 5; Ex. 87 (Beard Decl.) ¶ 4; Ex. 88 (Tribble Decl.) ¶ 4; Ex. 91
(Hall Decl.) ¶ 5; **Minnesota:** Ex. 42 (Feb. 13, 2020 Email from E. Nygren, MB2020_Wood_00177876) (reporting

Organizers to meet, not merely guidance.[21] These metrics were created by Bloomberg's state-level

and national leadership.[22] Field Organizers did not create their own metrics; as Bloomberg

testified, it could not permit Field Organizers to do so because Bloomberg's overall work needed

to align with its national, central plan for winning the election.[23] Field Organizers were required to

log all canvassing, phone calls, and volunteer recruitment activity in centralized databases, so their

direct supervisors (Regional Organizing Directors, or "RODs"), state-level officials, and

headquarters could review their progress, as well as the progress of the Campaign overall.[24] If a

---

████████████); Ex. 64 (Logan Tr.) at 88:18-89:12 (discussing ████████████); Ex. 65
(Jaramillo Tr.) at 172:12-19 (discussing weekly metrics for canvassing and calls); Ex. 66 (Waylett Decl.) ¶ 9; Ex. 71
(Soth Decl.) ¶¶ 4, 10-12, 17, 19-21; Ex. 70 (Cusick Decl.) ¶¶ 4, 10-12, 17, 19-21; Ex. 74 (Conrad Decl.) ¶¶ 11, 15,
19; Ex. 75 (Muskovitz Decl.) ¶¶ 11, 15, 19; Ex. 77 (Eugene Decl.) ¶¶ 10, 14, 18; Ex. 79 (Butler Decl.) ¶¶ 4, 10-12,
17, 19-21; Ex. 104 (Anderson Decl.) ¶¶ 4, 10-12, 17, 19-21.

[21]   *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 144:13-145:9, 178:1-24 (goals are "a floor"); **California:** Ex. 54
(Ceppos Tr.) at 99:8-100:4 (the "metrics were something that the campaign pressured us to hit and we were
reprimanded if we did not. . . . I was just told what to do and that I needed to hit these goals and so I hit them,
because my level of responsibility within the campaign was not to make decisions like that. My level was to do what
I was told."), 168:18-169:15 (Plaintiff Ceppos was unable to take an optional day off because she could not meet
metrics if she took a day off, and would be fired if she was unable to meet metrics), 173:2-174:3 (Campaign used a
spreadsheet to compare states progress against each other); Ex. 55 (Coker Tr.) at 81:10-83:8 (FOs were "singled out
for not . . . meeting a quota of phone banking" and if one "didn't hit [their] goals something brought it up"); Ex. 57
(Wheatley-Diaz Tr.) at 223:10-225:8 (FOs were unable to take breaks because metrics were "unattainable" and were
under pressure from various levels of Bloomberg leadership); Ex. 83 (Castillo Decl.) ¶ 4; Ex. 93 (Kim Decl.) ¶ 4;
Ex. 90 (Jones Decl.) ¶ 4; Ex. 105 (Alva Decl.) ¶ 4; **New York:** Ex. 67 (Kelly Decl.) ¶ 9; Ex. 84 (Reilly Decl.) ¶ 5;
Ex. 89 (Munoz Decl.) ¶ 5; Ex. 98 (Shawn Decl.) ¶ 4; Ex. 95 (Nazario Decl.) ¶ 4; **Illinois:** Ex. 59 (Doherty Tr.) at
56:19 ("had to hit" the metrics); Ex. 99 (Doherty Decl.) ¶ 9; Ex. 73 (Benigni Decl.) ¶ 5; Ex. 76 (Bush Decl.) ¶ 4;
Ex. 81 (Adams Decl.) ¶ 4; Ex. 96 (Bowman Decl.) ¶ 4; **North Carolina:** Ex. 69 (Smith Decl.) ¶ 4; Ex. 72 (Braden
Decl.) ¶ 4; Ex. 78 (Walthour Decl.) ¶ 5; Ex. 97 (Patel Decl.) ¶ 4; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶ 9; Ex.
68 (Oram Decl.) ¶ 9; Ex. 80 (Washington Decl.) ¶ 5; Ex. 82 (Harrison Decl.) ¶ 4; Ex. 85 (Defoe Decl.) ¶ 4; Ex. 92
(Hill Decl.) ¶ 4; Ex. 94 (Almahameed Decl.) ¶ 4; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶ 5; Ex. 87 (Beard
Decl.) ¶ 4; Ex. 88 (Tribble Decl.) ¶ 4; Ex. 91 (Hall Decl.) ¶ 5; **Minnesota:** Ex. 66 (Waylett Decl.) ¶ 9; Ex. 71 (Soth
Decl.) ¶¶ 4, 7, 17, 19; Ex. 70 (Cusick Decl.) ¶¶ 4, 7, 17, 19; Ex. 74 (Conrad Decl.) ¶ 11; Ex. 75 (Muskovitz Decl.)
¶ 11; Ex. 77 (Eugene Decl.) ¶ 10; Ex. 79 (Butler Decl.) ¶¶ 4, 7, 17, 19; Ex. 104 (Anderson Decl.) ¶¶ 4, 7, 17, 19.

[22]   *See* Ex. 50 (Simpson Tr.) at 160:23-161:14; Ex. 53 (Sinclair 30(b)(6) Tr.) at 49:9-21 (goals and metrics
were identified at the Campaign's headquarters, and discussed with state leadership "to ensure they were
consistent"), 53:22-56:5 (state data director, deputy organizing director, or ROD would create and assign geographic
regions to Field Organizers, and state data director created lists of voters for phone calls and canvassing), 65:20-
67:1-22 (describing how the Campaign had "a top-level goal" that was achieved by going "further down the
campaign chain from the statewide to the regional to the turf level . . . ."), 85:19-86:8, 169:23-170:25, 172:17-
173:19, 175:3-13, 179:12-22; Ex. 75 (Muskovitz Decl.) ¶¶ 11, 15, 19; Ex. 74 (Conrad Decl.) ¶¶ 11, 15, 19; Ex. 77
(Eugene Decl.) ¶¶ 10, 14, 18; Ex. 103 (Stone Decl.) ¶ 13.

[23]   *See* Ex. 50 (Simpson Tr.) at 160:23-161:7; Ex. 53 (Sinclair 30(b)(6) Tr.) at 165:25-168:9.

[24]   Ex. 12 (Phonebanking Toolkit, MB2020_Wood_00097271) (████████████
████████████); Ex. 45 (Making Calls with ThruTalk, MB2020_Wood_00186822)
(describing ████████████); Ex. 50 (Simpson Tr.) at 81:4-18
(████████████), 116:6-16, 167:25-168:14; Ex. 49 (Kanninen Tr.) at

- 11 -

Field Organizer or field office was not meeting its metrics, the state-level leadership team would

take note and respond.[25]

Bloomberg directly supervised the work of Field Organizers through its Regional

Organizing Directors.[26] Bloomberg used RODs to manage, coach, and supervise Field Organizers,

---

57:3-16, 64:19-25 (████████████████████████████), 82:8-83:10
██████████████████████████████████████████████████); Ex. 53
(Sinclair 30(b)(6) Tr.) at 83:15-84:15, 131:25-133:7; **California:** Ex. 54 (Ceppos Tr.) at 173:2-174:3, 182:10-22,
191:19-194:20 (Bloomberg campaign reviewed FOs progress on metrics regularly to check progress); Ex. 57
(Wheatley-Diaz Tr.) at 220:10-221:5 (campaign tracked canvassing); Ex. 56 (Summers Tr.) at 99:13-22, 100:25-
101:9; Ex. 83 (Castillo Decl.) ¶ 17; Ex. 93 (Kim Decl.) ¶ 17; Ex. 90 (Jones Decl.) ¶ 17; Ex. 105 (Alva Decl.) ¶ 17;
**New York:** Ex. 25 (Jan. 25, 2020 Email from M. Glassman, MB2020_Wood_00165282) (███████████████████
████████████████████████████); Ex. 84 (Reilly Decl.) ¶ 18; Ex. 89 (Munoz Decl.) ¶ 18; Ex. 98 (Shawn Decl.)
¶ 17; Ex. 95 (Nazario Decl.) ¶ 17; **Illinois:** Ex. 59 (Doherty Tr.) at 110:9-16 (████████████████████), 121:6-21 (data
team tracked metrics); Ex. 73 (Benigni Decl.) ¶ 18; Ex. 76 (Bush Decl.) ¶ 17; Ex. 81 (Adams Decl.) ¶ 17; Ex. 96
(Bowman Decl.) ¶ 17; **North Carolina:** Ex. 60 (Newman Tr.) at 242:17-244:13; Ex. 61 (Morton Tr.) at 159:3-
162:9; Ex. 69 (Smith Decl.) ¶ 17; Ex. 72 (Braden Decl.) ¶ 17; Ex. 78 (Walthour Decl.) ¶ 18; Ex. 97 (Patel Decl.)
¶ 17; **Michigan:** Ex. 80 (Washington Decl.) ¶ 17; Ex. 82 (Harrison Decl.) ¶ 17; Ex. 85 (Defoe Decl.) ¶ 17; Ex. 92
(Hill Decl.) ¶ 17; Ex. 94 (Almahameed Decl.) ¶ 17; **Wisconsin:** Ex. 43 (WI Organizing Onboarding,
MB2020_Wood_00181153) (██████████████████████████████); Ex. 86 (Jackson-Brown Decl.) ¶ 18; Ex. 87
(Beard Decl.) ¶ 17; Ex. 88 (Tribble Decl.) ¶ 17; Ex. 91 (Hall Decl.) ¶ 18; **Minnesota:** Ex. 71 (Soth Decl.) 16-17;
Ex. 70 (Cusick Decl.) ¶¶ 16-17; Ex. 74 (Conrad Decl.) ¶¶ 13, 15; Ex. 75 (Muskovitz Decl.) ¶¶ 13, 15; Ex. 77
(Eugene Decl.) ¶¶ 12, 14; Ex. 79 (Butler Decl.) ¶¶ 16-17; Ex. 104 (Anderson Decl.) ¶¶ 16-17.
[25]      *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 48:2-10, 84:1-15, 146:7-12, 180:7-21; *see also, e.g.,* Ex. 26 (Feb. 28,
2020 Email from K. Green, MB2020_Wood_00165596) █████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████████████████████████.
[26]      *See* Ex. 6 (FO Job Description, MB2020_Wood_00089188) ("This position will report to the Regional
Organizing Director."); Ex. 14 (FO Job Description, MB2020_Wood_00097532) (same); Ex. 7 (ROD Job
Description, MB2020_Wood_00089190) (responsibilities include "[m]anaging a team of Field Organizing
Directors"); Ex. 53 (Sinclair 30(b)(6) Tr.) at 57:12-58:16; **California:** Ex. 54 (Ceppos Tr.) at 172:2-8 (Plaintiff
Ceppos was supervised when working from home, via text, Slack, or other check-ins); Ex. 55 (Coker Tr.) at 129:13-
130:20 (Plaintiff Coker's schedule and tasks were provided by ROD or higher-level managers); Ex. 56 (Summers
Tr.) at 89:7-11 (ROD assigned Summers daily tasks); Ex. 83 (Castillo Decl.) ¶¶ 10-12, 17, 19; Ex. 93 (Kim Decl.)
¶¶ 10-12, 17, 19; Ex. 90 (Jones Decl.) ¶¶ 10-12, 17, 19; Ex. 105 (Alva Decl.) ¶¶ 10-12, 17, 19; **New York:** Ex. 58
(Goldstein Tr.) at 159:8-19 (ROD was Plaintiff Goldstein's boss), 84:9-85:12 (ROD reviewed script with Plaintiff
Goldstein and another FO for an event); Ex. 67 (Kelly Decl.) ¶¶ 11-12; Ex. 84 (Reilly Decl.) ¶¶ 11-13, 18, 20; Ex.
89 (Munoz Decl.) ¶¶ 11-13, 18, 20; Ex. 98 (Shawn Decl.) ¶¶ 10-12, 17, 19; Ex. 95 (Nazario Decl.) ¶¶ 10-12, 17, 19;
Ex. 103 (Stone Decl.) ¶ 5; **Illinois:** Ex. 59 (Doherty Tr.) at 33:11-23 (tasks were given by ROD), 38:17-39:9 (ROD
sets tasks for FOs), 55:20-56:9 (ROD set clear goals, cut canvassing turf); Ex. 99 (Doherty Decl.) ¶ 12; Ex. 73
(Benigni Decl.) ¶¶ 11-13, 18, 20; Ex. 76 (Bush Decl.) ¶¶ 10-12, 17, 19; Ex. 81 (Adams Decl.) ¶¶ 10-12, 17, 19; Ex.
96 (Bowman Decl.) ¶¶ 10-12, 17, 19; **North Carolina:** Ex. 60 (Newman Tr.) at 149:3-13; Ex. 61 (Morton Tr.) at
70:10-12, 103:2-24, 131:10-13; Ex. 69 (Smith Decl.) ¶¶ 10-12, 17, 19; Ex. 72 (Braden Decl.) ¶¶ 10-12, 17, 19; Ex.
78 (Walthour Decl.) ¶¶ 11-13, 18, 20; Ex. 97 (Patel Decl.) ¶¶ 10-12, 17, 19; **Michigan:** Ex. 62 (Watson-Moore Tr.)
at 73:9-18; Ex. 102 (Watson-Moore Decl.) ¶ 12; Ex. 68 (Oram Decl.) ¶¶ 11-12; Ex. 80 (Washington Decl.) ¶¶ 11-13,
18, 20; Ex. 82 (Harrison Decl.) ¶¶ 10-12, 17, 19; Ex. 85 (Defoe Decl.) ¶¶ 10-12, 17, 19; Ex. 92 (Hill Decl.) ¶¶ 10-12,
17, 19; Ex. 94 (Almahameed Decl.) ¶¶ 10-12, 17, 19; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶¶ 11-13, 18, 20;
Ex. 87 (Beard Decl.) ¶¶ 10-12, 17, 19; Ex. 88 (Tribble Decl.) ¶¶ 10-12, 17, 19; Ex. 91 (Hall Decl.) ¶¶ 11-13, 18, 20;
**Minnesota**: Ex. 64 (Logan Tr.) at 85:3-86:2 (weekly one-on-one meetings with ROD); Ex. 65 (Jaramillo Tr.) at
115:8-116:12 (Jaramillo considered ROD to be his immediate supervisor and manager); Ex. 66 (Waylett Decl.)
¶¶ 11-12; Ex. 71 (Soth Decl.) ¶¶ 10-12, 17, 19; Ex. 70 (Cusick Decl.) ¶¶ 10-12, 17, 19; Ex. 74 (Conrad Decl.) ¶¶ 4,

