# Exhibit 49

IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
DONNA WOOD, CAELAN DOHERTY, MAX GOLDSTEIN, BRIDGET LOGAN, JAMES KYLE NEWMAN, ZIA ORAM, ALAN ROBINSON, ALEXANDRA MARIE WHEATLEY-DIAZ, individually and on behalf of others similarly situated, and CHERYL BALDWIN, JONATHAN BARRIO, DESMOND BATTS, GARRETT BECKENBAUGH, COCHIESE BOWERS, MILES CEPLECHA, ROBIN CEPPOS, MELINDA CIRILO, JANE CONRAD, ROBERT CORDOVA, JR., CHRISTINE DOCZY, RACHEL DOUGLAS, THERESA EDWARDS, ELIZA FINK, JASON FINKELSTEIN, ILSE MENDEZ FRAGA, JOSH FREDRICKSON, MARIA GONZALEZ, NATHANIEL ROBERT GROH, BRANDI HARRIS, PETER KAMARA, MACK KENNEDY, MADISON OLIVER MAYS, PATRICK MCHUGH, FRIDA MICHELLE NARANJO, PAUL MONTEROSSO, REY MURPHY, JOSEPH NESTOR, LUKE NICHOLAS, JOSEPHINE OLINGER, ALEC SILVESTER, DANIEL SMITH, CHRIS SOTH, AUDRA TELLEZ, CARLOS TORRES, ELLIOTT TRICOTTI, GLORIA TYLER, LAKISHA WATSON-MOORE, JESSE WEINBERG, CLEM WRIGHT, ANOOSH YARAGHCHIAN, and JESUS ZAMORA, individually,

Plaintiffs,

-against-          No. 20 Civ. 2489(LTS)(GWG)

MIKE BLOOMBERG 2020, INC.,

Defendant.
-------------------------------------------X

January 19, 2023

ZOOM DEPOSITION OF DANIEL KANNINEN.



Page 34

[redacted]

Page 35

[redacted]

Page 36

[redacted]

11    MR. BATTEN: Justin, before you get into
12  ticking through that list can we take a short
13  break?  It's been about 45 minutes.
14    MR. SWARTZ: Yeah, sure.  How long do you
15  need?
16    MR. BATTEN: Ten minutes?
17    MR. SWARTZ: Yeah, sure.  We'll be back
18  by, let's just take 14 minutes, we'll be back
19  at 11:00.
20    MR. BATTEN: Great, thank you.
21    (Recess taken)
22    MR. SWARTZ: Back on the record.
23  BY MR. SWARTZ:
24    Q   Mr. Kanninen, were you involved in
25  creating the overall compensation structure for the

Page 37

1           DANIEL KANNINEN
2   Bloomberg campaign?
3      A   I was involved in conversations about what
4   that structure might be, yes.
5      Q   Not in any particular state, but
6   campaign-wide?
7      A   For certain elements of the campaign.
8      Q   Which elements?
9      A   Largely within the states team, which was
10  my department.
11     Q   And can you describe what was within the
12  states team?
13     A   Are you asking what roles or what
14  personnel existed within the states team?
15     Q   Yeah.  Just what did you mean when you
16  just said "largely within the states team"?
17     A   What I mean by that is that the states
18  team was, I guess you could call it a department
19  within the campaign.  And that included folks that
20  worked on that team at my direction in New York, and
21  also folks that worked within that department in, in
22  the various states where we were competing for
23  delegates.
24     Q   What positions does that include?
25     A   Dozens of positions.

MAGNA LEGAL SERVICES

DANIEL KANNINEN

Q Okay. It was your understanding during the conversations about how to compensate field organizers that they were to be exempt from being entitled to overtime compensation, right?

A My understanding is that all paid campaign employees, including organizers, would be exempt, as they had been on any campaign I've ever worked on.

Q Right. And did you have an understanding of what exemption to FLSA coverage applied to field organizers?

MR. BATTEN: Objection.

A Could you clarify what you're asking, counsel? I think I understand but I'm not sure.

Q Yeah. Are you aware that employees are generally entitled to overtime unless there's some exemption that covers them? Do you understand that generally?

A I'm generally aware of that, yes.

Q Do you understand that there are a number of exemptions, many exemptions under the Fair Labor Standards Act, right?

A Again, I'm generally aware of that construct.

Q Did you understand a particular exemption

DANIEL KANNINEN

to apply to field organizers at the time that the campaign made a decision about how they were compensated?

MR. BATTEN: Let me just caution the witness not to disclose any conversations with counsel if that's the source of any information that would be responsive to that question. But otherwise please answer.

Q Yes, and that is a good caution, so let me withdraw the question and ask another one really quick. Did you talk to any lawyers about the compensation for field organizers, and if you did, just say yes or no, don't tell me what you talked about with them.

A You mean at the time of setting up the campaign, counsel?

Q Correct.

A I don't recall any conversations at that time.

Q Okay. And did you have any information from others about what lawyers told or advised the campaign with respect to compensation for field organizers at the time the campaign was being set up?

DANIEL KANNINEN

A No, sir, no.

