# Exhibit 51

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.:
20-CV-2489(LTS)(GWG)

- - - - - - - - - - - - - - - - - - - X

DONNA WOOD, et al,
Plaintiffs,

- against -

MIKE BLOOMBERG 2020, INC.,
Defendant.

- - - - - - - - - - - - - - - - - - - X

Via Zoom Videoconference

February 3, 2023
10:07 a.m.

VIDEOCONFERENCED EXAMINATION BEFORE TRIAL OF DANIEL ENSIGN, the Witness herein, taken by an attorney for the Plaintiffs, pursuant to Notice, held at the above date and time before Apryl S. Montero, a Stenographic Court Reporter and Notary Public for the State of New York.

-o0o-



**Q. Can you describe what, a short description, what your job entailed?**

A. Yeah. I served as the, functionally the liaison between various headquarters departments and the teams in the states, so the various state level campaign teams.

I oversaw human resources, IT, HR, and budgeting were my core areas of responsibilities with regards to the states program.

**Q. When you say with regard to the states program, what do you mean by that?**

A. There was a large headquarters operation going on as well, and I had no remand over those sort of portfolio functions for headquarters employees that were not a part of the states team.

**Q. Can you describe or distinguish between the states team and headquarters employees?**

A. Yeah. The states teams was anyone who worked not in headquarters on a state level team, so for illustrative purposes, North Carolina or Texas or whatever -- you know, I think we had operations in somewhere around 35





to 40 states, so those states versus headquarters was focused on different priorities.

**Q. Thank you.**

**So you said that, among your responsibilities, human resources, IT, and budgeting?**

A. That's correct.

**Q. Any other responsibilities, general categories?**

A. Just broader operational support, including offices, leases, et cetera.

**Q. If I asked, what do you mean by broader operational support?**

A. Offices, leases, providing materials, physical materials to the states. That was sort of general operational response -- ops responsibilities, I guess you could say.

**Q. When you say leases, you're talking about leases for various campaign offices in various states?**

A. Yes, correct.

**Q. Any other kind of leases?**

A. Not that I'm aware of.





**Q. Okay. When you say offices, you're talking about the same thing, offices in various states, campaign offices?**

A. Yeah. Those leases were for the field offices, campaign offices.

**Q. Did you have other responsibilities with respect to the offices, other than the leases?**

A. We helped to furnish the offices or equip the teams to furnish the offices. We coordinated with IT, as I mentioned, so on the actually networking and technology that's necessary in the office. That's primarily it.

**Q. What about physical materials? What are you referring to?**

A. Printed -- you know, literature, T-shirts, other -- you know, items that they may distribute to volunteers or supporters.

It could also be furnishing for the offices, so supporting -- you know, if they needed to buy tables or chairs, et cetera.

**Q. With respect to T-shirts, did the campaign sell T-shirts?**

A. We did not.





**Q. I'm going to break it down a little bit further now.**

**Can you describe your HR responsibilities generally, and then I'll ask you some questions about what you described.**

A. Uh-huh.

High level, it's basically the on-boarding process, and then any ongoing support for current employees, followed by, if necessary, working with the HR team at headquarters if employees needed to be off-boarded for any sort of reason.

**Q. Off-boarded is another word for terminated?**

A. That's correct.

**Q. Any other general categories of your HR responsibilities that you can think of?**

A. That's -- those are the major ones.

**Q. Talking about the on-boarding process first, that's the first one you mentioned; right?**

A. Uh-huh.

**Q. And just remember, I know it's not natural, to try to give audible answers --**



A. Correct. That is the first.

**Q. So with respect to the on-boarding process, can you describe your responsibilities and tasks performed with respect to the on-boarding process?**

A. Coordinating between states and the human resources department at headquarters on the physical act of moving an employee through the recruitment process, and then once a decision to hire that person was made, how do we on-board them to get them into our HR system, payroll, and then coordinating with the IT department, making sure that employee has the assets they need to do their job, so a phone, a computer. That was my primary responsibility.

**Q. Did that include on-boarding of field organizes?**

A. As part of the broader on-boarding of all employees in the states, yes.

**Q. What else did the on-boarding process entail?**

A. Those were the major components.

**Q. I'm going to skip to the last one. What about off-boarding? Can you describe**





**the off-boarding process and the tasks with respect to that?**

A. Yes.

Primarily, again, serving as the liaison between the states and headquarters, should a decision be made, whether it was in the states or headquarters, that an employee needed to be terminated for any reason, helping to ensure that HR was involved as necessary so that all proper procedures were followed.

And then coordinating any necessary steps at headquarters to ensure that IT assets were returned or repurposed, if necessary, payroll systems were updated, et cetera, both for employees terminated or if an employee chose to leave of their own will, also helping to coordinate that process.

