# Exhibit 53

Daniel Kanninen  30(b)(6)
September 12, 2022

```
            IN THE UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF NEW YORK


RODNEY SINCLAIR, individually and on:NO.
behalf all others similarly situated:20Civ.4528(KMW)(GWG)
                                     :
          Plaintiffs,                :
                                     :
     -vs.-                           :
                                     :
MIKE BLOOMBERG 2020, INC.,           :
                                     :
          Defendant.                 :
```

                     SEPTEMBER 12, 2022




               ZOOM VIDEOCONFERENCE 30(b)(6) DEPOSITION OF

DANIEL KANNINEN, held via remote teleconference hosted by

U.S. Legal Support, located at 1818 Market Street, Suite

1400, Philadelphia, Pennsylvania, on Monday, September 12,

2022, at 10:00 a.m., before Michelle Keys, a Stenographer

and Notary Public of the Commonwealth of Pennsylvania.

Daniel Kanninen  30(b)(6)
September 12, 2022

Page 26

1          What does "organizing" mean?
2   A.     Are you asking that in the context of a
3   campaign or in general?
4   Q.     Yeah.  As in this is called the organizing
5   department.  And I'm just curious what the word
6   "organizing" means in that context.
7   A.     Yeah.  Organizing in the term -- in the -- in
8   the context of democratic campaigns I would say
9   usually refers to what may have previously been
10  referred to as the field department of -- of
11  campaigns.  At some point, the term of art changed.
12          And organizing largely refers to
13  those activities that are done by field organizers,
14  which is a position in a campaign.  And, again,
15  refers to the work done on the ground as opposed to
16  work that could be done more remotely.
17  Q.     And a couple things you mentioned.  One is
18  door knocking.
19          Can you explain what door knocking
20  meant on the campaign?
21  A.     Sure.
22          Door knocking, which could also be
23  referred to as canvassing is simply the -- the
24  tactic -- the campaign tactic of -- of building an
25  infrastructure of volunteers largely, sometimes

Page 27

1   staff, who physically knock on doors in a targeted
2   neighborhood perhaps using a targeted list to have
3   direct contact with either voters or perhaps
4   volunteers.
5   Q.     And I think you said infrastructure of
6   volunteers and sometimes staff.
7          So is it true that both volunteers
8   and staff would engage in door knocking?
9   A.     It would really depend region by region,
10  state by state, turf by turf.
11  Q.     And how would it -- what would it depend on?
12  A.     Quite a few things, I'd imagine.  First, it
13  would depend upon the plan a state or a region in
14  that state had in the context of our campaign.  We
15  had a variety of approaches in each state which may
16  have been different.  And so the type of tactics and
17  also how they went about using their resources to
18  engage in those tactics could have been different.
19          It also could have been different
20  based upon the capacity, resources, or performance
21  of a particular region within a state.
22  Q.     And you also mentioned phone calls.
23          What does that refer to?
24  A.     Phone calls like -- like canvassing or door
25  knocking is a direct voter contact activity, meaning

Page 28

1   volunteers or staff are picking up the phone and
2   calling into a list either of prospective voters or
3   perhaps prospective volunteers.
4   Q.     You mentioned a plan for a particular state
5   or region.
6          Can you tell me more about what
7   the -- the organizing plan would have been for
8   Massachusetts?
9   A.     I don't have a specific recollection of what
10  the Massachusetts plan might have been.
11  Q.     Was there a Massachusetts organizing plan?
12  A.     I believe that every state that had an
13  organizing director and staff would have had an
14  organizing plan.  So I assume so.
15  Q.     And would that plan have been created by
16  Ms. Simpson, the national organizing director or by
17  someone else?
18  A.     Again, I can't speak to Massachusetts with
19  clarity, but generally speaking the plans would have
20  been created at the state level, but using guidance
21  and perhaps approval from the national team.
22  Q.     And what types of things would be in a
23  state's plan?
24          MR. BATTEN:  I'm sorry.  I didn't
25      hear that question.

Page 29

1   BY MR. DANNA:
2   Q.     I said:  What types of things would be in a
3   state's plan?
4   A.     Do you mean the type of tactics that they
5   might have in the plan?
6   Q.     That -- sure.
7          I'm just asking generally as someone
8   not familiar with what a plan would look like or
9   contain.  You know, what would be -- what would be
10  in there?
11  A.     Yeah.  Well, at the simplest level, any
12  campaign plan from any department would involve a
13  distillation of the staff, their rules, their scope
14  of work, their capacity, their structure.  It would
15  have involved -- it would involve a timeline for
16  building that team.  Usually referred to as a ramp.
17  It would have involved a timeline of activities and
18  tactics and a definition of those activities and
19  tactics.  Also sometimes referred to as a ramp.
20          In other words, this week we're going
21  to do so many of these things, and next week we're
22  going to do these activities at this level.  It
23  might include a budget or requested budget.
24  Q.     Does the state plan reflect the campaign
25  strategy for that particular state?

Daniel Kanninen  30(b)(6)
September 12, 2022

Page 30

1  A.    A state plan should reflect to be responsive
2  to the strategy, yes.
3  Q.    And when you said "a requested budget," is
4  there someone at the national level who would
5  approve a state's requested budget?
6  A.    Yes.  There were multiple players in that
7  kind of decision-making process.  Both from a
8  departmental level, so field department, organizing
9  department, communications department, paid media,
10 and then, of course, leadership in headquarters.
11 Q.    And who at the state level -- and, again, I'm
12 referring specifically to Massachusetts, if you
13 know.
14        Who at the state level would create
15 their state's plan?
16 A.    I don't think the state -- the -- sorry.
17        Are you asking at the state level who
18 would create the state's plan?
19 Q.    Yes.
20 A.    Generally speaking, I would expect states to
21 get guidance from their national department heads
22 that helped in a template form direct them.  And
23 then the state department leads -- so that could
24 include communications, digital, organizing, et
25 cetera, would in turn take that template and create

Page 31

1  a plan tailored to their state.  And then state
2  leadership would synthesize all of that into a
3  single state's plan and send it back up to
4  headquarters.  Generally speaking, that's how I
5  would expect it to operate.
6  Q.    And why would they send it back up to
7  headquarters?
8  A.    Every plan of any campaign needs to be
9  tethered to a central strategy consistent with the
10 candidate's core message and -- and political
11 objectives.  And so at every level of the campaign,
12 you want good coordination and visibility into the
13 plan.
14 Q.    And that central strategy including the
15 candidate's message and objectives, is that
16 determined at the -- the national headquarter's
17 level?
18 A.    Is the national strategy determined at the
19 headquarters level?  Is that the question?
20 Q.    Yes.
21        You mentioned that every state plan
22 needs to be tethered to a central strategy.  And I'm
23 asking if that central strategy is created by the
24 national headquarters of the campaign.
25 A.    Sure.

Page 32

1        I would say that the national
2  strategy, meaning distilling, you know, into a short
3  concise, few bullets, the path to victory is done
4  first nationally, as for the frame, and then
5  provided to states seeking their input to tailor
6  that in a way that fits the politics, the resources,
7  and the voting constituency on the ground.
8  Q.    And when you said "every level needs good
9  coordination," what did you mean by "good
10 coordination"?
11 A.    Well, campaigns, you know, at their root are
12 about time and -- and communicating to the right
13 constituency of voters effectively.  And so
14 decisions that are made both at the state level need
15 the benefit of understanding, for example, if paid
16 media would be coming into their state or not.
17 Similarly, decisions of the national level would be
18 better made with information about what's happening
19 on the ground and how it's going.
20 Q.    And I'm going to jump back to this -- this
21 exhibit.
22        So kind of in the middle on that row
23 is the "East Regional Director, Rob Diamond."
24        Could you tell me what was the East
25 Region?

Page 33

1  A.    There may be some modification to this, but
2  generally speaking, the regions were constructed
3  based on time zones.  So for the most part -- and,
4  again, there may have been a couple exceptions.  But
5  for the most part, the states in the Eastern Region
6  would have been states in the Eastern time zone.
7  Q.    So Massachusetts was in the East Region?
8  A.    That's my recollection, yes.
9  Q.    What was the role of the East regional
10 director?
11 A.    The East regional director, like all the
12 regional directors, served as the head of what we
13 sometimes casually refer to as the "pod."  And the
14 pod are staffers who act as desks or liaisons for
15 their departments.  And they have a corresponding
16 person in the states that helps ensure good
17 information flow and coordination.
18 Q.    Okay.  One more on this page.  Over on the
19 right, there's a title called "Director Organizing
20 Technology."
21        What does that refer to?
22 A.    That's a good question.  That's -- that could
23 refer to a few different things.  I have a vague
24 recollection that that particular role evolved over
25 time.  So I'm not exactly sure what that -- that

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 34

1  staffer did with respect to the states at this
2  juncture versus later.  I could speculate as to what
3  the role ended up being, but I think that was one
4  that shifted a bit.
5  Q.    Is there anything that you know without
6  speculating about what the director of organizer
7  technology did on the campaign?
8  A.    At a very early stage, I know that that
9  particular person -- and it may not have been in
10 that -- that title at that point -- helped to
11 identify some, but not all, the platforms or tech --
12 tech tools that -- that states might employ to
13 assist their organizing efforts.
14 Q.    Were there any other departments or teams
15 responsible for identifying platforms and tech tools
16 that states employed?
17 A.    I'm sure the organizing department
18 contributed to that discussion quite a bit, being
19 the team that, you know, helped build the structure
20 and manage those employees.  They would have had
21 a -- have equities in the tools they used, for sure.
22 Q.    Okay.  And the next page of this document,
23 page 2, it appears to be focused on the East Region.
24 And we have that same "Regional Director, Rob
25 Diamond" at the top.  And then below him, there is a

Page 35

1  title here "Deputy Regional Director."
2              What was the role of the deputy
3  regional director in the East Region?
4  A.    So the deputy regional director in the
5  East -- and I think this is consistent across all
6  the regions -- would have been the number two in
7  that pod structure.  And what you're looking at here
8  is that pod I described a minute ago.  The deputy,
9  you know, functionally is the number two to the
10 regional director.
11             In some states, the deputy -- sorry.
12 In some regions, the deputy and the regional
13 director split their duties in different ways.  You
14 know, some tackling a particular scope and the other
15 tackling another scope.  So in that way, worked on
16 as partners as much as a subordinate relationship.
17 Q.    Okay.  And -- and I'd like go through at
18 least some of the -- the departments on the next
19 line and just understand what they did and what the
20 titles did.
21             I see one here in the middle called
22 "Regional Finance Lead."
23             What would have been the role of the
24 regional finance lead in the East Region?
25 A.    I believe the finance lead largely interfaced

Page 36

1  with the New York operational and -- and fiscal team
2  on some of the financial operations components.  I
3  have recollection that we expanded the operations
4  team with this finance lead to help have a very
5  clear cohort or -- or -- or corresponding staffer
6  in -- in New York to work with the states so that
7  issues involving transfer of -- of resources were
8  seamless.  Or as best as possible, they were
9  seamless.
10 Q.    So just so I understand, there was an
11 operations team in New York that would work with the
12 East regional finance lead on fiscal issues in the
13 states in the East Region.
14             Is that what you said?
15 A.    Yes.  Although as I look at this document,
16 and -- and, again, I'm not sure if this ended up
17 being the final org chart.  And I'm struggling to
18 recall if -- if that's, in fact, the position title
19 we landed on.  In part because in -- in most
20 campaigns, a finance lead would refer to a
21 fundraising lead, which is not a -- a department we
22 had on our campaign.  And so I'm -- I'm actually not
23 sure entirely if that's maybe an early org chart
24 that assumed that role that never actually was
25 created, or perhaps this became that sort of budget

Page 37

1  role that I described earlier.  I don't recall with
2  precision.
3  Q.    Okay.  And you mentioned a fiscal team in
4  New York that --
5              THE STENOGRAPHER:  You're coming in
6         muffled.
7              MR. DANNA:  Sorry about that.
8  BY MR. DANNA:
9  Q.    So you mentioned a fiscal team in New York
10 that this role may have interfaced with.
11             What would have been the
12 responsibility of that fiscal team in New York?
13 A.    I probably couldn't speak to the entire
14 responsibility of that team, as that would have been
15 outside the purview of my -- my job.  I could only
16 speak to how our team interfaced with them.
17 Q.    Yeah, that's fine.  I'd just like your -- you
18 know, your knowledge of what the fiscal team did.
19 A.    Yeah.  My understanding of how our -- our
20 states team would have engaged the broader fiscal
21 team is that in the mechanics of -- of everything
22 involving money and the states teams -- so that
23 could be payroll, that could be leases and rent for
24 offices.  I don't think it extended to paid media,
25 but in theory it could have extended to the -- the

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 38

1  processing of -- of those payments.  That was a bit
2  out of our purview.  But those kind of logistics
3  would have been the -- the relationship.
4           So if we knew, for example, that we
5  were going to be onboarding a bunch of staff, you
6  know, anywhere, ensuring the fiscal team -- and,
7  again, I'm not sure that that's what they were
8  called.  It's a casual term I'm using.  To stay
9  ahead of those things, they weren't surprised, was
10  how we would engage with them.
11  Q.    Was there -- if it wasn't this regional
12  finance lead title, was there someone else in the
13  East Region who was overseeing state budgets?
14  A.    I think the operations team would have had a
15  line of sight into state budgets, as well as perhaps
16  the leadership in the region depending upon their
17  focus.
18  Q.    So then on this org chart, jumping over a
19  bit, there is a "Regional Operations Director."
20           When you say "the operations team,"
21  are you referring to a team that would have been led
22  by a regional operations director?
23  A.    Yes.  Although I don't think -- I make one
24  caveat to that.  I don't think the regional
25  operations director led, you know, a states -- an

Page 39

1  operation team in New York.  I would describe that
2  role somewhat differently.
3  Q.    How would you describe the regional
4  operations director role?
5  A.    I would describe the regional operations
6  director role first and foremost as being a liaison
7  to the state operations director in all the states
8  in which they had geographic equities.
9           So for the East, this role would have
10  been the direct point of contact for a state
11  operations director in all of the states we had
12  staff in the Eastern time zone.  And as a liaison,
13  that could mean giving them guidance, templates,
14  establishing processes for budget approvals or for
15  fiscal approvals or dealing with payroll issues or
16  office leases, that sort of thing.
17  Q.    So the regional operations director would
18  liaise with the Massachusetts state operations
19  director; is that right?
20  A.    Generally speaking that's how it would work,
21  yes.
22  Q.    And what as the role of the Massachusetts
23  state operations director?
24  A.    Speaking generally to what operations
25  directors do in most states, I would assume that

Page 40

1  their role would have been to help with those
2  logistical tasks I've described.  For example, the
3  onboarding of personnel, offices, maybe tech and
4  supply issues.
5  Q.    And when you say help with the things that
6  you just listed, what does that mean in practice?
7           What would they be doing?
8  A.    Well, in practice -- and I should say I've
9  never been a state operations director, so I'm, you
10  know, giving this comment based upon having managed
11  folks that manage them.
12           My understanding is that in practice,
13  it could be, you know, ensuring that, you know,
14  whatever inputs into a payroll system were made
15  properly, right?  Ensuring that your New York
16  operations director knows about the plans to onboard
17  anyone in the state, you know, or offboard anyone in
18  the state.  That you're working hand in glove with
19  the state -- the New York team on things like
20  identifying places for -- for offices.  Maybe
21  vetting those places to ensure they make sense,
22  executing a lease.  So they might be the person in a
23  state who actually performs these kind of tasks.
24  Q.    Did the East Region have a regional HR
25  director?

