# Exhibit 54

1     UNITED STATES DISTRICT COURT

2      SOUTHERN DISTRICT OF NEW YORK

3    -------------------------------x

4    DONNA WOOD, et al, individually

5    and on behalf of all others

6    similarly situated,

7            Plaintiffs,

8        vs.       20 Civ. 2489(LTS)(GWG)

9    MIKE BLOOMBERG 2020, INC.,

10           Defendant.

11   -------------------------------x

12

13        VIDEOTAPE DEPOSITION OF

14            ROBIN CEPPOS

15       VIA ZOOM VIDEOCONFERENCE

16          October 24, 2022

17            10:00 a.m.

18

19

20

21

22

23   Case No. 5541684

24   Reported by:

25   Maureen Ratto, RPR, CCR

Page 66

ROBIN CEPPOS
2  Q.  -- when you were in the
3  Downtown office?
4  A.  Well, sometimes -- even when I
5  was assigned to Pasadena sometimes they
6  would send us to the Downtown office if
7  there was an event or they needed people
8  to staff it and I was living very close
9  to Downtown.  I was told to move to
10 Downtown, to be in the Downtown office.
11 So I mean at least, you know, a couple
12 times a week I was in the Downtown LA
13 office.
14 Q.  Okay. But my question is about
15 canvassing house to house. How often when
16 you were assigned to the LA Downtown
17 office did you do that?
18 A.  I don't recall.  Towards the
19 end of the campaign there was more
20 canvassing because we were getting out
21 the vote but, you know, like I would say,
22 like, 30% of any time.
23 Q.  And did you go house to house
24 more often when you were in the Pasadena
25 office?

Page 67

ROBIN CEPPOS
2  A.  Yes.
3  Q.  And that was because it was a
4  different kind of an area; is that right?
5  A.  Yes.
6  Q.  And would it be fair to say
7  that you used your communications skills
8  in trying to get out the vote for Mike
9  Bloomberg?
10 MS. COLE-CHU:  Objection.
11 A.  I actually used a script. I
12 didn't --
13 Q.  Go ahead.
14 A.  I didn't really have that much
15 -- we were -- we were more focused when
16 we were canvassing toward the end of the
17 campaign to hit more houses. They were
18 all about hitting your metrics.  So I
19 didn't really have time to engage or
20 communicate full conversations with
21 people.
22 Q.  So your testimony is that you
23 used none of your communication skills to
24 try to get out voters for Mike Bloomberg?
25 MS. COLE-CHU:  Objection.

Page 68

ROBIN CEPPOS
2  A.  I used my communication skills
3  on the script. I followed the script, is
4  my testimony, yes.
5  Q.  And your testimony is you
6  never deviated from the script?
7  MS. COLE-CHU:  Objection.
8  A.  Not that I recall.
9  Q.  And that was a decision you
10 made because you wanted to hit your
11 metrics so you were focused on going to
12 as many houses as possible as opposed to
13 persuading people to vote for Mike
14 Bloomberg?
15 MS. COLE-CHU:  Objection.
16 A.  Correct. I mean, we still
17 asked them to vote, we still had the
18 talking point that said why they should
19 vote but it wasn't -- it was provided to
20 me by the campaign.
21 Q.  But you made the decision that
22 you were just going to read through it so
23 that you could hit as many houses as
24 possible as opposed to engaging in
25 one-on-one conversation; is that right?

Page 69

ROBIN CEPPOS
2  A.  I didn't make that decision. I
3  was told that we needed to hit these
4  houses, don't spend a lot of time on a
5  door.
6  Q.  So when you would go to the
7  door you made the decision as to what you
8  were going to say to that person,
9  correct?
10 MS. COLE-CHU:  Objection.
11 Q.  You were either going to read
12 the script or do something to persuade
13 them to vote for Mike?
14 MS. COLE-CHU:  Objection.
15 A.  I already said I followed the
16 script.
17 Q.  Were you not interested in
18 getting voters for Mike Bloomberg?
19 MS. COLE-CHU:  Objection.
20 A.  I was --
21 Q.  You can answer.
22 A.  I was interested in getting as
23 money voters as possible.
24 Q.  For Mike Bloomberg or just
25 generally?

18 (Pages 66 - 69)

Page 78

ROBIN CEPPOS

1
2  calls, right, guys? And everybody was
3  like yeah, that's sensible." That's all
4  in quotes attributed to an official. Do
5  you believe -- an official of the
6  campaign. Do you have any reason to
7  believe that that statement is untrue?
8      A.  I don't know. I mean, no, I
9  don't have any reason to believe it's
10 untrue but I've never -- I hadn't heard
11 of anyone saying that or doing it, so it
12 was news to me.
13     Q.  It then says, "Staffers also
14 admitted to siphoning away resources from
15 the campaign to serve their own interests
16 with Bloomberg's organizers in San Diego
17 reportedly using Bloomberg funds for
18 other local campaigns."
19         Do you see that statement?
20     A.  Yes.
21     Q.  Do you have any reason to
22 doubt the accuracy of that statement?
23     A.  The only reason that I would
24 doubt is, you know, I didn't know about
25 it. But other than that, no.

Page 79

ROBIN CEPPOS

1
2      Q.  Did you have any involvement
3  with the San Diego office?
4      A.  No.
5      Q.  Do you know whether anybody
6  was terminated in the San Diego office
7  for siphoning off funds to use for other
8  local campaigns?
9      A.  I don't know, no.
10     Q.  Going to the top of the next
11 page it says, "I would actively canvas
12 for Bernie when I was supposed to be
13 canvassing for Mike." Do you see that
14 statement?
15     A.  Yes.
16     Q.  Do you have any reason to
17 believe that's untrue?
18     A.  I didn't see anyone doing
19 that, but that would be my only reason to
20 believe it's untrue, you know.
21     Q.  And as you described the
22 canvassing a few minutes ago, you said
23 you would go with somebody else to a
24 neighborhood but then you would split up
25 and go separately to houses, correct?

Page 80

ROBIN CEPPOS

1
2      A.  Correct.
3      Q.  Okay. It goes on to say, "I
4  know of at least one team of volunteers
5  that was entirely fabricated by the
6  organizers who had to hit their goals."
7  Do you see that statement?
8      A.  Yes, I do.
9      Q.  Do you know -- do you have any
10 reason to believe that that statement was
11 untrue?
12         MS. COLE-CHU:  Objection.
13     A.  From my experience, it was
14 untrue. Like I said in my earlier
15 testimony, I wanted to hit my goals. It
16 was something that we were, you know,
17 measured against and they would talk
18 about afterwards. So I followed the
19 script and I went to as many houses as I
20 can.
21     Q.  So your testimony here today
22 is that you never fabricated your goals
23 but you don't have any information as to
24 whether any other organizers may have
25 done that, correct?

Page 81

ROBIN CEPPOS

1
2         MS. COLE-CHU:  Objection.
3      A.  Correct.
4         MS. BLOOM:  Okay.  We can take
5  a break now. Is that enough time
6  for you? Do you need more time than
7  that?
8         THE WITNESS:  Ten minutes is
9  good.
10        MS. BLOOM:  Okay.
11        VIDEOGRAPHER:  Time is 11:25.
12 We are off the record.
13        (Recess is taken.)
14        VIDEOGRAPHER:  The time is
15 11:39. We are on the record.
16     Q.  Thank you. Am I correct that
17 you attended the Graduate School of
18 Political Management at George Washington
19 University?
20     A.  Yes.
21     Q.  And that you are a Graduate
22 School of Political Management Scholar;
23 is that right?
24     A.  I don't remember -- I don't
25 know what a scholar is exactly but I won

21 (Pages 78 - 81)

ROBIN CEPPOS

1
2     Q.   Okay. And earlier today you
3  said when you were doing canvassing that
4  all that you did was you stuck to the
5  script.  Is that still your testimony?
6     A.   Yes, that's still my
7  testimony.  And I, you know, have told
8  you why that's my testimony because I had
9  metrics to hit and I was not fabricating
10 my metrics, I was doing my job as I was
11 told to do and that is, you know, what I
12 did.
13        MS. BLOOM:  Can we pull up the
14    document that appears in tab 44 and
15    mark this as Exhibit 7, please?
16        (Ceppos Exhibit 7, Bloomberg
17    Voter Contact Script, Bates
18    MB2020_Wood_00042524 was received
19    and marked on this date for
20    identification.)
21    Q.   Let me know when you've had an
22 opportunity to review it.
23    A.   I will.
24        (Deponent reviews the
25 document.)

ROBIN CEPPOS

1
2     A.   Okay. I've reviewed it.
3     Q.   Okay.  Do you recognize this
4  as a copy of the State Mike Bloomberg
5  Voter Contact Script?
6     A.   This isn't what we actually
7  used. We had this with us and we were
8  provided this but we were -- we brought
9  talking points, like, actual, like,
10 position papers and stuff.
11    Q.   So is it your testimony -- is
12 your testimony then that you did not use
13 this script when you went canvassing?
14    A.   I mean, I don't remember if it
15 was this exact script. It was something
16 similar, but we also -- you see where it
17 says insert personal story or, you know,
18 I care about this issue, blah, blah,
19 blah, we were also provided position
20 talking points for specific positions to
21 fill in for those.
22    Q.   Okay. So just going through
23 the script for a minute, was the first
24 thing that you asked whether someone was
25 going to vote in the Democratic primary

ROBIN CEPPOS

1
2  early or on primary day?
3     A.   Yes.
4     Q.   And would you ask what
5  candidate they were supporting?
6     A.   Yes.
7     Q.   And if somebody was undecided,
8  would you ask them what issues are most
9  important to them in the election?
10    A.   Yes.
11    Q.   And I would assume that -- and
12 it says actively listen to the voter. I
13 would assume different people gave
14 different answers to that question; is
15 that right?
16    A.   That's correct.
17    Q.   Can you just scroll up a
18 little bit more, please, Mr. Concierge?
19 Thank you.
20        And so in having this
21 conversation with the voter, what you
22 said next was in part dependent on what
23 their answer was; is that accurate?
24    A.   Correct.
25    Q.   And then you had to decide how

ROBIN CEPPOS

1
2  you were going to respond to this
3  undecided person to try to get their vote
4  for Mike Bloomberg, correct?
5     A.   Yes. But we had, like I said,
6  talking points on the different issues so
7  that we could respond.
8     Q.   So talking points on the
9  different issues, meaning the different
10 substantive issues that the candidate
11 stood for, so you had talking points so
12 that if a particular issue was
13 significant to a voter you could tell
14 them the candidate's position on that
15 issue; is that right?
16    A.   Yes.
17    Q.   Okay. But it says here too,
18 and I think you mentioned a moment ago,
19 in fact, you refer to this and you said,
20 you know, you see where it says share
21 personal story or use the talking points
22 below. So you made a decision -- you
23 would have to make a decision based on
24 what the voter said whether to share your
25 personal story or use one of the talking

