# Exhibit 55

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------x

DONNA WOOD, et al, individually and on behalf of all others similarly situated,

Plaintiffs,

vs. Case No. 20 Civ. 2489(LTS)(GWG)

MIKE BLOOMBERG 2020, INC.,

Defendant.

---------------------------------x

VIDEOTAPE DEPOSITION OF

NICHOLAS COKER

VIA ZOOM VIDEOCONFERENCE

April 6, 2023

10:15 a.m.

Reported by:

Maureen Ratto, RPR, CCR

Page 54

NICHOLAS COKER

it up in a way that it essentially runs itself. So I don't do work for that business. I'm just kind of, like, a face that shows up to represent it on occasion, on a rare occasion.

Q. And was that true in 2020 also?

A. Yeah. Yeah. That's been true for years.

Q. If we can go back to Exhibit 4, please?

So this resumé says you started work for the Campaign in December of 2019 and worked until March of 2020. Do you know whether that's correct?

A. No, I can't say whether that's accurate right now. Oftentimes when writing my resumé I can't remember whether it's accurate so I just put the dates down to the best of my recollection because I never really expected somebody to be going through it and being, like, are you sure this is the date. This is a first for me. I usually, when I'm putting

Page 55

NICHOLAS COKER

my resumé together, just put the dates as best I can remember them.

Q. All right. And then there is a paragraph under the dates that describes things that you did for the Campaign.

Do you know whether -- whether that paragraph is accurate or not?

MS. COLE-CHU: Objection to form.

A. I'd say it's fairly accurate. There is a few things that I may have tweaked a little bit.

Q. What are those?

A. Let's see. Okay. So I said followup on unresolved tickets, but we didn't have a ticket system. That was something that I was saying to try to sound more appealing to a customer service job because they often use ticketing systems to resolve issues with the customer.

Aside from that, I said that I planned and organized public outreach activities but I more attended public

Page 56

NICHOLAS COKER

outreach activities. That would be the difference.

Q. Okay. Did you plan any events while you worked for the Campaign?

A. I had -- I had some neighbors come over to my house to see -- to see, like, pamphlets and information about Mike and to hand out yard signs and stuff like that. And one other time, at a bar that I used to work at Werewolf American Pump, I just kind of went in there with paperwork and handed it out. And those were the only -- I guess that was the closest thing to planning an event that I did.

As far as the events that I attended, they were more planned by people who were higher up than me and basically my job was to help them set up and break down after the event, setup before the event, break down after the event. And it was very similar to what I do when I'm working as a cater waiter if I had to compare it to something.

Page 57

NICHOLAS COKER

Q. So you would set up the event and then take things down at the end. And did you stay -- did you stay at the event while it was going on, though?

A. Yeah. Yeah. I would be required to be there.

Q. And what would you do during the event, after you set up and before you were breaking down?

A. I would talk with potential voters.

Q. About what?

A. About Mike Bloomberg, of course.

Q. And how did you know what to say?

A. How did I know what to say about Mike Bloomberg?

Q. Yes.

A. I'm not sure I understand the question. I told you prior that when I was swaying votes for Mike Bloomberg the main thing that I used to sway votes was letting them know that Mike planned on

Page 58

NICHOLAS COKER

supporting whoever won the nomination. And that someone who was willing to do something like that for the good of the party deserves your vote. And I swayed a lot of votes that way. That was the primary thing that I discussed with potential voters.

Q. Okay. Understood. That's a good example.

Are there other things that you can think of that you also talked about with voters?

A. I'm sure there are but, you know, right now I can't recall. It would have been talking points that I was given.

Q. Do you remember that that's true or are you guessing?

A. I'm not sure whether or not I can remember any specifics. I do know I was given talking points, I know that for a fact. And sometimes I would also use those talking points to sway votes or to discuss with voters. However, I can't

Page 59

NICHOLAS COKER

remember the specific talking points. It's been too long.

Q. Sure. And would you phrase those talking points in your own words whatever you thought would be most persuasive or is that not accurate?

A. I don't think that's 100% accurate. I mean, it was in my voice, yes, but I don't think that I changed the talking points in any way that made them different or my own. It was just me regurgitating them.

