# Exhibit 56

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - -x
DONNA WOOD, et al., individually and on
behalf of others similarly situated,

                Plaintiffs,

      v.

MIKE BLOOMBERG 2020, INC.,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - -x

     Remote, videotaped deposition of AARON SUMMERS, taken pursuant to Notice, was held via videoconference, commencing March 29, 2023, at 10:05 a.m., on the above date, before Amanda McCredo, a Court Reporter and Notary Public in the State of New York.

Page 58

1      A. Summers
2   Q   Did your past history of supporting
3  Republicans, most notably John Boehner and Devin
4  Nunes -- did that come up during the application
5  process?
6      MS. COLE-CHU:  Objection to form.
7   A   It did not.
8  BY MR. FIASCONE:
9   Q   Were you worried that it might?
10  A   I was not worried, no.
11  Q   Did you have an explanation prepared in the
12 event that it might?
13  A   No.
14  Q   So, once you joined the campaign, can you
15 just describe what you did on a day-to-day basis?
16  A   Sure.
17     I mean, vast majority was sort of like I
18 anticipated, yeah, just lots of phone calls and
19 knocking on doors, that kind of thing, just voter
20 contact, yeah.
21  Q   And how did you learn what your duties were
22 going to be?
23  A   Like I said, I mean, I had a general
24 understanding of what it would be like going in,
25 just general campaign stuff.  And then, once I got

Page 59

1      A. Summers
2  there, on the ground in California, it was pretty
3  much confirmed that that was what it was going to
4  be, yeah.
5   Q   And how was it confirmed?  Did -- how was
6  it confirmed?
7   A   I mean, I don't specifically remember the
8  chronology of how I learned exactly what I was going
9  to be doing.
10     But, yeah, it didn't seem like there were a
11 lot of surprises.  It was a field organizing role;
12 lots of voter contact, long hours on the phone,
13 knocking doors, yup.
14  Q   Did someone explicitly tell you what your
15 responsibilities would be every day?
16  A   I'm sure they did, but I don't recall at
17 what point that was.
18  Q   Let's just take a typical day.
19  A   Yeah.
20  Q   You show up to the office?
21  A   Sure.
22  Q   What time would you show up to the office?
23  A   My recollection, it was like 9:00 a.m.,
24 roughly.
25  Q   And then what?  How did you figure out what

Page 60

1      A. Summers
2  you were going to do that day?
3   A   Yeah, I mean, it was pretty much
4  predetermined, right?  Pretty much get on the
5  phones, right?  Voter contact, yeah, that was the
6  vast majority of it.
7   Q   So, I'm just trying to understand how it
8  was predetermined.
9   A   I'm not sure what you mean.
10  Q   So, you know, you show up at 9:00 a.m.?
11  A   Sure.
12  Q   How do you know what to do?
13  A   I mean, you know, I'm sure on the very
14 first day I got there, they said, "Okay, here are
15 the phones.  Here's the software for making the
16 phone calls."  There is a, you know, preloaded list,
17 right?  "Go ahead and make those calls."
18     That was pretty much the extent of it.
19  Q   And so, then, after that first day, you
20 just kind of knew what to do from there?
21  A   I would say so, yeah.
22  Q   Did you know what to do based on your past
23 campaign experience?
24  A   I think my past campaign experience, not
25 necessarily.

Page 61

1      A. Summers
2     I mean, like I said, once I got there on
3  the first day, yeah, it was pretty self-explanatory
4  after day one, right.
5   Q   So, after day one, you just sort of took it
6  and ran with it; is that fair?
7     MS. COLE-CHU:  Objection to form.
8   A   Yeah.  I mean, there was always different
9  lists that we were calling into each day, but the
10 process itself was pretty similar.
11 BY MR. FIASCONE:
12  Q   Sorry, I'll let you take a sip.
13  A   Appreciate that.
14    Yeah, pretty similar.
15  Q   Pretty similar how?  The day-to-day process
16 was pretty similar?
17  A   Sure.
18  Q   Was it pretty similar to the Romney
19 campaign, for example?
20  A   In terms of the process of voter contact, I
21 would say it's generally similar, yes.
22  Q   So, did your experience with voter contact
23 on the Romney campaign help you out at all?
24  A   Definitely.
25     MS. COLE-CHU:  Objection to form.

