# Exhibit 57

Page 1

1       UNITED STATES DISTRICT COURT
2       SOUTHERN DISTRICT OF NEW YORK
3
4    --------------------------------x
5    DONNA WOOD, et al, individually
6    and on behalf of all others
7    similarly situated,
8           Plaintiffs,
9        vs.        20 Civ. 2489(LTS)(GWG)
10   MIKE BLOOMBERG 2020, INC.,
11          Defendant.
12   --------------------------------x
13
14         VIDEOTAPE DEPOSITION OF
15         ALEXANDRA WHEATLEY-DIAZ
16       VIA ZOOM VIDEOCONFERENCE
17          November 11, 2022
18            7:16 a.m. PST
19
20
21
22
23
24   Reported by:
25   Maureen Ratto, RPR, CCR

Page 54

1  ALEXANDRA WHEATLEY-DIAZ
2  of the conversation you talked about the
3  other people you'd be working with. Tell
4  me what you discussed in that regard?
5      A.   I understood that several
6  other of Jamarah's family would be
7  working there, friends, other people that
8  had been working in politics for a long
9  time at higher -- at different levels,
10 not at my level.
11     Q.   Why did you decide to take the
12 job?
13     A.   There was no real reason,
14 other than I -- I would say that for me I
15 took the job as an opportunity to be
16 exposed to a new experience and be
17 interested in a field that I had never
18 worked in before and support a candidate
19 that I was interested in learning more
20 about.
21     Q.   What was it about your
22 background that you thought would make
23 you a good field organizer?
24         MS. COLE-CHU:  Objection to
25    form.

Page 55

1  ALEXANDRA WHEATLEY-DIAZ
2      A.   To my understanding, I don't
3  think that was, like I said, considered.
4  I also, to my understanding, don't think
5  that anything in my background made me
6  more or less qualified for the position.
7  And as I stated before, there was no
8  interview so it was -- to my
9  understanding, it was never really
10 considered at all.
11     Q.   Do you think you were a good
12 field organizer?
13     A.   Oh, I was a great field
14 organizer.
15     Q.   Okay. What was it about you
16 that made you a great field organizer?
17     A.   I was passionate about my --
18 about my job, I'm a hard worker and I
19 take a lot of pride in what I do and how
20 I work.
21     Q.   Were you able to persuade
22 people to support Mike Bloomberg who
23 initially were not supporters?
24     A.   I can't say for sure.  I'd
25 like to believe that based on the script

Page 56

1  ALEXANDRA WHEATLEY-DIAZ
2  that I was given and the conversations
3  that I personally had with several
4  people, that that was the case but I
5  can't -- I can't know for sure.
6      Q.   And now, you referred to a
7  script and the conversations that you
8  had.
9          Give me an example of how you
10 might go about trying to convince
11 somebody that Mike Bloomberg was a
12 candidate that they should support?
13         MS. COLE-CHU:  Objection to
14    form.
15     A.   It's been a couple of years.
16 I don't have any of the resources that I
17 was allocated at that time to help me
18 prepare a statement or, like, a pitch for
19 that time. So I apologize.
20     Q.   Well, to the best of your
21 recollection, sitting here today, walk me
22 through what you would do?
23     A.   We were given several
24 different outlets to communicate with
25 potential voters, of which each outlet

Page 57

1  ALEXANDRA WHEATLEY-DIAZ
2  required different skills or different --
3  I recall -- I wouldn't say skills,
4  different methods of communication, not
5  skills. So the different methods of
6  communication, some of it was texting,
7  some of it was through an app, some of it
8  was door knocking and most of it was
9  calls.
10     Q.   You said that you were
11 passionate. How would you express that
12 passion in conversations with prospective
13 voters?
14         MS. COLE-CHU:  Objection to
15    form.
16     A.   For me that means that I
17 believe in what I'm saying versus feeling
18 like I'm just reading off of a script and
19 so for me it just came off like I really
20 -- here are some of the things in which
21 it's been brought to my attention this
22 man is trying to do for our community and
23 I would state what those several items
24 were that I was -- that I resonated with,
25 and I would speak openly and candidly

Page 90

ALEXANDRA WHEATLEY-DIAZ

Q. that correct?
A. I give a summary of my background, correct, and my work experience.
Q. You say, "Strategic communications, versatile professional"-- "professional" would be a reference to you, right?
A. Correct.
Q. -- "with a background in customer service and technical troubleshooting, strong track record of high impact, high pressure work and excerpt soft skills, a trusted leader with the ability to execute tasks, take on multiple roles, all while maintaining quality results under minimal supervision." You wrote that description, correct?
A. I cannot say for sure if I wrote that or if that was the statement that someone wrote on my behalf and I adopted it.
Q. Okay. And you think that

Page 91

ALEXANDRA WHEATLEY-DIAZ

accurately describes you?
A. Absolutely, yes.
Q. So the first job that's listed is the position at Genex, correct?
A. Correct, Genex & Mitchell, correct.
Q. And that has you still at Genex & Mitchell as of October of 2020, correct?
A. Correct.
Q. Then the next job that's listed is the Mike Bloomberg Campaign field organizer position, correct?
A. Correct.
Q. Okay. So the first thing that you say about your duties as a field organizer is that you "coordinated opening of Campaign field office in Torrance, California."
What did you do to coordinate the opening of the Campaign field office in Torrance, California?
A. I insured that I, alongside everybody else that was working there,

Page 92

ALEXANDRA WHEATLEY-DIAZ

coordinated the opening of the Torrance office. It was all hands on deck. And what I mean specifically is we just made sure that everybody knew where to park, we knew -- we all helped each other make sure to know where the office was, since it was in a -- a not commonly known area for some, we insured that people had chairs at their desk. That was pretty much the extent to what I would define as coordinated.
Q. Well, when we talk about coordinated, you say here that you coordinated the opening of the Campaign field office in Torrance, California. What did you do specifically do to coordinate the opening of that office?
A. Like I stated before, I, along -- I -- I sent out messages alongside my other co-workers, to insure people knew where to park, how to get in, where the bathroom was, what the code was, that there were chairs at tables, since there wasn't, that we had shirts. And that was

Page 93

ALEXANDRA WHEATLEY-DIAZ

something that me, alongside all the other mem -- all the other co-workers, what we were all doing.
Q. But --
A. But this is my resumé, so...
Q. I'm sorry?
A. I'm saying this is my resumé, so I'm saying in relation to me, yeah.
Q. Okay. Then your testimony here today is that when you talk about coordinating the opening of the office, that you did that as part of a group project? That's your testimony?
MS. COLE-CHU: Objection to form.
A. Yeah, incorrect. I wouldn't say it was a group project. I would say that we all took on those -- we all were -- we were all individually taking on -- insuring that we were all able to access the office.
Q. And when you say "all", who are you talking about?
A. Me and my co-workers.

