# Exhibit 64

1    UNITED STATES DISTRICT COURT

2     SOUTHERN DISTRICT OF NEW YORK

3   -------------------------------x

4   DONNA WOOD, et al, individually

5   and on behalf of all others

6   similarly situated,

7            Plaintiffs,

8       vs.      20 Civ. 2489(LTS)(GWG)

9   MIKE BLOOMBERG 2020, INC.,

10            Defendant.

11   -------------------------------x

12

13        VIDEOTAPE DEPOSITION OF

14             BRIDGET LOGAN

15       VIA ZOOM VIDEOCONFERENCE

16          November 10, 2022

17            9:10 a.m. CT

18

19

20

21

22

23   Case No. 5548190

24   Reported by:

25   Maureen Ratto, RPR, CCR

BRIDGET LOGAN

1
2    Q.   Going back to the first email
3  where you said "I'm in" in this chain,
4  this was sent on March 9th to Bridgette
5  Logan and the subject line is Bloomberg
6  Exit, did that "I'm in" language have
7  anything to do with your participation in
8  this lawsuit?
9    A.   I don't recall specifically
10 that that's what that pertained to.
11   Q.   Sitting here today, do you
12 have any recollection of what that
13 pertained to?
14   A.   As I stated before, it looks
15 like I went to the Facebook page. That's
16 -- that's what I would assume that's for.
17   Q.   How did you first learn about
18 this lawsuit?
19   A.   I don't recall the specifics.
20   Q.   Do you recall finding out
21 about the existence of the lawsuit on
22 your own or did somebody contact you to
23 let you know about the existence of the
24 lawsuit?
25   A.   I can safely say that there

BRIDGET LOGAN

1
2  was an opportunity for the field
3  organizers to get together and that there
4  was conversations on that, having action
5  against the campaign. I don't recall how
6  I got specifically involved with it.
7    Q.   When did you first consult a
8  lawyer about participating in this
9  lawsuit?
10   A.   I didn't consult any lawyers.
11 I believe that I was directed to whomever
12 was going to handle the case on behalf of
13 the field organizers. How I did that, I
14 don't recall.
15   Q.   Do you recall who directed you
16 to the lawyers?
17   A.   No, I do not.
18   Q.   Was it a field organizer?
19   A.   I don't recall.
20   Q.   Do you recall if a lawyer
21 reached out to you or you reached out to
22 the lawyer?
23   A.   I couldn't tell you which way
24 it went.
25   Q.   Do you recall who the first

BRIDGET LOGAN

1
2  lawyer is that you spoke to about this
3  case?
4    A.   No.
5    Q.   You have no recollection?
6    A.   I recollect talking to
7  someone. I don't recollect their name.
8    Q.   Have you ever sued an employer
9  before?
10   A.   No.
11   Q.   Have you ever filed an
12 administrative charge against an
13 employer?
14   A.   No.
15   Q.   Have you ever disputed wage
16 payments made to you by any employer?
17   A.   No.
18   Q.   Have you ever testified in a
19 trial?
20   A.   No.
21   Q.   Have you ever been sued?
22   A.   No.
23       MS. PHILION:  Duane, can you
24   please pull up tab 15?
25       (Logan Exhibit 2, resumé of

BRIDGET LOGAN

1
2  Bridget Logan, Bates P00395 was
3  received and marked on this date
4  for identification.)
5       CONCIERGE:  That's one-five?
6       MS. PHILION:  Yes, please.
7       CONCIERGE:  Logan 2 has been
8  marked.
9    Q.   Ms. Logan, can you please
10 review Exhibit 2 and let me know if you
11 recognize this document.
12   A.   I do recognize this document.
13   Q.   Is this a copy of your resumé?
14   A.   It is.
15   Q.   Did you create this resumé?
16   A.   I did.
17   Q.   When did you create this
18 resumé?
19   A.   I don't have a specific date.
20 It was either the end of January 2020 or
21 the start of February 2020.
22   Q.   Did you create this resumé
23 before you accepted a job with the
24 Bloomberg Campaign?
25   A.   Yes, I did.

9 (Pages 30 - 33)

BRIDGET LOGAN

1
2    Q.   Did you use this resumé to
3  apply for a job at the Bloomberg
4  Campaign?
5    A.   I did.
6    Q.   Since creating this resumé
7  have you updated it at all?
8    A.   No, I have not.
9    Q.   Looking at the resumé that you
10 created, is this an accurate description
11 of your educational and professional
12 experience as of the date you created it?
13   A.   Yes, it is.
14   Q.   Under the Skills heading where
15 you have about eight bullet points, is
16 this an accurate description of your
17 skill set?
18   A.   Yes.
19   Q.   Did you put this resumé
20 together for the purpose of applying to
21 the Bloomberg Campaign or were you
22 otherwise putting your resumé together
23 generally?
24   A.   I put it together for the
25 Bloomberg Campaign, to apply.

BRIDGET LOGAN

1
2    Q.   Did you have a prior version
3  of your resumé before you created this
4  one for the Bloomberg Campaign?
5    A.   Not that I can put my hands
6  on.
7    Q.   What does that mean?
8    A.   I've had several jobs before
9  the Bloomberg Campaign that I have
10 created resumés for. I guess I'm
11 anticipating a question of; do you have
12 them? And maybe I shouldn't anticipate
13 the question.
14   Q.   Do you have them?
15   A.   No, not that I can put my
16 hands on.
17   Q.   Prior to creating this resumé,
18 when was the last time before that that
19 you recall making a resumé?
20   A.   In 2014.
21   Q.   How much college have you
22 completed?
23   A.   I've completed an associate's,
24 and then some college after that.
25   Q.   And where did you complete

BRIDGET LOGAN

1
2  your associate's degree?
3    A.   It was called Brown Institute
4  at the time and then it turned into Brown
5  College in Mendota Heights, Minnesota.
6    Q.   And when did you complete your
7  associate's degree?
8    A.   I completed it in -- when was
9  she born? -- 2001.
10   Q.   And how much college credit do
11 you have beyond your associate's degree?
12   A.   I don't know the number of
13 credits. I know I am shy of completing
14 another associate's through a community
15 college, which I don't know is on there
16 or not.
17   Q.   Is that community college
18 Minneapolis Community and Technical
19 College?
20   A.   Correct.
21   Q.   Where do you currently work?
22   A.   I work at Minnetonka Title in
23 Wayzata, Minnesota.
24   Q.   Is this also the company you
25 worked at prior to joining the Bloomberg

BRIDGET LOGAN

1
2  Campaign?
3    A.   Correct.
4    Q.   How long have you worked at
5  Minnetonka Title?
6    A.   Not counting the month and a
7  half where I did not work there, I have
8  worked there since January 2014, so going
9  on nine years.
10   Q.   What kind of services does
11 Minnetonka Title provide?
12   A.   Minnetonka is a title
13 insurance company, so if you purchase or
14 refinance your home you need to go
15 through a title company to do that.
16 That's what we do.
17   Q.   And what is your position?
18   A.   I am an administrative
19 assistant/closing assistant to the two
20 closers at the company.
21   Q.   And what are your job
22 responsibilities in that position?
23   A.   A lot.
24   Q.   Can you describe them for me,
25 please?

BRIDGET LOGAN

1
2     A.   I am data entry, I answer the
3 phones, I do the recording for our
4 documents, I file, I send back mortgages,
5 I answer questions related to any of the
6 transactions going on for any and all
7 agents.  I am a little bit of everything
8 in our office.
9     Q.   Is the job you currently hold
10 the same job you had at Minnetonka prior
11 to joining the Bloomberg Campaign?
12     A.   Yes, it is.
13     Q.   When you were putting this
14 resume together to apply for the
15 Bloomberg Campaign, did you create it to
16 reflect content that you believed would
17 be relevant to the job you were applying
18 for?
19     A.   I created it to show the most
20 current employment that I had after the
21 last, I don't know, four jobs. I don't
22 like making resumés.
23     Q.   Did you think about whether
24 the content would be relevant to the job
25 you were seeking to get?

