# Exhibit 65

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONNA WOOD, et al., )
individually and on )
behalf of all others )
similarly situated, )
Plaintiffs, ) Civ. 2489
) (LTS)(GWG)
vs. )
)
MICHAEL BLOOMBERG 2020, )
INC., )
Defendant. )
_________________________ )

REMOTE VIDEOTAPED DEPOSITION OF
ANGELO JARAMILLO
Rochester, New York
Friday, November 4, 2022

Reported By:
CATHI IRISH, RPR, CRR, CLVS

Page 54

JARAMILLO

other means of communication?

A. My best recollection is that I did that broadly in person in terms of those face-to-face conversations and 10:55:38AM persuasion through social media was a much more kind of passive way of messaging.

Q. How did you persuade voters that you would be the best candidate?

A. I think a lot of the 10:55:55AM conversations I had, you know, kind of came back to the messaging and policy items I had chosen. I think I would certainly characterize my campaign as very deliberately policy focused, policy 10:56:11AM centered. I thought that was very complementary to my messaging presenting myself as a public policy expert and I think that's certainly a fair thing to say, so I think my messaging was really 10:56:24AM focused on the kinds of policy ideas I was proposing at the time.

Q. Did you consider yourself to be persuasive in the communications that you had with prospective voters? 10:56:39AM

Page 55

JARAMILLO

A. I would consider myself mildly persuasive by admitting successful conversations that ended with a pat on the back and I can recall one conversation 10:56:50AM with a guy saying, you know, that working people have a good future in you, but I'm not entirely sure that I was successful in my objective of convincing people to vote for me. 10:57:05AM

Q. You did not win this democratic primary; is that correct?

A. That is correct.

Q. Do you feel that the experience of running for your own political campaign 10:57:18AM helped develop your persuasive skill?

A. I think that's a broadly fair characterization. I wouldn't say that I became much more persuasive than I already had been but I think it was good to get 10:57:40AM that different perspective of being the candidate as opposed to it being the organizer for the candidate.

Q. Do you believe that gaining perspective on being a candidate helped 10:57:53AM

Page 56

JARAMILLO

you in future organizing jobs for other people's campaigns?

A. I think yes and no. I think yes in the way that getting more perspective 10:58:08AM is always going to be helpful for you and it's always important to stay grounded in that sense, but in terms of being able to do a field organizer job, I really don't think it gave me any additional persuasive 10:58:22AM abilities that I didn't already have or even contribute to what the role of the field organizer is.

Q. To run for office, is it fair to say that you had to familiarize yourself 10:58:41AM with the constituency of folks who would be eligible to vote for you?

A. I think in the most literal sense that is important to stake that out. I think that is true. 10:58:57AM

Q. And when you are organizing for someone else, would you agree with me that one thing you have to do is familiarize yourself with the constituency that is eligible to vote for the candidate? 10:59:06AM

Page 57

JARAMILLO

A. I think it's a much more narrow obligation you have as a field organizer to do that. I think you want to identify in the literal sense whom is and is not 10:59:16AM eligible to vote for your candidate. I don't think you have to do any particular research on what those people are interested in or whom they are more likely to support. I think that's research done 10:59:29AM by, you know, other means, by people who are not field organizers.

Q. Do you think familiarizing yourself with the constituency would make you a more effective organizer, make you 10:59:43AM better at the job?

A. Not particularly, no.

Q. Why not?

A. I think the job of a field organizer is to really execute on the 10:59:57AM messaging and strategy developed by either the communications team or otherwise by people in campaign management. I think that as an organizer, you know, your judgment is not in those questions and 11:00:11AM

Page 58

JARAMILLO

questions of strategy, messaging and execution, your judgment is, to put it bluntly, is much less valuable to the campaign than to the judgment of the 11:00:24AM communication experts or of the management experts that have already made those decisions for you.

Q. Do you believe to execute on a message effectively, that it's helpful to 11:00:35AM know what is important to the person that you're speaking with?

A. I think in a very specific sense there are certain cases where, you know, if you're a field organizer and you're 11:00:47AM talking to the voter over the phone or at their door and they say issue X is important to me and you have a talking point written by your communications team about issue X, that it is better for you 11:01:00AM as a field organizer to do the job to talk on that talking point you've been given. I don't think it is very beneficial to campaigns to have field organizers kind of eschewing their own judgements beyond the 11:01:16AM

Page 59

JARAMILLO

talking points and specific messaging they've been given by the campaign.

Q. During your campaign, approximately how many people do you think 11:01:25AM you spoke with to convince them to vote for you?

A. Can you clarify when you say during my campaign, we're again referring to my run for State Representative? 11:01:38AM

Q. Yes.

A. Thank you for that. In person-to-person interaction among voters I talked to personally to persuade, I would say it would be around two dozen. 11:01:54AM In the broader sense of people I spoke to at events around my constituency organizations or at debates, I would say that broader messaging was about 2- or 300 people. 11:02:12AM

Q. Did you plan any events in connection with running for elected position?

A. No.

Q. Did you attend events in the 11:02:22AM

Page 60

JARAMILLO

community?

A. I think that is broadly correct, yes.

Q. How did you determine what events 11:02:28AM that you would attend?

A. My thinking at the time, to the best of my recollection, was that I received a number of invitations and kind of my process in determining that was both 11:02:44AM running it by the -- my classmates who volunteered to help me out on the campaign and by making my own determination based on my policy platform what groups and organizations would be most friendly to 11:02:59AM the policies that I was supporting and advocating for as a candidate.

Q. Following your loss in the primary, you next worked for Mohamud Noor; is that correct? 11:03:07AM

A. My recollection, to give a more complete answer, is that in the literal sense I was not able to drop out of the race due to balloting deadlines and restrictions but that I had in fact 11:03:28AM

Page 61

JARAMILLO

endorsed candidate Mohamud Noor for State House a number of weeks before the primary election and I had begun kind of doing work for that candidate before the 11:03:43AM election and then continued doing some work after the election, although a much more limited set of work after the primary election.

Q. Your position listed on your 11:03:53AM résumé for Mr. Noor is a voter outreach coordinator. Did you undertake that work before or after the primary was over?

A. My recollection is that that work was almost entirely done before the end of 11:04:10AM the primary. There might have been one or two things I did on a volunteer basis like press statements or talking with the press. I believe that was done after the primary election. 11:04:26AM

Q. Can you describe your duties with the Noor campaign before the primary election?

A. Yeah, before the primary election, my recollection is that there 11:04:40AM

JARAMILLO

real relevant to add to this résumé.

Q. Going back to the résumé, can you please look at the bottom of your résumé where you listed your skills? I see media 11:14:05AM relations, public speaking, equity and inclusion training, NGP VAN software and volunteer training.

A. Yes, that is correct.

Q. Can you identify for me the 11:14:27AM skills you believe you either developed or strengthened on the campaigns in which you served as an organizer?

A. I think as an organizer, developing and strengthening skills like 11:14:47AM public speaking in the most literal sense of the speaking as being done in public, occasionally if the speaking is being done in front of one or multiple people, I think that's certainly the case. In 11:15:03AM regards to the Mohamud Noor campaign, I know the role was outreach coordinator, not necessarily organizer, but that would be kind of the origin of the media relations bullet point under the skills, 11:15:17AM

JARAMILLO

and I think specifically either with the Bloomberg campaign or other campaigns I served on as an organizer, the topic of NGP VAN software is certainly key to that 11:15:30AM and volunteer training broadly speaking is a piece in almost any organizer role.

MS. PHILION: Thank you. I would like to take about a 10-minute break so we will all meet back here at 11:25 11:15:45AM Eastern, 10:25 your time.

THE VIDEOGRAPHER: The time is 11:15. We are off the record.

(Recess taken from 11:15 a m. to 11:25 a m.) 11:25:46AM

THE VIDEOGRAPHER: The time is 11:25. We are on the record.

MS. PHILION: Duane, could you please pull up tab 6, please?

(Jaramillo Exhibit 3, document 11:26:07AM Bates labeled MB2020_Wood_00028701, marked for identification.)

VERITEXT CONCIERGE: Jaramillo 3 has been marked.

///

JARAMILLO

BY MS. PHILION:

Q. Mr. Jaramillo, do you recognize the document that's been marked as Exhibit 3? 11:26:22AM

A. The document appears to be some kind of plain text version of my résumé document.

Q. I have a question for you about this document on the first page under 11:26:41AM Internship Experience. It says under this internship experience that you worked for the office of Senator Tony Lourey, it appears in May 2019 and May 2017. Earlier you told me that you had only worked for 11:26:56AM the Senator once. Does this refresh your recollection that you worked for him more than once?

A. It does not. I don't believe that that is really reflective of what is 11:27:12AM written on my résumé. I believe that's reflective of the software used to parse the résumé into plain text. The May 2019 belongs to the education line, University of Minnesota, Humphrey School of Public 11:27:28AM

JARAMILLO

Affair, the line May 2017 belongs to St. Cloud State University.

