IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA WOOD, individually and on behalf all others similarly situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>MIKE BLOOMBERG 2020, INC.,<br><br>　　　　　　　　　Defendant. | No. 20-cv-02489-LTS |

**DECLARATION OF DANIEL BRADEN**

I, Daniel Braden, declare, based on personal knowledge and under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I worked for Mike Bloomberg 2020, Inc. (the "Campaign") as a Field Organizer from about January 2020 to April 2020.

2. I worked out of the Durham, North Carolina campaign office.

3. I typically worked seven days per week and about 70 hours per week. I was never paid any overtime wages when I worked more than 40 hours in a week.

4. My main job duties as a Field Organizer were to call prospective voters to promote Michael Bloomberg's candidacy for President and to recruit volunteers for phone banking and canvassing efforts. The Campaign required that I meet certain metrics for the number of calls I made, about 600 per week. I also met with voters and went door-to-door to encourage voters to vote for Michael Bloomberg.

5. My interactions with voters were largely the same whether in person or by the phone because I used the same script and talking points, and collected the same data, regardless.

6. When canvassing door-to-door, most interactions with potential voters were very brief. I never tried to convince a potential voter to let me in the door, and instead just stuck to the script and collected the necessary voter data as required by the Campaign.

7. Because the Campaign set very high mandatory voter contact metrics, the job did not even allow for interactions of more than a couple minutes with each individual. During that time, I primarily aimed to collect the key data points about each individual, including whether they planned to vote, who they planned to vote for, and what their primary campaign issue was.

8. I did not identify or develop community leaders. I did not typically have any sustained, ongoing work or interactions with particular potential voters. Most of my interactions with potential voters were no more than a couple minutes.

9. All Field Organizers I observed performed these same duties, which the Campaign headquarters dictated.

10. As a Field Organizer, I had no authority to set other employees' schedules or my own, to direct the work of other employees or my own, or to hire, fire, or discipline other employees. All important decisions were made by a Regional Organizing Director, a state director, or by officials in the Campaign's national headquarters in New York, NY.

11. I also had no authority to make decisions of significance regarding the operations of the Campaign or my field office. I performed the job duties assigned by my Regional Organizing Director, Erik Myster, including calling the potential voters, canvassing neighborhoods, and/or visiting addresses assigned to me each day by the Regional Organizing Director.

12. During my day to day work, I checked in with my supervisor, Erik Myster, regularly. He instructed me on the tasks for the day, including phone calls, canvassing, or attending a community event.

13. My job duties did not require any specialized education, training, or experience. After I was hired, I attended an orientation at which I learned about the basic job responsibilities.

14. Only a minimal amount of my time each week was spent attending or organizing events. In the Campaign, an "event" was typically just a gathering of volunteers who would make phone calls or go canvassing, or a table in a public place to pass out flyers prepared by the Campaign.

15. I used a script when making voter phone calls or speaking to voters in person. These scripts detailed specific questions I was required to ask each potential voter, including who they were likely to support, whether they were likely to vote, and what their main issue was. If time allowed, and the Campaign had prepared a talking point or policy position on that issue, I would provide the Campaign's specific talking point about the policy issue that the voter identified.

16. While I was encouraged to sound natural and not be robotic, I generally had to stick to the script and remain consistent with the Campaign's messaging and talking points. Part of the reason I needed to stick to the script was so I could collect the same data from each voter contact. Most voter interactions were so brief that the conversations did not go beyond the basic data questions I was required to ask.

17. I had to input the same data from each voter contact interaction into the Campaign's data tracking systems, including NGP Van. My understanding is that my supervisor

would review how many voter contacts I had made to determine if I was meeting the mandatory metrics each week.

17. I was not responsible for directing the work of any volunteers or staff. Volunteers selected the work they wanted to perform (such as making phone calls, hosting a community event). At times I assisted volunteers to get set up on the same phone systems and voter contact lists that I and other Field Organizers also used.

18. I did not develop the Campaign's strategy in any way. Instead, I only acted on the tasks and metrics directed by my immediate supervisor. I understand that all strategic decision-making was made by the Campaign's leadership.

19. I did not develop the Campaign's message, scripts, talking points, or literature. All messaging, talking points, and literature were provided to me by the Campaign.

20. I did not make any assessments or recommendations about resource deployment, organizing strategy, or the viability of any particular organizing assignments, such as where to staff organizers or volunteers.

21. During state-wide and nation-wide Campaign calls on strategy and messaging, I did not speak; instead, the Campaign's leadership instructed everyone on the calls, myself included, what the updates on strategy and messaging were.

22. I did not conduct any legal proceedings, such as National Labor Relations Board proceedings. I also did not help any individuals prepare complaints and did not file any complaints with the National Labor Relations Board or any other government entity.

23. I did not identify or analyze any legal issues through my interactions with potential voters, such as legal violations or health and safety concerns at any particular employer.

25. The Campaign was not a membership organizing, and I did not recruit new members. I was not responsible for asking potential voters to commit to joining the Campaign or any other organization as a members, such as National Labor Relations Board proceedings.

26. I frequently received emails from officials in the Campaign's New York headquarters.

27. I also attended weekly conference calls with Campaign staffers across the country during which officials in the Campaign's New York headquarters, who led the calls, provided updates and directives.

28. The Campaign's New York headquarters also required me and other Field Organizers to participate in additional conference calls with Campaign staffers across the country. During these calls, Campaign officials in the New York headquarters provided information and guidance, including talking points for explaining the campaign's policy proposals to voters.

29. My monthly salary was $6,000.

30. I also participated in the Campaign's health plan.

31. The Campaign did not pay me any overtime compensation for the hours I worked in excess of 40 in a workweek or 8 in a day.

32. I worked with approximately 5 to 6 other Field Organizers at my office.

33. I also know that other Field Organizers, including Sam Alberti, Clay de Souza, Nathan Blocker and Shailee Bruck, worked many overtime hours each week without receiving overtime pay. I know this because we worked together and discussed the long hours we were

working.

Dated: 04/11/2023

By: *Daniel Braden*

DANIEL BRADEN