## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA WOOD, individually and on behalf all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>MIKE BLOOMBERG 2020, INC.,<br><br>     Defendant. | No. 20-cv-02489-LTS |

## DECLARATION OF SAUL EUGENE

I, Saul Eugene, declare, based on personal knowledge and under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I worked for Mike Bloomberg 2020, Inc. (the "Campaign") as a Regional Organizing Director from about February 2020 to March 2020.

2. I worked out of the Rochester, Minnesota campaign office.

3. My primary job duties included overseeing and directing the daily work of Field Organizers in my office.

4. I managed approximately 3 Field Organizers at my office, including Carly (last name unknown) and Angelo Jaramillo.

5. I also was responsible for setting the schedules of Field Organizers in my office. Because I set their schedules and monitored their work hours, I am familiar with the hours worked by Field Organizers. In my office, Field Organizers typically worked 70 hours per week.

6. While most strategy and messaging decisions were made by the Campaign's state and national leadership, as my job as the lead organizer in each field office, I was tasked with

deciding how the office would meet its goals, including how much time the Field Organizers I supervised should spend on canvassing, phone banking, and attending community events.

7.      Field Organizers' primary job duty was speaking with potential voters by phone or in person and canvassing, and Field Organizers spent the vast majority of their time on these duties.

8.      Field Organizers occasionally helped with other duties such as setting up for events, but these duties were infrequent and were secondary to their duties with respect to contacting potential voters and canvassing.

9.      In the language of the Campaign, an "event" was usually a small gathering of volunteers who would making phone calls, canvas door-to-door, or send text messages to potential voters.

10.     As part of my supervisor role, I was given the metrics from the Campaign's state leaders to set specific, mandatory metrics for Field Organizers to meet each day and week. These metrics included a minimum number of voter contact attempts each week.

11.     Field Organizers were provided basic scripts and talking points to use for their voter contact interactions each day.  It was important that Field Organizers stay on message and consistent with the Campaign's national messaging and positions by using the script and the talking points.

12.     As part of Field Organizers daily work, they were required to collect and input data on every voter interaction, whether by phone or in person.  This data included the same information for each voter, including whether they planned to vote, who they planned to vote for, and what their main policy issue was.  I used this voter data to track Field Organizers' job performance daily and weekly.

2

13.     Because the Campaign used this data to make strategic decisions, it was important for Field Organizers to collect the same data from each voter contact.  This is another reason why it was critical for Field Organizers to stick to the script, which followed the data questions they were required to ask.

14.     The Campaign set high metrics for Field Organizers' work, and I and other supervisors evaluated Field Organizers based on whether they hit these metrics – i.e., how many phone calls and doors they hit each week.

15.     Field Organizers did not have authority to hire or fire other employees and could not set schedules; instead, those were my own job duties, or the duties of state-level directors above me.  Field Organizers also do not set rates of pay or direct the work of other employees.

16.     While I aimed to hire Field Organizers who would perform well in their job duties, Field Organizers did not require any specialized training, education, or skills prior to being employed as a Field Organizer by the Campaign.

17.     All matters of significance regarding campaign operations in my field office and across the country were made by national campaign officials in the Campaign's New York headquarters and communicated to me by the New York headquarters or state-level directors.

18.     The Campaign provided strict oversight over the operations of my field office, including how many Field Organizers I could hire, how many potential voters a day they must speak to, scripts to be used by Field Organizers when speaking with potential voters, how Field Organizers should upload voter information into a central database, metrics with regard to how many calls Field Organizers must make and how many doors Field Organizers must knock on, and other strategy and operations decisions.

19.     It was my job as the Regional Organizing Director to then direct the work of Field Organizers to accomplish the goals and expectations set by the Campaign.

20.     I frequently received emails and directives from officials in the Campaign's New York headquarters.

21.     I also attended weekly conference calls with Campaign staffers across the country during which officials in the Campaign's New York headquarters, who led the calls, provided updates.

22.     I also attended additional calls with Campaign staffers across the country, during which Campaign officials in the New York headquarters provided information and guidance, including talking points for explaining the Campaign's policy proposals to voters.

23.     I received other talking points from state-level directors and national Campaign officials regarding how to train and direct Field Organizers regarding policy changes.


Dated:      4/25
        _____, 2023
        Saint Louis Park, Minnesota

                                        _____
                                        SAUL EUGENE