UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA WOOD, et al., individually and on behalf of all others similarly situated,<br><br>                        Plaintiffs,<br><br>        v.<br><br>MIKE BLOOMBERG 2020, INC.,<br><br>                       Defendant. | 20 Civ. 2489 (LTS) (GWG)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT PROCEDURAL BACKGROUND........................................................................ 2

STATEMENT OF UNDISPUTED FACTS .............................................................................. 3

ARGUMENT .............................................................................................................................. 3

I.      PLAINTIFFS ARE NOT COVERED BY THE FLSA. ................................................. 3

      A.      Plaintiffs Cannot Establish Individual Coverage Because There Is No
            Evidence that FOs Regularly and Recurrently Engaged in Interstate
            Commerce. ........................................................................................................ 3

            1.      Plaintiffs Testified that They Did Not Regularly or Recurrently
                 Engage in Interstate Commerce ................................................................ 4

            2.      Participation in Conference Calls or Receipt of Emails Does Not
                 Establish Individual Coverage ................................................................. 5

      B.      Plaintiffs' Use of VAN and/or ThruTalk Does Not Establish Individual
            Coverage ........................................................................................................... 6

            1.      The Software Was Used Primarily for Intrastate Communication. ............ 6

            2.      The Software Evidence Does Not Establish that Plaintiffs Engaged
                 in Interstate Communications on a Regular and Recurrent Basis.............. 7

            3.      Any Interstate Communications Were Not Made in "Interstate
                 Commerce" ............................................................................................... 9

      C.      The Campaign Is Not a Covered Enterprise Because It Was Not
            Conducted for a Business Purpose..................................................................... 10

II.     THE FIRST AMENDMENT PRECLUDES PLAINTIFFS' OVERTIME
       CLAIMS UNDER THE FLSA AND STATE WAGE LAWS........................................ 12

      A.      Requiring Payment of Overtime Would Impermissibly Burden Core
            Political Speech................................................................................................ 12

      B.      The Ministerial Exception to Federal and State Overtime Laws
            Analogously Precludes Application of Overtime Rules to Avoid a First
            Amendment Violation........................................................................................ 15

III.    PLAINTIFFS' CLAIMS UNDER WISCONSIN LAW FAIL. ...................................... 16

IV.    THE CAMPAIGN ALSO IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' OVERTIME CLAIMS UNDER THE FLSA AND STATE LAWS BECAUSE PLAINTIFFS WERE PROPERLY CLASSIFIED AS EXEMPT ................ 17

    A.    Applicable Laws Regarding Exempt Administrative Professionals ..................... 17

        1.    FLSA, Illinois and North Carolina ............................................................ 17

        2.    Michigan, Minnesota and New York ......................................................... 18

        3.    Wisconsin and California ........................................................................... 18

    B.    Plaintiffs Were Exempt Administrative Professionals under All Laws ............... 19

        1.    Plaintiffs Easily Satisfy the Salary Threshold Standard under All Laws. .................................................................................................................. 19

        2.    Plaintiffs' Primary Duty Involved Performing Non-Manual Work Directly Related to the Campaign's Operations. ...................................... 19

        3.    Plaintiffs Exercised Discretion and Independent Judgment to Determine the Best Way to Persuade Voters ............................................ 21

        4.    The California and Wisconsin Plaintiffs Meet the Additional Prongs of the Administrative Exemption under California and Wisconsin Law ........................................................................................... 28

    C.    Because Plaintiffs Were Properly Classified as Exempt, They Cannot Serve as Representatives for the FLSA Collective or State Law Classes and Those Claims Must Be Dismissed. .................................................................. 29

V.    GOLDSTEIN LACKS STANDING TO BRING CLAIMS FOR ALLEGEDLY INACCURATE WAGE NOTICE AND WAGE STATEMENTS UNDER NEW YORK LAW ............................................................................................................... 30

VI.    THE CALIFORNIA PLAINTIFFS' LABOR CODE CLAIMS OVERWHELMINGLY FAIL ............................................................................... 30

    A.    The California Plaintiffs' Wage Statement and Recordkeeping Claims Fail. ....................................................................................................................... 31

    B.    Coker's and Wheatley-Diaz's Meal and Rest Break Claims Fail. ....................... 32

    C.    The California Plaintiffs' Reimbursement Claims Fail ........................................ 33

    D.    The UCL and PAGA Claims Fail for the Same Reasons. .................................... 34

CONCLUSION ........................................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alcazar v. Corp. of the Cath. Archbishop of Seattle*,
    627 F.3d 1288 (9th Cir. 2010) ..............................................................................15

*Amos v. Oakdale Knitting Co*.,
    331 N.C. 348 (1992) ..............................................................................................17

*Anderson v. Hearts with Hope Found.*,
    713 F. App'x 278 (5th Cir. 2017) .........................................................................10

*Antolini v. Thurman*,
    2023 WL 1113535 (2d Cir. Jan. 31, 2023) .............................................................3

*Boekemeier v. Fourth Universalist Soc'y in the City of N.Y.*,
    86 F. Supp. 2d 280 (S.D.N.Y. 2000).......................................................................4

*Bowrin v. Cath. Guardian Soc'y*,
    417 F. Supp. 2d 449 (S.D.N.Y. 2006)..................................................................4, 5

*Brinker Rest. Corp. v. Superior Court*,
    53 Cal. 4th 1004 (Cal. 2012)................................................................................32

*Brown v. Eli Lilly & Co.*,
    654 F. 3d 347 (2d Cir. 2011)...................................................................................3

*Buckley v. Valeo*,
    424 U.S. 1 (1976)..................................................................................................13

*Carpenter v. Werth Laundry, Inc*.,
    1999 WL 33441201 (Mich. App. June 18, 1999)..................................................18

*Chen v. Lilis 200 W. 57th Corp*.,
    2023 WL 2388728 (S.D.N.Y. Mar. 7, 2023) .........................................................30

*Cole v. CRST, Inc.*,
    2017 WL 1234215 (C.D. Cal. Mar. 30, 2017).................................................32, 33

*Cook v. Greenwood Hospitality Mgmt., LLC*,
    2023 WL 8356795 (E.D. Wis. Dec. 1, 2023) ........................................................19

*Crockett v. Gen. Motors LLC*,
    2023 WL 158882 (E.D. Mich. Jan. 11, 2023)........................................................25

*Crupar-Weinmann v. Paris Baguette Am., Inc*.,
    861 F.3d 76 (2d Cir. 2017)....................................................................................30

*Cruz v. Lawson Software, Inc.*,
   764 F. Supp. 2d 1050 (D. Minn. 2011) ...................................................................18

*Dailey v. Sears, Roebuck & Co.*,
   214 Cal. App. 4th 974 (Cal. Ct. App. 2013) .........................................................32

*Dean v. Pac. Bellwether, LLC*,
   996 F. Supp. 2d 1044 (D. N. Mar. Is. 2014) ...........................................................9

*Donohue v. AMN Services, LLC*,
   11 Cal. 5th 58 (Cal. 2021) ...................................................................................33

*Drake v. Aerotek, Inc.*,
   2016 WL 80672 (W.D. Wis. Jan. 7, 2016) ...........................................................19

*Drenckhahn v. Costco Wholesale Corp.*,
   2011 WL 3754659 (C.D. Cal. Aug. 24, 2011) ................................................32, 33

*Fed. Election Comm'n v. Cruz*,
   596 U.S. 289 (2022) .......................................................................................13, 14

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
   42 Cal. 4th 554 (Cal. 2007) ...........................................................................33, 34

*Gonzalez v. Victoria G's Pizzeria LLC*,
   2021 WL 6065744 (E.D.N.Y. Dec. 22, 2021) ....................................................3, 6

*Grupke v. GFK Custom Rsch. N. Am.*,
   2015 WL 363589 (S.D.N.Y. 2015) .......................................................................17

*Hamilton v. Mike Bloomberg 2020 Inc.*,
   2021 WL 1966843 (N.D. Tex. May 17, 2021) ...................................................3, 12

*Harty v. W. Point Realty, Inc.*,
   28 F.4th 435 (2d Cir. 2022) .................................................................................30

*Hernandez v. Christensen Bros. Gen. Eng'g, Inc.*,
   2023 WL 3069760 (C.D. Cal. Apr. 24, 2023) .......................................................31

*Hines v. State Room, Inc.*,
   665 F.3d 235 (1st Cir. 2011) ................................................................................27

*In re Family Dollar FLSA Litig.*,
   637 F.3d 508 (4th Cir. 2011) ...............................................................................29

*Isaacson* v. *Penn Cmty. Servs., Inc.*,
   1970 WL 794 (D.S.C. Oct. 19, 1970) ....................................................................6

*Jefferson v. Mike Bloomberg 2020 Inc.*,
    2021 WL 1966844 (N.D. Tex. May 17, 2021) .......................................................12

*Jian Long Li v. Li Qin Zhao*,
    35 F. Supp. 3d 300 (E.D.N.Y. 2014) ...................................................................7

*Jones v. SCO Family of Servs.*,
    202 F. Supp. 3d 345 (S.D.N.Y. 2016)..................................................................9

*Joseph v. Nichell's Caribbean Cuisine, Inc.*,
    862 F. Supp. 2d 1309 (S.D. Fla. 2012) ...............................................................7

*Kantor v. Air Atl. Med., P.C.*,
    2021 WL 3888067 (E.D.N.Y. July 7, 2021) ........................................................4

*Katz v. DNC Servs. Corp.*,
    2018 WL 692164 (E.D. Pa. Feb. 2, 2018) .......................................................7, 10

*Kitchings v. Fla. United Methodist Childs. Home, Inc.*,
    393 F. Supp. 2d 1282 (M.D. Fla. 2005) ............................................................11

*Krupinski v. Laborers E. Region Org. Fund*,
    2016 WL 5800473 (S.D.N.Y. Oct. 2, 2016)......................................20, 21, 23, 24

*Krupinski v. Laborers E. Region Org. Fund*,
    2017 WL 3267764 (S.D.N.Y. July 31, 2017) .....................................................18

*Leyva v. Avila*,
    634 F. Supp. 3d 670 (D. Ariz. 2022) ...................................................................7

*Locke v. St. Augustine's Episcopal Church*,
    690 F. Supp. 2d 77 (E.D.N.Y. 2010) .................................................................11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..........................................................................................30

*Marcus v. Lominy*,
    2022 WL 493688 (S.D.N.Y. Feb. 17, 2022)......................................................4, 5

*Mayer v. Bd. of Cnty. Comm'rs of Chase Cnty., Kan.*,
    5 F. Supp. 2d 914 (D. Kan. 1998).....................................................................26

*Mays v. Wal-Mart Stores, Inc.*,
    804 F. App'x 641 (9th Cir. 2020) ......................................................................31

*McCoy v. N. Slope Borough*,
    2013 WL 4510780 (D. Alaska Aug. 26, 2013).....................................................26

*McCutcheon v. Fed. Election Comm'n*,
    572 U.S. 185 (2014) ........................................................................................ 14

*Mekhitarian v. Deloitte & Touche (ICS), LLC*,
    2009 WL 6057248 (C.D. Cal. Nov. 3, 2009) ................................................ 29

*Mills v. Alabama*,
    384 U.S. 214 (1966) ........................................................................................ 13

*Mobile Republican Assembly v. U.S.*,
    353 F.3d 1357 (11th Cir. 2003) ..................................................................... 12

*Monitor Patriot Co. v. Roy*,
    401 U.S. 265 (1971) ........................................................................................ 12

*Morales v. Compass Grp., PLC*,
    2014 WL 5304913 (C.D. Cal. Oct. 16, 2014) .............................................. 29

*Owusu v. Corona Tire Shop, Inc.*,
    2013 WL 1680861 (E.D.N.Y. Apr. 17, 2013) ................................................ 3

*Paczkowski v. My Choice Family Care, Inc.*,
    384 F. Supp. 3d 991 (W.D. Wis. 2019) ....................................................... 16

*Perez v. Nwb Aspen, Inc.*,
    2016 WL 5853734 (M.D. Fla. June 6, 2016), *adopted by*,
    2016 WL 5815903 (M.D. Fla. Oct. 5, 2016) .................................................. 7

*Price v. Starbucks Corp.*,
    192 Cal. App. 4th 1136 (Cal. Ct. App. 2011) .............................................. 34

*Quieju v. La Jugueria Inc.*,
    2023 WL 3073518 (E.D.N.Y. Apr. 25, 2023) .............................................. 30

*Remmers v. Egor*,
    332 F.2d 103 (2d Cir. 1964) ............................................................................ 4

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ........................................................................................ 13

*Reyes v. Goya Foods, Inc.*,
    549 F. App'x 876 (11th Cir. 2013) ........................................................ 25, 26

