UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNA WOOD, et al., individually and on behalf of all others similarly situated,<br><br>                        Plaintiffs,<br><br>            v.<br><br>MIKE BLOOMBERG 2020, INC.,<br><br>                        Defendant. | 20 Civ. 2489 (LTS) (GWG)<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT'S RESPONSE IN OPPOSITION TO THE
BRIEF OF THE UNITED STATES IN INTERVENTION**

- i -

**TABLE OF CONTENTS**

**Page(s)**

I.    The Court Should Avoid the Constitutional Issue By Adopting an FLSA Exception Analogous to the Ministerial Exception. ........................................................................1

II.   The FLSA Is Subject to First Amendment Scrutiny As Applied to Political Campaigns. ..........................................................................................................................................2

III.  The FLSA Fails Intermediate Scrutiny As Applied to Political Campaigns. ...................6

    A.    The FLSA Does Not Advance a Significant Governmental Interest as Applied to Political Campaigns. ...................................................................................6

    B.    The FLSA Burdens Substantially More Speech Than Its Interests Require. ...............8

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Hearts with Hope Found.*,
    713 F. App'x 278 ...................................................................................................................7

*Arcara v. Cloud Books, Inc.*,
    478 U.S. 697 (1986)............................................................................................................2, 3

*Buckley v. Valeo*,
    424 U.S. 1 (1976)..........................................................................................................4, 8, 9

*Clementine Co., LLC v. Adams*,
    74 F.4th 77 (2d Cir. 2023) ..................................................................................................5, 6

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991)...............................................................................................................5

*Dole v. Shenandoah Baptist Church*,
    899 F.2d 1389 (4th Cir. 1990) ...............................................................................................7

*Donovan v. Shenandoah Baptist Church*,
    573 F. Supp. 320 (W.D. Va. 1983) ....................................................................................6, 7

*FEC v. Cruz*,
    596 U.S. 289 (2022)...........................................................................................................4, 8

*Jefferson v. Mike Bloomberg 2020 Inc.*,
    2021 WL 1966844 (N.D. Tex. May 17, 2021) .....................................................................7

*Kitchings v. Fla. United Methodist Childs. Home, Inc.*,
    393 F. Supp. 2d 1282 (M.D. Fla. 2005)................................................................................7

*McCutcheon v. FEC*,
    572 U.S. 185 (2014)...............................................................................................................9

*Mechmet v. Four Seasons Hotels, Ltd.*,
    825 F.2d 1173 (7th Cir. 1987) ...............................................................................................8

*Meyer v. Grant*,
    486 U.S. 414 (1988)...............................................................................................................9

*Oklahoma Press Publishing Co. v. Walling*,
    327 U.S. 186 (1946)...............................................................................................................5

*Overnight Motor Transp. Co. v. Missel*,
  316 U.S. 572 (1942) ..................................................................................................8

*Republican Party of Minn. v. White*,
  536 U.S. 765 (2002) ..................................................................................................4

*Schleicher v. Salvation Army*,
  518 F.3d 472 (7th Cir. 2008) ....................................................................................1

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994) ..................................................................................................3

*U.S. v. Darby*,
  312 U.S. 100 (1941) ..................................................................................................6

*U.S. v. O'Brien*,
  391 U.S. 367 (1968) ..................................................................................................3

**STATUTES**

29 U.S.C. § 202(a) ..............................................................................................................6, 7

**OTHER AUTHORITIES**

29 C.F.R. § 779.214 ................................................................................................................7

Defendant Mike Bloomberg 2020, Inc. (the "Campaign") hereby responds to the Brief of the United States of America ("the Government") in Intervention (ECF No. 502 "Brf.").

Unlike the commercial enterprises to which the Fair Labor Standards Act ("FLSA") applies – unlike even newspapers or other media – the Campaign existed for the sole purpose of disseminating core political speech. As the Court has acknowledged, the Field Organizers ("FOs") "were entrusted with achieving the Campaign's ultimate objective – persuading voters around the country to support Mr. Bloomberg's candidacy." (ECF No. 506 at 3.) Any statutory effort to dictate the amounts that the Campaign pays to its primary messengers (and therefore their level of activity) abridges that political speech, and threatens First Amendment rights. The Court should not permit that infringement.