and assigned a ratio of RODs to Field Organizers to allow for effective supervision.[27] RODs also

communicated Bloomberg's performance goals and metrics that Field Organizers were required

to meet.[28] Unlike Field Organizers, Bloomberg expected RODs to have prior political campaign

experience because, unlike Field Organizers, they managed employees.[29] State organizing

leadership teams met with RODs on a weekly basis to "giv[e] them clear guidance on . . . how to

manage their team below" and RODs conveyed information learned on these meetings "down

chain to the organizers."[30] RODs held frequent meetings with Field Organizers to discuss

messaging and progress toward their weekly goals for calls and canvassing.[31]

---

20; Ex. 75 (Muskovitz Decl.) ¶¶ 4, 20; Ex. 77 (Eugene Decl.) ¶¶ 3, 19; Ex. 79 (Butler Decl.) ¶¶ 10-12, 17, 19; Ex. 104 (Anderson Decl.) ¶¶ 10-12, 17, 19.

[27]     See Ex. 53 (Sinclair 30(b)(6) Tr.) at 57:12-18 ("Generally a regional organizing director would be the layer in between statewide organizing leadership and the organizers themselves and if one "didn't hit [their] goals someone brought it up"); **Illinois:** Ex. 59 (Doherty Tr.) at 33:21-23 (tasks given by RODs), 39:4-9 (RODs set tasks for FOs); **North Carolina:** Ex. 61 (Morton Tr.) at 103:2-24; Ex. 100 (Newman Decl.) ¶¶ 9, 12; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶¶ 9, 12; **Minnesota:** Ex. 64 (Logan Tr.) at 82:22-83:15 (weekly check-ins with ROD and other FOs), 85:3-87:14 (weekly one-on-one check-in with ROD), 88:24-89:12 (discussing ▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 65 (Jaramillo Tr.) at 172:12-174:6.

[28]     See Ex. 53 (Sinclair 30(b)(6) Tr.) at 60:11-17; **California:** Ex. 55 (Coker Tr.) at 81:10-83:8 (FOs were "singled out for not . . . meeting a quota of phone banking" and if one "didn't hit [their] goals someone brought it up"); **Illinois:** Ex. 59 (Doherty Tr.) at 33:21-23 (tasks given by RODs), 39:4-9 (RODs set tasks for FOs); **North Carolina:** Ex. 61 (Morton Tr.) at 103:2-24; Ex. 100 (Newman Decl.) ¶¶ 9, 12; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶¶ 9, 12; **Minnesota:** Ex. 64 (Logan Tr.) at 82:22-83:15 (weekly check-ins with ROD and other FOs), 85:3-87:14 (weekly one-on-one check-in with ROD), 88:24-89:12 (discussing ▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 65 (Jaramillo Tr.) at 172:12-174:6.

[29]     Ex. 7 (ROD Job Description, MB2020_Wood_00089190) ("You'll need to have . . . One cycle of political field or comparable political experience or issue related campaign/organizational management."); Ex. 53 (Sinclair 30(b)(6) Tr.) at 73:10-74:6.

[30]     See Ex. 53 (Sinclair 30(b)(6) Tr.) at 58:17-59:4, 67:8-13 ("Generally speaking, a ROD would have a check-in call, you know, sometimes daily, sometimes weekly with state organizing leadership. And there would be a conversation about how their region is performing, which includes a discussion of goals that you're hitting both ways, in fact."), 67:23-68:17 (ROD goals include voter contact and volunteer capacity).

[31]     See Ex. 53 (Sinclair 30(b)(6) Tr.) at 60:7-17; **California:** Ex. 54 (Ceppos Tr.) at 212:4-213:17 (weekly check-in calls or meetings with ROD, and check-in required during breaks); Ex. 83 (Castillo Decl.) ¶ 12; Ex. 93 (Kim Decl.) ¶ 12; Ex. 90 (Jones Decl.) ¶ 12; Ex. 105 (Alva Decl.) ¶ 12; **New York:** Ex. 84 (Reilly Decl.) ¶ 13; Ex. 89 (Munoz Decl.) ¶ 13; Ex. 98 (Shawn Decl.) ¶ 12; Ex. 95 (Nazario Decl.) ¶ 12; **Illinois:** Ex. 59 (Doherty Tr.) at 116:24-119:9 (daily check-ins with ROD), 123:7-22 (spoke with ROD "regularly throughout the week" about goals); Ex. 73 (Benigni Decl.) ¶ 13; Ex. 76 (Bush Decl.) ¶ 12; Ex. 81 (Adams Decl.) ¶ 12; Ex. 96 (Bowman Decl.) ¶ 12; **North Carolina:** Ex. 61 (Morton Tr.) at 76:10-77:4, 116:22-118:11; Ex. 69 (Smith Decl.) ¶ 12; Ex. 72 (Braden Decl.) ¶ 12; Ex. 78 (Walthour Decl.) ¶ 13; Ex. 97 (Patel Decl.) ¶ 12; **Michigan:** Ex. 80 (Washington Decl.) ¶ 13; Ex. 82 (Harrison Decl.) ¶ 12; Ex. 85 (Defoe Decl.) ¶ 12; Ex. 92 (Hill Decl.) ¶ 12; Ex. 94 (Almahameed Decl.) ¶ 12; **Wisconsin:** Ex. 63 (Angulo Tr.) at 138:5-19 (Plaintiff Angulo had regular check-in and check-out calls with direct supervisor), 145:3-146:10 (check-in and check-out calls were mandatory); Ex. 86 (Jackson-Brown Decl.) ¶ 13; Ex. 87 (Beard Decl.) ¶ 12; Ex. 88 (Tribble Decl.) ¶ 12; Ex. 91 (Hall Decl.) ¶ 13; **Minnesota:** Ex. 64 (Logan Tr.) at 82:22-84:15 (weekly check-ins with ROD and other FOs), 85:3-87:14 (weekly one-on-one check-ins with ROD); Ex. 71 (Soth Decl.) ¶ 12; Ex. 70 (Cusick Decl.) ¶ 12; Ex. 79 (Butler Decl.) ¶ 12; Ex. 104 (Anderson Decl.) ¶ 12.

Bloomberg also maintained close control over its state field offices. Field Organizers attended Bloomberg's mandatory weekly telephone conferences between its New York headquarters and campaign staffers across the country, as well as additional national telephone conferences for campaign staffers.[32] On these calls, Bloomberg provided talking points on Bloomberg's policy proposals and guidance on maintaining consistent messaging.[33] Field Organizers also attended regular state-wide conference calls, where Bloomberg discussed its overall strategy for the state, mandatory hours and events to attend, and updates regarding other

---

[32]       *See* Ex. 50 (Simpson Tr.) at 67:14-68:2; Ex. 49 (Kanninen Tr.) at 49:4-15, 50:12-23; **California:** Ex. 54 (Ceppos Tr.) at 195:18-197:9; Ex. 55 (Coker Tr.) at 126:21-129:12; Ex. 106 (Ceppos Decl.) ¶ 16; Ex. 83 (Castillo Decl.) ¶¶ 22, 27-28; Ex. 93 (Kim Decl.) ¶¶ 22, 27-28; Ex. 90 (Jones Decl.) ¶¶ 22, 27-28; Ex. 105 (Alva Decl.) ¶¶ 22, 27-28; **New York:** Ex. 67 (Kelly Decl.) ¶¶ 16-17; Ex. 84 (Reilly Decl.) ¶¶ 23, 28-29; Ex. 89 (Munoz Decl.) ¶¶ 23, 28-29; Ex. 98 (Shawn Decl.) ¶ 22; Ex. 95 (Nazario Decl.) ¶ 22; Ex. 103 (Stone Decl.) ¶¶ 15-17; **Illinois:** Ex. 59 (Doherty Tr.) at 145:12-146:21; Ex. 99 (Doherty Decl.) ¶¶ 16-17; Ex. 73 (Benigni Decl.) ¶¶ 23, 28-29; Ex. 76 (Bush Decl.) ¶¶ 22, 27-28; Ex. 81 (Adams Decl.) ¶¶ 22, 27-28; Ex. 96 (Bowman Decl.) ¶¶ 22, 27-28; **North Carolina:** Ex. 60 (Newman Tr.) at 184:5-185:4, 186:4-14; Ex. 61 (Morton Tr.) at 128:24-129:20; Ex. 100 (Newman Decl.) ¶¶ 16-17; Ex. 69 (Smith Decl.) ¶¶ 22, 27-28; Ex. 72 (Braden Decl.) ¶¶ 22, 27-28; Ex. 78 (Walthour Decl.) ¶¶ 23, 28-29; Ex. 97 (Patel Decl.) ¶¶ 22, 27-28; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶¶ 16-17; Ex. 68 (Oram Decl.) ¶¶ 16-17; Ex. 80 (Washington Decl.) ¶¶ 23, 28-29; Ex. 82 (Harrison Decl.) ¶¶ 22, 27-28; Ex. 85 (Defoe Decl.) ¶¶ 22, 27-28; Ex. 92 (Hill Decl.) ¶¶ 22, 27-28; Ex. 94 (Almahameed Decl.) ¶¶ 22, 27-28; **Wisconsin:** Ex. 63 (Angulo Tr.) at 138:5-24; Ex. 86 (Jackson-Brown Decl.) ¶¶ 23, 28-29; Ex. 87 (Beard Decl.) ¶¶ 22, 27-28; Ex. 88 (Tribble Decl.) ¶¶ 22, 27-28; Ex. 91 (Hall Decl.) ¶¶ 23, 28-29; **Minnesota:** Ex. 64 (Logan Tr.) at 90:10-91:19, 162:17-163:2; Ex. 65 (Jaramillo Tr.) at 78:6-80:2; Ex. 101 (Logan Decl.) ¶ 16; Ex. 66 (Waylett Decl.) ¶ 17; Ex. 71 (Soth Decl.) ¶¶ 22, 27; Ex. 70 (Cusick Decl.) ¶¶ 22, 27; Ex. 79 (Butler Decl.) ¶¶ 22, 27; Ex. 104 (Anderson Decl.) ¶¶ 22, 27.