MR. SWARTZ: Kari, could you please read back the question that I asked.

(Record read)

Q That reminded me, let me just ask the question again. So at the time that the campaign made a decision about how to compensate field organizers, were you aware of a particular FLSA exemption that applied to them?

A I can only say, counsel, that I'm only in the broadest terms aware of the construct of overtime exemptions, and I'm not familiar with the specifics of what those exemptions may or may not be.

Q Okay. So there was no particular exemption that the campaign determined applied to field organizers at the time that their compensation structure was being determined?

MR. BATTEN: Objection.

A I was not a part of any.

Q And none of those exemptions crossed your mind or were discussed in any conversations that you were involved in; is that right?

MR. BATTEN: Objection.

DANIEL KANNINEN

A Not that I was involved in.

Q Thank you.

Different topic. The Bloomberg campaign from time to time held national calls; is that correct?

A Could you, could you define what you mean by "national calls"?

Q Do you have an understanding of national calls or if you do, tell me, is there a better term?

A It's a vague term, counsel, it could mean lots of things.

Q Yeah. I'm talking about calls that involved campaign employees throughout the country.

A Yes.

Q Is there a term of art that the campaign used for calls that were calls that involved campaign employees at all levels throughout the company, throughout the country?

A I don't know that it was a term of art, but I know that we had those calls.

Q So for these questions I'm going to use the term "national calls" to describe calls that the campaign held with employees at all levels throughout the country. Okay?



DANIEL KANNINEN

A That's fine.
Q Were you on any such national calls?
A Yes.
Q Approximately how often during the course of the campaign were you on such calls?
A I think the frequency of those calls and my participation varied as the campaign evolved.
Q There were national calls that you were not on; is that right?
A It's possible. I don't recall.
Q Well, would it be fair to say for the most part with a few exceptions you were on all of the national calls?
MR. BATTEN: Objection.
A I'm not sure, counsel.
Q Well, give me some sort of sense of the volume, did national calls happen once an hour, once a day, once a week, once a month, give me some sense of how often they occurred, and if that varied from time to time, then tell me that too.
A It certainly varied. I think, I think at least weekly is probably a fair approximation.
Q So although it varied from time to time during the campaign, it would be fair to approximate

DANIEL KANNINEN

that national calls occurred approximately weekly; is that right?
A For certain durations of the campaign that was probably true, yes.
Q And for other durations did they occur more frequently?
A Or less. It really would depend on which part of the campaign you're talking about.
Q Okay. Can you generalize, as the campaign went on did more or fewer national calls occur?
A I'd have a hard time generalizing. The campaign is pretty dynamic because we were building it from scratch.
Q Well, is there a way to determine who dialed into the national calls?
A Can you clarify by what you mean by who?
Q Yeah. If I wanted to know the list of participants in the national calls, is there a way to find that out?
A That's possible. I don't know if we employed that kind of technology or not.
Q Is there a person who was employed by the campaign who you think would have that information, or people?

DANIEL KANNINEN

A I'm not sure.
Q Is there a department of the campaign that you can at least direct me to?
A I don't think I would have any idea where to direct you to that, to that question, counsel.
Q Okay. Another question. What about selling merchandise, did the campaign sell merchandise?
A I don't recall, counsel, if we sold merchandise or if merchandise was more of a volunteer carrot. I truly don't remember.
Q So is it fair to say that you were not involved in any merchandise sales or decisions with respect to merchandise sales?
A I don't recall. It's possible I was part of a conversation or a couple, but I don't remember any of them.
Q Is there a person you can direct me to or people who --
A No, I cannot.
Q -- I can ask about merchandise sales?
A No, I cannot, I'm sorry.
Q All right. Let's go back to data collection. I'm just going to review our list of

DANIEL KANNINEN

methods of data collection that we made together earlier just so we have it in front of our minds, [redacted]
A Sorry, counsel, just to clarify, the premise of this question was data collection or voter contact?
Q Well, what should have been the premise?
MR. BATTEN: Objection.
A I don't know what, what you're asking about.

Page 54

DANIEL KANNINEN

Q This list that we just went through, are these methods of voter contact?

A Yes.

[redacted]

Page 55

[redacted]

Page 56

[redacted]

Page 57

[redacted]

MAGNA LEGAL SERVICES

15 (Pages 54 to 57)



Page 62

Page 63

Page 64

Page 65

Q And so what about the Bloomberg campaign in particular, you said you were generalizing, what about other campaigns?

MAGNA LEGAL SERVICES

[redacted]

Q Was it important for the campaign to know what was going on in the field at the headquarters

level?

A Yes.

Q Why is that?

A Campaigns are big organizations. There are lots of people working on this in a compressed time frame. Sharing information is good for context. It helps set direction and strategy. And reports can create accountability that allows for better management of a team.

Q And that was true in the Bloomberg campaign specifically?

A That's true in all campaigns.

Q Including the Bloomberg campaign?

A Yes.

MR. BATTEN: When convenient, Justin, I think it would be another good time to take a break.

MR. SWARTZ: Sure. How about five minutes?