**Q. You mentioned proper HR procedures; right?**

A. Correct. I did.

**Q. What types of procedures were you talking about?**

A. I don't recall the specifics.

I mostly served as liaison to make sure





that the people in the states were connected with the HR professionals in headquarters to follow whatever steps the HR professionals required for off-boarding employees.

**Q. Why was it necessary to do that?**

A. Because we wanted to ensure that there was structure and process and that people were being terminated, if necessary, in the appropriate and legal way.

**Q. And what about your role with on-boarding? You also mentioned that you were a liaison between the states and headquarters with respect to the on-boarding process?**

A. That's correct.

**Q. Why was it necessary to have that liaison role?**

A. Many of the core HR functions, such as payroll or benefits, were ran out of headquarters, similar to most businesses, so just ensuring that there was a structure and a process so that things were being funneled to the headquarters human resources team in a way that was functional for all parties to resolve issues or get people on board as quickly as





possible.

**Q. Other than payroll and benefits, was there anything else that needed to be -- sorry. New question.**

**Other than payroll and benefits, was there anything that else that your liaison role between headquarters and the states involved with respect to on-boarding?**

A. Yeah. IT, as I previously stated, ensuring that the physical IT assets were delivered to the states so that when employees started they were able to work as soon as possible.

**Q. What about before on-boarding happened? Was there some sort of recruiting process?**

A. There was a recruiting process.

**Q. Did you play a role in the recruiting process?**

A. I was involved in the systems of the recruiting process at the beginning, but not in the recruitment of any individuals specifically.

**Q. What do you mean by systems?**

A. There was a portal for job applicants



**Q. They were dotted-line reports to you?**
A. Correct.
**Q. Can you explain what dotted-line reports meant in this organization?**
A. With respect to my team and my function they were functionally under me because they were operations people, but they also reported to their respective regional directors.
**Q. Okay. Can you tell me what the job duties of regional operations directors were?**
A. They supported a select set of states on the core operations team function, so the same things I previously discussed, human resources, budgeting, IT, other -- you know, we talked about physical assets, those sort of things, just for a subset of states instead of for the whole country.
**Q. Why was it necessary to have a job title?**
A. To the size and scale of the campaign.
**Q. Can you elaborate on that?**
A. We had operations in 35-plus states, and it would be unreasonable for one person to liaise with 35 states on a daily basis.





**Q. That one person being you?**
A. Correct.
**Q. Did you supervise them?**
A. As I've mentioned, it was a dotted line, so I worked with them and helped support them, but they also worked for the regional directors.
**Q. And do you know who the regional directors reported to?**
A. At this -- they reported to Dan Kanninen.
**Q. Okay. Real quick on Lisa Gluck, can you describe her job?**
A. She -- she did special projects, so she just pitched in as an extra set of hands, and she was only on the campaign for about three weeks.
**Q. What about Dominica Wambold? What were her duties?**
A. She was an office analyst. She worked to help us with our offices program that we previously discussed, the physically opening of offices across the country, working with the team that signed leases, et cetera.





**Q. Who was the team that signed leases?**
A. The only -- the lease signing person would have been the CFO for the campaign.
**Q. Did anybody else sign leases?**
A. I don't believe so.
**Q. What kind of things did she do in working with the team that signed leases?**
A. She tracked leases as they moved through the process, so sourcing of potential property, the financial negotiations with the landlord, the lawyers reviewing the lease to make sure it had no issues, so she was -- she just processed, tracked, and reported out on status on that.
**Q. Did anybody else negotiate leases, other than the CFO?**
A. I don't believe so.
**Q. What about Caitlin Graff, operations analyst?**
A. Her primary responsibility was supporting the states and spending money, so she liaised with them if they needed purchases -- you know, they needed a credit card to call in a phone order, kind of thing, and then helping to





track that.
**Q. And what about approve expenses? Did she play a role there?**
A. I don't believe so.
**Q. What about Chris Curry? What was his job?**
A. He supported me wherever necessary.
**Q. What did that mean?**
A. He could function in any of those four core ops functions, and if I needed to task him with something because I was focused on something else, he would step in on that.
**Q. How did his job differ, if at all, from the jobs of the regional operations directors?**
A. He did not have a specific geographic turf.
**Q. Otherwise it was the same job?**
A. He, because he did not have individual states he was responsible for, he served as a likely more senior person who could act in my place if they needed someone more senior to help them, provide guidance, coaching, et cetera.
**Q. Let's talk about your IT**



**responsibilities for a couple minutes, please.**
A. Sure.
**Q. If I'm repeating myself, forgive me, but describe generally your IT responsibilities, and I'll ask you some questions about it.**
A. Yes.
Supporting, the liaising between the headquarters IT function and the states to ensure the teams in the states had the IT assets necessary to do their jobs, the primary focus being making sure people received their computers and phones when on-boarded, making and then also helping with -- with regards to the offices, making sure that they were supported in getting Internet and networking equipment and any other IT assets forwarded to the offices.
**Q. And when you're talking about computers and phones, what job titles in the various states were provided with computers and phones?**
A. I believe every campaign employee was provided with a computer and phone.
**Q. So that included field organizers?**
A. That is correct.