Page 41

1  A.    I -- I believe all the regions had an HR
2  director, at least someone identified as the point
3  person for that responsibility.
4  Q.    And what was the role of the regional HR
5  director?
6  A.    The HR leads in -- in New York -- and I don't
7  recall if we established them as directors versus
8  leads versus a liaison.  I apologize.  But that role
9  would have been to be a point person to deal with HR
10  issues, employment issues that arose in the states.
11  Q.    And can you give some examples of the HR
12  issues or employment issues that you just referred
13  to?
14  A.    Sure.
15           I'm speaking generally here, not with
16  any specific knowledge to Massachusetts or any other
17  state.  But generally speaking and typical of most
18  campaigns and really any organization with the
19  number of staff we're dealing with here, there are
20  the rare but unfortunate issues which I would
21  describe as HR issues, including nonperformance,
22  could include insubordination, could include
23  harassment, that type of claims.
24           Those in particular, if they
25  occurred, would have been elevated I think pretty

Daniel Kanninen  30(b)(6)
September 12, 2022

Page 42

1  quickly to the HR leads to ensure what they were
2  dealt with in a professional manner and appropriate
3  manner.
4  Q.    Was there a Massachusetts state HR lead or
5  director?
6  A.    I don't recall if we established that role or
7  if Massachusetts themselves established that role.
8  They may have.
9  Q.    If Massachusetts didn't have a separate HR
10  lead role, is there a different role or department
11  in Massachusetts that would have done those same
12  functions?
13  A.    I can't speak to what Massachusetts did, but
14  generally speaking, those roles would -- those
15  functions would often flow through an operations
16  team in a state.
17  Q.    Did the campaign have a legal department?
18  A.    We definitely had counsel.  I don't know that
19  I would refer to them as a department.  Perhaps they
20  were.
21  Q.    When you say "had counsel," does that refer
22  to internal employees of the campaign or external
23  counsel?
24  A.    That's why I hesitate to -- to be super
25  clear.  I don't know if -- if the lawyers

Page 43

1  representing the campaign would have been internal
2  employees versus, you know, firms on contract for
3  various purposes.
4  Q.    Did the -- did Massachusetts have its own
5  legal counsel?
6  A.    I don't know.
7  Q.    I'm going to switch to another exhibit.
8         MR. DANNA:  This is Exhibit 3.  It
9         has a Bates number ending in 15832.
10             -  -  -
11         (Whereupon, Exhibit 3 was marked for
12         identification.)
13             -  -  -
14  BY MR. DANNA:
15  Q.    And, Mr. Kanninen, do you know what this is?
16  A.    Only by reading the document itself.
17  Q.    Can you tell me your understanding of what
18  this is?
19         MR. BATTEN:  Objection.
20         THE WITNESS:  This appears to be an
21         email regarding operations team -- team
22         updates.
23  BY MR. DANNA:
24  Q.    Who is Chris Curry?
25  A.    Chris Curry was a member of the states team

Page 44

1  in New York on the operations team specifically.
2  Q.    And on the bottom of this first page, there's
3  a bullet point that says "Don't sign on the dotted
4  line."
5         Do you see that?
6  A.    I do.
7  Q.    And this says "At no point should anyone in a
8  state be signing contracts.  There are only a few
9  authorized signers on the campaign, and they are all
10  on the finance team at HQ."
11         What does that mean?
12         MR. BATTEN:  Objection.
13         THE WITNESS:  To me, it would mean
14         exactly what is written in this -- in this
15         email.
16  BY MR. DANNA:
17  Q.    In your own words, then, could you state what
18  you think it means?
19         MR. BATTEN:  Objection.
20         THE WITNESS:  This appears to be
21         guidance to states about who is authorized
22         to sign contracts and who is not.
23  BY MR. DANNA:
24  Q.    What contracts is this email referring to?
25  A.    I couldn't speculate to what contracts this

Page 45

1  email refers to.
2  Q.    What is an authorized signer to the campaign?
3         MR. BATTEN:  Objection.
4         THE WITNESS:  Again, I'd be
5         speculating without knowledge of what this
6         conversation -- this operations thread was
7         about.
8  BY MR. DANNA:
9  Q.    Did anyone in Massachusetts have authority to
10  sign contracts on behalf of a campaign?
11  A.    I don't know.
12  Q.    What's the role of the state director in
13  Massachusetts?
14  A.    Generally speaking, a state director is the
15  most senior staff in a particular state for the
16  campaign and would be in charge of -- of building
17  the team around them and ultimately the person in
18  charge of the execution across all departments of
19  campaign tactics in that state.
20         MR. DANNA:  Okay.  I'm going to
21         introduce Exhibit 4.
22             -  -  -
23         (Whereupon, Exhibit 4 was marked for
24         identification.)
25             -  -  -

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 46

```
1   BY MR. DANNA:
2   Q.    This one I think is the -- the file size is
3   too large, so I think I'll just screen share.
4             Okay.  So this is a document that
5   begins with Bates number 11260.  It's a 134-page
6   document.  But just, you know, based on the first
7   page, Mr. Kanninen, I'll ask if you have seen this
8   or have an understanding of what -- what it is.
9   A.    I have seen this document in preparation for
10  this deposition.  I do not know who created this
11  document or where it lived in the draft-to-final
12  plan process within the campaign.
13  Q.    What is this document used for?
14  A.    Again, I don't know exactly what this
15  document is or from what it came from.  So it's --
16  it's hard for me to say that it was used really at
17  all.
18  Q.    Okay.  I'm going to switch down to page 54.
19            And so this is the portion of the
20  document that starts at Bates number 11313.  And I
21  understand your statements about your knowledge of
22  this specific document.  So when I'm using this
23  exhibit, I'll just be asking questions about the
24  roles it refers to.  But I do understand your
25  statements about the document itself.
```

Page 47

```
1             So here it says "Massachusetts state
2   director."  And in one of the bullet points under
3   "Responsibilities," it says "Accountable for
4   reaching statewide goals and metrics outlined in the
5   field plan by regional states director."
6             Do you see that?
7   A.    I do.
8   Q.    So earlier we had talked about a state plan
9   for Massachusetts.
10            Is that the same thing as a field
11  plan, or is a field plan something different?
12  A.    I -- I don't know what a field plan referred
13  to.  And as I mentioned earlier, the field
14  department is how we used to refer to -- and by
15  "used to," I mean several -- several campaign cycles
16  ago, maybe 2012.  It would have said the field
17  department, and then that shifted to organizing
18  department at some point.  So this could refer to
19  the organizing department.  It could refer to something
20  different.
21            It's a term that doesn't make a lot
22  of sense in the context of a document like this,
23  which is again why I -- I say not knowing if this
24  was a draft written by an assistant or it's
25  placeholder language.  It's hard to understand what
```

Page 48

```
1   was meant by that.
2   Q.    Okay.  And are you familiar with the terms
3   "statewide goals and metrics"?
4   A.    Yes.
5   Q.    And what do those terms refer to?
6   A.    Generally we would provide goals, you know,
7   both for states, for departments, perhaps.  And
8   those goals would be associated with some kind of
9   metrics to track progress and to help us revisit
10  goals, should that be necessary.
11  Q.    And you say "we would provide goals for
12  states."  Who do you mean by "we" in that sentence?
13  A.    Very generally speaking, campaign leadership.
14  And by -- that, I mean, in this case, maybe
15  states leadership.  So our -- our core team in New
16  York might establish some -- some broad goals.
17  However, we would also rely upon state leadership to
18  create tailored goals specific to their teams and
19  their states, and then work in partnership to
20  identify the metrics that we agreed we would track
21  and perhaps establish whatever numeric goal within
22  those metrics might be appropriate.
23  Q.    So the campaign's goals and metrics were
24  determined by the leadership teams in New York and
25  the state leadership at the state level; is that
```

Page 49

```
1   right?
2   A.    It's probably worth being more clear what you
3   mean by "the campaign's goals and metrics," because
4   there were obviously several different versions of
5   goals and metrics across the organization.
6   Q.    So here I'm referring to any goals and
7   metrics the campaign had that applied to
8   Massachusetts specifically.
9             So my question would be:  For goals
10  and metrics applying to Massachusetts, is it right
11  that those goals and metrics would be created by
12  campaign's leadership in New York and the state
13  leadership team in Massachusetts?
14  A.    It would depend, I think, on -- on the
15  particular department, the particular goal, and the
16  metric.  Generally it's fair to say that goals and
17  metrics identified at the leadership level in
18  New York would be discussed with the leadership
19  level in Massachusetts to ensure they were
20  consistent and made sense given the facts on the
21  ground.
22  Q.    And what are some examples of goals and
23  metrics?
24  A.    Well, the number one goal and metric would
25  have been delegates across the entire national
```

Daniel Kanninen  30(b)(6)
September 12, 2022

Page 50

1  battlefield, but then, of course, specific to
2  states.
3  Q.    Are there any other examples of goals and
4  metrics that you would give?
5  A.    Sure.
6          We could have had a goal, for
7  example, of endorsements both nationally and by
8  state.
9  Q.    Okay.  And another role that's mentioned in
10 this document is a state organizing director.
11         Can you describe the responsibilities
12 of a state organizing director in Massachusetts?
13 A.    Generally speaking, an organizing director in
14 any -- any state would be the head of that
15 department within the state.  They would work with
16 their counterpart in New York headquarters.  They
17 would establish an organizing plan for that state.
18 And by "organizing plan," I mean a plan for the
19 organizing department, which includes organizers.
20 They would have hired the infrastructure around them
21 in the department, which in turn would have built
22 out the infrastructure throughout the state, and
23 then managed the execution of the tactics of that
24 department.
25 Q.    Did Massachusetts have an organizing plan?

Page 51

1  A.    I'm quite confident that all of our states
2  that had an organizing director would have had an
3  organizing plan, so I assume so.  Yes.
4  Q.    And what are the -- the types of things that
5  would appear in a state organizing plan?
6  A.    Much like the previous answer on state plans,
7  they would include the staffing plan, a timeline, a
8  description of tactics, a ramp up of those tactics
9  across that timeline.
10 Q.    And it's part of the job responsibility of
11 the state organizing director to establish that
12 state's organizing plan?
13 A.    Yes, largely.  They would do that in
14 conjunction with some guidance perhaps of their
15 counterparts in New York at the regional level.  But
16 largely I would expect the state organizing director
17 to lead that process.
18 Q.    Does the state organizing director manage the
19 organizing team in that sate?
20 A.    It could depend, I suppose.
21 Q.    What would it depend upon?
22 A.    I think it would depend on the specific
23 structure by state.  For example, larger states with
24 a larger staff might have a deputy organizing
25 director who took on a management role in a way that

Page 52

1  allowed the state -- the state organizing director
2  to take more of a strategic role.  That's possible.
3  It really would depend on the personnel.
4          But they -- they certainly could and
5  probably in many cases would have the responsibility
6  of -- of management.
7  Q.    In Massachusetts, was there a deputy
8  organizing director?
9  A.    I don't recall.
10 Q.    Was there a data director in Massachusetts?
11 A.    I would expect so.
12 Q.    And what was the role of the data director?
13 A.    Generally speaking in -- in state structures,
14 a data director in a state would be providing
15 various departments with the lists or the data
16 required to complete their tasks.
17 Q.    So if we just focus on the organizing
18 department --
19 A.    Uh-huh.
20 Q.    -- what are the lists or data that the data
21 director would provide to complete the tasks of the
22 organizing department?
23 A.    Yeah.  It could be a few things depending
24 upon the program.  For instance, it could be a list
25 of a certain cohort of voters either for phone calls

Page 53

1  or for canvassing.  It could also be a list of
2  potential volunteer leads, people who the data
3  suggests would have a high propensity to be
4  interested in supporting the campaign, and,
5  therefore, become a volunteer.
6  Q.    And when you say the data director would
7  provide the departments with this -- these lists or
8  data, if we're talking specifically about the
9  organizing department, who would the data director
10 be providing that data to?
11 A.    You mean which staffer in particular?
12 Q.    Yeah.  If there's a particular role or title.
13 A.    Again, I'd rely on the fact that it can -- it
14 can change state by state depending upon the size of
15 the structure, who exactly is interfacing with a
16 department would depend a lot of what roles existed.
17 Q.    And do you know in Massachusetts
18 specifically?
19 A.    I don't have a precise recollection of their
20 data field structure.  So, no.  Organizing
21 structure, I should say.
22 Q.    Did the data director in a state have any
23 other responsibilities besides providing lists or
24 data to departments?
25 A.    Generally speaking, a data director could

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 54

1  assist various departments in -- in creating
2  geographic turf, meaning looking at the actual
3  geography of where voters lived and helping to
4  organize that based on pockets of more densely
5  organized voters, for instance.  They could help
6  with the paid media department in getting a list
7  of -- a targeted list of voters to send direct mail
8  to, for example.  They might be advisory in some
9  aspects to state leadership on strategy based on
10 what they were seeing in the data.
11            It would really depend on the
12 individual and the state's structure, but it -- it
13 could involve any of those things.  Not necessarily,
14 however.
15 Q.    Could you clarify what you mean by "creating
16 geographic turf"?
17 A.    Yes.
18            We generally refer to "turf" in a
19 campaign context as the geography by which we
20 organize an area down to.  And then that turf is
21 assigned to staff.  And effectively their role is to
22 then think of that turf as their domain to run their
23 program.
24            You want turf to be designed and --
25 and established in a way that's efficient based upon

Page 55

1  where you have staff, where you have volunteers,
2  and -- and how voters are organized in geographies
3  so that it can be as efficient as possible to engage
4  them effectively.
5  Q.    So it's the data director in a state that
6  creates the turf based on those factors that you
7  just described?
8  A.    I wouldn't say they would create it, but they
9  have the important role of -- of using and
10 navigating the tools that do so.  How turf is
11 created and decided what will constitute the turf
12 that they've used to organize is a function of both
13 state leadership and the organizing department
14 itself.  Could be the regional organizing director
15 that is creating turf within a congressional
16 district; could be the deputy organizing director
17 that's looking across the entire state.  They would,
18 in either case, be working with the data team.
19 Could be the data director; could be a subordinate
20 depending on how -- depending upon how big the team
21 is.
22            But the data teams were all enlisted
23 to manipulate the actual tools that look at the --
24 the data, the maps, you know, and create those --
25 those maps with the guidance of the organizing or

Page 56

1  leadership team.
2  Q.    And you also mentioned the data director
3  coming up with lists of voters for phone calls and
4  canvassing; is that right?
5  A.    Yes.
6  Q.    Did anyone else on the state level create
7  lists of voters for phone calls or canvassing
8  besides the data director or data team?
9  A.    I'm sure, but it would have depended on the
10 state and who had access to the voter file to do
11 that.
12 Q.    Do you know specifically in Massachusetts?
13 A.    I do not.
14 Q.    And when you say "who had access to the voter
15 file," what does that mean?
16 A.    Well, the voter file is a centralized
17 database of voters across the country.  And
18 depending upon your geography, you might be given
19 access to the parts of the file relevant to your
20 geography.  And permissions for that really depend
21 on many things, including the type of program you
22 were running, and the activities of -- of
23 organizers.
24            So in some instances, it would be
25 important for organizers or perhaps for regional

Page 57

1  organizing directors to have direct access in the
2  file to directly create lists.  In other instances,
3  that might not be necessary or advisable.  It would
4  depend quite a bit on the program.
5  Q.    In Massachusetts, did organizers have access
6  to the campaign's voter file?
7  A.    I don't recall what access or permissions
8  they would have had.
9  Q.    Did regional organizer directors have access
10 to the campaign's voter file in Massachusetts?
11 A.    I don't recall.
12 Q.    What is the role of the regional organizing
13 director in the campaign?
14 A.    Generally a regional organizing director
15 would be the layer in between statewide organizing
16 leadership and the organizers themselves and would
17 be a manager, coach, supervisor for those
18 organizers.
19 Q.    Did the regional organizing directors have a
20 role in creating the state's field plan?
21 A.    I think that would depend upon the states and
22 their structure.
23 Q.    In Massachusetts specifically, do you know?
24 A.    I don't know.
25 Q.    When you say "a layer in between the

Daniel Kanninen  30(b)(6)
September 12, 2022

Page 58

1  statewide organizing leadership and organizers,"
2  what do you mean by that?
3  A.    Well, for example, if you had, you know, 50
4  organizers in a state, you'd want to keep a
5  management ratio that was appropriate.  And so
6  perhaps you'd seek to have four or five or six
7  organizers, maybe seven -- it depends -- per
8  regional organizing director so that one person
9  isn't trying to manage more than, you know, six or
10 seven people at a time.
11          And so depending upon how many FOs
12 you had, field organizers, that would help determine
13 how many RODs you would need.  And those RODs, of
14 course, would then be the direct managers of the
15 organizers, but be connected to the statewide
16 leadership.
17 Q.    How are the RODs connected to the statewide
18 leadership?
19 A.    Generally speaking, a state organizing
20 leadership team would similarly be structured so
21 that they were managing, you know, one or two RODs
22 and giving them clear guidance on -- on how to
23 manage their team below them.  Again, could be
24 coaching, could be accountability, some supervision.
25          But the RODs, for example, might have

Page 59

1  a check-in, you know, once a week with state
2  leadership, and then have the benefit of that
3  information they could send down chain to the
4  organizers and their conversations.
5  Q.    What was involved in the management of
6  organizers by RODs?
7  A.    Could you be more specific?
8  Q.    Well, what did -- what did the regional
9  organizer directors do to manage field organizers?
10 A.    I think that could depend state by state,
11 region by region a great deal.
12 Q.    So we're talking about Massachusetts today.
13 And, you know, the focus of this deposition is on
14 organizers in Massachusetts and the supervision of
15 those organizers.  So that's really what I'm -- I'm
16 focused on and what I want you to answer.
17 A.    Yeah.  I would expect, generally speaking,
18 check-in calls, conversations, emails, you know, a
19 structured communication that would allow them to --
20 to coordinate and supervise and coach.
21 Q.    Why did the campaign have a management ratio
22 between -- I think you said four to seven organizers
23 per ROD?
24 A.    To be clear, I don't recall if that actually
25 was the ratio.  That's just my generalized

Page 60

1  recollection of what you might typically start with.
2  We have a ratio because you -- you want to ensure
3  that you have an appropriate number of people to
4  manage.  Not too many so that you can't effectively
5  manage them, and not too few so that you're
6  inefficient.
7  Q.    And what does it mean to "effectively manage"
8  the organizers?
9  A.    I mean in a sense of being effective at any
10 professional task; communicating clearly, et cetera.
11 Q.    What types of things would the RODs
12 communicate to the organizers?
13 A.    At a basic level, how the job is going, how
14 they made progress to goals, wherever they might be,
15 challenges they're encountering, updated message
16 guidance, perhaps.  Maybe information about events
17 happening that affect them, et cetera.
18          MR. DANNA:  Okay.  It's been about an
19          hour and a half.  I think now is probably
20          a good time for a break.  About
21          ten minutes, if that works for everyone.
22          We can reconvene at 11:45 Eastern.
23          MR. BATTEN:  Sure.
24                  - - -
25          (Whereupon, a recess was taken from

Page 61

1          11:35 a.m. to 11:45 a.m., after which time
2          the deposition resumed.)
3                  - - -
4          MR. DANNA:  So I'm going to switch to
5          a new exhibit.  This'll be Exhibit 5.
6                  - - -
7          (Whereupon, Exhibit 5 was marked for
8          identification.)
9                  - - -
10 BY MR. DANNA:
11 Q.    And is this a document with Bates number
12 ending in 00182.
13          Mr. Kanninen, do you recognize this
14 document?
15 A.    Yes, I do.
16 Q.    And what is it?
17 A.    This appears to be one of the documents
18 created at some point in the course of the campaign
19 to define the structure that we worked with.
20 Q.    What do you mean by "the structure that we
21 worked with"?
22 A.    I mean our campaign structure; personnel,
23 roles, responsibilities, et cetera.
24 Q.    And this document refers to the regional
25 organizer director position; is that right?

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 62

1  A.      That appears to be correct, yes.
2  Q.      So this is the document that defines the
3  roles and responsibilities of the regional
4  organizing director position; is that right?
5             MR. BATTEN:  Objection.
6             THE WITNESS:  It -- that is -- that's
7             what this document attempts to do.  I'll
8             refer to my previous caveat that, you
9             know, we created lots of drafts and lots
10            of different versions as we went forward.
11            So this -- this strikes me as -- as
12            what that represents, but I don't know if
13            it's a final version or not.
14  BY MR. DANNA:
15  Q.      Who would know if this was the final version
16  of the document outlining the roles and
17  responsibilities of the ROD position?
18  A.      I don't know who -- who could know without
19  understanding where this came from and -- and
20  reviewing, you know, the hundreds of thousands of
21  documents that were created at that time.
22  Q.      Is there a particular final document that
23  reflects the roles and responsibilities for the ROD
24  position in Massachusetts?
25  A.      I don't know.