Page 94

```
1           ROBIN CEPPOS
2  points, correct?
3      A.   I never shared a personal
4  story.
5      Q.   But that decision was
6  available to you, you just decided that
7  you weren't going to do that, right?
8      A.   I'm sorry. I'm not
9  understanding your question.
10     Q.   Okay. You said a few minutes
11 ago that, and you pointed me to this
12 document and you said that you see it
13 says share personal story or use talking
14 points below. Do you see that language,
15 correct?
16     A.   Yes.
17     Q.   Okay. And the talking points
18 are talking points that we just discussed
19 that would go to different substantive
20 issues and the talking points would say
21 what the candidate's position was on
22 those issues, correct?
23     A.   Yes.
24     Q.   So, for example, if somebody
25 was interested in gun control it would
```

Page 95

```
1           ROBIN CEPPOS
2  talk about what Mike Bloomberg's position
3  was on gun control, correct?
4      A.   Correct.
5      Q.   Okay. So in terms of the
6  talking points, you would actively listen
7  to the voter and whatever the issue or
8  issues were that were of interest to
9  them, you would use the specific talking
10 points that went to that issue, correct?
11     A.   Yes.
12     Q.   Because you wanted to make
13 sure that you accurately explained what
14 the candidate's view was on whatever the
15 particular issue that you were discussing
16 was, correct?
17     MS. COLE-CHU:  Objection.
18     A.   Yeah. I mean, that's -- I
19 don't think that takes a lot of, you
20 know, communication skills or critical
21 thinking skills. I think that's just, you
22 know, part of having a conversation with
23 someone.
24     Q.   Okay. Did somebody tell you
25 that you're not supposed to use your
```

Page 96

```
1           ROBIN CEPPOS
2  communication skills in being an
3  effective advocate for Mike Bloomberg?
4     MS. COLE-CHU:  Objection.
5      A.   No, but you've questioned me
6  about my communication skills, so -- and
7  how they were related.
8      Q.   Okay. So just so I understand
9  your testimony here today, your testimony
10 here today is that your background in
11 working for other political campaigns and
12 your education and communication are
13 things that were not relevant to whether
14 you were -- whether you were an effective
15 field organizer?  Is that what you are
16 saying?
17     A.   No, I'm saying it's not
18 relevant to the case.
19     Q.   Well, is it relevant to being
20 a good field organizer?
21     A.   I think there are different
22 types of field organizers, some that, you
23 know -- yeah. I mean, I guess it is. I've
24 never really thought about it.
25     Q.   Do you think it made you a
```

Page 97

```
1           ROBIN CEPPOS
2  better field organizer?
3      A.   Like I said, some -- there are
4  different types of field organizers who
5  do different things and connect with
6  people in different ways. I guess it made
7  me a good one but, you know, there were
8  plenty of people who did not have a
9  communication background that were good
10 field organizers.
11     Q.   Okay. So it depended on -- you
12 say you don't need to have that
13 background but certainly it's something
14 that at least in your case made you
15 better at your job.  Would you agree with
16 that?
17     A.   I wouldn't say I was better
18 than anyone else. I would say, you know,
19 I have experience and I was, you know,
20 effective.
21     Q.   Okay. So this also says, and
22 you mentioned earlier a few minutes ago,
23 that you could also make a decision to
24 share your personal story as opposed to
25 using one of the talking points, correct?
```

25 (Pages 94 - 97)

ROBIN CEPPOS
2   A.   Correct.
3   Q.   But you made the decision that
4 you were never going to share your
5 personal story; is that your testimony?
6        MS. COLE-CHU:  Objection.
7   A.   Not that I was never going to
8 share my personal story. We were, you
9 know, on a time crunch, we had metrics to
10 hit, so in order for me to fulfill my
11 goals with the campaign it was more
12 effective to use the talking points.
13   Q.   When you say "more effective
14 to use the talking points", you were
15 still focused on trying to convince
16 people to vote for Mike Bloomberg,
17 correct?
18   A.   Correct.
19   Q.   That was your objective,
20 correct?
21   A.   Correct.
22   Q.   So you made a decision that
23 using the talking points and addressing
24 whatever -- using the -- picking the
25 right talking points to address whatever

ROBIN CEPPOS
2 the voter's issue was was more effective
3 than telling your own personal story; is
4 that right?
5        MS. COLE-CHU:  Objection.
6   A.   It was more effective to hit
7 our metrics.
8   Q.   Is it your testimony here
9 today that you -- your decision was that
10 you'd rather make more calls than more
11 effective calls to get voters for Mike
12 Bloomberg?  Is that what you're telling
13 us?
14        MS. COLE-CHU:  Objection.
15   A.   That's not at all what I'm
16 telling you, no. What I'm telling you is
17 that metrics were something that the
18 campaign pressured us to hit and we were
19 reprimanded if we did not. So I didn't
20 really get to make my own decisions
21 about, you know, if I was a ROD or a
22 leader or manager like I am now.  I was
23 just told what to do and that I needed to
24 hit these goals and so I hit them,
25 because my level of responsibility within

ROBIN CEPPOS
2 the campaign was not to make decisions
3 like that. My level was to do what I was
4 told.
5   Q.   Okay. So just so I understand
6 your testimony, you're still saying that
7 you wanted to get Mike Bloomberg elected,
8 correct?
9   A.   Correct.
10   Q.   You are still saying that was
11 your primary objective, was to get voters
12 for Mike Bloomberg, correct?
13   A.   Well, my primary objective, in
14 addition to getting Mike Bloomberg
15 elected, was to do my job as it was
16 portrayed to me and, like, as I was
17 trained and told you need to hit these
18 metrics. It was -- otherwise you were
19 threatened to lose your job and I could
20 not afford to lose my job.  So as much as
21 I supported Mike Bloomberg, which I did,
22 I also knew that I had a job to do and I
23 was reporting to someone higher up.
24   Q.   Okay. And in terms of doing
25 that job and reporting to someone higher

ROBIN CEPPOS
2 up and meeting your metric, you made a
3 decision that using talking points on a
4 particular issue was more effective than
5 sharing your personal story, correct?
6        MS. COLE-CHU:  Objection.
7   A.   That's correct.  Based on what
8 I previously said, that there were
9 multiple things that went into it,
10 hitting your metric, keeping your job,
11 keeping, you know, -- yeah.
12   Q.   I just want to make sure that
13 I'm understanding you correctly.
14   A.   Yes.
15   Q.   You still did the thing that
16 you thought was best going to convince
17 that voter to vote for Mike Bloomberg,
18 correct?
19        MS. COLE-CHU:  Objection.
20   A.   There were certain cases where
21 if I was the one who was managing it, the
22 process, I would have spent more time
23 with people, but that was not up to me.
24   Q.   So are you saying that you
25 sacrificed getting voters for Mike

ROBIN CEPPOS

1  ROBIN CEPPOS
2  Bloomberg just so you could check a box
3  that said you made X many calls in a
4  particular day?
5      MS. COLE-CHU:  Objection.
6      A.  I didn't sacrifice anything. I
7  still communicated what Mike's positions
8  were and tried to get voters.
9      Q.  Okay. And you made a decision
10 that in order to meet your goals, the
11 most effective way to get all the things
12 done that you had to get done was to use
13 the talking points and whatever the
14 particular talking point was that
15 responded to the voter's issues, correct?
16     A.  Yes. Correct.
17     MS. BLOOM:  I'm going to ask
18 the concierge to please put up on
19 the screen under folder 51 and mark
20 it as Exhibit 8, please?
21     (Ceppos Exhibit 8, email dated
22 March 10, 2020 from Aaron Summers
23 to Robin Ceppos, Bates P006690 was
24 received and marked on this date
25 for identification.)

ROBIN CEPPOS

1  ROBIN CEPPOS
2      Q.  This is a copy of a document
3  that has Bates P006690 that was also
4  produced by you. If you could take a
5  minute to review it and let me know when
6  you've had a chance to review it?
7      A.  I reviewed it.
8      Q.  Okay. This looks like an email
9  from Aaron Summers to you dated March 10
10 of 2020; is that correct?
11     A.  That's correct.
12     Q.  He's describing the duties and
13 responsibilities of a field organizer on
14 the Bloomberg campaign, specifically your
15 duties and responsibilities; is that
16 right?
17     MS. COLE-CHU:  Objection.
18     A.  He was trying to make it sound
19 better than it was. Since I was with him
20 when he did this, he just took it from
21 online and, you know, changed out the
22 dates. But, again, I didn't write this,
23 so I don't know.
24     Q.  I understand that you didn't
25 write it. But he says in the first

ROBIN CEPPOS

1  ROBIN CEPPOS
2  bullet, "Coordinate opening of campaign
3  field office in Pasadena, lead office in
4  absence of Regional Organizing Director."
5  Do you see that?
6      A.  I do see that.
7      Q.  And is that a true statement?
8      A.  I did not lead the office in
9  the absence of the regional field
10 organizer. We were involved in the
11 opening. We didn't really -- I mean, it
12 depends. Like, we didn't coordinate
13 anything. We weren't involved with any
14 vendors or leases but we were there,
15 yeah. This is why I put on my resumé as
16 you saw that I produced, I did not put
17 specifics because a lot of this were the
18 things that when you look up what a field
19 organizer does, we actually did not do,
20 so I didn't feel comfortable.
21     Q.  I'm focused on just the first
22 bullet for now. You said that you didn't
23 coordinate the opening but you did
24 participate in the opening of the field
25 office in Pasadena; is that right?

ROBIN CEPPOS

1  ROBIN CEPPOS
2      A.  I was there when it opened,
3  yeah.
4      Q.  And it says, "Lead office in
5  absence of Regional Organizing Director."
6  Are you testifying now that's a false
7  statement?
8      MS. COLE-CHU:  Objection.
9      A.  It's not a false statement but
10 I did not do that. Aaron sometimes, when
11 Tim would go to lunch, they wanted a man
12 to be there at all times, so he was --
13 sat in when Tim went to lunch but I was
14 never alone in the office.
15     Q.  Okay. So you interpret "lead
16 office" as being alone in the office?
17     A.  Yeah.
18     MS. COLE-CHU:  Objection.
19     A.  I mean, based on what we
20 needed, it was -- someone was there.
21     Q.  And your testimony --
22     A.  And like --
23     Q.  Your testimony is that Aaron
24 did that but you did not; is that right?
25     A.  A-hum. That's correct. And the

27 (Pages 102 - 105)

Page 106

ROBIN CEPPOS

1
2  definition of lead that I'm describing
3  isn't lead like I'm a leader, but lead
4  like be the one that was there and
5  available.
6      Q.   Okay. So if something came up
7  whoever the person was that was there and
8  available would have to deal with what
9  came up, correct?
10      A.   Text him or Jonathan or
11  someone higher up, yes.
12      Q.   But you had to solve the
13  problem even if it means reaching out to
14  someone else, correct?
15          MS. COLE-CHU:  Objection.
16      A.   We did not make decisions. It
17  was basically if someone -- to hand out a
18  flier or give something and say you can
19  come back when our boss is here and we
20  would -- Aaron would text our boss and
21  say, like, this person stopped in or
22  something but...
23      Q.   You said a few minutes ago
24  that Aaron was alone in the office so you
25  weren't there, is that right?