Q. This Exhibit 4 here says that your title was field organizer and then says hybrid modalities. What did you mean by that?

A. Sometimes I worked at home, like, in the evenings when I would be phone banking until nine p.m., sometimes it would be one of the homes of my own colleagues or out of my own home.

Q. And sometimes in the office?

A. Well, during the day it was always in the office but late into the

Page 60

NICHOLAS COKER

evenings phone banking would often be done at home.

Q. When were you in the office on a typical day, if there was a typical day?

A. Probably like eight-thirty a.m., nine-thirty a.m. at the latest.

Q. Until when?

A. I would probably leave the office around -- I can't -- I can't really recall the dates so I'll do the best I can to tell you but I would leave the office around six, maybe six-thirty and I would get home and then all any colleagues would come and meet at my house or we would all go to their house and then we would start, like, an evening phone banking session or we would do the -- actually, we would usually do them both at the same time, the Hustle app that allowed you to send text messages out to countless people.

Q. Did you do any knocking on doors?

Page 61

NICHOLAS COKER

A. Yes, of course.

Q. When would you do that?

A. All different times. There wasn't a specific time that was given for knocking on doors. There were times where we went and canvassed in Downtown San Diego, where it wasn't, like, a specific door knocking because they're not doors but you're running into numerous people on the streets talking about Mike. There were -- I definitely did some knocking on doors in the neighborhood by 3707 Imperial Avenue. I knocked on doors in Bonita.

Yeah, I don't know, I knocked on doors in quite a few different areas in San Diego. Sometimes I would go to work in the Chula Vista office, sometimes I would go to work in the Downtown office.

Q. Which did you go to more, would you say, Chula Vista or Downtown?

A. I can't remember honestly.

Q. Exhibit 4 here says, "Used

Page 62

NICHOLAS COKER

CRMs to update voter information." Do you see that?

A. A-hum.

Q. What does that mean?

A. I updated the voter information. So, like, we had, like, a log with voter phone numbers, with their age, with the party they typically vote for and then if we called someone and then it said that they were deceased, then I would check "deceased" on the thing. If it said they were no longer at this address, this is their new phone number, then I would add the new phone number, things like that.

Q. It also says, "Managed campaign and app-related issues from constituents and committee members via auto-dialing system." Do you see that?

A. A-hum.

Q. What did you do with respect to that?

A. Well, there was an app that we had to have potential voters download,

Page 63

NICHOLAS COKER

that was, like, a big thing that was required of us. So we would essentially just influence people to download this app that could offer them more information about Mike Bloomberg.

Q. Do you remember the name of the app?

A. No, I do not.

Q. We can take thus exhibit down. Thank you. When you started with the Campaign how did you learn what your duties would be?

A. They were pretty clearly written out.

Q. What was the document where they were written out?

A. I believe there was information about the job duties in the initial hiring paperwork and then in addition to that I would receive, like, a daily email that would have all the additional job duties that were for that day or meetings or places that you were required to be at, things like that.

Page 64

NICHOLAS COKER

So you had basically an outline of what the job was in the contract and then once you started you had basically everyone that was above you sending you emails, just adding more and more things to it.

Q. And who would those emails typically come from?

A. I can't remember. I just know that there were people who were important, who were in charge. They weren't like me, they weren't worker bees.

Q. Did you go through any orientation or initial training?

A. You know, I can't remember.

Q. Did you get these emails about job duties every single day?

A. The email would essentially be a schedule for the day and, yes, I got them every day, I got them late into the night. I would get one at 10 p.m. that said you needed to be up and ready for something at seven a.m. and then I'd wake

Page 65

NICHOLAS COKER

up at six, at 5:58 it would say cancel the seven a.m. Everything was -- my email would just be going off all night long, to the point where I started shutting off my phone so that I could just get a couple hours of sleep before I had to be right back there again.

MR. BATTEN: Let's look at tab 36, please.

(Coker Exhibit 7, email string dated February 18, 2020 was received and marked on this date for identification.)

Q. Let's scroll down.

CONCIERGE: And this is Exhibit 7 for the record.

MR. BATTEN: Exhibit 7. Thank you.