16 (Pages 58 - 61)

Page 62

```
 1            A. Summers
 2  BY MR. FIASCONE:
 3      Q    Sorry, I didn't hear the answer.
 4      A    I said, "Definitely."
 5      Q    How so?
 6      A    Talking to voters.  The more you do it, the
 7  better you get at it, right?
 8      Q    And how did you own that craft?
 9      A    How did I own that?
10           MS. COLE-CHU:  Objection to form.
11      A    Probably just by practicing owning it on a
12  daily basis, I would think, yeah.
13  BY MR. FIASCONE:
14      Q    I want to look back at Exhibit 1, which is
15  tab 5.
16      A    Sure.
17      Q    Now we're going to look at your entry for
18  the Bloomberg campaign itself.
19      A    Sure.
20      Q    So, did you speak with thousands of
21  Democratic California swing voters by phone?
22      A    That is certainly my memory, yes.
23      Q    And how do you know the number of
24  individuals with whom you spoke?
25      A    No, I don't know the exact number of
```

Page 63

```
 1            A. Summers
 2  individuals I spoke with, but I was on the phone
 3  hours and hours a day.  So, it's probably an
 4  estimation.
 5      Q    And what -- what do you mean when you say
 6  that the calls were "designed to gauge support and
 7  inform voters of the candidate's policies"?
 8      A    Sure.  I mean, my memory is that, you know,
 9  it's a short survey, asking if they're generally
10  supportive of Mike Bloomberg or not, and then just,
11  you know, giving a little bit of information about
12  what Mike Bloomberg's policies might be, yeah.
13      Q    And you refer to these individuals as
14  "swing voters," right?
15      A    Yes.
16      Q    How did you know they were swing voters?
17      A    You know, the list they provided to us, my
18  recollection is that, you know, they would let us
19  know this is a list of swing voters, yeah.
20      Q    And just so we're on the same page --
21      A    Sure.
22      Q    -- how do you define "swing voters"?
23      A    A vote who, you know -- some algorithm,
24  some set of information has determined that these
25  people are swingable, one way or the other, between
```

Page 64

```
 1            A. Summers
 2  Democrat and Republican.
 3      Q    And so, do you agree that they may be
 4  persuadable?
 5      A    Sure.
 6      Q    Did you successfully persuade any swing
 7  voters to vote for Bloomberg?
 8      A    I think it's hard to say.
 9      Q    Any specific instances?
10      A    Nope, not really, to be honest.  Yeah, I
11  don't have any specific recollections of that.
12      Q    Did you ever call any Republican voters?
13      A    I don't know.  I don't recall specifically,
14  at this point, what lists we were calling on to on
15  a -- at a specific time.
16           But possibly, yeah.
17      Q    Do you recall if anyone identified
18  themselves as a Republican on the phone?
19      A    I don't specifically recall.
20      Q    How about Independent?
21      A    I don't specifically recall.
22      Q    How about someone who says, "I'm a
23  Democrat"?
24      A    I'm sure there were some of those, yes.
25      Q    Did you ever tell any voters that you
```

Page 65

```
 1            A. Summers
 2  were -- well, let's take a step back.
 3      A    Yup.
 4      Q    At that time, February 2020, did you
 5  identify yourself as a Republican, Independent,
 6  Democrat, something else?
 7      A    I was a registered Republican at that time,
 8  yes.
 9      Q    And did you ever tell any voters that you
10  were a registered Republican who was supporting
11  Bloomberg?
12      A    I don't specifically recall saying that at
13  the time.
14      Q    Do you think that might be a persuasive
15  message?
16      A    Sure.
17           MS. COLE-CHU:  Objection to form.
18      A    If we were calling onto a Republican list,
19  that was probably something that it was okay to
20  discuss, certainly.
21  BY MR. FIASCONE:
22      Q    Did you, in fact, call any Republican
23  lists?
24      A    I don't specifically recall that.
25      Q    Do you have any -- ever have any
```

17 (Pages 62 - 65)

Page 70

1        A. Summers
2  like he may have been a volunteer that I was in
3  contact with, perhaps, here. Let me look.
4     Q   Sure.
5     A   (Perusing document.)
6         Yes. It looks like this might have been
7  maybe Robin and then Rachel here, on the email, may
8  have been in contact with this person first, and
9  then I was talking to them, as well, yes.
10    Q   And so, he responds that he can help with
11 the phones Wednesday, February 19, at 1:00 p.m.:
12 "See you then."
13        Do you see that?
14    A   Sure, yeah.
15    Q   So, can you just walk me through what
16 happens after an email like this?
17    A   It looks like --
18        MS. COLE-CHU: Objection.
19    A   It looks like I said we'll see him on
20 Wednesday.
21        And so, perhaps he came in on Wednesday and
22 volunteered.
23 BY MR. FIASCONE:
24    Q   When you say "he came in," is that to the
25 office?