24 (Pages 90 - 93)

Page 94

ALEXANDRA WHEATLEY-DIAZ

Q. Which co-workers? What were their names?
A. I don't recall their names but the other members -- the other people that were working at that specific office.
Q. Can you recall anybody's name?
A. My friend Anoosh; Delmar was our ROD, the Regional Operations Director, I think is what they referred to him as; Ann Harris. There were several other people. I don't recall their names.
Q. Okay. In your resumé you go on to say "Led office in absence of Regional Organizing Director."
What did you do in the absence of the Regional Organizing Director?
A. I, alongside my co-workers, when we were left unsupervised, I would insure that, like I said before, the same -- the same items, to coordinate the opening of it, insure that people that came had -- were able to get into the

Page 95

ALEXANDRA WHEATLEY-DIAZ

bathrooms, since it was a code, were able to get into the office because that was a code as well, were able to get to the office building, since we were tucked in the back, so just merely access to the office was all that I -- all that I was doing in its entirety.
Q. So when you put on your resumé "led office in absence of Regional Organizing Director", you've now described to me what it was that you meant by those words?
A. I did not describe what I meant, I described what I did.
Q. Okay. So what did you mean by those words?
    MS. COLE-CHU: Objection to form.
Q. It says that you led the office. How did you lead the office?
A. Like I stated before, I made sure that people had access to the office, which in order to have people work they have to have access to the

Page 96

ALEXANDRA WHEATLEY-DIAZ

office in which we were all working at.
Q. How many times did you lead the office in the absence of the Regional Organizing Director?
    MS. COLE-CHU: Objection to form.
A. I can't confirm the number. That role was shared between every single co-worker that I had. It was understood that we all -- that we all were holding that same -- those same, I don't want to say responsibilities, but it was just understood that we were all there to assist one another in insuring that we all had -- that we all had access to the facility, that we were all helping each other out and answering any questions that might have come up at any point in time when our ROD was not available.
Q. Okay. And so just so I'm clear, this is a resumé that you submitted in connection with other potential jobs; is that right?
    MS. COLE-CHU: Objection to

Page 97

ALEXANDRA WHEATLEY-DIAZ

form.
A. This -- I cannot confirm or deny if this is the actual resumé that I submitted to all the -- all the other potential jobs that I had.
Q. Okay. We know you submitted this to at least one job; is that right?
A. That's incorrect. This was sent over to my friend to look over. He, like I stated before, he was looking at my resumé and fixing it, he also did have open positions. However, that was not -- there is no relationship between the two at the time this was sent over to him.
Q. So by using -- by saying that you led the office, based on your testimony here today, what you meant is that you were just part of some group effort? Is that what you're telling us?
    MS. COLE-CHU: Objection to form.
A. Yeah, that's incorrect. It was not a group effort. It was individual, an individual level of integrity that

25 (Pages 94 - 97)

Page 106

1  ALEXANDRA WHEATLEY-DIAZ
2  that what you're saying?
3      MS. COLE-CHU: Objection to
4   form.
5      A.  I am saying that I do not feel
6  comfortable providing a statement with
7  regards to how I maintain relationships
8  with volunteers that is going to be
9  written into the court that I cannot say
10 100% for certain what it was that I did
11 to maintain that relationship. I do not
12 feel comfortable making that statement.
13     Q.  Do you believe that you did
14 maintain relationships with Campaign
15 volunteers?
16     A.  I do believe that I maintained
17 relationships with Campaign volunteers.
18     Q.  Okay. But you can't give me an
19 example of anything that you did in that
20 regard? That's your testimony here
21 today?
22     A.  Correct. I cannot tell you
23 what I did. What I know -- how I know
24 that I maintained relationships is that
25 volunteers came back several times, the

Page 107

1  ALEXANDRA WHEATLEY-DIAZ
2  same volunteers came back several times
3  to do phone banking.
4      Q.  And you're saying that was
5  because of whatever it was that you did?
6      A.  Correct.
7      Q.  Okay. And it says here "build
8  and maintain relationships with Campaign
9  volunteers to multiply and maximize
10 overall field operations." Is that what
11 you're talking about, because of the fact
12 what you did to build and maintain these
13 relationships volunteers kept coming
14 back?
15     A.  It was my understanding and my
16 impression that that is correct.
17     Q.  Okay. Now, you go on to say
18 "engage with thousands of California
19 swing voters." What is a swing voter?
20     A.  To my understanding, a swing
21 voter is someone who is indecisive with
22 who they are going to be voting for in
23 the primary.
24     Q.  And when you put "swing voter"
25 on your resumé, that is the definition

Page 108

1  ALEXANDRA WHEATLEY-DIAZ
2  that you were using?
3      A.  That was my understanding at
4  the time that this was written, yes.
5      Q.  Do you have a different
6  understanding now about what a swing
7  voter is?
8      A.  A swing voter is somebody who
9  is -- I would say it's the same, it's the
10 same, but --
11     Q.  Great.
12     A.  -- that could change.
13     Q.  What?
14     A.  That that could change at any
15 point. Like, I'm always -- I don't -- I'm
16 always learning so at that time and at
17 this time I would believe that that is
18 still true.
19     Q.  That that's the definition of
20 a swing voter, is that your testimony?
21     A.  That is my understanding of
22 what a swing voter is. I wouldn't say
23 that's the definition.
24     Q.  Okay. So using your
25 understanding, you said that you engaged

Page 109

1  ALEXANDRA WHEATLEY-DIAZ
2  with thousands of California swing voters
3  through telephone calls and door knocks.
4  So telephone calls, that would be phone
5  banking?
6      A.  Telephone calls were through a
7  -- there were different ways of how that
8  was executed. There was this auto phone
9  and then there was also phone banking.
10 The terminology is, I would say, fluid or
11 just different things might mean the same
12 -- might seem like they mean the same
13 thing but they were different modalities
14 of how we executed phone banking.
15     So there was volunteers where
16 we would sit and call people that we were
17 given a list or with the volunteers we
18 were given a list and also there was the
19 app that we used which was automatic auto
20 phones, like, it was going automatically.
21     Q.  Okay. So when you say on your
22 resumé through telephone calls, that's
23 what you were talking about, those two
24 methods?
25     A.  Yeah, two methods.

Page 110

ALEXANDRA WHEATLEY-DIAZ

Q. Okay. Great. And then you say "and door knocks", what is a door knock?

A. A door knock is otherwise referred to as canvassing, to my understanding, and that is when we physically go out to designated areas that we have been given by the Campaign and we knock on -- on the doors that we have been pre- -- pre-designated prior to arriving at the said neighborhood or city to door knock or to knock on those doors and speak with those individuals.

Q. During the time that you worked for the Campaign, what percentage of your time did you spend doing door knocking?

A. Every month, different months required different -- different levels of engagement with voters. So I would say specifically in the month of March the canvassing was about maybe 40%.

Q. How about in February?

A. I don't recall. So canvassing looked a couple different ways while I

Page 111

ALEXANDRA WHEATLEY-DIAZ

was under employment with Bloomberg. One of them was door knocking, the other was attending -- like, the other was going out and handing out fliers to educate people on the streets. So in February we did more organic canvassing than we did with specified door knocking.