BRIDGET LOGAN

1
2     A.   Can you repeat the question?
3 I'm sorry.
4         MS. PHILION:  Maureen, can you
5     read the question back, please?
6         (Pending question is read back
7     by the reporter.)
8     A.   Did I think the content to be
9 relevant to the job I was seeking? Is
10 that a fair summary? Can you ask it in a
11 different way?
12     Q.   Sure. When you were creating
13 this resumé, did you think about
14 including content that would be relevant
15 to the job that you were seeking?
16     A.   I created content to reflect
17 my skills.
18     Q.   How did you learn about the
19 job at the Bloomberg Campaign?
20     A.   Good question. Word of mouth.
21 I knew someone who knew about them
22 hiring.
23     Q.   And who is that person?
24     A.   I don't recall. It was kind of
25 like a conversation had with --

BRIDGET LOGAN

1
2 somewhere. I wish I could be more
3 specific but...
4     Q.   Do you recall any details of
5 that conversation?  When it took place?
6 Let's start there.
7     A.   I would say January of 2020 is
8 when the original conversation took
9 place. It was probably at a bar and I was
10 having some beers, which might make the
11 memory fuzzy.
12     Q.   Were you drunk?
13     A.   No.
14     Q.   Do you have a sister named
15 Heather Logan?
16     A.   I do.
17     Q.   Has Heather ever worked for
18 any entities associated with
19 Mr. Bloomberg?
20     A.   Yes.
21     Q.   And what entities are those?
22     A.   Bloomberg.
23     Q.   Bloomberg, the company?
24     A.   Bloomberg, the company, yes.
25     Q.   Do you mean Bloomberg LP?

BRIDGET LOGAN

1
2     A.   I don't -- I just know she
3 worked in the Bloomberg office in New
4 York.
5     Q.   Do you know where in New York
6 the office was located?
7     A.   Manhattan.
8     Q.   Where in Manhattan?
9     A.   I don't know.
10     Q.   Does your sister currently
11 work for a Bloomberg entity?
12     A.   No, not that I'm aware of.
13     Q.   When did she work for a
14 Bloomberg entity?
15     A.   I don't know what year she
16 started. I know she was there in 2019
17 through 2021, maybe.
18     Q.   Did you learn of the Bloomberg
19 Campaign job through your sister?
20     A.   No, I did not. However, I did
21 ask her about it and asked her if she
22 thought I would be a good fit.
23     Q.   And what did she say?
24     A.   She said yes.
25     Q.   Did she tell you why she

11 (Pages 38 - 41)

BRIDGET LOGAN

1
2    Q.   Where was the St. Anthony
3 office located?
4    A.   On a map it's really close to
5 Minnesota.
6    Q.   Is it in Minneapolis, the city
7 or is it outside the city?
8    A.   It's one of those, here is
9 Minneapolis, here is St. Anthony, and
10 then here is Minneapolis. It kind of sits
11 in between the city.
12    Q.   Is St. Anthony considered an
13 urban area?
14    A.   I think it's fair to say that.
15    Q.   Are you familiar with the term
16 turf?
17    A.   In what context? I believe
18 there is like several different ways to
19 use it.
20    Q.   In the context of your job as
21 a field organizer, did you hear the word
22 turf being used?
23    A.   Possibly.
24    Q.   Do you have an understanding
25 of what the word turf means in the

BRIDGET LOGAN

1
2 context of political organizing?
3    A.   Yes.
4    Q.   And what does that mean to
5 you?
6    A.   Turf is an area, you have a
7 specific area that you are either
8 assigned to or a part of.
9    Q.   Did you have a turf while you
10 worked for the Bloomberg Campaign?
11    A.   I did.
12    Q.   What was that turf?
13    A.   So within our district, and we
14 were District 5, there are sub-districts
15 and we each picked a sub-district, for
16 lack of a better terminology. And I had
17 -- mine was in a neighborhood of part of
18 Minneapolis, what they call northeast
19 Minneapolis, not the whole thing but part
20 of it.
21    Q.   When you say that you each
22 picked sub-districts, are you referring
23 to each field organizer in your turf
24 selecting a sub-district?
25    A.   I can say the field organizers

BRIDGET LOGAN

1
2 within our office picked a specific area.
3    Q.   And each of you had a
4 different sub-district?
5    A.   Correct.
6    Q.   And your sub-district was in
7 northeast Minnesota?
8    A.   That's the neighborhood. If I
9 had a map I could show you specifically,
10 but that was the neighborhood.
11    Q.   And what was your
12 responsibility within that neighborhood?
13    A.   They wanted us to reach out to
14 the state representative of that district
15 to see if we could connect with them as a
16 representative of the campaign.  They
17 wanted us to, if there were
18 opportunities, to go and speak on behalf
19 of the campaign, like a neighborhood
20 organization or something like that, if
21 we were aware of it, to see if they would
22 allow the campaign to come and speak, we
23 were that rep.
24    Q.   Any other responsibilities
25 with respect to your sub-district?

BRIDGET LOGAN

1
2    A.   Yes. You were encouraged to go
3 and canvass there, canvassing meaning
4 door to door, knocking on people's doors
5 to talk to them about the campaign.
6    Q.   Any other responsibilities
7 with respect to that sub-district?
8    A.   Not that I recall.
9    Q.   Did you select your
10 sub-district?
11    A.   I did.
12    Q.   Why did you select northeast
13 Minnesota as your sub-district?
14    A.   I don't recall having a
15 specific reason. It is a neighborhood I'm
16 familiar with more than others in
17 Minnesota.
18    Q.   I believe you referred to your
19 region as District 5 earlier.  Is that
20 District 5 for the Bloomberg Campaign?
21    A.   I think so.
22    Q.   Was District 5 the only office
23 that you worked in while you were
24 employed by the Bloomberg Campaign?
25    A.   No. Worked? That was my

BRIDGET LOGAN

1
2 assigned campaign office. During the
3 weekend, what they call the Get Out The
4 Vote weekend prior to I did assist out of
5 the Hopkins office and I did assist out
6 of the Brooklyn Park office.
7    Q.   I'm sorry. Could you repeat
8 that?
9    A.   Brooklyn Park, Brooklyn Park,
10 Minnesota office, I think. I don't
11 remember where everybody was.
12    Q.   How many days did you work out
13 of the Hopkins office?
14    A.   Two.
15    Q.   And how many days did you work
16 out of the Brooklyn Park office?
17    A.   One.
18    Q.   And the other days that you
19 worked for the campaign were all out of
20 the St. Anthony office?
21    A.   Correct.
22    Q.   When you were working out of
23 the Hopkins office, what were you doing
24 those two days?
25    A.   I was canvassing and making

BRIDGET LOGAN

1
2 phone calls.
3    Q.   Canvassing was out of the
4 office? When you were canvassing were you
5 physically in the office or were you out
6 in the field?
7    A.   I was out in the field but we
8 -- our base was Hopkins if we needed to
9 come back or warm up or get something to
10 eat or something to drink.
11    Q.   When you were --
12    A.   -- use the restroom.
13    Q.   When you were canvassing --
14 please finish. Are you finished?
15    A.   Yeah.
16    Q.   Just for purposes of the
17 transcript.
18    A.   Yeah.
19    Q.   So when you were canvassing in
20 Hopkins, did you canvass on your own?
21    A.   I did.
22    Q.   And when you made phone calls,
23 where did you make those phone calls
24 from?
25    A.   I made them out of the Hopkins

BRIDGET LOGAN

1
2 office.
3    Q.   Do you know anyone in the
4 Hopkins office?
5    A.   Not by name anymore, no.
6    Q.   When you were making phone
7 calls, were there other people in the
8 Hopkins office?
9    A.   Yes.
10    Q.   Did you have any direct
11 interaction with them or were you just
12 there for the purpose of making phone
13 calls?
14    A.   I was just there to make my
15 phone calls. I might have talked to
16 people but I wasn't there to interact
17 with anybody but the phone.
18    Q.   And I apologize if you already
19 told me this, but what two days were you
20 in the Hopkins office? I don't mean the
21 dates, I mean relative to your employment
22 with the campaign.
23    A.   Near the end of the campaign.
24 It was called the Get Out The Vote
25 weekend.  It's the weekend prior to the

BRIDGET LOGAN

1
2 primary.
3    Q.   You said you worked one day in
4 the Brooklyn Park office. When did you
5 work in that office?
6    A.   That was Tuesday, primary day.
7    Q.   Super Tuesday?
8    A.   Thank you. Super Tuesday.
9    Q.   And what were you doing on
10 Super Tuesday?
11    A.   On that day, canvassing.
12    Q.   Did you canvass on your own?
13    A.   Yes.
14    Q.   And then for the rest of your
15 employment with the Bloomberg Campaign
16 you worked out of the St. Anthony office?
17    A.   Correct.
18    Q.   Other than Sina and the RODs
19 that you -- excuse me -- the field
20 organizers that you identified earlier.
21 -- withdrawn.  Let me start over.
22       Other than Sina and the other
23 field organizers that you identified
24 earlier, did anybody else work out of the
25 Minnesota office?