Q. Got it. As a field organizer, did you have any involvement in selling 11:27:36AM campaign merchandise?

A. I cannot recall any time where I sold campaign merchandise.

Q. Did you attend campaign calls as a field organizer? 11:27:50AM

A. I can recall multiple times where I attended campaign calls.

Q. The campaign calls that you can recall, were those in-state calls with Minnesota-based campaign employees? 11:28:03AM

A. I can recall both in-state and out-of-state calls.

Q. How many in-state calls per week do you recall participating in?

A. I can't recall a specific number 11:28:20AM other than to say there were certainly weeks where there were multiple calls. There were likely weeks where there was one call.

Q. These in-state calls that you 11:28:33AM

JARAMILLO

remember, what were the substance of those calls?

A. The kind of substantial remarks that I can recall from in-state calls 11:28:47AM typically had a lot to do with a lot of what the national focus was. Although these were in-state calls, it was a very clear strategic choice from the campaigning to have statewide strategy 11:29:00AM near national strategy so a lot of the calls had to do with framing national strategy and messaging within the context of our state when the election was held specifically as part of the Super Tuesday 11:29:14AM allotment of state elections.

Q. What do you base that statement on?

MR. DANNA: Objection.

MS. PHILION: Cathi, could you 11:29:29AM read back Mr. Jaramillo's answer for me, please?

(Record read.)

BY MS. PHILION:

Q. Mr. Jaramillo, my question to you 11:30:21AM

JARAMILLO

is: What information do you base that perception on, that it was a clear strategic choice to narrowing national strategy, what information do you have to 11:30:30AM support that?

A. Yeah, my recollection is really based off of what I heard from contemporaneous conversations, certainly from our state director and from the 11:30:43AM regional directors that supervise directly the field organizers, that there was always, you know, in my perception at least to my recollection, there was always conversations about where New York wanted 11:30:56AM to take strategy, New York being the kind of catchall reference to the campaign headquarters in New York City.

Q. What do you remember they said about strategy? 11:31:07AM

A. Can you repeat that question?

Q. Sure. What do you recall they actually said about strategy?

A. I can recall a lot of focus on whatever the given national messaging was. 11:31:20AM

JARAMILLO

There were many instances where directives from my point of view appeared to come from the New York headquarters that say as a campaign, we are focusing on X given 11:31:33AM issue this week, and the strategic determinations behind what issues were asked of us to focus on are a little bit beyond what I can understand or recall.

Q. So if I'm understanding your 11:31:50AM testimony correctly, you don't specifically recall anything anyone said to you, you're talking generally about your perception? I haven't heard you tell me one specific thing you recall about 11:32:09AM someone saying so I'm asking you, is there anything specifically you recall or you're just talking about your general perception based on statements you don't recall?

A. My testimony is that I can recall 11:32:22AM broad feelings and perceptions and I can recall instances where individuals who are regional organizing directors and the individual who is the state director for the Minnesota campaign saying, you know, 11:32:37AM

JARAMILLO

we got this directive from New York to focus on this issue. Although I cannot recall the exact conversations around that, I can recall, you know, those words 11:32:50AM coming out of those people's mouths.

Q. Other than focusing on issues, any other directives that you recall?

A. I can recall a general sense that there were many directives around the 11:33:11AM strategy, what the organizers should be doing, specific directives. I'm not sure they were made either at the state level or beyond the state level to say this day we're going to have organizers from your 11:33:25AM state call into this state because they are about to have their election, but I can't recall any other specific references to strategy coming from the national team beyond that kind of general feeling. 11:33:40AM

Q. General feeling, got it.

How often did you have calls with your regional organizing director?

A. I can recall many, that there were many fewer instances of phone calls 11:34:02AM

JARAMILLO

with my regional organizing director as opposed to just conversations in the office with the regional organizing director. 11:34:11AM

Q. I want to turn to out-of-state calls you mentioned so calls with people in other states. Approximately how many of those calls do you recall attending during the course of the campaign? 11:34:32AM

A. I can recall that there were one or two set weekly calls with national campaign staff. I can't recall the specific number of calls that I attended through the course of the campaign. 11:34:51AM

Q. Who do you recall speaking on these national calls?

A. I can recall instances where the campaign manager spoke and I can recall instances where there seemed to be a live 11:35:09AM feed to a microphone in the New York campaign headquarters where multiple speakers would come up that were significant in the campaign staff.

Q. Who are these people? 11:35:24AM

JARAMILLO

A. My best recollection is the campaign manager. I cannot recall his name at the moment.

Q. Anybody else you recall? 11:35:36AM

A. I can't recall other speakers.

Q. You said they were scheduled once or twice a week. Did you actually participate in all the calls that are scheduled? 11:35:52AM

A. My recollection is I did participate in the national calls that were scheduled for the field organizers to be on. My understanding is that there were certainly national calls where field 11:36:03AM organizers were not scheduled to be on and I would say I did not attend those such calls.

Q. I want to focus only on the calls that you were scheduled to be on. How 11:36:12AM many calls per week that were national in scope were you scheduled to be on?

A. To my best recollection on any given week there would be one or two scheduled national calls that I would be 11:36:30AM

JARAMILLO

on.

Q. What were the substance of those calls?

A. To my recollection the substance 11:36:33AM of the calls were typically around general campaign strategy. I think it's fair to characterize certainly one of the national calls per week as more pep talk and pep rally in style to kind of up the spirits 11:36:51AM and keep the motivation high for the field organizers and to kind of cast the campaign status in a very positive light and an optimistic light.

Q. Did you ever speak on any of 11:37:07AM these national calls?

A. I don't believe so, no.

Q. Do you consider yourself passionate about democratic politics?

A. I think that I would not use the 11:37:32AM word passionate but that I would use a similar word to convey that I care about democratic politics.

Q. What word would you use to say that you care about democratic politics? 11:37:50AM

JARAMILLO

A. I would say that I think it is important and I think it is a good goal for the country to embrace democratic politics. 11:38:04AM

Q. Why do you think that's a good goal for the country?

A. I think looking at it from the perspective of the policy and kind of the motivations behind what the policies are 11:38:17AM proposed in democratic politics are good for the country, certainly in my view at least in comparison to similar levels of republican politics.

Q. Why do you work on so many 11:38:35AM political campaigns?

A. I think I would say generally, you know, at the time that's kind of what I wanted to do with my career. I wanted to work at politics. I had aspirations to 11:38:47AM work kind of in more staff roles in politics and I saw political organizing as one way that would be a means to an end of still being able to actively work in politics at the time and further my career 11:39:04AM

JARAMILLO

an online application that I filed with my résumé and that résumé and just basic application information with several questions on the kind of website 11:48:00AM questionnaire, after I filed that, either a number of days or perhaps a week or so later, I received a phone call that was a kind of general screening phone call to gauge my interest, gauge my ability, gauge 11:48:13AM my physical location, and that that then set up to my recollection another phone call with a more substantive interview where I was either offered the job then or was then called back shortly after to be 11:48:28AM offered the job.

Q. Did you interview with anybody for this job?

A. I believe I did. My recollection is that I interviewed with Jared 11:48:40AM Muskovitch.

Q. And who is Jared Muskovitch?

A. My recollection is that he was a regional organizing director.

Q. Do you recall interviewing with 11:48:52AM

JARAMILLO

anybody besides Jared?

A. I can't recall interviewing with anyone else.

Q. What was your start date with the 11:49:00AM campaign?

A. I can't recall any particular specific start date. I do remember that it was in early January.

Q. Were you assigned to a field 11:49:19AM office when you joined the campaign?

A. My understanding at the time that I joined the campaign was that I was to be assigned to the kind of Minneapolis campaign headquarters as an office and 11:49:34AM later on there was an office opened up in a different part of Minneapolis or the north Minneapolis area, and I was later assigned to the field office in Rochester.

Q. So the first area that you were 11:49:50AM in was Minneapolis; is that correct?

A. That is correct.

Q. And then the second area that you were in was the Rochester area; is that correct? 11:50:02AM

JARAMILLO

A. That is correct.

Q. Are you familiar with the term "turf" as it relates to political organizing? 11:50:10AM

A. I am, yes.

Q. What does the term "turf" mean to you in the context of political organizing?

A. In this context I think there are 11:50:18AM I think two really strong meanings. There's turf in the broad sense where turf is, you know, where you work, where your field office is and kind of the area your field office is expected to cover in terms 11:50:29AM of organizing. And there is a more specific usage of the word turf. That means the literal area that you are assigned to go canvassing in on any given particular canvassing assignment. 11:50:44AM

Q. When you were in the Minneapolis office when you first joined the campaign, would that be the turf that you were expected to cover in the broader sense?