*Rincon v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
  2013 WL 4389460 (N.D. Cal. Aug. 13, 2013), *aff'd*, 638 F. App'x 631
  (9th Cir. 2016)...................................................................................................21, 22, 24

*Rosenberg v. Renal Advantage, Inc.*,
  2014 WL 1652580 (S.D. Cal. Apr. 24, 2014)..........................................................31

*Savage v. UNITE HERE*,
  2008 WL 1790402 (S.D.N.Y. Apr. 17, 2008) (Swain, C.J.)......................20, 21, 22

*Scarpinato v. E. Hampton Point Mgmt. Corp.*,
  2013 WL 5202656 (E.D.N.Y. Sept. 13, 2013) ........................................................27

*Schaefer-LaRose v. Eli Lilly & Co.*,
  679 F.3d 560 (7th Cir. 2012) ..................................................................................25

*Schleicher v. Salvation Army*,
  518 F.3d 472 (7th Cir. 2008) ............................................................................15, 16

*Scott v. Chipotle Mexican Grill, Inc.*,
  954 F.3d 502 (2d Cir. 2020)......................................................................................3

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
  363 F.3d 299 (4th Cir. 2004) ..................................................................................15

*Shi v. TL & CG Inc.*,
  2023 WL 5827598 (S.D.N.Y. Sept. 8, 2023)..........................................................30

*Shukla v. Sharma*,
  2009 WL 10690810 (E.D.N.Y. Aug. 21, 2009), *adopted by*,
  2009 WL 3151109 (E.D.N.Y. Sept. 29, 2009) ........................................................15

*Smith v. November Bar N Grill LLC*,
  441 F. Supp. 3d 830 (D. Ariz. 2020) ........................................................................8

*Snow v. Mike Bloomberg 2020 Inc.*,
  2021 WL 1966845 (N.D. Tex. May 17, 2021) .........................................................12

*Spencer v. Hyde Cnty.*,
  959 F. Supp. 721 (E.D.N.C. 1997)...........................................................................17

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021).............................................................................................30, 31

*U.S. v. Darby*,
  312 U.S. 100 (1941)..................................................................................................14

*Willis v. Koning Assocs.*,
   2023 WL 3569998 (N.D. Cal. May 19, 2023) ........................................................34

**STATUTES**

820 ILCS 105/4a(1) ...........................................................................................18, 20

26 U.S.C. §527(c)(3) .........................................................................................11, 12

29 U.S.C. § 203 ...................................................................................................3, 10

29 U.S.C. § 207 .......................................................................................................17

29 U.S.C. § 213(a)(1) ..............................................................................................17

Cal. Admin. Code Title 8, § 11040 .................................................................*passim*

Cal. Admin. Code Title 8, § 11070 ...................................................................31, 32

Cal. Lab. Code § 1182.12(b)(1)(D) ........................................................................19

Cal. Lab. Code § 2802(a) ..................................................................................33, 34

M.C.L.A. § 408.420(1) ............................................................................................17

N.C.G.S.A. § 95-25.14 ...............................................................................17, 18, 19

N.Y. Lab. L. § 195 ...................................................................................................30

**OTHER AUTHORITIES**

26 C.F.R. § 1.527-3(e) .............................................................................................12

29 C.F.R. § 541.3(a) ................................................................................................19

29 C.F.R. § 541.200(a)..................................................................................18, 19, 26

29 C.F.R. § 541.201 ...........................................................................................20, 28

29 C.F.R. § 541.202 .................................................................................................21

29 C.F.R. § 776.10(b) ................................................................................................4

29 C.F.R. § 779.214 .................................................................................................10

12 NYCRR § 142-2.14(c)(4)(ii) ........................................................................18, 19

Fed. R. Civ. P. 56(a) ..................................................................................................3

Mich. Admin. Code R. 408.701(b) ....................................................................18, 19

Minn. R. 5200.0200 ..............................................................................................18, 19

U.S. DOL Opinion Letter FLSA 2005-12NA (Sept. 23, 2005)..................................9

U.S. DOL Opinion Letter FLSA 2020-9 (June 25, 2020) ..........................................26

Wis. Admin Code DWD § 274.03 ...........................................................................16

Wis. Admin. Code DWD § 274.04 .....................................................................19, 28

Wis. Admin. Code DWD § 274.015 .........................................................................16

## PRELIMINARY STATEMENT

As Field Organizers ("FOs") for Mike Bloomberg 2020, Inc. (the "Campaign"), Michael Bloomberg's campaign for the Presidency of the United States, Plaintiffs were entrusted with achieving the Campaign's ultimate objective – persuading voters in their local area or "turf" to support Mr. Bloomberg's candidacy in whatever manner they deemed most effective. Plaintiffs advocated for Mr. Bloomberg's election by directly engaging with voters, recruiting volunteers to expand their persuasion efforts, and planning, executing, and speaking at campaign and community events. Plaintiffs were paid $6,000 per month for their efforts, in addition to health benefits, which far exceeded all other political campaigns at the time – all of which classified field organizers as exempt.

Notwithstanding the integral role they played in the Campaign and the significant discretion they were provided, Plaintiffs claim that they should have been classified as non-exempt and eligible for overtime under federal and state wage-and-hour laws. After years of discovery, it is clear that Plaintiffs' overtime (and derivative) claims fail for a multitude of reasons.

As a threshold matter, Plaintiffs cannot meet their burden to establish that they are covered by the Fair Labor Standards Act ("FLSA") through a theory of either individual or enterprise coverage. Even if Plaintiffs could establish FLSA coverage, requiring a political campaign to pay overtime to field organizers – the individuals primarily responsible for disseminating the candidate's political message – would unduly burden core political speech in violation of the First Amendment.

Even putting these two fundamental impediments aside, Plaintiffs' overtime claims under the FLSA and state laws fail on the merits because they performed quintessentially exempt duties. The Campaign expected them to exercise their discretion in campaigning for Mr. Bloomberg, and many Plaintiffs testified that they strategically engaged with voters, as well as recruited and supervised volunteers and planned events as they thought best. The Campaign provided Plaintiffs with talking points and scripts reviewing Mr. Bloomberg's position on various political issues, but those documents clearly advised Plaintiffs to exercise their discretion to determine the most

effective way to persuade each voter. To the extent that any specific Plaintiff did not do that, the law is clear that their decision not to do so cannot render them non-exempt and eligible for overtime. Because there is no material factual dispute that Plaintiffs were expected to perform the duties of exempt administrative professionals, summary judgment should be granted to the Campaign on Plaintiffs' overtime claims and their derivative state law claims.

## **RELEVANT PROCEDURAL BACKGROUND**

Plaintiffs worked for the Campaign between January and March 2020. Plaintiffs initiated this lawsuit on March 23, 2020 and filed the operative Complaint on September 20, 2022, alleging that they were misclassified as exempt under the FLSA, 29 U.S.C. §§ 201, *et seq.*, and the state laws of California, New York, Illinois, North Carolina, Michigan, Wisconsin, and Minnesota.[1] (Dkt. 296 (the "Compl.").) The parties engaged in fact discovery from August 2020 to May 16, 2023. On July 13, 2023, Plaintiffs disclosed a report from their expert on internet issues, Jonathan Jaffe, intended to establish that all FOs communicated interstate and so are individually covered by the FLSA.[2] The Campaign submitted a rebuttal from its expert, Daniel Steinbrook, on October 18, 2023. Although Plaintiffs had the opportunity to reply to Steinbrook's report, they declined to do so.

On August 16, 2023, Plaintiffs filed their motion to certify seven state law classes under Fed. R. Civ. P. 23, which is fully briefed and remains pending. (Dkt. 382.) On January 16, 2024, the Campaign moved to decertify the conditionally certified FLSA collective. (Dkt. 432.) The Campaign's motion to decertify will be fully briefed as of April 1, 2024.[3]

---

[1] The FLSA claims are asserted by the "Representative Plaintiffs," who are defined in the Complaint as Donna Wood, Caelan Doherty, Max Goldstein, Bridget Logan, James Kyle Newman, Lakisha Watson-Moore, Alan Robinson, Alexandra Marie Wheatley-Diaz, Robin Ceppos, and Nicholas Coker. (Compl. p. 2 & ¶¶ 67, 219-227.)

[2] On August 1, 2023, Jaffe submitted a corrected expert report.

[3] The legal issues in the instant motion intersect with those in Plaintiffs' motion for class certification and the Campaign's motion to decertify the collective. However, as the Campaign explained in its opposition to Plaintiffs' motion for class certification (Dkt. 402) and in support of its motion to decertify the collective (Dkt. 432), Plaintiffs' claims and those of any purported class or collective are all subject to dismissal because Plaintiffs have not offered any representative evidence to establish individual coverage under the FLSA and discovery has confirmed that the Campaign is not a covered enterprise, the First Amendment precludes Plaintiffs' overtime claims and regardless, and it is undisputed that FOs were expected to perform exempt duties. To the extent that any Plaintiff could establish

## STATEMENT OF UNDISPUTED FACTS

The pertinent facts are set forth in the accompanying Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 (hereinafter "UF"), which is incorporated herein by reference, including all defined terms.

## ARGUMENT[4]

## I.    PLAINTIFFS ARE NOT COVERED BY THE FLSA.

Plaintiffs' FLSA claims fail because they cannot establish that they are covered by the statute. Plaintiffs bear the burden of establishing that they are covered by the FLSA. *See Owusu v. Corona Tire Shop, Inc.*, 2013 WL 1680861, at *3 (E.D.N.Y. Apr. 17, 2013). Plaintiffs can satisfy their burden by establishing that they were (i) individually engaged in commerce or in the production of goods for commerce ("individual coverage"); or (ii) employed by an enterprise engaged in commerce or in the production of goods for commerce ("enterprise coverage"). 29 U.S.C. § 203(r). The undisputed evidence shows that they cannot establish either.

### A.   Plaintiffs Cannot Establish Individual Coverage Because There Is No Evidence that FOs Regularly and Recurrently Engaged in Interstate Commerce.

"The dispositive test for individual coverage under the FLSA looks to whether the plaintiff was an employee in the 'channels of interstate commerce' as distinguished from [one] who merely affected that commerce." *Gonzalez v. Victoria G's Pizzeria LLC*, 2021 WL 6065744, at *6 (E.D.N.Y. Dec. 22, 2021) (citation omitted). To satisfy this test, an employee's "work must be so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity." *Id.* (citation omitted). *See, e.g., Hamilton v. Mike Bloomberg 2020 Inc.*, 2021 WL 1966843, at *9 (N.D. Tex. May 17, 2021) (granting the Campaign's motion for summary judgment and finding no individual

---

individual coverage or that they were non-exempt, they would have to do so on an individualized basis, rendering class and collective treatment inappropriate. *See Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502 (2d Cir. 2020).

[4] Summary judgment is appropriate where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiffs cannot defeat a defendant's well-supported summary judgment motion unless they proffer sufficient admissible evidence on which a reasonable jury could rule in their favor with respect to each and every element of their claims. *Antolini v. Thurman*, 2023 WL 1113535, at *2 (2d Cir. Jan. 31, 2023). The non-movant "'must show more than some metaphysical doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F. 3d 347, 358 (2d Cir. 2011) (citation omitted).

coverage where the plaintiff did not establish interstate phone calls "were 'directly and vitally related to the functioning' of her employment"); *Kantor v. Air Atl. Med., P.C.*, 2021 WL 3888067, at *4 (E.D.N.Y. July 7, 2021) (allegation that plaintiff "regularly mailed letters to recipients in other states and would make phone calls" outside of New York insufficient to establish that he was "part of the channels of interstate commerce"). Notably, the U.S. Department of Labor ("DOL") confirms that not every employee who has "*any* use" of "channels of communication" is covered under the FLSA, but only employees whose work "involves the continued use" of instrumentalities for communication "across State lines" "as a *regular and recurrent* part" of their job duties. 29 C.F.R. § 776.10(b) (emphasis added).[5] Sporadic interstate communications are not regular and recurrent and do not establish individual coverage under the FLSA. *See Remmers v. Egor*, 332 F.2d 103, 104 (2d Cir. 1964) ("two isolated instances" of wrapping a package or packages shipped interstate and making an interstate delivery insufficient to invoke FLSA coverage); *Marcus v. Lominy*, 2022 WL 493688, at *16 (S.D.N.Y. Feb. 17, 2022) (interstate activities must be "regular and recurrent, and not just sporadic or occasional").