## ARGUMENT

### I. The Court Should Avoid the Constitutional Issue By Adopting an FLSA Exception Analogous to the Ministerial Exception.

Before considering the constitutional issue, and to avoid it, the Court should interpret the FLSA not to apply to political campaigns. As the Campaign has already explained, such an interpretation is readily available, because the Campaign was not a covered "enterprise," nor were the FOs covered individuals. (ECF Nos. 445 at 10, 488 at 2-6.) The FLSA also should not apply for the same reasons that the statute has been interpreted not to apply to religious organizations – to avoid abridging First Amendment rights.

The Government acknowledges that where the FLSA threatens to interfere with religious rights, courts decline to apply it. Brf. at 11; *see, e.g.*, *Schleicher v. Salvation Army*, 518 F.3d 472, 474 (7th Cir. 2008). But the Government offers no reason that religious rights should receive more protection from overtime rules than speech rights. It says that the ministerial exception "prevent[s] courts from interfering with a religious group's choice of 'those who will personify

its beliefs,'" Brf. at 11, but requiring ministers to be paid overtime would not interfere with that choice, and would not "entangle secular courts in religious personnel matters" to any greater degree than requiring overtime pay for campaign workers entangles courts in the personnel matters of organizations engaged (solely) in protected speech rather than protected religious practice. (Brf. at 12.) The Government notes that there is no case applying a similar exception to protect speech, but that is no reason not to adopt one; and the Government offers no principled rationale for its position. Instead, the Government contends that because "courts adjudicate labor and employment matters directly related to . . . politicians," courts can apply overtime rules that reduce the quantity of protected speech without violating the First Amendment. *Id*. The Government's argument fails to acknowledge that, as the Supreme Court has repeatedly held, expenditures by political campaigns *are* protected speech, and restrictions on how much a campaign may or must spend reduce the amount of speech in which campaigns can engage, and therefore abridge protected speech. The Court should interpret the FLSA to avoid this constitutional issue.

## II. The FLSA Is Subject to First Amendment Scrutiny As Applied to Political Campaigns.

The Government begins its constitutional argument by insisting that the Court not even consider the limitations on political speech that the FLSA imposes on political campaigns, merely because the FLSA is a "generally applicable law." (Brf. at 6-10.) The Government's argument relies heavily on a single aging Supreme Court decision, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), but the doctrine is more nuanced than the Government acknowledges. Far from holding that "generally applicable laws are not subject to First Amendment scrutiny," Brf. at 6, the Supreme Court's rulings actually make clear that "a generally applicable law may or

may not be subject to heightened scrutiny under the First Amendment." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 640 (1994).

In *U.S. v. O'Brien*, 391 U.S. 367 (1968), the Court considered a free-speech defense to a prosecution of a Vietnam War protestor who publicly burned his draft card. *Id*. at 369-70. He was prosecuted under a generally applicable law reaching anyone who "forges, alters, knowingly destroys, knowingly mutilates, or in any manner changes" their draft card. *Id*. at 370. The Court did not refuse to consider the First Amendment challenge, as the Government insists this Court should; even though the law in question did not target expressive activity, and simply prohibited any alteration of the card, it still was subject to First Amendment scrutiny. Even "when 'speech' and 'nonspeech' elements are combined in the same course of conduct," courts still examine the government's "interest in regulating the nonspeech element" to ensure that it is sufficiently weighty to "justify incidental limitations on First Amendment freedoms." *Id*. at 376-77.

In *Arcara*, the Court considered a county government's closure for one year of an adult bookstore that had permitted prostitution and overt sex acts within view of its proprietor. 478 U.S. at 699. As the Government acknowledges, Brf. at 6-7, *Arcara* distinguished *O'Brien* on the ground that O'Brien's card burning "had . . . at least the semblance of expressive activity," while the lewd conduct targeted in *Arcara* "manifests absolutely no element of protected expression." 478 U.S. at 702, 705. Addressing the dissent's point that the Court had repeatedly struck down "[g]enerally applicable statutes that purport to regulate nonspeech . . . if they unduly penalize speech, political or otherwise," *Id*. at 709 (Blackmun, J., dissenting), the *Arcara* majority held that in those cases, "the 'nonspeech' which drew sanction was intimately related to expressive conduct protected under the First Amendment." *Id*. at 706 n.3. Here there is no "nonspeech" being regulated. The *Arcara* Court noted that any burden on expressive activity there was

- 3 -

"mitigated by the fact that respondents remain free to sell the same materials at another location." *Id*. at 705. There is no such alternative here; the speech that the FLSA abridges is simply lost.