[33]       *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 115:8-25 (discussing regular conference calls between headquarters and states where messaging, guidance documents, and talking points were shared to ensure messaging on issues was consistent.); *see also* Ex. 50 (Simpson Tr.) at 67:14-68:5 (explaining that weekly nationwide organizing calls were important to "build[ing] a culture"); **California:** Ex. 54 (Ceppos Tr.) at 197:25-198:7 (national or state call provided new policy positions); Ex. 106 (Ceppos Decl.) ¶ 17; Ex. 83 (Castillo Decl.) ¶¶ 22, 27-28; Ex. 93 (Kim Decl.) ¶¶ 22, 27-28; Ex. 90 (Jones Decl.) ¶¶ 22, 27-28; Ex. 105 (Alva Decl.) ¶¶ 22, 27-28; **New York:** Ex. 67 (Kelly Decl.) ¶ 17; Ex. 84 (Reilly Decl.) ¶¶ 23, 28-29; Ex. 89 (Munoz Decl.) ¶¶ 23, 28-29; Ex. 98 (Shawn Decl.) ¶¶ 22, 27-28; Ex. 95 (Nazario Decl.) ¶¶ 22, 27-28; Ex. 103 (Stone Decl.) ¶¶ 15-17; **Illinois:** Ex. 99 (Doherty Decl.) ¶ 17; Ex. 73 (Benigni Decl.) ¶¶ 23, 28-29; Ex. 76 (Bush Decl.) ¶¶ 22, 27-28; Ex. 81 (Adams Decl.) ¶¶ 22, 27-28; Ex. 96 (Bowman Decl.) ¶¶ 22, 27-28; **North Carolina:** Ex. 61 (Morton Tr.) at 130:2-20; Ex. 100 (Newman Decl.) ¶¶ 16-17; Ex. 69 (Smith Decl.) ¶¶ 22, 27-28; Ex. 72 (Braden Decl.) ¶¶ 22, 27-28; Ex. 78 (Walthour Decl.) ¶¶ 23, 28-29; Ex. 97 (Patel Decl.) ¶¶ 22, 27-28; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶ 17; Ex. 68 (Oram Decl.) ¶ 17; Ex. 80 (Washington Decl.) ¶¶ 23, 28-29; Ex. 82 (Harrison Decl.) ¶¶ 22, 27-28; Ex. 85 (Defoe Decl.) ¶¶ 22, 27-28; Ex. 92 (Hill Decl.) ¶¶ 22, 27-28; Ex. 94 (Almahameed Decl.) ¶¶ 22, 27-28; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶¶ 23, 28-29; Ex. 87 (Beard Decl.) ¶¶ 22, 27-28; Ex. 88 (Tribble Decl.) ¶¶ 22, 27-28; Ex. 91 (Hall Decl.) ¶¶ 23, 28-29; **Minnesota:** Ex. 65 (Jaramillo Tr.) at 80:3-14 (national calls were about general campaign strategy and motivation for campaign staffers); Ex. 101 (Logan Decl.) ¶¶ 16-17; Ex. 66 (Waylett Decl.) ¶ 17; Ex. 71 (Soth Decl.) ¶¶ 22, 27-28; Ex. 70 (Cusick Decl.) ¶¶ 22, 27-28; Ex. 74 (Conrad Decl.) ¶ 23; Ex. 75 (Muskovitz Decl.) ¶ 23; Ex. 77 (Eugene Decl.) ¶ 22; Ex. 79 (Butler Decl.) ¶¶ 23, 28-29; Ex. 104 (Anderson Decl.) ¶¶ 23, 28-29.

field offices and their metrics.[34] Field Organizers frequently received emails from Bloomberg's New York headquarters, as well as communications from state leadership and their RODs with directives from New York.[35] This ensured that Field Organizers' messaging to potential voters and volunteers was consistent, so "that people [were] connected to the central theme, . . . the central value proposition of [the] campaign."[36]

### C. The "Entry-Level" Field Organizer Job Is the Lowest Position in the Campaign's Hierarchy.

Field Organizers' work was entirely dictated by Bloomberg's state and national leadership. As "entry-level" employees who were the lowest position in the Campaign's structure,[37] they did not have authority to make decisions on any matters of significance with respect to campaign staffing, strategy, operations, or planning.[38] All aspects of Bloomberg's operations and planning

---

[34]    *See* **California:** Ex. 54 (Ceppos Tr.) at 195:18-198:18; 218:12-219:10; Ex. 56 (Summers Tr.) at 95:2-12; Ex. 83 (Castillo Decl.) ¶ 22; Ex. 93 (Kim Decl.) ¶ 22; Ex. 90 (Jones Decl.) ¶ 22; Ex. 105 (Alva Decl.) ¶ 22; **New York:** Ex. 58 (Goldstein Tr.) at 120:24-121:25; Ex. 84 (Reilly Decl.) ¶ 23; Ex. 89 (Munoz Decl.) ¶ 23; Ex. 98 (Shawn Decl.) ¶ 22; Ex. 95 (Nazario Decl.) ¶ 22; **Illinois:** Ex. 59 (Doherty Tr.) at 146:22-147:21; Ex. 99 (Doherty Decl.) ¶ 15; Ex. 73 (Benigni Decl.) ¶ 23; Ex. 76 (Bush Decl.) ¶ 22; Ex. 81 (Adams Decl.) ¶ 22; Ex. 96 (Bowman Decl.) ¶¶ 22, 27-28; **North Carolina:** Ex. 61 (Morton Tr.) at 76:10-77:4; Ex. 69 (Smith Decl.) ¶ 22; Ex. 72 (Braden Decl.) ¶ 22; Ex. 78 (Walthour Decl.) ¶ 23; Ex. 97 (Patel Decl.) ¶ 22; **Michigan:** Ex. 62 (Watson-Moore Tr.) at 141:21-143:3; Ex. 80 (Washington Decl.) ¶ 23; Ex. 82 (Harrison Decl.) ¶ 22; Ex. 85 (Defoe Decl.) ¶ 22; Ex. 92 (Hill Decl.) ¶ 22; Ex. 94 (Almahameed Decl.) ¶ 22; **Wisconsin:** Ex. 63 (Angulo Tr.) at 138:5-19; Ex. 86 (Jackson-Brown Decl.) ¶ 23; Ex. 87 (Beard Decl.) ¶ 22; Ex. 88 (Tribble Decl.) ¶ 22; Ex. 91 (Hall Decl.) ¶ 23; **Minnesota:** Ex. 65 (Jaramillo Tr.) at 73:13-75:18; Ex. 71 (Soth Decl.) ¶ 22; Ex. 70 (Cusick Decl.) ¶ 22; Ex. 79 (Butler Decl.) ¶ 23; Ex. 104 (Anderson Decl.) ¶ 23.

[35]    *See* **California:** Ex. 54 (Ceppos Tr.) at 198:19-200:12; Ex. 106 (Ceppos Decl.) ¶ 15; Ex. 83 (Castillo Decl.) ¶ 26; Ex. 93 (Kim Decl.) ¶ 26; Ex. 90 (Jones Decl.) ¶ 26; Ex. 105 (Alva Decl.) ¶ 26; **New York:** Ex. 67 (Kelly Decl.) ¶ 15; Ex. 84 (Reilly Decl.) ¶ 27; Ex. 89 (Munoz Decl.) ¶ 27; Ex. 98 (Shawn Decl.) ¶ 26; Ex. 95 (Nazario Decl.) ¶ 26; Ex. 103 (Stone Decl.) ¶ 14; **Illinois:** Ex. 59 (Doherty Tr.) at 148:4-14; Ex. 99 (Doherty Decl.) ¶ 15; Ex. 73 (Benigni Decl.) ¶ 27; Ex. 76 (Bush Decl.) ¶ 26; Ex. 81 (Adams Decl.) ¶ 26; Ex. 96 (Bowman Decl.) ¶ 26; **North Carolina:** Ex. 61 (Morton Tr.) at 131:14-25; Ex. 100 (Newman Decl.) ¶ 15; Ex. 69 (Smith Decl.) ¶ 26; Ex. 72 (Braden Decl.) ¶ 26; Ex. 78 (Walthour Decl.) ¶ 27; Ex. 97 (Patel Decl.) ¶ 26; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶ 15; Ex. 68 (Oram Decl.) ¶ 15; Ex. 80 (Washington Decl.) ¶ 27; Ex. 82 (Harrison Decl.) ¶ 26; Ex. 85 (Defoe Decl.) ¶ 26; Ex. 92 (Hill Decl.) ¶ 26; Ex. 94 (Almahameed Decl.) ¶ 26; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶ 27; Ex. 87 (Beard Decl.) ¶ 26; Ex. 88 (Tribble Decl.) ¶ 26; Ex. 91 (Hall Decl.) ¶ 27; **Minnesota:** Ex. 101 (Logan Decl.) ¶ 15; Ex. 66 (Waylett Decl.) ¶ 15; Ex. 71 (Soth Decl.) ¶ 26; Ex. 70 (Cusick Decl.) ¶ 26; Ex. 74 (Conrad Decl.) ¶¶ 21, 24; Ex. 75 (Muskovitz Decl.) ¶¶ 21, 24; Ex. 77 (Eugene Decl.) ¶¶ 21, 23; Ex. 79 (Butler Decl.) ¶ 26; Ex. 104 (Anderson Decl.) ¶ 26.

[36]    Ex. 53 (Sinclair 30(b)(6) Tr.) at 116:4-117:16.

[37]    Ex. 50 (Simpson Tr.) at 66:14-24 (National Organizing Director could not recall any position that had a lower position in the campaign hierarchy).

[38]    *See* **California:** Ex. 54 (Ceppos Tr.) at 103:2-107:5 (FOs did not meaningfully "lead office" in absence of ROD, meant only FO was available at office if one was alone but otherwise needed authority from supervisors),

---

were conducted by its state and national leadership teams, which created state organizing plans that

addressed staffing, scope of work, capacity, structure, timelines, tactics, compensation, and

budgets.[39] Bloomberg's state budgets were requested by its state leadership teams and approved at

the national level.[40] Everything Bloomberg's employees in the Class States did, including Field

Organizers, was coordinated with the national headquarters and tethered to Bloomberg's national,