MR. BATTEN: Sorry, a five minute break or in five minutes?

MR. SWARTZ: In five minutes. Is that okay?

MR. BATTEN: Oh, sure, sure.

MR. SWARTZ: Hannah, can you please drop in the document that ends in 96899.

Q Mr. Kanninen, I think it's in there, so let me know when you have a chance to download it and then read it.

A I am currently downloading it. It's downloaded, I'm now reading it.

Q Okay. Thanks.

(Witness perusing documents)

A Okay. I have read the document.

Q Okay.

MR. SWARTZ: And can we please mark this as the next exhibit, 24.

(Exhibit 24 was marked for identification.)

Q So you have Exhibit 24 in front of you, marked 96899 on the bottom right hand corner; correct?

A Yes.

Q At the top of the document do you see an email dated February 24th, 2020, from you to Gwen Rocco; is that correct?

A Yes.

Q Referring to the email at the top of the

chain, did you write this email?

A Presumably, yes.

Q No reason to think you didn't, right?

A No.

Q Who's Gwen Rocco?

A Gwen Rocco was a Mike Bloomberg 2020 staffer in New York.

Q Do you know what her job was?

A She was on the communications team.

Q She reported to you?

A I think Gwen had a dual reporting structure, if I recall correctly.

Q Were you one of the people to whom she reported?

A I don't think she was a direct report to me, but -- but that's possible. I don't recall.

Q Do you know who she was a direct report to?

A I think Gwen had responsibility both to the communications director and to the states team. I don't recall if, if -- if that meant me personally or someone else on my team.

Q Who's Mitch Stewart?

A Mitch Stewart was an advisor on the Mike

MAGNA LEGAL SERVICES

DANIEL KANNINEN

Q What about recruiters, have you ever been contacted by a recruiter?

A I have, yeah, I think I have.

Q Have you ever had an opportunity to develop an understanding of what skills are important to be a good recruiter?

A Beyond the kind of general attributes that we discussed here, I'm not sure I would have any other understanding.

Q Same attributes, though?

A I think being persuasive, you know, just as a general statement would apply.

Q Is that something that's important for field organizers who are engaging in recruiting or signing up canvassers?

A It's important for any, any campaign at all levels of the campaign to understand how to persuade individuals or organizations.

Q Including field organizers?

A Sure, yes.

Q Do you know what kind of training field organizers got when they joined the campaign?

A I'm generally aware that we had a training program and some training resources that were

DANIEL KANNINEN

provided to states so they could in turn do additional trainings at the local level. And we had a team that helped build that collateral.

Q Who was on the team that helped build that collateral?

A We had a national training director. And I believe she had, you know, a couple of deputies or support staff on her team in New York. And then many states, maybe not all but many states had a training director within the states as well.

Q Do you know who was in charge of hiring those training directors?

A It would depend by state. In some cases it would be the state director, state leadership that did that. In other cases it may have been a candidate that came through another contact in the campaign, including but not limited to the national training director.

Q Is there any guidance that came from campaign headquarters with respect to hiring training coordinators?

A I'm sure there was some guidance. I don't recall specifically what we put together.

[redacted]

[redacted]

[redacted]

Q Then moving up the chain, it says that Ned Shell seems to have written this email to more than one person, right, it says "hi both"? Do you see that?

A I see that, yes.

Q And it looks like Maia is one of the

MAGNA LEGAL SERVICES



DANIEL KANNINEN

time to do this. I know you're busy. And again, as I said at the beginning, I want to thank you for all the important work that you do, and keep at it.

THE WITNESS: Thanks, Justin, thanks, everyone.

MR. SWARTZ: Take care.

MR. BATTEN: Thank you.

(Time noted: 2:53 p.m.)

ACKNOWLEDGMENT

STATE OF ___________ )
) ss:
COUNTY OF __________ )

I, DANIEL KANNINEN, hereby certify I have read the transcript of my testimony taken under oath in my deposition of 19 January, 2023; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

______________________
DANIEL KANNINEN

Subscribed and sworn to before me this _____ day of _________, 2023.

_________________________________
NOTARY PUBLIC

INDEX

| EXAMINATION BY | PAGE |
| --- | --- |
| MR. SWARTZ | 4 |

EXHIBITS:

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 22 | Transcript of deposition of Daniel Kanninen, held on 9/12/22 | 77 |
| 23 | An email from Megan Simpson ending Bates number 96825 | 77 |
| 24 | Email chain Bates stamped 96899 to 96901 | 83 |
| 25 | Document Bates stampepd 96774 | 95 |
| 26 | Two page document, Bates numbered 92500 and 92501 | 125 |
| 27 | Documents Bates stamped 92506 through 92508 | 151 |
| 28 | Document Bates stamped 97035 | 156 |

CERTIFICATE

STATE OF NEW YORK )
) SS:
COUNTY OF ORANGE )

I, KARI L. REED, a Shorthand Reporter (Stenotype) and Notary Public within and for the State of New York, do hereby certify:

I reported the proceedings in the within-entitled matter and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of January, 2023.

______________________
KARI L. REED