**Q. Why did the campaign provide the field organizers with computers?**
A. Because, to allow them to do their jobs, I assume so.
**Q. Can you give me more specifics about why they provided them with -- why it was necessary to give them computers to do their jobs?**
A. So that they can send emails or view files, if necessary.
Most -- many jobs provide computers these days.
**Q. What about phones? Why was it necessary to provide field organizers with phones?**
A. So that they had something to make calls or send text messages and communicate with their peers or teams as necessary.
**Q. Were there any apps that were installed on the field organizers' phones?**
A. I don't recall.
**Q. Do you recall whether there were any, even if you don't recall the names of them?**
A. I recall we used gmail for email, and





that is the only specific app that I can recall.
**Q. What about any particular software that field organizers used on their computers? Are you familiar with that?**
A. No.
**Q. But you were in charge of IT. That didn't fall within your responsibilities?**
A. I liaised between the IT team, but we were focused more on the devices versus the actual software.
**Q. I got it.**







62

63

64

65

**Q. The next bullet point says what a pain in the gas.**

A. Yes.

**Q. What's that about?**

A. One moment. Let me read this.



106

107

108

109

**Q. So in your experience working for the campaign, did each state have the authority to implement a payment process guide to make sure how vendors were getting paid, or was that a headquarters task?**

A. That, ultimately at the end of the day, vendors were paid by headquarters, unless it was extenuating circumstances, but again, it's not a situation you can look at organization-wide, because it did vary state by state.



MAGNA LEGAL SERVICES



[redacted]

**Q. You can put the document aside for a second. Now I'm asking you a separate question.**

**Did the campaign headquarters issue hiring guidelines to the states?**

A. There was guidelines about how the flow of hiring should work, but beyond that, I was not involved in the hiring of most of the state employees.

**Q. What about an off-boarding form? Did the campaign headquarters provide an**

**off-boarding form to the states?**

A. Yes. I believe that form was a form that, when a decision was made to off-board an employee, the states filled out so that it notified the relevant departments from the back end to deactivate IT, if necessary, payroll update, et cetera.

**Q. What's a vendor request form? Do you know?**

A. I don't recall specifically.

**Q. Do you recall at all?**

A. I don't know the details of that.

**Q. Do you know generally what a vendor request form is, even if you don't know the details?**

A. I don't. Sorry.

**Q. Those words don't mean anything with respect to the campaign?**

A. Not without knowing what's linked to that document, no.

**Q. I'm not talking about any particular document.**

**The words vendor request form, do those words mean anything to you with respect to the**

**Bloomberg campaign?**

A. No.

**Q. But your direct report Chris Curry was in charge of issuing these operations team daily updates; right?**

A. Correct.

But as I said, without seeing what the document is linked to, I can't.

**Q. He reported directly to you; right?**

A. That's correct.

**Q. Ultimately you were responsible for what he did; right?**

MS. PHILION: Object to form.

A. As I've said, I don't recall what the specific links are, so I can't comment on what the vendor request form that is linked here.

**Q. That wasn't my question. My question was different.**

**You were responsible for what Chris Curry did, right, as his supervisor?**

A. That is correct.

MS. PHILION: Objection to form.

MR. SWARTZ: Hannah, 97381, please.

(Whereupon, a brief discussion was

held off the record.)

(Whereupon, Plaintiff's Exhibit Number 6, email, was deemed marked for identification as of this date.)

THE WITNESS: I see this document.

[redacted]





118

[redacted]

119

[redacted]

120

CONFIDENTIAL -- Daniel Ensign
Let's take five minutes, please.
(Whereupon, a recess was taken from 1:42 p.m. to 1:49 p m.)
**Q. Mr. Ensign, do you know what an auto dialer is?**
A. I don't know the specifics.
**Q. Do you know generally what an auto dialer is?**
A. It's a tool for helping campaigns make phone calls to the field in a more efficient way, but that's the extent of my knowledge.
**Q. Did the Bloomberg campaign use auto dialers?**
A. I'm not sure.
**Q. In your capacity as a person in charge, partially in charge of IT, you didn't come across auto dialers at all?**
A. As I previously said, we're more about the physical hardware than the tools and that type of thing, so I'm not sure about the auto dialer.
**Q. I see. So what about VAN or VoteBuilder? Are you familiar with those terms?**
A. I'm familiar with those terms.