Page 63

1  Q.      Does this document apply to RODs in
2  Massachusetts?
3             MR. BATTEN:  Objection.
4             THE WITNESS:  I don't know.
5  BY MR. DANNA:
6  Q.      Is there any document that you know of that
7  reflects the roles and responsibilities of RODs in
8  Massachusetts?
9             MR. BATTEN:  Objection.  Asked and
10            answered.
11            THE WITNESS:  I would expect that
12            we -- "we" meaning the New York team
13            and -- and the campaign staff at large,
14            including the states teams would have
15            created documents like this and templates
16            like this and provided them to states as
17            they built out their structures.  I just
18            can't say for certain that this is the
19            final version of that.
20  BY MR. DANNA:
21  Q.      And what is the purpose of this document?
22            MR. BATTEN:  Objection.
23            THE WITNESS:  Any -- any template of
24            the type I was just describing would be
25            there to serve teams and states with some

Page 64

1             guidance and -- and a description to help
2             them build their structure and recruit
3             folks into that structure.
4  BY MR. DANNA:
5  Q.      So in this document in the "How Can You Help
6  Mike?" section it says "The organizing director's
7  work will be carried out by a number of field
8  organizers."
9             What does that mean?
10            MR. BATTEN:  Objection.
11            THE WITNESS:  Generally speaking,
12            organizers, you know, as I mentioned in
13            the previous section, would report to a
14            regional organizing director.  And I -- I
15            assume this refers to the activities
16            within their purview that would be managed
17            or coached or supervised by the regional
18            organizing director.
19  BY MR. DANNA:
20  Q.      And in the next section down, "The
21  responsibilities will include," it says "Being
22  accountable for reaching statewide goals and metrics
23  outlined in the field plan by state organizing
24  director."
25            Do you see that?

Page 65

1  A.      I do.
2  Q.      How were regional organizing directors
3  accountable for reaching statewide goals and
4  metrics?
5  A.      I don't think they'd be accountable for
6  reaching statewide goals.  I assume they'd be
7  accountable for reaching goals within their region
8  that may correspond to statewide goals.
9  Q.      So RODs may have goals within their region
10  that correspond to statewide goals.
11            Is that what you said?
12  A.      Yes.  Generally speaking, you know, you
13  could -- you could create a statewide goal, and
14  then -- at the state level, at the leadership level.
15  And then looking at your teams, the turf beneath
16  that level, the various regions within the state,
17  you might assign, you know, a portion of that goal
18  to a region.  So the goals they have are part of the
19  statewide goal, if that makes sense.
20  Q.      And who -- who would undertake that process
21  to assign portions of the statewide goals to
22  particular regions in a state?
23  A.      It would depend on the state, but -- but
24  leadership teams within -- for organizing goals,
25  leadership teams within the organizing department

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 66

1    would -- would create that process. It would be
2    part of the planning process for -- for the state.
3    Q.     So assigning goals to specific regions within
4    a state is something that the leadership team of the
5    state and the leadership of the state's organizing
6    department would do together.
7           Is that what you said?
8    A.     I guess how I would describe it -- and this
9    could apply to any number of different types of
10   goals -- is that there's largely a -- a top-level
11   goal, and then as you go further down the campaign
12   chain from the statewide to the regional to the turf
13   level, the various levels of the organization would
14   interpret those goals and work together to determine
15   what's an appropriate goal for that region or that
16   turf.
17          And that -- that's a conversation
18   that occurs between the FOs and the RODs, and
19   perhaps the RODs and their state leadership, and
20   perhaps their state leadership and the state
21   director all in an effort to make sure that whatever
22   goals are -- are finalized -- to the extent anything
23   is really finalized, it can be fluid -- it -- it's
24   done with the full understanding of what's possible
25   and practical on the ground and having that be

Page 67

1    coordinated with what the overall objective might
2    be.
3    Q.     And so you said that the RODs were
4    accountable for reaching the goals that were
5    allocated to their region.
6           How were they held accountable for
7    those goals?
8    A.     Generally speaking, a ROD would have a
9    check-in call, you know, sometimes daily, sometimes
10   weekly with state organizing leadership. And there
11   would be a conversation about how their region is
12   performing, which includes a discussion of goals
13   that you're hitting both ways, in fact.
14          In some instances, if you're hitting
15   a goal far more easily than -- than initially
16   predicted, you might increase that goal to reflect
17   the fact that more could be done. Or if you're far
18   short of a goal, you might reduce that goal to
19   reflect what's possible. Or if you're potentially
20   not hitting it by just a very little bit, it might
21   be a performance issue, that could be the
22   conversation.
23   Q.     And in this context where we're talking about
24   the -- work of the organizing department at the
25   state, what are some examples of -- of the goals

Page 68

1    that RODs would be accountable for?
2    A.     Well, various goals. They -- they might have
3    organizational goals, they might have voter contact
4    goals, they might have event goals. It would really
5    depend on the program.
6    Q.     What are the organizational goals that you
7    just referred to?
8    A.     Generally I mean building the campaign
9    organization, which includes volunteer capacity.
10   Q.     So could an example goal in that context be a
11   goal to recruit a certain number of volunteers?
12   A.     Yeah. Generally speaking, if your effort is
13   to build a volunteer structure, you're recruiting
14   volunteers. You are training them. You are giving
15   them assignments. You're evaluating their
16   contributions to the campaign. You're managing that
17   organization.
18   Q.     Can you clarify what you mean by a "volunteer
19   structure"?
20   A.     Sure.
21          I mean any structure of campaign
22   activity driven by support, meaning work product, of
23   volunteers. Meaning not paid staff, but rather
24   people volunteering on behalf of Mike.
25   Q.     And was it the goal of the campaign to build

Page 69

1    a volunteer structure at the ground level?
2    A.     Broadly speaking, yes. Specific to any state
3    or region, it would depend upon the turf they had
4    and what the core objectives in that plan were.
5    Q.     What assignments did volunteers work on for
6    the campaign?
7    A.     It could really depend upon the activities on
8    the ground. It could be phone. It could be door
9    knocking. It could be attending events or -- or
10   building a crowd for an event. It could be
11   visibility activities. It could be digital
12   organizing using relational organizing tools.
13   Really any activity that you can imagine a campaign
14   engaging and a volunteer could -- could be part of
15   at some level.
16   Q.     And what does "visibility activities" mean in
17   the list you just gave?
18   A.     Yeah. We generally refer to visibility
19   activities as activities that are primarily about
20   being present and being visible usually in a
21   high-traffic area. So, for example, if there was a
22   sporting event taking place with a lot of folks
23   walking up the same street, you might have a bunch
24   of volunteers with signage in an -- in an area where
25   they can be easily seen.

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 70

1  Q.      In that example that you just gave of the
2  sporting event, how would the volunteers know how to
3  go to that -- you know, that they should go to that
4  sporting event for that visibility activity?
5  A.      That could depend on how well built the
6  volunteer structure was.  Could be that the
7  volunteers themselves directed some of their work
8  within a set of goals.  It could be that the
9  volunteers were directed by an organizer.
10  Q.      So volunteers themselves could -- you said
11  direct their own work, they could pick their own
12  visibility activity to go to; is that right?
13  A.      Would really depend case by case.
14  Q.      What would it depend on?
15  A.      It would depend on how well built and how
16  effective the volunteer infrastructure was.
17  Q.      And what does it mean for the volunteer
18  infrastructure to be "well built"?
19  A.      So broadly speaking, campaigns are about
20  building more people to engage in your cause.  And
21  so an organizer who is attempting to build a
22  volunteer infrastructure is not just building
23  volunteers ideally to -- to go do only assigned
24  tasks, but they're building volunteers who
25  themselves are leaders within the volunteer cohort.

Page 71

1          For example, in the Obama campaigns
2  that I've been a part of, volunteers had job duties.
3  There was a volunteer who was a data captain and a
4  volunteer who was a canvass captain and a volunteer
5  who might have been a visibility captain.  And the
6  organizers then effectivity managed that team of
7  volunteers who manages another team of volunteers
8  for executing.  We refer to that as a snowflake
9  model.
10          And so a really well built volunteer
11  structure has the volunteers operating with a lot of
12  autonomy based on good training, accountability,
13  evaluation of how they're doing.  And a poor
14  volunteer infrastructure leaves you volunteers who
15  are only doing what they're exactly assigned to do,
16  or perhaps not having enough volunteers at all.
17  Q.      Was the volunteer infrastructure in
18  Massachusetts well built?
19  A.      I don't know.
20  Q.      Who would know that?
21  A.      I would expect the state organizing team
22  leadership and middle management and perhaps even
23  organizers to have a sense of that.
24  Q.      Okay.  So back on this exhibit.  Another
25  bullet point is -- it says "Identifying and tracking

Page 72

1  field staff progress to daily and weekly goals."
2          What does that mean?
3  A.      Could you repeat the question, please?
4  Q.      Yeah.
5          I'm asking, what does it mean in the
6  document when it says "Identifying and tracking
7  field staff progress to daily and weekly goals"?
8          MR. BATTEN:  Objection.
9          THE WITNESS:  This appears to relate
10          to the conversation I described earlier
11          where RODs are managing, coaching, and
12          supervising the work of organizers, which
13          includes understanding their goals and
14          coaching them through their progress.
15  BY MR. DANNA:
16  Q.      In the job title for this position, regional
17  organizing director is the word "director."
18          Do you know why it's called that?
19  A.      Specifically "director"?
20  Q.      Yeah.
21  A.      Well, at some level, I think that's just the
22  term of art.  You know, it -- for decades, it was
23  regional field director, and then at some point it
24  became regional organizing director.  I couldn't
25  speculate as to how that term was originally

Page 73

1  created.  I -- I can only comment on the job as I
2  understand it.
3  Q.      In the context of campaign, does the word
4  "director" have any kind of meaning or significance
5  in a job title?
6  A.      Not beyond the fact that this is what
7  campaign professionals up and down democratic
8  campaigns would understand this job to be.  This is
9  a term of art, essentially.
10  Q.      In the "You'll Need to Have" section of the
11  exhibit, it mentions "One cycle of political field
12  or comparable political experience."
13          Do you see that?
14  A.      I do.
15  Q.      Did the campaign require or expect RODs to
16  have previous political experience to be eligible
17  for hire?
18  A.      I don't recall that we had a hard and fast
19  requirement as opposed to a preference.
20  Q.      But the campaign at least set a preference
21  for RODs to have previous political experience?
22  A.      Sure.
23          You -- you would hope that people
24  that are managing other organizers have themselves
25  done that job at least once.

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 74

1  Q.    And why would the campaign prefer that its
2  RODs have previous political experience?
3  A.    For the same reason you would want anyone in
4  a managerial role or a supervisory role to have
5  knowledge of the tasks and responsibilities before
6  they're -- they're -- they're organizers.
7  Q.    Okay.  I'm going to stop sharing that.
8        What were the main responsibilities
9  of the field organizers in the campaign?
10 A.    Well, at a core level, they were our folks on
11 the ground in turf representing the campaign.  In
12 terms of their day-to-day responsibilities, that
13 really would have depended upon the kind of program
14 being run both in their turf, in their congressional
15 district, and -- and in their state.
16 Q.    How would the day-to-day tasks of the field
17 organizer role vary depending on the kind of program
18 that was in place in the state?
19 A.    It could vary quite a bit.  There were some
20 states and some congressional districts and some
21 turf within those districts where perhaps a high
22 propensity -- there existed voters or volunteers
23 with a high propensity to be interested in Mike.
24 And perhaps they were densely enough populated so
25 you might run a program focused on canvassing or

Page 75

1  phone calls or canvassing in particular because that
2  made sense, given the -- the opportunity in that
3  turf and the efficiency of that tactic.
4        There were other places where perhaps
5  it was more rural or suburban where that opportunity
6  didn't exist in the same way.  And given the
7  compressed time frame of a campaign, the program
8  might have been different.  It could have been more
9  about events or earned media.  Attempting to be in a
10 local newspaper, for example, might have been a more
11 efficient way to use their time.  Sometimes we were
12 looking for individual volunteers to be people in
13 paid media advertisements and -- and developing a
14 network that would help find and surface those
15 folks.
16        So everything from direct voter
17 contact to earned media to developing the assets for
18 paid media program.  There are probably dozens of
19 other political imperatives I could -- I could name
20 if you have the time.  But all of that could really
21 depend upon the kind of turf and the overall
22 politics and voter cohort that existed.
23 Q.    And specifically in Massachusetts as opposed
24 to other states, what were the -- the day-to-day --
25 some of the day-to-day tasks of field organizers?

Page 76

1  A.    I don't have a specific knowledge of -- of
2  the organizers' tasks in Massachusetts.
3  Q.    You can't say what day-to-day tasks
4  organizers performed in Massachusetts?
5  A.    Again, depending on the turf that they would
6  have been situated in, it could have been very
7  different.  I assume some would be doors and voter
8  contact.  I assume some could be doing earned
9  media-type work and political-type work.  It really
10 would depend.
11 Q.    And you say some could be doing doors, some
12 could be doing voter contact.
13        Do you have any knowledge of the
14 actual job duties of organizers in Massachusetts?
15 A.    Well, again, I -- I think my knowledge is --
16 is based upon what kind of programs were run across
17 the country.  And they included all of the things I
18 described.  There were some places, some turf where
19 a density of voters existed and a volunteer capacity
20 existed.  And perhaps the imperative of -- of what
21 was going to be successful in that state meant that
22 a voter contact program was the most efficient way
23 to proceed.  There were some places where a voter
24 contract program did not make as much sense for a
25 variety of reasons, and maybe an earned media

Page 77

1  program or a visibility program or a political
2  program was -- was more effective.
3        So all of those duties could have
4  been the duties of an organizer.  It really would
5  have depended even within a single state on any of
6  those factors.  I think it's impossible to
7  generalize.
8  Q.    And I'm not asking you to generalize.  I'm
9  just asking specifically about the programs in place
10 in Massachusetts to what the associated job duties
11 for organizers would have been based on those
12 programs.
13        Do you know what the programs in
14 place in Massachusetts were that would have impacted
15 those organizer duties?
16 A.    Only vaguely.  I'm sure there was some voter
17 contact.  I know that there was -- there was plenty
18 of trips, meaning principal trips to Massachusetts,
19 travel with Mike or other surrogates that would have
20 required them to support some of that work.  I don't
21 have a precise recollection of whether or not
22 they -- they helped find folks to be in paid media
23 advertisements, but that would not surprise me.
24        So then all -- all the things I've
25 described probably would have been reflected in the

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 78

1  program of Massachusetts, but I do not have a
2  specific recollection of -- of their duties.
3  Q.    And did you do anything to prepare today to
4  speak on the job duties of organizers in
5  Massachusetts?
6  A.    Other than reviewing the -- the documents
7  provided to counsel, no.  Not really.
8  Q.    You didn't really review anything specific
9  about their programs that would have impacted the
10 duties of organizers in Massachusetts?
11 A.    I did not.  Unless they were contained in the
12 documents provided to counsel.
13 Q.    So besides the -- the responses you -- you've
14 just made, you're unable to speak to the specific
15 responsibilities of organizers in Massachusetts; is
16 that right?
17         MR. BATTEN:  Objection.
18         You can answer.
19         THE WITNESS:  I think I can probably
20         make an inference based upon the documents
21         I've read, but it would be an inference.
22         And I'm -- I am sure, again, that they --
23         they -- "they" being the organizers
24         engaged in some or all of the activities
25         I've described.

Page 79

1         But with respect to specific goals or
2         responsibilities organized by organizer, I
3         wouldn't have direct knowledge of that.
4         MR. DANNA:  Okay.  I'm going to go to
5         a new exhibit.  That's in the chat.
6             -  -  -
7         (Whereupon, Exhibit 6 was marked for
8         identification.)
9             -  -  -
10 BY MR. DANNA:
11 Q.    I'm going to screen share.
12         Can you see the document,
13 Mr. Kanninen?
14 A.    Yes.
15 Q.    Do you recognize this document?
16 A.    I do.
17 Q.    Can you tell me what it is?
18 A.    This document was one of the documents I
19 believe I reviewed in preparation for this provided
20 to counsel.  It appears to be a description of the
21 field organizer responsibilities.  It looks like the
22 kind of template we might have provided, but as with
23 the previous documents, I -- I don't know if this
24 was the final version or something iterative.
25 Q.    And when you say "template we might have

Page 80

1  provided," what do you mean?
2  A.    Perhaps "template" is the wrong word.
3         I believe the states team, meaning my
4  team in New York, would have created generalized job
5  descriptions that could be applied to and provided
6  to states to help them build their organization.
7  And this looks like one of those type of documents.
8  Q.    Is it fair to call this document a job
9  description?
10 A.    That's what this looks like to me.
11 Q.    Is this a job description that would have
12 covered organizers in Massachusetts?
13 A.    Probably.  I don't have a specific
14 recollection of -- of this document.  While we were
15 on the campaign, I don't think I would have reviewed
16 it.  And so I can only say that's possible that
17 applied that broadly, but I don't know with --
18 with -- with certainty.
19 Q.    Were there other job descriptions that
20 applied to field organizers in Massachusetts?
21 A.    I'm not aware of any.
22 Q.    Okay.  So in the "How Can You Help Mike?"
23 section, this document refers to "Being responsible
24 for daily and weekly goals, all of which will be
25 recorded and tracked by the state leadership team."