Page 107

ROBIN CEPPOS

1
2          MS. COLE-CHU:  Objection.
3      A.   There were sometimes when I
4  was there but I was never alone, like I
5  said.
6      Q.   Okay. Now I'm asking you about
7  Aaron. You testified just two minutes ago
8  that Aaron was sometimes alone in the
9  office.
10          On the times that Aaron was
11  alone in the office you were not present,
12  correct?
13      A.   Correct.
14          MS. COLE-CHU:  Objection.
15      Q.   So you don't actually know
16  what he did or did not do; isn't that
17  right?
18      A.   I mean, he texted me all the
19  time. We were very close but I can't, you
20  know, say for sure.
21      Q.   No, I understand that you were
22  very close. We talked about that earlier.
23          My question was just about
24  whether you were present in the office
25  when he was supposedly or when he was

Page 108

ROBIN CEPPOS

1
2  alone in the office, and as I understand
3  it, you were not, otherwise he wouldn't
4  have been alone, correct?
5      A.   Correct.
6      Q.   Okay. It goes on.  The second
7  bullet is "Train, lead, build and
8  maintain relationships with campaign
9  volunteers to multiply and maximize
10  overall field operations." Do you see
11  that bullet?
12      A.   Yes, I do.
13      Q.   Do you agree with that?
14      A.   Agree in what sense, that
15  that's what he wrote or that we did that?
16      Q.   Well, first, that is what he
17  wrote, correct?
18      A.   Yes, that's what he wrote.
19      Q.   Are you saying that what he
20  wrote is false?
21          MS. COLE-CHU:  Objection.
22      A.   This was a draft of blurbs for
23  a resumé. It was never published
24  anywhere.  It was never -- because I
25  mean, we didn't -- it just -- it didn't

Page 109

ROBIN CEPPOS

1
2  -- it doesn't explain what our job duties
3  were.
4      Q.   Okay. Let's talk about
5  volunteers, though. You did have some
6  responsibilities for recruiting
7  volunteers, correct?
8      A.   We --
9      Q.   I'm talking about you
10  personally.
11      A.   Okay.
12      Q.   You recruited volunteers,
13  right?
14      A.   Me, personally, I asked people
15  on the phone to come volunteer and to
16  join, like, phone banks but that was all
17  in the talking points and something you
18  were supposed to say.
19      Q.   Okay. Talking points aside,
20  did you or did you not try to get
21  volunteers to come volunteer for the
22  campaign?
23      A.   Yes, I did.
24      Q.   And that was one of your
25  responsibilities, to try to get

28 (Pages 106 - 109)

ROBIN CEPPOS

1
2 volunteers to come and volunteer for the
3 campaign, correct?
4     A.   To call potential voters and
5 ask them to volunteer.
6     Q.   Okay. And did you do that?
7     A.   Yes.
8     Q.   Okay. And did you do anything
9 else to try to attract volunteers?
10    A.   I think we posted on social
11 media and there was, like, this app that
12 you were supposed to send, it would give
13 you news articles and you were supposed
14 to use your personal contacts and send a
15 certain amount of messages per day. So I
16 did do that, yeah.
17    Q.   Did you use your personal
18 contacts to try to attract volunteers,
19 correct?
20    A.   Correct, but they weren't
21 really -- it was -- no one ended up
22 volunteers of my personal contacts. I had
23 just moved to California, I -- you know,
24 most of my contacts were not in
25 California.

ROBIN CEPPOS

1
2 take any steps to try to recruit
3 volunteers to volunteer for the campaign?
4         MS. COLE-CHU:  Objection.
5     A.   There was one volunteer that
6 someone reached out to me, someone that I
7 knew that knew I was working on the
8 Bloomberg campaign reached out to me and
9 asked if I could help this person become
10 a volunteer, so I did do that. That's the
11 only one that I remember.
12    Q.   Okay.
13    A.   It was a long time ago.
14    Q.   And once the volunteer -- I
15 understand it was a long time ago and I'm
16 just asking for your best recollection.
17 So if the answer is you don't remember,
18 there may be somebody that remembers it
19 better or more clearly.
20         With regard to the volunteers
21 on the campaign, what were they supposed
22 to do?
23    A.   Make phone calls.
24    Q.   From the -- from the phone
25 bank?

ROBIN CEPPOS

1
2     Q.   Okay. I understand that you
3 may not have been -- you may not have
4 successfully performed that job duty but
5 my question was whether or not you used
6 your -- you reached out to your personal
7 contacts to try to get them to volunteer
8 for the Bloomberg organization?
9     A.   It was a requirement, we had
10 to link up our personal contacts with
11 this app. It was not my choice but, yes,
12 I did it.
13    Q.   And once you linked them up
14 did you make any outreach to any of your
15 personal contacts?
16    A.   Yeah. You had to send them --
17 the app would pop up with different
18 articles about the campaign and then you
19 were supposed to send a certain amount of
20 messages per day.
21    Q.   And did you reach out to your
22 personal contacts?
23    A.   Through the app, yes.
24    Q.   Okay. Other than that is it
25 your testimony here today that you didn't

ROBIN CEPPOS

1
2     A.   Yes, come into the office and
3 make calls.
4     Q.   Okay. Did they have to come
5 into the office to do it?
6     A.   I don't remember. I think we
7 weren't set up at the beginning for them
8 to do it from home but I think later when
9 we got a dialer which dials people
10 automatically they were able to do it
11 from home.
12    Q.   And did you make phone calls
13 from home?
14    A.   Yes.
15    Q.   Did you make phone calls from
16 the office?
17    A.   Yes.
18    Q.   How did you decide whether to
19 go into the office or do it from home?
20    A.   We were in the -- I was in the
21 office most of the day. There were -- we
22 were required to make phone calls pretty
23 -- you know, around dinner time, late
24 into the evening, et cetera. So that's
25 when I would usually do it from home.

Page 114

1        ROBIN CEPPOS
2 Unless, like, the one time I told you I
3 had a migraine and that was during
4 earlier in the day.
5    Q.   How much of your time did you
6 spend canvassing versus making phone
7 calls?
8    A.   Like I said earlier, about 70%
9 phone calls and 30% canvassing.
10    Q.   And the canvassing was
11 confined to California, correct?
12       MS. COLE-CHU:  Objection.
13    A.   Correct. Although, we did have
14 people -- for me it was confined to
15 California. Other staffers, like
16 Washington State had voted right before
17 California, they came in and canvassed in
18 California after, so there were
19 cross-state employees.
20    Q.   Okay. So there were people in
21 Washington whose experience was different
22 than yours in California because you only
23 canvassed in California, correct?
24    A.   Correct.
25    Q.   Okay. In terms of the phone

Page 115

1        ROBIN CEPPOS
2 calls, you only called voters in
3 California; isn't that right?
4       MS. COLE-CHU:  Objection.
5    A.   That's incorrect. That's
6 false.
7    Q.   How did you know where a voter
8 was located?
9    A.   It pops up on the ActBlue,
10 when you go to check them off it tells
11 you where they're registered to vote,
12 whether -- the area code pops up.
13    Q.   And I'm not sure I understand
14 that. Did you use the auto dialer?
15    A.   Yeah, I used the auto dialer
16 sometimes and sometimes I used the
17 ActBlue but you still had to go through
18 and, like, mark off who you talked to.
19    Q.   Okay. And with regard to who
20 you talked to, you don't know where that
21 person was primarily located, right?
22    A.   No, it tells you, the dialer
23 tells you.
24    Q.   If the dialer tells you the
25 area code, does the dialer tell you where

Page 116

1        ROBIN CEPPOS
2 the person physically is?
3    A.   I don't remember but ActBlue
4 definitely does. It tells you where they
5 are registered to vote, where they last
6 voted and where -- you know, if they're
7 traveling that may not be there but the
8 implication is that they're a voter
9 somewhere else if it says that.
10    Q.   What proportion of your calls
11 were to out-of-California voters?
12       MS. COLE-CHU:  Objection.
13    A.   At the first couple weeks that
14 I was on the campaign it was just
15 California voters because those were --
16 when we were trying to get people,
17 asking, you know, if they're registered
18 in the Democratic primary, et cetera, et
19 cetera.  Whereas, the last couple weeks
20 it was based on what states were voting
21 then and if we ran out of, like,
22 California they would bump in Florida or
23 other states.
24    Q.   So when you say "the last few
25 weeks", you mean the last two weeks that

Page 117

1        ROBIN CEPPOS
2 you worked for the campaign?
3    A.   To be safe I would say the
4 last two weeks, but it may have been
5 earlier, I just don't recall.
6    Q.   Okay. And what you were
7 supposed to do is you were first supposed
8 to exhaust the list of California voters,
9 correct?
10    A.   Well, first you were supposed
11 to -- I didn't come up with the list so,
12 you know, it was whoever I got. But the
13 goals that we were given at the beginning
14 were, you know, we need to make sure
15 people are registered, et cetera, in
16 California and then you want to talk to
17 the people that are voting that, you
18 know, when the election is coming up, and
19 there were a lot of states that voted on
20 the same day as California, so those were
21 the ones that we were primarily reaching
22 out to or were coming into the lists.
23    Q.   Were there field organizers in
24 those states?
25    A.   Yeah, there were. Well, not in

30 (Pages 114 - 117)

Page 130

ROBIN CEPPOS

1
2      A.   Harry, the one that I
3  recruited personally.
4      Q.   So you it won't a neighborhood
5  together. Did you go door to door
6  together or give out pamphlets together,
7  whatever you did that day?
8      A.   Harry would come with us a
9  lot. He had a car and I didn't have a
10 car, Aaron didn't have a car.  So there
11 were certain times that we would go to
12 neighborhoods, certain times we would go
13 to malls or town squares, but yes.
14     Q.   And was he specifically with
15 you or did you split up once you got
16 there?
17     A.   If we split up it would just
18 be, like, on the different street -- or
19 same street, different side of the
20 street -- excuse me -- but we could see
21 each other.
22     Q.   Did you tell him what he was
23 supposed to be doing?
24     A.   He -- he was trying to get a
25 job with the campaign and he, you know,

Page 131

ROBIN CEPPOS

1
2  would come to our staff meetings and
3  stuff, so he knew.
4      Q.   Did you have -- I assume that
5  you would have liked to see him get a
6  job; is that right?
7      A.   Oh, of course. He was a very
8  --
9      Q.   Did you help him at all?
10        MS. COLE-CHU:  I'm sorry. I
11     need to pause.
12        Ms. Bloom, I would like to ask
13     that you to let the witness finish
14     giving her response and not speak
15     over her.
16        MS. BLOOM:  Certainly it's
17     never been my intent to speak over
18     her at all.
19     Q.   I assume you wanted to see him
20 succeed and get a job, correct?
21     A.   He was a very big Bloomberg
22 supporter, so I would have loved for him
23 to get a job. I did, you know, introduce
24 him to staff but I was never involved in
25 any of the conversations or anything like

Page 132

ROBIN CEPPOS

1
2  that.
3      Q.   Did you give him suggestions
4  for how to be effective in dealing with
5  potential voters?
6      A.   No. He had also worked on
7  campaigns before and had a political
8  science degree, so I believe he was
9  pretty well equipped and understood.
10     Q.   So his past experience was --
11 you found was helpful and made him an
12 effective campaigner?
13     A.   Yes.
14     Q.   As a field organizer you said
15 your duties were to make phone calls and
16 to see canvassing; is that right?
17     A.   Correct.
18     Q.   And the phone calls were try
19 to get people to support Mike Bloomberg
20 and volunteer for his campaign; is that
21 right?
22     A.   Yes.
23     Q.   You did not ever ask anybody
24 to make a campaign contribution, correct?
25     A.   There was a fundraiser that I

Page 133

ROBIN CEPPOS

1
2  was invited to at someone's house but I
3  did not end up going. That's the only
4  time I remember making -- well, let me
5  take that back.  That's the only time I
6  could recall conversations about donating
7  to the campaign directly but we were
8  asked to have people buy sweatshirts,
9  SWAG, et cetera, and that did benefit the
10 campaign as well.
11     Q.   So you weren't supposed to ask
12 people for money, correct?
13     A.   Correct.
14     Q.   And in terms of the SWAG that
15 you just talked about, some of it was
16 given away free; is that right?
17     A.   Yeah, some of it was and --
18 but if someone, like, asked us on the
19 phone or something like that, we weren't
20 in person and didn't have the SWAG, then
21 we were to direct them to the website to
22 buy it.
23     Q.   And the purpose of people
24 having SWAG was to get out Mike
25 Bloomberg's name, correct?