Q. Do you recognize these emails, Mr. Coker?

A. Yeah. They look familiar.

Q. Let's go back up to the top, please. The first email at the top is an email from you to Sapphire Blackwood?

Page 74

NICHOLAS COKER

app that that we used to send text messages to potential voters.

Q. And I gather you were trained on it sometime either on February 17th or after that? Does that seem right?

A. Yes. I would assume so.

Q. So you were not trained on Hustle before the middle of February.

A. You know, I don't -- I don't know when I was trained on Hustle. I just know that I was trained on it because I used it frequently. I also know that I was trained on it because we would have volunteers come into our office and we would log onto Hustle and sit a volunteer at our computer to send messages. And then we would do that at multiple computers. So I not only had to know how to use Hustle myself but I had to know how to teach volunteers how to use Hustle. So, yes, I was trained but I don't know when.

Q. Let's take this exhibit down. Do I understand you to say that you

Page 75

NICHOLAS COKER

reported to some office, either actually Chula Vista or Downtown every day?

A. Yes.

Q. And how many other field organizers would be in the office with you?

A. I can't remember specifically but I'd say 20 maybe.

Q. 20? What kind of area were you organizing in San Diego in terms of was it urban? Rural? Mixed suburban? How would you describe it?

A. I'm not sure I understand the question.

Q. Well, you were out in the community sometimes either canvassing or knocking on doors or working on behalf of the Campaign, right?

A. Yes.

Q. And would you describe the places where you were doing that as urban or suburban or rural or some combination?

A. I'd say a combination. As I told you before, there were times when it

Page 76

NICHOLAS COKER

was in Downtown San Diego, so that's obviously not rural. There were times when it was in Chula Vista, which might be a little more urban and I'm not sure what you mean by urban, if you mean, like, communities with minorities or --

Q. No. I just meant in terms of density, urban versus suburban?

A. Okay. Well, yeah, I don't know. You'll have to tell me whether those are urban or suburb San Diego but Downtown, Chula Vista and also around 3707 Imperial Avenue.

Q. Did you have a particular turf or area that you were responsible for?

A. No. I can't say that you did because I was frequently told to go to different places. So there wasn't, like, a specific turf that I was responsible for. That would have been more the regional organizers, they're specifically responsible for a region. But I feel like with my employment throughout the Campaign as a field organizer I was

Page 77

NICHOLAS COKER

treated more like a floater, an unskilled laborer that just went where I was needed.

Q. And what was the region that Sapphire Blackwood was responsible for?

A. I can't say. You'd have to ask her.

MR. BATTEN: Let's look at tab 32, please.

MS. COLE-CHU: Mark, we've been going for more than an hour. When you get to the next convenient --

MR. BATTEN: Sure. Why don't we stop. That's fine. Ten minutes? Is that all right, Mr. Coker or do you need longer than that?

THE WITNESS: Ten minutes is fine with me. Thank you. I'll make sure we mute the computer so we don't have to discuss what I said to my husband.

MR. BATTEN: That's fine. Thank you.

Page 78

NICHOLAS COKER

MS. COLE-CHU: We'll come back at 11:55.

VIDEOGRAPHER: Time is 11:46 a.m. Eastern Standard Time. We're off the record.

(Recess is taken.)

VIDEOGRAPHER: We're on the record. The time is 11:57 a.m. Eastern Standard Time.

Q. If we can have tab 32, please?

(Coker Exhibit 8, email string dated January 28, 2020 was received and marked on this date for identification.)

Q. Do you recognize this email, which we'll scroll through the whole thing briefly? Do you recognize this document, Mr. Coker?

A. Yes, I do.

Q. What is this?

A. This was an event that my supervisor Sapphire hosted and she asked me to come with her and be backup there and answer questions for people.

Page 79

NICHOLAS COKER

Q. Did you do that?

A. Yes, I did.

Q. Do you remember approximately how many people attended?

A. No, I do not but -- one thing I remember is that the space that we had that -- "we" -- the space that Sapphire had arranged for this to take place at had, like, way too many seats.

So I can't remember the amount of people but I just remember there were hardly any people there.