Page 71

1        A. Summers
2     A   Correct.
3     Q   Was your office in Pasadena?
4     A   Looks like here they were, in the previous
5  email, talking about the Pasadena office grand
6  opening, yes.
7     Q   Is that where you worked out of?
8     A   Yes.
9     Q   And so, when Mr. Patton or any volunteer
10 comes into the office, how do they know what to do?
11    A   They would probably be trained by someone
12 who's working at the office, yeah.
13    Q   And what does that training involve?
14    A   Probably just, you know, getting him set up
15 on the phones, showing him the script, like I said
16 earlier. You know, and if they have any questions,
17 helping them out with it.
18    Q   How does he know who to call?
19    A   I'm sure there was a list similar to what
20 the field organizers had, yeah, you know, a
21 predetermined list of individuals to call.
22    Q   And how does he know what to say?
23    A   Like I said, there was a script.
24    Q   Did volunteers ever have questions about
25 the script?

Page 72

1        A. Summers
2     A   Maybe, yeah. It certainly seems possible,
3  yes.
4     Q   Did a volunteer ever come to you with a
5  question about the script?
6     A   I don't specifically remember.
7     Q   Maybe, though?
8     A   It's certainly possible.
9     Q   Were the voters that you spoke with
10 generally receptive to voting for Mike Bloomberg?
11        MS. COLE-CHU: Objection to form.
12    A   I don't -- I would say generally maybe not.
13 But, you know, it was always a mix, mixed bag, for
14 sure.
15 BY MR. FIASCONE:
16    Q   So, some were receptive?
17    A   I would say so.
18    Q   And voters generally -- whether they were
19 open to Mike or not, what sorts of issues were
20 voters concerned with?
21    A   I don't specifically --
22        MS. COLE-CHU: Objection to form.
23    A   Yeah, I don't specifically remember.
24 BY MR. FIASCONE:
25    Q   Was there anything that might help you

Page 73

1        A. Summers
2  remember?
3     A   I'm not -- yeah, I don't know.
4     Q   You opted into this lawsuit, correct?
5     A   I did.
6     Q   And is it your understanding that by opting
7  into this lawsuit, you could be potentially called
8  as a witness at trial?
9     A   Sure. I mean, I didn't -- I don't
10 specifically -- don't specifically know what the --
11 how a proceeding like this usually goes, but, sure.
12    Q   So, let's say at trial you were asked what
13 issues voters were concerned with.
14        Is there anything you'd do before the trial
15 that might help refresh your memory in order to help
16 your testimony?
17        MS. COLE-CHU: Objection to form.
18    A   Yeah, I don't know. I don't know.
19 BY MR. FIASCONE:
20    Q   Can you think of any issues that you spoke
21 about with a voter?
22    A   I don't specifically recall any issues that
23 I specifically talked about with voters, but we
24 could -- you know, if you want to start naming
25 political issues in general, I could do that, if you

```
                                                          Page 78
 1              A. Summers
 2  the better you get at it.
 3      Q    Do you know if -- do you agree that you
 4  have a good amount of political experience?
 5         MS. COLE-CHU: Objection to form.
 6      A    I have -- sure, I certainly have some
 7  political experience, sure.
 8  BY MR. FIASCONE:
 9      Q    Do you know if other field organizers had
10  as much political experience as you did?
11      A    You know, I would say that it was
12  definitely a diverse group of people in terms of
13  experience, in terms of age ranges, as well, and
14  backgrounds.
15         So, yeah, I would say that there was
16  certainly some people on the campaign who didn't
17  have the political background that I had. And it
18  came from different industries, random places.
19         Yeah, that's my recollection.
20      Q    Do you think that your own unique
21  experience made you perhaps more effective than
22  other field organizers?
23      A    I wouldn't say that.
24      Q    Are there any similarities between your
25  experience on the Bloomberg campaign and the Romney
```

```
                                                          Page 79
 1              A. Summers
 2  campaign?
 3      A    Voter contact, sure.
 4      Q    Can you explain that further?
 5      A    Making phone calls, knocking on doors,
 6  contacting voters, yeah, generally similar.
 7      Q    And so, that repetitive experience probably
 8  helped you out, right?
 9      A    Yeah, I think so. In general, I think so.
10      Q    It made you more effective as a field
11  organizer for the Bloomberg campaign?
12      A    I think, in general, like I said,
13  repetition with voter contact certainly is helpful.
14      Q    On the Bloomberg campaign, did you ever
15  have any negative interactions with voters?
16      A    I'm sure I did. I don't specifically
17  recall them.
18      Q    Let's say you did have a negative
19  interaction, would you use the same approach on the
20  next voter or would you change that approach?
21         MS. COLE-CHU: Objection to form.
22      A    I'm not sure what you mean.
23  BY MR. FIASCONE:
24      Q    So, you believe you had some negative
25  interactions with voters, right?
```

```
                                                          Page 80
 1              A. Summers
 2      A    I'm sure -- yeah, probably, talking about
 3  Mike Bloomberg, I think I did, yeah.
 4      Q    And in the wake of one of those negative
 5  experiences, would you change your pitch to the next
 6  voter or would you go with the same pitch?
 7      A    I'm not sure how the pitch would change
 8  from one voter to the next in the context of your
 9  question.
10      Q    Did you have any particularly positive
11  interactions stand out in your mind?
12      A    I'm sure I did. Nothing specific, though.
13      Q    Was there anything you were not allowed to
14  discuss with voters?
15      A    Not that I recall.
16      Q    So, going back to volunteers --
17      A    Yeah.
18      Q    -- did you have a strategy for recruiting
19  volunteers?
20      A    Like I said, I think there was probably --
21  if we were making volunteer recruitment calls, there
22  was certainly a list that was -- you know, a
23  preloaded the list, and we would just use that list
24  to contact potential volunteers.
25      Q    And once you contacted them, what was the
```

```
                                                          Page 81
 1              A. Summers
 2  ask?
 3      A    If they wanted to volunteer to make phone
 4  calls or knock on doors, as far as I remember.
 5      Q    Were you successful in recruiting
 6  volunteers?
 7      A    Sometimes.
 8         MR. FIASCONE: Pull up tab 11, please.
 9         MR. THOMAS: I'm sorry. Did you say
10      "tab 7"?
11         MR. FIASCONE: Eleven, one-one.
12         MR. THOMAS: One moment.
13         MR. FIASCONE: Thank you.
14         MR. THOMAS: Okay. Exhibit 7 has been
15      marked.
16             (MB2020_Wood_00155666 through
17             777 was marked as Exhibit 7 for
18             identification, as of this
19             date.)
20  BY MR. FIASCONE:
21      Q    Okay. Mr. Summers, just let me know when
22  you have that up.
23      A    Okay.
24      Q    And I'm going to talk about this document
25  generally. So, you can feel free to just scroll
```