Q. And what percentage of your time did you spend in February doing either canvassing or this organic canvassing that you described?

A. I can't say for certain. It was most likely 20%, maybe 30%.

Q. And the rest of the time you spent phone banking; is that your testimony?

A. Correct, yes.

Q. Did you attend events?

A. Can you describe what you mean by an event?

Q. Were there events that -- well, how would you describe an "event" in the context of the Bloomberg Campaign?

A. I would describe an event as a

Page 112

ALEXANDRA WHEATLEY-DIAZ

-- as a designated time in which a subject was being covered and others were asked to -- and we were invited to attend as a guest and not during work hours.

Q. Did you ever speak at an event on behalf -- while you were working for the Bloomberg Campaign, in connection with your job as a field organizer?

A. Not that I recall but I can't say for certain if I did or if I didn't. I would say that I don't recall doing that.

Q. Okay. Looking back again at your resumé it says "engaged with thousands of California swing voters through telephone calls and door knocks designed to gauge support, inform and persuade them to support the candidate's vision for electing a new president."

What do you mean by "gauge support"? How would you do that? Well, strike that. Let me ask it differently.

How would you gauge support from these thousands of California swing

Page 113

ALEXANDRA WHEATLEY-DIAZ

voters?

A. When I -- "gauge" me to be able to -- "gauge" to me, I understand that word to be to not necessarily predict but be able to have a good understanding of where we're at. And so "gauge support" would mean based on the amount of people that I have come into contact with, how many of those people are going to be voting for said president at that time -- said president -- not president -- I'm sorry. Said, like, Bloomberg, for Bloomberg or candidate. Sorry.

Q. So when you talk about gauging support of a particular voter, how would you figure out whether that person supported Bloomberg or not?

A. They would tell us if they were voting for him or not.

Q. So you would ask and they would tell you; is that right?

A. Incorrect. I wouldn't necessarily ask. They would -- they would

Page 114

ALEXANDRA WHEATLEY-DIAZ

generally volunteer that information or volunteer information of their disdain for the candidate.

Q. When you were doing door knocks would you generally have apparel on that would identify that you were there for Mike Bloomberg?

A. Correct, yes.

Q. And when you did phone banking you would start the conversation by saying that you were calling on behalf of Mike Bloomberg, correct, for the Campaign?

MS. COLE-CHU: Objection to form.

A. That's not correct. I don't recall how those conversations started. I -- I wouldn't say for certain that's how I started the conversation off with the people that we were asked to contact.

Q. Well, at some point in the conversation you let them know that you were working for the Campaign; is that right?

Page 115

ALEXANDRA WHEATLEY-DIAZ

A. I'd never said I was working for the Campaign. It was always we were in support of the candidate.

Q. Okay. It says here "designed to inform." What would you do to inform these thousands of California swing voters about the candidate's vision for electing a new president?

A. We were given talking points, we were given specific information to share, when asked, and we were educated through -- let me restate that.

We were given information in which we were then -- it was up to our discretion to inform ourselves to then inform the people that we were coming in contact with as to the certain policies of the candidate's -- that the candidate was promoting or was expressing at that time.

Q. And you say here "to persuade them to support the candidate's visions for electing a new president." How would you persuade a swing voter?

Page 116

ALEXANDRA WHEATLEY-DIAZ

A. I didn't -- I was given a script and I went off that script, and the script that I was given was, in my opinion, very persuasive in some of the talking points that it had.

Q. How many talking points were in the script?

A. It varied. It varied because it changed frequently. So I can't say for certain how many because of the frequency of which our scripts were changing.

Q. And the talking points were about the candidate's position on certain issues; is that right?

A. That I recall, to the best of my ability, yes.

Q. And just so I understand your testimony here today, your testimony is that when you would be persuading swing voters you would just read everything on the script to them? Is that your testimony?

A. My testimony is that I was given a script, I read that script and --

Page 117

ALEXANDRA WHEATLEY-DIAZ

and -- and each call that I had was -- sometimes I was -- sometimes there was more conversation, not pertaining to the script, sometimes there was less, depending on the interest of the person I was on the phone with.

Q. Okay. And that conversation that was not pertaining to the script, give me an example of what that might be?

A. I -- I would not be able to give you an example because it's been several years and I don't have any of the information that I was privy to at that time nor do I recall the length of, like, the details of the conversations that I would have.

Q. So just so I'm clear, though, you wouldn't stand in front of a swing voter with a piece of paper and just read through the script; is that right? That's not what you did --

MS. COLE-CHU: Objection to form.

Q. -- to persuade a voter?

30 (Pages 114 - 117)

Page 118
ALEXANDRA WHEATLEY-DIAZ
1
2  A.  I'm a bit confused. I thought
3  we were talking about the phone calls.
4  Are we now going back to the canvassing?
5  Q.  Let's talk about the
6  canvassing.
7  A.  Okay.
8  Q.  On the canvassing --
9  A.  Okay.
10  Q.  So what you did on the phone
11  was different than what you did on
12  canvassing; is that right?
13     MS. COLE-CHU:  Objection to
14     form.
15  Q.  I'm sorry. I didn't hear your
16  answer.
17  A.  The - the scope of what we
18  were doing was always the same. The
19  method of how we were doing it differed
20  based on the method of communication that
21  we were engaging with the voters.
22  Q.  What does that mean?
23  A.  That means that if we were on
24  the phone we had a very specified script
25  for that. If we were in person we had a

Page 119
ALEXANDRA WHEATLEY-DIAZ
1
2  different script or talking points or
3  different information that we had on
4  hand.
5  Q.  Okay. So let's talk about the
6  canvassing piece of this.
7      When you were trying to -- and
8  here you say that you successfully
9  persuaded thousands of California swing
10  voters. When you were persuading these
11  thousands of California swing voters
12  through canvassing, you didn't just stand
13  there and read down a script, did you?
14     MS. COLE-CHU:  Objection to
15     form.
16  A.  Yeah, I would say the
17  statement that you just made was
18  incorrect. I engaged with thousands of
19  California swing voters. I -- nowhere in
20  that statement did I state that I
21  actually succeeded in persuading all of
22  them, just that I engaged with that
23  amount of people.  And also, I would say
24  that when I went and saw them in person
25  it depended on who I was engaged with at

Page 120
ALEXANDRA WHEATLEY-DIAZ
1
2  that time if I read from a script
3  directly in front of you face or if I was
4  going based off of the -- off of memory
5  because at different -- like, from when I
6  began to when I ended I had memorized
7  what we had to say. So I can't say for
8  certain if I was standing staring at
9  something for all of them or if I was
10  going based off of my memory.
11  Q.  And when you would go either
12  off of the thing that you were just
13  reading in front of someone's face to try
14  to persuade them or going off of your
15  memory, would you talk about all of the
16  positions of the candidate or did you
17  talk about the ones that you thought were
18  important to the person you were trying
19  to persuade?
20     MS. COLE-CHU:  Objection to
21     form.
22  A.  I would stick to the points
23  that we were given for that specific time
24  period or that specific neighborhood,
25  depending on the information we were

Page 121
ALEXANDRA WHEATLEY-DIAZ
1
2  given to share with that specific area.
3  To the best of my knowledge, that's how
4  -- that's how I proceeded.
5  Q.  So if a swing voter wasn't
6  interested in climate control, but was
7  interested in gun control, you would --
8  if climate control was on the talking
9  points you would just read it to them
10  anyway? Is that your testimony?
11     MS. COLE-CHU:  Objection to
12     form.
13  A.  I just -- my testimony is that
14  I cannot recall for certain if that -- if
15  I was ever put in a position where a
16  potential swing voter was against
17  something and I read it anyways. I don't
18  believe that I did that but I can't say
19  for certain if that was done or not done.
20  Q.  You said that some of the
21  people that you spoke to would express
22  disdain for the candidate. When someone
23  expressed disdain for the candidate what
24  did you do to try to persuade them to
25  support him?