17 (Pages 62 - 65)

BRIDGET LOGAN

1
2    A.   You mean my office, the St.
3  Anthony one?
4    Q.   The St. Anthony office.
5    A.   I wouldn't use the term
6  "work". Were there other people there
7  from other campaign offices?  Yes. Did
8  they stay there to do work?  No.
9    Q.   What were they there to do?
10   A.   It's unclear. Pick up
11 something, campaign materials, talk to
12 Sina.
13   Q.   When did you first start with
14 the campaign?
15   A.   I believe that date was
16 February 3rd.
17   Q.   Was that a little late
18 compared to other field organizers in
19 your office?
20   A.   Not that I'm aware of. I don't
21 know. We all -- as far as I know, we all
22 had orientation on the same day.
23   Q.   When you first started with
24 the campaign, was the St. Anthony office
25 already open?

BRIDGET LOGAN

1
2    A.   I don't know.
3    Q.   Do you recall working
4  somewhere other than the St. Anthony
5  office when you started with the
6  campaign?
7    A.   Orientation was held at the
8  campaign headquarters and then we were
9  assigned an office.
10   Q.   When you say "campaign
11 headquarters", you many the Minnesota
12 headquarters for the campaign?
13   A.   Yes.
14   Q.   Okay. So we've been going for
15 a little bit more than an hour. So if
16 it's okay with you, I'm going to take
17 about a ten minute break and we'll all
18 reconvene at 11:30.
19   A.   Does this just stay on then?
20   Q.   So I would recommend that you
21 mute yourself and you turn your video off
22 and then we're going to go off the record
23 and then when we come back you'll turn
24 your video on and unmute yourself. I
25 would not disconnect.

BRIDGET LOGAN

1
2    A.   Great. Okay.
3        VIDEOGRAPHER:  Very well.
4  We're going off the record at 10:21
5  Central Time.
6        (Recess is taken.)
7        VIDEOGRAPHER:  We are going
8  back on the record at 10:31 a.m.
9  Central Time.
10   Q.   Ms. Logan, you testified
11 earlier that your first day of work for
12 the Bloomberg Campaign was February 3rd;
13 is that correct?
14   A.   Yes.
15   Q.   Did you attend field organizer
16 training on your first day of work?
17   A.   I did.
18   Q.   Do you recall how long field
19 organizer training was?
20   A.   All day.
21   Q.   Who else did you attend
22 organizing training with?
23   A.   The other field organizers for
24 the Minnesota offices and the director of
25 the campaign for the state made

BRIDGET LOGAN

1
2  appearance. Otherwise, the training was
3  led by a gentleman by the name of Aaron.
4  And if I had his last name in front of me
5  I could say yeah, that's his last name. I
6  don't recall his last name off the top of
7  my head.
8    Q.   Was it Aaron Rothe?
9    A.   Yes. Thank you.
10   Q.   And the director of the
11 campaign for the state, do you recall
12 that person's name?
13   A.   Michael. I don't recall his
14 last name.
15       MS. PHILION:  Duane, could you
16    please pull up tab 48 for me,
17    please?
18       (Logan Exhibit 3, Orientation
19    email dated January 31, 2020, Bates
20    P005727 was received and marked on
21    this date for identification.)
22       CONCIERGE:  Logan 3 has been
23    marked.
24   Q.   Ms. Logan, can you please take
25 a look at the document that's been marked

Page 74

1                BRIDGET LOGAN
2 you wrote "my chair?"
3      A.   That's a good question. "I
4 reached out to my chair today via email
5 and didn't hear back from him today."
6           You know, it might have
7 related to a conversation we had where
8 that terminology was used. I don't know
9 who that chair is supposed to be.
10     Q.   Do you know if you were
11 referring to someone in the local
12 community or someone within the Bloomberg
13 Campaign?
14     A.   It wouldn't have been within
15 the campaign.
16     Q.   So someone like a community
17 leader or someone like that?
18          MS. LIU:  Objection.
19     A.   I don't want to speculate but
20 it wasn't within the campaign.
21     Q.   Well, as part of your job, who
22 would you reach out to outside of the
23 campaign?
24     A.   It says making phone calls and
25 knocking on doors. I believe I had

Page 75

1                BRIDGET LOGAN
2 spoke -- reaching out to, I believe I
3 testified earlier about reaching out to
4 somebody within the district that I
5 chose. Otherwise, part of our duties was
6 to try to connect with people within the
7 community.
8      Q.   In the third sentence of this
9 email you wrote "but the current schedule
10 does not have a 40 total on it. I am
11 missing about 15 additional hours that
12 could be filled with either being in the
13 office (not sure if that counts) or added
14 hours if canvassing and calls go longer."
15 Do you see that?
16     A.   I do see that.
17     Q.   What did you mean by "the
18 current schedule does not have a 40 total
19 on it?"
20     A.   So ROD Sina asked that we
21 create the schedule for ourselves, which
22 I believe I spoke about earlier, and it
23 needed to have, it looks like, a minimum
24 of 40 hours scheduled for your day for
25 the campaign.

Page 76

1                BRIDGET LOGAN
2      Q.   For the day or for the week?
3      A.   For the week. Excuse me.
4 There's not 40 hours in a day.
5          MS. PHILION:  Duane, could you
6     please pull up tab 95, please?
7          (Logan Exhibit 5, weekly Excel
8     spreadsheet, Bates
9     MB2020_Wood_00025079 was received
10    and marked on this date for
11    identification.)
12          CONCIERGE:  Logan 5 has been
13    marked.
14     Q.   Ms. Logan, could you please
15 take a look at this document? And I'll
16 represent to you what you're going to see
17 on the first page is a blank sheet that
18 says "file provided natively".
19     A.   Yes.
20     Q.   All that means is that the
21 type of document that this is and the way
22 that we produced this document in
23 discovery, we had to indicate that it was
24 produced natively. That's not actually
25 part of the content of the document.

Page 77

1                BRIDGET LOGAN
2      A.   Okay.
3      Q.   So when I ask you to review
4 this document, I'm asking you to start on
5 page 2.
6      A.   Okay. I'm at that page.
7      Q.   Could you take a quick flip
8 through the pages to orient yourself with
9 the document, please.
10     A.   Okay.
11     Q.   Is this an example of the type
12 of schedule that you would populate and
13 send to Sina?
14     A.   It is.
15     Q.   Each week when you populated
16 the schedule Sina asked you to provide 40
17 hours of work; is that right?
18     A.   I don't recall her saying
19 specifically 40 hours. Based on that last
20 email, 40 hours is a good number for the
21 week to use. I don't recall her saying
22 that specifically.
23     Q.   And I'm looking at page 2 of
24 the document.
25     A.   Yup.