A. I think that is accurate, yes. 11:51:00AM

JARAMILLO

Q. And when you were in Rochester later in the campaign, would that be considered the turf you were expected to cover in the broader sense? 11:51:10AM

A. That is correct, yes.

Q. In each of those areas, was that also the turf in which you were expected to canvas?

A. My recollection is that in each 11:51:22AM of those areas, canvassing assignments were really done based on the campaign needs, based on strategic determinations, either by regional directors or state directors, so I would say that all the 11:51:36AM canvassing turfs that were really like day specific or hourly specific were within -- when I was in the Minneapolis field office, they were in the Minneapolis area. When I was in the Rochester office, they 11:51:51AM were in the Rochester area but those specific turfs were much smaller pieces and those would change either on a day-to-day or an hour-to-hour basis.

Q. Starting first with Minneapolis, 11:52:03AM

Page 98

JARAMILLO

campaign with you or that was you by yourself doing phone banking?

A. My recollection is that from home it was always me by myself doing the phone 11:57:22AM banking.

Q. What type of work did you do from the office?

A. From the office a lot of the work that was done was similar banking stuff. 11:57:39AM There was some phone banking assignments where we were sat down together in the same room, either upstairs or downstairs in the office and just told hey, we've got this list of how many hundred of people to 11:57:52AM call for this event that we want people to come to. We are all going to stand here or sit here together and call through until that list is concluded. There were other times where we were broken up into 11:58:03AM our areas, regions or turfs, as we've been discussing, and doing phone banking based off of other lists determined either until we worked through that or just for a specified amount of time, just depending 11:58:19AM

Page 99

JARAMILLO

on what the assignment was.

Q. How much interaction did you have with other field organizers in the Minnesota field office? 11:58:38AM

A. My recollection is that there was quite a lot of interaction. I think if there wasn't specific, you know, assignments that we were assigned to to say okay, you need to go sit down and do 11:58:56AM this much phone banking or doing this much calling for this event organizing, it was almost always some kind of group training exercise and that was kind of always very interactive. 11:59:12AM

Q. How many field organizers approximately worked in the Minnesota headquarters office with you?

A. My best recollection, to give a characterization, I'd characterize it 11:59:26AM around 2- or 3,000 at that time.

Q. Do you remember the names of any of them?

A. I can't recall any particular names. 11:59:41AM

Page 100

JARAMILLO

Q. When you moved into the field office for the Minneapolis area, did you have a regional organizing director?

A. My recollection is that we did, 11:59:59AM yes.

Q. Who was that?

A. I can't recall the name. I know it was a woman. I know that she had been brought in to do that job. As I mentioned 12:00:12PM the individual who had the organizing director, I believe her name was Sylvia, was reassigned to what my understanding and recollection was kind of a constituent director job and they brought someone else 12:00:32PM in to do the regional organizing position for the Minneapolis area, although I cannot recall that individual's name.

Q. How many other field organizers were there in the Minneapolis field office 12:00:46PM while you were there?

A. My best recollection was that there were approximately six other field organizers.

Q. Did they all report to the same 12:00:59PM

Page 101

JARAMILLO

regional organizing director as you?

A. My recollection and understanding, but yes, we all reported to the same regional organizing director. 12:01:11PM

Q. Do you recall any of their names?

A. I can't recall anyone's names that were fellow field organizers out of that office, no.

Q. At some point, did you relocate 12:01:23PM from Minneapolis to Rochester?

A. That is correct, yes.

Q. Why did you do that?

A. My recollection is that I was asked to. I'm not entirely clear on what 12:01:39PM the strategic considerations that were put into that decision were.

Q. Who asked you?

A. I can't recall who specifically asked me. 12:01:57PM

Q. Was it a Minnesota based Bloomberg staffer?

A. To my best recollection it was a Minnesota Bloomberg staffer, someone who I had several conversations with before. 12:02:18PM

Page 106

JARAMILLO

population, more concentrated in age of people who are younger in age, plus a concentration older in age, but not as much variance as there is in the 12:07:23PM Minneapolis area in terms of demographics.

Q. You testified a few minutes ago that you did more canvassing and door knocking in the greater Twin Cities area towards the end of the campaign. Were you 12:07:39PM talking about Get Out and Vote efforts in St. Paul?

A. That sounds accurate, yes, that is my recollection that I specifically was called back to the St. Paul office to do 12:07:53PM some Get Out and Vote door knocking efforts, varied other efforts in the St. Paul office. My recollection is that there may have been other people from other field offices called to the 12:08:03PM Minneapolis area as well.

Q. Focusing on you, do you know why you were called to the St. Paul area for the Get Out and Vote efforts?

A. My best recollection is that is a 12:08:17PM

Page 107

JARAMILLO

strategic decision based on population. I can't recall any specific reason why I was specifically brought to the St. Paul area as opposed to being brought to any other 12:08:28PM area or left in Rochester.

MS. PHILION: Duane, can you please pull up tab 7 for me, please?

(Jaramillo Exhibit 4, document Bates labeled MB2020_Wood_00029681, 12:08:46PM marked for identification.)

VERITEXT CONCIERGE: Jaramillo 4 has been marked.

BY MS. PHILION:

Q. Mr. Jaramillo, if you could take 12:09:08PM a look at Exhibit 4 and let me know if you recognize this document.

A. I see Exhibit 4 and I do recognize the document. It appears to be a copy of my résumé after a time with the 12:09:21PM Bloomberg campaign.

Q. Do you recall when you created this résumé?

A. I can't recall the exact time. It would likely be briefly after my time 12:09:34PM

Page 108

JARAMILLO

with the Bloomberg campaign because the formatting appears to be very similar to my résumé before the Bloomberg campaign.

Q. Is this résumé an accurate 12:09:45PM description of your educational and professional experience as of the date you created it?

A. My recollection -- to my recollection, it appears to be largely 12:10:00PM accurate, yes.

Q. What do you mean largely accurate, is it accurate or is it not accurate?

A. I'm just trying to look through 12:10:10PM it and see the differences. To my eyes, the difference appears to be the inclusion of the Mike Bloomberg for President subheading and that appears to be accurate to my recollection, yes. 12:10:23PM

Q. So looking at your description of Mike Bloomberg for President -- sorry, withdrawn.

Did you prepare this résumé, you wrote it? 12:10:37PM

Page 109

JARAMILLO

A. I did, yes.

Q. So looking at Mike Bloomberg for President where it says Field Organizer, under the first bullet point it says Third 12:10:43PM cycle of organizing experience. Are the other two cycles you're referring to here the Bernie campaign and the Noor campaign?

A. That is accurate, yes.

Q. As we discussed earlier, you 12:10:57PM testified that you also actually worked for a third campaign before this and that was the Amal campaign?

A. That is accurate, yes.

Q. Looking at the second bullet 12:11:08PM point under Mike Bloomberg for President, can you please read what you wrote?

A. The exhibit reads, quote, supervised and trained volunteer teams for canvassing, phone banking, and dialer 12:11:25PM shifts, end quote.

Q. Can you describe how you supervised and trained volunteer teams in a little more detail?

A. Yeah, my recollection into that 12:11:38PM

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 110

JARAMILLO

in terms of what my assignment was as a field organizer to supervise and train volunteer teams had a lot to do with having the volunteers come in either 12:11:50PM physically, I think always at one point, physically into the field office and helping familiarize them with the talking points and messages that our campaign team had prepared and making sure that those 12:12:06PM volunteers had a comfort level with the kind of assignment and volunteer opportunity that they had signed up for. Typically that would either be some kind of phone banking activity or some kind of 12:12:19PM door knocking canvassing activity.

Those materials that had been prepared by the campaign were pretty specifically tailored to whatever the particular outreach was so in terms of the 12:12:34PM training aspect, that was really making sure the volunteers had a familiarization with that, that they understood that it was very important to stick with the prepared and curated campaign messaging 12:12:45PM

Page 111

JARAMILLO

that had been provided, and I say to the supervision piece, a lot of that was really -- is really in the presentation and it has a lot to do with making sure 12:12:58PM that these volunteers are comfortable through their experience and that they have generally what has been given to them and that they are prepared to succeed kind of in their role and have a good volunteer 12:13:12PM experience.

Q. Approximately how many volunteers did you supervise and train over the course of your employment with Mr. Bloomberg's campaign? 12:13:23PM

A. To my best recollection, it would be under one dozen.

Q. So approximately 12 or so?

A. That's an accurate approximation, I believe. 12:13:45PM

Q. In your experience working on political campaigns, is creating a volunteer network an important function for organizing?

A. My understanding is that it is a 12:14:01PM

Page 112

JARAMILLO

part of it. I think different campaigns have different visions for what that looks like so I would say it is a part. I'm not sure I'm willing to go as far as to say it 12:14:13PM is an important part.

Q. Was it important for the Bloomberg campaign to recruit volunteers?

A. I'm not so sure that it was.

Q. What do you base that on? 12:14:32PM

A. I would base it on just the number of volunteers I interacted with and the number of volunteers we got. You know, just speaking from my experience on the Bloomberg campaign, I don't think that 12:14:50PM was a major point of emphasis for the campaign.