1. *Plaintiffs Testified that They Did Not Regularly or Recurrently Engage in Interstate Commerce.*

It is undisputed that FOs were expected to promote the Campaign primarily within their own localized turf – *i.e.*, within their assigned state. (UF ¶¶ 20-22, 274; *see also* UF ¶¶ 9-10, 33, 152-53.) As a result, FOs primarily, if not exclusively, communicated with voters in their own states. Plaintiffs Logan, Newman, and Coker testified that they did not contact any voters in other states. (UF ¶¶ 158, 179, 88.) Similarly, Named Plaintiffs Tyler and Olinger and Opt-in Plaintiffs Lewis, Summers, Wright and Ruiz all testified that they did not speak to voters outside of their designated states. (UF ¶¶ 217, 192, 144, 213, 268, 210.)

---

[5] *Bowrin v. Cath. Guardian Soc'y*, 417 F. Supp. 2d 449, 466 (S.D.N.Y. 2006) ("[W]here an employee's interstate activities are *de minimis*, or not regular or recurring, as a practical matter neither courts nor the DOL consider the employee covered under the FLSA."); *Boekemeier v. Fourth Universalist Soc'y in the City of N.Y.*, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) ("a substantial part of the employee's work must be related to interstate commerce").

4

The few Plaintiffs who testified that they communicated with voters in other states concede that they did not do so regularly and recurrently. Many of the Plaintiffs could only offer speculation that they may have communicated with voters outside of their designated state at all, and certainly did not know when or how often they actually did so. (UF ¶¶ 130, 202, 240.) Others admit that they did so at most sporadically. (UF ¶¶ 107, 61-62, 266, 167, 170.) No Plaintiff offered evidence that their communications with voters across state lines were at all regular or recurrent.

2. *Participation in Conference Calls or Receipt of Emails Does Not Establish Individual Coverage.*

Plaintiffs also cannot establish individual coverage based on their passive attendance on conference calls with Campaign headquarters in New York or receipt of emails from other states.

None of the Named Plaintiffs who testified that they attended conference calls with New York headquarters said that they ever spoke on these calls. (*See* UF ¶¶ 65, 189, 117, 165; *see also* UF ¶¶ 51, 172.) At most, a few Plaintiffs testified that they occasionally listened in to national calls, while others do not remember participating in any national calls at all. (*See id.; see also* UF ¶ 231.) Similarly, none of the Plaintiffs who testified about out-of-state emails contended that they regularly and recurrently sent emails to recipients in other states. Some testified that they received emails from out of state while others testified that they do not recall receiving emails from Campaign staff in other states at all. (*Compare* UF ¶¶ 118 & 264 *with* UF ¶¶ 49, 137, 147.)

These types of passive and tangential activities do not establish individual coverage. If such activities were sufficient, virtually every employee would be able to invoke individual coverage. Such a broad holding "would lead to untenable results ... [as] [i]t is difficult to imagine anyone, in this modern day and age, who does not meet this definition." *Marcus*, 2022 WL 493688, at *16 (citation omitted) (granting summary judgment in favor of defendants because plaintiff's out-of-state phone and online use were insufficient to trigger individual coverage). *See also Bowrin*, 417 F. Supp. 2d at 468 ("Nor does answering calls that happen to originate from out of state constitute 'use' of the channels of interstate commerce. As a matter of common sense, these types of activities do not require an employee to be 'directly engaged in the work of "communication" between the

State and places outside the State.'") (citing 29 C.F.R. § 776.10); *Gonzalez*, 2021 WL 6065744, at *7 ("it is well settled that merely making calls to entities in other states or mailing letters out of state…is not sufficient to show that an employee is engaged in interstate commerce for purposes of establishing individual coverage").[6]

**B. Plaintiffs' Use of VAN and/or ThruTalk Does Not Establish Individual Coverage.**

Plaintiffs also made use of software provided by the Campaign. They entered data about voters whom they spoke to in an application called "Votebuilder" or "VAN." (*See* UF ¶¶ 270-72.) Mostly late in the Campaign, some of them also used "dialer" software called ThruTalk that facilitated calls to voters. (*See* UF ¶¶ 273, 282.) Recognizing that their own testimony dooms their ability to establish individual coverage, Plaintiffs retained an expert to argue that their use of "VAN" and ThruTalk could have involved interstate communications, as data that FOs entered might have been transmitted by the software for storage on a server in another state. Plaintiffs' effort fails for three reasons.

1. *The Software Was Used Primarily for Intrastate Communication.*

The data the FOs entered into VAN, wherever it was transmitted along the way, was collected primarily for the use of the team within the FO's state. (UF ¶ 275.) The data collected depended on what each state's separate team "cared about" collecting within that state. (UF ¶ 276.) Each state's team trained their FOs on the data to collect (UF ¶ 277), and made their own decisions about data collection and how to use the data collected in each state (UF ¶ 278). Emails among Campaign staff in various states show VAN being used within those states as a measure of FOs' activity. (*See* UF ¶ 279.) While Campaign headquarters in New York could pull up an aggregated state-by-state report of such data if it chose (UF ¶ 281), the states did not submit

---

[6] Nor can Plaintiffs establish individual coverage based on any purported interstate travel. The only deponents who travelled to another state for work were Robinson and Angulo, who worked in the same Wisconsin field office and testified that they briefly traveled from Wisconsin to Minnesota on one occasion to canvass for a long weekend shortly before Super Tuesday. (UF ¶¶ 48, 204; *see also* Sayers Decl. Ex. 4 (itinerary for trip from Wisconsin to Minnesota).) This single trip cannot result in individual coverage with respect to either of them. *See Isaacson* v. *Penn Cmty. Servs., Inc.*, 1970 WL 794, at *4 (D.S.C. Oct. 19, 1970) (four trips out of state were too sporadic to invoke coverage). As for the remaining Plaintiffs, there is no evidence they ever crossed state lines in connection with their job duties, and every other deponent who was asked confirmed that they did not. (UF ¶¶ 61, 67, 158, 245,141, 144, 192.)

reports to headquarters. (UF ¶ 280.) The law is clear that communications intended primarily for intrastate use do not constitute engagement in commerce for purposes of individual coverage.[7]

Even more significantly, in *Katz v. DNC Services Corp.*, 2018 WL 692164, at *5 (E.D. Pa. Feb. 2, 2018) the court rejected field organizers' argument that they engaged in interstate activities by "accessing and entering data into the Votebuilder," which was then accessible by out-of-state parties. The court noted the lack of any authority for the proposition that "intrastate use of a document that is accessible by out-of-state actors constitutes interstate '*movement* of persons or things' as contemplated by the [FLSA]." *Id.* (emphasis in original). The court explained that "[b]y Plaintiffs' logic, any employee who ever saved a document to ICloud or ever uploaded a document to the internet would come under the FLSA's protection for having 'moved' information across state lines." *Id.*

Thus, Plaintiffs' expert testimony about the supposed internal workings of campaign software makes no difference. Even if Plaintiffs' expert is correct that some data Plaintiffs entered into the software may have crossed state lines to be stored in a database, the communications still were primarily for intrastate use, and any incidental interstate trip the data took to go from an FO to their in-state supervisors is legally irrelevant.

2.  *The Software Evidence Does Not Establish that Plaintiffs Engaged in Interstate Communications on a Regular and Recurrent Basis.*

Even if some FOs used the software to transmit information across state lines on some occasions, there is no evidence that they did so on a regular and recurrent basis. For example, ThruTalk was only gradually rolled out to states in February; FOs in Pennsylvania were not trained on the software until February 26, just five days before Super Tuesday, the last day of the

---

[7] *See, e.g., Jian Long Li v. Li Qin Zhao*, 35 F. Supp. 3d 300, 309 (E.D.N.Y. 2014) ("use of a cellular phone…, but *not* for communication between states, is strictly an intrastate activity, notwithstanding the fact that it utilizes interstate technology.") (emphasis in original); *Leyva v. Avila*, 634 F. Supp. 3d 670, 679 (D. Ariz. 2022) ("The mere *use* of an instrumentality of commerce – such as a phone – is insufficient to demonstrate engagement in commerce if such use is purely local and does not actually implicate interstate commerce.") (emphasis in original); *see also Perez v. Nwb Aspen, Inc*., 2016 WL 5853734, at *3 (M.D. Fla. June 6, 2016) (collecting cases holding that interstate communications to process credit cards do not constitute engaging in interstate commerce), *adopted by*, 2016 WL 5815903 (M.D. Fla. Oct. 5, 2016); *Joseph v. Nichell's Caribbean Cuisine, Inc*., 862 F. Supp. 2d 1309, 1313 (S.D. Fla. 2012) ("as a matter of law…[u]sage of credit cards is insufficient for purposes of establishing FLSA individual coverage").

Campaign. (UF ¶ 282; Sayers Decl. Ex. 19.) However the software operated, those FOs could not have used it on a regular and recurrent basis, simply because they did not have access to it until the very end of their employment.

Plaintiffs' expert also relied heavily on the notion that Campaign headquarters employees in New York were able to call up data entered by FOs in other states. (Dkt. 439-18 ¶¶ 84-86, 103-05.) The only testimony on that subject was that headquarters employees could choose to review reports of aggregated data, not necessarily data communicated by any particular individual. (UF ¶ 281.) A headquarters' request for information from a given state is its own separate communication, and is triggered not by the action of any FO but by the New York employee's query to the software, which might have come days or weeks after the data was input to the system, and certainly without the FO's knowledge that the particular data entered would be so transmitted.

Even accepting for these purposes Plaintiffs' expert's conclusion that the *software* likely communicated data entered by FOs to databases in other states as part of its own administration, there is no evidence that the data was transmitted interstate at the time the FO entered it or that the FO had any understanding or expectation that they were transmitting data interstate. *Cf. Smith v. November Bar N Grill LLC*, 441 F. Supp. 3d 830, 838 (D. Ariz. 2020) ("The evidence adduced…establishes only that this set of events [i.e. interstate communication] could conceivably have occurred; it does not give rise to a reasonable inference that it did in fact occur.") (citation omitted). Indeed, it is undisputed that Plaintiffs' expert lacks sufficient information to confirm that any data crossed state lines due to the actions of FOs, let alone on a regular basis. (Bloom Decl. Ex. SSS ¶¶ 5, 11, 12, 18, 22, 24, 26, 37.)

Most importantly, Plaintiffs' expert includes no information or opinion that would permit the Court to assess the degree of interstate communication by any particular FO using the software. (UF ¶ 285.) As a result, even assuming that all FOs used the software,[8] and even assuming that

---

[8] Plaintiffs' expert did not confirm directly from any software records that all 706 Opt-In Plaintiffs used the software; he testified simply that he "was satisfied that given the description of who these individuals were and their role within the campaign," all of them were "either using VAN, ThruTalk or some combination of the two." (UF ¶ 284.)

they all transmitted data across state lines as a result – neither of which can be established on this record – there remains no evidence that FOs engaged in such activity on a "regular and recurrent" basis. Plaintiffs' expert conceded that he lacked the data to determine how many days of their employment any particular FO used either system; how much time on any given day, if any at all, the FO used the systems; and that he could not measure the volume of data that any FO (or all of them) transmitted. (UF ¶¶ 286-88.) As a result, summary judgment should be granted in the Campaign's favor on Plaintiffs' FLSA claims to the extent they purport to establish individual coverage through their expert's opinion on their use of software. *See Jones v. SCO Family of Servs.*, 202 F. Supp. 3d 345, 351 (S.D.N.Y. 2016) (no individual coverage where the plaintiff provided no information about the frequency of the out-of-state contacts).

### 3.   *Any Interstate Communications Were Not Made in "Interstate Commerce."*

Plaintiffs also cannot establish individual coverage based on their use of software for the additional reason that none of the FOs engaged in any communication that had a business purpose of any kind. The Campaign recognizes that the Court's rejection of this argument is law of the case, but urges the Court to reconsider the point in connection with summary judgment now that discovery is concluded. [9] Supporting this limitation, another court has noted that the regulations on individual coverage "were drafted in an era before the Internet" and, at the time of drafting, "most uses of interstate communication devices necessarily contemplated the movement or prospective movement of goods." *Dean v. Pac. Bellwether, LLC*, 996 F. Supp. 2d 1044, 1050 (D. N. Mar. Is. 2014) (noting that the individual coverage regulations were "not meaningfully amended since 1970"). The court concluded that the plaintiff's downloading recipes from the Internet to

---

[9] In denying the Campaign's motion to dismiss on individual coverage grounds notwithstanding the nonprofit, political nature of Plaintiffs' activities, the Court held that "individual employee activities need not be conducted for business purposes to implicate coverage under the FLSA." (Dkt. 258 at 13.) The Court relied on *Bowrin*, which held that individuals "engaged in commerce" may be covered by the FLSA even if the employer is not a covered enterprise. *Id.* at 12 (quoting *Bowrin*, 417 F. Supp. 2d at 465). But the DOL opinion letters on which *Bowrin* in turn relied considered individual coverage of church employees whose activities were related to the movement of goods in interstate commerce. *See* U.S. DOL Opinion Letter FLSA 2005-12NA (Sept. 23, 2005) (noting that church janitors would not be covered unless they clean offices "where goods are regularly produced for shipment across state lines," and that cooks would not be covered "unless the employee is ordering, receiving or preparing goods that are moving or will move in interstate commerce"). It is of course possible for individuals to engage in commerce and be covered by the FLSA, even if their employer is not a covered enterprise, but their work still must be associated with a business purpose, such as movement of goods.

develop her restaurant employer's menu did not constitute interstate commerce, because it was not sufficiently connected with the movement of goods in commerce. *Id.* Similarly in *Katz*, the court rejected the field organizers' argument that by "updating and maintaining Votebuilder" they were sufficiently engaged in the "production of goods for commerce" for purposes of individual coverage. 2018 WL 692164, at *5. The court noted the lack of any authority supporting plaintiffs' contention that "intangibles like voter information could be considered a 'good' within the meaning of the FLSA." *Id*. The same reasoning applies here. The FOs' recording of data that may have been used by Campaign staff to evaluate electioneering efforts does not constitute interstate commerce because it was unrelated to the movement of goods or commercial services, and cannot satisfy Plaintiffs' obligation to show that they are individually covered by the FLSA.