This case therefore falls on the *O'Brien* side of the line, because applying the FLSA to target the salaries of political campaign employees directly "regulat[es] conduct that has an expressive element." 478 U.S. at 703. As the Supreme Court repeatedly has emphasized, limiting the amount a campaign may spend directly limits speech – ***the expenditure itself*** is protected speech. *FEC v. Cruz*, 596 U.S. 289, 304 (2022); *see also Buckley v. Valeo*, 424 U.S. 1, 39 (1976) (limiting campaign expenditures "impose[s] direct and substantial restraints on the quantity of political speech"). The FLSA's imposition of minimum amounts that a campaign must spend to disseminate its message, then, does not even regulate "nonspeech" – it regulates speech directly.

Unlike even a newspaper, which must sell advertising and otherwise engage in commerce to generate funds to support its dissemination of speech, a political campaign's only activity is speech, speech that is "at the core of our First Amendment freedoms." *Republican Party of Minn. v. White*, 536 U.S. 765, 774 (2002). As we have explained elsewhere, the Campaign did not engage in commerce, and so the FLSA does not apply in the first instance as a matter of statutory interpretation. (ECF Nos. 445 at 10, 488 at 2-6.) But that disconnection from commercial activity also means that limitations on what the Campaign may spend directly and inevitably limit speech. *Arcara*'s rule is defined by the subject law's targeting of conduct lacking any expressive content; in the case of a political campaign, there is no such conduct. As in *O'Brien*, the "'speech' and 'nonspeech' elements" are indistinguishable here. *Arcara* and cases following it simply do not apply, by *Arcara*'s own reasoning.

The Government cites a few other cases, all of which are similarly distinguishable. In *Clementine Co., LLC v. Adams*, 74 F.4th 77 (2d Cir. 2023), theater owners challenged a New York City regulation requiring them to check patrons' vaccination status. As in *Arcara*, the conduct for which a theater would be penalized had no expressive element; the vaccination check was far closer to the nonexpressive conduct targeted in *Arcara* than to the expressive conduct targeted in *O'Brien* and in this case.

And in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), the Court upheld a civil judgment for promissory estoppel where a newspaper broke a confidentiality agreement and published the name of a confidential source. The decision relied on the Court's consistent holding that information the press publishes "must have been lawfully acquired." *Id*. at 669. The Court held that the First Amendment did not "confer on the press a constitutional right to disregard promises," just as "[t]he press may not with impunity break and enter an office or dwelling to gather news." *Id*. at 672, 669. The Court effectively held that the newspaper had waived any First Amendment right by agreeing with the source not to publish his name and then doing so in violation of a legal obligation. There is no similar waiver issue here.[1]

To be clear, the Campaign does not assert, and need not, that the FLSA always triggers constitutional review; in most cases the statute's effect on speech may well be minimal or attenuated. Excluding campaigns from the FLSA does not inevitably require exceptions from other laws; FOs may receive traffic tickets. But as applied to a political campaign, overtime

---

[1] The Supreme Court's brief rejection of a First Amendment challenge to the FLSA in *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946) does not change the analysis. The case predates *O'Brien*, *Arcara*, and other relevant cases by decades, and the Court's three sentences on the relevant question, *id*. at 192-93, did not consider any of the concerns that the later cases hold to be essential.

requirements directly limit speech, and in that narrow context the FLSA and cognate state overtime laws are subject to First Amendment scrutiny.

### III. The FLSA Fails Intermediate Scrutiny As Applied to Political Campaigns.

To survive First Amendment scrutiny, the FLSA must "'advance[ ] governmental interests unrelated to the suppression of free speech' and . . . 'not burden substantially more speech than necessary to further those interests'." *Clementine Co.,* 74 F.4th at 88. As applied to political campaigns, the statute fails that test.