---

135:5-136:16 (Plaintiff Ceppos was not involved in financial or accounting decisions for campaign); 151:14-152:16 (Plaintiff Ceppos was not provided a Concur account because she did not deal with vendors or campaign expenses); 224:12-225:19 (coordinating field office opening involved making fliers and setting up chairs); Ex. 57 (Wheatley-Diaz Tr.) at 91:16-93:4 (coordinating "opening of Torrance office" involved setting up chairs and ensuring people knew where to park and where the office was), 94:15-96:20 ("leading office in absence of ROD" involved making office accessible to guests); Ex. 56 (Summers Tr.) at 101:14-25 (Summers did not provide anyone assignments, did not lead meetings, and did not plan events); Ex. 106 (Ceppos Decl.) ¶ 12; Ex. 83 (Castillo Decl.) ¶¶ 10-11, 18-21; Ex. 93 (Kim Decl.) ¶¶ 10-11, 18-21; Ex. 90 (Jones Decl.) ¶¶ 10-11, 18-21; Ex. 105 (Alva Decl.) ¶¶ 10-11, 18-21; **New York:** Ex. 67 (Kelly Decl.) ¶¶ 11-13; Ex. 84 (Reilly Decl.) ¶¶ 11-12, 19-22; Ex. 89 (Munoz Decl.) ¶¶ 11-12, 19-22; Ex. 98 (Shawn Decl.) ¶¶ 10-11, 18-21; Ex. 95 (Nazario Decl.) ¶¶ 10-11, 18-21; Ex. 103 (Stone Decl.) ¶¶ 10, 12; **Illinois:** Ex. 99 (Doherty Decl.) ¶ 12; Ex. 73 (Benigni Decl.) ¶¶ 11-12, 19-22; Ex. 76 (Bush Decl.) ¶¶ 10-11, 18-21; Ex. 81 (Adams Decl.) ¶¶ 10-11, 18-21; Ex. 96 (Bowman Decl.) ¶¶ 10-11, 18-21; **North Carolina:** Ex. 100 (Newman Decl.) ¶¶ 11-12; Ex. 69 (Smith Decl.) ¶¶ 10-11, 18-21; Ex. 72 (Braden Decl.) ¶¶ 10-11, 18-21; Ex. 78 (Walthour Decl.) ¶¶ 11-12, 19-22; Ex. 97 (Patel Decl.) ¶¶ 10-11, 18-21; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶ 12; Ex. 68 (Oram Decl.) ¶¶ 11-12; Ex. 80 (Washington Decl.) ¶¶ 11-12, 19-22; Ex. 82 (Harrison Decl.) ¶¶ 10-11, 18-21; Ex. 85 (Defoe Decl.) ¶¶ 10-11, 18-21; Ex. 92 (Hill Decl.) ¶¶ 10-11, 18-21; Ex. 94 (Almahameed Decl.) ¶¶ 10-11, 18-21; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶¶ 11-12, 19-22; Ex. 87 (Beard Decl.) ¶¶ 10-11, 18-21; Ex. 88 (Tribble Decl.) ¶¶ 10-11, 18-21; Ex. 91 (Hall Decl.) ¶¶ 11-12, 19-22; **Minnesota:** Ex. 65 (Jaramillo Tr.) at 147:17-150:4 (Bloomberg de-assigned FOs from performing outreach to individuals like mayor of Rochester, and had higher, management-level positions conduct constituent outreach); Ex. 101 (Logan Decl.) ¶¶ 11-12; Ex. 66 (Waylett Decl.) ¶¶ 11-12; Ex. 71 (Soth Decl.) ¶¶ 10-11, 18-21; (Cusick Decl.) ¶¶ 10-11, 18-21; Ex. 74 (Conrad Decl.) ¶¶ 16, 18; Ex. 75 (Muskovitz Decl.) ¶¶ 16, 18; Ex. 77 (Eugene Decl.) ¶¶ 15, 17; Ex. 79 (Butler Decl.) ¶¶ 10-11, 18-21; Ex. 104 (Anderson Decl.) ¶¶ 10-11, 18-21.

[39]     *See* Ex. 10 (Jan. 28, 2020 Email from C. Curry, MB2020_Wood_00097211) (▮▮▮▮▮▮▮▮); Ex. 9 (Jan. 31, 2020 Email from C. Curry, MB2020_Wood_00097173) (same); Ex. 13 (Feb. 26, 2020 Email from C. Curry, MB2020_Wood_00097381) (same); Ex. 50 (Simpson Tr.) at 22:10-17 (National Organizing Director at headquarters ensured "organizing pieces were included in all parts of campaign tactics"), 46:3-19 (data team at headquarters coordinated with states to provide data for voter outreach), 81:22-82:15 (headquarters determined Campaign strategy); Ex. 49 (Kanninen Tr.) at 36:24-37:4; Ex. 51 (Ensign Tr.) at 14:2-10 (Nat'l Operations Director oversaw HR, IT, and budgeting), 106:3-18 (▮▮▮▮▮▮▮▮), 121:22-122:10; Ex. 53 (Sinclair 30(b)(6) Tr.) at 28:18-30:2 (state plans are "created at the state level, but using guidance and perhaps approval from the national team," and included "staff, their rules, their scope of work, their capacity, their structure . . . a timeline for building that team" and "a timeline of activities and tactics," a "budget or requested budget," and "the strategy"), 30:20-31:5 (state plans created with "guidance from their national department heads"), 50:11-24 (state organizing directors created state's organizing plan and "managed the execution of the tactics of that [organizing] department"), 52:10-53:5 (state data directors provide "list of a certain cohort of voters either for phone calls or for canvassing" and "list of potential volunteer leads"); Ex. 75 (Muskovitz Decl.) ¶¶ 7, 18-19; Ex. 74 (Conrad Decl.) ¶¶ 7, 18-19; Ex. 77 (Eugene Decl.) ¶¶ 6, 17-18; Ex. 103 (Stone Decl.) ¶¶ 12-13.

[40]     *See* Ex. 5 (Feb. 4, 2020 Memo re States Team Expenses, MB2020_Wood_00042547) (▮▮▮▮▮▮ ▮▮▮▮▮▮); Ex. 37 (Feb. 19, 2020 Email from M. Brown, MB2020_Wood_00174303) (▮▮▮▮▮▮▮▮); Ex. 53 (Sinclair 30(b)(6) Tr.) at 30:3-10, 111:11-18 (organizers did not set budgets).

central strategy.[41] Bloomberg's national team chose the technology tools, devices, and platforms,

and used a national fiscal team to handle everything involving money, payroll, benefits, leases, rent,

processing media payments, etc.[42] Bloomberg's human resources function was centralized at

headquarters.[43] Any budget approvals for office leases or other expenses were coordinated between

Bloomberg's regional and state-level operations teams.[44] Bloomberg's state-level leadership also

coordinated all onboarding of personnel, office spaces, supplies, tech needs, etc.[45] ███████

████████████████████████████████████████████.[46] Field

Organizers uniformly had no role at all in any of this strategic planning, budget, and operations.[47]

---

[41]    *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 31:6-13 (plan "needs to be tethered to a central strategy consistent with the candidate's core message and political objectives"); Ex. 75 (Muskovitz Decl.) ¶¶ 18-19; Ex. 74 (Conrad Decl.) ¶¶ 18-19; Ex. 77 (Eugene Decl.) ¶ 17-18.

[42]    *See* Ex. 51 (Ensign Tr.) at 15:6-23, 18:3-16, 20:16-20, 21:6-14, 44:2-18, 46:4-17, 65:18-20; Ex. 53 (Sinclair 30(b)(6) Tr.) at 33:18-34:21 (national decisions on tech tools), 35:21-36:9 (describing regional and national finance and fiscal team), 37:19-24 (national fiscal team handled "everything involving money and the states teams – so that could be payroll, that could be leases and rent for offices"), 39:5-21 (a regional operations director liaised with state operations director regarding "guidance, templates, establishing processes for budget approvals or for fiscal approvals or dealing with payroll issues or office leases, that sort of thing"), 41:6-42:3 (human resources issues handled by team in New York headquarters).

[43]    *See* Ex. 51 (Ensign Tr.) at 20:16-20, 65:16-20.

[44]    *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 39:5-16.

[45]    *See* Ex. 51 (Ensign Tr.) at 16:7-14, 46:4-17; Ex. 53 (Sinclair 30(b)(6) Tr.) at 39:24-40:23 (state operations directors dealt with "onboarding of personnel, offices, maybe tech and supply issues," with HQ "on things like identifying places for offices" and "vetting those places to ensure they make sense, executing a lease").

[46]    *See* Ex. 5 (Feb. 4, 2020 Memo re States Team Expenses, MB2020_Wood_00042547) ███████████████████ ███████████████); Ex. 9 (Jan. 31, 2020 Email from C. Curry, MB2020_Wood_00097173) (describing HQ's oversight of office lease signing); Ex. 13 (Feb. 26, 2020 Email from C. Curry, MB2020_Wood_00097381) (███████████████████████ ███████████); Ex. 53 (Sinclair 30(b)(6) Tr.) at 43:24-44:22.

[47]    *See* **California:** Ex. 54 (Ceppos Tr.) at 103:2-107:5 (FOs did not meaningfully "lead office" in absence of ROD, meant only FO was available at office if one was alone but otherwise needed authority from supervisors), 135:5-136:16 (Plaintiff Ceppos was not involved in financial or accounting decisions for campaign), 151:14-152:16 (Plaintiff Ceppos was not provided a Concur account because she did not deal with vendors or campaign expenses), 224:12-225:19 (coordinating field office opening involved making fliers and setting up chairs); Ex. 57 (Wheatley-Diaz Tr.) at 91:16-94:14 (coordinating "opening of Torrance office" involved setting up chairs and ensuring people knew where to park and where the office was), 94:15-96:20 ("leading office in absence of ROD" involved making office accessible to guests); Ex. 56 (Summers Tr.) at 101:14-25 (Summers did not provide anyone assignments, did not lead meetings, and did not plan events); Ex. 106 (Ceppos Decl.) ¶¶ 12; Ex. 83 (Castillo Decl.) ¶¶ 10-11, 18-21; Ex. 93 (Kim Decl.) ¶¶ 10-11, 18-21; Ex. 90 (Jones Decl.) ¶¶ 10-11, 18-21; Ex. 105 (Alva Decl.) ¶¶ 10-11, 18-21; **New York:** Ex. 67 (Kelly Decl.) ¶¶ 11-13; Ex. 84 (Reilly Decl.) ¶¶ 11-12, 19-22; Ex. 89 (Munoz Decl.) ¶¶ 11-12, 19-22; Ex. 98 (Shawn Decl.) ¶¶ 10-11, 18-21; Ex. 95 (Nazario Decl.) ¶¶ 10-11, 18-21; Ex. 103 (Stone Decl.) ¶¶ 12-13; **Illinois:** Ex. 99 (Doherty Decl.) ¶¶ 11-12; Ex. 73 (Benigni Decl.) ¶¶ 11-12, 19-22; Ex. 76 (Bush Decl.) ¶¶ 10-11, 18-21; Ex. 81 (Adams Decl.) ¶¶ 10-11, 18-21; Ex. 96 (Bowman Decl.) ¶¶ 10-11, 18-21; **North Carolina:** Ex. 100 (Newman Decl.) ¶ 12; Ex. 69 (Smith Decl.) ¶¶ 10-11, 18-21; Ex. 72 (Braden Decl.) ¶¶ 10-11, 18-21; Ex. 78

Bloomberg also prohibited Field Organizers from speaking to the press.[48] None of this varied from person to person.

Field Organizers could not hire, fire, or discipline other employees, nor could they set other employees' schedules.[49] All such decisions were made by a Regional Organizing Director, a state director, or by officials in Bloomberg's headquarters.[50] This was true for all Field Organizers.

(Walthour Decl.) ¶¶ 11-12, 19-22; Ex. 97 (Patel Decl.) ¶¶ 10-11, 18-21; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶¶ 11-12; Ex. 68 (Oram Decl.) ¶¶ 11-12; Ex. 80 (Washington Decl.) ¶¶ 11-12, 19-22; Ex. 82 (Harrison Decl.) ¶¶ 10-11, 18-21; Ex. 85 (Defoe Decl.) ¶¶ 10-11, 18-21; Ex. 92 (Hill Decl.) ¶¶ 10-11, 18-21; Ex. 94 (Almahameed Decl.) ¶¶ 10-11, 18-21; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶¶ 11-12, 19-22; Ex. 87 (Beard Decl.) ¶¶ 10-11, 18-21; Ex. 88 (Tribble Decl.) ¶¶ 10-11, 18-21; Ex. 91 (Hall Decl.) ¶¶ 11-12, 19-22; **Minnesota:** Ex. 65 (Jaramillo Tr.) at 147:17-150:4 (Bloomberg reassigned outreach to individuals like mayor of Rochester from FOs to higher level Campaign staff); Ex. 101 (Logan Decl.) ¶ 12; Ex. 66 (Waylett Decl.) ¶¶ 11-12; Ex. 71 (Soth Decl.) ¶¶ 19-21; Ex. 70 (Cusick Decl.) ¶¶ 19-21; Ex. 74 (Conrad Decl.) ¶¶ 7, 18-19; Ex. 75 (Muskovitz Decl.) ¶ 7, 18-19; Ex. 77 (Eugene Decl.) ¶¶ 6, 17-18; Ex. 79 (Butler Decl.) ¶¶ 19-21; Ex. 104 (Anderson Decl.) ¶¶ 19-21.