121

CONFIDENTIAL -- Daniel Ensign
**Q. What do you understand?**
A. I did not use either VAN or VoteBuilder in the Bloomberg campaign, so I'm not sure of the context or use of that.
**Q. What's your understanding of what the terms VAN or VoteBuilder mean?**
A. In my past capacity, VAN or VoteBuilder is a tool campaigns use to manage voter lists and voter outreach.
**Q. And when did you learn about VAN or VoteBuilder?**
A. I believe I've used, it would have been the O'Malley campaign, most likely.
**Q. Can you elaborate on what you used them for on that campaign?**
A. I would not have used them either way. But as part of my capacity on the campaign I approved invoices, so I would have been familiar with it from the context of paying the bill.
**Q. All right. You said that part of your portfolio included budgeting; is that correct?**
A. That is correct.
**Q. Budgeting for what?**

**CONFIDENTIAL -- Daniel Ensign**

A. The budget for the states program for nonpaid media.

**Q. What does that mean, nonpaid media?**

A. Paid media would be TV advertising, and that ran from a different budget.

This would be referring to high-level office and personnel budgets as well as programmatic budgets, so funds used to do the programs in the states and beyond that.

**Q. That was part of what you were in charge of; right?**

A. That was a part of my portfolio, yes.

**Q. Are you familiar with the concept of a worker being exempt or nonexempt from overtime entitlement?**

MS. PHILION: Objection to the form.

A. I'm aware but not familiar with the details.

**Q. In your capacity at the Bloomberg campaign, did you ever participate in any conversations or discussions about whether field organizers would be classified as exempt or nonexempt from overtime entitlement?**

A. I did not participate in those



CONFIDENTIAL -- Daniel Ensign

discussions.

**Q. Are you aware of any discussions like that ever having occurred?**

A. Not that I'm aware of.

**Q. Are you aware of whether the campaign collected data for any purposes at all?**

MS. PHILION: Object to form.

A. In my role as operations director, the campaign was not involved in that, so I don't -- I don't know.

**Q. Do you know whether the campaign collected data for any reason at all?**

A. I don't know.

MS. PHILION: Object to the form.

**Q. You don't know?**

A. I don't.

**Q. Do you know what roo-tack [phonetic] is?**

A. I believe it was a piece of software used, but I don't know the details beyond that.

**Q. By the way, do you know where Maya Johnson works right now?**

A. I don't.

**Q. Would you know how to get in touch**



**CONFIDENTIAL -- Daniel Ensign**

**with Maya Johnson?**

A. I do not.

MR. SWARTZ: Give me an another five minutes, and then I might just come back and wrap up; okay?

MS. PHILION: Sure.

(Whereupon, a recess was taken from 1:55 p.m. to 1:58 p.m.)

**Q. Mr. Ensign, Hannah and I have different recollections of whether you spoke of Luke Gill, G-I-L-L, or Luke Till, T-I-L-L. Which one was it, or something else?**

A. Luke, L-U-K-E, G-I-L-L.

**Q. G-I-L-L. Okay.**

A. Yeah.

**Q. Luke Gill, do you know where Luke Gill works now?**

A. I don't.

**Q. Are you in touch with Luke Gill?**

A. I'm not.

**Q. Do you know who Luke Gill's supervisor was?**

A. I don't recall.

**Q. Do you know whether the field**



**CONFIDENTIAL -- Daniel Ensign**

**organizers sometimes traveled between states to canvas?**

A. I don't know.

**Q. What's your understanding of what a field organizer's primary job duty was?**

MS. PHILION: Objection.

A. My general understanding was that they were to support Mike's campaign in their given turf or area of responsibility, but beyond that, I was not on the organizing team, so I'm not -- I can't explain beyond that.

**Q. Did you ever approve any Hawkfish invoices?**

A. I don't believe so.

**Q. Was Hawkfish any part of the budget that you were in charge of?**

A. I don't believe so.

MR. SWARTZ: I don't have anything further. We're going to leave this deposition open because there are a number of production disputes outstanding at this point, and so there's a chance that we may need to seek to call you back.



CONFIDENTIAL -- Daniel Ensign

C E R T I F I C A T I O N

STATE OF NEW YORK )
)SS :
COUNTY OF NASSAU )

I, APRYL S MONTERO, a Notary Public for the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place, that said witness was duly sworn or affirmed before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness

I further certify that I am not related to any of the parties to this action by blood or by marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel

IN WITNESS WHEREOF, I have hereunto set my hand this March 3, 2023

APRYL S MONTERO

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter )

-o0o-