Page 81

1         Do you see that?
2  A.    Yes.
3  Q.    What are the daily and weekly goals for the
4  organizers that this is referring to?
5  A.    I think they would have been different turf
6  by turf.
7  Q.    And I'm asking at a high level what the daily
8  and weekly goals and metrics refers to, not any specific daily
9  weekly goal.
10         Just what does that term mean in the
11 job description?
12 A.    Generally it means as you create a plan, you
13 know, within a state and then within a congressional
14 district and then within a region of that district,
15 you'd create goals and metrics to help drive the
16 program and keep folks accountable.  And I -- I
17 presume this means -- articulated to the organizers
18 that they would have some goals that they'd be
19 responsible for achieving.
20 Q.    And what are some examples of the goals the
21 organizers in Massachusetts were accountable for
22 achieving?
23 A.    Again, I don't know with -- with specificity
24 to Massachusetts.  But broadly speaking, goals could
25 include things like phone calls.  They could include

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 82

1  canvassing objectives.  They could include volunteer
2  recruitment objectives.  There can be organizational
3  health metrics, which distinguished between a
4  volunteer who comes in once in a while and a
5  volunteer that is more a regular part of the team.
6          There could be metrics involving
7  constituency meetings, visibility events, other
8  events that engage volunteers or -- or the voting
9  public.  Any or all of those might apply.
10 Q.      And did you do anything to prepare to answer
11 questions on the daily and weekly goals of
12 organizers in Massachusetts today?
13 A.      Not beyond reviewing the documents provided
14 to counsel.
15 Q.      And this is one of the documents you said,
16 right?
17 A.      I believe this is, yes.
18 Q.      Are you aware of any instances when this job
19 description was customized for a particular employee
20 in Massachusetts?
21 A.      I don't have any knowledge of that, no.
22 Q.      Did any -- did the campaign use any other or
23 different job descriptions for field organizers in
24 Massachusetts?
25 A.      I don't have any knowledge of that, no.

Page 83

1  Q.      And when you say you don't have knowledge of
2  that, did you do anything to prepare to provide
3  testimony on whether the campaign had any job
4  descriptions applicable to organizers in
5  Massachusetts?
6  A.      Beyond reviewing the material provided
7  counsel, no.
8  Q.      So in that sentence that we had talked about
9  previously in the "How Can You Help Mike?" section
10 on the daily and weekly goals, it also said "All of
11 which will be reported and tracked by the state
12 leadership team."
13         Do you see that?
14 A.      Yes.
15 Q.      How did the state leadership team in
16 Massachusetts track organizers' goals?
17 A.      Well, again, generally speaking, the
18 structure applied fairly consistently state by state
19 with state leadership staff departmentally and
20 otherwise regional staff, and then organizing staff
21 in turf.  And organizing staff would roll up their
22 goals to the regional level, the regional level
23 would roll that up to the state level, and that's
24 all data by which state leadership could assess the
25 health of their program.

Page 84

1  Q.      And what would the state leadership do with
2  that data?
3  A.      Generally speaking, I would expect state
4  leadership to review progress to goals and to make
5  some determinations about whether they were being
6  successful or not and then analyze why that might be
7  the case.  As I mentioned earlier, in some cases,
8  goal setting, which is imperfect, is just off at the
9  beginning and you have to revisit your goals as
10 you're met with realties on the ground.
11         So one example could be revising
12 goals up or down based upon that experience.  And
13 then coaching, you know, staff throughout the
14 structure to respond to whatever revisions were
15 made.
16 Q.      And I believe when you were describing that
17 process of data rolling up, you said it was the RODs
18 who would roll up data to the state level; is that
19 right?
20 A.      Yeah.  And how that worked in practice
21 could -- could be different depending upon the data
22 team's interplay with the RODs.  But I -- I would
23 expect some type of report.  You know, an FO would
24 report to their ROD or ROD report on their -- on
25 their region to the -- the state leadership team.

Page 85

1  And that report can be qualitative or quantitative,
2  depending upon the program.
3  Q.      In Massachusetts, were the reports that RODs
4  made to state leadership qualitative or
5  quantitative?
6  A.      I would presume a mix of both, but I don't
7  know with any specificity.
8  Q.      Okay.  In the "Responsibilities" section of
9  the document, it says "Being accountable for
10 reaching individual goals and metrics outlined in
11 the field plan by regional organizing directors."
12         What does that mean?
13 A.      Well, I -- I think this is very similar to
14 the previous bullet we looked at where it's
15 articulated there would be goals and you have an
16 obligation to achieve them and you'll be working
17 with the regional organizing directors to see that
18 they're achieved.
19 Q.      So the regional organizing directors would
20 set the goals and metrics for the organizers to
21 achieve; is that right?
22 A.      I would expect that they would have the
23 responsibility for effectively blessing or approving
24 those goals.  Much in the same way that, you know,
25 our team in New York would look at state plans and

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 86

1  then -- and have a back-and-forth to determine if
2  they were appropriate and then say, "Yep. Here are
3  the plans."
4          That same process applies state to
5  region, region to FO. So a -- good ROD probably
6  would start -- have a starting point for an FO and
7  say, "This is the goal we," you know, "expect." But
8  that's a two-way conversation.
9  Q.    So I think you said you would expect. But --
10  but in Massachusetts, did RODs have the
11  responsibility to set organizer goals?
12  A.    I don't know with specificity. Probably, but
13  I don't know for sure.
14  Q.    And did you do anything to prepare before
15  today to testify on how RODs set organizers' goals
16  and metrics?
17  A.    Once again, I reviewed the material provided
18  to counsel.
19  Q.    But nothing beyond reviewing those documents?
20  A.    No.
21  Q.    You didn't speak to any other campaign
22  employees or former employees to prepare for today?
23  A.    I did not.
24  Q.    Did you review any documents other than those
25  provided by counsel?

Page 87

1  A.    I think I reviewed some prior testimony that
2  I've made about a different question, but no other
3  documents.
4  Q.    You reviewed your own prior testimony?
5  A.    Yes.
6  Q.    How many documents did you review to prepare
7  for today?
8  A.    I couldn't say.
9  Q.    Was it more than three?
10  A.    I think there was certainly more than three
11  in the -- in the package provided to counsel. So,
12  yes.
13  Q.    Would you estimate that it was more than ten?
14  A.    That sounds right, sure.
15  Q.    It sounds right that you reviewed about ten
16  documents to prepare for today?
17  A.    I'd have to look at -- at the packet again,
18  but that sounds order of magnitude about how many.
19  Maybe there were more. I'm not sure.
20  Q.    And about how many hours did you spend
21  preparing for the deposition today?
22  A.    Oh, I don't know. A couple hours at minimum.
23  Maybe longer.
24  Q.    So for the couple hours that you spent
25  preparing for today, did you do anything besides

Page 88

1  reviewing those documents that you were sent?
2  A.    Nothing specific beyond, you know, my own
3  recollection of the -- of the events of the campaign
4  and our -- our plan.
5  Q.    So besides what you've seen in the documents,
6  you're relying upon your own recollection of the
7  events of the campaign.
8          Is that what you said?
9  A.    That's fair to say.
10  Q.    Did you meet with counsel to prepare for
11  today?
12  A.    I did.
13  Q.    How many times did you meet with counsel?
14  A.    One time.
15  Q.    How long was that meeting?
16  A.    More than an hour. I don't know how much
17  longer than that.
18  Q.    Was that hour kind of factored into the total
19  time estimate you gave for preparing for today?
20  A.    Yeah.
21  Q.    So is it fair then to say you spent about an
22  hour speaking to counsel and about an hour
23  separately reviewing documents to prepare for today?
24  A.    Perhaps. I wasn't tracking the time with
25  that precision, but that's probably not an unfair

Page 89

1  thing to say.
2  Q.    And when did you receive the documents that
3  you reviewed for today?
4  A.    I believe I received them sometime last week.
5  Q.    And when did you meet with counsel to prepare
6  for today?
7  A.    I believe that meeting was on Friday, but I
8  am not entirely sure.
9  Q.    This past Friday, September 9th?
10  A.    That sounds right.
11  Q.    Okay. Continuing on with this document, the
12  fourth bullet point says "Recruiting, training, and
13  managing volunteers."
14          What does this mean?
15  A.    That appears to refer to the process I
16  described earlier about building a volunteer in the
17  structure to work on behalf of the campaign.
18  Q.    And so how did organizers in Massachusetts
19  work on building that volunteer work infrastructure?
20  A.    Like so many other things, this can be done
21  differently turf by turf. I would expect organizers
22  to make phone calls to volunteer lists or lists
23  provided to them of likely or potential volunteers.
24  I would expect them to engage with community leaders
25  or aligned interest groups who may have endorsed

Daniel Kanninen  30(b)(6)
September 12, 2022

1  Mike, for example.
2          Could have been engaging with local
3  officials who endorsed Mike and they themselves have
4  a volunteer network.  Could have run events, office
5  openings, visibility events.  They could have
6  attended public events, like sporting events.
7  Really what you did specifically would have depended
8  a lot on the turf and the circumstances of that
9  turf.
10  Q.     But you don't know specifically whether any
11  organizers in Massachusetts engaged with local
12  officials or did any of the tasks that you just
13  listed out; is that right?
14  A.     I -- I don't know.  It really would have
15  depended upon whether they had that option available
16  to them or not based on their turf.
17  Q.     And you don't know what options were
18  available to organizers based on their turf in
19  Massachusetts?
20  A.     Not specifically, no.
21  Q.     What would you need to do to learn the answer
22  to those questions?
23  A.     Which question specifically?
24  Q.     I mean, really what tasks organizers
25  performed in Massachusetts.  But specifically we

1  were talking about how organizers would build the
2  volunteer infrastructure in Massachusetts.
3  A.     I mean, short of talking to every one of the
4  RODs and assessing the individuals on their teams
5  and trying to pull recollection from them or perhaps
6  some plan that would have articulated that.  But
7  campaigns are fluid and you work with what you have.
8  And so I'm not sure any one person could know that
9  without talking to every other individual.
10  Q.     Did the state organizing team in
11  Massachusetts keep track of how well the volunteer
12  infrastructure in Massachusetts was, you know, being
13  built?
14  A.     I'm sure that they did.  I don't know what
15  their volunteer metrics may have been.  But whatever
16  they were, they would have been aware of them, I'm
17  sure.
18  Q.     So the Massachusetts organizing department
19  may have had some metrics to track how well the
20  volunteer infrastructure was being built, you just
21  don't know what those are?
22  A.     That's fair.  Yes.
23  Q.     Did organizers in Massachusetts manage
24  volunteers?
25  A.     Well, generally speaking, I would expect an

1  organizer who had turf with some volunteer objective
2  to then manage the volunteers they -- they brought
3  into the program, yeah.
4  Q.     And what would it mean to -- to manage a
5  volunteer?  What would be involved in that?
6  A.     Again, it would depend.  I can envision a
7  scenario where you manage volunteers as a one-off,
8  you know, a specific task.  You know, for example,
9  if there was going to be an important phone bank
10  ahead of, you know, an event of some sort, you might
11  manage their time literally just during that phone
12  bank.
13          And then there's the more structural
14  part of it where if you were building a structure
15  that was more self-sustaining where the volunteers
16  did have more autonomy and created goals beyond the
17  one-off event, then that management might include
18  things like coaching and training and -- and
19  one-on-ones to describe how it was going.
20          It really would depend on what
21  structure you had to work with and what your -- your
22  individualized goals and objectives were.
23  Q.     Did the campaign require previous political
24  experience for field organizers in Massachusetts to
25  be considered for hire?

1  A.     I -- I do not think we required that.  I
2  would have expected we would have sought candidates
3  with that experience, but I don't think we required
4  it.
5  Q.     Do you know why previous political experience
6  is not listed in the "You'll Need to Have" section
7  of the job description?
8  A.     I could speculate, but I don't know why.
9  Q.     What is your understanding of why that would
10  be absent?
11  A.     Could simply be that we were seeking to cast
12  a wider net to find folks from the communities who
13  could engage with us and didn't want to be limiting.
14  Q.     So it wasn't necessary to have prior
15  political experience to be an organizer on the
16  campaign; is that right?
17  A.     No, I -- again, I think it could be a
18  preference.  It's something we sought, but not
19  necessarily required.
20  Q.     And why wasn't it required?  Or -- yeah.  Why
21  wasn't it required?
22  A.     Again, I think it's a function of -- of
23  trying to identify the attributes that we need
24  fundamentally.  And I -- I think.  Again, my
25  recollection is not precise here, but I think we

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 94

1  determined that that was perhaps limiting to only be
2  looking at an applicant pool of previous campaign
3  employees.
4  Q.      And when you -- your phrase I think was
5  attributes that you needed fundamentally about
6  prospective field organizers.  Polit- -- previous
7  political experience just wasn't one of those
8  attributes.
9              Is that what you said?
10  A.     Well, again it's a preference, but I think
11  probably not a requirement at the end of the day.
12  So, no.
13  Q.      Could a field organizer with no prior
14  political experience do a good job for the campaign?
15  A.     Sure.
16  Q.      And how is it that someone would come into
17  that role with no prior political experience and be
18  able to do a good job?
19  A.     I mean, there's so many ways you can do a
20  good job on a campaign.  You can be flexible.  You
21  can be creative.  You can be a strong communicator.
22  You can be an inherently good leader.  You can have
23  hustle, you know, and work really hard.  And you can
24  engage your campaign team around you, both the RODs
25  and -- and your colleagues to help troubleshoot when

Page 95

1  you've not had that experience.
2              There are a lot of ways to be
3  successful in that environment.  It's one of the
4  things that makes campaigns great.
5              MR. BATTEN:  Michael, when
6          appropriate, maybe we could think about a
7          lunch break.  It's 12:45.
8              MR. DANNA:  Yeah.  How about
9          1:00 o'clock we'll stop?  Thereabouts.  I
10         just have a couple more questions.
11             MR. BATTEN:  Sure.  Sure.
12  BY MR. DANNA:
13  Q.      So in the "You'll Need to Have" section, it
14  refers to "Ability to work long and irregular hours"
15  and then at the end, in parentheses there it says,
16  "Expect to work seven days a week on an average
17  week."
18              Do you see that?
19  A.     I do.
20  Q.      Why does it say that in the job description?
21  A.     Well, I'd be speculating on this job
22  description.  But generally speaking, I think we
23  wanted to provide a very clear expectation to
24  campaign staff that campaigns are time-bound
25  enterprises.  And, in fact, time is the most

Page 96

1  important resource in any campaign, which means
2  necessarily many workdays and long hours.  And I
3  think that's a fundamental expectation any employee
4  should have coming into the organization.
5  Q.      Do you know if field organizers in
6  Massachusetts typically worked seven days a week on
7  average?
8  A.     I don't know.  I have -- I have a
9  recollection that we, in fact, provided, you know,
10  some days off on a weekly basis.  You know, or time
11  off when required in practice.  Although it doesn't
12  surprise me to see that we messaged that it could be
13  a seven-day week at the outset for the reasons I
14  described.
15             MR. DANNA:  Okay.  I'm going to
16         switch to a different document.
17                    -  -  -
18             (Whereupon, Exhibit 7 was marked for
19         identification.)
20                    -  -  -
21  BY MR. DANNA:
22  Q.      So this is Exhibit 7, an it's Bates number
23  13449.
24             Do you recognize this document?
25  A.     I do.

Page 97

1  Q.      What is it?
2  A.     I believe this is a notes template which I
3  presume guided folks screening candidates for -- for
4  employment.
5  Q.      And would that be candidates for employment
6  in the organizer position specifically?
7  A.     That appears to be what this is focusing on,
8  yes.
9  Q.      Did you review this document to prepare for
10  today's deposition?
11  A.     I did.
12  Q.      When you say this "guided folks screening
13  candidates for employment," how would that document
14  be used in practice?
15  A.     Well, I'd be speculating somewhat because I
16  didn't use this document myself, nor supervised its
17  use.  However, I -- I imagine that -- that we
18  provided -- and by "we," I mean the states
19  leadership team in New York provided some templates
20  to guide whoever was conducting and screening
21  interviews of applicants.
22  Q.      Was this used for screening candidates for
23  employment in Massachusetts?
24  A.     I don't know.
25  Q.      Were there any other interview notes

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 110

1  doesn't help.  It's -- it's more a question about
2  how you previously prepared for today.
3  A.    Yeah.  Again, really it's just the documents
4  provided in the folder.  And, you know, I guess I
5  could stipulate that if -- if they -- if they
6  reference, you know, information as does this one,
7  then I suppose that helps me to some degree.  But --
8  Q.    Okay.
9  A.    -- those are the documents.
10  Q.    But you didn't speak to anyone in the
11  Massachusetts staff or the campaign generally about
12  the hours worked by organizers in Massachusetts; is
13  that right?
14  A.    I did not.
15  Q.    Did field organizers in Massachusetts
16  typically work more than 40 hours a week?
17  A.    I would expect any field organizer in any
18  state in the country to work more than 40 hours a
19  week, yes.
20  Q.    Did field organizers in Massachusetts hire
21  any other employees?
22  A.    I don't believe they would have done that,
23  no.
24  Q.    Did field organizers in Massachusetts fire
25  any other employees?