34 (Pages 130 - 133)

Page 134

1        ROBIN CEPPOS
2    A.  I was not involved in
3  conversations about what the purpose of
4  the SWAG was.
5    Q.  Okay. It's true that the
6  campaign did not earn anything above cost
7  on any of the SWAG that was sold, that
8  was actually sold, correct?
9        MS. COLE-CHU:  Objection.
10   A.  I don't know what "above cost"
11 means and I wasn't involved in the
12 finance, you know.  I didn't see
13 accounting or any of that. I can't speak
14 to that.
15   Q.  So you have no idea whether
16 the campaign made money off of selling
17 SWAG, that that's your testimony, right?
18   A.  I've read that they made money
19 off it, but based on my personal
20 experience, I don't know.
21   Q.  Okay. And you don't know if
22 the SWAG, to the extent it was sold and
23 not given away, was sold at cost, you do
24 not know that, correct?
25   A.  I don't know what "at cost"

Page 135

1        ROBIN CEPPOS
2  means.
3    Q.  What does "at cost" mean to
4  you?
5        MS. COLE-CHU:  Objection.
6    A.  It sounds like a sales term or
7  something or an economics term but I
8  don't know. Does it mean, like, what it
9  cost to make it?
10   Q.  Do you know whether the
11 campaign made a profit on any of the SWAG
12 that was sold as opposed to SWAG that was
13 given away?
14       MS. COLE-CHU:  Objection.
15   A.  Oh, I don't know. I read that
16 they did but I don't know personally.
17   Q.  Okay. And would you agree with
18 me that anything that the campaign
19 received was treated as a campaign
20 contribution?
21       MS. COLE-CHU:  Objection.
22   A.  I don't know because usually
23 when someone makes a contribution towards
24 a campaign I think it might be tax
25 deductible and it's, like, recorded under

Page 136

1        ROBIN CEPPOS
2  the FEC reporting guidelines that you
3  have to upload and I don't think if
4  someone purchased, you know, a sweatshirt
5  that that was included.
6    Q.  Do you know?
7    A.  I said I don't know about the
8  finances or the accounting. I was not --
9  -- all I know is what I read and I can't
10 confirm the sources.
11   Q.  Okay. You didn't order any of
12 the SWAG from any manufacturers, did you?
13   A.  No, I was not involved.
14   Q.  You had no role in determining
15 what the SWAG was; is that right?
16   A.  Correct.
17   Q.  And you said that there was
18 SWAG that you gave away; is that right?
19   A.  When someone would come into
20 the office if they wanted something we
21 would offer them that. A lot of the time
22 the Pasadena office did not have a lot of
23 SWAG but the LA office did. So that's
24 when we would really tell people to go
25 online if we were in Pasadena.

Page 137

1        ROBIN CEPPOS
2    Q.  If somebody said hey, I would
3  love a sweatshirt, you would say you can
4  go online and buy one?
5    A.  Yeah.
6    Q.  Did you ever direct somebody
7  to the site to buy SWAG who had not asked
8  you about purchasing merchandise?
9    A.  I don't think so but I don't
10 remember.
11   Q.  That wasn't part of the
12 so-called script, though; isn't that
13 right?
14   A.  No. It was -- you know, if
15 they saw us wearing the sweatshirt or if
16 they wanted one they would ask but I
17 didn't, no, try to push people --
18   Q.  Now, you didn't push people to
19 buy it and you didn't initiate the
20 conversation about buying it, right?
21   A.  If I could have finished my
22 sentence, I was going to say, I didn't
23 push them to buy it without them asking
24 first.
25   Q.  And if somebody asked you

35 (Pages 134 - 137)

Page 150

ROBIN CEPPOS

1
2 a copy of the Employee Handbook?
3    A.   I do recognize it. I have not
4 seen it in a very long time. I tried to
5 get access to it after they fired us or
6 laid us off but I couldn't -- when I
7 would log in it wouldn't let me because
8 all of the systems were shut down.
9        So I do recognize it. I don't
10 -- but I don't know what -- you know,
11 details of it since I haven't seen it in
12 so long.
13    Q.   If we can just go to the last
14 page, I just want you to confirm that
15 that's the acknowledgment that you signed
16 acknowledging receipt of the handbook,
17 please?
18    A.   Yes, I did acknowledge
19 receiving the handbook.
20    Q.   Okay. Now, if we can go to
21 page 10 of the handbook, please,
22 specifically the travel and business
23 expenses policy?
24        You're aware there was a
25 travel and business expense policy

Page 151

ROBIN CEPPOS

1
2 contained in the handbook; is that right?
3    A.   Contained in the handbook,
4 yes, and you were supposed to contact
5 human resources, like it says in the
6 handbook. And after the campaign ended I
7 contacted human resources, they sent me
8 to a form to upload receipts and the form
9 did not work and I asked multiple times,
10 emailed asking for help and got no
11 response.
12    Q.   Okay. Let's take it one step
13 at a time. You can take down the exhibit.
14        You're aware that there was a
15 platform called Concur?
16    A.   Oh, that's the platform, yeah.
17 I did not have an account.  When I tried
18 to get an account it didn't work.
19    Q.   Did you try to get an account
20 during the time you were employed by the
21 campaign?
22        MS. COLE-CHU:  Objection.
23    A.   We -- you were only given an
24 account if you were dealing with vendors
25 or had things to upload related to, you

Page 152

ROBIN CEPPOS

1
2 know, campaign expenses, not for travel
3 and reimbursement, at least that's how
4 human resources and the campaign
5 explained it to me.
6        MS. BLOOM:  Can we take down
7    the exhibit, please, Mr. Concierge.
8    Q.   So my question was whether you
9 had signed up for an account at Concur
10 during the time that you worked for the
11 campaign.  And as I understand your
12 answer, your answer is that you did not;
13 is that right?
14    A.   I was not given the option so,
15 no, I did not but that wasn't because I
16 didn't want to.
17    Q.   So I asked you about expenses
18 that you claim that you were not
19 reimbursed for, right?
20    A.   Yes.
21    Q.   And you gave me an answer that
22 I didn't understand. So let's try to
23 break it down.
24        You put in for relocation
25 expenses, meaning from Washington, D.C.

Page 153

ROBIN CEPPOS

1
2 to California, right?
3    A.   I did not put into them. It
4 was sent to me because they knew I had
5 relocated. I never asked -- I mean, I
6 would have, but it was just added to my
7 paycheck one month.
8    Q.   Okay. So you got some amount
9 of money that was designated as a
10 relocation stipend; is that right?
11    A.   Correct.
12    Q.   Okay. Now, during the time
13 that you were working for the campaign
14 did you submit any business expenses?
15        MS. COLE-CHU:  Objection.
16    A.   Business expenses based on --
17 can you define what you mean by "business
18 expenses"?
19    Q.   Were there any expenses that
20 you claim you incurred while you were
21 working for the campaign that you should
22 have been reimbursed for and weren't?
23    A.   Yes, there were.
24    Q.   Okay. What were those?
25    A.   I don't remember them all off

39 (Pages 150 - 153)

ROBIN CEPPOS

1
2 receipts that you had from the time that
3 you worked on the campaign?
4        MS. COLE-CHU:  Objection.
5    A.   Aaron and I shared a lot of
6 rides and I shared rides with other
7 people too. So, you know, you would have
8 to get it from him and you would figure
9 out -- you would have to figure out who
10 paid for what when.
11   Q.   Are you seeking reimbursement
12 for Uber rides other than the ones
13 contained in Exhibit 12?
14        MS. COLE-CHU:  Objection.
15   A.   I don't know. I mean, I would
16 like to be reimbursed for all the Uber
17 rides that I took, including the ones
18 that I don't have access to because I did
19 pay for those, to the person who called
20 the Uber, the Lyft, but I don't -- that
21 would take a lot of work and I am not
22 talking to anyone about this case, so it
23 would require some more work.
24   Q.   Other than the documents in
25 Exhibit 12, do you have any other Uber

1        ROBIN CEPPOS
2 receipts that you are seeking
3 reimbursement for?
4        MS. COLE-CHU:  Objection.
5    A.   I don't understand your
6 question, exactly, given the way that
7 you're phrasing it.
8        As I said, if I had -- I would
9 like to be reimbursed for everything but
10 this is what I have access to and what
11 was on my Uber account, so this is what
12 I'm seeking compensation for right now.
13   Q.   Okay. Thank you.
14        We can take that down.  If we
15 can pull back up Exhibit 2, which was her
16 declaration, and go to the second page,
17 please. Can we put it on the screen,
18 please, Mr. Concierge?
19        CONCIERGE:  Yes, one moment.
20        MS. BLOOM:  Go to the second
21 page. Second page would be good,
22 and third page. Go up a little bit
23 more go back so we can see
24 paragraph 7. Okay.
25   Q.   You say that your typical

1        ROBIN CEPPOS
2 schedule was Monday to Sunday nine a.m.
3 to eight p.m. or nine p.m. Who set that
4 schedule?
5    A.   The campaign.
6    Q.   How did you know that that was
7 your schedule?
8    A.   We all had that schedule and
9 they provided us the schedule and told
10 us.
11   Q.   You had an optional day off
12 during the week, correct?
13        MS. COLE-CHU:  Objection.
14   A.   At the beginning, like the
15 first couple of weeks you did, you were
16 discouraged from using it and penalized
17 if you used it.
18   Q.   So at the beginning you had an
19 optional day off, though; is that right?
20   A.   I mean, optional but not
21 really because they threatened to fire
22 you, they said that you wouldn't meet
23 your metrics, which is true, you wouldn't
24 meet your metrics if you took your day
25 off and if you were low performing in the

1        ROBIN CEPPOS
2 metrics you would be fired.  So I don't
3 consider that a day off.
4    Q.   Okay.  So they said you could
5 have a day off but your testimony is that
6 you didn't think you could get them when
7 you were supposed to get them and take
8 your day off?
9    A.   Nobody could.  And my
10 testimony is that we were discouraged
11 from taking the day off and threatened to
12 be fired if we did take the quote/unquote
13 optional day off, which I don't know
14 anyone who would classify it as actually
15 optional.
16   Q.   Did anybody in either of the
17 two offices that you worked in get fired
18 for not meeting their metrics?
19        MS. COLE-CHU:  Objection.
20   A.   I don't remember specifically
21 but I think there were a couple, yeah.
22   Q.   You don't remember any of
23 their names, though?
24   A.   Uh-uh.  And I think some quit
25 as well because the hours were

43 (Pages 166 - 169)

ROBIN CEPPOS
1
2 unrealistic and you couldn't meet your
3 metrics.
4     Q.   I'm asking about people who
5 were fired for not meeting their metrics.
6 As you testified, you think there was a
7 couple; is that your testimony?
8     A.   I don't recall is my
9 testimony.
10     Q.   Okay. So possibly there is
11 nobody; is that right?
12     A.   Possibly.
13     Q.   Now, in terms of your duties
14 and responsibilities in paragraph 9 you
15 say, "My main duties as a field organizer
16 were to call prospective voters to
17 promote Michael Bloomberg's candidacy for
18 President and to recruit volunteers for
19 phone banking and canvassing efforts."
20          Is that a fair
21 characterization of your main job duties?
22     A.   Yes.
23     Q.   And in terms of calls to
24 prospective voters, where did you make
25 those calls from?