Q. So fewer than 20 people?

A. Yeah, I'd say even less than that maybe.

Q. Fewer than 10?

A. Yeah.

Q. So three or four, five people, something like that?

A. Let's just say fewer than 10.

Q. Okay. And what's your best recollection of what happened at this event?

A. We discussed Bloomberg and we

Page 80

NICHOLAS COKER

attempted to sway votes of people who maybe were on the fence. We also I think -- well I say "we", but Sapphire I think had a PowerPoint prepared that she showed and then I stood in front of a desk with my pamphlets and handed them out and answered questions.

Q. You answered questions, is that what you said?

A. Yes.

Q. Questions about what kinds of things?

A. I believe questions about what Mike Bloomberg's stance was on the LGBTQ community. As far as I can remember that was probably the main thing because there were a lot of -- well, there weren't a lot of people but the majority of the people that were there I think were members of the LGBTQ community.

Q. Did you try to recruit volunteers from that group that evening?

A. I can't recall if I did.

Q. Was recruiting volunteers

Page 81

NICHOLAS COKER

generally part of your job?

A. I -- I'd have to say yeah, that was kind of an aspect of it, you were to try to recruit people to come and volunteer for phone banking but that wasn't something -- how do I say? It didn't seem like that was measured the way that our other tasks were.

Q. Nobody was keeping track of how successful you were with volunteers; is that what you're saying?

MS. COLE-CHU: Objection to form.

Q. You can still answer.

A. I don't know that they weren't keeping track but it wasn't something that they gave us, like a certain amount of numbers that we had to fill. Whereas, other things there was more, like, you need to be doing this and there were times when -- this never happened to me personally but there were times when a couple of my colleagues got singled out for not -- not meeting a quota of phone

NICHOLAS COKER

banking.

Q. That never happened to you?

A. No one ever singled me out or brought anything to my attention about -- no one ever said anything to me except that I was doing a good job.

Q. Did you always meet your goals?

A. As far as I know, yes.

Q. Well, as far as you know, are you not sure whether you made your goals or not?

A. The people that didn't make their goals would get pulled aside. There wasn't, like, a big board in the center of the office and had your goals and whether or not you reached them and I didn't have access to any type of, like, project management software that I'm assuming my supervisors had access to that would allow them to track our progress. I can't say, but I know when you didn't hit your goals someone brought it up and nobody ever brought it up to

NICHOLAS COKER

me. So at one point I even remember going, am I doing okay? Because I'm constantly concerned, I want to make sure I'm doing what I'm supposed to. And when I asked that to Jesus he said yeah, you're doing great. So as far as I know, that's what I was doing.

Q. I'm sorry. I didn't mean to interrupt you.

Did you know what your goals were? Did somebody tell you you need to make this many phone calls or knock on this many doors or whatever it was?

A. I don't think there was a number for phone calls or a number for doors but there would an allotted time. Like, I will get a direction that you need to spend this many hours doing this or this many hours doing that.

Q. How would the Campaign know that you were spending the number of hours that you were supposed to?

A. Well, my immediate supervisor was with me, like, 95% of the time. So if

NICHOLAS COKER

I was canvassing, my immediate supervisor was right there canvassing with me. If I was phone banking, she would usually be there phone banking too. So not only would the project management software that allows them to track show them what was going on, also the immediate supervisor witnessing it firsthand would let them know that I was doing what I was supposed to.

Q. Well, you mention project management software but you don't know that that exists, do you?

A. Do I know that project managements software exists?

Q. That the Campaign used it.

A. Do I know that the Campaign used project management software?

Q. Right.

A. No, I'm assuming they may have. But as far as project management software existing, yeah, I'm very familiar with it.

Q. Sure. My question wasn't

NICHOLAS COKER

clear. You had said you thought maybe the Campaign's project management software was allowing them to track your hours, but you don't know that the Campaign had project management software to do that, do you?

A. No, I do not. That was an assumption.

Q. Okay. And with respect to your -- to Sapphire, is that who you were referring to being with you at all times?

A. Yes. Sapphire, the Regional Director, was with me the majority of the time.

Q. Okay.

A. As well as other co-workers, field organizers.

Q. And you described going home at the end of the day and making calls from there. Was Sapphire with you at your house?

A. Yeah. She was with me at my house when we did it at my house and other times when we did it at -- huh,

NICHOLAS COKER

Q. Did you attend a gun safety event --

A. Yes, I did.

Q. -- in January of 2020?

Who was there?