Page 86

1                A. Summers
2  bullet points and sent them to her, yeah.
3      Q    Did you use these in your own résumé?
4      A    I don't recall specifically.
5      Q    Was it your understanding that Ms. Ceppos
6  intended to use these for her résumé?
7         MS. COLE-CHU:  Objection to form.
8      A    I don't recall, yeah.
9  BY MR. FIASCONE:
10     Q    Did you perform any of these tasks here?
11        MS. COLE-CHU:  Objection to form.
12     A    Yeah, I mean, in general, these are the
13 tasks that, you know, describe -- you know, me
14 describing what I did on the campaign, sure.
15 BY MR. FIASCONE:
16     Q    So, looking at the first one, did you
17 coordinate the opening of the field office in
18 Pasadena?
19     A    Certainly I was there for the field office
20 opening, helped coordinate it, certainly.
21     Q    How did you help coordinate it?
22     A    Just by being there and working, and
23 working with the volunteers, coordinating their
24 efforts.
25     Q    Did you lead the office in the absence of a

Page 87

1                A. Summers
2  regional organizing director?
3      A    My recollection of that, it was something
4  like, if Tim left the office, and he said, "Okay,
5  you're in charge," that kind of thing, but
6  nothing -- you know, nothing formal, yeah.
7      Q    Did that "Okay, you're in charge" come with
8  any specific responsibilities?
9      A    No.
10     Q    How many days a week did you work?
11     A    Seven.
12     Q    Could you take a day off?
13     A    I can recall that I think I took perhaps
14 two days off.  In the following weeks of the
15 campaign, I think people may have been complaining
16 about not having a day off.  And so, they formalized
17 one day a week off for staffer -- sort of a
18 staggered schedule throughout the week, yeah.
19     Q    Do you recall what your specific day off
20 was?
21     A    I do not.
22        MR. FIASCONE:  Can we pull up tab 22,
23     please, Clint.
24        MR. THOMAS:  Exhibit 10 has been marked.
25          (MB_Wood_00094667 was marked as

Page 88

1                A. Summers
2          Exhibit 10 for identification,
3          as of this date.)
4  BY MR. FIASCONE:
5      Q    So, did you have Wednesdays off?
6      A    According to this email --
7         MS. COLE-CHU:  Objection to form.
8      A    According to this email from Jonathan
9  Salvador, who was the LA lead on the campaign, it
10 looks like for this specific week, Wednesday was my
11 assigned day that I would have off, perhaps.  Yeah,
12 that -- according to this email, yeah.
13 BY MR. FIASCONE:
14     Q    What time did you arrive at the office?
15     A    My recollection is it was around 9:00 a.m.
16     Q    And did you decide on 9:00 a.m.?
17     A    I'm sure I did not decide on 9:00 a.m. and
18 it was an office-wide thing.
19     Q    Did you go into the office every day?
20     A    Outside of the assigned day off, sure, yes.
21     Q    And why was that?  Why did you go in every
22 day?
23     A    Because that's where the office was; that's
24 where we were working.
25     Q    Were you ever working out in the field?