31 (Pages 118 - 121)

Page 130

1    ALEXANDRA WHEATLEY-DIAZ
2  see this document during my employment.
3      Q.   Okay. Let's look at tab 59,
4  Exhibit 8.
5          (Wheatley Exhibit 8, document
6      entitled Canvassing Toolkit, Bates
7      MB2020_Wood_00092756 was received
8      and marked on this date for
9      identification.)
10     Q.   Do you recognize this as the
11 Canvassing Toolkit?
12         CONCIERGE:  Wheatley 8 has
13     been marked.
14         (Deponent reviews the
15 document.)
16     A.   Like I said before, as of
17 November 2022 I do not recall seeing
18 this.  Not to say that I wasn't given
19 this or did not read through this on the
20 day -- during my employment time.
21     Q.   If you could turn to the
22 fourth page of Exhibit 8, which is Bates
23 00097259, does this look like a sample --
24 does that look like a sample script that
25 you were referring to?

Page 131

1    ALEXANDRA WHEATLEY-DIAZ
2          MS. COLE-CHU:  Objection to
3      form.
4      A.   I was given many scripts. It's
5  possible that this was one of them.
6      Q.   Does this look familiar to
7  you?
8      A.   Like I said, November 2022, I
9  don't recall the -- like, I don't recall
10 but not to say that in -- during my
11 employment time that this wasn't given to
12 me during that timeframe.
13         I was given a lot of
14 paperwork. I was given different scripts
15 to follow and I cannot say for certain if
16 this was one of them or if this wasn't
17 one of them.
18     Q.   So as a class representative
19 at trial is your testimony going to be
20 that you can't remember any particular
21 script or scripts that you were given as
22 a field organizer?
23         MS. COLE-CHU:  Objection to
24     form.
25     A.   As a Class A representative

Page 132

1    ALEXANDRA WHEATLEY-DIAZ
2  I'm going to do my best that the
3  information I'm providing is accurate.
4  And like I said before, I was given many
5  scripts and it is possible that this was
6  one of them but we were given many
7  scripts in which to follow and I can't
8  say for certain that this exact script
9  was the one that we were given.
10     Q.   What, if anything, are you
11 going to do to refresh your recollection
12 so that at trial, as a class
13 representative, you can provide more
14 specifics as to these alleged scripts
15 that you were given?
16         MS. COLE-CHU:  Objection to
17     form.
18     A.   I am going to meet with my
19 attorney and insure that I am well
20 prepared, if I do -- if, in fact, we do
21 end up at that point.
22     Q.   So you are going to get the
23 information from your lawyer; is that
24 your testimony?
25         MS. COLE-CHU:  Objection to

Page 133

1    ALEXANDRA WHEATLEY-DIAZ
2      form.
3      A.   I am going to discuss with my
4  lawyers ways in which I can be prepared,
5  if in fact that is the outcome and I am
6  in that position.

[redacted]

15     A.   I agree that is a statement. I
16 don't necessarily -- I feel indifferent
17 about this statement.

[redacted]

23     A.   I agree it is a statement. I'm
24 indifferent about the statement.
25     Q.   Okay. So if somebody on the

Page 142

ALEXANDRA WHEATLEY-DIAZ

canvassing?
A. I don't recall for certain if we did canvassing. I would say that I don't recall doing any canvassing during that time.
Q. And when you worked in the Torrance office did you do canvassing?
A. When I worked in the Torrance office I did do canvassing.
Q. And is that what you consider a residential area?
A. The office in Torrance was not a res -- I'm sorry. The office in Torrance was not a residential area, it was an office complex, an office, like, offices. The canvassing that we did required us to -- it was a destination. But it was when I went to the Torrance office that that occurred.
Q. Okay. So in the Torrance office you would get sent out to a residential area to do canvassing; is that right?
A. Correct.

Page 143

ALEXANDRA WHEATLEY-DIAZ

Q. And you would actually go to people's homes; is that right?
A. That is correct.
Q. And did you go with anybody else?
A. Generally, that varied. Sometimes I did, sometimes I did not.
Q. And what determined whether you went with somebody else or not?
A. Different variables. Just depended on the group. Sometimes we did it together so that we could get more stuff done, sometimes we did it -- sometimes we ran into each other because we were doing neighborhoods and it also depended on the -- our ROD, what our ROD had us doing. So he would tell us if we were going by ourselves or we were going with other individuals. And sometimes --
Q. And different RODs -- go ahead. I'm sorry.
A. I was going to say, and sometimes it also was with volunteers too. Just every day was different.

Page 144

ALEXANDRA WHEATLEY-DIAZ

Q. Okay. And if you went as a group you would go to a location as a group and then split up, you wouldn't go as a group house to house, right?
A. That is correct.
MS. BLOOM: Can we show the witness what is under tab 58 and mark it as Exhibit 9, please?
(Wheatley Exhibit 9, document entitled Voter Contact Script, Bates MB2020_Wood_00042524 was received and marked on this date for identification.)
CONCIERGE: Wheatley 9 has been marked.
Q. Do you recognize this document?
A. Can you repeat the question? I'm sorry.
MS. COLE-CHU: I was having trouble hearing you.
MS. BLOOM: I'm sorry. I missed both of that. My question was whether she recognized the

Page 145

ALEXANDRA WHEATLEY-DIAZ

document.
A. Yeah. This one I recognize.
Q. And what is this?
A. This is one of the scripts we were given at some point during my employment.
Q. So in looking at Exhibit 9 it says, "If undecided, what issues are most important to you in this election? Actively listen to the voter." Would you do that, ask an undecided voter what issues are most important to you in this election?
A. I did. And like I stated before when we were going over my resumé, I did that.
Q. Okay. Good. And would you actively listen to the answer?
A. I would, yes.
Q. Because the answer was important, right?
A. The answer was necessary in order to understand how to proceed.
Q. And then it says, "As someone

37 (Pages 142 - 145)