20 (Pages 74 - 77)

BRIDGET LOGAN

1
2    Q.   So when you were creating a
3  schedule you would think about your
4  various job duties and then you would
5  figure out when in the day you would
6  perform certain duties; is that right?
7    A.   Correct.
8    Q.   And then you would send this
9  document to Sina?
10    A.   Correct.
11       MS. PHILION:  Duane, can you
12  please pull up tab 94 for me?
13       (Logan Exhibit 6, itinerary
14  for training, Bates
15  MB2020_Wood_00025088 was received
16  and marked on this date for
17  identification.)
18       CONCIERGE:  Logan 6 has been
19  marked.
20    Q.   Ms. Logan, can you please take
21  a look at Exhibit 6 and let me know if
22  you recognize this document?
23    A.   His name wasn't Felix, it was
24  Mortez.
25       Am I familiar with the

BRIDGET LOGAN

1
2  document? I was just talking to myself.
3  My apologies.  I was looking at the
4  document and realizing I had forgotten I
5  had gotten people's names wrong, so I was
6  just under my breath commenting on that.
7  Did not mean to not say it out loud.
8       Am I familiar with this
9  document?  Yes.
10    Q.   So before I ask you questions
11  about this document, let's just correct
12  what you were just referring to.
13       So you said you might have
14  gotten someone's name wrong. Could you
15  please identify for me who that is?
16    A.   Mortez. I really wanted his
17  name to be Felix, I always called him
18  Felix but that was not his name.
19    Q.   So Mortez is one of the field
20  organizers that you worked with and you
21  did not work with a Felix; is that right?
22    A.   Correct.
23    Q.   Earlier when we were speaking
24  you said someone's last name was Ahmed
25  but you did not remember their first

BRIDGET LOGAN

1
2  name. Do you recognize their name on this
3  document?
4    A.   I do, Diyab.
5    Q.   Do you know what this document
6  is?
7    A.   No.
8    Q.   But you recall seeing it while
9  you worked on the campaign?
10    A.   It looks like a document I saw
11  during the campaign.
12    Q.   It looks to me like an
13  introductory document for the St. Anthony
14  office.  Does that look right to you?
15    A.   I think that's a good way to
16  describe it.
17    Q.   Did Sina provide you with this
18  document?
19    A.   I don't know who provided me
20  with this document specifically.
21    Q.   On the first page do you see
22  where it says, "St. Anthony office hours
23  and staff coverage?"
24    A.   Yes.
25    Q.   Did you have one day a week

BRIDGET LOGAN

1
2  where you were the person assigned to
3  work in the office?
4    A.   Yes.
5    Q.   Was your day for the campaign
6  Wednesday?
7    A.   This page says it was. I'm not
8  trying to be difficult, I don't recall it
9  specifically being Wednesday, but I think
10  it's fair to assume it.
11    Q.   Is it that you don't recall
12  one way or the other or you specifically
13  recall it being a day other than
14  Wednesday?
15    A.   I don't recall one way or the
16  other. It could have been a Thursday. We
17  could have switched. Right? This was a
18  tentative schedule more likely. I don't
19  think that we were supposed to -- at the
20  end I don't think there was any one day
21  anybody was supposed to be there.
22    Q.   When you started did you
23  generally cover the office one day per
24  week?
25    A.   Yes.

21 (Pages 78 - 81)

BRIDGET LOGAN

1
2     Q.   And for approximately how many
3 weeks do you recall that, being in the
4 office one day per week?
5     A.   For the length of the
6 campaign.  What was that, four weeks?
7 Five weeks?
8     Q.   And the days you were not the
9 person assigned to be in the office, what
10 were you doing?
11     A.   I mean, we can refer back to
12 that schedule if you wanted to but any
13 number of things related to the campaign,
14 in and out of the office, making phone
15 calls, canvassing.
16     Q.   Hosting events?
17     A.   If it was on the schedule for
18 that week.
19     Q.   Yes?
20     A.   If it was on the schedule for
21 that week, yes.
22     Q.   It says here there were daily
23 team check-ins scheduled from 10:30 to
24 11:30.  Is that a check-in with your ROD?
25     A.   That was a team check-in with

BRIDGET LOGAN

1
2 the ROD.
3     Q.   So you and the other field
4 organizers who reported to Sina would
5 participate in that call?
6     A.   We would participate, supposed
7 to participate in that call.
8     Q.   Did you always participate in
9 those daily check-ins?
10     A.   To the best of my
11 recollection, yes.
12     Q.   Approximately how long did the
13 daily calls run?
14     A.   Anywhere from 30 minutes to an
15 hour.
16     Q.   And looking back at your day
17 in the office, it says that the office
18 hours were 10 a.m. to 8 p.m. on the day
19 you were in the office.  Is that the
20 number of hours you covered the office on
21 your day?
22     A.   Those were the numbers that
23 was covered by -- that the campaign
24 office was open.  There were days that we
25 were there earlier.

BRIDGET LOGAN

1
2     Q.   So on the day that you were
3 covering the office, if it opened at 10,
4 what time would you arrive?
5     A.   No later than 9:30.
6     Q.   And what would you do between
7 9:30 and 10?
8     A.   Turn lights on, make sure the
9 office looked nice, make sure I had my
10 computer up, ready to go, office tasks.
11     Q.   On the days that you were not
12 assigned to cover the office, what would
13 be the first thing you would do on those
14 days?
15     A.   Can you repeat the question?
16     Q.   Sure. On days that you were
17 not scheduled to be the field organizer
18 covering the office, what would be the
19 first thing that you would do on those
20 days?  Would it vary?
21     A.   Yeah. There was the daily team
22 check-ins was the typical first thing
23 that happened. If I wasn't scheduled to
24 be there it might not have happened at
25 the office. I was typically at the office

BRIDGET LOGAN

1
2 every day.
3     Q.   Then underneath the daily team
4 check-ins it says that there were
5 proposed weekly ROD check-ins. Was this a
6 one-on-one meeting with your ROD?
7     A.   Correct.
8     Q.   Was your one-on-one meeting at
9 five p.m. on Mondays with Sina?
10     A.   It says proposed. I can't say
11 for certain it was every Monday at five
12 p.m. but it was a weekly check-in with
13 her one-on-one, I do recall.
14     Q.   And approximately how long
15 would that check-in last?
16     A.   30 minutes to an hour.
17     Q.   And what would you talk about
18 in those check-ins with Sina?
19     A.   How we were doing or how I was
20 doing, what I could do to improve, any
21 suggestions that she had as to what I
22 could do to improve, ideas for hosting
23 those events that they were looking to
24 have us do. Anything having to do with
25 the campaign was part of that

22 (Pages 82 - 85)

Page 86

BRIDGET LOGAN

1
2 conversation.
3    Q.   When you say she gave you
4 suggestions for how to improve, do you
5 recall anything specifically that she
6 said to you?
7    A.   I asked her for suggestions. I
8 don't recall any specifics.
9    Q.   Do you recall generally the
10 nature of the suggestions?
11    A.   Just be confident would be the
12 general nature.
13    Q.   Confident in what?
14    A.   Confident speaking about the
15 campaign.
16    Q.   And you said that you also
17 spoke with Sina about ideas for hosting
18 events. Can you describe the nature of
19 those conversations with Sina?
20    A.   The nature of the
21 conversation?
22    Q.   Sure. So what do you remember
23 about discussing ideas with her? Did you
24 give her ideas for hosting events?
25    A.   It's possible. I mean, I can't

Page 87

BRIDGET LOGAN

1
2 -- I don't recall specifics. It's been a
3 couple of years. I know that those
4 conversations were had, I don't remember
5 specifics.
6    Q.   I understand. I'm just asking
7 you for your best recollection.
8    A.   I know.
9    Q.   I understand. I'm just asking
10 for your best recollection. To the extent
11 you have a recollection, I'm just asking
12 you to answer those questions.
13    A.   Sure. I don't recall
14 specifics.
15    Q.   Underneath the proposed weekly
16 ROD check-in, going back to the exhibit
17 that's in front of you, it says "organize
18 weekly activities and goals." Do you see
19 that?
20    A.   I do.
21    Q.   And then after it goes through
22 1A through F. Turning to the next page
23 it says, "Including daily and ROD
24 check-ins, this is about 30 hours of
25 work. Spend the remaining 10 hours on

Page 88

BRIDGET LOGAN

1
2 activities that help move the lawn
3 signs."
4        Is this consistent with your
5 testimony earlier which is that Sina
6 asked you to schedule 40 hours of work
7 per week?
8        MS. LIU:  Objection.
9    Q.   You can answer.
10    A.   Can you repeat the question?
11        MS. PHILION:  Maureen, can you
12    read back the question?
13        (Pending question is read back
14    by the reporter.)
15    A.   I don't know how to answer
16 that. Is it consistent? Based on this
17 document, it is.