Q. So supervising and training volunteers is the first substantive bullet point that you have on your résumé. Why 12:15:03PM if it was not important did you list that as sort of the first substantive experience you gained on the Bloomberg campaign?

A. I think the listing of that is 12:15:16PM

Page 113

JARAMILLO

more an effort to show repurposable skills than it is a testimony to the importance of the activities I did on the campaign.

Q. As part of your volunteer 12:15:30PM experience on the campaign, did you also recruit the volunteers that you supervised and trained?

A. My recollection I'm not entirely sure the people who came in to be 12:15:48PM volunteers were actually individuals that I had personally recruited on the phone. My understanding is that there is a large effort based on using e-mailing software that did a fair amount of the volunteer 12:16:03PM recruitment piece as well.

Q. Did you recruit any volunteers for the campaign?

A. I can recall as part of like phone banking and canvassing scripts that 12:16:16PM the volunteer ask was a piece. I cannot recall any individual volunteers that I successfully recruited and that came in to actually be volunteers.

MS. PHILION: Duane, can you 12:16:29PM

Page 114

JARAMILLO

please pull up tab 41 for me, please?

(Jaramillo Exhibit 5, document Bates labeled MB2020_Wood_00036509, marked for identification.) 12:16:45PM

VERITEXT CONCIERGE: Jaramillo 5 has been marked.

BY MS. PHILION:

Q. Mr. Jaramillo, we'll look at that in a second. Can you estimate for me 12:16:48PM approximately how much of your work time on the Bloomberg campaign you spent supervising and training volunteers?

A. To my best recollection, it's hard to come up with a specific 12:17:07PM percentage. I would say that it would be a low, low number, that the most active role in that process of supervising and training is the training part, but a lot of the supervision, if they are out doing 12:17:21PM canvassing, I'm not there with them so the extent of the supervision is really passive. It's me being in the office, me being available or doing other activities. If it's volunteers coming into the office 12:17:35PM

Page 115

JARAMILLO

to phone bank, you know, they are there phone banking. My supervision is again a very passive thing so it's difficult for me to make an assumption of the percentage 12:17:45PM of time that was other than to say that that is a small percentage of the time.

Q. When you were working on the campaign, did you consider a regional organizing director to be your immediate 12:18:00PM superior?

A. That is accurate, yes.

Q. Did you consider that person to be a manager?

A. I would agree with that, yes. 12:18:11PM

Q. Did your regional organizing director canvas with you in the field?

A. I can't recall anytime where that happened, no.

Q. Did your regional organizing 12:18:23PM director stick with you and watch you while you phone banked?

A. I think that happened once or twice, either sitting and watching me phone bank or sitting and phone banking 12:18:36PM

Page 116

JARAMILLO

with me.

Q. Once or twice over the entire duration of the campaign?

A. To be more specific, I can recall 12:18:42PM once or twice where the regional organizing director sat and like watched and listened to me phone bank throughout the campaign. I can recall several other times where the regional organizing 12:18:55PM director sat and did the phone banking with me, kind of listening in a passive way but more focused on the phone banking.

Q. Can you look at the exhibit that Duane has pulled up? 12:19:14PM

MS. PHILION: Duane, remind me of the exhibit number.

VERITEXT CONCIERGE: Jaramillo 5.

BY MS. PHILION:

Q. Mr. Jaramillo, do you recognize 12:19:25PM this document?

A. Not particularly, no.

Q. Do you recall it as part of something you received with your organizing training for the campaign? 12:19:31PM

Page 117

JARAMILLO

A. Not in particular, no.

Q. Are you familiar with the term "one-on-one"?

A. In a broad sense, I am. I'm not 12:19:40PM entirely sure of the application to this document though.

[redacted]

Remind me how many campaigns have you worked on?

A. Several.

Q. Is your testimony that even 12:20:10PM though you worked on several campaigns, you're not familiar with one-on-ones?

A. My testimony is I kind of have a broad understanding of what a one-on-one is in the organizing context. I would say 12:20:25PM that I'm not entirely sure of where the kind of assertion is coming from in this document, in my view anyway.

Q. What is your broad understanding of the one-on-one? 12:20:40PM

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



Page 118

JARAMILLO

A. My understanding as I have seen it applied in organizing is the idea that it's, you know, a way to have kind of a conversation with prospective volunteers 12:20:54PM with someone who said yes to volunteering, to kind of bring them in and see if you can have a recurring volunteer.

[redacted]

Q. When you're recruiting a volunteer for a campaign, you are trying 12:21:47PM

Page 119

JARAMILLO

to persuade someone to give their time for free; is that right?

A. That is correct, yes.

Q. Is that a challenging thing to 12:22:00PM do, persuading someone to give their time for free?

A. In a broader sense, it is. In the context of a political campaign, it has really been my experience that some 12:22:18PM people really believe it and are really into it and it's not that hard of a sell to make to them. So I think although we use the terminology "hard ask" in terms of getting a volunteer or getting people to 12:22:32PM volunteer, I don't think it's especially challenging to get that to happen, no.

Q. So it would be easy for you to recruit volunteers?

A. I would not say it's easy to 12:22:45PM recruit volunteers. I would say that if you're going to get someone to volunteer, they have kind of in one way or another already made the decision. So I would say that there are very few people who are 12:22:56PM

Page 120

JARAMILLO

persuadable to the idea of volunteering in general, but there are some people who are already willing to volunteer or have already volunteered at some other point, 12:23:10PM if that makes sense.

Q. Did you persuade volunteers to give their time to the Bloomberg campaign?

A. I can't recall any specific time where I persuaded someone to volunteer 12:23:31PM that wasn't already interested in volunteering or willing to say I want to volunteer.

Q. How did you ascertain whether they were already interested in 12:23:42PM volunteering?

A. My best recollection is that part of either our call script or part of our door knocking script or part of how door knocking was presented in kind of the mini 12:23:56PM VAN app or the NGP software for door knocking scripts is that there's an ask in it where the scripted line is something along the lines of, you know, some kind of talking points and then asking the literal 12:24:11PM

Page 121

JARAMILLO

question would you like to volunteer with us or presenting a specific volunteer event that has already been organized.

[redacted]

BY MS. PHILION:

Q. Is it your testimony that you did not share personal stories with the 12:24:43PM volunteers you were attempting to recruit?

A. It is my testimony that my focus as an organizer was always more on the messaging and talking points of the campaign than it was any individual 12:24:56PM personal story.

Q. So you did not follow the guidance that was provided in this document; is that correct?

MR. DANNA: Objection. 12:25:05PM



Page 122

JARAMILLO

THE WITNESS: I don't believe that that is correct.

BY MS. PHILION:

Q. How is that not correct? Explain 12:25:09PM that to me because I think that's what you just told me.

MR. DANNA: Objection.

Page 123

.

BY MS. PHILION:

Q. Earlier you testified that you 12:26:09PM care about getting democrats elected to public office; is that right?

A. That is my testimony from earlier, yes.

Q. And you also testified that you 12:26:18PM believed in Mr. Bloomberg's campaign for candidacy; correct?

A. That is correct, yes.

Q. And you had personal reasons why you thought Mr. Bloomberg was a qualified 12:26:28PM candidate for this elected office; is that correct?

A. I had the broad reasons that we kind of discussed, yes.

Q. Did you share any of those 12:26:40PM reasons with volunteers that you were attempting to recruit to donate your time to Mr. Bloomberg's campaign?

A. My recollection is that the messages I shared were really much more 12:26:54PM

Page 124

JARAMILLO

oriented towards the talking points. I don't think beyond any kind of scripted things in a given call script or door knocking script that I volunteered any 12:27:08PM individual opinions or thoughts about the campaign that were outside of the given messaging that we had as organizers.

Q. Did you ever encounter a voter who initially was not inclined to support 12:27:21PM Mr. Bloomberg that you convinced to support him?

A. My best recollection is that that happened. I can't recall any specific instance or the specific conversation 12:27:39PM where that did happen.

MS. PHILION: It's 12:30. I am going to take break. It seems like a good time to take a break for lunch. I'm going to say a half an hour, if 12:28:06PM that's okay with you, Mr. Jaramillo.

THE WITNESS: Yeah, it sounds good to me.

MS. PHILION: Mr. Danna?

MR. DANNA: That's fine. 12:28:22PM

Page 125

JARAMILLO

(Lunch recess taken at 12:28 p.m.)



Page 126

JARAMILLO

A F T E R N O O N S E S S I O N

(Time noted: 1:02 p m.)

A N G E L O J A R A M I L L O, resumed and testified as follows: 12:53:15PM

THE VIDEOGRAPHER: So we went off the record at 12:28. The time is now 1:02 and we are on the record.

MS. PHILION: Duane, can you please pull up tab 49 for me? 01:02:36PM

VERITEXT CONCIERGE: That was 49?

MS. PHILION: 49.