## C. The Campaign Is Not a Covered Enterprise Because It Was Not Conducted for a Business Purpose.

Plaintiffs cannot salvage their FLSA claims through a theory of enterprise coverage because the Campaign is not a covered enterprise. The FLSA defines "enterprise" as "the related activities performed…by any person or persons for a common *business purpose*." 29 U.S.C. § 203(r) (emphasis added).[10] The Campaign was a non-profit political organization within the meaning of 26 U.S.C. §527 and registered as a principal campaign committee with the Federal Election Commission ("FEC"). (UF ¶ 2.) Nonprofit organizations founded for some purpose other than to conduct business are not subject to the FLSA, except to the extent that they "engage in ordinary commercial activities or serve the general public in competition with ordinary commercial enterprises." 29 C.F.R. § 779.214; *see also Anderson v. Hearts with Hope Found.*, 713 F. App'x 278, 280 (5th Cir. 2017) (nonprofit organizations "are generally exempt" from enterprise coverage). Here, the Campaign did not engage in "business," nor did it "compete" with any

---

[10] To qualify as an enterprise the business must have "employees engaged in commerce or the production of goods for commerce, or [having employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," and the business's "annual gross volume of sales made or business done [must not be] less than $500,000 …." 29 U.S.C. § 203(s)(1)(A)(i)-(ii).

"ordinary commercial enterprises." It existed for the sole purpose of advocating on behalf of Mr. Bloomberg's candidacy for president, not to engage in commerce. (UF ¶ 8; *see also* UF ¶ 2-3.)

Plaintiffs cannot rely on the Campaign's ancillary distribution of merchandise to bring it within the purview of the FLSA because it did not constitute commercial activity.[11] It is well-established that the mere receipt of money in excess of $500,000 annually is not alone sufficient to justify FLSA coverage. *See, e.g., Locke v. St. Augustine's Episcopal Church*, 690 F. Supp. 2d 77, 89 (E.D.N.Y. 2010) (church's income from charitable contributions is "not included in this calculation," and so is not relevant to enterprise coverage, even though it exceeded $500,000; its "commercial income" did not exceed the threshold); *Kitchings v. Fla. United Methodist Childs. Home, Inc*., 393 F. Supp. 2d 1282, 1294 n.28 (M.D. Fla. 2005) ("The fact that an eleemosynary organization receives income in the form of fees or gifts does not itself render it a 'for profit' or 'business' enterprise. Obviously, the organization will have expenses which must be offset by revenues from some source."). The only contributions that the Campaign accepted were from those who ordered merchandise through the Campaign's online store. (UF ¶ 4.) The Campaign did not receive any net monetary benefit from these transactions. (UF ¶ 6.) Rather, the purpose of the merchandise was to communicate political messages. (UF ¶ 5.) Accordingly, those merchandise sales were not "commercial income." (*See* UF ¶¶ 3-8.) Instead, they were nontaxable campaign contributions. (UF ¶ 7.) Under 26 U.S.C. § 527, a political organization's income is exempt from tax to the extent it arises from an "exempt function," which the statute defines to include, among other things, "a contribution of money or other property" and "proceeds from the sale of campaign materials, ***which are not received in the ordinary course of any trade or business***." 26 U.S.C. §527(c)(3) (emphasis added). The regulations further clarify the exemption:

> Proceeds from the sale of political memorabilia, bumper stickers, campaign buttons, hats, shirts, political posters, stationery, jewelry, or cookbooks are related to such a political activity [and are therefore exempt] where such items can be identified as

---

[11] In fact, each FO who was asked testified that they did not sell Campaign merchandise and gave it away for free. (UF ¶¶ 50, 66, 116, 135, 142, 164, 168, 171, 188, 193, 203, 211, 215, 218, 230, 265, 269.)

relating to distributing political literature or organizing voters to vote for a candidate for public office.

26 C.F.R. § 1.527-3(e).

Notably, the FEC instructed the Campaign to designate receipts from the sale of merchandise as tax-exempt, and not as income arising from any "trade or business." (UF ¶ 7.) *See* 26 U.S.C. § 527(c)(3)(C); *Mobile Republican Assembly v. U.S.*, 353 F.3d 1357, 1359 (11th Cir. 2003) ("Congress enacted 26 U.S.C. § 527 in 1975 in order to shield contributions to political organizations from taxation as income."). The revenue the Campaign received in exchange for political merchandise was not received "in the ordinary course of any trade or business," and so cannot qualify to subject the Campaign to enterprise coverage. 26 U.S.C. § 527(c)(3)(C).

Indeed, several courts have already held that the sale of merchandise did not render the Campaign a covered enterprise. *See Jefferson v. Mike Bloomberg 2020 Inc.*, 2021 WL 1966844, at *8 (N.D. Tex. May 17, 2021) (granting the Campaign's motion for summary judgment because the Campaign's promotional materials were not received in the ordinary course of any trade or business and income from those sales was not commercial); *Snow v. Mike Bloomberg 2020 Inc.*, 2021 WL 1966845, at *8 (N.D. Tex. May 17, 2021) (same); *Hamilton*, 2021 WL 1966843, at *8 (same). The Court should reach the same conclusion here as there remains no evidence that the Campaign was engaged in commerce within the meaning of the FLSA.

## II.    THE FIRST AMENDMENT PRECLUDES PLAINTIFFS' OVERTIME CLAIMS UNDER THE FLSA AND STATE WAGE LAWS.

The First Amendment precludes application of federal and state overtime laws to political campaigns. As a result, summary judgment should be granted to the Campaign on Plaintiffs' overtime claims and any claims that are derivative of those claims.[12]

### A.    Requiring Payment of Overtime Would Impermissibly Burden Core Political Speech.

The Supreme Court has held that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*,

---

[12]Because all of Plaintiffs' claims except the timing of payment and reimbursement claims under California law are derivative of their overtime claims, the First Amendment bars all of Plaintiffs' claims except the timing of payment

401 U.S. 265, 272 (1971); *see also Republican Party of Minn. v. White*, 536 U.S. 765, 774 (2002) (holding that political speech concerning candidates for public office is "at the core of our First Amendment freedoms"). Indeed, "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, … of course includ[ing] discussions of candidates." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

In the seminal case on campaign finance restrictions, the Supreme Court upheld limitations on contributions to candidates, but struck down limits on expenditures in support of a candidate, in part on the grounds that a contribution limit merely compels those who would have contributed more "to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression." *Buckley v. Valeo*, 424 U.S. 1, 22 (1976). Expenditure limits, by contrast, do "impose direct and substantial restraints on the quantity of political speech." *Id*. at 39.

Similarly, in striking down limitations on campaigns' use of post-election funds to repay loans a campaign received from the candidate, the Court held that such restrictions were likely to increase the risk that such loans would not be repaid, which "in turn inhibits candidates from loaning money to their campaigns in the first place, burdening core speech." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 303 (2022). The prospect that a candidate might be deterred from lending to their campaigns, thereby reducing the amount of money that the campaign had available to spend, impermissibly limited the amount of speech in which the campaign was able to engage. *See id*. at 304. For example, in *Meyer v. Grant*, the Court struck down a state statute making it a felony to pay anyone to solicit signatures supporting an initiative petition because a prohibition on paid solicitation "limits the number of voices who will convey [the petitioners'] message and the hours they can speak and, therefore, limits the size of the audience they can reach." 486 U.S. 414, 422-23 (1988). Statutory overtime requirements similarly purport to mandate what must be paid to individuals disseminating a political message, and similarly restrict "core political speech." *Id*.

---

and reimbursement claims under California law. As explained in Section VI.C., *infra*, the reimbursement claims fail regardless.

Analogously, the *Cruz* Court noted that personal loans are "especially important for new candidates and challengers" who may have "limited connections to front-load campaign spending." *Cruz*, 596 U.S. at 304. The limitation on repayment of such loans, the Court held, "raises a barrier to entry — thus abridging political speech." *Id*. The same is true of overtime requirements: they similarly raise a barrier to entry and make each campaign employee's speech more expensive and administratively burdensome than it would be otherwise, thereby limiting a candidate's reach.

Where, as here, a statute or regulation "reduce[s] the quantity of expression by restricting…the size of the audience reached," it is subject to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 197 (2014) (quoting *Buckley*, 424 U.S. at 19, 44-45).[13] The only governmental interest that the Supreme Court has ever held sufficient to justify government interference with spending decisions by political campaigns is the interest in preventing quid pro quo corruption. *Cruz*, 596 U.S. at 305 ("This Court has recognized only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance.").

Of course, federal and state overtime laws were not aimed at preventing any kind of corruption, and their imposition on a political campaign cannot be justified on this ground. Rather, as this Court acknowledged, Congress enacted the FLSA to "prevent[] the shipment in interstate commerce of certain products and commodities produced in the United States under labor conditions as respects wages and hours which fail to conform to the standards set up by the Act." *U.S. v. Darby*, 312 U.S. 100, 109 (1941); *see* Dkt. 258 at 11. And Congress' power to impose such standards in the first place arises entirely out of its authority to regulate interstate commerce. *Darby*, 312 U.S. at 114-15. Even assuming the interest in regulating commerce – or, more precisely, the wages paid to those working to manufacture products that travel in interstate

---

[13] Even the contribution limits at issue in *Buckley*, which were held to be less burdensome on speech than expenditure limits, were carefully reviewed to ensure that the government had "demonstrate[d] a sufficiently important interest and employ[ed] means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id*. (quoting *Buckley*, 424 U.S. at 25). Courts since have applied either "exacting scrutiny" or "'closely drawn' scrutiny" to legislative burdens on campaign speech, depending on the restriction at issue. *See, e.g.*, *Cruz*, 596 U.S. at 305.

commerce – could ever justify infringement of speech, it cannot suffice as an interest weighty enough to overcome its burden on core political speech by a candidate for the Presidency. The Campaign produced no goods, nor offered any services in commerce; it was a non-profit that existed solely to engage in political speech. And the Plaintiffs were principal mouthpieces for that speech, as they carried the candidate's political message from door to door. Thus, in evaluating the application of the FLSA to the Campaign, the only potentially relevant legislative interest is in regulating the wages paid to individuals merely because they communicate information across state lines, without regard to the purpose of those communications or their effect on the flow of goods or services in the marketplace. That interest cannot justify the "drag" the FLSA imposes on a candidate's ability to disseminate a political message.

State wage and hour laws must similarly give way to the federal constitutional rule. A state limitation on how federal campaigns pay their field teams imposes the same burdens on political speech as the FLSA, and indeed may impose greater burdens where state wage and hour laws impose higher standards for exemption than the FLSA. And states cannot justify that burden on expression any more than the federal government can. Nothing in the Supreme Court's analysis of the interests that permit regulation of federal campaigns' spending – that is, the sole legitimate interest of preventing quid pro quo corruption – distinguishes between federal and state attempts at regulation. Overtime requirements, whether federal or state, impermissibly burden speech as applied to federal political campaigns.

**B. The Ministerial Exception to Federal and State Overtime Laws Analogously Precludes Application of Overtime Rules to Avoid a First Amendment Violation.**

The idea that the First Amendment may require an exception to federal and state overtime laws is not itself novel. Several Circuits have held that FLSA or state overtime requirements cannot be applied to employees of religious organizations who perform religious functions. *See, e.g.*, *Alcazar v. Corp. of the Cath. Archbishop of Seattle*, 627 F.3d 1288 (9th Cir. 2010) (state overtime law); *Schleicher v. Salvation Army*, 518 F.3d 472 (7th Cir. 2008) (FLSA); *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299 (4th Cir. 2004) (FLSA); *see also Shukla v. Sharma*,

2009 WL 10690810, at *6 (E.D.N.Y. Aug. 21, 2009) ("Certainly, the case law is clear that plaintiff's claims relating to overtime wage law violations under the FLSA and state law fall clearly within the ministerial exception."), *adopted by*, 2009 WL 3151109 (E.D.N.Y. Sept. 29, 2009).