#### A. The FLSA Does Not Advance a Significant Governmental Interest as Applied to Political Campaigns.

As to the first prong, the Government offers nothing beyond the platitude that the FLSA ensures the payment of "a wage sufficient [for workers] to provide for themselves." (Brf. at 14) (quoting *Donovan v. Shenandoah Baptist Church*, 573 F. Supp. 320, 326 (W.D. Va. 1983)). The inquiry again is far more nuanced than the Government acknowledges.

The FLSA expresses its purpose exclusively in terms of regulating interstate commerce: it is concerned only with the wages paid to workers who manufacture goods or provide services that travel in interstate commerce, and imposes those requirements because of the effect such wage practices have on commerce.[2] *See, e.g.*, *U.S. v. Darby*, 312 U.S. 100, 109 (1941) (noting that Congress enacted the FLSA to "prevent[ ] the shipment in interstate commerce of certain products and commodities produced in the United States under labor conditions as respects

---

[2] *See* 29 U.S.C. § 202(a) ("The Congress finds that the existence, **in industries engaged in commerce or in the production of goods for commerce**, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes **commerce** and the **channels and instrumentalities of commerce** to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens **commerce** and the free flow of **goods in commerce**; (3) constitutes an unfair method of **competition in commerce**; (4) leads to labor disputes **burdening and obstructing commerce** and the free flow of **goods in commerce**; and (5) interferes with the orderly and fair **marketing of goods in commerce**.") (emphasis added).

wages and hours which fail to conform to standards set up by the Act"). The FLSA accordingly does not extend to entities that do not engage in such commerce – and therefore leaves the wages they pay unaffected. *See, e.g.*, 29 C.F.R. § 779.214 (excluding entities that do not "engage in ordinary commercial activities"); *Jefferson v. Mike Bloomberg 2020 Inc.*, 2021 WL 1966844, at *8 (N.D. Tex. May 17, 2021); *Anderson v. Hearts with Hope Found.*, 713 F. App'x 278, 280 (5th Cir. 2017 (nonprofits "are generally exempt" enterprises); *Kitchings v. Fla. United Methodist Childs. Home, Inc.*, 393 F. Supp. 2d 1282, 1294 (M.D. Fla. 2005).

As the Campaign has addressed more fully elsewhere,[3] it did not engage in commerce (and indeed the FLSA should not apply to the Campaign for that statutory reason, wholly apart from the constitutional issue). The wages paid to FOs do not "burden[] commerce" or affect "the free flow of goods in commerce" or the "fair marketing of goods in commerce," nor affect competition through the "channels and instrumentalities of commerce." 29 U.S.C. § 202(a). Accordingly, the FLSA has little interest in regulating the wages of political campaigns, and it fails the first prong of the intermediate scrutiny test.

Further, the decisions on which the Government relies for its statement of the FLSA's purpose, *Donovan* and *Dole*, arose from the same case, in which the U.S. Department of Labor asserted minimum wage and equal pay claims, not overtime claims. *See Donovan*, 573 F. Supp. at 320-21; *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1391 (4th Cir. 1990).[4] Whatever interest there may be in ensuring workers a minimum wage – an issue not presented by this case, where FOs were paid well in excess of that floor – the purpose of the overtime provisions is

---

[3] *See* ECF Nos. 445 at 10, 488 at 2-6.

[4] The cases also are no longer good law, because the decades-old decisions have been overtaken by the cases recognizing a ministerial exception to the FLSA.

different: enacting the law at the height of the Great Depression, Congress sought to make work over 40 hours per week more expensive for employers, and thereby to encourage employers to hire more workers.[5]  Like the interest in promoting commerce, a governmental interest in reducing unemployment (by businesses engaged in commerce) carries less weight as applied to political campaigns, whose employees are bound by a like-minded interest in advancing the agenda of a particular candidate, not simply earning a living from one of many employers who may be viewed as essentially fungible.