[48]     *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 122:9-123:3.

[49]     *See* Ex. 51 (Ensign Tr.) at 18:3-16 (states and headquarters coordinating on hiring), 18:24-19:18 (same for termination), 114:18-115:8; Ex. 53 (Sinclair 30(b)(6) Tr.) at 110:20-111:10 (Field Organizers did not hire, fire, or discipline other Campaign employees); **California:** Ex. 56 (Summers Tr.) at 101:14-16 (Summers does not recall providing anyone assignments); Ex. 106 (Ceppos Decl.) ¶ 11; Ex. 83 (Castillo Decl.) ¶ 10; Ex. 93 (Kim Decl.) ¶ 10; Ex. 90 (Jones Decl.) ¶ 10; Ex. 105 (Alva Decl.) ¶ 10; **New York:** Ex. 67 (Kelly Decl.) ¶ 11; Ex. 84 (Reilly Decl.) ¶ 11; Ex. 89 (Munoz Decl.) ¶ 11; Ex. 98 (Shawn Decl.) ¶ 10; Ex. 95 (Nazario Decl.) ¶ 10; Ex. 103 (Stone Decl.) ¶ 10; **Illinois:** Ex. 99 (Doherty Decl.) ¶ 11; Ex. 73 (Benigni Decl.) ¶ 11; Ex. 76 (Bush Decl.) ¶ 10; Ex. 81 (Adams Decl.) ¶ 10; Ex. 96 (Bowman Decl.) ¶ 10; **North Carolina:** Ex. 100 (Newman Decl.) ¶ 11; Ex. 69 (Smith Decl.) ¶ 10; Ex. 72 (Braden Decl.) ¶ 10; Ex. 78 (Walthour Decl.) ¶ 11; Ex. 97 (Patel Decl.) ¶ 10; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶ 11; Ex. 68 (Oram Decl.) ¶ 11; Ex. 80 (Washington Decl.) ¶ 11; Ex. 82 (Harrison Decl.) ¶ 10; Ex. 85 (Defoe Decl.) ¶ 10; Ex. 92 (Hill Decl.) ¶ 10; Ex. 94 (Almahameed Decl.) ¶ 10; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶ 11; Ex. 87 (Beard Decl.) ¶ 10; Ex. 88 (Tribble Decl.) ¶ 10; Ex. 91 (Hall Decl.) ¶ 11; **Minnesota:** Ex. 101 (Logan Decl.) ¶ 11; Ex. 66 (Waylett Decl.) ¶ 11; Ex. 71 (Soth Decl.) ¶ 10; Ex. 70 (Cusick Decl.) ¶ 10; Ex. 74 (Conrad Decl.) ¶ 16; Ex. 75 (Muskovitz Decl.) ¶ 16; Ex. 77 (Eugene Decl.) ¶ 15; Ex. 79 (Butler Decl.) ¶ 10; Ex. 104 (Anderson Decl.) ¶ 10.

[50]     Ex. 7 (ROD Job Description, MB2020_Wood_00089190) (ROD responsibility includes "hiring, leading, training and mentoring field team"); *see* **California:** Ex. 54 (Ceppos Tr.) at 197:25-198:18 (leadership on daily statewide or national call conveyed new policy positions, when there was an event, and if there was a schedule change); Ex. 55 (Coker Tr.) at 129:13-130:20 (Plaintiff Coker would "receive marching orders" from RODs or other California leadership team members, "just went where [he] was told frequently and if [he] wasn't told anything, then [he] would just follow the schedule that was given to [him]."); Ex. 106 (Ceppos Decl.) ¶ 11; Ex. 83 (Castillo Decl.) ¶ 10; Ex. 93 (Kim Decl.) ¶ 10; Ex. 90 (Jones Decl.) ¶ 10; Ex. 105 (Alva Decl.) ¶ 10; **New York:** Ex. 67 (Kelly Decl.) ¶ 11; Ex. 84 (Reilly Decl.) ¶ 11; Ex. 89 (Munoz Decl.) ¶ 11; Ex. 98 (Shawn Decl.) ¶ 10; Ex. 95 (Nazario Decl.) ¶ 10; **Illinois:** Ex. 99 (Doherty Decl.) ¶ 11; Ex. 73 (Benigni Decl.) ¶ 11; Ex. 76 (Bush Decl.) ¶ 10; Ex. 81 (Adams Decl.) ¶ 10; Ex. 96 (Bowman Decl.) ¶ 10; **North Carolina:** Ex. 100 (Newman Decl.) ¶ 11; Ex. 69 (Smith Decl.) ¶ 10; Ex. 72 (Braden Decl.) ¶ 10; Ex. 78 (Walthour Decl.) ¶ 11; Ex. 97 (Patel Decl.) ¶ 10; **Michigan:** Ex. 102 (Watson-Moore Decl.) ¶ 11; Ex. 68 (Oram Decl.) ¶ 11; Ex. 80 (Washington Decl.) ¶ 11; Ex. 82 (Harrison Decl.) ¶ 10; Ex. 85 (Defoe Decl.) ¶ 10; Ex. 92 (Hill Decl.) ¶ 10; Ex. 94 (Almahameed Decl.) ¶ 10; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶ 11; Ex. 87 (Beard Decl.) ¶ 10; Ex. 88 (Tribble Decl.) ¶ 10; Ex. 91 (Hall Decl.) ¶ 11; **Minnesota:** Ex. 101 (Logan Decl.) ¶ 11; Ex. 66 (Waylett Decl.) ¶¶ 11-12; Ex. 71 (Soth Decl.) ¶¶ 10-11, 19-21; Ex. 70 (Cusick Decl.) ¶¶ 10-11, 19-21; Ex. 79 (Butler Decl.) ¶¶ 10-11, 19-21; Ex. 104 (Anderson Decl.) ¶¶ 10-11, 19-21.

### D. Field Organizers' Job Duties Uniformly Overlap With Those of Unpaid Volunteers.

Bloomberg's unpaid volunteers performed the same voter contact tasks that make up the vast majority of Field Organizers' time and primary duties, including making phone calls, canvassing, and attending Campaign events.[51] Bloomberg provided volunteers with an auto-dialer or call or neighborhood lists for their phone calls and canvassing tasks, just as it did for Field Organizers, and provided them the same scripts and talking points to communicate with voters.[52] Volunteers passed out campaign flyers and attended visibility events.[53] Because the script and talking points contained the information that Bloomberg collected data on and communicated to voters, volunteers were able to perform these tasks with little to no training.

---

[51]      *See* Ex. 50 (Simpson Tr.) at 72:6-74:5 (discussing volunteer tasks); Ex. 53 (Sinclair 30(b)(6) Tr.) at 26:22-27:4 (canvassing performed by "infrastructure of volunteers largely, sometimes staff"), 27:24-28:3 (phone calls made by "volunteers or staff [who] are picking up the phone and calling into a list either of prospective voters or perhaps prospective volunteers"), 68:18-69:15, 135:25-137:17 (volunteer duties at canvassing, phone banking, events); *see also* **California:** Ex. 83 (Castillo Decl.) ¶ 18; Ex. 93 (Kim Decl.) ¶ 18; Ex. 90 (Jones Decl.) ¶ 18; Ex. 105 (Alva Decl.) ¶ 18; **New York:** Ex. 84 (Reilly Decl.) ¶ 19; Ex. 89 (Munoz Decl.) ¶ 19; Ex. 98 (Shawn Decl.) ¶ 18; Ex. 95 (Nazario Decl.) ¶ 18; **Illinois:** Ex. 73 (Benigni Decl.) ¶ 19; Ex. 76 (Bush Decl.) ¶ 18; Ex. 81 (Adams Decl.) ¶ 18; Ex. 96 (Bowman Decl.) ¶ 18; **North Carolina:** Ex. 69 (Smith Decl.) ¶ 18; Ex. 72 (Braden Decl.) ¶ 18; Ex. 78 (Walthour Decl.) ¶ 19; Ex. 97 (Patel Decl.) ¶ 18; **Michigan:** Ex. 80 (Washington Decl.) ¶ 19; Ex. 82 (Harrison Decl.) ¶ 18; Ex. 85 (Defoe Decl.) ¶ 18; Ex. 92 (Hill Decl.) ¶ 18; Ex. 94 (Almahameed Decl.) ¶ 18; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶ 19; Ex. 87 (Beard Decl.) ¶ 18; Ex. 88 (Tribble Decl.) ¶ 18; Ex. 91 (Hall Decl.) ¶ 19; **Minnesota:** Ex. 71 (Soth Decl.) ¶ 18; Ex. 70 (Cusick Decl.) ¶ 18; Ex. 79 (Butler Decl.) ¶ 18; Ex. 104 (Anderson Decl.) ¶ 18.

[52]      *See* Ex. 18 (Persuasion GOTV Phone/Canvass Script, MB2020_Wood_00158784) (████████████ ████████████████████████); Ex. 50 (Simpson Tr.) at 41:8-20 (volunteers use auto-dialer), 43:17-44:13 (national data team would provide lists of voters for volunteers to call and text); **California:** Ex. 57 (Wheatley-Diaz Tr.) at 221:14-222:12 (volunteers were given lists for canvassing); Ex. 56 (Summers Tr.) at 71:9-23 (volunteers were given scripts and call lists like what FOs had); **New York:** Ex. 58 (Goldstein Tr.) at 98:15-102:2 (████████████████████████████████); **Illinois:** Ex. 59 (Doherty Tr.) at 93:2-10, 94:8-11; **North Carolina:** Ex. 60 (Newman Tr.) at 62:9-63:4; **Wisconsin:** Ex. 63 (Angulo Tr.) at 102:16-103:10 (volunteers were given call list and scripts); **Minnesota:** Ex. 65 (Jaramillo Tr.) at 109:22-111:11 (volunteers were provided campaign's talking points and messaging prepared by leadership).

[53]      *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 70:5-9.

## II.    Bloomberg Classified All Field Organizers Categorically as Exempt and Required Significant Overtime Work.

Bloomberg maintained a uniform exempt classification for Plaintiffs and all other Field Organizers, with no variation between individuals or offices.[54] Bloomberg admits that it classified them all as exempt from overtime pay under the FLSA and applicable state laws.[55] Bloomberg engaged in no individualized analysis of any particular person's job duties to make that uniform classification decision, and made that decision prior to even creating a job description or hiring any organizers.[56] In other words, Bloomberg made one decision about whether all Field Organizers should be exempt—just as a jury can do here.

Bloomberg required Plaintiffs and Field Organizers to work well over 40 hours each week.[57] In accordance with the Field Organizer job posting requiring "long and irregular hours . . . 7 days/week on an average week,"[58] the standard FO recruiter screening script communicating

---

[54]    Ex. 48 (RFA Resps.) at Request 5; ECF No. 287 (Answer) ¶¶ 63 & Second, Eighteenth Affirmative Defenses (raising same classification defense as to all FOs).

[55]    ECF No. 287 (Answer) ¶ 63; Ex. 49 (Kanninen Tr.) at 46:2-8; Ex. 48 (RFA Resps.) at Request 13.

[56]    *See* Ex. 49 (Kanninen Tr.) at 47:10-49:2; Ex. 53 (Sinclair 30(b)(6) Tr.) at 185:8-24 ("Generally speaking, campaigns that I've worked on . . . for forever dating back to 2002, have always treated organizers as . . . exempt from overtime. And in that way, I think it was an assumption at some level that would be how we would proceed in this instance."), 186:1-14 ("I don't recall a specific conversation about exemption status. As I said, it was almost really . . . an assumption, certainly on my part, given that's how this class of employee has always been treated on every campaign that I've ever known.").