Page 111

1  A.    I don't believe so, no.
2  Q.    Did field organizers in Massachusetts
3  discipline any other employees?
4  A.    As a general matter, I would expect not.
5  I -- I could envision a circumstance where, you
6  know, an FO became a little more senior within an FO
7  cohort and had some quasi manager roles as a result
8  of that.  But I don't have any specific recollection
9  of that occurring in Massachusetts.  It could have.
10  I'm not sure.
11  Q.    Did organizers in Massachusetts set any part
12  of the campaign's budget for Massachusetts?
13  A.    They may have made budget requests.  They
14  would not have set the budget.
15  Q.    And those requests would be made to whom?
16  A.    Would depend a lot on the type of request.
17  Probably most likely to the operations team, perhaps
18  to their organizing leadership team.
19  Q.    Did field organizers in Massachusetts have
20  authority to sign any contracts on behalf of the
21  campaign?
22  A.    I don't recall if we -- if that authority
23  existed for them or not.
24        MR. BATTEN:  Michael, we've been
25        going more than three hours now and I'd

Page 112

1        ask you to consider letting us take a
2        lunch break.
3        MR. DANNA:  Yeah.  Thanks, Mark.  As
4  I mentioned, I'm just wrapping up a line
5  of questions and we can take a break soon.
6        MR. BATTEN:  Okay.  Yeah.  You said
7  1:00 o'clock.  It's now almost 1:15, so
8  that's why I asked.
9        MR. DANNA:  Right.  I expected these
10  questions to go a little faster than they
11  have.  I'll wrap up in just a minute or
12  two.
13        We can actually stop there.  That's
14  fine.
15        Is 30 minutes for lunch fine on your
16  end?
17        MR. BATTEN:  Let's make it 45, unless
18  that's going to compress your afternoon.
19        MR. DANNA:  That should be fine.  So
20  we can -- we can just come back together
21  at 2:00 p.m. Eastern.
22        MR. BATTEN:  Perfect.  Thank you.
23        - - -
24        (Whereupon, a recess was taken from
25  1:12 p.m. to 2:00 p.m., after which time

Page 113

1        the deposition resumed.)
2        - - -
3  BY MR. DANNA:
4  Q.    Mr. Kanninen, thanks for rejoining us.  I
5  hope you had a nice break, lunch break.
6        So I'm going to continue talking
7  about field organizers.
8        And specifically did field organizers
9  use scripts or talking points when interacting with
10  potential voters?
11  A.    I would have expected organizers to have some
12  talking points at their disposal, scripts either for
13  their own volunteers or perhaps themselves,
14  depending on the tactic.
15  Q.    And who would create the scripts that field
16  organizers would have?
17  A.    It would depend on the script.  You know,
18  some might be given to them by the team leading, for
19  example, a call script to encourage rally attendants
20  around, like, a Mike Bloomberg rally.  That could
21  have been done centrally by the advanced team, you
22  know, or the states team in New York.
23        If it was a volunteer script, that
24  could have probably been created in state by their
25  leadership or perhaps in conjunction with their

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 114

1  leadership.  I think depending upon the tactic, you
2  could see a variety of scripts and talking points
3  employed that would have been generated by a number
4  of different elements of the organization.
5  Q.     And why did the campaign use scripts and
6  talking points?
7  A.     Well, first and foremost, as -- as a tool.
8  You know, you want to eliminate friction in the
9  exercise of any tactic because, again, you're
10 looking for efficiency given the short runway.
11         So giving someone a tool kit of
12 sorts, which can include talking points or -- or a
13 script can -- can make the work progress more
14 efficiently.  Sometimes scripts can be useful for
15 volunteers if you want to put, you know, a -- a
16 phone bank, for example, on a specific task and
17 focus that.
18 Q.     Did the campaign use different scripts and
19 talking points for different field organizers within
20 Massachusetts?
21 A.     Sorry.  Could you repeat the question or
22 clarify it?
23 Q.     Yeah.
24         So did the campaign, you know, create
25 or provide different scripts for different field

Page 115

1  organizers in Massachusetts?
2  A.     I don't know that they would have been
3  created specific to a field organizer.  I do think
4  that probably different field organizers use
5  different scripts, depending upon what they were --
6  what they were trying to accomplish with their
7  program.
8  Q.     Was it important to the campaign to have
9  consistent messaging on campaign issues?
10 A.     Yes, I'd say so.
11 Q.     Did the campaign do anything to ensure that
12 its messaging on issues was consistent?
13 A.     Yeah.  Many -- many things.  I could name a
14 few.  You know, everything from regular conference
15 calls, you know, leadership to the whole team within
16 states, within regions.  We often invite
17 communication staff to join those calls and -- and
18 talk through particular issues of note to provide
19 some context or guidance.  Documents could be
20 shared, you know, messaging, guidance documents,
21 talking points.  You know, either generally or
22 perhaps specific to an issue of importance.
23         All of -- all of that and more would
24 have been done to communicate effectively throughout
25 the campaign how our message developed.

Page 116

1  Q.     And how did the campaign ensure that the --
2  the field organizers and volunteers were correctly
3  sending the message on those issues?
4  A.     How would they ensure that the field
5  organizers were essentially using the correct
6  messaging?
7  Q.     Yeah.
8  A.     You know, I think in the same way that we try
9  to create some accountability and connectivity and
10 coaching opportunities up and down the organization.
11 You know, earlier I described the very common
12 practice of having weekly or even daily, you know,
13 one-on-one check-ins where, you know, for example,
14 FOs might be talking to their RODs and conversations
15 could come in that context about how they're dealing
16 with a particular issue.
17         You know, then, of course, you know,
18 you mentioned some of the talking point documents.
19 You know, those are things that would be provided to
20 help folks have something to -- to tether themselves
21 to.
22 Q.     And was it important for the campaign's
23 consistent messaging that organizers were tethered
24 to those talking points?
25 A.     Well, to an extent. I mean, you don't want

Page 117

1  someone saying something about Mike Bloomberg that's
2  not true, right?  Or not central to the campaign.
3  But you wouldn't want anyone just reading from a
4  script, you know, word for word.  That comes across
5  as inauthentic and canned.  And, in fact, you know,
6  one of the things that we train folks to do,
7  volunteer, staff, and up and down, is to weave your
8  personal story into a campaign so that you are
9  reflecting and using your own experience and your
10 own -- your own lived experience as a way of
11 relating to the candidate and the value of the
12 candidacy.
13         So, yeah, at a basic level, ensuring
14 that people are connected to the central theme, you
15 know, the central value proposition of a campaign,
16 that's important.  But then giving a space for
17 people to expand upon that using their own
18 individual stories is equally important.
19         MR. DANNA:  Okay.  I'm going to
20         introduce the next document -- exhibit,
21         which I believe will be number 8.
22                    - - -
23         (Whereupon, Exhibit 8 was marked for
24         identification.)
25                    - - -

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 118

```
1   BY MR. DANNA:
2   Q.    Okay.  So this is Exhibit 8.  It ends with
3   Bates number 00144.
4              Have you seen this document before?
5   A.    I have.
6   Q.    Can you tell me what it is?
7   A.    This looks like a -- a final or draft script
8   provided to -- well, I'm not sure who it would have
9   been provided to.  It's a draft script for voter
10  contact on the campaign.
11  Q.    Was this provided to organizers in
12  Massachusetts?
13  A.    I would presume so.
14  Q.    And how would that be used by organizers in
15  Massachusetts?
16  A.    Well, typically scripts are used, again, as a
17  tool kit for people who are either phone banking
18  or -- or making calls on behalf of the campaign.  In
19  this instance, this looks like a volunteer script.
20  So I'd imagine, that, you know, an organizer would
21  be conducting a phone bank, for example.  Perhaps
22  bringing volunteers into that phone bank, giving
23  them some training and some resources.
24              So this script would probably be
25  provided to the volunteer along with that training
```

Page 119

```
1   and along with a list of voters to contact.
2   Q.    Would organizers use scripts like this as
3   well in Massachusetts?
4   A.    I don't know if they used this one or not.
5   This -- this appears to be a volunteer script, so
6   I -- I couldn't say.
7   Q.    And how do you know it's a volunteer script?
8   A.    The beginning sentence indicates that "My
9   name is" blank "and I'm a volunteer with
10  Mike Bloomberg."
11  Q.    So are there different scripts that the
12  campaign would use for organizers instead of
13  volunteers?
14  A.    Sure.
15              And there's many different scripts
16  created all the time.  You know -- you know, there
17  might be scripts updated every -- a few times a week
18  depending upon the events of a campaign.
19  Q.    And who would be creating and updating those
20  scripts along the way?
21  A.    It could be all levels.  Again, if it was a
22  script that was primarily in service of -- of a
23  nationally driven priority -- like, for example, if
24  you're assembling a phone bank to call people to
25  encourage them to come to a Mike Bloomberg rally,
```

Page 120

```
1   that probably would have been a more centrally
2   created script focused on Mike's travel, right?  So
3   we would have created that in headquarters.
4              If it's a script around, you know,
5   the name your county fair, you know, and trying to
6   get volunteers to attend that county fair, that
7   would have been created much more locally.
8              MR. DANNA:  I'm going to introduce
9         Exhibit 9.
10                     -  -  -
11              (Whereupon, Exhibit 9 was marked for
12         identification.)
13                     -  -  -
14  BY MR. DANNA:
15  Q.    Okay.  Have you seen this before?
16  A.    I think so.  I'm just confirming, but I think
17  this is one of the emails that was in the packet
18  that was provided to counsel.
19  Q.    Okay.  And can you tell me what it is?
20  A.    This appears to been an email, a campaign
21  email discussing talking points.
22  Q.    Okay.  And do you know who Eydie Silva is at
23  the front -- on the front line?
24  A.    I believe Eydie was one of the regional
25  organizing directors, if I'm not mistaken.
```

Page 121

```
1   Q.    Okay.  And was it the responsibility of
2   regional organizing directors to distribute talking
3   points to field organizers?
4   A.    That's a function they -- they could play,
5   certainly.  Others had that same responsibility
6   depending upon where the talking points came from.
7   Q.    Okay.  And in the second paragraph here it
8   says "Please keep to script and be careful not to
9   answer questions you don't know or fully
10  understand."
11              Were field organizers typically
12  expected to keep to the script, in this person's
13  words?
14  A.    Well, I think it depends on the script.  This
15  email looks like it's related to national policy
16  talking points.  And, you know, we wouldn't expect
17  our organizers to want to riff on what was a
18  carefully considered policy position, for example.
19              So I could image that this is the
20  kind of script where more adherence to the -- the
21  text would be appropriate.  But other scripts are
22  much more templated guidance designed to give space
23  for personal story and for -- for customization at
24  the local level.
25  Q.    And why wouldn't you want organizers to riff
```

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 122

1    on policy talking points?
2    A.    Well, I think when you're describing policy,
3    you're trying to do so in a way that's consistent
4    with -- with a carefully considered, you know,
5    position.  And so I think having a little more
6    clarity and concise and consistent information in
7    that sort of script would make sense as opposed to
8    many, many other scripts where it can be more fluid.
9    Q.    And this says a little further down "A
10   national policy is that we don't speak to press.
11   Direct them to call the national campaign."
12         Is that -- was it the policy of the
13   campaign that organizers were not permitted to speak
14   to the press?
15   A.    In -- in general, you want to maintain
16   discipline when it comes to who speaks to the press.
17   And so, you know, communication staffers who had
18   that role would obviously do so.  And sometimes
19   organizers would be asked to speak with the press if
20   prepped, right?  If it was decided it was a -- a
21   wise use of time, and also the right messenger to
22   deliver, depending upon what that might be.
23         So there were obviously exceptions to
24   that rule if it was in the interest of the campaign
25   But as a broad policy, you want folks focused on

Page 123

1    their responsibilities and moving press inquiries to
2    the folks that are -- that are trained and -- and
3    have the mandate to deal with that relationship.
4          MR. DANNA:  I'll stop sharing that
5    one.
6          The next exhibit to the chat, this is
7    Exhibit 10.
8                -  -  -
9          (Whereupon, Exhibit 10 was marked for
10   identification.)
11               -  -  -
12   BY MR. DANNA:
13   Q.    And that ends with Bates number 15401.
14         Have you seen this document before?
15   A.    I have.
16   Q.    So what is it?
17   A.    This appears to be another call script.
18   Q.    And how would this be used?
19   A.    Well, this particular script looks like it is
20   a persuasion GOTV script, which means this would be
21   used to guide conversations with voters heading into
22   election day.
23   Q.    So in practice, this would be used in contact
24   with a potential voter; is that right?
25   A.    Yes.

Page 124

1    Q.    And in the first line it says "I'm a
2    volunteer/organizer."
3          Does that mean that this script could
4    be used by either volunteers or organizers?
5    A.    Presumably, yes.
6    Q.    Do you know if this script was used by
7    organizers in Massachusetts?
8    A.    I would imagine it was, but I don't know that
9    with certainty.
10   Q.    And who created this persuasion GOTV script?
11   A.    Well, this could have been created at either
12   the state level or perhaps the national level.  It
13   wouldn't surprise me if this was part of a -- a
14   script that was a set of resources heading into what
15   we call GOTV and then provided to the state, and
16   then the state either takes in whole cloth or
17   tailors it to their -- their needs.
18   Q.    And it looks like this could be used for door
19   knocking or phone calls based on that second line;
20   is that right?
21   A.    Yes.  I agree with that.
22   Q.    And why would the campaign create and use a
23   script like this?
24   A.    Well, a number of reasons.  One, you want to
25   provide a resource to your organization so that

Page 125

1    volunteers especially have some easy to digest
2    guidance on how to -- how to make a pitch to vote
3    for Mike.  That's one reason.
4          The other reason is that you're
5    trying to collect data as you go on how well these
6    conversations are -- are -- are going on.  And so
7    giving them some guidance on how to do that and
8    identify, you know, whether the voter is leaning or
9    undecided is -- is useful for that purpose.
10         And then lastly, it's just reminding
11   the organizer or the volunteer how to push someone
12   either to commit to vote, or if they've already
13   voted, to move them into a volunteer lane.  Or if
14   they're undecided, to move them into a -- a
15   persuasion conversation kind of lane.  So it gives
16   the broad framework of how -- how to think about
17   those three imperatives:  Volunteer, getting out to
18   vote, or persuading.
19   Q.    And a little bit further down on the page in
20   the paragraph starting "If on primary day" -- it
21   looks like there are some -- some placeholders maybe
22   for information.  It says "XX a.m. to XX p.m." and
23   then later in that paragraph says "See bracket state
24   Democratic primary voting guide."
25         Do those kind of placeholders

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 126

1  indicate that this is likely to have been used in
2  multiple states?
3  A.    Yeah.  That leads me to believe that this was
4  a document that was part of a packet, a tool kit
5  that then was presented to multiple states where
6  they would then tailor that kind of information
7  specific to the -- the -- the timing and the
8  deadlines and the locations of their state.
9              MR. DANNA:  Okay.  I'm going to stop
10             sharing that one.
11             This is Exhibit 11.
12                     -  -  -
13             (Whereupon, Exhibit 11 was marked for
14             identification.)
15                     -  -  -
16  BY MR. DANNA:
17  Q.    It ends with Bates number 09042.
18        Have you seen this email before?
19  A.    I think this is, again, one of the emails in
20  the packet, if I'm not mistaken.
21  Q.    And do you know what it is?
22  A.    Looks like another message from one of the
23  regional organizer directors to what I presume are
24  FOs in -- in the campaign.
25  Q.    Okay.  And the subject line here says "Sexual

Page 127

1  harassment news" and the first line says "We must
2  keep to the talking points about sensitive issues."
3              Do you see that?
4  A.    I do.
5  Q.    Did the campaign want consistent messaging
6  regarding sexual harassment?
7  A.    We wanted consistent messaging regarding any
8  issue of importance, certainly.
9  Q.    And so on issues of importance, was it
10  expected by the campaign that organizers would,
11  quote, keep to the talking points?
12             MR. BATTEN:  Objection.
13             THE WITNESS:  I mean, again, the
14             talking points and message guides are
15             there to help the staff communicate
16             consistently with the campaign.  You know,
17             when you would say "Keep to the talking
18             points," I think thematically and
19             certainly factually, you want to say what
20             is -- what is the central theme of
21             those -- those points?  But they're not
22             scripts.  You know, it's not a
23             word-for-word situation, obviously.
24  BY MR. DANNA:
25  Q.    Okay.  I believe earlier we talked in passing

Page 128

1  about campaign events, visibility events.  I'm going
2  to show you a document.
3              MR. DANNA:  This'll be Exhibit 12.
4                     -  -  -
5              (Whereupon, Exhibit 12 was marked for
6              identification.)
7                     -  -  -
8              THE WITNESS:  I'm sorry, folks.
9              Everything froze for a sec.  So I missed
10             what everyone said in the last maybe
11             ten seconds.
12  BY MR. DANNA:
13  Q.    Okay.  I said I'm going to be introducing
14  Exhibit 12, which I'll add to the chat.
15        Have you seen this document before?
16  A.    I'm not sure.  If it's not in the packet, and
17  I'm trying to see if it's in the packet, I don't
18  think I've seen it.  But I'm just looking through
19  the packet to confirm that.
20  Q.    When you say you're looking through the
21  packet, do you mean you have documents provided by
22  counsel in front of you?
23  A.    Yeah.
24  Q.    Okay.  So let's just focus on the exhibits
25  rather than other documents you may have gone

Page 129

1  through today.
2  A.    If it was in the package of documents
3  provided by counsel, I would have seen it.  But I --
4  I just don't recall if it was or not.
5  Q.    Okay.  Do you have an understanding of what
6  this document is?
7  A.    Only by looking at it and making an
8  inference.  It looks like it's a -- a -- a, you
9  know, wrap-up report, newsletter is how they're
10  describing it, you know, daily update, something
11  like that provided to staff.  I presume
12  Massachusetts because it's labeled "Massachusetts."
13  Q.    Okay.  I'm going to go down to the third page
14  where it says "types of events."  And there is a
15  table, it looks like, at the top.  It says "event
16  types," and there are two columns, and there are six
17  different rows to the "event types" column.
18        Do you see all that?
19  A.    I do.
20  Q.    What is this table referring to when it says
21  "event types"?
22             MR. BATTEN:  Objection.
23             THE WITNESS:  I -- I presume this is
24             attempting to classify different events to
25             clarify the common nomenclature so they

Daniel Kanninen  30(b)(6)
September 12, 2022

Page 130

1          can use for the campaign.
2   BY MR. DANNA:
3   Q.     And above the table it says "Please make sure
4   your FOs are aware of these event standards since
5   they affect the goals in the PTG tracker."
6                 What is the "PTG tracker"?
7   A.     I presume that refers to the term "percent to
8   goal." And, again, making an inference here or
9   speculating this is coming from the data team, I
10  suspect what they're -- they're suggesting is that
11  if we're recording, you know, progress to goal
12  across whatever metrics you have, it's important to
13  do so with the right classifications so the data is
14  then therefore clean.
15  Q.     Is the PTG tracker something that would be
16  used and maintained at the -- the state level or the
17  national level?
18  A.     Well, both.  I -- I think in this instance,
19  they're using that term a little casually.  You
20  know, we would certainly be tracking percent to goal
21  of certain -- of some things in New York.  They're
22  probably tracking percent to goal of different
23  things or more localized things in Massachusetts.
24                 So I don't know if this is referring
25  to one subset of goals in the state, or if it's

Page 131

1   referring to something more broadly than that.  But
2   depending on -- on what we're talking about, it
3   could have been looked at by both Massachusetts
4   staff or by headquarters staff.  It would depend.
5   Q.     And did the campaign in Massachusetts then
6   track the percent to goal of different types of
7   events?
8   A.     I would expect so, yes.
9   Q.     And why would you expect that?
10  A.     Well, really with any events or any -- I'm
11  sorry.  With any goals we might create.  And by
12  "we," I mean the campaign at large, you're creating
13  a set of metrics and goals to correspond, you know,
14  again, to hold books accountable to give them
15  something to drive towards to -- to examine if your
16  plans are effective or ineffective.
17                 And so whether the -- the goals were
18  based on phone calls, door knocks, volunteer
19  capacity, events, you know, one-on-ones, or even
20  something you track as a goal, there's a number of
21  things that it could be.  But whatever the goals
22  might have been turf by turf, region by region,
23  state by state, I would have expected some metric
24  tracking.
25  Q.     And is the information about each of these

Page 132

1   events entered into some kind of database or system
2   for that tracking?
3   A.     Yeah.  Predominantly campaigns use the voter
4   activation network or VAN sometimes called Vote
5   Builder.  There are other --
6                 (Stenographer clarification.)
7                 THE WITNESS:  I think I said
8          predominantly campaigns use a database
9          called VAN, V-A-N, alternatively called
10         Vote Builder.
11                THE STENOGRAPHER:  Thanks.  Sorry.
12                THE WITNESS:  No worries.
13                There are other tools that might be
14         employed to track different things, but I
15         think fair to say that VAN and Vote
16         Builder is the most widely used.
17  BY MR. DANNA:
18  Q.     And what would that campaign track on
19  Vote Builder?
20  A.     Any number of things.  It could track
21  one-one-one conversations you have with prospective
22  volunteers.  It could track phone calls made by
23  individual volunteers or by a team within a turf or
24  by a team within a region.  It could track door
25  knocks.  And within that would -- would track

Page 133

1   successful completed door knocks, meaning a
2   conversation was had versus no one home.  It could
3   track result of those door knocks.
4                 Same with phone calls.  It could
5   track event attendants if you're building for an
6   event.  All manner of things related to voter
7   contact.
8   Q.     Did a campaign in Vote Builder track each
9   event that a field organizer in Massachusetts
10  attended?
11  A.     I wouldn't expect so in Vote Builder.  If
12  possible, some of that was tracked.  I would -- I
13  would expect instead that -- that sometimes an
14  organizer might submit a soft report to -- to their
15  supervisor.  And by soft report versus hard report,
16  you often mean something that really is a -- a
17  qualitative description of activities as opposed to
18  just entering data into a database.
19                 So I might, you know, in some
20  template form, send an email daily or weekly to
21  my -- if I was an FO to my ROD saying "Here are the
22  things that I -- I did this week," for example.  So
23  I don't know.  That could be tracked in VAN, but not
24  necessarily.  And that might depend upon, again, the
25  program locally.