ROBIN CEPPOS
1
2     A.   Primarily from the office but
3 sometimes from home.
4     Q.   And how did you decide whether
5 to do them from home or from the office?
6     A.   I believe you've already asked
7 me this question but I'm happy to provide
8 it again.
9          If it was, you know, a late
10 evening and we were allowed to do it from
11 home.  And our typical -- like, there was
12 a three-hour block where you had to be on
13 the dialer and that was -- I think it
14 went up to -- like, it was, like, five to
15 eight or six to nine or something.  I
16 don't remember exactly but if you were
17 eating -- you needed to make dinner while
18 you were doing it, like, there was just
19 no other time to get anything else done.
20 So typically in the evenings I would be
21 doing it from home.
22     Q.   So you could be on the dialer
23 and making dinner or eating dinner; is
24 that your testimony?
25     A.   Yeah.

ROBIN CEPPOS
1
2     Q.   Okay. Now, when you were at
3 home you were not supervised; is that
4 right?
5          MS. COLE-CHU:  Objection.
6     A.   We were supervised constantly,
7 you know, being texted, Slacked, checked
8 in with, but not, you know, face-to-face.
9     Q.   Now, when you were in the
10 office, and we already -- as you say in
11 paragraph 9 here, sometimes you would be
12 doing phone banking and sometimes you
13 would be doing canvassing, and when you
14 were doing the phone banking in the
15 office, how many people would be in the
16 office at the same time doing phone
17 banking?
18     A.   In the Downtown LA office,
19 that was huge. I would say at least 20.
20 In the Pasadena office it would range
21 from, like, two to, like, five, six.
22     Q.   Were there also volunteers
23 doing phone banking at the same time?
24     A.   Sometimes, not always but
25 sometimes.

ROBIN CEPPOS
1
2     Q.   Did anybody keep track of your
3 calls other than you?
4     A.   Yes, the campaign did. There
5 was, like, a spreadsheet that they would
6 produce weekly that showed the top
7 performers, how many calls, how many
8 people they talked to and I know the
9 campaign used that to talk about which
10 states were performing better than
11 others, et cetera. Our State Director,
12 Chris Myers, spoke to us a lot about that
13 and the fact that we needed to be the
14 best performing state.
15     Q.   And how do you define "best
16 performing"?
17     A.   The way they defined it, the
18 campaign defined it or me, was the most
19 calls or --
20     Q.   What do you mean "the most
21 calls"? Most calls per person or most
22 calls per office?
23     A.   Well, we were all -- all of
24 those things were measured. You wanted to
25 make the most calls per person but also

44 (Pages 170 - 173)

Page 174

ROBIN CEPPOS

1
2 you wanted your office to, you wanted
3 your state to.
4     Q.   When you were physically in
5 the office making calls, was there
6 somebody supervising the office?
7     A.   Sorry. I didn't hear. Somebody
8 what in the office?
9     Q.   Supervising the office.
10    A.   I'm not understanding.
11    Q.   Was there a supervisor in the
12 office or --
13    A.   Oh, supervisor.
14    Q.   -- or were you on your own?
15    A.   Yes. There was a supervisor,
16 yeah, a ROD.
17    Q.   And what was the ROD -- what
18 did the ROD do while you made calls?
19    A.   He often made calls too
20 because he had his metrics to hit.
21    Q.   So he was making his own
22 calls; is that right?
23    A.   Yes.
24    Q.   Are you aware of other field
25 organizers who used volunteers to make

Page 175

ROBIN CEPPOS

1
2 their calls and then the field organizers
3 went out and did other things?
4     A.   No. I didn't even know that
5 was a thing.
6     Q.   Okay. So that wasn't a thing
7 in LA or Pasadena; is that your
8 testimony?
9         MS. COLE-CHU:  Objection.
10    A.   I can't say for certain that
11 no one did it. I don't know of anyone
12 doing it and my testimony is that I --
13 the first time that I've even heard of
14 that was you bringing it up now.  So I
15 don't know of anyone who did it, no.
16    Q.   Now, during the time that you
17 were working in the Downtown office, did
18 you ever take a break?
19        MS. COLE-CHU:  Objection.
20    A.   We were given 15 minute breaks
21 to go and get food, things like that.
22 But you always had to -- if it was, like,
23 that three-hour window where you had to
24 be on a call you still had to have your
25 earplugs in and be dialing while you were

Page 176

ROBIN CEPPOS

1
2 walking. As soon as you got the food you
3 had to get back on. You weren't -- it
4 wasn't like what I would characterize as
5 a break from my job duties. I was still
6 doing my job duties the whole time.
7     Q.   Okay. Did you ever take a
8 break when you continued to do your job
9 duties?
10        MS. COLE-CHU:  Objection.
11    A.   Not that I remember, except
12 for the times that I mentioned to you
13 when I had a migraine once and went home
14 and laid down and another time when I
15 threw up when I was canvassing.
16    Q.   When you worked in the
17 Pasadena office did you ever take a
18 break?
19        MS. COLE-CHU:  Objection.
20    A.   If we took a break we were --
21 like, sometimes we would take walks, we
22 had to bring literature and pass that
23 out.  And, Tim, who was my ROD, would
24 say; okay, I can let you take a break if
25 you, like, hand stuff out.

Page 177

ROBIN CEPPOS

1
2     Q.   Do you know anybody that
3 smoked in either of the two offices that
4 you worked in?
5     A.   No.
6     Q.   If you wanted to get coffee
7 during the day could you walk outside and
8 go get a cup of coffee?
9     A.   Yeah, but you still had to be
10 on your -- have your headphones in, if
11 you were making a call, be on Slack, be
12 communicating, pass out.  So you were
13 never, like, really -- it was -- I was
14 told that if I wanted to do that I needed
15 to be available or hand out literature,
16 like...
17    Q.   If you wanted to make a
18 personal call, how would you do that?
19    A.   You would do that very late at
20 night. My mom -- there were so many calls
21 where I would just ignore her because you
22 just weren't available to take a personal
23 call. I had doctor's appointments that
24 were on Saturdays because of it or late
25 at night, Saturdays and Sundays we would

45 (Pages 174 - 177)

Page 178

ROBIN CEPPOS

1
2  come in sometimes a little later than --
3  you were allowed to start at 10, I think.
4     Q.   So you would make your
5  doctor's appointments for Saturdays?
6     A.   A-hum.
7     Q.   Sorry. You have to say yes or
8  no.
9     A.   Yes.
10    Q.   What other personal
11 appointments did you make on the weekend?
12    A.   I would sometimes see a friend
13 but there were -- depending on what the
14 hours were that day, I would change based
15 on where we were. My typical schedule was
16 eight a.m. to nine or nine p.m. every day
17 but there were some days that they would
18 let us start at ten.
19    Q.   Did you see other people
20 taking breaks or going for a walk?
21       MS. COLE-CHU:  Objection.
22    A.   I saw people going for a walk,
23 going to get food, but they had their
24 headphones in and were making calls while
25 they were doing that. I never saw anyone,

Page 179

ROBIN CEPPOS

1
2  like, take a real break.
3     Q.   So when you say they had their
4  headphones in and they were making calls,
5  you didn't accompany them so you don't
6  actually know whether or not they were
7  making calls; is that right?
8       MS. COLE-CHU:  Objection.
9     A.   I mean, I wasn't in their ear.
10 We would talk about this as field
11 organizers and talk about how we were
12 required to do this, but I was not
13 listening to their conversations or their
14 headphones.
15    Q.   Did you bring your lunch?
16    A.   Sometimes.
17    Q.   And on the days when you
18 didn't bring your lunch, how would you
19 get food?
20    A.   Walk to pick something up
21 while I was making calls or Uber Eats.
22 Uber Eats was very common coming to the
23 office because so many people knew they
24 couldn't leave.
25    Q.   So you were in Downtown LA and

Page 180

ROBIN CEPPOS

1
2  you wanted to get food, is it fair to say
3  you would walk somewhere and bring it
4  back; is that your testimony?
5       MS. COLE-CHU:  Objection.
6     A.   Sometimes, and sometimes I
7  would Uber Eats and sometimes I wouldn't
8  eat lunch.
9     Q.   Sometimes what?
10    A.   I wouldn't eat lunch.
11    Q.   And when the food would come
12 from Uber Eats, what did you do?
13    A.   You went to the door, picked
14 it up, sat down, ate it while you made
15 calls or were in a meeting while they
16 talked.
17    Q.   When you worked in Pasadena
18 how would you get food?
19    A.   I would always walk in
20 Pasadena but I did not eat lunch every
21 day.
22    Q.   How many days a week did you
23 not eat lunch?
24    A.   The majority. I lost a lot of
25 weight because we were discouraged from

Page 181

ROBIN CEPPOS

1
2  taking breaks and I was stressed that I
3  was going to get fired.
4     Q.   Who discouraged you from
5  taking breaks?
6     A.   The campaign.
7     Q.   When you say "the campaign",
8  is there a --
9     A.   Jonathan Valencia was probably
10 -- Jonathan Salvador, was very very
11 aggressive toward field organizers and
12 the fact that we needed to constantly be
13 making calls or canvassing and...
14    Q.   In your declaration you say
15 that, "The campaign required that I meet
16 certain metrics for the number of calls
17 that I made, which were many per week."
18       What were your metrics for
19 calls per week?
20    A.   I can't tell you. I don't
21 remember.
22    Q.   You say here that you also had
23 to do canvassing, and we've talked about
24 canvassing. There were no metrics for
25 canvassing, correct?