A. I can't remember.

Q. Who is Beth Penny?

A. I believe she was the personal assistant to Mary Anne Pintar.

Q. Who is Mary Anne?

A. She was somebody really important. I just know because she would say things and then everyone would scurry. I don't remember what her title was but I know that Sapphire was in charge of me and I know that Jesus Cardenas was in charge of Sapphire and I knew that Mary Anne Pintar was in charge of Jesus. I don't know how I knew but you could just tell that each one was communicating with their boss.

Q. Did you have a role at this gun safety event?

A. Just to be a body, help set

NICHOLAS COKER

up, break down, typical cater waiter stuff.

Q. And in between setting up and breaking down, did you have a role?

A. No. I mean --

Q. You didn't speak to anybody at the event?

A. I spoke to people at the event but I'm not familiar with gun safety. I don't own a firearm and I don't plan on owning a firearm. So this was something a little out of my element. I just attended because I was told by someone important that they needed people there. And essentially, like, that's -- that happened frequently.

Q. Let's look at tab 34.

(Coker Exhibit 10, email dated February 4, 2020 was received and marked on this date for identification.)

Q. Let's scroll down to see the whole thing. This says Mary Anne was the Regional Director; is that right?

NICHOLAS COKER

A. Yeah, if that's what it says.

Q. You don't know one way or the other?

A. I mean, I'm assuming that's what it says because that's what's written there but prior to you showing me this I didn't know what her title was.

Q. And this doesn't refresh your memory?

A. Again, she was a boss, like, high up person and I was like a peon. So, like, you know, now that you put it in front of me, yeah, I'm assuming, yeah, she was the regional political director. But in my mind she was just a boss. That's what I'm trying to make clear to you, she was just a boss.

Q. Let's go back up to the top of the document, please.

So towards the bottom of what's visible there is an email from Beth Penny February 3rd, 11:08. "Mary Anne would like us to read through this important operations info." Do you see

NICHOLAS COKER

that?

A. A-huh.

Q. And it looks like you responded and said you were looking forward to taking action after you return from hearing Mike speak in Compton, right?

MS. COLE-CHU: Objection to form.

A. Yes.

Q. Do you see the email I was reading from?

A. Yes.

Q. Did you hear Mike speak in Compton?

A. I did. I went with my supervisor, Sapphire Blackwell -- Blackwood. I'm going to keep getting it wrong. I apologize.

Q. And in a subsequent email you say, "We will take tons of pics and post them and videos on the political channel on Slack." Do you see that?

A. Yes.

Page 126

NICHOLAS COKER

being done the way they were supposed to.

Q. Okay.

A. And then I would report back to our supervisor if they weren't, and the supervisor would take action.

Q. But you don't know whether the Campaign did the same thing?

A. I don't know. No.

Q. Did you ever interact with any voters who were outside of California?

MS. COLE-CHU: Objection to form.

A. I did not. Only people in California.

Q. How about on the phone, did you ever talk to anybody -- excuse me. Did you ever talk to any voters who were outside of California on the phone?

A. No, I did not.

Q. Did you participate in staff calls?

A. Yes.

Q. How often did that happen?

A. Daily.

Page 127

NICHOLAS COKER

Q. Who was the staff, just by sort of geography, who were the staff that were on those daily calls?

A. It would depend for each call. Sometimes it was people all over the U.S., sometimes it was people just in San Diego, sometimes it was the entire State of California. It just depended.

Q. How often were there calls where people -- where Campaign staff from out of state were on the call?

A. Quite a bit.

Q. Was there a set schedule for calls with national staff?

A. Yes. There was a schedule with calls.

Q. Sorry. Say that again.

A. It was a schedule for the calls but it would be like adjusted frequently, switched around because the more important people, when they weren't available because something came up, then it would just be, like, okay, now the call is at this time. I think I had said

Page 128

NICHOLAS COKER

something about that earlier where I would get emails until, like, three o'clock in the morning, five o'clock in the morning and I'd have to find the most recent one to be, like, okay this is what time the call is at.

Q. So except for when things were adjusted, what was the normal schedule of calls that involved people from the national Campaign, people from out of state?