Page 89

1                A. Summers
2      A    Sure.  We were on the ground, yeah.  But I
3  think -- my recollection is that we -- I would go to
4  the office first, before going out and knocking on
5  doors or whatever the case was, yeah, that day,
6  right.
7      Q    So, how did you know what to do in a given
8  day?
9         MS. COLE-CHU:  Objection to form.
10     A    Our regional organizing director would
11 assign us daily tasks.
12 BY MR. FIASCONE:
13     Q    Did you keep a calendar of what you did in
14 a day?
15     A    No.
16     Q    Nothing -- no electronic calendar?
17     A    Not that I recall.
18     Q    No?
19        Nothing handwritten?
20     A    Not that I recall.
21     Q    Did you work with other field organizers?
22     A    Sure, of course.
23     Q    What time did they go into the office?
24     A    My recollection, it was everyone was there
25 roughly at 9:00 a.m.

Page 90

```
1                A. Summers
2    Q   And did you see them every day?
3    A   Most of the team I saw every day, unless
4  they had their assigned day off, I would say yes.
5    Q   They worked the same hours as you?
6    A   Roughly, yes.
7    Q   Did you ever work from home?
8    A   Not that I -- I don't -- I don't
9  specifically recall doing that, no.
10   Q   Might you have?
11   A   It's possible that we were allowed to make
12 phone calls from home at a certain point, but I
13 don't specifically recall doing that.
14   Q   How many hours a week did you work?
15   A   My recollection is that it was, you know,
16 pretty much the seven-day calendar, outside of those
17 one day off we had the last two weeks of the
18 campaign or so.  And my recollection, it was roughly
19 a 12-hour workday.  I think we had an organizing
20 call maybe at 8:30 a.m. and then a wrap-up call at
21 like 8:30 p.m., so close to 12 hours-ish.
22   Q   That 8:30 a.m. call was before you arrived
23 in the office?
24   A   Yes, we were able to take that call outside
25 the office, yes.
```

Page 91

```
1                A. Summers
2    Q   Where did you usually take that call?
3    A   Probably either in the Uber -- in the Uber
4  ride over to the office or at the apartment.
5    Q   Were you required to keep track of your
6  time using a time sheet or a timekeeping system?
7    A   Not that I recall, no.
8    Q   So, how do you know the number of hours you
9  worked a week?
10   A   I couldn't tell you the specific number of
11 hours I worked a week, but my general memory is that
12 it was, like I said, roughly, you know, 8:30 call --
13 8:30 a.m. and a 8:30 p.m. call was sort of the --
14 book-ending the day.
15   Q   Did your hours vary depending on the week?
16   A   I would say, in general, they were
17 roughly -- they were roughly the same.  Pretty much
18 throughout the campaign, for the primary campaign,
19 yeah, roughly 12-hour window during the day.
20   Q   And then is that same day to day, as well?
21       MS. COLE-CHU:  Objection to form.
22   A   Yes.
23 BY MR. FIASCONE:
24   Q   What about weekends?
25   A   Weekends were the -- there may have been a
```

Page 92

```
1                A. Summers
2  truncated schedule on the weekends.  Yeah, there may
3  have been, but I don't specifically recall the
4  hours.
5    Q   Did you do anything to track how many hours
6  you were working?
7    A   Like I said, I did not.
8    Q   So, if I wanted to reconstruct the number
9  of hours that you worked every day, how would I do
10 that?
11   A   Yeah, I mean, I would say --
12       MS. COLE-CHU:  Objection to form.
13   A   Okay.  Yeah, I mean, I would say on the
14 weekdays, it was, you know, certainly the sort of
15 8:30 a.m./8:30 p.m., like I discussed.
16       And then on the weekends, maybe we would go
17 in a little bit later and leave a little bit
18 earlier.  So, the office hours may have been
19 shortened on Saturday and Sunday, that I recall,
20 yeah.
21 BY MR. FIASCONE:
22   Q   Did you ever take care of personal matters
23 during the workday?
24   A   No, not that I recall.
25   Q   Call a doctor, deal with an issue with your
```

Page 93

```
1                A. Summers
2  apartment?
3    A   Not -- not that I recall.
4    Q   Did you ever stop for groceries or stop at
5  a pharmacy?
6    A   During work hours, I don't -- no, I don't
7  recall that.
8    Q   Stop at an ATM to withdraw cash?
9    A   Not that I recall.
10   Q   You ever order something online during the
11 workday, maybe an Amazon purchase?
12   A   Not that I recall.
13   Q   Did you ever complain about the hours that
14 you were working?
15   A   I don't specifically -- I don't
16 specifically recall complaining about the hours I
17 was working no.
18       MR. FIASCONE:  Pull up tab 20, please,
19   Clint.
20       MR. THOMAS:  Tab 11 -- apologies.
21   Exhibit 11 has been marked.
22          (MB_Wood_00155857 was marked as
23          Exhibit 11 for identification,
24          as of this date.)
25
```