Page 146

1  ALEXANDRA WHEATLEY-DIAZ
2  who also cares about this issue because"
3  -- and it says -- "personal reason." I
4  hear your concern, I am supporting Mike
5  because" and it says, "Share personal
6  story or use talking points below."
7  Focusing on the first
8  sentence, "As someone who also cares
9  about this issue because", and put in a
10  personal reason, did you do that?
11  A.  To the best of my
12  recollection, I would state that I
13  believe that I did, yes.
14  Q.  Then it says, "Go on, I hear
15  your concerns, I'm supporting Mike
16  because", and you can share your personal
17  story or use the talking points.  Did you
18  share your personal story?
19  A.  It depended on the issues that
20  the voter had expressed and it depended
21  on if I had any relationship to the
22  issues that were being expressed.
23  MS. BLOOM:  Okay. Thank you.
24  Can we look at tab 71, please and
25  mark that as Exhibit 10?  And this

Page 147

1  ALEXANDRA WHEATLEY-DIAZ
2  is Bates P007619 to P007624.
3  (Wheatley Exhibit 10, email
4  dated January 30, 2020, Bates
5  P007619 was received and marked on
6  this date for identification.)
7  CONCIERGE:  Wheatley 10 has
8  been marked.
9  Q.  Ms. Wheatley, these are
10  documents that you provided in the course
11  of discovery. Do you recognize them?
12  A.  Do I recognize this email?
13  Yes, I do.
14  Q.  Okay. And you were -- well,
15  first of all, who is Erin Moses?
16  A.  Erin Moses is my friend.
17  Q.  And were you helping Erin
18  Moses apply for a position as Deputy
19  Field Officer for the Campaign?
20  MS. COLE-CHU:  Objection to
21  form.
22  A.  I was not helping her get a
23  job.  I was simply forwarding over
24  information on a job, about a job where I
25  was working, where I was currently

Page 148

1  ALEXANDRA WHEATLEY-DIAZ
2  employed.
3  Q.  And why were you doing that?
4  A.  I was asked to by the company
5  that -- or I was asked to by my employer
6  and I also -- yeah, I was asked to by my
7  employer.
8  Q.  When you say -- what were you
9  asked to do by your employer?
10  A.  I was asked to -- I was asked
11  to inform people about a position that
12  was opened at the -- at the company.
13  Q.  And when you say "the
14  company", you mean the Campaign?
15  A.  The Campaign yes.
16  Q.  And other than Erin Moses, did
17  you inform anybody else about open
18  positions at the Campaign?
19  A.  I did.  And you can see below
20  it was to Brianna Garza and Maya Jackson
21  and John Scott.
22  Q.  Were those also friends of
23  yours?
24  A.  I don't recall who exactly
25  John is, but Maya and Brianna Garza were

Page 149

1  ALEXANDRA WHEATLEY-DIAZ
2  friends of mine, yes.
3  Q.  And did any of them actually
4  come and work for the Campaign?
5  A.  I believe that Brianna was
6  interviewed. I don't believe that she was
7  hired.
8  Q.  And it says, "Our deputy
9  organizers will work 20 to 25 hours per
10  week with a flexible work schedule."  Do
11  you see that?
12  A.  I do see that.
13  Q.  So for the position that you
14  were informing these people about, was a
15  position for 20 to 25 hours a week with a
16  flexible work schedule; is that correct?
17  A.  That is what the statement is
18  and that was my understanding at the time
19  that I sent this, that I forwarded this
20  email over to those individuals.
21  Q.  And you were never a deputy
22  organizer; is that right?
23  A.  That is correct.
24  Q.  In terms of the hours -- and
25  you can take that down.

Page 150

ALEXANDRA WHEATLEY-DIAZ

Q. In terms of the hours that you devoted, that you spent on the Campaign when you were working as a field organizer in the month of January, how many hours a week did you work for the Campaign?

A. In January I worked every day. I'd have to sit with a calculator to measure the time but it was well over right away 40 hours. I worked all day Saturday and Sunday and I worked generally between 10 to 12 Monday through Friday ending at about 9:00.

Q. I'm sorry. You said you worked between 10 to 12 Monday through Friday?

A. I usually got to the office when the office opened. The opening of the office varied, so that some days it was 10, 11 or 12. It just depended on when the office opened, it depended on if we had a meeting that day and it depended on my job -- my other job as well. So it was generally between 10 and 12 that I got to the office.

Page 151

ALEXANDRA WHEATLEY-DIAZ

Q. Okay. And how many hours in January per week were you working for your other job?

A. I cannot say for certain the amount of hours but anywhere between -- I cannot -- I couldn't say for certain on the record the amount of hours.

Q. Well, approximately how many?

A. Maybe, approximately, like, 30 hours, 35.

Q. 35 hours a week?

A. Approximately.

Q. And how many hours a week for the Campaign during that time?

A. Like I said, if I got there to the office between 10 and 11 -- generally, it was between 11 or 12 and then I would leave around 9, 8, 9, sometimes 10, depending on the day. Like Fridays and then on weekends it was typically in the morning all the way to the nighttime on Saturday and Sunday.

Q. And it's your testimony that you worked every Saturday and Sunday for

Page 152

ALEXANDRA WHEATLEY-DIAZ

the Campaign in January?

A. In the month of January when I was hired, from when I was hired I did work those weekends. And if I -- I'd have to look at a calendar to see for sure what weekends those were and when I actually began, because that is something that I don't necessarily recall the exact date, so...

Q. And there were some weekends that you couldn't work because of your other job, correct?

MS. COLE-CHU: Objection to form.

A. That's not correct. I did not ever not work a weekend.

Q. Could you ever not work a weekend day, meaning Saturday or Sunday, when you worked for the Campaign?

A. No, I worked every Saturday and Sunday for the Campaign.

Q. Okay. In February and March also?

A. Correct, yeah.

Page 153

ALEXANDRA WHEATLEY-DIAZ

Q. Okay. And it's your testimony here today that you never, during the entire time you worked for the Campaign, you worked every single Saturday and Sunday?

A. To the best of my knowledge, that is true, that I remember, and that I recall. I do not recall ever not working those weekends and I'm also uncertain of when we stopped working in March. So depending on when the last day was in March and when the first day was that I started working in January, and to the best of my knowledge, I recall working all those weekends.

Q. In the month of February how many hours a week did you work for the Campaign?

A. It was the same that I worked in January. I'd have to get a calculator to calculate the amount of time but, like I said, if we were on the latter side, between 12 every day, you know, 10 -- generally between 12, leaving the office

Page 154

1  ALEXANDRA WHEATLEY-DIAZ
2  at 8 or 9 or 10, depending on the day,
3  and depending the responsibilities on
4  hand Monday through Friday and on
5  weekends, arriving at the office early,
6  early -- generally early mornings until
7  the end of the day or depending on the
8  activities that we were doing that day.
9  So it all fluctuated --
10     Q.   And how many hours -- and how
11  did the activities that you were doing
12  impact your hours?
13        MS. COLE-CHU:  I don't believe
14     the witness is done with her answer
15     to the last question.
16     A.   Yeah. It fluctuated is my
17  statement, was my last statement.
18     Q.   How did the activities impact
19  your hours?
20     A.   If we were asked to go to a
21  flea market that began at 7 a.m., then we
22  were asked to show up at the flea market
23  when it began. If we were -- so it just
24  depended on what we were asked to do that
25  day.