Page 89

8    A.   Correct.
9    Q.   And you would do that for each
10 of the metrics that you were responsible
11 for, that are listed in this document?
12    A.   Correct.
13    Q.   As a field organizer did you
14 have any involvement in selling campaign
15 merchandise?
16    A.   No.
17    Q.   Did you have any involvement
18 in ordering any campaign merchandise from
19 manufacturers?
20    A.   No.
21    Q.   Did you have any involvement
22 in merchandise operations on the campaign
23 website?
24    A.   No.
25    Q.   So we just talked about two

23 (Pages 86 - 89)

BRIDGET LOGAN

1
2 different types of calls. You talked
3 about weekly check-ins with your ROD and
4 you testified about daily team check-ins
5 with your ROD and field organizers.
6         Other than those calls, did
7 you attend any other calls for the
8 campaign?
9     A.   As a team?
10    Q.   I'm just interested in knowing
11 any calls for the campaign, other than
12 those two types of calls that you
13 participated in.
14    A.   There was, I believe, a weekly
15 call from New York's headquarters for the
16 campaign that they wanted us to be on.
17 There was no reason not to be on it.
18 Those I think are the only other phone
19 calls as a -- you know, as opposed to
20 phone calls with volunteers or phone
21 calls with voters, those are the only
22 phone calls that I recall having within
23 the campaign.
24    Q.   And these weekly calls that
25 you are describing, they occurred

BRIDGET LOGAN

1
2 approximately once per week?
3     A.   To the best of my
4 recollection.
5     Q.   Who do you recall speaking on
6 those calls?
7     A.   I recall Kevin, who was the
8 campaign, like, the campaign manager guy.
9 I don't recall his last name. I recall
10 another voice, like, saying "here is
11 Kevin", but I don't recall who that was.
12 I recall other people being on the call.
13 I don't recall who they were. I just
14 remember Kevin.
15    Q.   What was the general content
16 or subject matter of the calls that you
17 participated in?
18    A.   They felt like weekly updates
19 as to how things were going nationwide.
20    Q.   Did you speak on any of these
21 calls?
22    A.   No, I did not.
23    Q.   Do you recall hearing anyone
24 from within the Minnesota campaign team
25 speaking on any of these calls?

BRIDGET LOGAN

1
2     A.   Not that I recall.
3     Q.   I'm going to the calls with
4 voters and volunteers that you referred
5 to earlier, when you were making calls to
6 voters and volunteers, were you making
7 calls to folks within Minnesota?
8     A.   Yes.
9     Q.   Were you making calls to folks
10 only within Minnesota?
11    A.   Correct.
12    Q.   And when you canvassed, did
13 you only canvass within Minnesota?
14    A.   I only canvassed within
15 Minnesota.
16    Q.   Going back to our schedule
17 discussion. So Sina required you to
18 schedule yourself for at least
19 40 hours of work per week; is that right?
20    A.   That's what it looks like.
21    Q.   If you were able to accomplish
22 the metrics required of you within that
23 40 hours, did Sina require you to
24 schedule yourself for any additional
25 work?

BRIDGET LOGAN

1
2     A.   No, she did not require it.
3     Q.   Did you do any other work
4 while you were working on the campaign
5 for any other entity?
6     A.   No.
7     Q.   We talked a little bit today
8 about hosting events. Was that one of
9 your job duties with the campaign?
10    A.   That is one of the things they
11 wanted us to do.
12    Q.   Did you host any events while
13 you were working for the Bloomberg
14 Campaign?
15    A.   I did not host any events.
16    Q.   Did you do any planning in
17 anticipation of hosting any events?
18    A.   No, I did not.
19         MS. PHILION:  Duane, could you
20 please pull up tab number 71?
21         Actually while we're there, to
22 make this efficient, Duane, why
23 don't you pull up tab 71, tab 93,
24 and tab 96 and mark them as
25 separate exhibits, but if you could

BRIDGET LOGAN

1
2 were going to host an event?
3    A.   Yes.
4    Q.   And then turning to Logan
5 Exhibit 9, is this another event that you
6 tried to plan?
7    A.   Correct.
8    Q.   Did this event come to
9 fruition?
10    A.   I don't think so.
11    Q.   Do you have any specific
12 recollection as to why?
13    A.   No specific recollection as to
14 why.
15    Q.   In looking at the last three
16 exhibits that we just reviewed and these
17 turnout plans, is this the kind of
18 planning that you would talk to your ROD
19 about on your weekly check-ins?
20    A.   Yes.
21    Q.   Was one of your job duties to
22 recruit volunteers for the campaigns?
23    A.   Yes.
24    Q.   Approximately how many
25 volunteers did you recruit during the

BRIDGET LOGAN

1
2 course of the campaign?
3    A.   Maybe two.
4    Q.   And what did you recruit these
5 volunteers to do?
6    A.   To make phone calls. To come
7 into our office to make phone calls.
8    Q.   And when you say to come into
9 your office to make phone calls, you were
10 recruiting them to make phone calls to
11 advocate for Mr. Mike Bloomberg's
12 candidacy for the presidency; is that
13 right.
14    A.   I apologize. Can you repeat
15 that?
16    Q.   Sure. So when you were
17 recruiting volunteers to make calls, were
18 you recruiting them to make calls to
19 engage in political advocacy for
20 Mr. Bloomberg?
21    A.   I was recruiting them to make
22 phone calls on behalf of the campaign,
23 yes.
24    Q.   To support Mr. Bloomberg's
25 candidacy for the president?

BRIDGET LOGAN

1
2    A.   If that means the same thing,
3 on behalf of the campaign.
4    Q.   It's your testimony, so you
5 tell me if it means the same thing to
6 you. That's what I'd like to know.
7    A.   It's not the terminology I
8 would use.
9    Q.   What terminology would you
10 use?
11    A.   Campaign on behalf of the
12 campaign.
13    Q.   What was the objective of the
14 campaign?
15    A.   To get Mike Bloomberg -- to
16 get Mike Bloomberg into the presidency. I
17 can't think of the correct word right
18 now. Elected.
19    Q.   How did you recruit
20 volunteers?
21    A.   When I would phone bank, when
22 I would make phone calls I believe the
23 two volunteers kind of fell into my lap.
24 They walked in.
25    Q.   They walked into the office?

BRIDGET LOGAN

1
2    A.   A-hum. Yes.
3    Q.   I think earlier you said one
4 volunteer that you recall her name was
5 Eileen, is that one of the volunteers you
6 were referring to?
7    A.   No. No. I didn't see her as a
8 volunteer, I saw her as someone who
9 wanted to host a house party. I don't see
10 that as the same thing.
11    Q.   What do you see someone who
12 wanted to host a house party as?
13    A.   I see someone who wanted to
14 host a house party as someone who already
15 was a Bloomberg supporter and wanted to
16 create a space to encourage other people
17 to vote for Mike Bloomberg.
18    Q.   How is that different than the
19 other volunteers that you recruited?
20    A.   She really didn't do what I
21 would call the active, which would make
22 -- she didn't do phone calls and she
23 didn't canvass. She just created a space
24 where someone from the campaign could
25 come and talk about Mike Bloomberg

Page 114

BRIDGET LOGAN

1
2 campaign, presidential campaign. What
3 that specifically would be, I don't know.
4 I don't recall.
5    Q.   Do you recall having any sort
6 of parameters around what you were
7 looking for?
8    A.   No. You know, we were adults,
9 we were hired as field organizers for a
10 campaign and they -- you know, they gave
11 us scripts to use.  They didn't give us
12 specifics on what type of groups to reach
13 out to.
14    Q.   So you selected the types of
15 groups that you wanted to reach out to?
16       MS. LIU:  Objection.
17    Q.   You can answer.
18    A.   In this particular instance,
19 yes.
20       MS. PHILION:  Duane, could you
21 please pull up tab 69?
22       (Logan Exhibit 11, email dated
23    February 10, 2020, Bates
24    MB2020_Wood_000148487 was received
25    and marked on this date for

Page 115

BRIDGET LOGAN

1
2 identification.)
3       CONCIERGE:  Logan 11 has been
4 marked.
5    Q.   Ms. Logan, could you please
6 take a look at Exhibit 11 and let me know
7 if you recognize this email?
8    A.   Yeah, I do recognize the
9 email.
10    Q.   This is an email from you to
11 someone name Marcus Mills on Monday,
12 February 10th, 2020.
13       Is Mr. Mills the gentleman
14 that you referenced a few minutes ago
15 that you reached out or is Mr. Mills
16 someone different?
17    A.   Mr. Mills is someone
18 different.
19    Q.   Do you know who Mr. Mills is?
20    A.   According to this email it
21 looks like he has some position within
22 the Minnesota DFL.
23    Q.   What is the Minnesota DFL?
24    A.   Minnesota Democratic Farm and
25 Labor Party.