VERITEXT CONCIERGE: Thank you.

(Jaramillo Exhibit 6, document Bates labeled P004937, marked for 01:02:47PM identification.)

VERITEXT CONCIERGE: Jaramillo 6 has been marked.

CONTINUED EXAMINATION

BY MS. PHILION: 01:03:02PM

Q. Mr. Jaramillo, can you please review Exhibit 6?

A. Okay, I see the exhibit. It appears to be an e-mail.

Q. Do you recognize this e-mail? 01:03:20PM

Page 127

JARAMILLO

A. The e-mail looks familiar. I would not say I recognize the specific contents of it.

Q. Can you please review the 01:03:30PM contents of the e-mail?

A. Yes, I can do that now.

(Witness perusing document.)

Okay, I've had a chance to review the e-mail contents. 01:04:34PM

Q. Is this an e-mail that you received from Emily Nygren on January 22, 2020?

A. Yes.

Q. Who is Emily? 01:04:43PM

A. I can't recall the exact position she had on the campaign. I do recall that she had some position in campaign management.

Q. When you say campaign management, 01:04:55PM do you mean campaign management in Minnesota?

A. Yes, that sounds right to me, yes.

Q. Looking at the e-mail that Emily 01:05:03PM

Page 128

JARAMILLO

sent, do you see where it says Wednesday's action items underlined?

A. Yes, I do see that area of the e-mail. 01:05:15PM

MR. DANNA: Objection.

THE WITNESS: To my recollection, 01:05:42PM that does not really sound like a either familiar or repeated goal on the campaign. I do recall instances or at least one specific instance where we were asked to have or do an 01:05:53PM event. I can't recall many instances of that being a repeated goal in my work as an organizer though.

BY MS. PHILION:

Page 129

MR. DANNA: Objection. 01:06:21PM

THE WITNESS: To my recollection, I can see that that is an e-mail and that does sound like something I can recall being in such an e-mail. My recollection is that that was not 01:06:34PM really a repeated or reoccurring goal.

BY MS. PHILION:

Q. Were you involved in planning any events?

A. I can recall one instance of 01:06:41PM event planning that I did. I can't recall any kind of assumption or a meeting of an expectation of two events per organizer or any time period in which that was a reoccurring goal. 01:06:57PM

Page 130

JARAMILLO

Q. Can you tell me about the event you planned?

A. Yeah, to the best of my recollection, I planned an event either in 01:07:04PM Minneapolis or at least in the relative Minneapolis area that was some kind of coffee event. My recollection is that there was some effort either -- I'm not sure if I did direct phone banking to 01:07:22PM recruit for that event. My recollection is most of our events had people come based on automated e-mails that were sent out by some integrated software. I wasn't really involved in that process but my 01:07:36PM recollection specific to that event is that it was a coffee event and it was in the general Minneapolis area.

Q. Why did you pick a coffee event?

A. My best recollection is that it 01:07:51PM was an event that had either been done before by members of the Bloomberg campaign in another state or that I saw the idea for an event in some kind of listing of Bloomberg campaign events for 01:08:09PM

Page 131

JARAMILLO

just the campaign nationally. My recollection is that there is or there was a page that was publicly accessible that had kind of a list of events near you 01:08:21PM where people interested in the campaign could go and search for events either near their zip code or look at events in other areas. And my recollection was that I saw that as an event that had been done with 01:08:37PM some success at least or had been done multiple times across the country and it seemed like a good event to do just in general.

Q. Is your testimony that you didn't 01:08:49PM come up with the idea for that event?

A. I would say to my recollection that it's not an event that I invented out of whole cloth. It's my recollection that it was an event that had been done to some 01:09:16PM success by other people in the Bloomberg campaign in another state.

Q. What independent thinking did you contribute to that event?

A. My recollection is that kind of 01:09:32PM

Page 132

JARAMILLO

my contribution or my role in that process was to come up with an event that I could take ownership of and take some level of responsibility in terms of physically 01:09:46PM attending and having an event people would want to come to in terms of kind of original thinking of what the content of the event would be or what the ask of the event would be. I can't recall any 01:10:02PM specific original substance that I contributed to.

Q. How many people came to the event, approximately?

A. To the best of my recollection, I 01:10:11PM can recall between five and 10 people attending the event.

Q. Do you recall the name of the coffee store -- of the coffee place -- sorry, withdrawn. 01:10:26PM

Do you remember the name of the coffee business where you had this event?

A. I can't recall the particular business.

Q. Did you reach out to the business 01:10:35PM

Page 133

JARAMILLO

to ask them to host the event?

A. I can't recall any kind of reaching out ahead of time.

Q. Well, you planned the event; 01:10:44PM right?

A. My recollection is that I proposed the event and kind of wrote up a blurb about what the event would be. In terms of what the logistical planning 01:11:03PM looked like, I wasn't particularly involved in that aspect.

Q. Who was involved?

A. I can't really recall that I ever had direct knowledge of who it was that 01:11:11PM exactly logistically put the event together in the kind of digital work space that the campaign used or if that individual contacted the business ahead of time to tell them that we would have a 01:11:24PM gathering at their establishment.

Q. Is your testimony that once you wrote up a blurb for this event, you showed up at the event and didn't do anything in between in furtherance of the 01:11:36PM

Page 134

JARAMILLO

event?

MR. DANNA: Objection.

BY MS. PHILION:

Q. You can answer. 01:11:40PM

A. I don't believe that that's a specifically accurate version what happened. I think what I did was -- I think what I did was to do some level of recruitment but in terms of making the 01:11:54PM event happen, it was primarily physically showing up and physically having the materials to distribute, whether it was signs, whether it was kind of a sign-up form or information gathering about that. 01:12:08PM

Q. I'd like for you to tell me everything you remember doing between writing up the blurb and showing up at the coffee shop.

MR. DANNA: Objection. 01:12:18PM

MS. PHILION: What's the objection, Michael?

MR. DANNA: It's vague. I don't think --

MS. PHILION: How is it vague? 01:12:26PM

Page 135

JARAMILLO

Can you explain that to me?

MR. DANNA: I think it's vague because you didn't tailor the question to everything he was doing at the 01:12:34PM event. You asked for everything he did between writing up the blurb and showing up at the event.

MS. PHILION: Sounds like a good understanding of my question. 01:12:42PM

BY MS. PHILION:

Q. Mr. Jaramillo, can you please answer my question?

A. Yeah, my recollection of what I did in between proposing the event and 01:12:51PM going and physically being at the event was really getting the approval that the event was green lit, getting the information that, you know, some form of e-mail communication based on some kind of 01:13:08PM e-mail list had been sent out. That was not an e-mail I had any input on drafting beyond the kind of text of what the event

Page 136

broadly complete sense of that part of it.

I think as it came real near the event I physically gathered some campaign items that were relevant, like stickers, 01:14:26PM signs, some yard signs, and I think I gathered some kind of voter contact form or some kind of sign-in sheet where the people who attended the event could sign on the sheet and say if they were 01:14:40PM

Page 137

JARAMILLO

interested in volunteering or interested in coming to other events, things like that, writing down the e-mail, writing down their phone number, their name, 01:14:47PM things along that nature and kind of gathering that material and prior to the event I think that is a fairly accurate, accurate in the sense of being broad and complete, obviously accurate in the sense 01:15:01PM of that's what happened. I think that is a fairly broad summation of my activities around this event.

Q. Were you the host of the event?

A. My recollection is that yes, I 01:15:19PM was the, you know, person there from the campaign at the event. I think it's fair to characterize that role as generally host.

MS. PHILION: Duane, can you pull 01:15:34PM up tab 51 for me, please?

(Jaramillo Exhibit 7, document Bates labeled MB2020_Wood_00029681, marked for identification.)

VERITEXT CONCIERGE: Jaramillo 7 01:15:58PM





Page 142

JARAMILLO

not exactly an original idea so I think it comes from both other people on the Bloomberg campaign and certainly the event that I did for the Sanders campaign. 01:21:07PM

Q. Just to be clear, nowhere in this e-mail did you write to Emily this is based on someone else's idea; right?

A. I don't believe that string of text is in this e-mail, ma'am. 01:21:21PM

Page 143

Page 144

Q. When you were attempting to 01:23:31PM recruit volunteers, did you try to implement the strategy items that you just discussed?

A. My recollection is that we had, you know, pretty specific scripts for 01:23:47PM phone banking or door knocking where we would typically make those volunteer asks and that these issues that I've listed came pretty much directly from talking points that were issued by the campaign. 01:24:02PM

Q. The question I asked you is different. Totally understand your testimony about the script. The question I asked you was you just articulated to me a strategy behind why you thought this 01:24:14PM

Page 145

JARAMILLO

event, an issue focused phone bank would be successful. I'm asking you if the strategy that you described to me that you testified to is something that you sought 01:24:20PM to implement when you attempted to recruit volunteers, yes or no.