In these cases, courts hold that the First Amendment precludes application of overtime laws to the employment of individuals with ministerial duties, because dictating wages would unduly interfere with the organizations' constitutional right to be free from "entanglements of the secular courts in religious affairs." *Schleicher*, 518 F.3d at 474. Obviously the Campaign does not suggest that its employees qualify directly as ministers, as Plaintiffs mischaracterize the issue in their opposition to the Campaign's motion to decertify the collective. Rather, the point is that a similar rationale applies to campaign committees, whose sole purpose is to engage in political speech that, like the free exercise of religious practice, is at the core of the First Amendment. Just as courts decline to impinge on the way churches pay workers who spread the religious word, courts should also decline to dictate how political campaigns elect to pay workers engaged in spreading a candidate's message.

## III.    PLAINTIFFS' CLAIMS UNDER WISCONSIN LAW FAIL.

Plaintiffs' overtime claims under Wisconsin law fail because the Campaign is not subject to Wisconsin's overtime regulation (Wis. Admin Code DWD § 274.03).[14] Wisconsin's overtime provision applies only to:

> employees employed in manufactories, mechanical or mercantile establishments, beauty parlors, laundries, restaurants, confectionary stores, telegraph or telephone offices or exchanges or express or transportation establishments, hotels, and by the state, its political subdivisions and any…body in state or local government….

Wis. Admin. Code DWD § 274.015. The Campaign does not fall into any of these categories. Indeed, the court in *Paczkowski v. My Choice Family Care, Inc.*, 384 F. Supp. 3d 991, 997 (W.D. Wis. 2019) held that Wisconsin's overtime law does not apply to non-profit organizations. It is

---

[14] Although the Complaint reflects that Robinson is asserting the Wisconsin claims, Plaintiffs moved to substitute Angulo for Robinson as the proposed Wisconsin class representative after Robinson engaged in inappropriate and offensive conduct at his deposition, which included making multiple profane statements and gestures at the questioning attorney. (Dkts. 318, 321.) Judge Gorenstein granted this request in March 2023. (Dkt. 338.)

undisputed that the Campaign was a non-profit organization (UF ¶ 2) and therefore, it is not covered by Wisconsin's overtime law. Plaintiffs' claims under Wisconsin law should be dismissed.

## IV.    THE CAMPAIGN ALSO IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' OVERTIME CLAIMS UNDER THE FLSA AND STATE LAWS BECAUSE PLAINTIFFS WERE PROPERLY CLASSIFIED AS EXEMPT.

Even if Plaintiffs were covered by the FLSA (they are not) and their claims were not barred by the First Amendment (they are), their overtime claims still fail. Plaintiffs were properly classified as exempt administrative professionals under the FLSA and relevant state laws because, among other reasons, the Campaign expected them to exercise their discretion and independent judgment in determining how best to carry out their exempt primary duty of promoting Mr. Bloomberg's candidacy and persuading potential voters to vote for him on election day, a matter of paramount significance to the Campaign. Testimony from individual Plaintiffs that they did not apply the discretion and independent judgment that the Campaign expected of them cannot, as a matter of law, establish their claim.[15] The Campaign's motion for summary judgment should be granted as to the following Causes of Action: First (FLSA), Second (NY), Fifth (CA), Eleventh (MI), Twelfth (WI), Thirteenth (IL), Fourteenth (MN), and Fifteenth (NC).[16]

### A.    Applicable Laws Regarding Exempt Administrative Professionals

#### 1.    *FLSA, Illinois and North Carolina*

The FLSA exempts employees from overtime requirements if they occupy a "bona fide…administrative" position. 29 U.S.C. §§ 207, 213(a)(1). The administrative exemption under the FLSA requires that (1) the employee is compensated on a salary or fee basis of at least $684 per week, (2) the employee's primary duty involves "the performance of office or non-manual work directly related to the … general business operations of the employer," and (3) the

---

[15] Even if the Plaintiffs could establish that some among them might have a claim, that would only establish how inapt this case is for resolution on a class or collective basis.

[16] The North Carolina and Michigan overtime provisions also do not apply to employers who are subject to the FLSA. N.C.G.S.A. § 95-25.14(a)(1); M.C.L.A. § 408.420(1); *see also Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353 (1992). Therefore, if the Campaign is covered by the FLSA (which it is not), Plaintiffs' claims under North Carolina and Michigan law fail as a matter of law. *See, e.g., Spencer v. Hyde Cnty.*, 959 F. Supp. 721, 728 (E.D.N.C. 1997); *Grupke v. GFK Custom Rsch. N. Am.*, 2015 WL 363589, at *8 (S.D.N.Y. 2015). Regardless of whether Plaintiffs are covered under the FLSA or these state laws, however, they still were properly classified as exempt administrative employees and are not entitled to overtime compensation.

employee's primary duty "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

The administrative exemption under Illinois and North Carolina law is the same as the FLSA's exemption. *See* 820 ILCS 105/4a(1)-(2)(E) (overtime provision does not apply to administrative employees in Illinois "as defined by or covered by the [FLSA] and [its] rules"); N.C.G.S.A. § 95-25.14(b)(4) ("[a]ny person employed in a bona fide…administrative…capacity, as defined under the [FLSA]" is not entitled to overtime compensation).

### 2. *Michigan, Minnesota and New York*

The Michigan, Minnesota and New York laws each contain an administrative exemption that largely parallels and is analyzed coextensively with its federal counterpart. *See, e.g.,* Mich. Admin. Code R. 408.701(b); *Carpenter v. Werth Laundry, Inc*., 1999 WL 33441201, at *3 (Mich. App. June 18, 1999) ("Michigan law obviously parallels the federal act" with respect to the administrative exemption); Minn. R. 5200.0200(1); *Cruz v. Lawson Software, Inc*., 764 F. Supp. 2d 1050, 1070 (D. Minn. 2011) (Minnesota's "administrative exemption is analogous to the FLSA's administrative exemption"); 12 NYCRR § 142-2.14(c)(4)(ii); *Krupinski v. Laborers E. Region Org. Fund*, 2017 WL 3267764, at *3 (S.D.N.Y. July 31, 2017) ("[t]he FLSA and the [New York Labor Law ("NYLL")] define 'administrative employee' almost identically").[17]

### 3. *Wisconsin and California*

California's and Wisconsin's administrative exemptions are substantively similar to their federal counterpart, but deviate from the FLSA in that they consider whether the employee performs special tasks under general supervision only, and quantitively assess whether the

---

[17] Under New York law, an exempt employee must be paid a salary of at least $1,125 per week in New York City and certain counties. 12 NYCRR § 142-2.14(c)(4)(ii). New York's administrative exemption test also adds to the FLSA test a requirement that the employee "regularly and directly assist[] an employer…." *Id.* Notably, however, "a number of district courts in this circuit have ignored this fourth element, suggesting that it contributes nothing substantive to the rest of the test." *Krupinski,* 2017 WL 3267764, at *5 (collecting cases). As Plaintiffs have previously argued that New York law "mirror[s] the FLSA" for the administrative exemption (Dkt. 422 at 25 & n.67), there appears to be no dispute that if Goldstein is exempt under the FLSA, he also is exempt under New York law. In any event, it is clear that Goldstein regularly and directly assisted the Campaign in its core mission of building support for Mr. Bloomberg's candidacy. *See* pp. 20-21, *infra.*

employee was "primarily engaged" in exempt duties.[18] Cal. Admin. Code tit. 8, § 11040(1)(A)(2); Wis. Admin. Code DWD § 274.04(1)(b). With respect to the quantitative component, California looks to whether an employee was engaged in exempt duties for more than 50% of their time, whereas Wisconsin requires that no more than 20% of the week is dedicated to non-exempt work.[19] Cal. Admin. Code tit. 8, § 11040(2)(N); Wis. Admin. Code DWD § 274.04(1)(b)(4).

### B. Plaintiffs Were Exempt Administrative Professionals under All Laws.

#### 1. *Plaintiffs Easily Satisfy the Salary Threshold Standard under All Laws.*

The Campaign paid all Plaintiffs a salary of $6,000 per month. (UF ¶¶ 32, 53, 78, 104, 125, 149, 174, 195, 220, 233, 254.) This far exceeds the salary threshold for the administrative exemption under all relevant laws.[20]

#### 2. *Plaintiffs' Primary Duty Involved Performing Non-Manual Work Directly Related to the Campaign's Operations.*

The second prong of the administrative exemption is met because Plaintiffs performed non-manual work directly related to the general operations of the Campaign. 29 C.F.R. § 541.200(a)(2). Plaintiffs' primary duty—engaging with prospective voters for the purpose of "promot[ing] [Mr.] Bloomberg's candidacy for [P]resident" and recruiting volunteers to build out the Campaign's field operations (Compl. ¶ 59; UF ¶¶ 22, 33-34, 54-55, 79, 105, 126-27, 150, 175, 196-97, 221, 234, 255-56)—plainly does not constitute manual work.[21] *See, e.g.*, *Krupinski v. Laborers E.*

---

[18] California also requires that exempt administrative employees be paid a salary of at least double the state minimum wage. Cal. Admin. Code tit. 8, § 11040(1)(A)(2)(g). California's minimum wage in 2020 was $13.00 per hour. Cal. Lab. Code § 1182.12(b)(1)(D). The salary threshold in 2020 therefore was $1,040 per week.

[19] Because Wisconsin law expressly states that its "exemptions shall be interpreted in such a manner as to be consistent with the [FLSA]" and its regulations, Wis. Admin. Code DWD § 274.04, courts addressing exemptions under Wisconsin law often apply the FLSA standard to determine whether the employee was properly classified. *See Cook v. Greenwood Hospitality Mgmt., LLC*, 2023 WL 8356795, at *4 (E.D. Wis. Dec. 1, 2023) ("while the court will focus on Ms. Cook's FLSA misclassification claim, the court's conclusions will apply equally to her state law claim."); *Drake v. Aerotek, Inc.*, 2016 WL 80672, at *6 (W.D. Wis. Jan. 7, 2016) (recognizing the "close similarity" between the administrative exemption under Wisconsin and federal law).

[20] *See* 29 C.F.R. § 541.200(a)(1) ($684 per week); 820 ILCS 105/4a(2)(E) (same); N.C.G.S.A. § 95-25.14(b)(4) (same); Mich. Admin. Code R. 408.701(b)(i) (same); Minn. R. 5200.0200(1)(A) (same); Wis. Admin. Code DWD § 274.04(1)(b)(5) ($700 per month); Cal. Admin. Code tit. 8, § 11040(1)(A)(2)(g) ($1,040 per week); 12 NYCRR § 142-2.14(c)(4)(ii) ($1,125 per week in New York City and certain counties).

[21] While the FLSA does not define non-manual work, the regulations define manual work as that performed by "manual laborers" using their "hands, physical skill and energy," such as employees working on a production line or in carpentry, plumbing, construction, maintenance, iron working, mechanical work and similar occupations. 29 C.F.R. § 541.3(a).

*Region Org. Fund*, 2016 WL 5800473, at \*5-6 (S.D.N.Y. Oct. 2, 2016) (holding that union organizer's "primary duty of organizing workers" was non-manual in nature).

There also is no question that Plaintiffs' duties were "directly related" to the Campaign's general operations. Activities meet this requirement if they are "directly related to assisting with the running or servicing of the business," 29 C.F.R. § 541.201(a), such as, for example, "representing" or "promoting" the organization. *Savage v. UNITE HERE*, 2008 WL 1790402, at \*8 (S.D.N.Y. Apr. 17, 2008) (Swain, C.J.) (citation omitted); *see also* 29 C.F.R. § 541.201(b) (describing qualifying work as including, *inter alia*, advertising, marketing, public relations and government relations). As FOs for the Campaign, Plaintiffs' primary duty was to "promote Mr. Bloomberg's candidacy for President" to prospective voters, volunteers, organizations and leaders in their respective local communities. (UF ¶¶ 22, 33-34, 54-55, 79, 105, 126-27, 150, 175, 196-97, 221, 229, 234, 255-56; *see also* Compl. ¶ 59.) This core responsibility permeated all facets of their day-to-day activities. Regardless of whether they were engaging with prospective voters over the phone, in the field, or as a Campaign representative at events in their community, Plaintiffs were responsible for building grassroots support for the Campaign one conversation at a time, informing constituents about Mr. Bloomberg and his positions and goals, and ultimately convincing voters to cast their votes for him on election day. (*Id.*; *see also* UF ¶¶ 8-9, 21, 23-24.) Plaintiffs also recruited (and then trained and managed) volunteers to amplify their own efforts to promote Mr. Bloomberg's candidacy. (UF ¶¶ 22, 34, 40-42, 54-55, 64, 85, 105, 108, 110-12, 127, 131-32, 134, 150, 175, 180-81, 183-87, 196-97, 199-201, 221, 225, 227, 241-42, 255, 259, 262; *see also* UF ¶¶ 109, 182.) They also planned and attended events in their community as representatives of the Campaign, where they spoke to potential voters about the candidate and encouraged them to support the Campaign. (UF ¶¶ 43-44, 82-83, 113-15, 133-34, 153, 159-63, 226-28, 234, 259-61.) All of these activities directly contributed to the Campaign's central mission of advancing Mr. Bloomberg's candidacy for the Presidency. (UF ¶¶ 8-10.)