### B. The FLSA Burdens Substantially More Speech Than Its Interests Require.

For the same reasons, the FLSA fails the second part of the intermediate scrutiny test: it restricts far more speech than necessary to serve its expressed interests.  Because neither the Campaign nor its employees engaged in commerce, the FLSA's restriction of protected political speech does not serve Congress's expressed purposes at all.

While the Government insists that Supreme Court decisions concerning campaign finance laws do not apply directly here, it does not contest any of the principles discussed in those cases.  In particular, the Court has regularly held that limitations on the amounts a campaign may spend directly – not incidentally – abridge core political speech.  *Cruz*, 596 U.S. at 304 (deterring candidates from loaning money to their campaigns creates an impermissible "drag" on First Amendment rights); *Buckley*, 424 U.S. at 39 (limiting campaign expenditures "impose[s] direct and substantial restraints on the quantity of political speech").  So direct is that effect on political

---

[5] *See, e.g.*, *Overnight Motor Transp. Co., v. Missel*, 316 U.S. 572, 577 (1942) ("one of the fundamental purposes of the Act was to induce worksharing and relieve unemployment by reducing hours of work"); *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1176 (7th Cir. 1987) (Congress enacted overtime requirements "to spread work and thereby reduce unemployment, by requiring an employer to pay a penalty for using fewer workers to do the same amount of work as would be necessary if each worker worked a shorter week").

speech, in fact, that restrictions that "reduce[] the quantity of expression by restricting . . . the size of the audience reached," which the FLSA does as applied here, are subject to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) (quoting *Buckley*, 424 U.S. at 19, 44-45).

The Supreme Court's decision in *Meyer v. Grant*, 486 U.S. 414 (1988) speaks directly to this issue. There a Colorado law forbade proponents of initiative petitions from paying solicitors engaged to collect voter signatures. The Court struck down the law as an impermissible limitation on speech, holding that prohibiting payment of solicitors "limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach," thereby "reducing the total quantum of speech on a public issue." *Id*. at 422-23. And that restriction of the quantity of speech also made it less likely that an initiative petition would gain enough signatures to appear on the ballot. *Id*.

The FLSA is the mirror image of the Colorado law: instead of prohibiting payment of employees, it makes 50% more expensive speech by campaign employees that occurs after more than 40 hours of speech in a week. The burden on core political speech is not meaningfully different from that in *Meyer*: as related to a political campaign, both laws "reduc[e] the total quantum of speech on a public issue." *Id*. at 422-23.

There can be no question, then, that overtime pay requirements directly diminish core protected speech. The Government dismisses *Meyer* and other campaign finance cases because those cases involved laws directly targeting speech, rather than a generally applicable law like the FLSA. (Brf. at 10-11.) But the abridgement of political speech by the FLSA is no less than the restriction struck down in *Meyer*. The FLSA would restrict campaign speech only to avoid

- 9 -

burdens on interstate commerce, in which the Campaign did not engage. The statute thus abridges more speech than is necessary regardless of the test applied.

## **CONCLUSION**

The Court should hold, as a matter of statutory interpretation, that the Campaign and its employees fall outside the scope of the statute's enterprise or individual coverage provisions, or that the FLSA is subject to an exception analogous to the ministerial exception. If the Court finds instead that the FLSA must be read to apply to the Campaign, the Court should hold that the FLSA as so applied violates the First Amendment.

Respectfully submitted,

Dated: September 9, 2024                                  PROSKAUER ROSE LLP

*/s/ Elise M. Bloom*
Elise M. Bloom
Rachel S. Philion
Noa M. Baddish
Allison L. Martin
Pinchos N. Goldberg

Eleven Times Square
New York, New York 10036
(T) 212.969.3000
ebloom@proskauer.com
rphilion@proskauer.com
nbaddish@proskauer.com
amartin@proskauer.com
pgoldberg@proskauer.com

PROSKAUER ROSE LLP

Mark W. Batten (admitted *pro hac vice*)
One International Place
Boston, Massachusetts 02110
(T) 617.526.9850
mbatten@proskauer.com

VENABLE LLP

Nicholas M. Reiter
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
(T)  212.307.5500
nmreiter@venable.com

*Attorneys for Defendant*
MIKE BLOOMBERG 2020, INC.