[57]    *See* Ex. 53 (Sinclair 30(b)(6) Tr.) at 110:15-19 (Bloomberg "would expect any field organizer in any state in the country to work more than 40 hours in a week. . . ."), 192:9-193:15 (witness testifying that the decision to exempt FOs from overtime assumed they would "be working 60, 70, 80 hours a week without overtime"); Ex. 50 (Simpson Tr.) at 170:24-171:2 (noting that Field Organizers generally worked Saturdays and Sundays); **California:** Ex. 83 (Castillo Decl.) ¶¶ 3, 31, 33; Ex. 93 (Kim Decl.) ¶¶ 3, 31, 33; Ex. 90 (Jones Decl.) ¶¶ 3, 31, 33; Ex. 105 (Alva Decl.) ¶¶ 3, 31, 33; **New York:** Ex. 67 (Kelly Decl.) ¶¶ 8, 20-21; Ex. 84 (Reilly Decl.) ¶¶ 4, 32, 34; Ex. 89 (Munoz Decl.) ¶¶ 4, 32, 34; Ex. 98 (Shawn Decl.) ¶¶ 3, 31, 33; ; Ex. 95 (Nazario Decl.) ¶¶ 3, 30, 32; Ex. 103 (Stone Decl.) ¶ 7; **Illinois:** Ex. 73 (Benigni Decl.) ¶¶ 4, 32, 34; Ex. 76 (Bush Decl.) ¶¶ 3, 31, 33; Ex. 81 (Adams Decl.) ¶¶ 3, 31, 33; Ex. 96 (Bowman Decl.) ¶¶ 3, 31, 33; **North Carolina:** Ex. 69 (Smith Decl.) ¶¶ 3, 31, 33; Ex. 72 (Braden Decl.) ¶¶ 3, 31, 33; Ex. 78 (Walthour Decl.) ¶¶ 4, 32, 34; Ex. 97 (Patel Decl.) ¶¶ 3, 31, 33; **Michigan:** Ex. 68 (Oram Decl.) ¶¶ 8, 19-20; Ex. 80 (Washington Decl.) ¶¶ 4, 32, 34; Ex. 82 (Harrison Decl.) ¶¶ 3, 31, 33; Ex. 85 (Defoe Decl.) ¶¶ 3, 30-31; Ex. 92 (Hill Decl.) ¶¶ 3, 31, 33; Ex. 94 (Almahameed Decl.) ¶¶ 3, 31, 33; **Wisconsin:** Ex. 86 (Jackson-Brown Decl.) ¶¶ 4, 32, 34; Ex. 87 (Beard Decl.) ¶¶ 3, 30, 32; Ex. 88 (Tribble Decl.) ¶¶ 3, 31, 33; Ex. 91 (Hall Decl.) ¶¶ 4, 32, 34; **Minnesota:** Ex. 66 (Waylett Decl.) ¶¶ 7-8, 20-21; Ex. 71 (Soth Decl.) ¶¶ 3, 33; Ex. 70 (Cusick Decl.) ¶¶ 3, 33; Ex. 79 (Butler Decl.) ¶¶ 3, 33; Ex. 104 (Anderson Decl.) ¶¶ 3, 33.

[58]    Ex. 6 (FO Job Description, MB2020_Wood_00089188); Ex. 14 (FO Job Description, MB2020_Wood_00097532).

"████████████████████████████████████████████████

████████████████████████████,"[59] and Bloomberg's interview template ████████████

████████████████████████████████████████████████"[60] Plaintiffs and other Field

Organizers regularly worked over 40 hours a week without overtime pay, and usually exceeded 60

or 70 hours per week.[61]  Bloomberg's corporate witness testified this is because "time is the most

important resource in any campaign, which means necessarily many workdays and long hours."[62]

Bloomberg also required Plaintiffs and Field Organizers to work schedules that Bloomberg set, six

or seven days a week, usually at least ten hours a day.[63]

---

[59]     Ex. 15 (FO Recruiter Screening Script, MB2020_Wood_00097557); *see also* Ex. 16 (Jan. 14, 2020 Email from K. Sayers, MB2020_Wood_00097877) (████████████████████████████████████████████████████).

[60]     Ex. 8 (Interview Notes Template, MB2020_Wood_00091870).

[61]     *See* **California:** Ex. 54 (Ceppos Tr.) at 167:14-169:15 (typical schedule was Monday through Sunday, 9 AM to 8 or 9 PM 194:14-195:13 (describing working 12-hour days); Ex. 55 (Coker Tr.) at 139:7-140:11 (estimates working 70 hours or more a week, working 12-hour days, seven days a week); Ex. 57 (Wheatley-Diaz Tr.) at 150:2-154:25, 239:4-21 (estimates working from 50-70 hours per week); Ex. 56 (Summers Tr.) at 90:14-92:20 (Summers worked 7 days a week, 12 hours a day with exception of one day each week off for the last two weeks of the campaign); Ex. 106 (Ceppos Decl.) ¶¶ 7-8; Ex. 83 (Castillo Decl.) ¶ 3; Ex. 93 (Kim Decl.) ¶ 3; Ex. 90 (Jones Decl.) ¶ 3; Ex. 105 (Alva Decl.) ¶ 3; **New York:** Ex. 58 (Goldstein Tr.) at 79:24-80:3 (arrived at work around 9, 9:30 AM), 87:20-88:19 (worked until 9 PM); Ex. 67 (Kelly Decl.) ¶ 8; Ex. 84 (Reilly Decl.) ¶ 4; Ex. 89 (Munoz Decl.) ¶ 4; Ex. 98 (Shawn Decl.) ¶ 3; Ex. 95 (Nazario Decl.) ¶ 3; Ex. 103 (Stone Decl.) ¶ 7; **Illinois:** Ex. 59 (Doherty Tr.) at 137:24-138:3; Ex. 73 (Benigni Decl.) ¶ 4; Ex. 76 (Bush Decl.) ¶ 3; Ex. 81 (Adams Decl.) ¶ 3; Ex. 96 (Bowman Decl.) ¶ 3; **North Carolina:** Ex. 60 (Newman Tr.) at 226:10-19; Ex. 69 (Smith Decl.) ¶ 3; Ex. 72 (Braden Decl.) ¶ 3; Ex. 78 (Walthour Decl.) ¶ 4; Ex. 97 (Patel Decl.) ¶ 3; **Michigan:** Ex. 62 (Watson-Moore Tr.) at 185:8-9, 140:15-141:11; Ex. 68 (Oram Decl.) ¶ 8; Ex. 80 (Washington Decl.) ¶ 4; Ex. 82 (Harrison Decl.) ¶ 3; Ex. 85 (Defoe Decl.) ¶ 3; Ex. 92 (Hill Decl.) ¶ 3; Ex. 94 (Almahameed Decl.) ¶ 3; **Wisconsin:** Ex. 63 (Angulo Tr.) at 96:20-99:14 (confirming hours schedule of over 50 hours of work per week); Ex. 86 (Jackson-Brown Decl.) ¶ 4; Ex. 87 (Beard Decl.) ¶ 3; Ex. 88 (Tribble Decl.) ¶ 3; Ex. 91 (Hall Decl.) ¶ 4; **Minnesota:** Ex. 64 (Logan Tr.) at 187:14-24 (worked up to 70 hours per week), 76:5-78:10 (discussing schedule showing over 40 hours of scheduled work); Ex. 65 (Jaramillo Tr.) at 166:24-167:15 (schedule in Rochester office was "firmly 10 AM to 8 PM," six days a week), 170:14-17, 171:19-172:7; Ex. 66 (Waylett Decl.) ¶¶ 7-8; Ex. 71 (Soth Decl.) ¶¶ 3, 33; Ex. 70 (Cusick Decl.) ¶¶ 3, 33; Ex. 74 (Conrad Decl.) ¶ 6; Ex. 75 (Muskovitz Decl.) ¶ 6; Ex. 77 (Eugene Decl.) ¶ 5; Ex. 79 (Butler Decl.) ¶¶ 3, 33; Ex. 104 (Anderson Decl.) ¶¶ 3, 33.

[62]     Ex. 53 (Sinclair 30(b)(6) Tr.) at 95:25-96:4.

[63]     **California:** Ex. 21 (Feb. 15, 2020 Email from L. Bubar, MB2020_Wood_00163809) (███████████████████████████████████████); Ex. 30 (Jan. 27, 2020 Email from M. Blakeley, MB2020_Wood_00172924) ████████████████████████████████████████); Ex. 47 (Feb. 14, 2020 Update, P000235) (describing "60 hour work week"); Ex. 54 (Ceppos Tr.) at 167:14-169:15 (typical schedule was Monday through Sunday, 9 AM to 8 or 9 PM and FOs were discouraged from and penalized for taking a day off), 194:14-195:13 (describing working 12-hour days); Ex. 55 (Coker Tr.) at 139:7-140:11 (estimates working 70 hours or more a week, working 12-hour days, seven days a week); Ex. 57 (Wheatley-Diaz Tr.) at 150:2-154:25, 239:4-21 (estimates working from 50-70 hours per week); Ex. 56 (Summers Tr.) at 90:14-92:20 (Summers worked 7 days a week, 12 hours a day with exception of one day each week off for the last two weeks of the campaign); **New York:** Ex. 58

## ARGUMENT

### I.        Legal Standard

Class certification is appropriate if: "(1) the class is so numerous that joinder of all

members is impracticable; (2) there are questions of law or fact common to the class; (3) the

claims or defenses of the representative parties are typical of the claims or defenses of the class;

and (4) the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a); *see also Salim Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d

234, 251 (2d Cir. 2011). For a class seeking damages, there must also be common questions of

law or fact that predominate over any questions affecting only individual members, and the class

action must be superior to other available methods. Fed. R. Civ. P. 23(b)(3).

### II.       Field Organizers' Overtime Claims Are Well Suited for Class Adjudication.

Class actions are critical to ensuring that the "broad remedial goal[s]" of wage and hour

laws can be met because they allow workers to pool their resources and hold large corporations

accountable for widespread violations. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 173

(1989); *see also Perez v. Allstate Ins. Co.*, No. 11 Civ. 1812, 2014 U.S. Dist. LEXIS 130214, at

*67 (E.D.N.Y. Sept. 16, 2014) (class members lacked the resources to even "contemplate

proceeding with this [wage and hour] litigation in any context other than through their

---

(Goldstein Tr.) at 79:24-80:23 (arrived at work around 9, 9:30 AM), 87:20-88:19 (worked until 9 PM); Ex. 89 (Munoz Decl.) ¶ 3; Ex. 84 (Reilly Decl.) ¶ 3; Ex. 67 (Kelly Decl.) ¶ 7; Ex. 103 (Stone Decl.) ¶ 7; **Illinois:** Ex. 59 (Doherty Tr.) at 131:21-137:23; Ex. 73 (Benigni Decl.) ¶ 3; **North Carolina:** Ex. 41 (Jan. 29, 2020 Email from J. Mitchell, MB2020_Wood_00175878) (███████████████████████████████); Ex. 60 (Newman Tr.) at 169:6-170:25; Ex. 61 (Morton Tr.) at 115:2-14 (daily call started around 8 or 8:30 AM), 122:18-123:11 (worked 7 days a week, work days ended by 8-9 PM, and weekends started from 9-10 AM); Ex. 78 (Walthour Decl.) ¶ 3; **Michigan:** Ex. 19 (Organizer Schedule Template, MB2020_Wood_00159999) ███████████████████████████); Ex. 62 (Watson-Moore Tr.) at 140:15-23; Ex. 29 (Jan. 21, 2020 Email from D. DeFoe, MB2020_Wood_00166176) ███████████); Ex. 68 (Oram Decl.) ¶ 7; Ex. 80 (Washington Decl.) ¶ 3; **Wisconsin:** Ex. 43 (WI Organizing Onboarding, MB2020_Wood_00181153) at 181214 (███████████████████████████████████); Ex. 63 (Angulo Tr.) at 96:20-99:14 (confirming hours schedule of over 50 hours of work per week); Ex. 86 (Jackson-Brown Decl.) ¶ 3; Ex. 91 (Hall Decl.) ¶ 3; **Minnesota:** Ex. 64 (Logan Tr.) at 187:14-188:9 (worked up to 70 hours per week), 76:5-78:10 (discussing schedule showing over 40 hours of scheduled work); Ex. 65 (Jaramillo Tr.) at 166:24-167:15 (schedule in Rochester office was "firmly 10 AM to 8 PM," six days a week).

participation in a class action"). The ability to pool resources is particularly important in the wage and hour context, where each worker's individual damages would be overwhelmed by the cost of litigating the claims individually. *Rivera v. Harvest Bakery Inc.*, 312 F.R.D. 254, 277 (E.D.N.Y. 2016); *see also Catholic Health Care W. v. U.S. Foodserv.*, 729 F.3d 108, 130 (2d Cir. 2013) (class actions "facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery"); *Long v. HSBC USA Inc.*, No. 14 Civ. 6233, 2015 U.S. Dist. LEXIS 122655, at *22 (S.D.N.Y. Sept. 11, 2015) (same).