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 134

1  Q.     In the paragraph below the table, there are a
2  couple references to "Mobilize."
3  A.     Yeah.
4  Q.     What is "Mobilize"?
5  A.     I believe they're referring to
6  Mobilize America, which is a platform that is
7  largely a tool for an organizing team and/or their
8  volunteers to build crowds or build capacity for
9  events on a campaign.
10 Q.     And how would it be used to build crowds or
11 capacity for events?
12 A.     Well, my secondhand understanding of using
13 Mobilize is that it's -- it's a -- an interface
14 essentially that allows social media to sync up
15 with -- with the VAN, the Voter Activation Network,
16 so that if you're trying to get, you know, folks to
17 come to a phone bank or folks to come to a community
18 event or folks to come to some office opening event
19 where you're trying to build a crowd, the interface
20 allows you to use the convenience and the wide
21 adoption of social media.  But then on the back end,
22 links back to the Voter Activation Network so that
23 data is immediately in our database.
24        And that's -- that's a service to
25 organizers and their volunteers because in the old

Page 135

1  days, you'd organize for an event and then you'd
2  spend time in the evening manually entering the data
3  yourself of who came and who was -- attempted to
4  come.  And this interface accomplishes that for you,
5  essentially.
6  Q.     So in the table itself, in these six rows
7  under the heading "Event Types," what do these
8  labels refer to?
9  A.     The "Event Type" labels you mean?  Like
10 "Canvass, phone banks"?
11 Q.     Yeah.
12        It just as -- as a list, what -- what
13 is this?  What is this a list of?
14 A.     That looks to me like the type of events most
15 typical, although I would -- I don't think exclusive
16 or exhaustive, but most typical that an organizer
17 might encounter.  And, therefore, they're the -- the
18 well-known common tags we would call them.
19        They would associate, you know, with
20 the activities you're doing for the purposes of
21 coding them in the database.
22 Q.     In the "description" column, the first three
23 rows say "Event where volunteers" and then words
24 beyond that.
25        Are these events primarily where

Page 136

1  volunteers would be going and doing a set of tasks?
2        MR. BATTEN:  Objection.
3        THE WITNESS:  A canvass or a phone
4        bank certainly would, or a text bank.  You
5        named the top three.  In all those events,
6        we use the term "event" to mean a
7        convening of volunteers, in that case.
8        So, for example, if I was an
9        organizer and building a canvass event,
10       what that looks like in -- in practice is
11       there's a location, there's a time.
12       I'm -- I'm recruiting folks to come.
13       They all come to that centralized
14       location.  They probably get a canvass
15       packet.  They probably get a walk list,
16       meaning the doors they're supposed to hit.
17       They probably get a training.  You know,
18       maybe they get fed.  That's the event.
19       And then you send them all out to go
20       complete the task and they come back and
21       report on how they did.
22       And that -- that effectively would
23       apply to phone banks or text banks as
24       well.  In other events, it wouldn't be
25       that.  You know, an engagement event, for

Page 137

1        example, could be that you're about to
2        open an office, and so you want to have a
3        big crowd come to the office and you're
4        not making phone calls or doing door
5        knocks, you're just getting people excited
6        to be together on behalf of Mike.  And so
7        that kind of event would be different.
8        You'd have a program, maybe a
9        speaking program.  Maybe you're bringing
10       in an elected official to give remarks.
11       It's like a political event in that sense.
12       So we use events -- I think in this
13       context so can you code things
14       conveniently.  We use the term "event" to
15       both mean the canvass-type events, which
16       are about tasks and the engagement-type
17       events which are more political in nature.
18 BY MR. DANNA:
19 Q.     And in the canvass-type tasks where a
20 volunteer has a call list or a walk list, who on the
21 campaign prepares those walk lists or call lists for
22 volunteers?
23 A.     That would be done in a partnership between
24 the data team and the field team or the organizing
25 team, I should say, in state.  So depending on the

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 138

1  structure, depending upon the program, you know, an
2  organizer might make that walk list, you know, with
3  the data team and have them pull the appropriate
4  list to their turf.  Maybe there is a more
5  specialized task that is directed at the regional
6  level or the state level, depending on what you're
7  talking about.
8            So those lists could be pulled -- and
9  by "pull," I mean it is -- it is taken with the
10  database and then printed out or given to an app.
11  Those lists can be pulled, you know, at all levels
12  depending upon the kind of task it is and the kind
13  of permissions that folks would have.
14  Q.    And did any organizers in Massachusetts work
15  with the data team to create walk lists or call
16  lists?
17  A.    I don't know if they did specifically.
18  Q.    So looking at the "engagement event"
19  description in the document, in the second line, it
20  says "Should be planned well in advance in
21  conjunction with the ROD and organizer."
22            Do you see that?
23  A.    Yes.
24  Q.    What would the ROD's role be in planning an
25  engagement event?

Page 139

1  A.    It would depend I think on the kind of event.
2  I think -- and, again, also depending upon the
3  volunteer structure, you know, within a -- within a
4  turf.  There are examples I can think of where, you
5  know, a volunteer, a really good volunteer may just
6  want to have an event because they're -- they are,
7  you know, a member of the church, for example, and
8  they want to do a church barbecue and invite their
9  friends and family.  And that's the kind of thing
10  that we would want to encourage and support.
11            And so, you know, perhaps the ROD and
12  the organizer -- more likely the organizer in that
13  case would be coaching the volunteer to do that.
14  Maybe giving the volunteer some resources.
15  Literature, for example, signs to make that event
16  successful.  And that's an example of where the ROD
17  probably wouldn't be doing anything with it, other
18  than knowing it was happening because we're tracking
19  campaign activity.
20            Other events, like an office opening,
21  you know, might be something the ROD is involved in.
22  Perhaps there's a budget request that needs to go up
23  chain, and so the ROD needs to be aware of that.
24  And maybe there is a need to engage with other
25  departments to bring a surrogate to the event or

Page 140

1  something like that.  So really depending on the
2  kind of event.
3            I -- I think with the larger events,
4  and this -- this blurb here seems to be speaking to
5  that to some degree, the guidance is really that if
6  you're planning something bigger that requires
7  additional resources, you should flag that early on.
8  Q.    And the last sentence in this "Description"
9  box says "The impetus here is that organizers lean
10  on prospective volunteer leaders to help those who
11  are and execute events in their local community."
12            Do you see that?
13  A.    I do.
14  Q.    What is -- what does that mean?
15            MR. BATTEN:  Objection.
16            THE WITNESS:  Well, I suspect that
17       refers to the situation I described -- the
18       situation I described a moment ago with
19       the church leader, right?
20            You know, campaigns are about
21       building effectively trained capacity to
22       go then broaden engagement further.
23       And -- and so a good volunteer structure
24       would have volunteers who have the -- have
25       the training and the -- and the resources

Page 141

1  necessary to go autonomously build
2  engagement events in their own
3  communities.
4            MR. DANNA:  Okay.  I'm going to
5  switch to a new exhibit.  Okay.  This is
6  Exhibit 13 and it ends with Bates number
7  09099.
8              - - -
9            (Whereupon, Exhibit 13 was marked for
10       identification.)
11              - - -
12  BY MR. DANNA:
13  Q.    Do you recognize this document?
14  A.    Yes.
15  Q.    Can you tell me what it is?
16  A.    This looks like a couple of emails.  A
17  forward of one email.  Again, looks like the
18  organizing team in Massachusetts.
19  Q.    Okay.  And in -- in the second full paragraph
20  that begins with "Community events," it says
21  "Community events are defined as any meeting where
22  voters can be targeted."
23            Is a community event different from
24  an engagement event, just as a classification?
25  A.    Maybe.  I don't know.  It could be.  It could

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 142

1 be synonymous.  I'm not sure how they're using that
2 in this context.
3 Q.    Okay.  And further in that paragraph it says
4 "You can attend the community event by standing
5 outside on public property, sidewalk, and hand out
6 fliers to attendees."
7           Do you see that?
8 A.    Yep.
9 Q.    So in the campaign's tracking, a community
10 event could be, for example, as this says "Standing
11 outside an event and handing out fliers"; is that
12 right?
13 A.    I can't speak to how they tracked this.  I --
14 I see what is written in the email here describing
15 that situation, but that's as much as I can say.
16 Q.    Do you know how the campaign tracked
17 community events in Massachusetts?
18 A.    The campaign broadly speaking, or the
19 campaign in Massachusetts?
20 Q.    In Massachusetts.
21 A.    I don't know if they had a different
22 classification for events of this type versus events
23 of the type we were discussing a moment ago.  I just
24 don't know.
25 Q.    Okay.  And looking down further, there is a

Page 143

1 table here.  It says "Remaining goals week ending
2 2/13."  And there are a few columns, "Door knocked,"
3 "Campaign calls," "Community events" and "Dialer
4 hours."
5           Do you see all that?
6 A.    Yep.
7 Q.    Can you tell me what this table is conveying?
8 A.    I can't with precision because this table was
9 created by this particular ROD dealing with this --
10 these FOs, and I presume there was some context
11 here.  This is -- this looks to me like one of, you
12 know, a regularly sent email tracking progress.  And
13 so there's obviously a context beyond what's on the
14 page here that I'm not privy to.
15           But -- but broadly speaking, I can
16 say this looks like a -- a, you know, what's
17 probably a regular report.  Probably a regular way
18 for -- for the ROD to let the organizers know how
19 they're doing against whatever goals they're --
20 they're tracking.
21           And it looks like this in this
22 particular week, they're looking at, you know, four
23 goals at least.
24 Q.    And in the "Community Events" column is the
25 number "3" for each row.

Page 144

1           What would that refer to?
2           MR. BATTEN:  Objection.
3           THE WITNESS:  I'd be speculating.  I
4      mean, it looks like based on this email it
5      refers to the events that she describes up
6      the page, but I only know that from what's
7      written on the page here.
8 BY MR. DANNA:
9 Q.    And back up in that first paragraph, in the
10 middle it says "As a reminder, meeting FO/District
11 goals are mandatory achievement for the
12 team/district."
13           What does it mean that "goals are a
14 mandatory achievement"?
15           MR. BATTEN:  Objection.
16           THE WITNESS:  Well, I think campaigns
17      are binary.  You win or you lose,
18      generally.  And -- and we often try to get
19      folks thinking about goals in the same
20      way.  You've got to hit your goal.  You
21      know, 98 percent to goal is a very bad
22      number.  You want to be at 100 percent
23      goal or 105, right?
24           So I don't know what is being
25      communicated exactly in this message

Page 145

1           except to assert that, you know, you
2           aren't just guidance.  Goals are goals.
3 BY MR. DANNA:
4 Q.    Are there any consequences if an organizer
5 did not meet their goals?
6 A.    Well, there could be.  It would depend I
7 think entirely on the context both around the goals
8 themselves and the broader performance of the
9 organizer.
10 Q.    And how -- how would it depend on the goal
11 itself?
12 A.    Well, as I mentioned at some earlier point in
13 this conversation, you know, goal setting is not
14 perfect.  And -- and you often start with your best
15 guess looking at whatever data you have at your
16 disposal.  And that data could include things like
17 the number of volunteers modeled to live in an area,
18 right?  The number of persuadable voters modeled to
19 live in an area.
20           Your plan is derived from big chunky
21 sets of data like that and then broken down into
22 manageable pieces on the ground.  But then reality
23 strikes, and it may be that your model isn't bearing
24 out in a certain community.  And in that instance,
25 an FO and their ROD would have a conversation about

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 146

1  what they're seeing on the ground and they might
2  say, "Look, you know, we've got this volunteer list.
3  The model suggests I should be getting a bunch of
4  volunteers by calling through this list.  We've hit
5  this list five times.  No one is showing up.  You
6  know, I'm getting blood from a rock."
7          And it's determined that the outputs
8  are there but it's not resulting in something,
9  then -- then a rational ROD and FO might say, "Well,
10 let's -- let's shift the plan and revise the goals.
11 Maybe revise the plan to do something that would be
12 successful."
13         I mean, other instances, it could be
14 that the FO is failing to attract volunteers and the
15 ROD can see that part of the problem is the output
16 is just not there.  So that might be a performance
17 conversation.
18         Really would depend upon what you're
19 seeing and the experience of the ROD to say "Well,
20 let's coach you through this" or "Let's change
21 tacts" versus "You got to bear down."  And that's a
22 very individualized approach.
23 Q.    Did the campaign set any limits on the events
24 that organizers planned?
25 A.    The limits on how many -- one organizer might

Page 147

1  plan?
2  Q.    Not necessarily how many, but just on that
3  plan in general.
4  A.    I wouldn't say that exactly.  What I would
5  say is that the campaign -- and by "the campaign" in
6  this case, I mean leadership in New York would work
7  with states to identify the best and most efficient
8  pathway to -- to building delegates in their state.
9  And there are some states where voter contact, which
10 is a very traditional and kind of bread and butter
11 campaign tactic, would make a lot of sense.
12         For example, voter contact makes a
13 lot of sense where you have an efficiency among your
14 target voters.  And by "efficiency," I mean they're
15 clustered.  They're geographically close.  You can
16 easily hit a bunch of doors, you know, in a small
17 window of time without driving to and fro to do so.
18 Or there is just the right cohort of voters who can
19 be communicated with efficiently through that
20 tactic.
21         Other places may not have clusters of
22 voters that you can reach very efficiently by doors,
23 but perhaps they're rural and perhaps they're older
24 and they're on Facebook.  And so we can use relation
25 organizing and social media engagement to reach

Page 148

1  them.  Other places still really require paid media,
2  mail, or earned media.
3          And an organizing team there might be
4  doing community events with a state senator, you
5  know, not so much to reach a volume of voters, but
6  rather to get a nice clip in the local paper that
7  will be read by a lot of voters.  Those are all very
8  different approaches that depend entirely on the
9  region, the turf, the goals of the state, the goals
10 of the congressional district, the goals of the
11 overall campaign.
12         And so we wouldn't seek to place an
13 artificial limit on anyone's activity, but everyone
14 should understand, you know, what the path to
15 victory is in their particular state and how the
16 path to victory -- how they can distribute best to
17 that path of victory.  And they should have an
18 understanding of the most efficient way to do that,
19 given what their turf looks like.
20         Also, we want to organizers to [audio
21 distortion] less in turn, "Hey, this isn't working
22 in my turf for X, Y, and Z reason."  And we really
23 gave states the autonomy to be nimble in that way,
24 partly because this was not a campaign driven by
25 voter contact metrics, but rather a campaign driven

Page 149

1  by -- by visibility and presence.  And so that could
2  really be a choose -- choose your own adventure
3  depending upon the geography you were in.
4  Q.    Did the campaign require any kind of approval
5  by an ROD for any aspect of a field organizer's
6  event planning?
7  A.    I don't think we required that approval as a
8  matter of policy.  I could certainly imagine some
9  RODs exercising that as a management tool, depending
10 upon their team.
11 Q.    Was there a limit to how much cam- -- how
12 much in campaign funds organizers could commit to an
13 event without seeking approval?
14 A.    I do -- I don't recall what the amount might
15 have been, but I do think we had, you know, just as
16 a management tool, again, a generalized for --
17 for -- to eliminate friction, right?  "Here is what
18 you can confidently go do without additional
19 approval, and above that amount you got to get
20 approval."
21         I do think a policy like that was in
22 place, yes.
23 Q.    And what do you mean "to eliminate friction,"
24 that process?
25 A.    Well, campaigns are about how much -- how

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 150

1  much you can contact voters, communicate with voters
2  in a short period of time.  And time is everything.
3  So creating an ability for organizers to move
4  quickly without having to -- to check every
5  few minutes if they were allowed to do something
6  is -- is valuable.
7          And so you want to give them guidance
8  and goals and objectives and tools, but you want --
9  and you want obviously control against the budget,
10  so you can't be limitless in that regard.  But
11  giving some basic tools including some -- some
12  identified budget to go forward, eliminate the
13  friction of getting approvals for everything you
14  did.
15  Q.     And what would some of those tools be beyond
16  the -- the preapproved budget?
17  A.     Tools could be talking points.  They could be
18  scripts.  They could be technological tools that --
19  that made their job easier like Mobilize America.
20  They could be signage and literature and -- and
21  things that could live in the campaign office that
22  they would have access to whenever they needed them.
23  They could include events budgets of that type.  All
24  of those would be pretty basic tools for an
25  organizer.