46 (Pages 178 - 181)

Page 182

```
1          ROBIN CEPPOS
2       MS. COLE-CHU:  Objection.
3    A.  I think there were. It was a
4 certain amount of doors you had to hit
5 and also a certain number of people you
6 had to -- who were Mike Bloomberg voters
7 that you had to talk to and make sure or
8 persuade to become Bloomberg voters, but
9 I don't remember what those numbers were.
10   Q.   And when you were canvassing
11 you were out there on your own, nobody
12 was watching how you spent your time,
13 correct?
14   A.  Well, other field organizers
15 were with you, sometimes a ROD or a
16 surrogate or someone would come but for
17 the majority of the time, yeah, you were
18 on your own. They were tracking you via
19 an app to make sure you were going to the
20 doors and they were -- you had to, you
21 know, check off as you did it, so you
22 were being virtually supervised.
23   Q.   And if you wanted to eat lunch
24 when you were canvassing, what would you
25 do?
```

Page 183

```
1          ROBIN CEPPOS
2    A.  That was different. We were
3 allowed to -- like, you can take a lunch
4 break because you're not somewhere where
5 you can go and -- like, there's not an
6 office where you can sit while you eat
7 and make calls. There is nowhere, unless
8 you're, you know, eating at someone's
9 house that you canvassed, there is just
10 no place to do that.
11   Q.   So when you were canvassing
12 you took breaks?
13       MS. COLE-CHU:  Objection.
14   A.  I didn't really canvas a lot
15 during, like, lunchtime, though or -- it
16 was usually in the evenings or mornings
17 you would get people when they were home.
18 So I don't recall really a lot of
19 specifics about taking breaks.
20   Q.   Okay. My question is just a
21 little different than that. Based on your
22 testimony, when you were canvassing you
23 could take a break if you wanted to,
24 correct?
25       MS. COLE-CHU:  Objection.
```

Page 184

```
1          ROBIN CEPPOS
2    A.  If it wasn't at a break time
3 that was classified in the schedule.
4    Q.   And it says in paragraph 9
5 that you met with voters and you went
6 door to door to encourage voters to vote
7 for Michael Bloomberg, correct?
8    A.  Yes.
9    Q.   So that was your mission, get
10 voters for Mr. Bloomberg, correct?
11   A.  Yes.
12   Q.   That was the goal of the whole
13 organization, to get him elected, right?
14   A.  Yes.
15   Q.   And in order to get him
16 elected he had to have a sufficient
17 number of voters, correct?
18   A.  Yes.
19   Q.   Now, during the time that you
20 worked for the campaign you were provided
21 with an itemized wage statement; isn't
22 that right?
23       MS. COLE-CHU:  Objection.
24   A.  I don't know. I don't --
25 everything was direct deposit. I don't
```

Page 185

```
1          ROBIN CEPPOS
2 think I ever saw an itemized wage
3 statement, but maybe there was one that I
4 don't remember seeing.
5    Q.   Did you ever look to see if
6 you had a wage statement?
7       MS. COLE-CHU:  Objection.
8    A.  I --
9    Q.   You said your money was direct
10 deposited.  Did you ever look at what
11 information was provided along with the
12 direct deposit?
13   A.   No. Well, I did when I paid my
14 taxes, but most of the time it was -- no,
15 I mean, not while I was there.
16   Q.   Did you ever notice any
17 information missing from your wage
18 statements when you reviewed them?
19   A.   No. Other people had
20 information missing and we were
21 encouraged to review the wage statements
22 if something -- the amount you received
23 via direct deposit was off, but mine was
24 not off.
25   Q.   So you said people were
```

47 (Pages 182 - 185)

ROBIN CEPPOS

1
2 California when I was working on the
3 campaign.
4     Q.   But you haven't been a
5 resident of California -- you said you
6 were a temporary resident of California.
7 You haven't even been a temporary
8 resident of California since April of
9 2020, correct?
10     A.   Correct.
11     Q.   Do you have any record of the
12 number of hours that you worked for the
13 campaign?
14     A.   I have the sheet that they
15 gave us but I don't -- I mean, I don't
16 know how they were tracking time.
17     Q.   You didn't keep track of your
18 hours?
19     A.   No, because they gave us a
20 schedule where everyone had to show up.
21 It wasn't on you to, like, you were
22 meeting with a client and you needed to
23 record it. It was, like, okay, this is
24 your time, you're there. If you weren't
25 there, you would obviously get called out

ROBIN CEPPOS

1
2 and get in trouble and that would
3 probably be recorded but if you followed
4 instructions, you were just counted as
5 being there.
6     Q.   You mean being in the office?
7     A.   Being in the office or being
8 -- having permission to make calls at
9 home if it was late.
10     Q.   When you would make calls at
11 home did you have to notify anybody when
12 you were done making your calls?
13     A.   There was a time period that
14 everyone was supposed to be on calls in
15 the evening. I think it was like a
16 three-hour period and if you didn't
17 notify somebody that it was done it was
18 just the time ended and you were done.
19     Q.   Did anybody take attendance?
20     A.   They took attendance when you
21 went to the office in the morning but
22 they didn't take attendance, I don't
23 think, on the calls. They took -- they
24 would see when they pulled the metrics,
25 like, that you were there.

ROBIN CEPPOS

1
2     Q.   When you say "when they pulled
3 the metrics", what information is
4 recorded in the metrics?
5         MS. COLE-CHU:  Objection.
6     A.   I think that the metrics that
7 the campaign pulled -- I don't know if it
8 was a daily or weekly basis -- was how
9 many calls you made and how many doors
10 you knocked and that's how you would be,
11 like, ranked.
12     Q.   But the metrics didn't include
13 the time of day that you made calls,
14 correct?
15     A.   No --
16         MS. COLE-CHU:  Objection.
17     A.   -- but they didn't care, as
18 long as you were making the calls and
19 hitting the metrics.
20     Q.   So they didn't care if you
21 were in the office or not at designated
22 times as long as you were meeting your
23 metrics; is that your testimony?
24     A.   No. My testimony is they
25 didn't care to track time of every

ROBIN CEPPOS

1
2 individual if you were meeting your
3 metrics because it was assumed that you
4 were -- in order to meet the metrics,
5 that you would be spending three hours in
6 the evening on calls and, you know, three
7 in the morning or whatever the schedule
8 broke out because the metrics also --
9     Q.   Go ahead.  I'm sorry.
10     A.   The metrics also changed based
11 on how far out you were from Super
12 Tuesday. Like, it became less calls and
13 more canvassing at that point.
14     Q.   When you got closer to Super
15 Tuesday?
16     A.   Yes.
17     Q.   I just want to make sure I
18 understand your answer. So the metrics
19 that you claim the campaign was looking
20 at had nothing about hours, it was just
21 about number of calls that were made; is
22 that right?
23         MS. COLE-CHU:  Objection.
24     A.   That's right.  But you were
25 required to be there during the hours and

49 (Pages 190 - 193)

Page 194

ROBIN CEPPOS

1        ROBIN CEPPOS
2  they produced a schedule but they were
3  not, from what I understand, tracking it
4  on an hourly basis. They were making
5  sure, you know, tracking us if they were
6  canvassing through an app and they were
7  tracking how many, you know, calls we
8  were making and checking off. But I don't
9  know how they were measuring that
10 specifically, if -- and, like, where the
11 data came from if they were looking at
12 time. They may have, I just don't know
13 because I wasn't involved in that.
14     Q.   So if you were making your
15 metrics did it matter how many hours you
16 put in or didn't put in?
17        MS. COLE-CHU:  Objection.
18     A.   It was impossible to meet the
19 metrics unless you put in the full 12
20 hours a day.
21     Q.   That wasn't my question. My
22 question was, the expectation was based
23 on meeting your metrics, not how many
24 hours you put in, correct?
25     A.   Correct, but you were also --

Page 195

1        ROBIN CEPPOS
2  if you met your metrics you still had to
3  make more calls and stuff. You weren't,
4  like, ever not supposed to make calls, it
5  was call time.
6      Q.   But you were judged on whether
7  you met your metrics or not, correct?
8      A.   A-hum. And then how much above
9  your metrics were, like, whoever made the
10 most calls; wow, this person, for
11 example, met his metrics but went way
12 overboard and made 5,000 more calls or
13 whatever, that person was rewarded.
14     Q.   You talked about -- first you
15 said that there were statewide calls that
16 took place?
17     A.   Yeah.
18     Q.   What's a statewide call?
19     A.   Everyone from every California
20 office was on the call.  Chris Myers, the
21 California State Director led them. He
22 would talk about which -- if there was
23 events happening, if Bloomberg was
24 visiting, what office that would be. And
25 then they would also talk about different

Page 196

1        ROBIN CEPPOS
2  regions and how they were performing.
3  So, like, LA would get a shout-out if LA
4  was number one that day on calls. So it
5  was sort of to pit us against each other,
6  in my opinion.
7      Q.   You said that they would talk
8  about what events were going on, whether
9  Mr. Bloomberg was visiting and then they
10 would also talk about if there was an
11 office that was doing particularly well?
12     A.   A-hum.
13     Q.   I'm sorry. You have to say yes
14 or no.
15     A.   Yes.
16     Q.   And could you call into this
17 call from anywhere?
18     A.   Yes, I believe you could.
19     Q.   How often did the call take
20 place?
21     A.   It was a daily call. And I
22 can't remember if it was in the morning
23 or the evening. There was one call that
24 was daily that was in the evening and one
25 that was in the morning and one was

Page 197

1        ROBIN CEPPOS
2  national and one was California-based.
3  And I believe the California-based one
4  was the one late at night, I think it was
5  at 10 or 9:30 or 10 and the national one
6  was in the morning but I don't -- I would
7  have to, like, ask someone or look back
8  on documents because I don't remember
9  which was which.
10     Q.   Did anyone take attendance on
11 the call?
12     A.   It was -- each of the RODs had
13 to say that they were there and
14 representing their region but they didn't
15 go through the specifics. The RODs were
16 responsible for knowing whether their
17 field organizers were on the call.
18     Q.   So if you took the call from
19 out of the office did you tell your ROD
20 that you were on it or not?
21     A.   Yes.
22     Q.   And did you ever speak on any
23 of the calls?
24     A.   I don't think so.
25     Q.   Was there ever any content on

50 (Pages 194 - 197)

Page 198

1          ROBIN CEPPOS
2 either the daily call or the national
3 call that you used in doing your
4 day-to-day job duties?
5     A.   Yeah. I mean, of course. They
6 would say when there was a new policy
7 position out or, like I said, when there
8 was an event, so you needed that
9 information, or if there was a schedule
10 change or...
11     Q.   What kind of a schedule
12 change?
13     A.   Like today we're starting at
14 10 because it's the weekend or we have an
15 event or there's a debate, so we're going
16 to -- we have a debate watch party and
17 everybody watches the debate at six, you
18 know, those kind of things.
19     Q.   They were not regular emails
20 from out-of-state campaign staff,
21 correct?
22        MS. COLE-CHU:  Objection.
23     A.   That's actually incorrect.
24 There were regular emails from --
25     Q.   What kinds of emails?

Page 199

1          ROBIN CEPPOS
2     A.   What emails?
3     Q.   What kinds of emails?
4     A.   There was press clippings that
5 came out every day and also email I think
6 from Dan Kanninen, I don't remember, it
7 was someone in headquarters who was in
8 charge of like the states and the field
9 program.
10     Q.   And what was the content of
11 the email from Dan Kanninen?
12     A.   I don't remember. I think it
13 was, like, a new office was opening
14 whether if, like, a new video came out
15 or, you know, stuff related to the
16 campaign, in general.
17     Q.   Was any record kept of whether
18 or not you actually read the email?
19     A.   I don't know if there was a
20 record kept.
21     Q.   Did you keep any of the
22 emails?
23     A.   Yeah. I kept them all in my
24 Bloomberg email, I think, or I would read
25 them and trashed them.  I don't really

Page 200

1          ROBIN CEPPOS
2 remember what I would do after I read
3 them, but they were in my Bloomberg
4 inbox.
5     Q.   And the emails were basically
6 informational; is that right?
7        MS. COLE-CHU:  Objection.
8     A.   I believe so. I don't remember
9 the details of every email.
10     Q.   But that sounds like a pretty
11 accurate characterization?
12     A.   Yeah.
13     Q.   Now, when we were talking
14 about the Second Amended Complaint and
15 you confirmed for me that you were just
16 an individual plaintiff in the Second
17 Amended Complaint, if you look at Exhibit
18 14, this is the proposed Third Amended
19 Complaint and you said that you were
20 familiar with that document as well; is
21 that right?
22     A.   Yes.
23     Q.   Now, in the Third Amended
24 Complaint you're seeking to take on a
25 larger role; is that correct?