A. I can't recall the normal schedule. I can just tell you that they would sometimes be in the morning and they would sometimes be in the afternoon. Like, the one that Mike Bloomberg himself spoke on was in the afternoon.

Q. Was it a monthly, weekly kind of thing? Was there that kind of regularly to it? I'm talking about the out of state staff calls.

A. There was a regularity to us having people out of state on a conference call, yes. I don't know

Page 129

NICHOLAS COKER

whether it was, like, literally every single staffer for the U.S. but there would be people who were on the conference calls who were higher up that were maybe not in the same state or city as me frequently.

Q. And I'm saying did that happen monthly or weekly or some other --

A. I couldn't tell you. It seems like more than monthly, probably weekly but I don't know for sure.

Q. You don't know. Okay. You said today that you were often in the office and then also sometimes in the field.

Can you estimate, like, what percentage of the time you were in the office versus out in the field?

MS. COLE-CHU: Objection to form.

Q. You may answer.

A. Typically I just did what I was told to do that day and it would change, like, I feel like I would arrive

Page 130

NICHOLAS COKER

at the office and I would receive marching orders from either June or Beth or Sapphire or Jesus and that would kind of determine how the day went. Because even though there was somewhat of a schedule, I think based on what the supervisors felt was necessary, that schedule was just constantly adjusted.

So, like, if they felt like there weren't enough calls, then they would put you on phone banking. If they felt like they needed you to set up for an event, then they would send you to set up for an event. If they needed you to go get ice, you would go get ice. It was just -- I just went where I was told frequently and if I wasn't told anything, then I would just follow the schedule that was given to me.

Q. Overall, you're not able to tell me sort of what percentage of the time you were in the office and what percentage of the time you were out in the field?

Page 131

NICHOLAS COKER

A. Not with enough accuracy that I would be confident in. I'm sorry.

Q. Okay. Are you aware of any field organizers who were promoting other campaigns when they were supposed to be out canvassing for Bloomberg?

A. I had heard a rumor about that but I never -- there was never, like, a specific person that anyone had said did it. So...

Q. Did you ever do that?

A. Huh?

Q. Did you ever do that?

A. No, I did not do that. No.

Q. Were you aware of -- I'm sorry. Go ahead.

A. I was happy to have that opportunity and that job and I was very grateful for it. I wouldn't have done anything to have risked losing it. It was very important to me. It was more money than I had made from, you know, most of my jobs, almost $20,000 more than what I was typically paid a year. So I didn't --

Page 132

NICHOLAS COKER

you know, even though I did feel like the hours were insanely long and I did feel like I never got breaks, I also felt grateful. So I wouldn't have done anything to jeopardize that.

Q. You heard a rumor, though, that others worked on other people's campaigns, other candidate's campaigns.

A. I had heard that at the Downtown office, yes. There was a rumor that someone, like, phone banked and had done something for another Campaign or mentioned another candidate. And, you know, there were a lot of whispers about it. But I recall being, like, who was it who was it? And one knew who it was, so...

Q. Do you know who told you about the rumor.

A. I think it was June -- June, Maureen and I can't remember the other lady's name. She was very kind. She was an Asian American and her husband was a doctor. I recall her being in the group

Page 133

NICHOLAS COKER

at the table that said it. But yeah, no one ever said who it was. It was, like, everyone was kind of suspicious of everyone else but I never found out who.

Q. And when these people were talking to you about it were they saying they had heard a rumor or they said they knew who it was and just didn't want to talk about it?

A. No one said they knew who it was and they didn't want to talk about it. They were just whispering about it; did you hear that someone was maybe working on the other Campaign and I was like no, I didn't. Like, what was it? What happened? It was a thing like that. And then, you know, people; who was it? Who was it? And then no one ever said who it was, so I don't know. I'm curious. I would be curious to know who it was.

Q. Was it your understanding that it was just one person or multiple people?

A. It was my understanding that

Page 138

NICHOLAS COKER

A. No. Nobody -- nobody reprimanded me but I did feel like they were disappointed in me.

Q. What makes you say that?

A. They were just a little cold to me the next day.

Q. Who are we talking about?

A. My supervisors.

Q. So Sapphire?

A. Actually, it wasn't Sapphire that was cold, it was more June and the other kind of higher-ups at the Downtown office.

Q. Did anybody say anything about your having taken a Sunday off?

A. Nobody specifically said anything but I definitely felt discouraged to do that again and I made sure to finish out the rest of my time there as scheduled.