24 (Pages 90 - 93)

Page 94

1                A. Summers
2  BY MR. FIASCONE:
3     Q    Do you recognize this email, Mr. Summers?
4     A    I don't specifically recall this email, but
5  it looks like this is an email from me to Jonathan
6  Salvador, yes.
7     Q    Did you switch offices around this date?
8     A    It looks that way, yes, from the downtown
9  office to Pasadena office.
10    Q    Where was the downtown office?
11    A    It was in downtown Los Angeles.  I'm not
12 sure what the -- what street it was on, but it was
13 downtown Los Angeles.
14    Q    And why did you ask to be relocated?
15    A    I don't recall, to be honest.  I don't
16 recall why that was.
17    Q    Does reading the second paragraph of this
18 email help refresh that?
19    A    Okay, yeah.  So, I guess Robin was worried
20 about walking home alone at night.  So, I guess that
21 was the reason, yeah.  The campaign wanted to try to
22 make it easier on us, yeah.
23    Q    And they allowed you to move to Pasadena?
24    A    Yes.  Yes, we ended up in the Pasadena
25 office, yes.

Page 95

1                A. Summers
2     Q    So, we talked about that morning call at
3  8:30.
4          Was that every day?
5     A    Yes.  That's my recollection, yes.
6     Q    And who was on that call?
7     A    You know, state campaign leadership.  I
8  don't recall specific names, but I'm pretty sure it
9  was a California-wide call at least once a day.  And
10 then with Jonathan Salvador, who was the LA lead,
11 and then all the regional organizing directors and
12 the field organizers.
13    Q    Did you ever speak on that call?
14    A    Not that I recall.
15    Q    Did you ever talk to any voters outside of
16 California?
17    A    Not that I recall.
18    Q    So, aside from your campaign-issued phone,
19 did you have a personal cellphone during your
20 employment with the campaign?
21    A    Yes.
22    Q    And what kind of phone was that?
23    A    iPhone.
24    Q    And do you still have that same phone?
25    A    I do not.

Page 96

1                A. Summers
2     Q    When did you stop using it?
3     A    I don't recall.
4     Q    Did you take any steps to back up the data
5  on that phone?
6     A    Not that I -- I don't -- not that I recall.
7     Q    Did you ever text with friends or family
8  during work hours?
9     A    It's possible.
10    Q    Do you think it's fair to say that you
11 might have texted someone for non-work reasons on a
12 daily basis?
13         MS. COLE-CHU:  Objection to form.
14    A    I mean, it's possible.
15 BY MR. FIASCONE:
16    Q    How many personal texts do you think you
17 sent and received during the workday during the
18 Bloomberg campaign?
19    A    I couldn't say.
20    Q    More than five personal texts?
21    A    I couldn't say.
22    Q    Is it fair to say that you at least
23 sometimes texted about personal matters?
24    A    It's possible.
25    Q    If you needed to make a personal phone call

Page 97

1                A. Summers
2  during work hours, were you able to do that?
3     A    Yeah.  My recollection is that that was not
4  an issue with -- that was not an issue.
5     Q    Do you recall actually doing that?
6     A    I do not.
7     Q    How often were you out in the field?
8     A    You're saying knocking on doors versus
9  making phone calls?
10    Q    Yeah, how often were you knocking on doors?
11    A    I'm not sure.  I mean, it was probably --
12 overall, it was more phone calls.  Yes, I couldn't
13 say.  But less than 50 percent of the time was
14 knocking doors.
15    Q    Besides phone calls and knocking on doors,
16 what other tasks did you perform on a daily basis?
17    A    Yeah.  So, those two things were definitely
18 the vast majority of what I did on a daily basis.
19    Q    Anything else you can think of?
20    A    Not specifically.
21    Q    Did you have a supervisor when you were
22 knocking on doors?
23    A    Tim Valencia, the regional organizing
24 director, was my supervisor, I would say, whether or
25 not I was making phone calls or knocking on doors.

25 (Pages 94 - 97)

Page 98

1          A. Summers
2    Q    And was he out supervising you knocking on
3  doors?
4    A    No.  He was not physically supervising me
5  while I was knocking on doors, no.
6    Q    Were you alone when you were knocking on
7  doors?
8    A    Sometimes, yes.
9    Q    How often were you alone versus with
10 someone else?
11   A    I couldn't say.
12   Q    50/50?
13       MS. COLE-CHU:  Objection to form.
14   A    I'm not sure.
15 BY MR. FIASCONE:
16   Q    Who else was with you when you were
17 accompanied?
18   A    Other field organizers.
19   Q    And did you have to answer questions from
20 voters?
21   A    I don't --
22       MS. COLE-CHU:  Object to form.
23   A    I don't recall specifically.
24 BY MR. FIASCONE:
25   Q    What sort of things did you speak about