Page 155

1  ALEXANDRA WHEATLEY-DIAZ
2     Q.   And in the month of February,
3  how many hours a week did you work for
4  Genex?
5     A.   I would say it was the same. I
6  can't -- I can't state for certain the
7  amount of hours.
8     Q.   So about 35 hours a week, is
9  that your testimony?
10     A.   That's my testimony.
11     Q.   And when you were working for
12  Genex, did you ever do any of that work
13  when you were at the Bloomberg Campaign?
14     A.   There were instances where I
15  was allowed to come to the office to --
16  and I was allowed to work my other job so
17  I could immediately start working the
18  Bloomberg job at a specified time.
19     Q.   And do you have any records of
20  that?
21     A.   That was just a verbal
22  agreement given by my ROD and me.
23     Q.   And I assume that Genex would
24  have records of the hours that you worked
25  and how much you were paid, correct?

Page 156

1  ALEXANDRA WHEATLEY-DIAZ
2     A.   I cannot say for certain.
3        MS. COLE-CHU:  Objection to
4     form.
5     Q.   And in March, how many hours a
6  week did you work for Genex?
7     A.   I would say it was the same
8  amount.
9     Q.   And for the Campaign?
10     A.   It was -- I can't say for
11  certain because I don't recall, like,
12  when things ended or, like, when the
13  company -- when we stopped being
14  employed, but it was -- there was
15  definitely an increase in how much we
16  were working in March.
17     Q.   And you still were working
18  your 35 hours a week for Genex?
19     A.   That I recall, that is
20  correct.
21        MS. BLOOM: If we can show the
22     witness what's under tab 72 and
23     mark it as Exhibit 11? It's
24     P008132.
25        (Wheatley Exhibit 11, email

Page 157

1  ALEXANDRA WHEATLEY-DIAZ
2  dated January 30, 2020, Bates
3  P008132 was received and marked on
4  this date for identification.)
5        CONCIERGE:  Wheatley will 11
6     has been marked.
7     Q.   Do you recognize this as an
8  email from you to Anoosh on January 30th,
9  2020?
10     A.   That is correct. I do
11  recognize it is.
12     Q.   And Anoosh is your friend; is
13  that right?
14     A.   He was a friend of mine, yes.
15     Q.   And here he's talking about
16  being interested in coming to work for
17  the Bloomberg Campaign; is that right?
18     A.   He is, yeah. He is, yup.
19     Q.   And did he eventually work for
20  the Campaign?
21     A.   He did.
22     Q.   It says here, "I was referred
23  my friend Alex Wheatley who I witnessed
24  in just a short time how much she enjoys
25  working for the Bloomberg Campaign." Is

Page 218

ALEXANDRA WHEATLEY-DIAZ

 2  A.  I do.
 3  Q.  What does that mean? What does
 4  that mean?
 5  A.  I don't recall the contents of
 6  why she stated that subject line at that
 7  time but just I would assume -- I don't
 8  want to assume. I would just say I'm not
 9  sure what the purpose of her writing that
10  subject was, other than that's the
11  subject that she chose.
12  Q.  Did she send you these
13  documents that are attached here?
14      MS. COLE-CHU:  Objection to
15  the form.
16  A.  It appears that she did.
17  Q.  And why was she sending you
18  these documents on August 26th of 2020?
19  A.  I can't recall why she sent
20  them over to me, just that she did.
21      MS. BLOOM:  You can take it
22  down.
23  Q.  When you were working for the
24  Campaign and you said that you would
25  either work in the office or you would be

Page 219

ALEXANDRA WHEATLEY-DIAZ

 2  out canvassing; is that right?
 3  A.  When I worked for the
 4  Campaign, I was -- every day
 5  differentiated, so I can't say for
 6  certain if what I did on a daily basis
 7  was limited to those two references.
 8  Q.  But you could also be working
 9  at an event; is that right?
10  A.  I was -- I was asked to work
11  events, not...
12  Q.  Okay. I'm sorry?
13  A.  No. That's it.
14  Q.  Besides working in the office,
15  canvassing and working events, what else
16  did you do?
17  A.  That I recall, I think it's
18  limited to those three avenues.
19  Q.  Okay. Now, when you were out
20  canvassing you didn't have a supervisor
21  with you, did you?
22  A.  It depended on where we were
23  canvassing. Sometimes we did and
24  sometimes we didn't.
25  Q.  What would you do for lunch

Page 220

ALEXANDRA WHEATLEY-DIAZ

 2  when you were canvassing?
 3  A.  Usually I brought my own lunch
 4  or we would on our way back to the office
 5  stop to grab something to go. I don't
 6  recall there ever being a time where we
 7  actually stopped to sit down at, like, a
 8  restaurant to have dinner or lunch or
 9  breakfast.
10  Q.  So did anyone tell you that
11  you couldn't take a lunch break?
12  A.  It was never verbalized that
13  we could or that we couldn't verbally or
14  -- I don't recall, like, somebody calling
15  us and saying to take a lunch break or
16  take a dinner break.
17  Q.  How about somebody -- did
18  anybody say that you couldn't?
19  A.  No one said we could, no one
20  said we couldn't.  But it was definitely
21  -- we were definitely made aware of when
22  we weren't working and they could see
23  that because they were tracking what we
24  were doing and when we were doing it.
25  Q.  When you say they were

Page 221

ALEXANDRA WHEATLEY-DIAZ

 2  tracking, did they track the number, when
 3  you were canvassing, the number of doors
 4  that you called on?
 5  A.  Yes.
 6  Q.  And did you have a number that
 7  you were supposed to reach?
 8  A.  We didn't have a particular
 9  number but we were given a list of places
10  that we needed to go and I wouldn't -- I
11  don't know the number and I wouldn't --
12  it was just a list and we had to go to
13  those places on the list.
14  Q.  And you said sometimes
15  volunteers went with you; is that right?
16  A.  I think there was one occasion
17  that volunteers -- a couple of occasions,
18  more than two maybe, that volunteers came
19  with us, correct.
20  Q.  And then when you got to the
21  canvassing place you would split up,
22  you'd split up the list; is that right,
23  with whoever was with you?  If you were
24  going as a group or individually, you
25  would split up the list because one

Page 222

1    ALEXANDRA WHEATLEY-DIAZ
2  person would go to each door; is that
3  right?
4      A.  When I was with volunteers
5  generally it would be me with the
6  volunteers doing it together. And we were
7  all given our own list. So that's not
8  accurate. Like, I was given a list and
9  Jane Doe was given a list and we might do
10 that list together but we were doing both
11 lists and that was very rare that that
12 occurred.
13     Q.  What happened when you
14 finished that list?
15     A.  We would go back to the office
16 to continue phone banking.
17     Q.  But when you were done with
18 the list you were done with the list,
19 right?
20     A.  It depended on the day.
21 Sometimes you were asked to -- sometimes
22 mid-canvassing we were given another list
23 and it was just based on -- I'm not sure
24 exactly what it was based on but it was
25 my limited understanding that it was