Page 116

BRIDGET LOGAN

1
2    Q.   If you know, what is the
3 relationship between the Minnesota DFL
4 and the National Democratic Party, if
5 there is one?
6    A.   I don't know. I don't know.
7    Q.   Do you understand the DFL to
8 be the Democratic party of Minnesota?
9    A.   Yes, or the MN DFL, yes.
10    Q.   Why did you reach out to
11 Mr. Mills?
12    A.   To talk about the campaign.
13    Q.   Is he another person that you
14 identified through your research? How did
15 you find Mr. Mills?
16    A.   On the internet.
17    Q.   And do you have a specific
18 recollection of why you reached -- you
19 made the decision to reach out to
20 Mr. Mills, in particular?
21    A.   Probably because Mike
22 Bloomberg was running on that ticket and
23 I felt that this would be a good
24 connection to make, on the Democratic
25 ticket.

Page 117

BRIDGET LOGAN

1
2    Q.   While you were working for the
3 campaign, did you attend any events that
4 were happening within the community?
5    A.   No.
6    Q.   Was that something that you
7 were looking to do while you were working
8 for the campaign?
9    A.   Not that I recall.
10       MS. PHILION:  Duane, could you
11 please pull up tab 64?
12       (Logan Exhibit 12, email dated
13    February 5, 2020, Bates
14    MB2020_Wood_00014649 was received
15    and marked on this date for
16    identification.)
17       CONCIERGE:  Logan 12 has been
18 marked.
19    Q.   Ms. Logan, could you please
20 review the exhibit that's been marked as
21 Logan 12 and let me know if you recognize
22 it?
23    A.   Oh, there's more pages. Give
24 me a moment.
25    Q.   Take your time.

30 (Pages 114 - 117)

BRIDGET LOGAN

1
2 that right?
3    A.   Correct.
4    Q.   And then caucus-goers would
5 have the opportunity to speak with you
6 about your candidates, who in this case
7 was Mike Bloomberg; is that right?
8    A.   Correct.
9    Q.   And in terms of the
10 conversations that you had with caucus
11 goers, was your approach similar to when
12 you stood up and provided remarks to the
13 group?
14    A.   I'd never really had to
15 provide remarks. If anybody engaged with
16 me they were looking to engage with me
17 and so they approached me and they asked
18 me questions.
19    Q.   Sorry. Let me clarify. A few
20 minutes ago you said that there was an
21 opportunity to provide remarks to the
22 group. I'm just asking you when you
23 described your approach to how you
24 handled that, I'm asking you in the
25 one-on-one conversations you had was your

BRIDGET LOGAN

1
2 approach similar in terms of what you
3 were saying and how you were
4 communicating?
5    A.   Maybe I didn't convey this
6 well enough. I didn't have an approach
7 when people approached me. You know what
8 I mean? They were usually looking for
9 something specific. They were usually
10 coming to me, rather than me coming to
11 them, so I didn't have to have an
12 approach. Excuse me.
13    Q.   Were they coming to you about
14 particular issues that were important to
15 them?
16    A.   I only giggle because most of
17 the time when people approached me about
18 Mike Bloomberg it felt more of, like, an
19 attack. So it was more of -- like, it was
20 more about how they felt about Mike
21 Bloomberg and why they felt he wasn't a
22 good candidate. There wasn't at these
23 caucuses a positive engagement for the
24 campaign.
25    Q.   Did you provide information

BRIDGET LOGAN

1
2 with them to try to change their minds?
3    A.   I talked to them about what
4 they provided for us to talk about for
5 talking points based on whatever topic
6 they brought up. I don't remember
7 specific topics or policies wanting to be
8 discussed with people who approached me.
9    Q.   Did you do that with the
10 objective of them -- of trying to get
11 them to think differently about
12 Mr. Bloomberg and his campaign?
13    A.   Since I wanted Mike Bloomberg
14 to win the candidacy for the DFL, I think
15 it's fair to say that whatever I
16 specifically said to them was to put Mike
17 Bloomberg in a positive light.
18    Q.   Thank you. So it's a little
19 bit after 12:45. So I think now is a good
20 time to take a short lunch break. If
21 you're comfortable with a half hour,
22 that's what I propose.
23    A.   Half hour works for me.
24    Q.   Great. We'll round up. Let's
25 say we plan to meet back here at 1:20

BRIDGET LOGAN

1
2 Eastern.
3    A.   I can work with that.
4        VIDEOGRAPHER:  Very well. We
5 are going off the record at 11:48
6 a.m. Central Time.
7        (Lunch recess is taken.)
8        VIDEOGRAPHER:  We are going
9 back on the record at 12:23 p.m.
10 Central Time.
11    Q.   Ms. Logan, in 2020 Minnesota
12 was a Super Tuesday state; is that
13 correct?
14    A.   Correct.
15    Q.   And Super Tuesday in 2020 was
16 March 3rd, 2020; is that right?
17    A.   I believe so, yes.
18    Q.   What was your last day of work
19 for the campaign?
20    A.   March 3rd, where specifically
21 did anything regarding the campaign.
22    Q.   You were paid by the campaign
23 through March 31st, 2020; is that
24 correct?
25    A.   I thought it was through

33 (Pages 126 - 129)

BRIDGET LOGAN

1
2  April.
3      Q.   Okay. But you recall being
4  paid by the campaign through a date after
5  you stopped working for the campaign?
6      A.   Where I stopped doing anything
7  for the campaign, correct.
8      Q.   Did you elect to continue your
9  health insurance from the campaign
10 through November 2020?
11     A.   No, I did not.
12     Q.   Did you decide not to continue
13 your health coverage because you had
14 resumed employment with Minnetonka?
15     A.   That probably would have been
16 the biggest factor.
17     Q.   So based on your testimony
18 today, is it fair to say that you worked
19 for the campaign for four weeks in total,
20 if your start date was February 3rd, 2020
21 and your last day of work was March 3rd,
22 2020?
23     A.   Yes.
24     Q.   When you worked in the St.
25 Anthony office you testified that you

BRIDGET LOGAN

1
2  spent some of your time canvassing?
3      A.   Yes.
4      Q.   When you canvassed, did you do
5  that on your own?
6      A.   Yes and no.
7      Q.   So explain that to me?
8      A.   There were some instances
9  where in the beginning I did canvass with
10 another field organizer, and that was
11 Wes, and he was out of our office, and we
12 did that a couple of times and then after
13 that I canvassed on my own.
14     Q.   Other than canvassing with Wes
15 a couple of times --
16     A.   Oh, I take that back. I'm so
17 sorry. I didn't mean to interrupt. I also
18 -- can I add?
19     Q.   You can add, yes.
20     A.   Okay. Sorry about that. I also
21 canvassed with LaTonya (sic) out of our
22 office at another time.
23     Q.   I'm going to take those one at
24 a time.
25         So starting when you canvassed

BRIDGET LOGAN

1
2  with Wes, you canvassed with him a couple
3  of times during the course of the
4  campaign?
5      A.   Yes, I believe it was like the
6  very first two times we canvassed. I
7  think the reason for that was to get us
8  both used to doing it. And then -- so,
9  yeah, that was with Wes.
10     Q.   When did you start with
11 LaTonya?
12     A.   Later, but within our
13 district. Specific dates, I don't know.
14 Prior to March 3rd.
15     Q.   Approximately how many times
16 did you canvass with LaTonya?
17     A.   That was another two days.
18     Q.   Other than the four days total
19 that you canvassed with Wes and LaTonya,
20 did you otherwise canvass on your own?
21     A.   Yes.
22     Q.   You also phone banked when you
23 worked in the St. Anthony office; is that
24 right?
25     A.   Correct.

BRIDGET LOGAN

1
2      Q.   Did you phone bank on your
3  own?
4      A.   There was always somebody
5  there. I mean, I wasn't on the phone with
6  any other field organizer. I made the
7  phone calls on my own with other people
8  in the room.
9      Q.   Were the other people in room
10 listening to your phone calls or were you
11 listening to their phone calls or you are
12 you were physically in the same room?
13     A.   We were physically in the same
14 room. No one was listening in on my
15 calls.
16     Q.   Other than your testimony on
17 events that you described today, did you
18 ever attend any events with other members
19 of the Bloomberg Campaign?
20     A.   Yes. There was a debate night
21 and so there was a party held at the
22 Minnesota headquarters in Minneapolis,
23 and there were other field organizers and
24 other members of the campaign, the
25 Minnesota campaign there.