A. I don't think that's entirely accurate that this strategy I used to set up an event would be the same strategy 01:24:32PM that I would use to recruit volunteers in general.



Page 146

Page 147

BY MS. PHILION:

Q. Did you perform any outreach to community leaders while you were working on the Bloomberg campaign?

A. My recollection is that there was 01:27:07PM one time where I was asked to perform outreach and I performed outreach to the mayor of Rochester, Minnesota. I do not believe that -- or I should say my recollection is that that had not been the 01:27:31PM

Page 148

JARAMILLO

intention from the management to my managements and that I was quickly deassigned and my colleagues were quickly deassigned from that role. 01:27:41PM

Q. What is your understanding of why you were deassigned from that role?

A. My understanding and my recollection of that is that we had at the time our regional director conveying one 01:27:53PM version of what we were intending to do and when those conversations kind of led to an e-mail chain with the mayor of Rochester, the strategic decision was made that it would be more proper to have that 01:28:10PM outreach be done not by field organizers, but rather by more higher paid, more expert management-level people in the campaign whose job was constituency outreach, more particular than the job of 01:28:23PM the field organizer.

Q. What do you base that understanding on?

A. I base that understanding on my recollection of just kind of the sequence 01:28:33PM

Page 149

JARAMILLO

of events. I can recall getting that e-mail chain and kind of receiving some level of support or some level of buy-in from the mayor of Rochester and kind of 01:28:43PM just hearing broad discussions between the regional director who was supervising that effort and someone to their superior or even maybe the person whose more formal job duty was the kind of specific job 01:29:02PM outreach to people like elected officials. And it was just my understanding that they thought it would be better to put that role in the hands of someone who they thought to be more qualified or more fit 01:29:14PM in their job duties to handle that than a field organizer.

Q. Did someone write that to you in an e-mail?

A. I can't recall if that was 01:29:24PM written in an e-mail or conveyed verbally.

Q. Do you recall the specific conversation?

A. I can recall a conversation where I was told and I think my colleagues were 01:29:40PM

Page 150

JARAMILLO

told that the outreach had been moved from our hands to the hands of someone at a management or director level.

Q. Who was that conversation with? 01:29:49PM

A. I can't recall if that was with either higher up campaign management or with the regional director at the time.

Q. So you don't remember who you had that conversation with? 01:30:00PM

A. That is correct, I can't recall who exactly that was with.

Q. When did you have that conversation?

A. To the best of my recollection, 01:30:07PM we had that conversation during the time that I was still working in the Minneapolis headquarters office. I can't recall an exact date.

Q. Prior to the deassignment, in 01:30:20PM your words, what did you do in furtherance of outreach to the Rochester mayor?

A. My recollection is that there was -- that I sent an e-mail to either someone in the Rochester mayor's office or 01:30:38PM

Page 151

JARAMILLO

someone in our office that was assigned to her public communications, just kind of outreaching, saying, you know, I am working for this campaign, you know, we 01:30:50PM have an active campaign in Minnesota and we would like to talk about, you know, potentially having you involved with the campaign. That's kind of the extent that I recall to that e-mail and to my 01:31:04PM recollection, there was some response of an interest in an in-person meeting with the Rochester mayor.

Q. How did you decide to reach out to the Rochester mayor? 01:31:15PM

A. I can't recall my exact deliberations in that process.

Q. Did you have previous connections to the Rochester mayor based on any of your other political experience in 01:31:27PM Minnesota?

A. Not that I can recall, no.

Q. In your other political experience in Minnesota before you joined the Bloomberg campaign, did you have 01:31:37PM

Page 152

JARAMILLO

connections to any community leaders in the areas you were working?

A. My recollection is that I had some connections to some community 01:31:53PM leaders. I cannot recall instances at this time where I had leveraged those connections in furtherance of my job with the Michael Bloomberg campaign.

Q. You made the choice not to 01:32:07PM leverage them?

A. I can't recall the choices I did or didn't make around my connections at the time.

Q. So you can't recall one way or 01:32:16PM another whether you leveraged those connections, is that your testimony?

A. My testimony is that I just broadly don't recall instances of leveraging those connections with the 01:32:27PM Bloomberg campaign.

MS. PHILION: Duane, can you pull up tab number 9 for me, please?

(Jaramillo Exhibit 8, document Bates labeled P002854, marked for 01:32:44PM

Page 153

JARAMILLO

identification.)

VERITEXT CONCIERGE: Jaramillo 8 has been marked.

BY MS. PHILION: 01:33:09PM

Q. Mr. Jaramillo, can you please take a look at Exhibit 8?

A. Okay, I see the exhibit.

Q. Do you recognize it?

A. Yeah, it looks like a printout of 01:33:21PM my LinkedIn page at one time.

Q. Is this a LinkedIn page that you prepared?

A. Yes.

Q. Can you tell what date it is a 01:33:36PM LinkedIn page as of?

A. Based on the date at the top of the document, it appears to be December 2, 2020.

Q. Since December 2, 2020, have you 01:33:51PM updated your LinkedIn page?

A. Yes.

Q. How many times have you updated it since December 2, 2020?

A. Several times. I can't recall an 01:34:01PM

Page 162

JARAMILLO

stability. I wanted a career that, to be frank, paid more money and certainly computer science and tech fits that bill, and for me I really also wanted to apply 01:43:18PM my problem-solving skills that I think I've always had, and I find computer science and computer programming to be a satisfying way of applying those skills.

MS. PHILION: Duane, can you 01:43:33PM please pull up tab 37 for me, please?

(Jaramillo Exhibit 9, document Bates labeled P000660, marked for identification.)

VERITEXT CONCIERGE: Jaramillo 9 01:44:05PM has been marked.

BY MS. PHILION:

Q. Mr. Jaramillo, can you please review Exhibit 9?

A. Okay, I see Exhibit 9. It 01:44:16PM appears to be Bloomberg first day - Monday 1/20 e-mail. I will review down the e-mail chain here.

(Witness perusing document.)

Okay, I've had a chance to review 01:45:11PM

Page 163

JARAMILLO

this document and e-mail chain.

Q. Earlier you testified that you believe you began working for the Bloomberg campaign in early January. Does 01:45:20PM this refresh your recollection that your first day of work was January 20th, 2020?

A. It seems to. In my mind I suppose the only recollection I associate more that that kind of first conversation 01:45:39PM about being offered the job and hired, I recall it being much earlier than January 20th, but kind of looking through this document where it says this is when the training is, you're meeting at this French 01:45:55PM breakfast place, I remember that event and I remember getting a laptop and a cell phone and that seems to be the accurate reflection of events.

Q. So on January 20, 2020, if you 01:46:10PM look at the page that's Bates marked P000662, I would like you to take a look at the Bloomberg campaign organizer training agenda that's reflected on that page. Do you see it? 01:46:24PM

Page 164

JARAMILLO

A. Okay. I do. I do see the training agenda here.

Q. Did you attend that organizer training on January 20, 2020? 01:46:32PM

A. Yes.

Q. How many days was training before you started organizing?

A. To my recollection, I believe there was this training. I think we might 01:46:47PM have even had some practice with phone calls at the very end. I think that is even recognizing the schedule at the end, call time. So we had this day of training and call time. I think you could pretty 01:47:05PM reasonably say it constitutes organizing, doing calls is organizing. I think we also had further training activities after this as well.

Q. What further training activities 01:47:16PM do you remember?

A. I can recall days where we would come into the headquarters and you'll have somewhat formal meetings where we would talk and discuss through different parts 01:47:29PM

Page 165

JARAMILLO

of the campaign, different parts of our job duties, how we were expected to conduct ourselves, certain notes that either came from headquarters or came from 01:47:37PM someone in management about how we were intended to do our jobs.

Q. I'm not sure you answered my original question which is how many days was your organizer training, was it one 01:47:49PM day or was it multiple days?

A. To my recollection, there was this one day for formal organizer training and then there was ongoing organizer training throughout several days past this 01:48:03PM January 20th training day.

Q. The agenda that we're looking at reflects that training was scheduled, breakfast started at 9 a m., welcome and introduction started at 10 a.m., went to 01:48:18PM 5 p m., and then from 5 to 6 there were call schedules. Is that approximately the schedule you recall following that day?

A. Yes, that is the schedule I recall. 01:48:30PM

Page 166

JARAMILLO

Q. So following formal training, you testified earlier you started at the Minneapolis headquarter office before the Minneapolis field office opened; is that 01:48:41PM correct?

A. That is correct, yes.

Q. When you were working in the Minneapolis headquarters office, was there a schedule? 01:48:52PM

A. I can't really recall.

Q. You can't recall one way or the other whether there was a schedule?

A. Right.

Q. Was one day different from the 01:49:05PM next with respect to your schedule?

A. My recollection is that we had a time where we were expected to be in there to show up. In terms of how long we stayed, I think that was very variable 01:49:24PM during the time that we were just all in HQ as compared to once we broke out into field offices.