Courts addressing comparable duties performed by union organizers have held that they satisfy the administrative exemption's "directly related" requirement. For instance, in *Savage*, this

Court held that a union organizer's primary duty was to "represent and promote" the union, and these duties were directly related to the running and servicing of the union's business. 2008 WL 1790402, at *7-8 (Swain, C.J.).[22] Similarly, in *Krupinski*, Judge Sullivan concluded that a union organizer's duties of representing and promoting the union to the public and nonunion workers was related to his employer's business operations. 2016 WL 5800473, at *6-8; *see also Rincon v. Am. Fed'n of State, Cnty., & Mun. Emps.,* 2013 WL 4389460, at *19-20 (N.D. Cal. Aug. 13, 2013), *aff'd*, 638 F. App'x 631 (9th Cir. 2016) (same). The same is true here: Plaintiffs' primary duty of promoting and representing the Campaign was directly related to the Campaign's operations, satisfying the second prong of the administrative exemption.

3. *Plaintiffs Exercised Discretion and Independent Judgment to Determine the Best Way to Persuade Voters.*

The Campaign also expected Plaintiffs to perform the duties of exempt administrative professionals by exercising discretion and independent judgment with respect to matters of significance. An employee exercises discretion and independent judgment if, "[i]n general," their work "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). The determination of whether an employee satisfies this standard is based on an evaluation of the totality of "all the facts involved in the particular employment situation." 29 C.F.R. § 541.202(b).

The Campaign expected FOs to develop and build grassroots support for Mr. Bloomberg's candidacy in their respective "turfs" through a combination of voter engagement; recruiting, training, and supervising volunteers; and planning and execution of events, including making connections on behalf of the Campaign with their community groups and leaders.[23] (UF ¶¶ 20-21.)

---

[22] Plaintiffs have tried to suggest that *Savage* is distinguishable because, according to them, the union organizer in *Savage* was a "true leader" because she scheduled meetings, came up with ways to try to persuade workers in her assigned plant to support the union, "motivated" workers, identified worker concerns, collected union membership cards, and identified workers to volunteer as leaders for their union, among other duties. (Dkt. 438 at 26-27.) All of these duties are the same, or substantially the same, as the duties Plaintiffs performed. (*See, e.g.,* UF ¶¶ 183-84 (scheduled meetings); UF ¶ 127 (persuaded voters and volunteers to support the Campaign); UF ¶ 112 (motivated volunteers); UF ¶ 128 (identified voter concerns); UF ¶ 181 (increased votes for candidate); UF ¶¶ 108-09 (recruited volunteers to support the Campaign).)

[23] The FO job description states that FOs were expected to "execute the overall field strategy" and "maximize the campaign's outreach to key constituency groups," by serving as a "campaign representative;" "recruit[], train[], and

Every FO was expected to exercise their discretion and independent judgment to determine the most effective way to persuade voters and volunteers to support Mr. Bloomberg as the nominee, the Campaign's central objective. (UF ¶¶ 8, 24.) Although the manner in which each Plaintiff chose to execute on their core mandate of promoting Mr. Bloomberg's candidacy varied materially, Plaintiffs' testimony establishes that they each performed the duties of exempt administrative employees.

i.    Persuasive Outreach to Potential Voters

It is undisputed that Plaintiffs' primary duty was to engage with constituents to "promote Mr. Bloomberg's candidacy" (Compl. ¶ 59; UF ¶¶ 22, 54; 150, 175, 196, 221, 255), and to persuade potential voters to go out and vote for Mr. Bloomberg on election day. (UF ¶ 33, 55, 79, 105, 126-27, 197, 235, 256.) This is squarely the type of duty that has been deemed exempt under the administrative exemption. In *Savage*, for example, this Court found that a union organizer was exempt under the FLSA where her primary duty "entailed fieldwork" and involved "represent[ing] and promot[ing] her employer" and "its goals to the community and customers," and her "day-to-day activities focused on increasing [the union's] membership and, through that, its…strength." *Savage*, 2008 WL 1790402, at *6-8. This Court held that the plaintiff exercised discretion and independent judgment because her job "required her to determine how to best approach individual workers and convince them of the benefit of organizing" and she "made her own decisions about whom to approach and tailored her approach to each individual worker." *Id*. at *9. This Court also found that the discretion and independent judgment exercised by the plaintiff related to matters of significance because persuading unrepresented workers to join the union "could hardly be more significant" to her employer. *Id*. at *10; *see also Rincon*, 2013 WL 4389460, at *21 (relying on *Savage* in concluding that union organizer was exempt under FLSA and California law).

Likewise, in *Krupinski*, Judge Sullivan determined that a union organizer was exempt where he "identified target workers and potential candidates for house calls during organizing

---

manag[e] volunteers;" and work with organizational and community allies "to plan creative, engaging, and effective events." (UF ¶ 23; Bloom Decl. Ex. LL.) These are plainly exempt duties.

campaigns," "used some sort of script when interacting with workers, but regularly went off-script at his discretion," "incorporated his personal history and background into discussions with workers," and "varied his approach during organizing campaigns depending on the situation," all in an effort to promote the "core mission" of the union. *Krupinski*, 2016 WL 5800473, at *8-9.

So too here, Plaintiffs' core duty of engaging with voters to promote Mr. Bloomberg's candidacy required them to exercise their discretion and judgment in determining the most effective way to convince voters to vote for Mr. Bloomberg as the nominee. That Plaintiffs had – and used – discretion and judgment is perhaps most apparent from the varying approaches they each took, and issues they each chose to emphasize, when trying to persuade voters. For example:

- **Goldstein (FLSA/NY)** used his discretion to personalize his conversations with prospective voters by asking what issues the voter was focused on—and why—and then would "tailor [his] response as to why [a voter] should vote for [Mr.] Bloomberg" based on the issues important to that voter. (UF ¶¶ 128-29.)
- **Newman (FLSA/NC)** tried to "connect" with North Carolina voters by talking to them about his background as a North Carolina native and how that factored into why he personally supported the Campaign (UF ¶ 178), and exercised his "judgment" in determining how to best present the Campaign's message to different people. (UF ¶¶ 176-77) ("You know, my judgement would be, 'Okay. This person is a straight talker, wants me to get right to the point, versus this person wants me to be a little bit more softer.").
- **Angulo (FLSA/WI)** used his judgment to determine when and how to "customize[]" the message he conveyed to prospective voters, as well as deciding when to share his personal reasons for supporting the Campaign with a voter. (UF ¶¶ 36-37.)
- **Robinson (FLSA/WI)** sought to "educate" voters as a way to convince them to vote and volunteer, and shared personal stories with voters on Campaign issues that resonated with him personally, including his experiences with race and poverty. (UF ¶¶ 197-98.)
- **Doherty (FLSA/IL)** decided to try to persuade potential voters by showing them sections of her written Campaign materials that she deemed relevant to their interests, and using the materials as a demonstrative while she spoke. (UF ¶¶ 105-06.)
- **Logan (FLSA/MN)** chose to pitch the message to potential voters that Mr. Bloomberg was "the best one to defeat Donald J. Trump" because she personally considered "making [Donald Trump] a one-term president" to be of utmost important with respect to the 2020 Presidential election. (UF ¶¶ 156-57.)
- **Watson-Moore (FLSA/MI)** made the decision to "emphasiz[e]" that Mr. Bloomberg was the former Mayor of New York when a voter asked her about the candidate because she considered his mayoral experience personally compelling. (UF ¶¶ 222-23.)
- **Wood (FLSA)** exercised her discretion to share different personal stories (including about her own health issues) depending on the concerns expressed by a particular voter, and emphasizing the need to elect a candidate who would make change. (UF ¶¶ 257-58, 260.)

23

- **Wheatley-Diaz (FLSA/CA)** tried to persuade voters to support Mr. Bloomberg's candidacy by, *inter alia*, focusing on the aspects of his plans that resonated with her personally and "openly and candidly" discussing those issues with voters. (UF ¶ 237; *see also* UF ¶ 238-39.)
- **Coker's (FLSA/CA)** "main" tactic to persuade voters was to discuss Mr. Bloomberg's plans to support the eventual Democratic Party nominee, an approach he deemed to be successful. (UF ¶ 80.)
- **Ceppos (FLSA/CA)** had the discretion to decide whether to share a personal story while engaging with voters, but she made the decision to follow a script because she believed the script permitted her to speak to the greatest number of voters, which she considered more important than sharing a personal story. (UF ¶¶ 56-57.)

The different ways Plaintiffs tried to convince constituents to support the Campaign shifted not only from Plaintiff-to-Plaintiff, but often from voter-to-voter. (*See, e.g.,* UF ¶¶ 36-37, 58, 81, 128-29, 131-32, 198, 238-39, 258; *see also* UF ¶ 178 ("every conversation was different.").) As these divergent approaches demonstrate, each Plaintiff used their judgment to decide the most effective way to convey the Campaign's messages in the context of each conversation.

Plaintiffs also exercised their discretion and judgment with respect to their voter outreach in various other ways, such as making independent decisions about the turf they wanted to cover (UF ¶¶ 35, 152); deciding when to engage with voters in the field and how long to spend doing so (UF ¶¶ 151, 34); whether to try to use their personal social media networks to advocate on behalf of the Campaign (UF ¶¶ 38-39, 199); and using their judgment as to how to effective cover their turf by, *inter alia*, to identify events in their community to attend that they believe would provide meaningful opportunities for the Campaign to connect with constituents, and engaging with prospective voters during these events as representatives of the Campaign. (UF ¶¶ 43, 82-83, 113, 133-34, 153-55, 159-61, 226-28, 259.)

Plaintiffs suggest that because the Campaign provided them with scripts and talking points to help guide their conversations with potential voters and facilitate consistency in Campaign messaging, they cannot be exempt. This is not the law. As the court held in *Krupinski*, an organizer's decisions about when to depart from a script, when to engage in "further persuasion," and "how best to approach" conversations all require the exercise of discretion and independent judgment. 2016 WL 5800473, at *8-9; *see also Rincon*, 2013 WL 4389460, at *21-22 (union

organizer was exempt even though the employer provided her with a script to use when speaking with workers); *Schaefer-LaRose v. Eli Lilly & Co*., 679 F.3d 560, 581 (7th Cir. 2012) (sales representatives who were given "precise wording and materials" to follow when speaking to medical providers still satisfied the administrative exemption). Plaintiffs here made the same type of independent decisions in deciding how to use most effectively Campaign materials to achieve their main objective of persuading voters to vote for Mr. Bloomberg as the nominee and to volunteer for the Campaign. Angulo, for example, testified that he followed a script at times, but that he also used his judgment to "customize[]" his message to prospective voters at other times. (UF ¶ 37; *see also, e.g.,* UF ¶¶ 81, 113, 236, 239.) Other Plaintiffs also described exercising their judgment in connection with deciding, for instance, whether it was worthwhile to try to change the opinion of a constituent who was not a supporter of the Campaign as opposed to ending the conversation (UF ¶ 58), or the most effective approach to use with a particular voter. (UF ¶¶ 176-77.)

Moreover, it is undisputed that the Campaign <u>expected</u> Plaintiffs to use their discretion and judgment about how to engage with voters and persuade them to support the Campaign most effectively. (UF ¶¶ 24, 30; *see also* UF ¶¶ 21, 26-27, 29.) The scripts themselves encouraged Plaintiffs to personalize their conversations with voters by, *inter alia*, trying to relate to the concerns expressed by a particular voter and using their judgment to decide when to share their personal stories. (UF ¶¶ 28, 29.) That a specific Plaintiff may have decided to ignore the Campaign's requests[24] and treated the script as something to be read verbatim rather than as a general guide does not negate their exempt status. *See, e.g.*, *Reyes v. Goya Foods, Inc.*, 549 F. App'x 876, 877-78 (11th Cir. 2013) (holding that an employer's expectations regarding an employee's job duties can render the employee exempt, even if the employee did not perform the expected duties); *Crockett v. Gen. Motors LLC*, 2023 WL 158882, at *5 (E.D. Mich. Jan. 11, 2023)

---

[24] *See* UF ¶ 29; Bloom Decl. Ex. NN at MB2020_Wood_0097257 ("[d]on't read the script to the voter"); *id.* at MB2020_Wood_0097259 ("The script you are given should give you a good sense of the key talking points and the message you are trying to convey, but you will be most effective when the message comes directly from you. Your reason for why you are out knocking on doors will be far more effective than any talking points on their own."); *id.* at MB2020_Wood_0097261 ("You should not read from the script.").