## III.   Plaintiffs Meet All of the Rule 23(a) Requirements.

Plaintiffs seek to certify seven state law classes of former Field Organizers who worked for Bloomberg in California, New York, Illinois, North Carolina, Michigan, Wisconsin, and Minnesota. In order to certify a class, the Court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24, 41 (2d Cir. 2006). The Court has more than enough evidence to do so here.

### A.   Rule 23(a)(1): Class Members Are Sufficiently Numerous Such That Joinder Is Impracticable.

Rule 23(a)(1) requires Plaintiffs to show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members . . . ." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Courts also regularly find that numerosity is satisfied where the class size is nearly 40 individuals. *See Town of New Castle v. Yonkers Contracting Co., Inc.*, 131 F.R.D. 38, 41 (S.D.N.Y. 1990) (class with 36 members satisfied numerosity requirement). Numerosity can also be satisfied where the proposed class has fewer than 40 members, where joinder is otherwise impracticable. *Gortat v. Capala Bros.*, 949 F. Supp. 2d 374, 383-84 (E.D.N.Y. 2013) (class with

24 members satisfied numerosity requirement due to impracticability of joinder). Here, based on Bloomberg's document production, there are 205 individuals in the California class; 104 individuals in the New York class; 77 individuals in the Illinois class; 86 individuals in the North Carolina class; 67 individuals in the Michigan class; 42 individuals in the Wisconsin class; and 31 individuals in the Minnesota class. Swartz Decl. ¶ 18. Given the size of the proposed classes, the numerosity requirement is satisfied.[64]

### B.    Rule 23(a)(2): Commonality Is Satisfied.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "For purposes of Rule 23(a)(2) even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (internal alternations and quotation marks omitted). A "common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (alteration in original); *Myers v. Hertz Corp.,* 624 F.3d at 549 (commonality met where "'some' of the [common] questions can be answered with respect to the members of the class as a whole 'through generalized proof'").

Here, the principal common question for each of the seven Class States is whether Bloomberg can establish its common affirmative defense that the primary duties of Field Organizers make them either "administrators," whose primary duty is business administration (as

---

[64]     While the proposed Minnesota class has fewer than 40 members, it would be highly inefficient for the Court to require dozens of separate lawsuits, particularly here where the damages per person are relatively low and it is unlikely that many of these individuals would be able to bring their own suits.

opposed to production work),[65] or "executives," whose primary duty is management.[66] Each of the Class States mirror the FLSA for both exemptions.[67]

Under the administrative exemption, Bloomberg must establish that Field Organizers' "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and their "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.'" *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 510-11 (2d Cir. 2020) (quoting 29 C.F.R. § 541.200(a)). "The second element — whether the employee's primary duty is directly related to management — requires consideration of whether the employee 'perform[s] work directly related to assisting with the running or servicing of the business, as distinguished . . . from working on a manufacturing production line or selling a product in a retail or service establishment.'" *Id.* (quoting 29 C.F.R. § 541.201(a)). Under the executive exemption, Bloomberg must establish that Field Organizers' "primary duty is

---

[65]     *See Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531-32 (2d Cir. 2009) ("Employment may . . . be classified as belonging in the administrative category, which falls squarely within the administrative exception, or as production/sales work, which does not.").

[66]     Additional common questions exist for New York class members, as to whether Bloomberg provided them accurate wage statements, and for California class members, as to whether Bloomberg provided them accurate wage statements, failed to pay wages on a timely basis, and conducted unfair labor practices. These claims are all derivative of the exemption analysis and largely rise or fall with the same common question of whether Bloomberg can establish its affirmative exemption defense.

[67]     *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012) ("Like the FLSA, the NYLL 'mandates overtime pay and applies the same exemptions as the FLSA.'" (quoting *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010))); Industrial Welfare Commission Wage Order No. 4-2001 §§ 1(A)(1)(e), 1(A)(2)(e) (California wage order expressly incorporates federal regulations for the administrative and executive exemption); N.C. Gen. Stat. § 95-25.14(b)(4) (North Carolina statute expressly incorporates FLSA exemptions); *Hecker v. Petco Animal Supplies, Inc.*, No. 16 Civ. 10857, 2017 U.S. Dist. LEXIS 87016, at *18 (N.D. Ill. June 7, 2017) ("Illinois's exemption mirrors the FLSA's."); *Saginaw Firefighters Ass'n, Local 422, etc. v. Saginaw*, 137 Mich. App. 625, 632, 357 N.W.2d 908, 911 (Mich. 1984) ("the Michigan [minimum wage] law obviously parallels the federal act."); *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1070 (D. Minn. 2011) ("MFLSA's administrative exemption is analogous to the FLSA's administrative exemption."); *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1029-30 (D. Minn. 2007) (finding MFLSA executive exemption claims to be "substantially parallel to the FLSA claims"); Wis. Admin. Code DWD § 274.04 (Wisconsin exemptions are "interpreted in such a manner as to be consistent with the Federal Fair Labor Standards Act and the Code of Federal Regulations as amended").

management of the enterprise . . . or of a customarily recognized department or subdivision thereof," they "customarily and regularly direct[] the work of two or more other employees," and "they 'ha[ve] the authority to hire or fire other employees or' if their 'suggestions and recommendations' on personnel decisions 'are given particular weight.'" *Id.* (quoting 29 C.F.R. § 541.100(a)).

The primary duty question is well-suited for class-wide resolution because "there are significant elements of proof that are common across all class members" that can establish the key features of Field Organizers' job duties. *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008). The primary job duties of the Field Organizer position—contacting potential voters and volunteers through phone calls, canvassing, in-person interactions in the community, and collecting data on voters' support for Bloomberg—are defined by a single, nationwide job description, and are further reflected in common interview and training materials. *See supra* Statement of Facts § I.A. The consistent testimony and declarations of forty-five Plaintiffs and class members, and four supervisors, confirm that they performed the same job duties. *See id.* Bloomberg's exemption decision was also common to all Field Organizers, and not based on any particular individual's job duties; indeed, the exemption decision was more of "an assumption" that occurred before any organizers began working. *See id.* § II. Bloomberg maintains that all Field Organizers were correctly classified as exempt from overtime, and its affirmative defense does not vary based upon any differences among the class members.[68]

Courts in this Circuit routinely find that such common questions satisfy the commonality requirement for unpaid overtime cases. *See, e.g.*, *Alves v. Affiliated Care of Putnam, Inc.*, No. 16 Civ. 1593, 2022 U.S. Dist. LEXIS 59122, at *63 (S.D.N.Y. Mar. 30, 2022) (granting class

---

[68]    *See* ECF No. 287 (Answer) ¶¶ 63 & Second, Eighteenth Affirmative Defenses (raising same classification defense as to all FOs).

certification in overtime misclassification case for unpaid overtime and improper wage statements; "In wage cases, the commonality requirement is usually satisfied where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices." (quoting *Spencer v. No Parking Today, Inc.*, No. 12 Civ. 6323, 2013 U.S. Dist. LEXIS 36357, at *15 (S.D.N.Y. Mar. 15, 2013))); *Heckle v. Matrix Absence Mgmt., Inc.*, No. 21 Civ. 1463, 2022 U.S. Dist. LEXIS 225514, at *9-10, 22 (S.D.N.Y. Dec. 14, 2022) (granting class certification in overtime misclassification case for unpaid overtime and improper wage statements; commonality satisfied by common questions including "what TCEs' primary job duties are, whether defendant provided the TCEs with the requisite wage statements, and whether the TCEs' duties . . . [satisfy] the administrative exception"); *Porter v. MooreGroup Corp.*, No. 17 Civ. 7405, 2021 U.S. Dist. LEXIS 151187, at *30 (E.D.N.Y. Aug. 11, 2021) (granting class certification in unpaid overtime case; common question of "whether defendants . . . had a policy of not paying wages at an overtime rate after an employee worked over 40 hours in a given work week").

Courts also routinely find that evidence similar to that here establishes commonality because it "tend[s] to show that the subsidiary questions involved in resolving [the] exemption [elements] will be answerable through evidence generally applicable to the class." *Myers*, 624 F.3d at 549; *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 415 (S.D.N.Y. 2013) ("uniform classification" and "uniform description of . . . duties" supported commonality); *Youngblood v. Family Dollar Stores, Inc.*, No. 09 Civ. 3176, 2011 U.S. Dist. LEXIS 115389, at *9 (S.D.N.Y. Oct. 4, 2011) (fact that company based its exemption decision on interviews with just 13 of approximately 6,800 store managers supported commonality); *Damassia*, 250 F.R.D. at 156-57 (blanket classification decision and common job description were "probative of [plaintiffs'] actual duties," such that "there are significant elements of proof . . . that do not require an

individualized examination"); *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 909 (7th Cir. 2012)

(commonality met in misclassification case where class member declarations described similar

job duties), *vacated and remanded*, 133 S. Ct. 1722 (2013).

Bloomberg was also centrally organized and controlled. Bloomberg's state-level and

national leadership made all decisions that impacted Bloomberg's strategic planning, staffing,

budgeting, finances, human resources, technology, messaging, and all other areas of importance.

Field Organizers uniformly had no role in any of these areas. Bloomberg's centralized control

extended to each field office in which Field Organizers worked, including setting and tracking

the metrics for each office. *See Perez*, 2014 U.S. Dist. LEXIS 130214, at *19-21, 41-43

(common evidence of job duties included uniform corporate policies); *Jacob*, 289 F.R.D. at 415

(common evidence included "uniform procedures set in place for each store"); *Youngblood*, 2011

U.S. Dist. LEXIS 115389, at *2-3 (common evidence included standardized corporate policies).

Field Organizers' duties are also determined by Bloomberg's strict top-down planning on metric-

setting, turf-allocation, voter targeting, and messaging. *See supra* Statement of Facts § I.B; *cf.*

*Damassia*, 250 F.R.D. at 157 (commonality met where there was testimony about corporate

"protocols" that defined managerial authority).

Significantly, Bloomberg made one, uniform decision to classify the Field Organizer

position as exempt nationwide before hiring any individuals or even creating the job description,

which supports commonality. *Heckle*, 2022 U.S. Dist. LEXIS 225514, at *17 (noting that

"defendant's blanket policy exempting all TCEs from the NYLL's overtime provisions—

regardless of the type of claims they handle or their proficiency level—suggests defendant

'believes some degree of homogeneity exists among the employees, and is thus in a general way

relevant to the inquiry here.'" (quoting *Myers*, 624 F.3d at 549)).

**C.      Rule 23(a)(3): Typicality Is Satisfied Because Plaintiffs' Claims Are Identical to Those of the Class.**

Rule 23(a)(3) is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)). Typicality focuses on "the fairness of allowing an entire class's claim to rise or fall with the fate of the named representative's claims." *Lopez v. Setauket Car Wash & Detail Ctr.*, 314 F.R.D. 26, 29 (E.D.N.Y. 2016) (quoting *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 652 (S.D.N.Y. 2013)). The claims of the named plaintiff and the class "only need to share the same essential characteristics, and need not be identical." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015) (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002)). "[T]he burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 46 (S.D.N.Y. 2013) (quoting *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 40 (E.D.N.Y. 2008)).