Page 151

1          MR. DANNA:  I'm going to introduce
2      Exhibit 14.
3                 - - -
4          (Whereupon, Exhibit 14 was marked for
5      identification.)
6                 - - -
7  BY MR. DANNA:
8  Q.     Do you recognize this document?
9  A.     This was like an email, again, in
10  Massachusetts from the operations director on budget
11  guidance.
12  Q.     Okay.  And, just for the record, this is a
13  document that ends with Bates number 14633.
14          You mentioned this is from the
15  operations director.
16          Is that the state operations director
17  for Massachusetts?
18  A.     That appears to be the author, yes.
19  Q.     Okay.  And would it be the responsibility of
20  the state operations director to determine how the
21  campaign would allocate its budget for events?
22  A.     I'm not sure they would determine that, no.
23  I think the operations director would perhaps be
24  communicating guidance across departments on a
25  number of things, including this sort of event

Page 152

1  guidance.
2  Q.     Okay.  So this says "I need to send out
3  instructions regarding events to provide some more
4  guidance aside from FOs seeking my approval if they
5  want to spend more than $100."
6          Is this the approval process that we
7  were just talking about where above that 100-dollar
8  amount, an organizer would need to seek approval for
9  an event budget?
10  A.     I'd be speculating here.  It -- I'm reading
11  it slightly different than that.  It seems like the
12  operation director is saying, "A lot of folks are
13  asking me and I don't have a good answer, so let's
14  get our -- our policy together."
15  Q.     Do you know why FOs would seek the operations
16  director's approval if they wanted to spend more
17  than $100?
18  A.     I don't know.  But, again, I'm inferring here
19  that perhaps they're -- they were doing that and so
20  she appears to be getting her colleagues to say,
21  "Let's get together and create a better answer" or a
22  better structure, a better process.
23  Q.     What was the budget threshold in
24  Massachusetts above which an organizer needed to
25  request approval?

Page 153

1  A.     I don't know beyond what this email is
2  suggesting.
3          MR. DANNA:  I'm introducing
4      Exhibit 15, which ends in Bates number
5      14079.
6                 - - -
7          (Whereupon, Exhibit 15 was marked for
8      identification.)
9                 - - -
10  BY MR. DANNA:
11  Q.     Do you recognize this document?
12  A.     I'm not sure that I do.  This might be
13  something in a packet of materials, but I'm not
14  entirely sure.
15  Q.     Do you have an understanding of the contents
16  of this document?
17  A.     I'm actually not sure I know exactly what the
18  document is attempting to do.
19  Q.     Did the campaign use specific, you know,
20  template -- event descriptions or talking points to
21  advertise upcoming events?
22  A.     Could you be a little more specific on that?
23  I'm sorry.
24  Q.     Did the campaign use template descriptions or
25  talking points, you know, when an event was planned

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 162

```
1                    And -- and what that goal was
2   depended upon your turf, your mandate, what made
3   sense.  But in every instance across the entire
4   country, that's -- that's the fundamental criteria.
5   What are the goals that we're setting collectively,
6   and how are you doing against those goals?
7                    And, then, of course, very typical,
8   you know, softer metrics -- not metrics.  Softer
9   criteria including, you know -- you know, how
10  collaborative someone was, how eager they were.  You
11  know, those kind of like less hard -- harder to
12  define metrics, but things that matter to
13  performance.
14                    MR. DANNA:  I'm going to introduce a
15              new exhibit.  This one is 16.
16                       -  -  -
17                    (Whereupon, Exhibit 16 was marked for
18              identification.)
19                       -  -  -
20
21  BY MR. DANNA:
22  Q.      So Exhibit 16 ends in Bates number 13271.
23                    Do you recognize this document?
24  A.      This looks like a plan regarding
25  redeployment.
```

Page 163

```
1   Q.      And what does that mean, "plan regarding
2   redeployment"?
3   A.      "Redeployment" generally refers to taking
4   capacity from one area and moving it to another
5   area.  It's typical for campaigns, particularly when
6   there is a calendar of -- of consecutive elections,
7   not a single election.
8   Q.      And on this first page, you know, one of the
9   states listed is Massachusetts; is that right?
10  A.      I see that, yes.
11  Q.      And so was this redeployment plan applicable
12  to the campaign in Massachusetts?
13  A.      I mean, this document certainly is
14  considering Massachusetts.  I don't know that this
15  plan was a final plan by any stretch, but I can see
16  this document does look at Massachusetts as one
17  state to consider.
18  Q.      Okay.  And on the fourth page which has Bates
19  number 13274, towards the bottom, it refers to a
20  "States team skills assessment."
21                    Do you see that?
22  A.      Yes.
23  Q.      What was the skills assessment created for?
24  A.      I think that's the assessment I was referring
25  to a moment ago when I -- I recalled that they
```

Page 164

```
1   were -- that we at headquarters created some
2   standardized way of measuring performance across --
3   across the entire campaign.
4   Q.      And so this says "The skills assessment will
5   be used to evaluate our field staff on who best to
6   redeploy."
7                    Is that right?
8   A.      That's what this document says, yes.
9   Q.      So is it fair to say that these reflect, you
10  know, critical or key skills of field organizers?
11                    MR. BATTEN:  Objection.
12                    THE WITNESS:  I don't recall exactly
13              what criteria we provided to states, but I
14              recall that, generally speaking, you know
15              we had a very large organization.  We
16              hired folks at a very rapid clip.  There
17              was precious little time to do a more
18              broad evaluation.  Super Tuesday was
19              giving us a break point -- a moment in
20              time by which to evaluate the entire
21              organization.
22                    So for any number of purposes, it
23              seemed wise to have a general evaluation
24              of the team and kind of group folks into
25              different tiers of performance.
```

Page 165

```
1   BY MR. DANNA:
2   Q.      And does this reflect the criteria that
3   you're referring to?
4   A.      You mean the bottom of this page that we're
5   looking at that says "for organizers"?
6   Q.      Yes.
7   A.      Yeah.
8                    Again, I don't recall if this was the
9   exact document that was sent out, but that -- that
10  does reflect, you know, the kind of thing we would
11  have been seeking to learn.
12                    MR. DANNA:  Okay.  It's been a little
13              while since lunch, so I think let's take a
14              quick break if that works for everyone,
15              and we can reconvene at 3:30 Eastern.
16                    MR. BATTEN:  Okay.
17                       -  -  -
18                    (Whereupon, a recess was taken from
19              3:22 p.m. to 3:30 p.m., after which time
20              the deposition resumed.)
21                       -  -  -
22  BY MR. DANNA:
23  Q.      Mr. Kanninen, we've been discussing goals and
24  metrics for organizers work throughout the day.
25                    One question I have is:  Why did the
```

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 166

1  campaign set goals and metrics for organizers?
2  A.    Well, every campaign of any type in politics,
3  and certainly this is true of our campaign, sets --
4  sets a goal and a metric so as to be as efficient as
5  possible with the task of communicating to voters in
6  a short time frame.
7  Q.    But why does the campaign set those goals?
8  Why not just leave the organizers to decide how to
9  do that as they will?
10 A.    Well, again, it depends on the kind of
11 program you're running and what you're trying to
12 achieve.  But, you know, you're trying to achieve a
13 task of winning delegates fundamentally.  And in
14 your path to victory, you might have some sort of
15 estimation.  Admittedly, it's often more art than
16 science, but it is some science that establishes how
17 you're going to get to that path to victory.
18              In other words, how you're going to
19 gain the votes you need to win.  And that -- that's
20 done in a delegate race, which this was, at a
21 congressional district by congressional district
22 basis.  So every district would have had, you know,
23 their individualized path to victory with an
24 understanding of how many voters lived there, who
25 was committed to whom based on polling or other

Page 167

1  research we could do, focus groups, modeling, you
2  name it.  What kind of primary it was?  Meaning is
3  it open, is it closed?  Can we get independents,
4  republicans to vote?
5              Are we stuck with the just the
6  democratic electorate that's narrowed and only
7  comprised of registered democrats?  What does the
8  modeling polling tell us about who is available and
9  who is not available?  Based on that modeling and
10 polling of who is available and who is not
11 available?  What is the best method to reach them?
12 Is that method best done by direct mail?  Is this
13 type of audience susceptible to that or receptive to
14 that?
15              Is it best done by paid media?  Is it
16 best done by political endorsements?  Does that
17 particular politics work in this area versus that
18 area?  These are all the considerations that goes
19 into making a plan that's tethered to winning the
20 votes in a district necessary to get [audio
21 distortion] the threshold that nets you delegates.
22              So do that, obviously you have to
23 centralize some of the core elements of that plan to
24 be efficient with your personnel, with your
25 capacity, with your time, and with your money.  And

Page 168

1  then from there, you need folks on the ground that
2  help tailor that to what's real and -- and modify
3  that plan based on how it's going, what -- what --
4  what's applicable to that scenario, et cetera.
5              But if you don't start with what only
6  a centralized data operation can know, then you're
7  building a plan based on no strategy.  You need a
8  coherent centralized strategy, and then from there,
9  broaden that out to folks on the ground.
10            MR. DANNA:  I'm going to introduce
11            exhibit -- I think we're on 17.
12                   - - -
13            (Whereupon, Exhibit 17 was marked for
14            identification.)
15                   - - -
16 BY MR. DANNA:
17 Q.    This is a document that ends with Bates
18 number 14491.
19            Do you recognize this document?
20 A.    I -- I don't know if I've seen this before.
21 Could have been in the packet that I reviewed, but
22 I'm not -- I'm not entirely sure.
23 Q.    Okay.  Looking at the document, would you be
24 able to tell me what it is?
25 A.    This looks like a document sent to

Page 169

1  Massachusetts leadership.  It looks like it's
2  copying folks from the team from the Eastern Region
3  in New York and describing plans and metrics for the
4  weekend of action in mid February, early February.
5  Q.    And who is Erin Phillips, the person who sent
6  the email?
7  A.    I believe Erin was one of the deputy national
8  field directors, if I'm not mistaken.  Or organizing
9  director, I should say.
10 Q.    And halfway through the email it says "Goals
11 for your state."  And then there is that table.
12            Can you tell me what that table of,
13 you know, "goals for your state" would be conveying?
14 A.    Well, just by reading it, it looks like
15 they're creating some metrics around --
16 communicating some metrics around events and other
17 tactics that could be tracked.
18 Q.    And so this is the deputy national organizer
19 director communicating metrics around events that
20 could be tracked to the Massachusetts leadership
21 team; is that right?
22 A.    That's fair, yes.
23 Q.    And who would create metrics like these?
24 A.    Would depend on lots of things.  There were
25 sometimes a national push to do something like a day

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 170

1  of action.  That's a technique designed to bring the
2  entire campaign together around a single moment
3  of -- of particular importance.  You do those from
4  time to time for a bunch of reasons.  Perhaps you do
5  so because you have a broad communications
6  imperative to communicate to the country that a
7  campaign is big and it's strong and it's active.
8              Sometimes you do so because we're
9  attempting to hit some national metric that matters
10  in the Democratic contest itself.  Sometimes you do
11  so because these national days of action become
12  competitions between states.  What often happens is
13  that one state will challenge a neighboring state to
14  try to, you know, beat them effectively in number of
15  events or number of doors knocked or whatever they
16  want to compete over.  And that -- that's healthy
17  competition.  It's for a greater output.
18              So for all of those reasons, a
19  National Day of Action might, you know, stem from
20  headquarters to lead the team.  But that's -- that's
21  the rarity.  Usually these are -- are -- the program
22  itself is managed, you know, within the state and
23  tailored to the state.  But, again, on occasion,
24  you'll have a National Day of Action of the type I
25  think you're seeing here.

Page 171

1  Q.     And so just looking a little bit at the --
2  this table, one of the rows under the metrics header
3  says "total events" and then in the "totals" column,
4  it say "30."
5              Is it fair, then, to understand that
6  the -- the goal communicated to Massachusetts for
7  the number of events for this action would have been
8  30 events?
9              MR. BATTEN:  Objection.
10             THE WITNESS:  Based on the document.
11             And I don't -- I don't know really if the
12             event goal came from their team and our
13             team collaboratively.  And it's often the
14             case that -- again, we have this desking
15             structure where the regional field desk
16             and maybe others from the field leadership
17             team in New York would be working with
18             state leadership, you know, to create
19             roles that made sense.
20             So, you know, I don't know if it was
21             communicated versus up or down and this is
22             just sort of codifying what was decided,
23             but it could be either way.
24  BY MR. DANNA:
25  Q.     So for a particular time period, like covered

Page 172

1  by this email, if the goal in Massachusetts is 30
2  events, would that goal then be allocated among
3  the -- the region's field offices?
4  A.     What do you mean by "allocated"?
5  Q.     Well, I'm asking essentially how the campaign
6  would carry out its statewide goal of 30 events at
7  the regional level.  You know, how would it be that
8  those events happen?
9  A.     Yeah.  Well, it can happen in a number of
10  ways.  Again, it's a two-way conversation, right?
11  So I'll paint a picture, I guess, as best I can as
12  to how this kind of day of action comes together.
13  You know, we might decide nationally that we want a
14  day of action on a certain day that was important.
15  I recall that February 8th and 9th was right around
16  the Iowa caucus dates.  I think that's the case.
17             So I think that this day of action
18  may have been -- the Iowa caucus is happening,
19  let's -- let's show the country how prepared we are
20  right afterwards, right?  So I think that idea
21  probably generates from headquarters.
22             And then the field desks in New York
23  would talk to their field desks in the states about
24  that plan.  The state directors would probably talk
25  to the regional directors also that plan because

Page 173

1  there would be more than just organizing at play
2  here, there would be -- other departments would have
3  a role to play in these days of action besides just
4  this department.
5              And then with some guidance and with
6  some general -- general topline goal setting, those
7  states would come back to the headquarters teams
8  with what they proposed to do.  And then I might say
9  to my regional team, "Well, how many events do you
10  think you're going to be able to pull off for that
11  weekend of action?"  And they would say, "Well, it
12  looks like we've got a couple hundred planned in my
13  states total."  And we would package that all up in
14  the narrative.
15             But I -- I say all that to illustrate
16  that that conversation happens both ways, right?
17  The general concept is presented, but then states
18  kind of huddle up, you know, at every level of their
19  team and determine what they want to do with that.
20             MR. DANNA:  Okay.  The next exhibit
21             is number 18.
22                      -  -  -
23             (Whereupon, Exhibit 18 was marked for
24             identification.)
25                      -  -  -

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 174

1   BY MR. DANNA:
2   Q.   This is a document that ends in Bates number
3   14490.
4        Do you recognize this document?
5   A.   I'm not sure if I've seen it or not, but
6   it -- it looks like an email from our national field
7   leadership to -- to the state leadership in
8   Massachusetts.
9   Q.   Okay.  And this, again, has that phrase
10  "goals for your state" and then a table with a bunch
11  of numbers and dates.
12       Is this another example of what you
13  were just describing of the -- national
14  organizing team working with the state leadership
15  team to come up with goals for the state?
16  A.   This looks very similar, yes.
17  Q.   And so in the "Goals for your State" section
18  where it says "total events 45," is it right that
19  that's -- that's the number of events that could be
20  part of that -- that state's organizing plan, and
21  that would be determined in cooperation between the
22  states leadership and the national organizing team;
23  is that right?
24       MR. BATTEN:  Objection.
25       THE WITNESS:  I think so, that that

Page 175

1   is what this is referring to, yeah.
2   BY MR. DANNA:
3   Q.   Is there any other process besides the states
4   leadership and the national organizing team coming
5   up with the numbers that would result in a set of
6   goals for a state?
7   A.   Is there another process besides and state
8   team or the national team setting goals?
9   Q.   Right.  Yeah.
10  A.   Those would be the entities in the campaign.
11  I'm not -- I guess I'm not sure what you're asking.
12  Q.   Okay.  It sounds like that's the answer then.
13  A.   Yeah.
14  Q.   And then if we have these 45 goals --
15  45-event goal for the state of Massachusetts at this
16  particular time period like I believe you said
17  earlier, it would then be the state's leadership who
18  would coordinate with the different regions to
19  figure out how to kind of carry out their goal of 45
20  events; is that right?
21  A.   Yeah.
22  Q.   Okay.  I'll stop sharing that one.
23       MR. DANNA:  I'm going to introduce
24       Exhibit 19.
25            - - -

Page 176

1        (Whereupon, Exhibit 19 was marked for
2        identification.)
3            - - -
4   BY MR. DANNA:
5   Q.   And this is a document that ends with Bates
6   number 12224.
7        Now, can you tell me what this
8   document is?
9   A.   It looks like an email from Ross Doty to
10  other staff.
11  Q.   And who is Ross Doty?
12  A.   I believe Ross was the organizing director in
13  Massachusetts.
14  Q.   Okay.  And can you tell who is being emailed
15  here?
16  A.   I recognize Eydie from other correspondence
17  and -- that we've been reviewing today.  I know -- I
18  don't know the other staffers.
19  Q.   Okay.  Does it appear to you like an email
20  that would be directed towards the regional
21  organizing director team in the state?
22       MR. BATTEN:  Objection.
23       THE WITNESS:  It looks of that type
24       of email.  It would not surprise me if
25       that's what this was.

Page 177

1   BY MR. DANNA:
2   Q.   Okay.  So the -- just jumping to a few points
3   in this email.  The first is where it says "A word
4   to the wise."
5        Do you see that?
6   A.   I do.
7   Q.   And it says "Goals are increasing this week
8   and a lot of your FOs will be nervous about hitting
9   them."
10       Do you know what goals the state
11  organizing director would be referencing in an email
12  like this?
13  A.   I could speculate, but I'm not sure what this
14  particular email is referencing.
15  Q.   In terms of goals that an FO would have to
16  hit, would those be goals on things, like door
17  knocking, community events, volunteer recruitment,
18  like we've talked about earlier?
19  A.   Yeah.  These are the type of goals that would
20  be applicable, for sure.
21  Q.   Okay.  And then going to the next page, is
22  there a section that says "1/31 to 2/6 Field
23  Organizer Goals."
24       Do you see that?
25  A.   Yep.