Page 201

1          ROBIN CEPPOS
2     A.   Correct.
3     Q.   And how did that come about?
4     A.   I offered.
5     Q.   What made you offer?
6     A.   What made me offer was that
7 through discussions with my lawyer, there
8 was an opportunity and things that -- I
9 mean, I don't want to talk about
10 privileged information in the
11 conversations with my lawyers but it was
12 -- I learned new information that made me
13 -- gave me the option to be a class
14 representative.
15     Q.   Did you learn anything about
16 Ms. Wheatley Diaz and her desire to
17 participate or not participate in the
18 case?
19     A.   I know she wanted to
20 initially.  Like I said, I haven't talked
21 to her in a year and I don't talk to my
22 lawyers about Alex, I talk about me. So I
23 don't know anything about that.
24     Q.   And what do you understand --
25 if the court were to allow the Third

51 (Pages 198 - 201)

Page 202

ROBIN CEPPOS

1
2  Amended Complaint, what do you understand
3  your role would be?
4       MS. COLE-CHU:  Objection.
5    A.   My role is what I'm doing
6  right now, I produced documents,
7  discovery, I am meeting with you today
8  for this deposition.
9    Q.   What about your role as a
10 class representative, what do you
11 understand that to be?
12   A.   That I'm representing the
13 class of similarly situated field
14 organizers.
15   Q.   You've used the term
16 "similarly situated" many times today.
17 What does that term mean to you?
18   A.   That means that we were all
19 hired to do the same thing. Our job
20 duties may have not been exactly
21 identical down to the day-to-day but that
22 it consisted primarily of making phone
23 calls and canvassing on behalf of the
24 campaign.
25   Q.   You said, in terms of your job

Page 203

ROBIN CEPPOS

1
2  duties, they became more heavily weighted
3  toward canvassing toward Super Tuesday.
4  Would that be true for other field
5  organizers?
6    A.   I would assume so. In my past
7  experience on a campaign that always is
8  the case. It is also, though, dependent
9  on the area that you are in, urban,
10 rural, what the voter turnout looks like,
11 and that is determined by someone higher
12 up, usually in charge of some sort of
13 constituency or policy.  But we all do,
14 you know, basically the same thing, in
15 what we were told, given what region and
16 supervisors.
17   Q.   How does whether something is
18 urban or rural impact what you're going
19 to do and the mix of what you do?
20   A.   It depends on really the
21 constituents in the urban and rural area,
22 if it's primarily Democratic, primarily
23 Republican, many undecided. But, you
24 know, you may only need a certain -- a
25 smaller amount of people to win the

Page 204

ROBIN CEPPOS

1
2  precinct or the area because it's a
3  smaller community because, you know, all
4  of that is information that they provide
5  to us once we get -- once you get in the
6  field office you learn about the area.
7    Q.   So it's urban, rural, what the
8  constituency makeup is, what the
9  demographics are and how does whether you
10 have more undecided voters impact what
11 the field organizers do?
12       MS. COLE-CHU:  Objection.
13   A.   You do more -- you're supposed
14 to do more persuasion if you are, you
15 know, given the time to talk to people
16 and stuff, but yeah.
17   Q.   So if someone is undecided
18 there is more persuading to do to try to
19 get them to vote for whoever the
20 candidate is that you're advocating for?
21   A.   That's right. And that's why
22 in the phone script you showed me the
23 first question was, are you voting in the
24 primary, and then the second one is if
25 you're supporting Bloomberg or not. If

Page 205

ROBIN CEPPOS

1
2  they say yes, then, you know, it advises
3  you based on how they answer, if they're
4  undecided you go into the spiel and ask
5  them about what issues are important to
6  them.
7    Q.   And what do you do if somebody
8  is, like, a diehard; I'm not supporting
9  Bloomberg, what would you do in that
10 situation?
11   A.   It would depend on if it's a,
12 you know, a likely Democratic voter that
13 is planning to vote and is just
14 undecided, you could try to persuade them
15 still or if they're nasty and don't want
16 to talk then I'd end the call, but
17 everyone handles it differently.
18       MS. BLOOM:  Let's take a ten
19 minute break.
20       VIDEOGRAPHER:  The time is
21 2:10. We are off the record.
22       (Recess is taken.)
23       VIDEOGRAPHER:  Time is 2:21.
24 We are on the record.
25   Q.   With regard to the auto

52 (Pages 202 - 205)

Page 206

ROBIN CEPPOS

1
2 dialer, does that just make the calls for
3 you? Is that how that works?
4     A.   Yeah, that's what I remember.
5 I think it's an app but I don't -- I
6 don't remember the exact, you know, how
7 it does it.
8     Q.   What happens if someone
9 doesn't pick up?
10     A.   Oh, it sends you to the next
11 call.
12     Q.   So does it let it ring a
13 certain number of times?
14     A.   I don't think so. You're
15 always talking to someone.
16     Q.   So if someone doesn't pick up
17 it just goes right to the next call?
18     A.   Right. Because I don't think
19 you hear it ringing, from what I
20 remember. I think you just hear someone
21 pick up.
22     Q.   And what happens if somebody
23 picks up and hangs up?
24     A.   Oh, then you mark that off,
25 you say that they hung up on you.

Page 207

ROBIN CEPPOS

1
2     Q.   And how often did that happen?
3     A.   That they would hang up on
4 you? I don't remember. Like, usually -- I
5 mean, they would obviously always hang up
6 on you but usually you could get through
7 at least a couple of questions before
8 they would do that.
9     Q.   So somebody picks up the phone
10 and then you ask them a series of
11 questions?
12     A.   Yes.
13     Q.   And then the next question is
14 based on whatever the answer is to the
15 question before?
16     A.   Yeah, but when you do the auto
17 dialer, whether you're doing it on your
18 phone, the app on your phone or the
19 computer, but I think for the majority of
20 the time we would do it through the
21 computer, you would hit, like, "next"
22 once they answered the first question,
23 and there is a script on the screen.
24     Q.   And that was the script we
25 were talking about earlier?

Page 208

ROBIN CEPPOS

1
2     A.   No, it was a different one for
3 the dialer. The dialer -- I mean, a lot
4 of the questions were the same, like,
5 substance-wise but they may have been
6 worded a little differently and they
7 would walk you through, and you would hit
8 "next" and then it would pop up with what
9 you were supposed to say next.
10     Q.   And if the person -- again, if
11 someone is undecided you would ask them
12 what issues are most important to you?
13     A.   Yeah. And you would be able to
14 mark off if they were undecided in the
15 screen and if they -- I think you could
16 fill in a specific issue if they said it
17 but there was also a dropdown.
18     Q.   And then you would try to talk
19 to them about whatever that issue was and
20 what Mike Bloomberg's stance was on that
21 issue?
22     A.   A-hum. And if I recall the way
23 the dialer worked and the script was that
24 if you selected an issue on the, dropdown
25 like, they tell you climate change, then

Page 209

ROBIN CEPPOS

1
2 the climate change talking points pop up.
3     Q.   Okay. And it would explain,
4 like, what Mike Bloomberg's -- what his
5 position is, what he's done for climate
6 change?
7     A.   Yes.
8     Q.   You have to answer out loud.
9 I'm sorry.
10     A.   Yes.
11     Q.   With regard to the Third
12 Amended Complaint, what is your
13 understanding about the difference, if
14 any, in terms of the relief that you're
15 seeking?
16     MS. COLE-CHU:  Objection.
17     A.   I don't know specifics on the
18 relief. I would have to consult with my
19 lawyers about that.
20     MS. BLOOM:  Okay. I'm going to
21 ask the concierge to pull up the
22 document that's under tab 38 and
23 mark it as our next exhibit, which
24 I think is Exhibit 14.
25     (Ceppos Exhibit 15,

53 (Pages 206 - 209)

ROBIN CEPPOS
1
2 spreadsheet of work schedule, Bates
3 P000278 was received and marked on
4 this date for identification.
5     MS. COLE-CHU:  We're on 15.
6     MS. BLOOM:  15? Thank you.
7  Q.  Do you recognize this
8 document?
9  A.  Yes.
10     MS. COLE-CHU:  It's not
11 loading on Exhibit Share.
12     CONCIERGE:  Refresh and it
13 should be in the marked folder now.
14     MS. COLE-CHU:  Thank you.
15     MS. BLOOM:  Hannah, do you
16 have it?
17     MS. COLE-CHU:  Yes.
18  Q.  Do you recognize this
19 document?
20  A.  Yeah, I do.
21  Q.  What is it?
22  A.  It was the schedule.
23  Q.  Okay. I have some questions
24 about -- and was this a document that you
25 had in your possession?

ROBIN CEPPOS
1
2  A.  I think, yeah, there were a
3 couple of very similar ones that changed
4 based on how far out we were from Super
5 Tuesday.  But yeah, I do recognize this.
6 They all looked very similar.
7  Q.  So across the top it has days
8 of the week; is that right?
9  A.  Yes.
10  Q.  And this doesn't assign any
11 particular names to particular shifts,
12 correct?
13  A.  Correct.
14  Q.  And as I understand it,
15 there's three shifts.  So there is the
16 a.m., p.m. and then the later p.m.?
17     MS. COLE-CHU:  Objection.
18  A.  Well, everyone did all of the
19 shifts.
20  Q.  Well, there is no -- from
21 looking at this document it doesn't say
22 that anywhere, correct?
23  A.  It doesn't say that but there
24 were other documents there was in each
25 office that said this, that said what I'm

ROBIN CEPPOS
1
2 saying. But no, it doesn't say this. This
3 is just a very general schedule.
4  Q.  The regional team call, what's
5 that?
6  A.  That's when you would check in
7 with your region early, like, they would
8 do attendance and talk about the day.
9 And that was not a call always, it was
10 usually in the office and it was usually
11 before 10.
12  Q.  Okay. This shows that as 10 to
13 10:30?
14  A.  Yes.  It doesn't show what you
15 did from 9:40 to 10 but yeah, it was --
16 it was not -- you know, it changed based
17 on how far out we were from the campaign,
18 the hours were even more aggressive the
19 closer we were.
20     I also had to get to the
21 office, which was far from where I was
22 living and so I was often, you know, on
23 my way by nine.
24  Q.  It also from 12 to 12:30 has a
25 break every day. Do you see that?