Q. You didn't take any other days off?

A. Not that I can recall.

Q. Were you required to keep

Page 139

NICHOLAS COKER

track of the hours that you worked in any way?

MS. COLE-CHU: Objection to form.

A. Not that I recall.

Q. Do you know how many hours a week you worked.

A. Sometimes 70 hours a week or more, it felt like. Yeah, 70 hours a week or more, I'd say.

Q. And how do you come to that number?

A. Just because roughly 12 hours a day, seven days a week.

Q. Were the hours different on the weekends than they were on the weekdays?

A. Not that I recall. They were pretty similar. Usually there was, like, a time that an event would start at that would be a reasonable time but, like I said, I would be, like, a cater waiter who would show up way before the event and help set up the tables and the drinks

Page 140

NICHOLAS COKER

and things like that, and I would stand there during the event smiling, you know, with my hands behind my back in my nicest sport coat. And when the event was over I would clean everything up. So that was common. And then also phone banking on the weekends was common as well and canvassing, because that way you would knock on people's doors and they would actually be home.

Q. Did you ever complain about the number of hours you were working?

A. Yeah, a lot.

Q. To whom.

A. To my husband.

Q. Did you ever complain about the hours you were working to anybody on the Campaign.

A. No. I was afraid to lose the opportunity. I may have said it to a colleague. I may have been like, gosh, I am at the end of my rope, like, you know, something like that. But, like, I didn't say it to a superior because I wouldn't

Page 141

NICHOLAS COKER

want to risk losing the job.

Q. What did you do for lunch while you were working?

MS. COLE-CHU: Objection to form.

A. Frequently lunch was provided for us at the office at our desk. We would usually just sit at the desk and eat in between phone banking.

At the time I remember -- I remember actually feeling really grateful that free lunch was provided for us. But when I think about it now, it was -- it seems like it was maybe to keep us at our desk.

Q. Are you saying you were making phone calls while you were having lunch?

A. Yes.

Q. It's probably a little challenging to make a phone call with your mouthful of sandwich, right?

MS. COLE-CHU: Objection to form.

A. I think you would in between

Page 190

NICHOLAS COKER

A. No, not even one. And also one of the ones that was brought up is actually the one that was cancelled due to COVID. So nobody went on it, the one in May, I think.

Q. You also gave testimony today regarding training volunteers to use Hustle. Do you recall that?

A. Yes, ma'am.

Q. Approximately how long did that take, typically?

A. That could take -- it would depend on the age of the volunteer usually and, like, whether or not they were used to using, like, cellular devices or laptops. If they weren't accustomed to those devices it could take a significant amount of time. If they were younger, which was actually kind of more rare of an occurrence, it would happen fast, but the majority of people that were coming out to volunteer were not familiar with technology, let's say.

Q. What did it involve, the

Page 191

NICHOLAS COKER

training?

A. Essentially it was showing them how to use the Hustle app to contact potential voters or constituents in the area and just, you know, discuss Bloomberg with them or notify them about upcoming events or -- Hustle was actually used quite a bit to recruit volunteers as well because if you encountered someone on Hustle who -- who was interested in the Campaign and volunteering then you would give them the information to come down to the office and sign up in a time slot. They had time slots posted at the front of the office, I think.

Q. And did the Campaign provide you with the information to provide the prospective volunteers?

A. Yes.

MS. COLE-CHU: Those are my only questions.

MR. BATTEN: Nothing further from me. Thank you.

THE WITNESS: Thank you all. I

Page 192

appreciate your time.

MS. COLE-CHU: You can sign off, Nicholas.

VIDEOGRAPHER: We're off the record. Time is 3:02 Eastern Standard Time. This concludes today's testimony given by Nicholas Coker.

(The proceedings were adjourned at 3:02 p.m.)

Page 193

C E R T I F I C A T E

I, MAUREEN M. RATTO, a Registered Professional Reporter, do hereby certify that prior to the commencement of the examination, WITNESS was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

Maureen Ratto

MAUREEN M. RATTO, RPR
License No. 817125