Page 99

1          A. Summers
2  with voters?
3    A    It was mostly a survey question, survey
4  questions, when I was speaking with voters.
5    Q    Mostly a survey question, but not always?
6    A    My memory is that it was primarily survey
7  questions, yeah.  Yeah.
8    Q    Every once in a while, it was not survey
9  questions?
10   A    I couldn't say.  I mean, my memory is that
11 it was either survey questions or recruiting
12 volunteers.
13   Q    Did you report back to anyone at the end of
14 the day?
15   A    I mean, yes, there was a reporting process.
16 And if I was out by myself knocking on doors, you
17 know, you -- there was an app, you know, on the
18 phone where you could track the survey responses
19 from house to house.  So, they kind of -- the
20 management knew -- or the supervisors knew whether
21 or not you completed your list or how far you had
22 made it on the app that day, sure.
23   Q    And when you were done knocking on doors,
24 would you go home?
25   A    Sometimes, yes, I would go from knocking

Page 100

1          A. Summers
2  doors to going back to my apartment, yes, I believe.
3    Q    Was that the same or different from other
4  field organizers?
5    A    I couldn't say.  I mean, I don't think --
6  you know, some people were either, I would say, in
7  the office making phone calls or out knocking on
8  doors.  There was some variation.  I couldn't say
9  specifically.
10   Q    Did you ever discuss non-work related
11 matters with Robin Ceppos during the workday?
12   A    It's possible.
13   Q    Did you ever do any phone banking?
14   A    Did I do any phone banking on the Bloomberg
15 campaign?  Yes.
16   Q    Was there a supervisor monitoring what you
17 said?
18   A    Monitoring physically what I said?  Not --
19 not all the time.
20   Q    Did you ever make any calls from home?
21   A    Not that I recall.  Possibly.  Like I said
22 earlier, I think there may have been times where we
23 were allowed to make calls from physically outside
24 the office, but I don't recall specifically.
25   Q    Did you have to report back to anyone about

Page 101

1          A. Summers
2  how your calls went?
3    A    Not specifically.  I think that I -- my
4  recollection is that there was, like, a quota of
5  calls you were supposed to hit per day, and then
6  some people would want to go over and above that.
7       So, yes, there was some monitoring -- daily
8  monitoring process that they knew how much call
9  volume you were making in a given day, sure.
10   Q    How about you?  Did you like to exceed your
11 quota in a day?
12   A    To be honest, I probably would try to get
13 as many calls as I could in a given day, yes.
14   Q    Did you ever provide anyone with
15 assignments?
16   A    Not that I recall.
17       MS. COLE-CHU:  Objection to form.
18 BY MR. FIASCONE:
19   Q    Did you ever attend any meetings?
20   A    Sure.
21   Q    Did you lead any meetings?
22   A    No.
23   Q    Did you plan any events for the Bloomberg
24 campaign?
25   A    No.

26 (Pages 98 - 101)

Page 134

1            A. Summers
2    1 --
3    A   Sure.
4    Q   -- which is on the second page at the
5  bottom.
6    A   Okay.
7    Q   It asks you to identify each person you
8  spoke about this case with.
9        And in your response, on page 4, you
10 identify Robin Ceppos.
11   A   Yes.
12       MS. COLE-CHU:  Objection.
13 BY MR. FIASCONE:
14   Q   Did you discuss this deposition with
15 Ms. Ceppos?
16   A   I did not.
17   Q   Look at number 3, which asks you to
18 identify all individuals with knowledge concerning
19 the nature and extent of duties, tasks, and
20 responsibilities, and/or training that you performed
21 or participated in on behalf of the campaign.
22   A   Yes.
23   Q   So, you identify "Tim Valencia, Jonathan
24 Salvador, Mark Blakeley, Robin Ceppos, and Ashlyn
25 [last name unknown]."

Page 135

1            A. Summers
2      Is that correct?
3    A   Yes.
4    Q   Do you recall Ashlyn's last name?
5    A   I think it's Ojeda, O-J-E-D-A.
6    Q   And what knowledge do each of these
7  individuals have?
8    A   Oh, I'm not sure, to be honest.  Yeah, I
9  don't know.
10   Q   Who is Ashlyn Ojeda?
11   A   Oh, she was a field organizer in the
12 downtown Los Angeles office and Pasadena office.
13       MR. FIASCONE:  Okay.  Hannah, I think I'm
14   almost done, if you want to just take five.
15       MS. COLE-CHU:  Sure.  Sounds good.
16       THE VIDEOGRAPHER:  Going off the record.
17   The time is 12:50 p.m.
18           (Recess taken.)
19       THE VIDEOGRAPHER:  We're back on the
20   record.  The time is 12:55 p.m.
21 BY MR. FIASCONE:
22   Q   Off the record, we marked Exhibit 24.  If
23 you could pull that up, please, Mr. Summers.
24           (MB2020_Wood_00158543 through
25           614 was marked as Exhibit 24 for