Page 223

1    ALEXANDRA WHEATLEY-DIAZ
2  based on how many doors we actually were
3  able to knock on. So if we -- yeah.
4      Q.  When you worked in the office
5  you had a designated lunch break every
6  day; isn't that right?
7         MS. COLE-CHU:  Objection to
8      form.
9      A.  That was not my understanding.
10     Q.  There was a time -- you were
11 allowed to take breaks when you worked in
12 the office; isn't that right?
13        MS. COLE-CHU:  Objection to
14     form.
15     A.  That was not my understanding
16 either.
17     Q.  What was your understanding?
18     A.  That we were there to work and
19 that we needed to hit the numbers that
20 they had asked us to hit.
21     Q.  And once you hit those numbers
22 could you leave?
23     A.  The numbers were unattainable,
24 so no.
25     Q.  Well, if one could attain them

Page 224

1    ALEXANDRA WHEATLEY-DIAZ
2  could they leave?
3         MS. COLE-CHU:  Objection to
4      form.
5      A.  I -- I'm not at liberty to say
6  that. I'm not -- I didn't see that occur
7  so I can't say if that's true or not.
8      Q.  If you had to go to the
9  bathroom, could you get up and go to the
10 bathroom?
11     A.  It felt as though we couldn't
12 but of course, we did anyways.
13     Q.  If you wanted to go get a cup
14 of coffee, could you go get a cup of
15 coffee?
16     A.  There were instances where I
17 would be on the phone grabbing a cup of
18 coffee or sending a text message,
19 grabbing a cup of coffee. So there was
20 never a time where I was grabbing a cup
21 of coffee and not simultaneously on the
22 phone.
23     Q.  Was that your choice?
24        MS. COLE-CHU:  Objection to
25     form.

Page 225

1    ALEXANDRA WHEATLEY-DIAZ
2      A.  I felt as though that was the
3  only choice.
4      Q.  Because of what your numbers
5  were, is that why?
6      A.  Because of the environment,
7  because of the leadership and because of
8  the pressure that we were under.
9      Q.  Did anybody ever tell you that
10 you couldn't take a break during the
11 workday?
12     A.  I don't recall if that
13 statement was ever made by anybody.
14     Q.  Did you ever consider quitting
15 the job at the Campaign?
16     A.  I don't recall the sentiment
17 that I felt during that time. I was very
18 -- I do know that I was very passionate
19 and very motivated to keep going.
20     Q.  Did you bring your lunch --
21 oh, passionate about the candidate?
22     A.  About the position that I was
23 working in, I really enjoyed -- I really
24 enjoyed what I was doing. I was learning
25 something, yeah.

Page 238

ALEXANDRA WHEATLEY-DIAZ

Q. What was your hourly rate at the insurance company during the time that you were working for the Campaign?

A. I don't even recall how much I was being paid at that time. That was years ago. I don't recall for certain the hourly rate. But the hourly rate versus the hours versus the statement I think are two different subject matters.

Q. How did what you were earning at the insurance company compare to what the Campaign was paying you?

A. When you say "compare", what do you --

Q. Was it more or less? Was it more or less? Your compensation at the insurance company right before you started work at the Campaign, was it more or less than what the Campaign was paying you?

A. It was less.

Q. And after the Campaign ended you went back to work at the insurance company or you resumed your hours at the

Page 239

ALEXANDRA WHEATLEY-DIAZ

insurance company, correct?

A. Correct.

Q. If you look at the next page in paragraph 96, it says that you regularly worked approximately 65 hours a week for the Campaign. Is that a true statement?

A. It is a true statement of which varied based on the week. That's why the word "approximately" is important.

Q. What was the range?

A. It could have been 50, could have been 65, could have been 70, honestly. That's why the word "approximately" I think is really important in that statement because it was around that amount of hours.

Q. Was it ever less than 40?

A. No.

Q. So assuming it was 65 hours a week, and that you were working 35 hours a week for the insurance company, is it your testimony here today that you would

Page 240

ALEXANDRA WHEATLEY-DIAZ

have been working 100 hours a week?

A. I cannot make that testimony, nor do I feel confident in making that statement. I would just simply say that I worked approximately a certain amount of hours at the -- at Genex and I worked a significant amount more at the Campaign working every single day up until I was let go.

Q. And sitting here today, can you tell me if there was any overlap in the hours, meaning that you were working for both entities at the same time?

A. I cannot recall during that timeframe if that occurred or not.

Q. If that did occur, then you would have been getting paid from both of them simultaneously?

MS. COLE-CHU: Objection.

A. I cannot -- I cannot -- I -- I don't -- I don't believe that that's a fair -- I don't believe that that statement is accurate because I was not being paid hourly from the Campaign. I

Page 241

ALEXANDRA WHEATLEY-DIAZ

was given a set amount to work a set amount of hours that should not have exceeded a certain amount of hours and did. So I would disagree with that statement because I don't think it's valid.

Q. Okay. So if you were working for Genex and you were working for the Campaign at the same time, meaning you were charging both of them for your hours, would you not count that as an hour worked for the Campaign because you were on salary? Is that what you're saying?

MS. COLE-CHU: Objection to form.

A. I'm not saying that at all. I'm simply saying that the Campaign was paying me to work a certain amount of hours of which were exceeded and my job with Genex was paying me to work a certain -- to do certain tasks which I was doing as well. So I don't think that the statement that you're making is --

Page 246

ALEXANDRA WHEATLEY-DIAZ

back on the record. The time is 12:33 p.m.

EXAMINATION BY MS. COLE-CHU:

Q. Ms. Wheatley, what were your primary job duties as a field organizer for the Mike Bloomberg Campaign?

A. My primary duties were to canvass when asked and to phone bank and to work events when necessary.

Q. So looking specifically at canvassing and phone banking, what percentage of your overall job duties, while employed by the Mike Bloomberg Campaign as a field organizer, were you canvassing and phone banking?

A. It depended on the month but in the month of January and February we were primarily phone banking, with the occasional canvassing at a rate of about 20%. When March hit we were approximately -- it was pretty 50/50, like half the day would be, depending on the day, canvassing and the other half would be phone banking. Some days it would

Page 247

ALEXANDRA WHEATLEY-DIAZ

primarily just be phone banking. And when I say phone banking I also mean text messages and the auto-dial.

Q. When you look at those job duties combined, canvassing and phone banking, as a percentage of your overall job duties while working for the Campaign, what percentage of your overall job duties were canvassing and phone banking?

A. I would say 98% of it.

Q. We looked at an email. Do you mind pulling up Exhibit 12 and taking a look at that with me?

A. Oh, yes.

MS. BLOOM: Can you put it on the screen, please? Could the Concierge put that on the screen? Thanks.