34 (Pages 130 - 133)

Page 134

BRIDGET LOGAN

1
2    Q.    That event was to watch the
3    debate with other members of the
4    campaign?
5    A.    Yes. And other people were
6    invited outside, outside of the campaign.
7    So it was, along with voters, it was an
8    event held for Bloomberg supporters and
9    then to watch the debate together.
10    Q.    Other than the debate event,
11    did you attend any other events with
12    other members of the Bloomberg Campaign?
13    A.    Super Tuesday there was -- at
14    Surly Brewery in Minneapolis, they had
15    rented out a spot for the field
16    organizers and anybody else who was out
17    on Super Tuesday on behalf of the
18    campaign. I believe there were other
19    people outside of field organizers that
20    were working on this thing.
21    Q.    Was this a social event or a
22    voter engagement event?
23    A.    It was an event to watch the
24    numbers come in after Super Tuesday. I
25    don't know what you would call that.

Page 135

BRIDGET LOGAN

1
2    Q.    Any other events that you
3    attended with other members of the
4    Bloomberg Campaign?
5    A.    Not that I recall.
6    Q.    Going back to the canvassing
7    that you did with Wes and LaTonya, for
8    each one of those canvassing events,
9    approximately how much time did you spend
10    with each of those organizers when you
11    were canvassing?
12    A.    I believe with Wes it was
13    approximately three hours each time and
14    then with LaTonya it was over the course
15    of a day. We would canvass, because it
16    was cold out, go back, get warmed up, go
17    back out and canvass. I don't know if I
18    could put a specific number on that.
19    Q.    Were you going door to door
20    together or were you working in the same
21    area but going to separate homes?
22    A.    LaTonya and I?
23    Q.    Yes.
24    A.    We were working together door
25    to door.

Page 136

BRIDGET LOGAN

1
2    Q.    Same question with respect to
3    Wes, were you going door to door together
4    or were you working in the same area but
5    going to different doors?
6    A.    We did a mixture of both.
7    MS. PHILION:  Duane, could you
8    please pull up tab 30?
9    (Logan Exhibit 14, Offer
10    Letter, Notice of Acknowledgement
11    of Pay Rate and Pay Day,
12    Confidentiality Agreement,
13    Prevention and Coordination Policy
14    and Code of Conduct, Bates
15    MB2020_Wood_00036909 was received
16    and marked on this date for
17    identification.)
18    CONCIERGE:  Logan 14 has been
19    marked.
20    Q.    Ms. Logan, could you please
21    review Exhibit 14 and let me know if you
22    recognize this type of document?
23    A.    I do recognize this document.
24    Q.    Do you recognize this as the
25    offer letter packet that you signed when

Page 137

BRIDGET LOGAN

1
2    you joined the Bloomberg Campaign?
3    A.    Gosh, way back in January,
4    that far. Sorry, I was just noting the
5    date and I don't recall it being that far
6    into January, but I recall reading this
7    and signing this.
8    Q.    The campaign paid you a
9    semi-monthly salary of $3,000; is that
10    correct?
11    A.    That is correct.
12    Q.    And turning to the page that
13    has a Bates number that ends in diction
14    910, which is the second page of the
15    document you're looking at, can you
16    please look at that page and confirm for
17    me that you electronically signed this
18    document on January 20th, 2020?
19    A.    I did electronically sign this
20    document on January 20th, 2020.
21    Q.    Looking at the page of Bates
22    number 36911, which is the third page in
23    the packet, do you see the Notice of
24    Acknowledgment of Pay Rate and Pay Day?
25    A.    I do see the acknowledgment.

35 (Pages 134 - 137)

Page 162

BRIDGET LOGAN

1
2   A.   No, I do not.
3   Q.   Looking at your response to
4 interrogatory 12, so this is an
5 interrogatory in which we asked you to
6 identify any individuals that you believe
7 have relevant facts, other than
8 individuals you identified in response to
9 other interrogatories, so a catch-all, if
10 I may.  So here you listed five people
11 and then two categories of people, so I
12 want to go over that.
13       So the first person you listed
14 was Michael Bloomberg. Have you ever had
15 any interactions with Mr. Bloomberg?
16   A.   No, I have not.
17   Q.   Next person you listed was
18 Kevin Sheekey. Have you ever had any
19 interactions with Mr. Sheekey?
20   A.   I was on a phone call with him
21 but he did not call me specifically.
22   Q.   What phone call were you on
23 with Mr. Sheekey?
24   A.   There was those weekly phone
25 calls from the campaign headquarters in

Page 163

BRIDGET LOGAN

1
2 New York.
3   Q.   Outside of those phone calls,
4 any interactions with Mr. Sheekey?
5   A.   No.
6   Q.   Tim O'Brien, have you ever had
7 any communications with Tim O'Brien?
8   A.   No.
9   Q.   Do you know who Mr. O'Brien
10 is?
11   A.   No.
12   Q.   Do you know who Dan Kanninen
13 is?
14   A.   No.
15   Q.   Ever had any communications
16 with Mr. Kanninen?
17   A.   No.
18   Q.   Do you know who Katherine
19 Whelan is?
20   A.   No. Do I? No.
21   Q.   Can you please turn to
22 interrogatory 16?
23   A.   Which number?
24   Q.   16.
25   A.   One-six?

Page 164

BRIDGET LOGAN

1
2   Q.   Yes, starts on top of page 14
3 and your response is also on page 14.
4   A.   Okay.
5   Q.   This interrogatory asked you
6 to provide a calculation of your damages.
7 Do you see that?
8   A.   Yes.
9   Q.   In the second sentence of your
10 response to this interrogatory it states,
11 "Subject to and notwithstanding these
12 objections, Plaintiff seeks damages in
13 the amount of lost income and benefits
14 plus unreimbursed business expenses." Do
15 you see that?
16   A.   I do.
17   Q.   Are there any expenses for
18 which you claim the campaign owes you
19 money?
20   A.   I did pay for out-of-pockets,
21 beverages and food for the sort of event
22 that I held here at my home. Those would
23 be the out-of-pocket expenses that I
24 would be looking for.
25   Q.   Did you submit receipts for

Page 165

BRIDGET LOGAN

1
2 that event to the campaign for
3 reimbursement?
4   A.   I don't recall.
5   Q.   You don't recall one way or
6 the other or don't recall submitting
7 them?
8   A.   I don't recall. They might
9 have asked but I don't recall if I
10 submitted them or not.
11   Q.   Are you familiar with Concur?
12   A.   The word "concur"?
13   Q.   No, the expense reporting
14 system Concur.
15   A.   No.
16   Q.   During your employment with
17 the campaign do you recall creating a
18 Concur account for yourself?
19   A.   No.
20   Q.   Do you recall ever submitting
21 receipts to be processed for
22 reimbursement in Concur?
23   A.   Not that I recall.
24   Q.   Do you have any specific
25 recollection of reaching out to anyone on

42 (Pages 162 - 165)

BRIDGET LOGAN

1        BRIDGET LOGAN
2  another if you ever may have posted about
3  Mr. Bloomberg or the campaign or you
4  specifically know that it didn't happen?
5      A.   I don't recall one way or the
6  other.
7      Q.   And that would go for
8  Facebook, Instagram, Twitter and Reddit?
9      A.   That would go for any of the
10  four that we have said, yes.
11     Q.   Okay. So we'll follow up in
12  writing with your counsel but I am going
13  to ask that you conduct a search for any
14  documents that are responsive to the
15  request that the campaign has made of you
16  in this lawsuit.
17          (Request for document
18  production.)
19          MS. PHILION:  And I think with
20  that, I don't have any further
21  questions for today.
22          THE WITNESS:  Okay.
23          MS. PHILION:  Thank you.
24          THE WITNESS:  You're welcome.
25          MS. LIU:  I'm going to have a

1        BRIDGET LOGAN
2  few questions.  Do you mind if we
3  take a five minute break and then
4  come back?
5          MS. PHILION:  Five minutes,
6  sure.
7          VIDEOGRAPHER:  Very well. We
8  are going off the record at 1:43
9  Central Time.
10          (Recess is taken.)
11          VIDEOGRAPHER:  We are going
12  back on the record at 1:48 p.m.
13  Central Time.
14  CROSS-EXAMINATION BY MS. LIU:
15     Q.   Ms. Logan, you testified
16  earlier today about the proposed schedule
17  that you submitted to your ROD, Sina
18  Black, who requested you to schedule 40
19  hours of work. Do you recall that
20  testimony?
21          MS. PHILION:  Objection.
22     A.   I do.
23     Q.   Did you work more than 40
24  hours a week?
25          MS. PHILION:  Objection.