Q. And once you broke out into field offices, was there a schedule? 01:49:39PM

Page 167

JARAMILLO

A. My recollection is yes, there was a schedule.

Q. Do you recall what that schedule was? 01:49:51PM

A. In my recollection, I can't recall the specific schedule for the Minneapolis field office. To the best of my recollection, I can recall the schedule in the Rochester field office was pretty 01:50:06PM firmly 10 a m. to 8 p m.

Q. And how many days per week did you work in the Rochester office?

A. To my best recollection, a typical week would be six days. 01:50:21PM

Q. With one day off?

A. That is correct, yes.

Q. Was there a set day you had off?

A. To my recollection it wasn't a particular set day. I think it was just 01:50:42PM kind of whenever it fit in. My recollection is that the regional director tried to kind of stay during the days off among the organizers, that any given day there would be at least two or so 01:50:53PM

Page 168

JARAMILLO

organizers available, perhaps three.

Q. Were there any days where you worked fewer hours than another day?

A. To my recollection, broadly 01:51:11PM speaking, there certainly could have been days where we worked fewer than those 10 hours I listed, but once things got into the Rochester field office, it was pretty typically expected to be 10 a m. to 8 p m. 01:51:28PM

Q. Do you mean as you got closer to Super Tuesday?

A. Yeah, that is correct, that is around the time that I was in the Rochester field office, yes. 01:51:41PM

Q. And that's when the schedule became more set?

A. That is correct.

Q. And approximately how long before Super Tuesday did that happen? 01:51:58PM

A. To my recollection, it was around a month, a month prior to Super Tuesday.

Q. Did you take a lunch break when you were in the Rochester office?

A. I can't recall if we had defined 01:52:18PM

Page 169

JARAMILLO

lunch break as much as it was you're okay to go get a lunch and then come back and eat it in the office.

Q. And when you would do that, 01:52:33PM approximately how long would you take to go get your lunch and come back?

A. My recollection is it would typically be five minutes, either going to the Chinese place in the same plaza or 01:52:47PM going to the grocery store in the same plaza to get a sandwich, something along those lines.

Q. Then you would come back and eat your lunch in the office? 01:52:59PM

A. That is correct, yes.

Q. Did you come back to the office because that was the only place you had to eat?

A. No, my recollection is that that 01:53:06PM was just kind of the expectation to physically spend as much time as possible during that work time in the office.

Q. Did someone specifically communicate that expectation to you? 01:53:18PM

Page 170

JARAMILLO

A. My recollection is that yes, I think my regional director did communicate that expectation.

Q. Who was your regional director? 01:53:28PM

A. Saul Eugene.

Q. Did you take any other breaks during the day when you were in the Rochester office?

A. My recollection, you know, aside 01:53:41PM from the obvious restroom breaks is no, and I typically didn't take a protracted break away from work.

Q. For the 10 a.m. start time, is that when you would arrive in the office? 01:54:03PM

A. To the best of my recollection, yes, that typically is one.

Q. Would you always start your day in the office?

A. To my recollection, yes, that was 01:54:14PM the typical place to start the day.

Q. What would be the first activity of the day?

A. To my recollection, there wouldn't necessarily be a set first 01:54:28PM

Page 171

JARAMILLO

activity beyond kind of getting in the office, make sure the lights are turned on, make sure appearances are set so people can just kind of walk in. I think 01:54:40PM that first activity would be just kind of making sure everything is neat and presentable from whatever was going on the night before in the office.

Q. And how long would you stay in 01:54:49PM the office once you arrived in the morning?

A. My recollection would be typically stay in the office through until about lunchtime to go run and get lunch. 01:55:01PM The time that that happened would be very variable just depending on what was going on.

Q. And what would you do -- did you stay in the office until 8 o'clock every 01:55:16PM day?

A. My recollection is on a typical day that was very either phone bank heavy or we had volunteers to come in but yes, I typically would stay in the office that 01:55:29PM

Page 172

JARAMILLO

time, but there were many days where we were asked to do canvassing or door knocking where at that point that it was time to go do that, I would exit the 01:55:40PM office until the completion of that turf that I was assigned.

Q. When you canvassed did you do that on your own?

A. Yes, to my recollection, every 01:55:49PM time I did canvassing was on my own.

Q. Did you have certain metrics that you were responsible for on a weekly basis?

A. To my recollection, there were 01:56:08PM typically weekly metrics set. I can't really recall exactly what those metrics were but they tended to relate to either canvassing or phone banking.

Q. And once you met your metrics 01:56:28PM could you stop working?

A. To my recollection, no, not really stop working. I think there's always stuff to do. In the literal sense there's always more people to call, more 01:56:44PM

Page 173

JARAMILLO

people to talk to. I think the work would just shift more into talking with people who came into the office, being present at either volunteer community events so it 01:56:54PM would just be a shift in work priority, I suppose.

Q. So if you were able to meet your call and canvassing metrics more efficiently than another field organizer, 01:57:10PM that would free you up to take on other job duties; is that correct?

A. To my recollection, it was very situationally dependent. I can recall times where the regional director was much 01:57:27PM more focused on like group regional goals than the individual goals. So it typically in my recollection might not necessarily be the case that if I hit a personal goal, you've made so many phone 01:57:45PM calls or you made so many -- you knocked on so many doors this week that it would go into a mode of not working but it might go into a mode of just different job assignments, if that makes sense. 01:57:57PM

Page 174

JARAMILLO

Q. And those assignments would depend on what your regional organizing director asked a particular FO to do?

A. To my recollection, yes, that is 01:58:10PM my understanding.

MS. PHILION: Duane, can you please pull up tab 40A, please? Actually hold on one second, Duane.

BY MS. PHILION: 01:58:22PM

Q. While you were working for the campaign, did you take any time off?

A. I can't recall a time where I took time off.

MS. PHILION: Okay, I'll take 01:58:33PM that document, please.

VERITEXT CONCIERGE: Jaramillo 10 has been marked.

BY MS. PHILION:

Q. Mr. Jaramillo, can you please 01:58:58PM take a look at Exhibit 10?

A. Okay, I see the exhibit. It appears to be an e-mail chain.

Q. Does this e-mail refresh your recollection that you took some time off 01:59:19PM

Page 175

JARAMILLO

due to illness at the end of February?

A. I'm looking at Exhibit 10 and that doesn't seem to be pertinent to that.

Q. I'm sorry, I think we have an 01:59:33PM exhibit problem which is the issue. Sorry, did I not say 40A?

MS. PHILION: So Duane, I asked for 40A.

VERITEXT CONCIERGE: My 01:59:49PM apologies.

MS. PHILION: Can you please set up the right tab?

VERITEXT CONCIERGE: Give me one second. 01:59:57PM

MS. PHILION: And we can take tab 48 out. I'm not at this moment anticipating using it as an exhibit.

VERITEXT CONCIERGE: I've deleted it. 02:00:11PM

MS. PHILION: Thank you.

(Jaramillo Exhibit 10, document Bates labeled MB2020_Wood_00029075, marked for identification.)

VERITEXT CONCIERGE: Jaramillo 10 02:00:22PM

Page 176

JARAMILLO

has been marked.

BY MS. PHILION:

Q. Try this again. Mr. Jaramillo, can you take a look at Exhibit 10 and tell 02:00:27PM me if you're familiar with this document?

A. This e-mail looks familiar enough.

Q. Does this refresh your recollection that you were out of the 02:00:45PM office on February 27th with some sort of illness?

A. That seems to be what the e-mail says, yes.

Q. Do you recall how long you were 02:00:51PM out of work?

A. I don't recall, no.

MS. PHILION: Duane, can you pull up tab 40B?

(Jaramillo Exhibit 11, document 02:01:08PM Bates labeled MB2020_Wood_00029389, marked for identification.)

VERITEXT CONCIERGE: Jaramillo 11 has been marked.

///

Page 177

JARAMILLO

BY MS. PHILION:

Q. Mr. Jaramillo, let me know if you recognize Exhibit 11, please.

A. Yes, this looks familiar. 02:01:28PM

Q. Does this refresh your recollection that you were still out of work as of February 29th with what you described as stomach flu?

A. Yeah, that looks about right. I 02:01:40PM seem to remember that somewhat, yeah.

Q. Did you take any other time off during the campaign?

A. Not that I can recall.

Q. I just want to be clear to a lot 02:01:51PM about your recollection today. Is it that you can't recall one way or another or you don't recall ever taking other time?

A. I can't recall taking any other time. 02:02:07PM

Q. While you were working for the Bloomberg campaign, did you do any work for any other entities?

A. No.

Q. Did you take any academic courses 02:02:26PM

Page 202

JARAMILLO

MS. PHILION: Duane, can you please pull up tab 24, please?

(Jaramillo Exhibit 16, document Bates labeled MB2020_Wood_00089197, 02:29:13PM marked for identification.)

VERITEXT CONCIERGE: Jaramillo 16 has been marked.