("It is the expectations of an employee's job duties rather than whether the employee successfully performed those duties that instructs whether an exemption applies.") (collecting cases).

Similar to the union organizing activities in *Savage* and *Krupinski*, Plaintiffs' primary duty of promoting the Campaign in their voter interactions and convincing as many voters as possible to vote for Mr. Bloomberg was plainly a "matter[] of significance" to the Campaign. 29 C.F.R. § 541.200(a)(3). Indeed, the Campaign's entire *raison d'être* was to accomplish this goal. (UF ¶ 8.) Plaintiffs therefore were engaged in exempt work.

### ii. Recruiting, Training and Managing Volunteers

Plaintiffs also recruited, and then scheduled, trained, and managed, volunteers as part of their primary duty of building support for the Campaign. (Compl. ¶ 59; UF ¶¶ 22, 34, 40-42, 54-55, 64, 85, 105, 108, 110-12, 127, 131, 134, 150, 175, 180-81, 183-87, 196-97, 199-201, 221, 225, 227, 241-42, 255, 259, 262.)[25] These activities further support their exempt status. *See* U.S. DOL Opinion Letter FLSA 2020-9 (June 25, 2020) ("duties to recruit, supervise, and schedule volunteers are exempt personnel-management tasks"); *see also McCoy v. N. Slope Borough*, 2013 WL 4510780, at *11-12 (D. Alaska Aug. 26, 2013) (coordinating volunteer training, and assisting volunteer organizations in processing documentation, could fall within "one or both of the primary duties for the administrative exemption"); *Mayer v. Bd. of Cnty. Comm'rs of Chase Cnty., Kan.*, 5 F. Supp. 2d 914, 917-20 (D. Kan. 1998) (plaintiff was properly classified as exempt in part because she "determined a schedule of work for herself and the volunteers" and dealt with issues that arose with volunteers).

The undisputed evidence establishes that Plaintiffs exercised their discretion and independent judgment with respect to recruiting volunteers, including, for example, in deciding how to most effectively persuade volunteers to get involved with the Campaign (*see, e.g.,* UF ¶¶

---

[25] Coker was the sole Plaintiff who denied recruiting volunteers, but he admitted that this was one of his job duties and he simply chose not to perform it. (UF ¶ 84.) His unilateral refusal to perform a duty expected of him – which is described in the Complaint as a "primary dut[y]" for all FOs (UF ¶ 22; Compl. ¶ 59) – does not render him non-exempt. *See, e.g., Reyes*, 549 F. App'x at 877-78.

183, 185)[26]; the manner in which they went about recruiting volunteers (*see, e.g.,* UF ¶¶ 41, 183 (one-on-one meetings); UF ¶ 199 (personal social media); UF ¶¶ 134, 227, 259 (pitches at events)); and/or who they targeted as prospective volunteers (*see, e.g.,* UF ¶ 108 (a list Plaintiff created); UF ¶¶ 186, 199 (personal network); UF ¶ 229 (local political leaders)). Many Plaintiffs also scheduled, trained and managed volunteers, even overseeing teams of upwards of 40 volunteers who completed hundreds of volunteer shifts. (UF ¶¶ 180-81; *see also* UF ¶¶ 40, 42, 64, 85, 108, 111-12, 131, 187, 199-201, 225, 242, 262.). The recruitment and supervision of volunteers also was plainly a matter significance for the Campaign because volunteers were a critical part of amplifying FOs' efforts to promote Mr. Bloomberg's candidacy "the more people you have[,] the more people you can reach." (UF ¶ 109; *see also* UF ¶ 8-9, 21, 24.)

      iii.   <u>Organizing and Managing Campaign Events</u>

     Several Plaintiffs also engaged with potential voters by planning and executing events "to raise awareness and generate enthusiasm" for the Campaign. (UF ¶ 133; *see also, e.g.,* UF ¶ 44, 82, 114-15, 134, 162-63, 261) This too has been repeatedly recognized as a duty that entails the type of discretion and independent judgment that qualifies as exempt. *See, e.g., Hines v. State Room, Inc*., 665 F.3d 235 (1st Cir. 2011) (affirming summary judgment decision finding event planners satisfied the requirements of the FLSA's administrative exemption); *Scarpinato v. E. Hampton Point Mgmt. Corp.*, 2013 WL 5202656, at *12 (E.D.N.Y. Sept. 13, 2013) ("the description of [plaintiff's] role in managing events provided by defendants exemplifies a level of managerial discretion well within the purview of the administrative exemption").

*    *    *

     Because Plaintiffs satisfy all three elements of the administrative exemption under the FLSA, the Campaign's motion for summary judgment should be granted as to all Representative Plaintiffs on the First Cause of Action; as to Goldstein on the Second Cause of Action (NY); as

---

[26] Newman, for example, tried to persuade constituents to volunteer by connecting with the person on a personal level (which he "[t]ypically" chose to do by discussing what was at stake in the election) and then offering volunteer opportunities tailored to that person's interests. (UF ¶ 183-84.) Another approach he used to convince prospective volunteers was to "make the pitch that we're stronger together," telling his supervisor that this "works!" (UF ¶ 185.)

to Watson-Moore on the Eleventh Cause of Action (MI); as to Doherty on the Thirteenth Cause of Action (IL); as to Logan on the Fourteenth Cause of Action (MN); and as to Newman on the Fifteenth Cause of Action (NC).[27]

4. *The California and Wisconsin Plaintiffs Meet the Additional Prongs of the Administrative Exemption under California and Wisconsin Law.*

i. <u>The California and Wisconsin Plaintiffs Were Primarily Engaged in Exempt Duties.</u>

Ceppos, Wheatley-Diaz and Coker (the "California Plaintiffs") and Angulo and Robinson (the "Wisconsin Plaintiffs") were primarily engaged in exempt work of "promot[ing] Mr. Bloomberg's candidacy" to potential voters, and trying to persuade them to vote for Mr. Bloomberg on election day and volunteer for the Campaign. (UF ¶¶ 33, 54-55, 79, 196-97, 234.)[28] Indeed, the California and Wisconsin Plaintiffs represent that they spent virtually *all* of their time on a day-to-day basis engaged in these exempt duties. (UF ¶¶ 34, 59, 79, 197, 235.) This satisfies the quantitative components of the administrative exemption under California and Wisconsin law. Wis. Admin. Code DWD § 274.04(1)(b)(5); Cal. Admin. Code tit. 8, § 11040(1)(A)(2).

ii. <u>The California and Wisconsin Plaintiffs Performed Voter Outreach under Minimal Supervision.</u>

Lastly, the California and Wisconsin Plaintiffs executed their tasks under general supervision only. Cal. Admin. Code tit. 8, § 11040(1)(A)(2); Wis. Admin. Code DWD § 274.04(1)(b)(3). In performing primary core duty of promoting and building support for the Campaign, it is undisputed that they each regularly communicated with prospective voters one-

---

[27] With respect to Doherty and Wheatley-Diaz, even if they were misclassified, the undisputed evidence establishes that they were engaged in significant other commitments during portions of their Campaign workday. Wheatley-Diaz had a second, full-time job working remotely for Genex and was paid by Genex for being "available for calls" until approximately 7:00 p.m. EST daily Monday through Friday. (UF ¶ 252.) Doherty was a full-time student at Loyola University and was taking four classes during the spring 2020 semester (while she was employed by the Campaign) that were scheduled until 12:20pm or later every day during the week, in addition to working weekly shifts at Loyola's "call center." (UF ¶¶ 119-23.) Wheatley-Diaz and Doherty are not entitled to overtime compensation for any workweeks in which they did not perform more than 40 hours of work for the Campaign (or more than 8 hours of work in a day for Wheatley-Diaz under California state law), nor are they entitled to any compensation for time when they were working for other employers or engaged in their other commitments.

[28] California law explains that "activities constituting exempt [administrative] work and non-exempt work shall be construed in the same manner as such terms are construed in" 29 C.F.R. § 541.201 (Cal. Admin. Code tit. 8, § 11040(1)(A)(2)(f)), and include work in areas such as "advertising; marketing;… public relations; government relations;…and similar activities." 29 C.F.R. § 541.201(b).

on-one, in conversations that did not involve a supervisor.[29] The Wisconsin Plaintiffs, for example, did not canvass with supervisors at all and they were not supervised while engaging with voters over the phone in the field office. (UF ¶¶ 46, 47, 200, 205-06; *see also* UF ¶ 45.) The California Plaintiffs similarly communicated with prospective voters independently, without any supervision, during door-to-door canvassing and/or over the phone, including when making calls from their own homes. (UF ¶¶ 60, 63, 86-87, 243-44.) Because the Wisconsin and California Plaintiffs were expected to act independently and were subject to little-to-no direct supervision when they performed their self-described "primary duties" of engaging with potential voters to persuade them to support Mr. Bloomberg's candidacy (*see* UF ¶ 22, 33-34, 54-55, 79, 196-97, 234), they were properly classified as exempt under California and Wisconsin law. The Campaign's motion for summary judgment should be granted as to Ceppos, Wheatley-Diaz, and Coker on the Fifth Cause of Action (CA), and as to Angulo and Robinson on the Twelfth Cause of Action (WI).

## C. Because Plaintiffs Were Properly Classified as Exempt, They Cannot Serve as Representatives for the FLSA Collective or State Law Classes and Those Claims Must Be Dismissed.

Because Plaintiffs were exempt administrative employees, they cannot represent the FLSA collective or state law classes pled under Rule 23 seeking overtime compensation. (*See* Compl. ¶¶ 219-97.) These claims therefore must be dismissed. *See, e.g.*, 1 McLaughlin on Class Actions § 4:28 (20th ed.) ("If no putative representative is a member of the proposed class on any claim alleged, the appropriate remedy is to dismiss the case (or claim) for lack of standing, or if only as to certain claims, strike the class allegations regarding such claims under Rule 23(d)(1)(D)"); *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 519 (4th Cir. 2011) ("Without a viable claim, [the lead plaintiff] cannot represent others whom she alleged were similarly situated.").

---

[29] For purposes of assessing supervision, it is immaterial that Plaintiffs may have received assignments from RODs. *Morales v. Compass Grp., PLC*, 2014 WL 5304913, at *6 (C.D. Cal. Oct. 16, 2014) (rejecting argument that plaintiff was subject to more than general supervision because she had to perform tasks assigned to her by her supervisor and kept a daily calendar for her supervisor to be informed of her whereabouts). "[I]n order for a position to be correctly classified as 'exempt' an employee does not have to have absolute autonomy, and an exempt classification does not preclude an employer from holding an employee accountable for completing tasks." *Id.* at n.5(citing *Mekhitarian v. Deloitte & Touche (ICS), LLC*, 2009 WL 6057248 (C.D. Cal. Nov. 3, 2009) ("Virtually every employee—no matter how high ranking—is subject to some degree of supervision by a superior")).

## V.      GOLDSTEIN LACKS STANDING TO BRING CLAIMS FOR ALLEGEDLY INACCURATE WAGE NOTICE AND WAGE STATEMENTS UNDER NEW YORK LAW.

In addition to failing because they are derivative of his deficient misclassification allegations for all of the reasons set forth above, Goldstein's claims that the Campaign failed to provide him with an accurate wage notice and wage statements in violation of NYLL §§ 195(1) and 195(3) also should be dismissed for lack of standing under Article III.[30] The Supreme Court has made clear that "[a]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (quotation omitted). A plaintiff therefore must demonstrate some "downstream consequences from failing to receive the required information" to establish injury-in-fact. *Id.* (quotation omitted); *see also Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022). Following *TransUnion*, numerous courts within the Second Circuit have dismissed NYLL §§ 195(1) and 195(3) claims for lack of standing where the plaintiffs failed to establish a concrete injury-in-fact that was traceable to their employer's failure to provide accurate wage notices or statements.[31] The same fatal deficiency exists in this case. There are no allegations and no evidence that Goldstein was injured *at all* in connection with the Campaign's alleged violations of NYLL §§ 195(1) and 195(3). (*See* Compl. ¶¶ 92, 318-25.) The Third and Fourth Causes of Action should therefore be dismissed for lack of standing.