Here, proposed Class Representatives Ceppos, Wheatley-Diaz, Coker, Goldstein, Doherty, Newman, Watson-Moore, Logan, and Angulo assert claims that are typical of the claims of the classes they seek to represent. Plaintiffs performed similar job duties as other class members, and like all class members, were subject to Bloomberg's company-wide policies, which significantly limit all Field Organizers' managerial authority and discretion. *See Perez*, 2014 U.S. Dist. LEXIS 130214, at *47 (typicality met where "[named] plaintiffs have established that [all class members], including the named plaintiffs, shared common job duties"); *Jacob*, 289 F.R.D. at 417-18 (typicality met where named plaintiffs' "accounts of the [assistant

manager] duties are largely consistent with one another, and consistent with the majority of the other deposed ASMs' testimony").

### D.      Rule 23(a)(4), (g): Plaintiffs and Their Counsel Are Adequate.

Adequacy under Rule 23(a)(4) "is evaluated in two ways: (1) by looking to the qualifications of plaintiffs' counsel; and (2) by examining the interests of the named plaintiffs." *Hill v. City of N.Y.*, 136 F. Supp. 3d 304, 356 (E.D.N.Y. Sept. 28, 2015) (quoting *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014)). Class Representatives meet Rule 23(a)(4) because they do not have interests antagonistic to the class and they have demonstrated a commitment to the classes by assisting with the prosecution of the case and participating in discovery. *Shahriar*, 659 F.3d at 253 (adequacy requirement met where "class representatives are prepared to prosecute fully the action and have no known conflicts with any class member"); *see also* Swartz Decl. ¶ 19. Class Representatives have participated in numerous rounds of written discovery, including responding to document requests, interrogatories, and requests for admission, and have produced thousands of documents.[69] Swartz Decl. ¶ 20. Class Representatives have also each sat for full depositions. *Id.* ¶ 22. Class Representatives also selected counsel who are "qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson*, 222 F.3d 52, 60 (2d Cir. 2000); *see also* Swartz Decl. ¶¶ 4-13; Palitz Decl. ¶¶ 5-12.

The Court should appoint Outten & Golden LLP ("O&G") and Shavitz Law Group, P.A. ("SLG") (collectively, "Plaintiffs' Counsel") as Class Counsel because they satisfy the requirements of Rule 23(g). Rule 23(g) requires the Court to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable

---

[69]      Further, Class Representatives Wheatley-Diaz and Doherty have endured subpoenas served on their former employer and university, respectively. Swartz Decl. ¶ 21.

law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

Plaintiffs' Counsel have performed significant work and committed substantial resources to investigating and prosecuting the class claims. They engaged in extensive discovery, including preparing responses to 74 total sets of discovery, as well as briefing numerous discovery-related motions; reviewed the over 60,000 documents produced by Bloomberg; prepared Class Representatives and 11 other Plaintiffs and opt-in Plaintiffs for their depositions, for a total of 20 depositions; and took the deposition of four Bloomberg officials. Swartz Decl. ¶ 23.

Courts have appointed O&G as class counsel numerous times because of their "extensive experience prosecuting and settling nationwide wage and hour class and collective actions" and found lawyers at O&G to be "well-versed in wage and hour and class action law." *Clem v. Keybank, N.A.*, No. 13 Civ. 789, 2014 U.S. Dist. LEXIS 42426, at *13 (S.D.N.Y. Mar. 27, 2014); *Strauch v. Computer Scis. Corp.*, 322 F.R.D. 157, 181 n.15 (D. Conn. 2017) (appointing O&G class counsel in overtime misclassification class action); *see also* Swartz Decl. ¶¶ 8, 13. SLG is also regularly appointed class counsel in overtime actions. *See, e.g.*, *Clem*, 2014 U.S. Dist. LEXIS 42426, at *14-15; *see also* Palitz Decl. ¶12.

## IV.    Plaintiffs Meet the Rule 23(b)(3) Requirements.

### A.    Common Questions of Law and Fact Predominate.

Rule 23(b)(3) requires "questions of law or fact common to class members [to] predominate over any questions affecting only individual [class] members[.]" Fed. R. Civ. P. 23(b)(3). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453 (internal quotation marks omitted). "A court examining predominance must assess (1) 'the elements of the claims and defenses to be

litigated,' (2) 'whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief,' and (3) 'whether the common issues can profitably be tried on a class[-]wide basis, or whether they will be overwhelmed by individual issues.'" *Scott*, 954 F.3d at 512 (quoting *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015)).

In a misclassification case, common issues predominate over individual ones so long as the plaintiffs' job duties are "largely similar." *Perez*, 2014 U.S. Dist. LEXIS 130214, at *52; *see also Jackson*, 298 F.R.D. at 166 (minor differences in duties cannot defeat predominance where all class members "have the same primary responsibility"); *Jacob*, 289 F.R.D. at 421-22 (predominance satisfied notwithstanding some slight variations among class members because of significant common evidence of similar duties); *Damassia*, 250 F.R.D. at 160 ("Where . . . there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities."). "Importantly, 'Rule 23 does not impose upon plaintiffs the impossible task of showing that all class members have identical job responsibilities.'" *Heckle*, 2022 U.S. Dist. LEXIS 225514, at *16 (quoting *Romero v. H.B. Auto. Grp., Inc.*, 2012 U.S. Dist. LEXIS 61151, at *19 (S.D.N.Y. May 1, 2012)). "Instead, '[c]ertification is appropriate when the evidence shows that the job duties of the putative class members were largely consistent or when the [evidence] . . . relating to their specific job duties is generalizable.'" *Id.*

As discussed above, common evidence will drive resolution of the merits, including Bloomberg's corporate testimony, a uniform job description, a common exemption policy, the testimony of forty-five Plaintiffs and class members as to their uniform duties, and additional

documents showing Bloomberg's centralized control of Field Organizers' work such as common

scripts and strict metrics.[70] Any small variations in Field Organizers' work experiences, work

locations, job backgrounds, or specific hours worked do not defeat predominance because their

job duties were largely uniform. *Alves*, 2022 U.S. Dist. LEXIS 59122, at *60 ("[C]ourts in this

[d]istrict have found that the types of individual questions that exist in wage-and-hour cases,

such as the hours worked or the exact damages to which each plaintiff might be entitled, are

inevitable and do not defeat the predominance requirement." (quoting *Zivkovic v. Laura Christy

LLC*, 329 F.R.D. 61, 75 (S.D.N.Y. 2018))). It is irrelevant if, for example, some Field Organizers

spent a greater proportion of their time on phone banking or canvassing, as they are essentially

the same duty: contacting potential voters with a script to collect data and information. It is

similarly irrelevant whether some Field Organizers had prior political experiences and others did

not. Such differences "do not eliminate the overriding consistencies present throughout all the

testimony[.]" *Jacob*, 289 F.R.D. at 421. Where, as here, class members all perform the same

uniform set of duties, as confirmed by Bloomberg's witnesses and documents, and uniformly

performed no exempt duties, predominance is satisfied. *See Scott*, 954 F.3d at 513

(predominance requirement not met only where "the primary duty performed by class plaintiffs –

the dispositive question of the exemption inquiry – was not adequately similar"); *see also Jacob*,

289 F.R.D. at 419, 420 (predominance satisfied where all class members "described their jobs as

a mix of a similar set of [non-exempt] duties" and "have experienced that their duties are cabined

somewhat by the ultimate direction of the [store manager] or [corporate] – no matter whether

they pass on information related to hiring or terminations, or not, and no matter whether they

---

[70]      Common evidence will also drive the resolution of Plaintiffs' derivative New York and California claims,
as if a jury concludes that Bloomberg failed to pay overtime wages to the class, it can then determine whether
Bloomberg's wage statements were inaccurate and whether unpaid wages were late.

claim to spend the majority of their time in the office, rather than on the floor, or not").

**B.      A Class Action Is the Superior Mechanism to Any Alternative.**

Rule 23(b)(3) requires courts to determine "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts "routinely hold that a class action is superior where . . . potential class members are aggrieved by the same policy, [and] the damages suffered are small in relation to the expense and burden of individual litigation[.]" *Moreira v. Sherwood Landscaping, Inc.*, No. 13 Civ. 2640, 2015 U.S. Dist. LEXIS 43919, at *39 (E.D.N.Y. Mar. 31, 2015); *accord Hicks v. T.L. Cannon Corp.*, 35 F. Supp. 3d 329, 356 (W.D.N.Y. 2014); *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 126 (S.D.N.Y. 2014).

In determining whether superiority is met, the Court may consider the following non-exclusive list of relevant factors:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Plaintiffs satisfy all four factors. First, where "many of the class members are alleged to be owed only a relatively modest amount which might not justify the cost of individual litigation, . . . pursuing this litigation individually would be a hindrance rather than a boon." *Grenawalt v. AT&T Mobility, LLC*, No. 11 Civ. 2664, 2014 U.S. Dist. LEXIS 139179, at *15-16 (S.D.N.Y. Sept. 29, 2014) (internal quotation marks omitted). Second, Plaintiffs are unaware of any other pending litigation by members of the proposed classes regarding the correct classification of Field Organizers in the Class States. Swartz Decl. ¶ 24. Third, concentrating the litigation in this forum is desirable because Bloomberg's national headquarters operated in this

District, and this Court is familiar with the action, which has been pending here for several years, along with a related case regarding the exemption of Bloomberg's Field Organizers in Massachusetts. *See In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (concentrating class action where case was pending for six years).

Fourth, this case is unlikely to present manageability problems because the claims of potential class members are largely identical across the seven Class States. *Cruz v. Hook-Superx, LLC*, No. 09 Civ. 7717, 2010 U.S. Dist. LEXIS 81021, at *14 (S.D.N.Y. Aug. 5, 2010) (holding that a class action involving misclassification claims of assistant managers under six different state laws was manageable where "the fundamental elements" of each state law claim were "similar" and the "FLSA is the model for each body of applicable state law"); *see also In re U.S. Foodservice*, 729 F.3d at 127 ("the crucial inquiry is not whether the laws of multiple jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues"). Liability will be based on common, generally applicable evidence, including corporate documents and corporate testimony and Plaintiffs' testimony. Following a liability finding, damages could be determined using a class-wide methodology. Nothing in this case—including the analysis of Field Organizers' duties or the hours they worked—is so complex that it would be unmanageable as a class action at trial. Accordingly, a class action is a superior method of resolving these claims on behalf of the proposed classes.

## CONCLUSION

Because Plaintiffs satisfy all elements of Rule 23(a) and 23(b)(3), the Court should grant the motion and certify state law classes of Field Organizers in California, New York, Illinois, North Carolina, Michigan, Minnesota, and Wisconsin; appoint Plaintiffs Ceppos, Wheatley-Diaz, Coker, Goldstein, Doherty, Newman, Watson-Moore, Logan, and Angulo as Class Representatives; and appoint Plaintiffs' Counsel as Class Counsel.

Dated: August 16, 2023
    New York, NY

Respectfully submitted,

By: */s/ Justin M. Swartz*
    Justin M. Swartz
    Michael C. Danna
    **OUTTEN & GOLDEN LLP**
    685 Third Avenue, 25th Floor
    New York, NY 10017
    Telephone: (212) 245-1000
    Facsimile: (646) 509-2060
    jms@outtengolden.com
    mdanna@outtengolden.com

    Hannah Cole-Chu*
    Theanne Liu Svedman
    **OUTTEN & GOLDEN LLP**
    1225 New York Avenue NW, Suite 1200B
    Washington, D.C. 20005
    Telephone: (202) 847-4400
    Facsimile: (202) 847-4410
    hcolechu@outtengolden.com
    tliusvedman@outtengolden.com

    Gregg I. Shavitz*
    Tamra C. Givens*
    **SHAVITZ LAW GROUP, P.A.**
    951 Yamato Road, Suite 285
    Boca Raton, FL 33431
    Telephone: (561) 447-8888
    Facsimile: (561) 447-8831
    gshavitz@shavitzlaw.com

    Michael J. Palitz
    **SHAVITZ LAW GROUP, P.A.**
    830 3rd Avenue, 5th Floor
    New York, New York 10022
    Telephone: (800) 616-4000
    Facsimile: (561) 447-8831
    mpalitz@shavitzlaw.com