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 178

1  Q.    And the couple of parts I just wanted to
2  understand better.
3        So one is, it says "Goals are a
4  floor, not a ceiling."
5        What does that mean?
6        MR. BATTEN:  Objection.
7        THE WITNESS:  I can't speak to what
8        this email means directly, but generally
9        speaking, campaigns give the -- the -- the
10       guidance and I think the attitude to staff
11       and the volunteers that you're trying to
12       hit more than a 100 percent of whatever
13       your goal is.
14       I think I described earlier that it's
15       often said that, you know, 98 percent to
16       goal is the worst number possible because
17       that implies you could have got there, you
18       just didn't, right?  Almost rather, see
19       half to goal because half to goal means
20       maybe there's something wrong with the
21       program that we can fix.  So generally
22       speaking, we expect and try to instill the
23       attitude across the campaign that a goal
24       is a floor.
25  ///

Page 179

1  BY MR. DANNA:
2  Q.    And below that paragraph it says "Per day,
3  per FO, 63 doors, 136 calls, 4 lawn sign requests."
4        Can you tell me what that is -- what
5  information that's conveying?
6        MR. BATTEN:  Objection.
7        THE WITNESS:  I don't know who this
8        is to or what time frame or if it's
9        generalized averages or if it's specific.
10       So I -- I don't really know.
11  BY MR. DANNA:
12  Q.    Did the campaign set daily goals for
13  organizers in Massachusetts?
14  A.    What do you mean by "the campaign"?
15  Q.    The campaign as an entity.
16        So it's -- it's leadership or, you
17  know, as a campaign, was there someone in the
18  campaign who set daily goals for field organizers?
19  A.    Well, within the state.  You know, RODs
20  and -- and field leadership would have set various
21  goals for organizers.  Some would have been daily;
22  some could have been weekly.  It would depend.
23  Q.    And are these at least examples of the daily
24  goals that could be set by this standard by a ROD, a
25  number of doors, a number of calls?

Page 180

1  A.    You know, again, I don't know.  I mean, I'm
2  seeing half an email here and this could be -- this
3  could be an average communicated to leadership to
4  illustrate directionally where we were headed.  This
5  could be specific to each organizer.  I just -- I
6  can't tell without more context.
7  Q.    And did the campaign in Massachusetts track
8  whether organizers were meeting any of the daily
9  goals that were set for them?
10  A.    I'm sorry.  Could you repeat the first part
11  of that?  I just missed the first few sentences.
12  Q.    Did the campaign in Massachusetts track
13  whether organizers were meeting the daily goals that
14  were set for them?
15  A.    Yeah.  I mean, tracking -- creating metrics
16  across the campaign in every state in every -- in
17  every region and every commercial district.
18  Creating metric goals and then coaching the team
19  through those metric goals, which includes tracking
20  them was a fundamental job of -- of the entire
21  campaign.
22  Q.    Another document I'd like to show you is
23  Exhibit 20.
24                    -  -  -
25                    (Whereupon, Exhibit 20 was marked for

Page 181

1        identification.)
2                    -  -  -
3  BY MR. DANNA:
4  Q.    And this document ends in Bates number 14848.
5        Do you know what this document is?
6  A.    It looks like an email.
7  Q.    Looking at the document as a whole, do you
8  agree it's an email between Ross Doty, the
9  organizing director, and a regional organizing
10  director?
11  A.    Yes.
12  Q.    Okay.  So in -- it looks like an email chain.
13  But in the chain, it looks like there is an initial
14  message from Ross Doty where he says "The following
15  people spent more than 15 minutes in 'not ready.'"
16        Do you know what's referred to by
17  "not ready"?
18  A.    I don't with -- with real clarity.  I mean, I
19  can surmise based on the subject line, but I'm not
20  really sure.
21  Q.    Yeah.  If you have an understanding based on
22  the subject line, I'd appreciate that.
23  A.    And this is a very cursory understanding, but
24  I -- I think that ThruTalk was -- was a -- a
25  campaign tool platform that was used in states.  I'm

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 182

1  not very familiar with ThruTalk, to be honest.  But
2  I'm imagining that there were various
3  classifications of -- of what phase of ThruTalk you
4  were in.  So this looks like that.
5          But, I -- you know, that's really
6  speculation and not a lot of direct knowledge of
7  this conversation.
8  Q.     Did the campaign in Massachusetts set
9  guidance for organizers on how many minutes to spend
10 in not ready in ThruTalk?
11 A.     Well, I don't know about that.  I think that
12 the campaign certainly would have expected
13 organizers to be utilizing, you know, evening call
14 time as efficiently as possible.  That's -- that's
15 a -- you know, a function of when people are home,
16 there's only so many days, there's only so many
17 hours, you know, in those hours, where, you know,
18 the sun is shining, so to speak.  And I mean that
19 metaphorically.
20         You know, you want to make sure
21 you're -- you're using those hours efficiently.  You
22 don't get many of them.  But I don't know how that
23 corresponds to the ThruTalk system.
24 Q.     And so do you know why Ross Doty would say
25 that 15 minutes in not ready is unacceptable?

Page 183

1  A.     Again, I'd be speculating here.  You know,
2  assuming this is an email about call time and
3  assuming you have only a few hours of productive
4  call time a night, you know, if you're -- if you're
5  not using that efficiently, that could be a point
6  of -- of discussion.  But I'm really making an
7  assumption.
8  Q.     Okay.  And -- and one more question on this.
9          So a little bit further down in the
10 email it says "If FOs game the system by sitting in
11 'wrap up' the sum total of wrap up won't count."
12         Do you know what it means to "game
13 the system by sitting in 'wrap up'"?
14 A.     Well, I'd be speculating to -- to suggest.
15 Q.     Do you know what it means to sit in wrap up?
16 A.     Again, I'd be speculating just based on the
17 subject line.  And, you know, a general knowledge of
18 call time.  But I don't know what this really refers
19 to.
20         MR. DANNA:  Okay.  One more document.
21         This is Exhibit 21.
22              - - -
23         (Whereupon, Exhibit 21 was marked for
24         identification.)
25              - - -

Page 184

1  BY MR. DANNA:
2  Q.     So I have this as Exhibit 21.
3          Have you seen this document before?
4  A.     Yes.
5  Q.     And what is your understanding of what this
6  document is?
7  A.     This looks like the document we've been
8  looking at a couple times today that describes
9  the -- the topics and other things of the
10 deposition.
11 Q.     Oh, okay.
12         So actually this document, I'll
13 represent, is the answer that the campaign served in
14 the litigation in response to Plaintiff's complaint
15 in the litigation in June 2021.
16         Does that help -- help remind you if
17 you've seen this before or not?
18 A.     Oh, I see.  I'm sorry.  I was -- I was
19 conflicting this with another document.  I'm not
20 sure that I've seen this.
21 Q.     Okay.  So if we turn to page 2, paragraph 4,
22 can you just quickly review that paragraph?
23         MR. BATTEN:  Are you going to show
24         him the allegations in paragraph 4 that
25         this is responding to, Michael?  Or you

Page 185

1  want him to just respond to what he's
2  seeing here?
3          MR. DANNA:  I'm just asking him to
4          review the paragraph that I'm showing
5          here.
6          THE WITNESS:  Okay.  I reviewed it.
7  BY MR. DANNA:
8  Q.     Okay.  Is it correct that all field
9  organizers in Massachusetts are classified as exempt
10 from overtime?
11 A.     Yes.
12 Q.     And how did it come to be that field
13 organizers in Massachusetts were classified as
14 exempt?
15         MR. BATTEN:  I'll just caution the
16         witness not to disclose any conversations
17         with counsel.
18         THE WITNESS:  Generally speaking,
19         campaigns that I've worked on, you know,
20         for forever dating back to 2002, have
21         always treated organizers as -- as exempt
22         from overtime.  And in that way, I think
23         it was an assumption at some level that
24         would be how we proceed in this instance.
25 ///

Daniel Kanninen  30(b)(6)
September 12, 2022

Page 186

BY MR. DANNA:

1  Q.      Were you involved in determining the
3  exemption status of organizers in Massachusetts?
4  A.      Yes.  In that I was involved in creating the
5  overall compensation structure for organizers around
6  the country, which included the organizers of
7  Massachusetts.
8  Q.      Was anyone else involved in determining the
9  exemption status of organizers in Massachusetts?
10  A.      I don't recall a specific conversation about
11  exemption status.  As I said, it was almost really
12  a -- an assumption, certainly on my part, given
13  that's how this class of employee has always been
14  treated on every campaign that I've ever known.
15  Q.      So you don't recall if there was any other
16  specific person or department that was involved in
17  determining that exemption status?
18  A.      No.  I don't recall a conversation about the
19  exemption status specifically at all.
20  Q.      And who made the final decision about the
21  exemption classification for organizers?
22  A.      To the extent that was an open question, I'm
23  not aware.
24  Q.      Did the campaign consult with lawyers when
25  making the decision to classify organizers as

Page 187

1  exempt?
2  A.      If there was any consultation, I wasn't a
3  part of it.
4  Q.      Understood.
5          But I'm asking:  Did the campaign
6  consult the lawyers when making that decision?
7  A.      I'm not aware.
8  Q.      You can't say yes or no?
9  A.      It's possible, but I'm not aware of that
10  conversation.
11  Q.      When did the campaign decide to classify
12  organizers as exempt?
13  A.      I really think it was an assumption made
14  almost immediately, and one that held consistently.
15  I -- I don't recall there being a discussion point
16  about it.
17  Q.      Did the campaign decide to classify
18  organizers as exempt before it started hiring
19  organizers?
20  A.      Well, we set a compensation level in full
21  awareness of the number of hours that would be
22  required to do this job.  And so in the sense that I
23  was aware of a couple things.
24          I was aware of what other campaigns
25  paid their organizers, and so we set a compensation

Page 188

1  level that was higher and, therefore, more
2  competitive.  But we also were cognizant of, you
3  know, at the time what had been the -- since
4  rescinded, but at the time, Obama Department of
5  Labor ruled that it would establish a floor of 47K a
6  year for salaried employees before overtime would be
7  required.  So we wanted to be above that.  And we
8  certainly recognized the number of hours that were
9  at play in doing this job, as noted in some of the
10  documents we've covered.
11          So to the extent that we were aware
12  this was going to be a, you know, 50-, 60-
13  70-hour-a-week job or more, depending on how many
14  days a week you were working, that conversation in
15  terms of establishing a base salary, that was fair
16  and equitable, was certainly a conscious choice
17  before hiring.
18          But I do not recall a conscious or
19  explicit discussion of the exemption status before
20  hiring.  That's sort of embedded in that early
21  calculation that we were making, but it wasn't a
22  specific discussion point that I was part of.
23  Q.      So when you say you were cognizant of the
24  labor rule establishing the floor of 47,000 for
25  salaried employees and wanted to be above that, how

Page 189

1  did that factor into this decision of whether
2  organizers would be exempt or nonexempt?
3          MR. BATTEN:  Objection.
4          THE WITNESS:  I mean, again I -- I'd
5          classify it as more of an assumption than
6          a decision.  You know, I -- I walked into
7          the -- the role as states director with an
8          understanding that from campaigns I've
9          been a part of in 2002 and 2004 and 2006,
10          and 2008 and '12 and '16 and in '18, in
11          all of those, had paid organizing staff
12          and all of those were considered exempt.
13          And overtime was never a contemplated
14          expense in any those campaigns.
15          Now, having said that, I was also
16          cognizant of the fact that organizers
17          increasingly saw in democratic politics
18          were expecting more, in some cases seeking
19          collective bargaining agreements.  And I
20          was aware that previous campaigns, even
21          those I had been on had grossly underpaid
22          organizers given the time that that
23          required.
24          And so for all those reasons,
25          assuming the exemption status would be the

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 190

1    same as every other campaign I had known,
2    understanding that the world was changing
3    for the better and understanding we needed
4    to be fair and competitive in our
5    salaries, we used that assumption to
6    create a compensation form.
7        But I don't think we had a debate or
8    decision, at least not one that I'm aware
9    of, about the nature of that status.  It
10   was simply the incumbent status for every
11   organizer from time in memorial.
12  BY MR. DANNA:
13  Q.    If there had been a discussion about whether
14  to classify organizers as exempt or nonexempt, would
15  you have been a part of it?
16           MR. BATTEN:  Objection.
17           THE WITNESS:  Possibly.  I don't
18       know.
19  BY MR. DANNA:
20  Q.    Who would know if there had been a discussion
21  about whether to classify organizers as exempt or
22  nonexempt?
23  A.    I could only speculate wildly as to who might
24  have known about a conversation.  I'm not aware as
25  to whom.

Page 191

1    Q.    Do you know the -- the people or departments
2    who would have been responsible for determining the
3    exemption status of a position like the organizers?
4           MR. BATTEN:  Objection.
5           THE WITNESS:  I'd be speculating.
6    BY MR. DANNA:
7    Q.    Was there a person or department on the
8    campaign responsible for determining the exemption
9    status, even if they didn't have a conversation
10   about it?
11          MR. BATTEN:  Objection.
12          THE WITNESS:  Again, it's impossible
13      for me to know and speculate, given it was
14      from my experience, a very basic
15      assumption.
16  BY MR. DANNA:
17  Q.    Okay.  I'm just going to go back to Exhibit 1
18  one more time.  I'm going to share the screen.
19          Can you see paragraph number 9?
20  A.    Yes.
21  Q.    And this refers to the decision to classify
22  field organizers as exempt, including -- it lists a
23  few things.  And number 4 is "The individuals or
24  departments involved in making or approving the
25  decision."

Page 192

1            Do you see that?
2    A.    I do.
3    Q.    Did you do anything to prepare to testify on
4    the topic of the individuals or departments involved
5    in making or approving the exemption decision?
6    A.    I reviewed the documents provided by counsel
7    which is number 35, and then also my deposition from
8    a previous action.
9    Q.    After reviewing those documents and your
10   prior testimony, you're still not able to say
11   whether there was an individual or department
12   involved in making or approving the exemption
13   decisions?
14          MR. BATTEN:  Objection.
15          THE WITNESS:  The knowledge that I
16      have is that like every other campaign in
17      the history of democratic politics, field
18      organizers were going to be considered
19      exempt employees to the point at which it
20      was a given and an assumption from the
21      get-go.
22          I believe that assumption was well
23      understood because the context of our
24      compensation conversations was all around
25      the fact that they'd be working 60, 70,

Page 193

1    80 hours a week without overtime.
2    BY MR. DANNA:
3    Q.    Right.
4    A.    And so more than just a casual assumption.
5    It was baked into the very fabric of the
6    compensation discussion of which I was a part of.
7        But if you're asking was there some
8    separate conversation specific to that assumption
9    and whether that assumption was poked at separately,
10   I -- I don't know that that happened or existed and
11   couldn't speculate as to who might have done that.
12   But I am quite clear of understanding that
13   assumption was there from the beginning, and our
14   compensation decisions reflected that assumption
15   fairly explicitly.
16   Q.    Did you speak to anyone else on the campaign
17   to try to determine if any individuals or
18   departments had conversations about the exemption
19   status of organizers?
20   A.    Other than speaking with counsel and
21   reviewing the documents I've described previously,
22   no.
23          MR. DANNA:  Okay.  I'm nearly done.
24      I'm just going to take a quick five-minute
25      break to look at my notes and then I'll --

Daniel Kanninen   30(b)(6)
September 12, 2022

Page 194

1    then I'll come back.
2         MR. BATTEN:  Okay.
3              -  -  -
4         (Whereupon, a recess was taken from
5    4:13 p.m. to 4:18 p.m., after which time
6    the deposition resumed.)
7              -  -  -
8         MR. DANNA:  Okay.  I think we're
9    ready to get back on the record.
10        So I have no further questions that I
11   can ask today.  The deposition -- we're
12   not going to conclude the deposition.
13   We're going to keep it open.
14        Our view is that the campaign has not
15   adequately prepared a witness on a number
16   of the deposition topics, and so we'll be
17   conferring with the campaign on that issue
18   and how to approach it and address it.
19   But that would be it for today.
20        Mr. Kanninen, I want to thank you for
21   the time you took today out of your
22   schedule answering my questions, and I
23   hope you and everyone else has a great
24   rest of your day.
25        MR. BATTEN:  We obviously disagree

Page 195

1    with the characterization that the witness
2    was inadequately prepared or wasn't the
3    right witness, but we'll -- we'll deal
4    with that outside the transcript.
5         MR. DANNA:  All right.  Thank you,
6    everyone.
7         THE STENOGRAPHER:  Do you need a
8    copy, Mr. Batten?
9         MR. BATTEN:  Yes, please.
10        THE STENOGRAPHER:  Thank you.
11        Have a good day.
12             -  -  -
13        (Whereupon, the deposition was
14   concluded at 4:20 p.m.)
15             -  -  -

Page 196

1              CERTIFICATE
2         I HEREBY CERTIFY that the proceedings, evidence,
3    and objections are contained fully and accurately in the
4    stenographic notes taken by me upon the deposition of
5    DANIEL KANNINEN taken on SEPTEMBER 12, 2022, and that this
6    is a true and correct transcript of same.
7
8         I FURTHER CERTIFY that I am neither attorney nor
9    counsel for, not related to nor employed by any of the
10   parties to the action in which this deposition was taken;
11   further, that I am not a relative or employee of any
12   attorney or counsel employed in this case, nor am I
13   financially interested in this action.
14
15
16              _Michelle Keys_
17              Michelle Keys
                Stenographer
18              and Notary Public
19
20
21        (The foregoing certification of
22   this transcript does not apply to any
23   reproduction of the same by any means
24   unless under the direct control and/or
25   supervision of the certifying reporter.)

Page 197

1              ERRATA SHEET
2    PAGE    LINE    CHANGES OR CORRECTION AND REASON
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____