ROBIN CEPPOS
1
2  A.  I do see that. It did -- I've
3 never -- I don't remember the breaks
4 being that long. We were typically told
5 to try to make them 15 minutes.  And on
6 other schedules they were 15 minutes, the
7 ones that I remember from the office.
8  Q.  Okay. But you remember a
9 break, your disagreement with Exhibit 15
10 is that you don't think they were half an
11 hour?
12     MS. COLE-CHU:  Objection.
13  A.  I don't think they were a half
14 hour and even while we were taking the
15 break we were required to be working,
16 checking in, handing out pamphlets,
17 making calls while we walked.
18  Q.  Do you know what three-hour
19 vol shift means?
20  A.  Where? Yeah. That --
21  Q.  Is that a reference -- are
22 those the volunteers?
23  A.  Yes.
24  Q.  Do you know the significance
25 of the different colors on this schedule?

ROBIN CEPPOS

1
2 hours were, provided the schedules, like,
3 that came out of the HR team.
4    Q.   Did you ever question the
5 hours that you were working to her?
6    A.   You didn't go to Margo for
7 things like that. That's what you went to
8 your ROD for. Margo was, like, if you
9 weren't getting your health benefits or
10 your check was wrong or something like
11 that.
12    Q.   Who is Chris Myers?
13    A.   California State lead.
14    Q.   And did you work in the same
15 office with Mr. Myers at any point?
16    A.   He travelled all over the
17 state. There were certain days where he
18 was visiting Downtown LA when I was there
19 and certain days that he came to Pasadena
20 that I was there.
21    Q.   Did you ever talk to him about
22 your job as a field organizer?
23    A.   He talked to us, presented to
24 us and then we would -- he would talk to
25 us again on the California State calls.

ROBIN CEPPOS

1
2    Q.   And when you say he talked to
3 you, like, what kinds of things would he
4 talk to you about?
5    A.   What the strategy of the
6 campaign was, what the political
7 demographics of the area were, he did
8 that when he came to Pasadena, you know,
9 where we are, the status of what we still
10 have to accomplish, things like that.
11    Q.   And who is Rachel Douglas?
12    A.   She was a field organizer.
13    Q.   She's one of the people that
14 was on the text messages with you, right?
15    A.   Yes. And she was in Pasadena
16 as well.
17    Q.   In Pasadena and Downtown or
18 just Pasadena?
19    A.   Well, just -- well, no, she
20 came to Downtown even after we opened the
21 Pasadena office but not as often as I did
22 because her house was in Pasadena and my
23 apartment was in Downtown LA, but both.
24    Q.   What about Aaron Summers?
25    A.   We already talked about, he

ROBIN CEPPOS

1
2 was -- he is/was someone that I had a
3 complicated relationship with, and we
4 moved together, and he was also a field
5 organizer.
6    Q.   Are you still in contact with
7 him?
8    A.   The last time I talked to him
9 -- we don't talk at all -- I mean, we've
10 gone periods of time without talking, but
11 he reached out when my dad died. Yeah, I
12 talked to him then. It was not on the
13 phone it was just a text.
14    Q.   And who is Robin Copple?
15    A.   Another field organizer and he
16 was only in Downtown LA.
17    Q.   Was he on the text messages
18 also?
19    A.   Yes.
20    Q.   And Jackson Monroe?
21    A.   Another field organizer,
22 Downtown LA. And Jackson I've known my
23 whole life, we're family friends.
24    Q.   Did you recruit him to work on
25 the campaign?

ROBIN CEPPOS

1
2    A.   No. He was actually hired
3 before I was. Jamarah Hayner, who
4 recruited us both, were family friends.
5 All of us were family friends. That's
6 how we got on the campaign.
7    Q.   Did you go to Pasadena before
8 Tim Valencia?
9    A.   Before he was the ROD?
10    Q.   Yes.
11    A.   No, he was -- he was the ROD
12 when it opened.
13    Q.   Why did Aaron Summers think
14 that you had been in Pasadena when there
15 wasn't a ROD in that office yet?
16        MS. COLE-CHU: Objection.
17    A.   I don't know that he did.
18    Q.   You have no explanation -- go
19 ahead.
20    A.   What do you mean, that Aaron
21 thought that? I don't --
22    Q.   You have no explanation why he
23 put that in the email?
24        MS. COLE-CHU: Objection.
25    A.   I don't know what email you're

Page 222

ROBIN CEPPOS

1
2 referring to.
3     Q.   The email bullets that started
4 with --
5     A.   Oh, that email was just us
6 trying to brainstorm different field
7 organizer roles for resumés. It was not
8 -- it was a draft. It wasn't based on
9 anything but what we had read as a field
10 organizer role online. There was -- I
11 mean, you would have to ask Aaron but
12 that was just an email between the two of
13 us that had nothing -- it was never
14 published or -- I mean, we say a lot of
15 things. We would say a lot of things back
16 and forth to each other that were just
17 ideas. No one was, like, verifying that.
18     Q.   Alex Wheatley is Alex Wheatley
19 Diaz; is that right?
20     A.   Yes.
21         MS. BLOOM:  Let's take a five
22     minute break, I'm either done or
23     close to done.
24         VIDEOGRAPHER:  Counsel, the
25     time is 2:40. We are off the

Page 223

ROBIN CEPPOS

1
2     record.
3         (Recess is taken.)
4         VIDEOGRAPHER:  Time is 2:48.
5     We are on the record.
6         MS. BLOOM:  I'm going to ask
7     the concierge to pull up Exhibit 8,
8     please.
9     Q.   I wanted to make sure we were
10 talking about the same email when I was
11 asking you about the opening of the
12 Pasadena office.
13         This is the email that you
14 were referring to; is that right?
15     A.   I wasn't sure what you were
16 talking about at first and then later I
17 figured it out, but at the beginning I
18 thought you were saying that Aaron had,
19 like, uploaded some sort of email that I
20 didn't know about that was talking about
21 my role.
22     Q.   I'm talking about this email
23 right here. And this email is entitled
24 Bloomberg Resumé Blurb. Do you see that?
25     A.   Yes. Now I understand.

Page 224

ROBIN CEPPOS

1
2     Q.   And it says Mike Bloomberg for
3 President, Los Angeles, California
4 January 2020 to the Present, Field
5 Organizer.  Do you see that?
6     A.   A-hum.
7     Q.   You have to say yes or no?
8     A.   Yes, I do.
9     Q.   And it's March 10 of 2020; is
10 that correct?
11     A.   Yes.
12     Q.   And just so we're on the same
13 page, is it your testimony that you did
14 or did not coordinate the opening of the
15 field office in Pasadena?
16         MS. COLE-CHU:  Objection.
17     A.   Define "coordinate"? Like, we
18 were there, we weren't in charge of
19 anything, we didn't get the lease or any
20 of that.  When Tim was the ROD they
21 divided it up and said Tim was going to
22 lead the office and these were the people
23 that need to report to the Pasadena
24 office.
25     Q.   Did you help set up the office

Page 225

ROBIN CEPPOS

1
2 at all?
3     A.   Oh, like, made, like, some
4 fliers and put up some chairs but there
5 was really no furniture. It was just all
6 folding chairs. There was -- there wasn't
7 much they were doing to set up the
8 office. They knew it was a short period
9 of time that they were going to have it,
10 so I didn't bring the chairs or buy them.
11 I opened a folding chair.
12     Q.   And when it says "Lead office
13 in absence of Regional Organizing
14 Director", your interpretation of that is
15 to be in the office when the ROD is not
16 there; is that right?
17         MS. COLE-CHU:  Objection.
18     A.   To be sitting at the front of
19 the office, yeah, but I never did that.
20         MS. BLOOM:  I'm going to ask
21     the concierge if you can pull up
22     the document that appears in tab 31
23     and mark that as Exhibit 17,
24     please? If we could go to the last
25     page.

57 (Pages 222 - 225)

Page 230

ROBIN CEPPOS

1
2  direct deposit amounts were correct when
3  you checked them.  Do you recall that
4  testimony?
5        CONCIERGE:  The witness is
6     muted.
7     A.  Oh, sorry. Yes, I recall that
8  testimony.
9     Q.  Do you mean that your wage
10 statements were correct in the sense that
11 the amounts appeared to be correct to you
12 based on what you understood the campaign
13 was paying you at that time?
14       MS. BLOOM:  Object to the form
15    of the question.
16    A.  Correct. That is what I meant.
17 It didn't -- I wasn't referring to the
18 claims of the case, including the fact
19 that we did not get overtime, and some
20 people were not paid on time and there
21 were no breaks and that we should be -- I
22 mean, they were classified -- we were
23 classified as exempt when we should have
24 been non-exempt.
25       MS. COLE-CHU:  Those were my

Page 231

ROBIN CEPPOS

1
2  only questions.
3        MS. BLOOM:  Thank you.
4        VIDEOGRAPHER:  Okay.  Counsel,
5     if there are no further questions
6     or stipulations to the transcript
7     or any objections, I'll conclude
8     the video recording for today's
9     proceeding.
10       MS. BLOOM:  The normal stips.
11    It's just normal Federal stips.
12       VIDEOGRAPHER:  Thank you,
13    counsel. Here ends Media Unit 3.
14    This concludes the video-recorded
15    virtual remote deposition of Robin
16    Ceppos appearing -- taken by the
17    parties on Monday, October 24,
18    2022. Time is 3:08 p.m. Eastern
19    Daylight Time and we are going off
20    the record.
21       (The proceedings were
22 adjourned at 3:08 p.m.)
23
24
25

Page 232

CERTIFICATE

1
2        I, MAUREEN M. RATTO, a
3  Registered Professional Reporter, do
4  hereby certify that prior to the
5  commencement of the examination, ROBIN
6  CEPPOS was sworn by me to testify the
7  truth, the whole truth and nothing but
8  the truth.
9        I DO FURTHER CERTIFY that the
10 foregoing is a true and accurate
11 transcript of the proceedings as taken
12 stenographically by and before me at
13 the time, place and on the date
14 hereinbefore set forth.
15       I DO FURTHER CERTIFY that I am
16 neither a relative nor employee nor
17 attorney nor counsel of any of the
18 parties to this action, and that I am
19 neither a relative nor employee of such
20 attorney or counsel, and that I am not
21 financially interested in this action.
22
23
24       *Maureen Ratto*
          _____
          MAUREEN M. RATTO, RPR
25        License No. 817125

Page 233

INDEX

1
2  WITNESS:  ROBIN CEPPOS          5
3  DIRECT EXAMINATION BY MS. BLOOM 5
4  EXAMINATION BY MS. COLE-CHU     229
5
6        EXHIBITS
7  Ceppos Exhibit 1, PAGA notice   20
8  and email,
9  Ceppos Exhibit 2, Declaration of 29
10 Robin Ceppos
11 Ceppos Exhibit 3, resumé of      33
12 Robin Ceppos, Bates P001483
13 Ceppos Exhibit 4, screenshots of 56
14 text messages, Bates P001613
15 Ceppos Exhibit 5, National       75
16 Review article dated March 6,
17 2020,
18 Ceppos Exhibit 6, screenshot of  82
19 LinkedIn messages dated April 7,
20 2020, Bates P001454
21 Ceppos Exhibit 7, Bloomberg      90
22 Voter Contact Script, Bates
23 MB2020_Wood_00042524
24 Ceppos Exhibit 8, email dated    102
25 March 10, 2020 from Aaron

59 (Pages 230 - 233)