Page 136

1            A. Summers
2            identification, as of this
3            date.)
4    A   Okay.
5  BY MR. FIASCONE:
6    Q   Do you recognize this document?
7    A   Not specifically, but it looks like a Mike
8  Bloomberg "Employee Handbook, Policies &
9  Procedures."
10   Q   I'll just ask you to quickly scroll to
11 the -- page 30.
12   A   Sure.
13   Q   Apologies.  It's a long document.
14   A   That's okay.
15       Last page here, "Audit Trail"?
16   Q   Sorry, page 30.
17   A   Page 30.
18   Q   In the middle there.
19   A   In the middle, okay.
20       I'm not seeing page numbers.
21   Q   If you see the stamps in the bottom-right
22 corner?
23   A   Yeah.
24   Q   Do you see those?
25   A   Sure.

Page 137

1            A. Summers
2    Q   The stamped page is 158572.
3    A   572, okay.
4        Okay, 572.
5    Q   And is that your signature on this page?
6    A   It looks like it, yes.
7        MR. FIASCONE:  Okay.  I don't have any
8    further questions.
9        MS. COLE-CHU:  I have just a couple
10   questions.
11       Can we just take five so I can gather my
12   notes?
13       MR. FIASCONE:  Sure.
14       THE VIDEOGRAPHER:  Going off the record.
15   The time is 12:58 p.m.
16           (Recess taken.)
17       THE VIDEOGRAPHER:  We're back on the
18   record.  The time is 1:03 p.m.
19 EXAMINATION BY
20 MS. COLE-CHU:
21   Q   Mr. Summers, you testified today about
22 asking voters questions from a survey, and I think
23 at one point you said "a short survey."
24       Do you recall that testimony?
25   A   Sure.

Page 138

1             A. Summers
2  Q  Was that survey a script?
3  A  Yes.
4  Q  And did the Bloomberg campaign provide you
5  with --
6  A  Yes.
7  Q  -- that script?
8  A  Yes.
9  Q  You gave testimony today that if you had a
10 negative interaction with a voter, you weren't sure
11 how that would change your pitch from one voter to
12 the next.
13     Do you recall that testimony?
14 A  Sure.  Yes.
15     MR. FIASCONE:  Objection to form.
16 BY MS. COLE-CHU:
17 Q  Is that because you were following a script
18 with each interaction with a voter?
19 A  Yes.  Yes, exactly.
20     MR. FIASCONE:  Objection.
21 BY MS. COLE-CHU:
22 Q  And you were expected to follow the same
23 script for every call?
24     MR. FIASCONE:  Objection.
25 A  Yes, of course.

Page 139

1             A. Summers
2     MR. FIASCONE:  Mr. Summers, if you can just
3  give me a minute.
4     THE WITNESS:  Sure.
5  BY MS. COLE-CHU:
6  Q  You also testified today regarding getting
7  voters -- excuse me.  Strike that.
8     You also testified today regarding getting
9  volunteers set up to use phones to make calls and
10 showed them a script.
11     Do you recall that testimony?
12 A  Yes.
13 Q  Approximately how long would that take?
14 A  How long would it take to run through the
15 script?
16 Q  To do all of those tasks associated with
17 orienting a volunteer.
18 A  Probably no more than 10 to 15 minutes.
19 Q  You also testified today that you ate lunch
20 most days.
21 A  Sure.
22 Q  Do you recall that testimony?
23 A  Sure.
24 Q  Did you ever eat lunch at your desk while
25 working?

Page 140

1             A. Summers
2  A  Possibly, yes.
3  Q  Do you recall how often you took a lunch
4  break where you stopped working entirely?
5  A  I don't recall.
6     MS. COLE-CHU:  I think that's all I have.
7     THE WITNESS:  Sure.
8     MR. FIASCONE:  Okay.  Nothing from me.
9     THE VIDEOGRAPHER:  Okay.
10    We are off the record at 1:06 p.m., and
11 this concludes today's testimony given by Aaron
12 Summers.  The total number of media units used
13 was three and will be retained by Veritext.
14         (Time adjourned: 1:06 p.m.)

Page 141

           C E R T I F I C A T E

   I, AMANDA McCREDO, a Shorthand Reporter
and Notary Public of the State of New York, do
hereby certify:
   That the witness whose examination is
hereinbefore set forth was duly sworn, and that
such examination is a true record of the
testimony given by such witness.
   I further certify that I am not related to any
of the parties to this action by blood or
marriage, and that I am in no way interested in
the outcome of this matter.

       *Amanda McCredo*
       AMANDA McCREDO