Q. Do you have the exhibit in front of you, Ms. Wheatley?

A. I do.

Q. This is Exhibit 12, an email sent by you to Jonathan Salvador and the

Page 248

ALEXANDRA WHEATLEY-DIAZ

subject is Alex Events For February. Do you remember the events of this email?

A. I remember discussing this email with Jonathan or with you guys?

Q. Do you remember discussing this email today?

A. Yes, I do remember discussing this email today.

Q. I would just like to go through some of these events with you.

In the first line there is an event -- well, I'll read the line. It says, "Friday, January 31st" it says, "Hosting event for outvote in Long Beach." Did that occur?

A. It did not.

Q. There is another event and you say, "Saturday February 1st, yoga on the roof attending or just going to Equinox and calling all day if I have addresses. I will attend this as well." Did you attend that event?

A. I did not.

Q. In the third paragraph down

Page 249

ALEXANDRA WHEATLEY-DIAZ

there is some underlined text reading, "Equinox attending in South Bay as they asked me to come back. This is where I go to the gym, I'll also be there Friday and every day in the morning." Did you attend that event?

A. I would not signify that as an event but I did drop off information on the Campaign to them and when I went to the gym I brought information and I dropped that off to them because I was allowed to. So, yeah.

Q. How many times did you do that?

A. I believe I only actually did it once.

Q. Looking at the next paragraph down it reads, "Thursday February 6th: All district meeting at 6:30 meeting at Manhattan Beach." Was this an event in connection with your work with the Bloomberg Campaign?

A. It was not.

Q. Looking at the next paragraph

Page 250

ALEXANDRA WHEATLEY-DIAZ

Q. down it reads "Saturday South Bay Lunar Festival at 6:30 p.m." Did you attend that event?
A. I did not.
Q. The next line down it reads, "February 9th: Hosting a Valentines day party for outvote." Is that an event that you attended on behalf of the Mike Bloomberg Campaign?
A. To my -- yeah, no, I not recall attending that event.
Q. Further down in the email you state, "February 1st at night and February 28th at night hosting this event at 7 p.m." Do you remember giving testimony on this earlier today?
A. I do.
Q. Did you attend events in connection with your work with the Bloomberg Campaign on either of these nights?
A. I cannot recall specifically if it was those two dates but it is -- it's possible.

Page 251

ALEXANDRA WHEATLEY-DIAZ

Q. Next line down -- well, let me ask about those events. Do you recall what those events were?
A. I don't. I do not.
Q. And is your testimony that you don't remember either way whether you attended?
A. That is correct. That's my testimony.
Q. Do you know whether they happened?
A. I don't know whether they happened and I certainly do not know if I attended. Based on my experience with this email, in particular, none of the events -- these two events specifically would -- probably would, to the best of my understanding and recollection, fall under the category of providing information that Jonathan requested, not actually having any validity to the statement in which I wrote.
Q. Did you do anything beyond writing this email to plan any of the

Page 252

ALEXANDRA WHEATLEY-DIAZ

events identified here in this email?
A. No.
Q. Looking down towards the bottom of the email you wrote, "February 15th, Torrance Farmers Market attending all morning." Do you recall if you went to the Torrance Farmers Market on February 15th?
A. I do not recall going to the Torrance Farmers Market. I did go to the Torrance Flea Market, which are two different things but I cannot say it was on February 15th.
Q. Did you ever go to an event at the Torrance Farmer's Market on behalf of the Bloomberg Campaign at any point?
A. I do not believe I went to the Torrance Farmer's Market on behalf of the Bloomberg Campaign at any point.
Q. Further down in the email you wrote, "Feb 29th, girls on the run in the South Bay/Get a Clue event later that night, pillow park." Do you know what event that's referring to?

Page 253

ALEXANDRA WHEATLEY-DIAZ

A. I do not. I do not recall that event.
Q. Did you attend that event?
A. I do not recall if I attended that event or that it actually ever happened, yeah.
Q. Did you ever host a game night outvote party in connection with your employment with the Bloomberg Campaign?
A. I believe it was my intention but it never actually occurred.
Q. Did you attend a blood drive on February 10th in Manhattan Beach in connection with your work on the Bloomberg Campaign?
A. I did not.
Q. Were you involved in the planning of any events in connection with your work as a field organizer for the Bloomberg Campaign?
A. I was not. In regards to planning, I was not.
MS. COLE-CHU: Those are my only questions.

64 (Pages 250 - 253)

Page 254

1  MS. BLOOM: Thank you. Subject
2  to the supplemental discovery.
3  VIDEOGRAPHER: Anything
4  further before I take us off the
5  record for today?
6  MS. COLE-CHU: We can go off.
7  VIDEOGRAPHER: All right. We
8  are going off the record at 12:42
9  p.m. and this includes today's
10 testimony given by Alexandra
11 Wheatley-Diaz.
12 The total number of Media
13 Units used was 5 and will be
14 retained by Veritext Legal
15 Solutions.
16 (The proceedings were
17 adjourned at 12:42 p.m. PST)

Page 255

CERTIFICATE

I, MAUREEN M. RATTO, a Registered Professional Reporter, do hereby certify that prior to the commencement of the examination, ALEXANDRA WHEATLEY-DIAZ was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of he proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

*Maureen Ratto*
MAUREEN M. RATTO, RPR
License No. 817125

Page 256

INDEX

WITNESS: ALEXANDRA WHEATLEY-DIAZ 6
DIRECT EXAMINATION BY MS. BLOOM  6
EXAMINATION BY MS. COLE-CHU    246

EXHIBITS

Wheatley Exhibit 1, email       23
forwarding resumé of Alexandra
Wheatley-Diaz, Bates P007635
Wheatley Exhibit 2, email dated  45
January 16, 2020, Bates P008641
Wheatley Exhibit 3, letter dated 76
October 19, 2020 from Outten &
Golden
Wheatley Exhibit 4, email dated  86
October 6, 2020, Bates P007945
Wheatley Exhibit 5, email       124
forwarding resumé dated
September 14, 2020, Bates
P007951
Wheatley Exhibit 6, document    127
entitled Introductory
One-on-one, Bates
MB2020_Wood_00036509
Wheatley Exhibit 7, document    129

Page 257

entitled Volunteer Retention,
Bates MB2020_Wood_00097259
Wheatley Exhibit 8, document    130
entitled Canvassing Toolkit,
Bates MB2020_Wood_00092756
Wheatley Exhibit 9, document    144
entitled Voter Contact Script,
Bates MB2020_Wood_00042524
Wheatley Exhibit 10, email dated 147
January 30, 2020, Bates P007619
Wheatley Exhibit 11, email dated 156
January 30, 2020, Bates P008132
Wheatley Exhibit 12, email dated 162
January 30, 2020, Bates
MB2020_Wood_00090165
Wheatley Exhibit 13, email dated 167
February 7, 2020, Bates
MB2020_Wood_00090101
Wheatley Exhibit 14, email dated 170
February 7, 2020, Bates
MB2020_Wood_00091049
Wheatley Exhibit 15, email dated 177
February 6, 2020, Bates
MB2020_W00d_90133,
Wheatley Exhibit 16, pay        180