1        BRIDGET LOGAN
2      A.   I did.
3      Q.   Do you remember about how many
4  hours a week you worked?
5          MS. PHILION:  Objection.
6      A.   It could be anywhere from 40
7  to 70. It depended upon the day. There
8  were days that -- or weeks that were
9  definitely more than 40.
10     Q.   You also testified earlier
11  today that you had never canvassed
12  outside of Minnesota. Do you recall that
13  testimony?
14          MS. PHILION:  Objection.
15     A.   Yes. I have never canvassed
16  outside the State of Minnesota.
17     Q.   Do you recall if any field
18  organizers outside the State of Minnesota
19  ever canvassed in Minnesota?
20          MS. PHILION:  Objection.
21     A.   They did. We had some
22  canvassers in the State of Wisconsin come
23  and help, I think it was during that Get
24  Out The Vote weekend in the Hopkins
25  office.

1        BRIDGET LOGAN
2      Q.   Okay. Ms. Logan, what were
3  your primary job duties as a field
4  organizer for the Bloomberg Campaign?
5          MS. PHILION:  Objection.
6      A.   I was to call people on the
7  phone and talk to them about the
8  campaign, I was to -- door to door I
9  canvassed -- made phone calls and
10  canvassed, canvassed to get a feel for
11  who was a Bloomberg supporter.
12     Q.   And as a field organizer with
13  the Bloomberg Campaign, did the campaign
14  require you to collect information from
15  voters that you were contacting?
16     A.   Yes.
17     Q.   What information were you
18  collecting?
19     A.   I collected if they were at
20  home, their gender, collected if they
21  even answered the phone, collected if
22  they stated who they were going to be
23  voting for, if it wasn't Mike Bloomberg.
24  Not everybody answered those questions on
25  the phones or at the doors.

48 (Pages 186 - 189)

BRIDGET LOGAN

1
2    Q.    And if you were phone banking,
3  would you be collecting this information
4  during the course of a phone call?
5          MS. PHILION:  Objection.
6    A.    Yes.  And afterwards you had
7  to state if they answered or not and then
8  if you did end up having a conversation,
9  what was it that you ended up talking
10 about.
11   Q.    And so as you were collecting
12 this information during the phone call,
13 were you inputting it into some system at
14 the same time?
15         MS. PHILION:  Objection.
16   A.    Yes.
17   Q.    And when you were using that
18 system were you doing it, putting the
19 information you were getting -- strike
20 that.
21         Would you report the data you
22 collected from voters back to the
23 campaign?
24         MS. PHILION:  Objection.
25   A.    Say that again.

BRIDGET LOGAN

1
2    Q.    Would you report the data that
3  you collected from voters in the system
4  in the phone call back to the campaign?
5          MS. PHILION:  Objection.
6    A.    If the campaign had access to
7  that information then, yes, it was given
8  to them. I never had to directly
9  communicate to the campaign that
10 information.
11   Q.    Okay. And you also mentioned
12 earlier in your testimony that you were
13 also collecting some information after a
14 phone call. How did you do that?
15         MS. PHILION:  Objection.
16   A.    Collect some information after
17 a phone call? There was spots, right, you
18 would hang up and they would be, like,
19 how did the phone call go, if I recall.
20 And once again, was it at home, if you
21 did get a chance to talk to them, you
22 know, what did you guys talk about, if
23 anything? They asked if they -- you know,
24 they stated if they were going to vote
25 for Bloomberg or not.

BRIDGET LOGAN

1
2    Q.    Okay. Earlier you also
3  testified that you canvassed by knocking
4  on doors for the campaign.  Do you recall
5  that testimony?
6          MS. PHILION:  Objection.
7    A.    Yes.
8    Q.    When you were canvassing door
9  to door were you also collecting any
10 information from voters as you were
11 talking to them?
12         MS. PHILION:  Objection.
13   A.    If I did talk to them, yeah.
14 Once again, this was a system that was
15 used and you had to say; were they home,
16 were they not home, did you talk -- you
17 know, if they were home, did you get a
18 chance to talk to them, things of that
19 nature.
20   Q.    And the system that you used,
21 was it on the phone or was it on an iPad?
22 What device did you use?
23   A.    So in canvassing --
24         MS. PHILION:  Objection.
25   A.    -- we used --

BRIDGET LOGAN

1
2          MS. PHILION:  Ms. Logan, I'm
3  not trying to cut you off.  I want
4  to make sure the Reporter is
5  getting my objections.  And I will
6  be objecting to a lot of these
7  questions, so just take a pause
8  after the end of the question.
9          So, Maureen, I just want to
10 make sure you got the objection to
11 the last question Theanne asked.
12         THE REPORTER:  Yes, I did.
13   A.    Theanne, would you mind
14 repeating the question?
15         MS. LIU:  Maureen, can you
16 read back the question?
17         (Pending question is read back
18 by the reporter.)
19   A.    So the campaign provided
20 phones and laptop computers to do the
21 campaign work on and so when canvassing
22 we used the phones to collect the
23 information and then when we were phone
24 banking we used the PC laptops.
25   Q.    And the information that you

49 (Pages 190 - 193)

Page 194

BRIDGET LOGAN

1        BRIDGET LOGAN
2  collected while you were canvassing, was
3  this information similar to the
4  information you collected while you were
5  phone banking?
6        MS. PHILION:  Objection.
7     A.   I think that's fair to say.
8     Q.   And did you also report this
9  data that you collected while canvassing
10 back to the campaign?
11       MS. PHILION:  Objection.
12    A.   If they were looking at those
13 systems after the fact or while I was
14 doing it, then that's how they got their
15 information. I never directly was in
16 contact with the campaign with this
17 information --
18    Q.   Okay.
19    A.   -- from phone banking or
20 canvassing.
21    Q.   And similarly, did you input
22 this data into the system in realtime as
23 you were talking to voters, while
24 canvassing?
25       MS. PHILION:  Objection.

Page 195

1        BRIDGET LOGAN
2     A.   Yes.
3        MS. LIU:  I have no further
4  questions.
5        MS. PHILION:  I just have a
6  couple of followups.
7  REDIRECT EXAMINATION BY MS. PHILION:
8     Q.   Ms. Logan, did you talk to
9  your attorney on the last break that we
10 took?
11    A.   That last five-minute break?
12    Q.   Yes.
13    A.   No.
14    Q.   Did you talk to your attorney
15 on any of the other breaks that we've
16 taken today?
17    A.   Yes.
18    Q.   And in any of those other
19 breaks where you talked to your attorney,
20 did you talk to her about the substance
21 of your testimony today?
22    A.   No.
23       MS. PHILION:  Thank you.
24       VIDEOGRAPHER:  Very well.  Am
25 I good to take us off the record,

Page 196

1        BRIDGET LOGAN
2  counsel?
3        MS. PHILION:  Off the record.
4        VIDEOGRAPHER:  We're now going
5  off the record at 1:56 p.m. Central
6  Time and this concludes today's
7  testimony given by Bridgette Logan.
8  The total number of Media Units
9  used was 5 and will be retained by
10 Veritext Legal Solutions.
11       Thank you very much and have a
12 great day.
13       (The proceedings were
14 adjourned at 1:56 p.m. Central
15 Time)
16
17
18
19
20
21
22
23
24
25

Page 197

1        C E R T I F I C A T E
2        I, MAUREEN M. RATTO, a
3  Registered Professional Reporter, do
4  hereby certify that prior to the
5  commencement of the examination,
6  BRIDGET LOGAN was sworn by me to
7  testify the truth, the whole truth and
8  nothing but the truth.
9        I DO FURTHER CERTIFY that the
10 foregoing is a true and accurate
11 transcript of the proceedings as taken
12 stenographically and before me at
13 the time, place and on the date
14 hereinbefore set forth.
15       I DO FURTHER CERTIFY that I am
16 neither a relative nor employee nor
17 attorney nor counsel of any of the
18 parties to this action, and that I am
19 neither a relative nor employee of such
20 attorney or counsel, and that I am not
21 financially interested in this action.
22
23
24       _____
          MAUREEN M. RATTO, RPR
25        License No. 817125

50 (Pages 194 - 197)