BY MS. PHILION:

Q. Mr. Jaramillo, can you please 02:29:21PM take a look at Exhibit 16 and let me know if you recognize it?

A. Okay, I see it. It appears to be the employee handbook. It looks pretty familiar to me. 02:29:32PM

Q. You received it during the campaign?

A. I believe so, yes.

Q. Can you turn to the last page of the document that's Bates marked 02:29:41PM MB2020_Wood_00089268?

A. Okay, I see the last page here.

Q. Did you digitally sign your acknowledgment in receipt of this handbook in January 2020? 02:30:04PM

Page 203

JARAMILLO

A. To the best of my recollection, yes, it appears that I did.

Q. Did you review the handbook before you signed it? 02:30:13PM

A. Yes.

MS. PHILION: I'm going take about a 10-minute break so can we agree to reconvene at 2:40 Eastern Time? 02:30:26PM

MR. DANNA: Yes. Rachel, do you know how much longer you might go today?

MS. PHILION: I don't anticipate very much longer. 02:30:33PM

MR. DANNA: Okay, thanks.

THE VIDEOGRAPHER: The time is 2:30. We are off the record.

(Recess taken from 2:30 p m. to 2:40 p m.) 02:40:36PM

THE VIDEOGRAPHER: The time is 2:40. We are on the record.

MS. PHILION: I don't have any more questions at this time for you, Mr. Jaramillo. In light of some of 02:40:54PM

Page 204

JARAMILLO

your testimony today and some document requests that I've made, I'm going to keep this deposition open but for now I thank you for your time. 02:41:05PM

MR. DANNA: Thanks, Rachel. I do have some questions. I also want to note that I believe we have produced the text message that Mr. Jaramillo testified about as well as an updated 02:41:14PM LinkedIn but we can cover that further off the record.

EXAMINATION

BY MR. DANNA:

Q. Mr. Jaramillo, I have just a few 02:41:24PM questions for you before we wrap up today. I just want to look at my notes.

What were your main job duties as a field organizer on the Bloomberg campaign? 02:41:38PM

A. To the best of my recollection, my main job duties were really about that voter contact piece, about phone banking and canvassing/door knocking.

Q. And I believe you just described 02:42:06PM

Page 205

JARAMILLO

phone banking and canvassing both as voter contact; is that right?

MS. PHILION: Objection.

THE WITNESS: Yes, that is 02:42:21PM correct.

BY MR. DANNA:

Q. Were phone calls -- are making phone calls and canvassing similar forms of voter contact? 02:42:28PM

MS. PHILION: Objection.

THE WITNESS: They very similar forms of contact, voter contact.

BY MR. DANNA:

Q. How are they similar? 02:42:36PM

A. They were similar in the sense that the scripts were written around, to my recollection, the same kinds of talking points and communication messages that the campaign really wanted to get out there, 02:42:52PM and the way that they were scripted in terms of the flow of the conversation and the data that we were collecting were both pretty similar. It's just different means of delivering the same message coming from 02:43:07PM



Page 206

JARAMILLO

the campaign.

Q. And you just mentioned data. What data were you collecting in the voter contact inputs? 02:43:24PM

MS. PHILION: Objection.

Page 207

Page 208

Page 209

BY MR. DANNA:

Q. Did you collect the same data when you were making phone calls as when 02:46:34PM you were doing your canvassing?

MS. PHILION: Objection.

MR. DANNA: What's the objection, Rachel?

MS. PHILION: All of these 02:46:42PM questions, Michael, are leading. It was a compound question. It was vague because he described multiple things that you've not characterized as data. Those are my objections. 02:46:51PM

MR. DANNA: Thanks.

THE WITNESS: Yeah, to my recollection, the data was pretty thoroughly similar. I think the collections or the ways that we asked 02:47:03PM

Page 210

JARAMILLO

it might have been, you know, on the surface different but materially and substantively is my recollection of the data was pretty uniformly the same 02:47:11PM between phone making and canvassing contacts.

BY MR. DANNA:

Q. In the course of your phone banking duties, did you call voters 02:47:27PM outside of the state of Minnesota?

A. It's my recollection that there were several times where as an organizer I was asked to hop on some kind of phone banking or auto dialer session targeted to 02:47:42PM voters of a specific state outside of the state of Minnesota.

Q. And how did you know -- sorry.

Did you know when you were making the phone calls that they were located 02:47:54PM outside the state of Minnesota?

A. Yes, my recollection is that we were specifically told that, you know, you're going to be making for the next hour phone calls for this particular 02:48:06PM

Page 211

JARAMILLO

state.

MR. DANNA: I have no further questions.

MS. PHILION: I have some 02:48:21PM questions with respect to Mr. Danna's prior questions.

FURTHER EXAMINATION

BY MS. PHILION:

Q. Did you discuss your testimony 02:48:29PM with your lawyer today on any of the breaks that we took, including right before we just went back on the record?

MR. DANNA: Objection, calls for privileged information. 02:48:42PM

MS. PHILION: It's a yes or no question. Are you instructing him not to answer it?

MR. DANNA: It sounds to me, Rachel, that you're asking for him to 02:48:51PM disclose privileged communications. If that is what you're asking, then yes, I am instructing him not to answer.

MS. PHILION: I asked him whether 02:49:00PM

Page 212

JARAMILLO

he discussed the substance of his testimony with you on breaks today. Are you instructing him not to answer that question because you believe that 02:49:08PM would divulge privileged communications you had with him?

MR. DANNA: Mr. Jaramillo, you can testify as to whether we communicated and the topics but I 02:49:28PM advise you not to answer any specifics that we discussed.

THE WITNESS: Yeah, based on that advice from my legal counsel, I would just say that we had basic calls 02:49:42PM between these sessions that were very logistical in nature and just literally about what time we're coming back, you know, is the Internet working, topics among those. 02:49:55PM

BY MS. PHILION:

Q. Are those the only topics of the conversations that you had?

A. Those are the general topics of the conversation we had. 02:50:07PM

Page 213

JARAMILLO

Q. Is that yes?

A. Logistical in nature.

Q. Is that the only topic of the conversations that you had, that was my 02:50:13PM question?

MR. DANNA: Objection, asked and answered.

BY MS. PHILION:

Q. You can answer. 02:50:19PM

A. The topic was logistics.

Q. Is that it?

MR. DANNA: Objection, asked and answered.

MS. PHILION: Yes or no. 02:50:30PM

MR. DANNA: He's now answered several times.

MS. PHILION: Are you instructing him not to answer, yes or no?

MR. DANNA: I am not instructing 02:50:37PM him not to answer but I am saying you have now asked this several times verbatim.

THE WITNESS: The topic was logistics. 02:50:48PM

JARAMILLO

BY MS. PHILION:

Q. Is that it?

MR. DANNA: Objection. You've asked this now I think four times, Rachel. 02:50:52PM

MS. PHILION: And he hasn't actually given me a yes or no answer.

MR. DANNA: He has answered.

BY MS. PHILION: 02:50:59PM

Q. I'm asking for a yes or no answer. Is the answer yes or no? Were only logistics discussed?

A. The topic was logistics.

MS. PHILION: No further questions. 02:51:09PM

THE VIDEOGRAPHER: Counsel, if there are no further questions, I will conclude the video recording and if there are no objections. So here ends media unit number 3. This concludes the video recorded virtual remote deposition of Angelo Jaramillo taken by the parties on Friday, November 4, 2022. The time is approximately 02:51:20PM 02:51:34PM

JARAMILLO

2:51 p.m. Eastern Daylight Time and we are going off the record.

(Time noted: 2:51 p.m.)

_______________________

ANGELO JARAMILLO

Subscribed and sworn to before me this ___ day of __________, 2022.

___________________________________

JARAMILLO

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NASSAU )

I, CATHI IRISH, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New York, do hereby certify:

That ANGELO JARAMILLO, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of November, 2022.

___________________________

CATHI IRISH, RPR, CRR, CLVS

JARAMILLO

---------------- I N D E X ---------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| ANGELO JARAMILLO | MS. PHILION | 5, 211 |
| | MR. DANNA | 204 |

----------------- EXHIBITS ---------------

| EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Jaramillo Exhibit 1, document Bates labeled MB2020_Wood_00028713 | | 23 |
| Jaramillo Exhibit 2, document Bates labeled MB2020_Wood_00037081 | | 31 |
| Jaramillo Exhibit 3, document Bates labeled MB2020_Wood_00028701 | | 71 |
| Jaramillo Exhibit 4, document Bates labeled MB2020_Wood_00029681 | | 107 |
| Jaramillo Exhibit 5, document Bates labeled MB2020_Wood_00036509 | | 114 |
| Jaramillo Exhibit 6, document Bates labeled P004937 | | 126 |
| Jaramillo Exhibit 7, document Bates labeled MB2020_Wood_00029681 | | 137 |
| Jaramillo Exhibit 8, document Bates labeled P002854 | | 152 |