## VI.     THE CALIFORNIA PLAINTIFFS' LABOR CODE CLAIMS OVERWHELMINGLY FAIL.

The Sixth, Seventh, Eighth, Ninth, Tenth, and Sixteenth Causes of Action all assert claims under California law. The Seventh Cause of Action for failure to provide meal and rest breaks is purely derivative of the misclassification theory. Cal. Admin. Code tit. 8, §§ 11040(1)(A),

---

[30] Article III standing requires a plaintiff to establish (1) "an injury in fact" that is "concrete," "particularized" and "actual or imminent," (2) "a causal connection between the injury and the conduct complained of," and (3) redressability. *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 861 F.3d 76, 79 (2d Cir. 2017) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[31] *See, e.g., Shi v. TL & CG Inc.*, 2023 WL 5827598, at *2-4 (S.D.N.Y. Sept. 8, 2023) (dismissing NYLL §§ 195(1) and 195(3) claims after trial for lack of standing, and collecting post-*TransUnion* cases finding same); *Chen v. Lilis 200 W. 57th Corp.*, 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023) (holding that plaintiffs lacked standing because they had not established any "downstream consequences" from failing to receive wage information); *Quieju v. La Jugueria Inc.*, 2023 WL 3073518, at *2 (E.D.N.Y. Apr. 25, 2023) (dismissing claims because plaintiff failed to establish "*how* he was injured by defendants' failure to provide" wage statements and notice) (emphasis in original).

11070(1)(A) (meal and rest break requirements "shall not apply to persons employed in administrative, executive, or professional capacities"). Because the California Plaintiffs were properly classified as exempt under the administrative exemption, this claim fails and must be dismissed. *See e.g.*, *Rosenberg v. Renal Advantage, Inc.*, 2014 WL 1652580, at *12 (S.D. Cal. Apr. 24, 2014) (granting summary judgment on claims deriving from failed misclassification theory). So must the Sixth, Ninth, Tenth, and Sixteenth Causes of Action, to the extent they derive from the misclassification theory. *Id.* But even apart from any alleged misclassification, the California claims overwhelmingly fail.

### A. The California Plaintiffs' Wage Statement and Recordkeeping Claims Fail.

The California Plaintiffs' Sixth Cause of Action asserting claims for failure to provide accurate wage statements and failure to keep accurate records under the California Labor Code fail for lack of standing. Consistent with Supreme Court precedent (*see* Section V., *supra*), California courts have held that a bare violation of the California wage statement and recordkeeping statutes, without evidence of concrete harm, does not confer Article III standing. *See, e.g., Hernandez v. Christensen Bros. Gen. Eng'g, Inc.*, 2023 WL 3069760, at *7 (C.D. Cal. Apr. 24, 2023); *Mays v. Wal-Mart Stores, Inc.*, 804 F. App'x 641, 643 (9th Cir. 2020).

There are no allegations and no evidence that the California Plaintiffs suffered any injury as a result of these alleged violations. Plaintiffs' allegation that claimed inaccuracies on wage statements "imped[ed]" them "from knowing the amount of wages to which they were entitled" (Compl. ¶ 334) is plainly insufficient as it does not identify any "downstream consequences" traceable to the alleged informational violation. *TransUnion*, 594 U.S. at 442. Moreover, Coker's and Ceppos's testimony that they did not look at their wage statements at all or until after their employment with the Campaign ended confirms that they did not suffer any concrete injury. (UF ¶¶ 68-69, 90-91.) The Sixth Cause of Action should therefore be dismissed.

**B. Coker's and Wheatley-Diaz's Meal and Rest Break Claims Fail.**

"An employer's duty … is an obligation to *provide*" meal and rest breaks to its nonexempt employees. *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1040 (Cal. 2012) (emphasis added). "The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity" to take an uninterrupted break, "and does not impede or discourage them from doing so." *Id.* ("[T]he employer is not obligated to police meal breaks and ensure no work thereafter is performed."); *see also* Cal. Admin. Code tit. 8, §§ 11040(12)(A), 11070(12)(A) (employers must "authorize and permit" rest breaks). Therefore, a meal or rest break claim fails when "the evidence in the record establishes that Plaintiff could take breaks when he wanted to take them." *Cole v. CRST, Inc.*, 2017 WL 1234215, at *7 (C.D. Cal. Mar. 30, 2017) (granting summary judgment on meal and rest break claim where plaintiff admitted no one "ever told him that he was not allowed to take breaks," even though he "subjectively believed that he should not take breaks").

Even if the California Plaintiffs were entitled to meal breaks, in order to prevail on their claims, they must prove the Campaign provided no *opportunity* for proper breaks. *See Drenckhahn v. Costco Wholesale Corp.*, 2011 WL 3754659, at *3 (C.D. Cal. Aug. 24, 2011) (granting summary judgment on break claims despite misclassification, because "no one told [plaintiff] he could not take a meal break" and "during the course of the day, he was able to leave [his] department" if he chose); *see also Dailey v. Sears, Roebuck & Co.*, 214 Cal. App. 4th 974, 1002 (Cal. Ct. App. 2013) (denying class certification on meal break claims where there was evidence that Sears complied with its break obligations because "no one prevents [plaintiffs] from taking meal and rest breaks, and they are free to do so as they deem appropriate"). Coker's and Wheatley-Diaz's testimony dooms their meal break claims because it confirms that they had the opportunity to take meal breaks. (UF ¶¶ 92-98, 247-48.)[32] Indeed, Coker testified that he was free to manage his own

---

[32] The Campaign contends that Ceppos was also provided meal and rest breaks in compliance with California law but does not address the merits of her claim in this motion. However, if the Court holds that Ceppos was properly classified as exempt under the administrative exemption, then summary judgment must be granted on her meal and rest break claim as well. *See* Cal. Admin. Code tit. 8, §§ 11040(1)(A), 11070(1)(A) (meal and rest break requirements "shall not apply to persons employed in administrative, executive, or professional capacities").

schedule without consequence. (UF ¶¶ 96-98.) *See*, *e.g.*, *Drenckhahn*, 2011 WL 3754659, at *3 (summary judgment granted on break claims despite misclassification because plaintiff was able to manage his own breaks and was never discouraged from taking one). Wheatley-Diaz testified that no one suggested to her that she could not take a meal break (UF ¶¶ 247-48), and her subjective belief that she felt pressure to work through breaks is insufficient to create a material issue of fact. *Cole*, 2017 WL 1234215, at *7 (granting summary judgment for employer where "despite Defendant's policy of allowing breaks, Plaintiff subjectively believed that he should not take breaks"). The Campaign is entitled to summary judgment on Coker's and Wheatley-Diaz's meal and rest break claims.[33]

### C. The California Plaintiffs' Reimbursement Claims Fail.

California Labor Code § 2802 requires employers to reimburse employees "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer." Cal. Lab. Code § 2802(a). One permissible method of providing reimbursement is "the use of a lump-sum payment," whereby "the employee need not submit any information to the employer," and "[t]he employer merely pays a fixed amount" for the anticipated expenses. *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 570 (Cal. 2007) (emphasis omitted). So long as "the amount paid is sufficient to provide full reimbursement for actual expenses necessarily incurred," the lump sum method fully complies with California law. *Id.* Here, the Campaign paid the California Plaintiffs an expense reimbursement stipend of $375 per month. (UF ¶¶ 70-71, 99, 249.) The record evidence reflects this lump sum stipend was more than sufficient to cover their expenses. (UF ¶¶ 72-73, 100-02, 250-51.)

Over the course of her employment, Ceppos was paid a total stipend of $750. (UF ¶¶ 70, 72.) Although she suggests her business expenses exceeded this amount, the evidence

---

[33] *Donohue v. AMN Services, LLC*, 11 Cal. 5th 58 (Cal. 2021), does not require a different result. Under *Donohue*, "time records showing noncompliant meal periods raise a rebuttable presumption of meal period violations at summary judgment." *Id.* at 74. However, even where the presumption applies, it does not "result in 'automatic liability' for employers" and "[e]mployers can rebut the presumption by presenting evidence that employees…had in fact been provided compliant meal periods," as the Campaign does here. *Id.* at 77.

demonstrates that her expenses incurred during her employment totaled only $466.34. (UF ¶ 73.) Because "the amount [the Campaign] paid [was] sufficient to provide full reimbursement," Ceppos's reimbursement claim fails. *Gattuso*, 42 Cal. 4th at 570.[34]

Coker's and Wheatley-Diaz's lump sum expense reimbursements from the Campaign totaled $801.12 and $750, respectively. (UF ¶¶ 100, 250.) There also is no evidence they incurred expenses exceeding these amounts. (UF ¶¶ 101-02, 251.) To defeat summary judgment, Coker and Wheatley Diaz must show that the reimbursement stipend the Campaign paid was less than their reimbursable expenses. *See Willis v. Koning Assocs.*, 2023 WL 3569998, at *6 (N.D. Cal. May 19, 2023) (granting summary judgment despite plaintiff's argument that stipend "was inadequate" because plaintiff submitted no evidence his stipend did not provide full reimbursement). Because they have no evidence of their expense amounts, Coker and Wheatley-Diaz cannot prove, as they must, that their reimbursable expenses exceeded the hundreds of dollars the Campaign paid them. Therefore, the Campaign is entitled to summary judgment.

### D.  The UCL and PAGA Claims Fail for the Same Reasons.

For their Tenth and Sixteenth Causes of action, the California Plaintiffs bring derivative claims under the Unfair Competition Law ("UCL") and Private Attorneys General Act ("PAGA"), seeking restitution and statutory penalties for the same alleged violations. (Compl. ¶¶ 348-55, 399-407.) To the extent the underlying claims fail, so too do the derivative UCL and PAGA claims. *Price v. Starbucks Corp.*, 192 Cal. App. 4th 1136, 1147 (Cal. Ct. App. 2011) ("Because the underlying causes of action fail, the derivative UCL and PAGA claims also fail.").

---

[34] Ceppos testified that she is owed reimbursement for flying to Louisiana, where she relocated *after her employment ended*. (UF ¶ 74.) However, any moving expenses she incurred after termination obviously were not incurred in "the discharge of [her] duties" or in "obedience to the directions of the employer." Cal. Lab. Code § 2802(a). Regardless, the cost of the flight ($258.98) plus the total of her employment expenses ($466.34) is only $725.32—still less than the $750 stipend she was paid. (UF ¶¶ 72-73, 75.) Moreover, Ceppos was paid an additional relocation stipend of $8,205.13. (UF ¶ 76.) The Campaign is not aware of any authority suggesting it was required to reimburse Ceppos's relocation expenses under Section 2802, but regardless, there is no evidence that the amounts it paid Ceppos were insufficient to cover all of her relocation expenses, including her post-employment flight back to Louisiana.

## **CONCLUSION**

For all of the foregoing reasons, the Court should grant the Campaign's motion for partial summary judgment and specifically:

(1) dismiss Plaintiffs' FLSA overtime claims for lack of coverage, because they are barred by the First Amendment, and/or because Plaintiffs were properly classified as exempt;

(2) dismiss Plaintiffs' state law overtime claims and meal and rest break claims, and any claims derivative of those claims, including claims for failure to provide accurate wage notice and wage statements, unfair competition and PAGA penalties, because they are barred by the First Amendment and/or Plaintiffs were properly classified as exempt;

(3) dismiss Plaintiffs' overtime claims under Wisconsin law because the Campaign is not covered by Wisconsin overtime law;

(4) dismiss Goldstein's wage notice and wage statement claims for lack of standing;

(5) dismiss the California Plaintiffs' wage statement and recordkeeping claims for lack of standing; and

(6) dismiss Ceppos' and Coker's meal break claims and all California Plaintiffs' reimbursement claims.


Dated: March 15, 2024                    PROSKAUER ROSE LLP

                                         */s/ Elise M. Bloom*
                                         Elise M. Bloom
                                         Rachel S. Philion
                                         Noa M. Baddish
                                         Allison L. Martin
                                         Pinchos N. Goldberg

                                         Eleven Times Square
                                         New York, New York 10036
                                         (T)  212.969.3000
                                         ebloom@proskauer.com
                                         rphilion@proskauer.com
                                         nbaddish@proskauer.com

amartin@proskauer.com
pgoldberg@proskauer.com

PROSKAUER ROSE LLP

Mark W. Batten (admitted *pro hac vice*)
Samantha R. Manelin (admitted *pro hac vice*)
One International Place
Boston, Massachusetts 02110
(T)  617.526.9850
mbatten@proskauer.com
sregenbogen@proskauer.com

VENABLE LLP

Nicholas M. Reiter
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
(T)  212.307.5500
nmreiter@venable.com

*Attorneys for Defendant*
MIKE BLOOMBERG 2020, INC.