UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

DONNA WOOD, et al., individually and
on behalf of all others similarly situated,

                      Plaintiffs,

        -v-                              No. 1:20-CV-2489-LTS-GWG

MIKE BLOOMBERG 2020, INC.,

                      Defendant.

-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Plaintiffs Donna Wood, Caelan Doherty, Max Goldstein, Bridget Logan, James

Kyle Newman, Lakisha Watson-Moore, Tristan Angulo, Alexandra Marie Wheatley-Diaz, Robin

Ceppos, and Nick Coker (together, "Plaintiffs"), individually and on behalf of all others similarly

situated, bring this collective and class action against Mike Bloomberg 2020, Inc. (the

"Campaign" or the "Defendant"), asserting claims under the Fair Labor Standards Act (the

"FLSA"), 29 U.S.C. § 201 et seq., and state labor laws. (See docket entry no. 514 (the "Fourth

Amended Complaint" or the "FAC").)[1] The Court has jurisdiction of Plaintiffs' FLSA claims

pursuant to 28 U.S.C. sections 1331 and 1337 and 29 U.S.C. section 216(b), and has

supplemental jurisdiction of Plaintiffs' state law claims pursuant to 28 U.S.C. section 1367. The

---

[1]     The Fourth Amended Complaint also asserts state wage and hour law claims against the
Campaign on behalf of Cheryl Baldwin, Garrett Beckenbaugh, Cochiese Bowers, Miles
Ceplecha, Melinda Cirilo, Robert Cordova, Jr., Christine Doczy, Rachel Douglas,
Theresa Edwards, Eliza Fink, Jason Finkelstein, Ilse Mendez Fraga, Maria Gonzalez,
Brandi Harris, Peter Kamara, Mack Kennedy, Madison Oliver Mays, Patrick Mchugh,
Frida Michelle Naranjo, Paul Monterosso, Rey Murphy, Luke Nicholas, Josephine
Olinger, Alec Silvester, Chris Soth, Audra Tellez, Carlos Torres, Elliott Tricotti, Gloria
Tyler, Jesse Weinberg, Clem Wright, Anoosh Yaraghchian, and Jesus Zamora,
individually.

Court also has jurisdiction of all of Plaintiffs' state law claims—except for that of the New York class—pursuant to 28 U.S.C. section 1332(d).

The case is before the Court on (1) the Campaign's letter motion for leave to file a reply Local Civil Rule 56.1 statement (docket entry no. 491 ("Reply 56.1 Request")), (2) the Campaign's motion to exclude the opinions and testimony of Jonathan Jaffe (docket entry no. 479 ("Motion to Exclude")), (3) Plaintiffs' motion for partial summary judgment (docket entry no. 455 ("Pl. MSJ")), and (4) the Campaign's motion for partial summary judgment (docket entry no. 444 ("Def. MSJ")).  The Court has reviewed and considered thoroughly all of the parties' submissions in connection with the Motions.  For the following reasons, (1) the Campaign's letter motion to file a reply 56.1 statement is denied, (2) the Campaign's motion to exclude the opinions and testimony of Jonathan Jaffe is denied, (3) Plaintiffs' motion for partial summary judgment is denied, and (4) the Campaign's motion for partial summary judgment is granted in part and denied in part.

BACKGROUND

Familiarity with the general context and procedural history of this case is assumed for the purposes of this Memorandum Opinion and Order.  The following facts are undisputed unless otherwise indicated.[2]

---

[2]     Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements (docket entry nos. 446 ("Def. 56.1 St."), 457 ("Pl. 56.1 St."), 472 ("Def. 56.1 Resp." or "Def. 56.1 SAMF"), 476 ("Pl. 56.1 Resp." or "Pl. 56.1 SAMF")) incorporate by reference the parties' citations to the underlying evidentiary submissions.

The Campaign filed a letter (docket entry no. 491) requesting leave to file a Reply 56.1 Statement (docket entry no 491-1).  Plaintiffs also filed a reply to the Campaign's 56.1 response.  (Docket entry no. 487.)  "Local Civil Rule 56.1 does not provide for a 'reply'

Factual Background

In November 2019, Michael Bloomberg announced his candidacy for President of the United States.  (Def. 56.1 St. ¶ 1.)  The Campaign's purpose was to advance Mr. Bloomberg's presidential candidacy (id. ¶ 8); the Campaign also collected data on voters, regardless of whether they supported Mr. Bloomberg or another candidate (Pl. 56.1 Resp. ¶ 8). The Campaign was a non-profit political organization within the meaning of 26 U.S.C. section 527 and registered as a principal campaign committee with the Federal Election Commission ("FEC").  (Def. 56.1 St. ¶ 2.)

The Campaign had two sources of income: contributions, both cash and "in kind," from Mr. Bloomberg, and the proceeds from merchandise, including hats and t-shirts, sold on its website.  (Id. ¶¶ 3-4; Pl. 56.1 Resp. ¶¶ 3-4; Pl. 56.1 St. ¶ 3.)  "The sole purpose of the distribution of merchandise was to communicate messages concerning Mr. Bloomberg's candidacy for the Presidency and energize his supporters, not to generate revenue."  (Def. 56.1 St. ¶ 5.)  The Campaign did not receive any monetary benefit from selling its merchandise, and the FEC

---

in further support of a Rule 56.1 statement of undisputed facts."  Capital Records, LLC v. Vimeo, LLC, No. 09-CV-10101-RA, 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 10, 2018).  "Courts in this District have concluded that a reply Rule 56.1 statement constitutes 'a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules.'"  Mayagüez S.A. v. Citibank, N.A., No. 16-CV-6788, 2022 WL 901627, at *9 (S.D.N.Y. Mar. 25, 2022) (citation omitted).  "The Court is capable of determining whether [a party] improperly disputed a fact without needing [the other party] to file a procedurally improper document explaining as much."  G.S. v. Pleasantville Union Free Sch. Dist., No. 19-CV-6508-CS, 2020 WL 4586895, at *1 n. 2 (S.D.N.Y. Aug. 10, 2020).  "Accordingly, courts provided such filings have regularly disregarded them."  Walker v. Carrozzo, 664 F. Supp. 3d 490, 501 n.1 (S.D.N.Y. 2023) (collecting cases).  The Court finds the proffered replies unnecessary and improper, and therefore will not consider them.

directed the Campaign to classify the sales as "contributions" to the Campaign in its FEC filings. (Id. ¶ 7.) These "contributions" (or "gross revenue" from the sale of merchandise on the Campaign's website) totaled over $900,000. (Pl. 56.1 St. ¶¶ 30-31; Def. 56.1 Resp. ¶¶ 30-31.)

The Campaign's headquarters were based in New York, where "significant decisions regarding the Campaign's strategy, resources, human resources, technology, marketing, messaging, and other administrative functions were made." (Pl. 56.1 Resp. ¶ 16.) These decisions included setting goals and metrics for organizers working in each state. (Id.) Many decisions related to state-specific strategy were made by "separate state organizations, each typically (but not always) led by a State Director and an Organizing Director." (Def. 56.1 St. ¶ 16.) "Each state or territory in which the Campaign operated was then subdivided into numerous regional field offices." (Id. ¶ 17.) In sum, "[a]ll aspects of Bloomberg's operations and planning were conducted by its state and national leadership teams, which created state organizing plans that addressed staffing, scope of work, capacity, structure, timelines, tactics, compensation, and budgets." (Pl. 56.1 SAMF ¶ 15; see also id. ¶¶ 16-23.)

Plaintiffs worked as Field Organizers ("FOs") and "were tasked with primarily conducting phone calls and door-to-door canvassing with potential voters in the day-to-day functional work of the Campaign." (Pl. 56.1 Resp. ¶ 10.) In this regard, the Campaign relied on FOs to "accomplish [their] central mission" to "mobilize volunteers and supporters, communicate with potential voters, and persuade them to support Mr. Bloomberg." (Def. 56.1 St. ¶¶ 9-10.) "FOs were classified as exempt from overtime [pay] and received salaries of $6,000 per month and other benefits." (Id. ¶ 12.)[3] FOs reported to Regional Organizing

---

[3]    Consistent with this classification, there is no evidence that any FOs received wage notices or wage statements indicating that they were entitled to overtime pay. (See Def. 56.1 St. ¶¶ 68-70, 90, 138, 246.) Mr. Goldstein, who worked for the Campaign in New

Directors ("RODs").  (Id. ¶ 18.)  FOs occupied "entry level" positions and were at the lowest

level in the Campaign's hierarchy.  (Pl. 56.1 SAMF ¶ 1.)  They were expected to work long and

irregular hours seven days per week.  (Id. ¶¶ 10-13.)

       The Campaign assigned FOs to specific regional field offices.  (Pl. 56.1 Resp.

¶ 20.)  When FOs canvassed door-to-door, the Campaign instructed them as to which general

areas or neighborhoods to go to, and gave each FO the same script with the same talking points.

(Id.)  These scripts and talking points were also pre-loaded in "VAN," the software FOs used to

record voter data.  (Id.)  FOs were also provided scripts and talking points when they made

phone calls to prospective voters.  (Id. ¶ 24.)  FOs recruited volunteers in the course of phone

banking and canvassing, and there is evidence that some FOs were involved in other community

engagement efforts such as posting on social media, training and supervising volunteers, and

hosting Campaign events.  (Id. ¶ 21; see Def. 56.1 St. ¶¶ 21, 23, 38-44, 64, 82, 85, 105, 108-15,

131-34, 154-55, 159-61, 180-87, 199, 225-29, 241-42, 259-62.)  However, it is undisputed that

the vast majority of FOs' time was spent canvassing and phone banking.  (See Def. 56.1 St. ¶ 10;

Pl. 56.1 Resp. ¶ 10.)

       While FOs canvassed and phone banked, they also collected voter data.  (Pl. 56.

St. ¶ 10.)  They inputted this data into one of two software programs, VAN and ThruTalk,[4] in

---

    York, and Ms. Ceppos, Ms. Wheatley-Diaz, and Mr. Coker (the "California Plaintiffs"),
    submitted declarations indicating that, if they had been provided with "accurate" wage
    notices or wage statements providing their hours worked and rates of pay, they would
    have had the information necessary to assess underpayment and promptly complain to the
    Campaign.  (Docket entry no. 475-1 ("Ceppos Decl.") ¶¶ 3-5; docket entry no. 475-2
    ("Coker Decl.") ¶¶ 3-5; docket entry no. 475-4 ("Goldstein Decl.") ¶¶ 3-7; docket entry
    no. 475-6 ("Wheatley-Diaz Decl.") ¶¶ 3-5.)

[4]    "The Campaign did not begin using ThruTalk until February 2020, shortly before the
    Campaign suspended its operations, when the software was rolled out to various states
    over several weeks in February 2020, including February 7 (California), February 10
    (Massachusetts and New York), February 11 (Minnesota), February 12 (North Carolina),

real time or on the same day that the data was collected.  (<u>Id.</u> ¶¶ 11-13.)  Plaintiffs point to evidence that the kinds of data collected were determined by prompts in the script that were created by national Campaign leadership and consistent across states.  (Pl. 56.1 Resp. ¶¶ 275-78; Pl. 56.1 SAMF ¶ 24.)  The Campaign also proffers evidence that state Campaign leadership (1) was involved in deciding what other data its FOs collected—in addition to the data that Campaign headquarters directed them to collect—through VAN and ThruTalk, and (2) were responsible for conducting trainings related to data collection.  (<u>See</u> Def. 56.1 St. ¶¶ 275-78.)

According to the Campaign, FOs' job duties required—and FOs were expected to use—"discretion and independent judgment about how to most effectively persuade voters and volunteers to support Mr. Bloomberg as the nominee."  (<u>Id.</u> ¶ 24.)  The Campaign points to some evidence that discretion was expected; one Campaign employee explained that FOs were expected to use "their own words" rather than read directly off the script (<u>id.</u> ¶¶ 26-27) and were "encouraged" in Campaign training materials to tell voters "their own personal reasons for supporting Mr. Bloomberg" (<u>id.</u> ¶ 29).  Some FOs did, in fact, testify to sharing their personal reasons for supporting the Campaign with voters and conveying the messaging from the script in their own words.  (<u>See id.</u> ¶¶ 36-37, 128-29, 176-78, 198, 237-39, 258.)

Plaintiffs, in contrast, point to evidence that FOs' job duties required very little discretion.  (<u>See</u> Pl. 56.1 Resp. ¶¶ 24-30.)  For example, the record indicates that FOs were required "to follow a script, using pre-determined talking points, in order to deliver a consistent message and collect and record consistent data, which did not involve discretion or independent judgment."  (<u>Id.</u>)  Indeed, there is evidence that the Campaign did not permit FOs to "riff on what

---

February 15 (Arkansas and Missouri), February 21 (Ohio), and February 26 (Pennsylvania)."  (Def. 56.1 St. ¶ 282.)  Plaintiffs dispute this factual assertion but do not cite evidence controverting the Campaign's representations.  (<u>See</u> Pl. 56.1 Resp. ¶ 282.)

was a carefully considered policy position" when talking to potential voters, and expected "adherence" to scripts and talking points.  (Id.)

Plaintiffs also proffer evidence that the Campaign set daily and weekly metrics, including the number of voters called and the number of doors knocked on, that FOs were required to meet.  (Pl. 56.1 SAMF ¶¶ 3, 6.)  The record indicates that these goals were often ambitious, and that the California Plaintiffs were therefore discouraged from taking meal and rest breaks.  For example, Mr. Coker testified that he typically ate lunch at his desk because "[t]here wasn't always the ability to just completely break away and have, like, time away from the noise of the Campaign to eat" and that "free lunch was provided for" FOs "to keep [them] at their desk" during lunch time.  (Pl. 56.1 Resp. ¶¶ 94-95.)  Similarly, Ms. Wheatley-Diaz testified that "there was never a time where [she] was grabbing a cup of coffee and not simultaneously on the phone" and it was her "only choice" to do so "[b]ecause of the environment, because of the leadership and because of the pressure that [FOs] were under."  (Id. ¶¶ 247-48.)

The Campaign proffers undisputed evidence that the California Plaintiffs were paid a lump sum stipend to reimburse their Campaign-related expenses.  (Def. 56.1 St ¶¶ 71-76, 99-102, 249-51.)

Jonathan Jaffe's Expert Report and Deposition Testimony

Plaintiffs offer testimony from Jonathan Jaffe as an expert witness to establish that Plaintiffs communicated data in interstate commerce so as to be individually covered by the FLSA.[5]  Mr. Jaffe is "a technology consultant, data scientist, software developer, and the founder and owner of Its-Your-Internet, an advanced technology software and general litigation support

---

[5]       The Campaign submitted a rebuttal report from Daniel Steinbrook.  (Docket entry no. 481-2 ("Steinbrook Rpt.").)

consulting firm, established in 2008." (Docket entry no. 481-1 ("Jaffe Rpt.") ¶ 2.) His areas of expertise include "how the internet works, how a data center works, how we code things, how these apps work, [and] how these applications work," (docket entry no. 493-2 ("Jaffe Tr.") at 58:3-12), and he has testified as an expert in numerous other matters (docket entry no. 493-4 ("Jaffe CV")). In order to form his opinions in this case, Mr. Jaffe "utilized [his] 25 years expertise and experience with developing, expanding, and evaluating Enterprise level software systems" and "examined documents produced by the Defendant, Defendant's interrogatory responses, depositions of the Plaintiffs and Defendant fact witnesses, and publicly available materials both from the web sites of [VAN and ThruTalk], their social media, archived versions of pages, and technical architecture articles." (Jaffe Rpt. ¶¶ 34, 38.)

Mr. Jaffe opined that "Plaintiffs and opt-in Plaintiffs transmitted data and information across state lines using the NGP Van system" and "the Thru Talk system." (Id. ¶¶ 6-7.) Specifically, Mr. Jaffe describes how, based on the material he reviewed, data that Plaintiffs collected would cross state lines (1) when it was stored in a single, national database located in another state, and (2) when it was aggregated to be viewed by employees in the Campaign's headquarters in New York. (Id. ¶¶ 106-107, 116, 122-23.) To form his conclusion, Mr. Jaffe relied on evidence that FOs collected voter data and inputted that data into VAN and ThruTalk. (See id. ¶¶ 15-19.) Mr. Jaffe noted that, in order to transmit the data they had collected across state lines for storage in a database located in another state, Plaintiffs either manually clicked a button to "sync" or enabled an "auto-sync" feature in the software. (See id. ¶¶ 83 n. 42, 95, 98.) Mr. Jaffe compares the "function of the underlying system" to "a long-distance phone call [by which] an individual would not physically transport their voice across state line[s] [but] effected the transmission of their voice across state lines by dialing the number" or "mailing a package

through UPS or FedEx" whereby a delivery person, rather than the sender, physically transports the package.  (Id. ¶ 83 n. 42.)

DISCUSSION

Motion to Exclude Expert Opinions and Testimony

The Campaign moves to exclude Mr. Jaffe's expert report and testimony under Federal Rules of Evidence 702 and 403.  For the following reasons, neither Rule justifies the exclusion of Mr. Jaffe's expert opinions.

Rule 702

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer expert opinion testimony if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's opinions "will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." FED. R. EVID. 702.  The Rule assigns "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).  "Although it establishes a 'gatekeeper' function for expert testimony, the Daubert test is nonetheless 'a liberal' and 'permissive' standard of admissibility."  Hewitt v. Metro-North Commuter R.R., 244 F. Supp. 3d 379, 385 (S.D.N.Y. 2017) (quoting Nimely v. City of New York, 414 F.3d 381, 395–96 (2d Cir. 2005)).

The Campaign first argues that Mr. Jaffe's opinions and testimony are not relevant within the meaning of Daubert "because they will not assist in understanding or

resolving the issue of Plaintiffs' alleged individual FLSA coverage." (Docket entry no. 480

("Def. Daubert Mem.") at 2.) Expert testimony is relevant if it assists in "understanding and

resolving the primary issues in the case." De La Rosa v. 650 Sixth Ave. Trevi LLC, No. 13-CV-

7997-VEC, 2019 WL 6245408, at *3 (S.D.N.Y. Nov. 22, 2019). Plaintiffs proffer Mr. Jaffe as

an expert witness to establish that they were each individually covered by the FLSA; employees

are only individually covered if their work "involves the continued use" of instrumentalities for

communication "across State lines" "as a regular and recurrent part" of their job duties. 29

C.F.R. § 776.10(b) (Westlaw through March 27, 2025, 90 FR 13847). The test "is not whether

the employee's activities affect or indirectly relate to interstate commerce but whether they are

actually in or so closely related to the movement of the commerce as to be a part of it."

Boekemeier v. Fourth Universalist Soc'y in the City of N.Y., 86 F. Supp. 2d 280, 287 (S.D.N.Y.

2000) (quoting McLeod v. Threlkeld, 319 U.S. 491, 497 (1943)). Mr. Jaffe's conclusions—that

"Plaintiffs and opt-in Plaintiffs transmitted data and information across state lines using the NGP

Van system" and "the Thru Talk system" (Jaffe Rpt. ¶¶ 6-7)—are plainly relevant to the question

of whether Plaintiffs' work involved the use of instrumentalities for communication across state

lines.

        To overcome this obvious conclusion, the Campaign insists that Mr. Jaffe's

analysis merely "addresses an entirely different question: whether data and information that was

entered in VAN and ThruTalk by Plaintiffs crossed state lines ***at all***, at any point, by operation of

the equipment being used, without consideration of whether Plaintiffs were responsible for the

purported transmission." (Def. Daubert Mem. at 7-8 (emphasis in original).) The Campaign's

highly technical relevance argument—that "whether Plaintiffs transmitted data" with a specific

action is a different question from whether "the software's internal workings" or a "headquarters

request for information from another state" caused the data transmission (id. at 10-11)—is not

supported by the case law.  Not one of the cases that the Campaign cites imposes such a

causation requirement for individual coverage under the FLSA.[6]  The Campaign's arguments,

therefore, go to the weight, rather than the admissibility, of the opinion in connection with the

determination of whether Plaintiffs have met their burden to establish individual coverage under

FLSA.

        The Campaign next insists that Mr. Jaffe's conclusions are unreliable because his

"opinions and testimony are based on insufficient facts and data, and they are the product of

inappropriate speculation."  (Def. Daubert Mem. at 2.)  Under Daubert, expert testimony should

be excluded only "if it is speculative or conjectural or based on assumptions that are so

---

[6]    Two of the cases cited by the Campaign to support its argument (see Def. Daubert Mem. at 8) involved plaintiffs who only engaged in local work.  See Jian Long Li v. Li Qin Zhao, 35 F. Supp. 3d 300, 309 (E.D.N.Y. 2014) (holding that food delivery workers' "use of a cellular phone…, but not for communication between states, is strictly an intrastate activity, notwithstanding the fact that it utilizes interstate technology") (emphasis in original)); Leyva v. Avila, 634 F. Supp. 3d 670, 679 (D. Ariz. 2022) (holding that, for workers who installed tiles for local bathroom renovations, "[t]he mere use of an instrumentality of commerce – such as a phone – is insufficient to demonstrate engagement in commerce if such use is purely local and does not actually implicate interstate commerce.") (emphasis in original)).  There was no allegation in those cases that data or information crossed state lines.

The Campaign's citation of two out-of-circuit cases, holding that processing credit cards for local transactions, without more, is not enough to establish the use of instrumentalities of interstate commerce for purposes of FLSA coverage, are not persuasive either.  (Def. Daubert Mem. at 8 (citing Perez v. Nwb Aspen, Inc., No. 16-CV-412-DAB, 2016 WL 5853734, at *3 (M.D. Fla. June 6, 2016) and Joseph v. Nichell's Caribbean Cuisine, Inc., 862 F. Supp. 2d 1309, 1313 (S.D. Fla. 2012).)  Those cases do not discuss, let alone require Plaintiffs to establish, causation regarding the movement of information or data across state lines.  Moreover, these cases carry less persuasive weight in this Circuit, in which courts have held that regular and recurrent "processing [of] credit card transactions" is relevant to the individual coverage test under the FLSA.  Jacome v. Optical 49, Inc., No. 20-CV-02615-DG-PK, 2021 WL 3375134, at *8 (E.D.N.Y. July 9, 2021), report and recommendation adopted, 2021 WL 3373130 (E.D.N.Y. Aug. 3, 2021).

unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Restivo v. Hessemann, 846 F.3d 547, 577 (2d. Cir. 2017) (quoting Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009)). "Absent this degree of unreliability, any 'other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" Hewitt, 244 F. Supp. 3d at 385 (quoting Restivo, 846 F.3d at 577).

The Campaign's argument that "Jaffe admittedly never used the software systems at issue, and he also lacked the information required to establish that all Plaintiffs used the software systems" (Def. Daubert Mem. at 2), does not meet this high bar. While Mr. Jaffe never used the software systems at issue, he "utilized [his] 25 years expertise and experience with developing, expanding, and evaluating Enterprise level software systems" and "examined documents produced by the Defendant, Defendant's interrogatory responses, depositions of the Plaintiffs and Defendant fact witnesses, and publicly available materials both from the web sites of the two vendors, their social media, archived versions of pages, and technical architecture articles" to arrive at his conclusions. (Jaffe Rpt. ¶¶ 34, 38.) An expert with relevant experience and expertise, like Mr. Jaffe, may "permissibly rely upon materials other than personal observations . . . to form his opinions[.]" Hewitt, 244 F. Supp. 3d at 389. Because Mr. Jaffe "does at least provide 'some explanation as to how [he] came to his conclusion and what methodologies substantiate that conclusion,'" Washington v. Kellwood Co., 105 F. Supp. 3d 293, 315 (S.D.N.Y. 2015) (quoting Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006), aff'd, 552 U.S. 312 (2008)), "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" his expert opinions, Daubert, 509 U.S. at 596.

The Campaign's argument that Mr. Jaffe's opinions are unreliable because "he did not confirm that all Plaintiffs used the VAN and/or ThruTalk software" and "did not have the data required to make determinations regarding the number of days that Plaintiffs may have transmitted data across state lines, the amount of time in each day that Plaintiffs may have spent transmitting data across state lines, or the volume of data that Plaintiffs may have transmitted across state lines" is similarly unavailing. (Def. Daubert Mem. at 14.) The Campaign's "concerns related to the underlying data . . . go to weight rather than admissibility." Chen-Oster v. Goldman, Sachs & Co., No. 10-CV-06950-AT-RWL, 2022 WL 814074, at *17 (S.D.N.Y. Mar. 17, 2022), on reconsideration in part, No. 10-CV-06950-AT-RWL, 2022 WL 3586460 (S.D.N.Y. Aug. 22, 2022).

For the foregoing reasons, Mr. Jaffe's expert opinion and testimony is admissible under Rule 702.

Rule 403

The Campaign insists that, even if the Court were to find Mr. Jaffe's opinions and testimony admissible under Rule 702 and Daubert, "the Court should exclude them because they present a substantial danger of confusing the issues and misleading the factfinder" under Federal Rule of Evidence 403. (Def. Daubert Mem. at 15.) Rule 403 provides that evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, [or] misleading the jury[.]" FED. R. EVID. 403. The Second Circuit has made clear that expert testimony that "undertakes to tell the jury what result to reach" and "attempts to substitute the expert's judgment for the jury's" must be excluded under Rule 403. Nimely, 414 F.3d at 398 (citation omitted). For instance, "opinions phrased in terms of

inadequately explored legal criteria" must be excluded under Rule 403.  Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) (citation omitted).

The Campaign's arguments regarding admissibility under Rule 403 merely repeat its arguments regarding admissibility under Rule 702.  (See Def. Daubert Mem. at 15 ("Jaffe fails to present information and opinions that would assist the jury in resolving whether Plaintiffs transmitted data across state lines and whether they did so on a regular and recurrent basis, and he instead opines on whether data was transmitted across state lines at all, without consideration of whose actions caused the transmission or the frequency of transmission.").)  Because Mr. Jaffe does not opine on the ultimate legal issue—whether Plaintiffs are individually covered under the FLSA—his opinions and testimony would not present a danger of misleading the jury. The Court therefore declines to exclude Mr. Jaffe's opinions and testimony under Rule 403 should this case go to trial.

In sum, the Campaign's motion to exclude Mr. Jaffe's expert opinion and testimony is denied.

Motions for Partial Summary Judgment

Summary judgment is warranted when there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is considered material when it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court views the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor.

Ashley v. City of N.Y., 992 F.3d 128, 136 (2d Cir. 2021). The nonmoving party may not rely

solely on "conclusory allegations or unsubstantiated speculation" to survive summary judgment

but "must come forward with specific evidence demonstrating the existence of a genuine dispute

of material fact." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted).

## FLSA Coverage

Section 207(a)(1) of the FLSA provides that, subject to exceptions, "no employer

shall employ any of his employees who in any workweek is engaged in commerce or in the

production of goods for commerce, or is employed in an enterprise engaged in commerce or in

the production of goods for commerce, for a workweek longer than forty hours unless such

employee receives compensation for his employment in excess of the hours above specified at a

rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C.A.

§ 207(a)(1) (Westlaw through P.L. 119-4). "An employer is subject to [29 U.S.C.] § 207(a)

coverage either (1) if the employer was an enterprise engaged in commerce or in the production

of goods for commerce regardless of whether the plaintiff was so engaged, or (2) if an employee

individually was engaged in commerce or in the production of goods for commerce."

Kuhnmuench v. Phenix Pierre, LLC, No. 16-CV-9162-LTS, 2018 WL 1357383, at *4 (S.D.N.Y.

Mar. 15, 2018) (quoting Jones v. SCO Family of Servs., 202 F. Supp. 3d 345, 349 (S.D.N.Y.

2016)). These are commonly referred to as the "enterprise" and "individual" theories of

coverage, respectively. Jacobs v. N.Y. Foundling Hosp., 577 F.3d 93, 96 (2d Cir. 2009). The

Supreme Court has "consistently construed the [FLSA] liberally to apply to the furthest reaches

consistent with congressional direction" given that "broad coverage is essential to accomplish the

goal of outlawing from interstate commerce goods produced under conditions that fall below

minimum standards of decency." <u>Tony & Susan Alamo Found. v. Sec'y of Labor</u>, 471 U.S. 290, 296 (1985) (internal quotations and citations omitted).

<u>Enterprise Coverage</u>

Both Plaintiffs and the Campaign move for summary judgment on the issue of whether the Campaign is a covered enterprise under the FLSA.  The FLSA defines an "enterprise" as "the related activities performed . . . by any person or persons for a common business purpose."  29 U.S.C.A. § 203(r)(1) (Westlaw through P.L. 119-4).  To qualify as an enterprise, the business must have "employees engaged in commerce or in the production of goods for commerce, or [having] employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," and the business's "annual gross volume of sales made or business done [must not be] less than $500,000. . . ." <u>Id.</u> § 203(s)(1)(A)(i)-(ii).  Non-profit organizations, like the Campaign, "generally would not be considered an 'enterprise' under" the FLSA, but the statue "is applicable to [a non-profit's] activities insofar as they 'serve the general public in competition with ordinary commercial enterprises.'" <u>Boekemeier v. Fourth Universalist Soc'y in the City of N.Y.</u>, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) (quoting <u>Alamo Found.</u>, 471 U.S. at 299).

Plaintiffs argue that the Campaign is an "enterprise" that performed activities for a common business purpose under the FLSA "because it sold campaign merchandise online in competition with other sellers."  (Docket entry no. 456 ("Pl. MSJ Mem.") at 9.)  Every court to consider the question of whether a political campaign's sale of merchandise triggers enterprise coverage under the FLSA has rejected this argument.  <u>See</u> <u>Katz v. DNC Services Corp.</u>, No. 16-CV-5800, 2018 WL 692164, at *6 (E.D. Pa. Feb. 2, 2018) (declining to find enterprise coverage where defendant's "primary focus is the election of democratic candidates to local, state, and

national office" and there was nothing to "suggest that commercial competition was a primary, secondary, or even tertiary endeavor for Defendant"); see also Johnson v. Trump for President, Inc., No. 8:19-CV-00475-T-02-SPF, 2019 WL 2492122, at *4 (M.D. Fla. June 14, 2019) (noting it was "unclear whether enterprise coverage can apply to a political campaign" due to lack of a "common business purpose").  Indeed, in three separate (albeit nearly identical) actions, the Northern District of Texas held that the Bloomberg campaign was not an "enterprise" under the FLSA because the Campaign "created and sold promotional campaign materials at its cost which were 'not received in the ordinary course of any trade or business,' and therefore, are not considered commercial income."  Hamilton v. Mike Bloomberg 2020 Inc., No. 20-CV-488-BP, 2021 WL 1966843, at *8 (N.D. Tex. May 17, 2021) (quoting 26 U.S.C. § 527(c)(3)); Jefferson v. Mike Bloomberg 2020 Inc., No. 20-CV-00489-BP, 2021 WL 1966844, at *8 (N.D. Tex. May 17, 2021) (same); Snow v. Mike Bloomberg 2020 Inc., No. 20-CV-00490-BP, 2021 WL 1966845, at *8 (N.D. Tex. May 17, 2021) (same).  In those cases, the Northern District of Texas further emphasized that, "[a]t most, the sale of campaign items was ancillary to Defendant's primary mission of supporting Mr. Bloomberg's quest for the presidency."  Hamilton, 2021 WL 1966843, at *8; Jefferson, 2021 WL 1966844, at *8; Snow, 2021 WL 1966845, at *8.

Although no court has concluded that a political campaign is a covered enterprise under the FLSA, Plaintiffs nevertheless insist that the Campaign is an "enterprise" that operated with a common business purpose to the extent that "[t]he merchandise sales were ordinary commercial activity."  (Pl. MSJ Mem. at 9.)  This argument is unpersuasive for at least two reasons.

As an initial matter, Congress has made clear that "proceeds from the sale of political campaign materials" ought to be treated like contributions for tax purposes because

"they are not received in the ordinary course of any trade or business."  26 U.S.C.A.

§ 527(c)(3)(C) (Westlaw through P.L. 119-4).  Plaintiffs have not explained why the sale of

campaign merchandise would be explicitly excluded from ordinary business activity under one

statute but implicitly included under another.

Additionally, courts have only found that a non-profit operates with a common

business purpose to the extent that it engages in commercial activities that "compete in the

marketplace with ordinary commercial enterprises."  Locke v. St. Augustine's Episcopal Church,

690 F. Supp. 2d 77, 87 (E.D.N.Y. 2010).  For example, in Alamo Foundation, the Supreme Court

concluded that a non-profit was a covered "enterprise" because "the Foundation's businesses

serve the general public in competition with ordinary commercial enterprises, . . . and the

payment of substandard wages would undoubtedly give petitioners and similar organizations an

advantage over their competitors."  471 U.S. at 299 (citations omitted).  The Court went on to

explain that "[i]t is exactly this kind of 'unfair method of competition' that the Act was intended

to prevent, . . . and the admixture of religious motivations does not alter a business's effect on

commerce."  Id. (citations omitted).  Likewise, in Archie v. Grand Central Partnership, Inc., 997

F. Supp. 504 (S.D.N.Y. 1998), the court determined that a non-profit was "an enterprise that

engaged in commerce" on the ground that the defendant's activities "serve the general public in

competition with ordinary commercial enterprises, and that the payment of substandard wages

gives them an unfair advantage in commercial activity."  Id. at 529.  The Court focused on the

non-profit defendant's ability to offer its "services to other private corporations at a significant

discount" because it did not pay its employees minimum wage as set by the FLSA.  Id.

Plaintiffs, in contrast, do not adequately explain how campaign merchandise sold

at cost "to promote Michael Bloomberg's candidacy for president" (Pl. MSJ Mem. at 9) was in

competition with ordinary commercial goods. That the Campaign sold items "of a type (hats, t-shirts) that other online sellers sold" (id. at 10) does not demonstrate why an individual seeking to buy a hat or t-shirt would consider Campaign merchandise—designed to promote Mr. Bloomberg's candidacy for president—a competitive alternative to items of clothing sold by a commercial business. Nor can Plaintiffs explain how "the payment of substandard wages" gave the Campaign an "unfair advantage in commercial activity." Archie, 997 F. Supp. at 529. The purpose of the merchandise sales was not, after all, to create any monetary benefit for the campaign.

Because the Campaign did not operate with a "common business purpose," the Court concludes that it is not a covered "enterprise" under the FLSA. For that reason, Plaintiffs' motion for partial summary judgment is denied, and the Campaign's motion for partial summary judgment is granted on the issue of enterprise coverage.

Individual Coverage

The Campaign moves for summary judgment on the issue of whether Plaintiffs are individually covered under the FLSA. "The dispositive test for individual coverage under the FLSA looks to whether the plaintiff was an employee in the 'channels of interstate commerce' as distinguished from [one] who merely affected that commerce." Gonzalez v. Victoria G's Pizzeria LLC, No. 19-CV-6996-DLI-RER, 2021 WL 6065744, at *6 (E.D.N.Y. Dec. 22, 2021) (citation omitted), report and recommendation adopted, 2022 WL 842666 (E.D.N.Y. Mar. 22, 2022). To satisfy this test, an employee's "work must be 'so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity.'" Id. (citation omitted). Interstate activities must be

"regular and recurrent, and not just sporadic or occasional." Marcus v. Lominy, No. 18-CV-1857-NR, 2022 WL 493688, at *16 (S.D.N.Y. Feb. 17, 2022).[7]

The Campaign proffers three arguments that Plaintiffs have failed to proffer evidence that FOs regularly and recurrently transmitted voter data across state lines though VAN or ThuTalk. (Docket entry no. 445 ("Def. MSJ Mem.") at 6-9.)[8] None of these arguments, however, justifies summary judgment on the issue of individual coverage.

First, the Campaign argues that "the software was used primarily for intrastate communication." (Def. MSJ Mem. at 6-7.) In support of this argument, the Campaign points to evidence that state Campaign leadership (1) was involved in deciding what other data its FOs collected—in addition to the data that Campaign headquarters directed them to collect—through VAN and ThruTalk, and (2) were responsible for conducting trainings related to data collection. (See Def. 56.1 St. ¶¶ 275-78.) Not only is this argument irrelevant to the question of individual coverage,[9] but the conclusory statement that VAN and ThruTalk "were used primarily for

---

[7]     The Campaign insists that, to establish individual coverage under the FLSA, Plaintiffs must establish that their interstate activities had a "business purpose." (Docket entry no. 445 ("Def. MSJ Mem.") at 9-10.) "The Campaign recognizes that the Court's rejection of this argument is law of the case, but urges the Court to reconsider the point in connection with summary judgment now that discovery is concluded." (Id. at 9.) The conclusion of discovery, however, is not a sufficient reason to disturb the law of the case on a pure question of law. See Teoba v. Trugreen Landcare LLC, No. 10-CV-6132-CJS-JWF, 2013 WL 1560208, at *4 (W.D.N.Y. Apr. 10, 2013) (holding that exceptions to the law of the case doctrine should only be made where there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice" (citation omitted)).

[8]     Plaintiffs do not respond to the Campaign's argument, and therefore appear to concede, that "that they cannot establish individual coverage based on their original theory plead in their complaint that they called out-of-state voters and passively attended conference calls with Campaign headquarters in New York." (Docket entry no. 488 ("Def. MSJ Reply") at 9 n.13.)

[9]     It is well-established that an employee's use of an instrumentality of interstate commerce, such as a cell phone, for intrastate communication only is insufficient for individual

intrastate communication" disregards Plaintiffs' proffer of competing evidence regarding how

the national Campaign headquarters engaged with data collection about voters.  (See Pl. 56.1

Resp. ¶¶ 275-78.)

The Campaign cites Katz v. DNC Services Corp., No. 16-CV-5800, 2018 WL

692164 (E.D. Pa. Feb. 2, 2018), in which the court rejected field organizers' argument that they

engaged in interstate activities by "accessing and entering data into the Votebuilder," which was

then accessible by out-of-state parties.  (Def. MSJ Mem. at 7 (quoting Katz, 2018 WL 692164, at

*5).)  The Campaign correctly observes that, in Katz, the court noted the lack of any authority for

plaintiffs' proposition that "intrastate use of a document that is accessible by out-of-state actors

constitutes interstate 'movement of persons or things' as contemplated by the [FLSA]."  2018

WL 692164, at *5.  The court ultimately granted the defendant's motion to dismiss, however, on

the ground that plaintiffs did "not allege they mailed, emailed, or otherwise actively transported

the Votebuilder information across state lines."  Id. (holding plaintiffs' "allegation too vague to

support a finding of individual coverage under the FLSA").  Here, by contrast, the record

includes an expert report detailing precisely how the data inputted by Plaintiffs into the VAN and

ThruTalk software was transported across state lines.  (See docket entry no. 474 ("Pl. MSJ

Opp.") at 8-9.)

---

coverage under the FLSA.  See, e.g., Jian Long Li v. Li Qin Zhao, 35 F. Supp. 3d 300,
309 (E.D.N.Y. 2014) (holding that food delivery workers' "use of a cellular phone…, but
not for communication between states, is strictly an intrastate activity, notwithstanding
the fact that it utilizes interstate technology") (emphasis in original)).  The Campaign,
however, has not cited any authority requiring that an employee's use of an
instrumentality of interstate commerce must be "primarily" for interstate commerce.  So
long as their interstate activities are "regular and recurrent," plaintiffs are individually
covered by the FLSA.  See Marcus, 2022 WL 493688, at *16.

Second, the Campaign argues that, "[e]ven if some FOs used the software to transmit information across state lines on some occasions, there is no evidence that they did so on a regular and recurrent basis." (Def. MSJ Mem. at 7-9.) This conclusion is flatly contradicted by Plaintiffs' evidence. Plaintiffs—and all other FOs who have testified in this action—uniformly state that they collected voter data throughout each day and recorded that data in VoteBuilder and ThruTalk on the same day. (Pl. 56.1 St. ¶¶ 11-13.) Additionally, Plaintiffs' expert in internet architecture, Jonathan Jaffe, explained in his opinions that this data regularly crossed state lines because it was accessed and viewable by the Campaign in New York. (Pl. SAMF 56.1 ¶ 40.) Leaders at the Campaign's headquarters also testified that the data was transmitted in real time and viewed daily. (Id. ¶¶ 39-40, 42.) The Campaign's proffer of competing evidence—that one of the two platforms, ThruTalk, "was only gradually rolled out to states in February[,]" the last full month of the Campaign's operation, and that "Plaintiffs' expert includes no information or opinion that would permit the Court to assess the degree of interstate communication by any particular FO using the software" (Def. MSJ Mem. 8-9)—merely identifies two factual issues that are not suited for resolution at summary judgment.

Third, the Campaign argues that evidence of Campaign headquarters' ability to access data that Plaintiffs inputted, or of the software's transmission of data across state lines, does not support a finding of individual coverage under the FLSA. (Def. MSJ Mem. at 8.) In other words, the Campaign insists that Plaintiffs themselves did not trigger the transmission of data across state lines because "[a] headquarters' request for information from a given state is its own separate communication, . . . which might have come days or weeks after the data was input to the system, and certainly without the FO's knowledge that the particular data entered would be so transmitted." (Id.) The Campaign goes on to argue that, "[e]ven accepting for these purposes

Plaintiffs' expert's conclusion that the <u>software</u> likely communicated data entered by FOs to databases in other states as part of its own administration, there is no evidence that the data was transmitted interstate at the time the FO entered it or that the FO had any understanding or expectation that they were transmitting data interstate." (<u>Id.</u> (emphasis in original).) As explained above (<u>supra</u> at 10-11 & n. 6), there is no case law to support the kind of technical causation analysis that the Campaign urges the Court to adopt.

Instead, "[t]he dispositive test for individual coverage under the FLSA looks to whether the plaintiff was an employee in the 'channels of interstate commerce[.]'" <u>Gonzalez</u>, 2021 WL 6065744, at *6. Here, Plaintiffs proffer evidence demonstrating that FOs regularly and recurrently collected voter data and inputted that data into VAN and ThruTalk. (Pl. 56.1 St. ¶¶ 10-14.) Plaintiffs also point to evidence that, in order to transmit the data they had collected across state lines, they either manually clicked a button to "sync" or enabled an "auto-sync" feature in the software. (<u>See</u> Jaffe Rpt. ¶¶ 83 n. 42, 95, 98.) Plaintiffs' technical expert compares the "function of the underlying system" to "a long-distance phone call [by which] an individual would not physically transport their voice across state line[s] [but] effected the transmission of their voice across state lines by dialing the number" or "mailing a package through UPS or FedEx" whereby a delivery person, rather than the sender, physically transports the package. (<u>Id.</u> ¶ 83 n. 42.) At a minimum, this evidence is sufficient to demonstrate that the Plaintiffs, by inputting voter data into VAN and ThruTalk, initiated the process by which data was transmitted across state lines. This evidence of Plaintiffs' essential role to regularly and recurrently initiate the movement of voter data across state lines, therefore, represents a material fact that supports their claim of individual coverage under the FLSA.

Because material disputes of fact exist as to Plaintiffs' individual involvement in commerce, the Campaign's motion for summary judgment on the issue of individual coverage is denied.

First Amendment

The Campaign argues that "[t]he First Amendment precludes application of federal and state overtime laws to political campaigns" under two principal theories.[10]  (Def. MSJ Mem. at 12-16.)  Neither theory is consistent with longstanding Supreme Court precedent.

The Campaign first argues that "requiring payment of overtime" under the FLSA and state laws "would impermissibly burden core political speech" if applied to political campaigns.  (Id. at 12.)  While the Supreme Court has emphasized that political speech concerning candidates for public office candidates is "at the core of our First Amendment freedoms[,]" Republican Party of Minn. v. White, 536 U.S. 765, 774 (2002) (citation omitted), it is well-established that generally applicable laws that neither target nor disparately affect protected speech, but may have an incidental effect on speech, do not trigger First Amendment scrutiny, Arcara v. Cloud Books, Inc., 478 U.S. 697, 707 (1986); Clementine Co., LLC v. Adams, 74 F.4th 77, 87 (2d Cir. 2023).  Because the FLSA is a generally applicable labor law, it does not trigger First Amendment scrutiny.[11]

---

[10]    The Campaign also argues that "[t]he Court should avoid the Constitutional issue" by "interpret[ing] the FLSA not to apply to political campaigns."  (Docket entry no. 513 ("Def. 1A Opp.") at 1.)  The canon of constitutional avoidance is a doctrine of statutory construction that is applicable only when "after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."  Jennings v. Rodriguez, 583 U.S. 281, 296 (2018) (citation omitted).  That canon does not apply here because the Campaign has not identified any statutory ambiguity.  See Warger v. Shauers, 574 U.S. 40, 50 (2014).

[11]    That the FLSA is a generally applicable law distinguishes this case from the line of cases applying First Amendment scrutiny to campaign finance laws that applied only to

The Campaign next asks the Court to recognize an exception to the FLSA that is analogous to the "ministerial exception" to federal and state labor laws.  (Def. MSJ Mem. 15-16.)  Just as "[s]everal Circuits have held that FLSA or state overtime requirements cannot be applied to employees of religious organizations who perform religious functions[,]" the Campaign argues that "courts should also decline to dictate how political campaigns elect to pay workers engaged in spreading a candidate's message."  (Id.)  Courts that have recognized the ministerial exception to the application of the FLSA or state labor laws, however, have emphasized that the exception is designed to avoid "entanglements of the secular courts in religious affairs."  E.g., Schleicher v. Salvation Army, 518 F.3d 472, 474 (7th Cir. 2008).  This concern is "derive[d] from both the Free Exercise and Establishment Clauses of the First Amendment."  Alcazar v. Corp. of the Cath. Archbishop of Seattle, 627 F.3d 1288, 1291 (9th Cir. 2010).  Concerns about secular judicial "entanglement" in religious matters have no analogue in the speech context, which is not governed by the Free Exercise or the Establishment Clause.

Because the First Amendment does not bar the application of the FLSA and state labor laws to political campaigns, the Campaign's motion for summary judgment on that ground is denied.

Claims under Wisconsin Law

The Campaign moves for summary judgment on Plaintiffs' claims under Wisconsin law "because the Campaign is not subject to Wisconsin's overtime regulation (Wis. Admin Code DWD § 274.03)."  (Def. MSJ Mem. at 16.)  Wisconsin's overtime provision applies only to:

political campaigns.  (See Def. MSJ Mem. at 13-14.)

> employees employed in manufactories, mechanical or mercantile establishments, beauty parlors, laundries, restaurants, confectionary stores, telegraph or telephone offices or exchanges or express or transportation establishments, hotels, and by the state, its political subdivisions and any…body in state or local government….

WIS. ADMIN. CODE DWD § 274.015.  At least one court in Wisconsin has held that the labor law does not apply to non-profit organizations, and Wisconsin's Department of Workforce Development has offered interpretive guidance providing that "the one limited circumstance in which a nonprofit <u>would</u> have to pay overtime [is] when one of its employees worked in an establishment such as a restaurant or hotel."  <u>Paczkowski v. My Choice Fam. Care, Inc.</u>, 384 F. Supp. 3d 991, 997 (W.D. Wis. 2019) (emphasis in original).

The Campaign is not covered by the Wisconsin overtime law because it is a non-profit organization, and it does not fall under one of the exceptions provided for in the interpretive guidance from Wisconsin's Department of Workforce Development.  Plaintiff's argument that the Campaign is a covered "mercantile establishment" because it "engaged in merchandise sales as an ordinary commercial activity, in an online marketplace in competition with others[,]" essentially repeats their position that the Campaign is a covered enterprise under the FLSA because it operates with a common "business purpose."  (Pl. MSJ Opp. at 33.)  This characterization is not persuasive for the reasons discussed above.  (<u>Supra</u> at 16-19.)

Therefore, the Campaign's motion for summary judgment dismissing Plaintiffs' claims under Wisconsin law is granted.

<u>Exempt Classification</u>

The Campaign moves for summary judgment on the issue of whether Plaintiffs were properly classified as exempt administrative professionals under the FLSA and relevant state laws.  (Def. MSJ Mem. at 17-29.)  The FLSA exempts employees from overtime requirements if they work in a "bona fide . . . administrative" position.  29 U.S.C.A. § 213(a)(1)

(Westlaw through P.L. 119-4). The administrative exemption under the FLSA requires that (1) the employee is compensated on a salary or fee basis of at least $684 per week, (2) the employee's primary duty involves "the performance of office or non-manual work directly related to the … general business operations of the employer," and (3) the employee's primary duty "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The relevant state laws incorporate the same exceptions as the federal law.[12]

In order to establish that the administrative exemption applies to FOs, the Campaign must prove that their "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and that their "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.'" Scott v. Chipotle Mexican Grill, Inc., 954 F.3d 502, 510-11 (2d Cir. 2020) (quoting 29 C.F.R. § 541.200(a)). The question of "whether the employee's primary duty is directly related to management" requires "consideration of whether the employee 'perform[s] work directly related to assisting with the

---

[12]    See, e.g., Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 556 n.1 (2d Cir. 2012) ("Like the FLSA, the NYLL 'mandates overtime pay and applies the same exemptions as the FLSA.'" (quoting Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 105 (2d Cir. 2010))); Industrial Welfare Commission Wage Order No. 4-2001 §§ 1(A)(1)(e), 1(A)(2)(e) (expressly incorporating federal regulations for the administrative exemption under California law); N.C. Gen. Stat. § 95-25.14(b)(4) (expressly incorporating FLSA exemptions under North Carolina law); Hecker v. Petco Animal Supplies, Inc., No. 16-CV-10857, 2017 WL 2461546, at *6 (N.D. Ill. June 7, 2017) ("Illinois's exemption mirrors the FLSA's."); Saginaw Firefighters Ass'n, Local 422, etc. v. Saginaw, 137 Mich. App. 625, 632, 357 N.W.2d 908, 911 (Mich. 1984) ("[T]he Michigan [minimum wage] law obviously parallels the federal act."); Cruz v. Lawson Software, Inc., 764 F. Supp. 2d 1050, 1070 (D. Minn. 2011) ("MFLSA's administrative exemption is analogous to the FLSA's administrative exemption."); Nerland v. Caribou Coffee Co., 564 F. Supp. 2d 1010, 1029-30 (D. Minn. 2007) (finding MFLSA executive exemption claims to be "substantially parallel to the FLSA claims").

running or servicing of the business, as distinguished . . . from working on a manufacturing production line or selling a product in a retail or service establishment.'" Id. (quoting 29 C.F.R. § 541.201(a)) (alterations in original). "The Court notes that due to the fact intensive nature of determining whether an employee is exempt from overtime pay regulations, even where there has been full discovery, courts are often reluctant to grant summary judgment based on a FLSA exemption." Benitez v. Valentino U.S.A., Inc., No. 19-CV-11463-JGLC, 2024 WL 1347725, at *8 (S.D.N.Y. Mar. 29, 2024), reconsideration denied, 2024 WL 5145564 (S.D.N.Y. Dec. 17, 2024) (citation and quotation marks omitted); see also Hoxhaj v. Michael Cetta, Inc., No. 21-CV-6486-LJL, 2023 WL 3455444, at *3 (S.D.N.Y. May 15, 2023) ("[W]hether an employee is exempt is a question rarely susceptible of resolution on a motion for summary judgment.").

This case is no exception; there are genuine issues of fact as to whether Plaintiffs fit within the administrative exemption to the FLSA and relevant state laws. Critically, Plaintiffs proffer material evidence that FOs' primary duty—engaging with prospective voters for the purpose of promoting Mr. Bloomberg's presidential candidacy—was not "directly related to the management or general business operations" of the Campaign. 29 C.F.R. § 541.201(a). While Plaintiffs' work was obviously essential to the success of the Campaign, that is not sufficient to establish that Plaintiffs were exempt administrative professionals. Instead, the Second Circuit has held that exempt administrative work is not the "day-to-day . . . activities" or "functional" work of the employer, such as merely selling a product, but rather "more substantial" duties that are "conceptual," like advising, human relations, business strategy, or the other areas listed in the Department of Labor regulations, which are focused on "determining the future strategy or direction of the business" or are "related to the business's overall efficiency or mode of operation." Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 534-35 (2d Cir. 2009).

Plaintiffs' proffered evidence indicates that FOs were tasked with carrying out the routine, day-to-day activities of the Campaign, including making dozens or hundreds of phone calls and door-to-door canvassing visits each day and week of their employment, which was required in order to meet the Campaign's strict metrics regarding how many voter interactions each Plaintiff and FO needed to accomplish.  (Pls. 56.1 Resp. ¶¶ 10, 21, 23, 55-59, 79, 153, 196, 221, 234, 255; see also Pl. 56.1 SAMF ¶¶ 3, 6-9.)  Plaintiffs have also proffered evidence that FOs had no role in running or overseeing the campaign, or in making any decisions about strategy, operations, budgeting, staffing, finances, human relations, labor management, technology, or press relations; additional evidence in the record supports Plaintiffs' argument that such major decisions were instead handled by individuals higher up in the Campaign's hierarchy.  (Pls. 56.1 SAMF ¶¶ 15-23.)

These material facts distinguish this case from the only two cases that the Campaign cites to support its argument that Plaintiffs' primary duties related to the management or general business operations of their employer:  Savage v. UNITE HERE, No. 05-CV-10812-LTS, 2008 WL 1790402 (S.D.N.Y. Apr. 17, 2008), and Krupinski v. Laborers E. Region Org. Fund, No. 15-CV-982-RJS, 2016 WL 5800473 (S.D.N.Y. Oct. 2, 2016).  (Def. MSJ Mem. at 20-23.)  In Savage, the court held that the undisputed factual record established that a union organizer was an exempt administrative employee; in that case, however, the union organizer's "job was to plan how to develop union support in her assigned plant" and to "monitor[] the overall progress of the campaign."  2008 WL 1790402, at *2.  Plaintiffs in this case, in contrast, have proffered evidence indicating that they were not involved in these kinds of high-level plans or in decisions that affected the Campaign's strategy overall.  Likewise, in Krupinski, the court found that the undisputed facts established that a union organizer was properly classified under

the administrative exemption to the extent that he helped to "run" the union's organizing campaigns. 2016 WL 5800473, at *7. Here, Plaintiffs proffer evidence to undercut any implication from the Defendant that they "ran" the Campaign. (Pl. 56.1 SAMF ¶ 15 ("All aspects of Bloomberg's operations and planning were conducted by its state and national leadership teams, which created state organizing plans that addressed staffing, scope of work, capacity, structure, timelines, tactics, compensation, and budgets.").)

Because Plaintiffs proffer material facts that challenge the Campaign's assertion that their primary duty was "directly related to the management or general business operations" of the Campaign, summary judgment is denied on the issue of whether the administrative exemption to the FLSA applies to Plaintiffs.[13]

<u>Standing to Bring Claims under NY and CA Wage Notice and Statement Laws</u>

The Campaign also moves for summary judgment on (1) Mr. Goldstein's claim that the Campaign failed to provide him with an accurate wage notice and wage statements in violation of New York Labor Law ("NYLL") sections 195(1) and 195(3) and (2) the California Plaintiffs' claims for failure to provide accurate wage statements and failure to keep accurate records under the California Labor Code. Defendant argues that, under the Supreme Court's holding in <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413 (2021)—that "[a]n asserted informational injury that causes no adverse effects cannot satisfy Article III[,]" <u>id.</u> at 442—, these Plaintiffs lack standing to raise claims related to their wage notices or statements. (Def. MSJ Mem. at 30.) "Defendant['s] argument is a familiar one that has been consistently raised in wage and hour

---

[13]     Because an administrative employee must both perform work directly related to management policies or general business operations <u>and</u> customarily and regularly exercise discretion and independent judgment, the Court need not address whether Plaintiffs customarily and regularly exercised discretion and independent judgment with respect to matters of significance. <u>See</u> <u>Davis</u>, 587 F.3d at 537.

cases since <u>TransUnion</u> was decided in 2021.  Courts within this Circuit, and even within this

District, have come to differing conclusions."  <u>Lipstein v. 20X Hosp. LLC</u>, No. 22-CV-04812-

JLR-JW, 2023 WL 6124048, at *8 (S.D.N.Y. Sept. 19, 2023) (collecting cases).

Plaintiffs argue that Mr. Goldstein and the California Plaintiffs testified that they

were injured by not being provided with proper wage notices or statements as required by their

respective state laws.  (Pls.' 56.1 Resp. ¶¶ 70, 90, 138, 246.)  Their declarations assert "that if

they were provided with accurate wage notices or wage statements providing their hours worked

and rates of pay, they would have had the information necessary to assess underpayment and

promptly complain to Bloomberg."  (Pl. MSJ Opp. at 34.)  Three courts in this District have

suggested that similar allegations in a pleading are sufficient to survive a motion to dismiss.  <u>See</u>

<u>Lipstein</u>, 2023 WL 6124048, at *10; <u>Chapman v. City Winery NY - Pier 57, LLC</u>, No. 23-CV-

2778-LGS, 2023 WL 8280608, at *2 (S.D.N.Y. Nov. 30, 2023); <u>Metcalf v. TransPerfect</u>

<u>Translations Int'l, Inc.</u>, No. 19-CV-10104-ER-KHP, 2022 WL 19300779, at *4 (S.D.N.Y. Nov.

15, 2022), <u>report and recommendation adopted,</u> No. 19-CV-10104-ER-KHP, 2023 WL 2674743

(S.D.N.Y. Mar. 29, 2023).  At the summary judgment stage, however, plaintiffs must proffer

evidence of something more than "[v]ague allegations that Defendants' violations facilitated

their other unlawful conduct" to establish standing for a claim under the NYLL and the

analogous California law.  <u>Chen v. Lilis 200 W. 57th Corp.</u>, No. 19-CV-7654-VEC, 2023 WL

2388728, at *8 (S.D.N.Y. Mar. 7, 2023); <u>see also</u> <u>Brown v. Eli Lilly & Co.</u>, 654 F.3d 347, 358

(2d Cir. 2011) (explaining that opposing party "may not rely on conclusory allegations or

unsubstantiated speculation" to survive summary judgment (citation omitted)).

Because Plaintiffs have not come forward with any non-conclusory evidence

demonstrating that Mr. Goldstein and the California Plaintiffs suffered non-hypothetical injuries

as a result of the Campaign's failure to provide them with wage notices and statements reflecting

an overtime rate of pay and their hours worked, the Court grants the Campaign's motion for

summary judgment on that issue.

<u>Other Claims under California Law</u>

The Campaign also moves for summary judgment on Plaintiffs' remaining claims

under California state law (1) for meal and rest breaks, (2) for unreimbursed business expenses,

and (3) under the Unfair Competition Law ("UCL") and Private Attorneys General Act

("PAGA"). The Court considers each set of claims in turn.

The Campaign argues that Plaintiffs have failed to present evidence that it denied

them the rest and meal breaks that non-exempt employees are entitled to under California law.

(Def. MSJ Mem. at 32-33.) In California, "[a]n employer's duty … is an obligation to provide"

meal and rest breaks to its nonexempt employees; "[t]he employer satisfies this obligation if it

relieves its employees of all duty, relinquishes control over their activities and permits them a

reasonable opportunity" to take an uninterrupted break, "and does not impede or discourage them

from doing so." <u>Brinker Rest. Corp. v. Superior Court</u>, 53 Cal. 4th 1004, 1040 (Cal. 2012). A

meal or rest break claim fails when "the evidence in the record establishes that Plaintiff could

take breaks when he wanted to take them." <u>Cole v. CRST, Inc.</u>, No. 08-CV-1570-VAP, 2017

WL 1234215, at *7 (C.D. Cal. Mar. 30, 2017).

Plaintiffs provide material evidence, in the form of testimony from Ms. Wheatley-

Diaz and Mr. Coker, that California Plaintiffs were discouraged from taking meal and rest

breaks.[14] For example, Mr. Coker testified that he typically ate lunch at his desk because

---

[14]    This evidence distinguishes Plaintiffs' claims from the cases that the Campaign cites.
<u>See Cole</u>, 2017 WL 1234215, at *7 (concluding that "the overwhelming evidence in the
record" demonstrated that the defendant "encouraged employees to take" breaks and that

"[t]here wasn't always the ability to just completely break away and have, like, time away from the noise of the Campaign to eat" and that "free lunch was provided for" FOs "to keep [them] at their desk" during lunch time.  (Pl. 56.1 Resp. ¶¶ 94-95.)  Similarly, Ms. Wheatley-Diaz testified that "there was never a time where [she] was grabbing a cup of coffee and not simultaneously on the phone" and it was her "only choice" to do so "[b]ecause of the environment, because of the leadership and because of the pressure that [FOs] were under."  (Id. ¶¶ 247-48.)  Taken together, these statements provide evidence that the Campaign pressured California Plaintiffs to not take breaks.  While California employers "need not guarantee that employees take breaks[,]" Drenckhahn v. Costco Wholesale Corp., No. 2:08-CV-01408-JHN, 2011 WL 3754659, at *3 (C.D. Cal. Aug. 24, 2011), they may not "impede[] or discourage[]" employees from taking breaks[,]" Cole, 2017 WL 1234215, at *4 (citation and quotation marks omitted).  Therefore, the Campaign's motion for summary judgment as to the meal and rest breaks claim is denied.

The Campaign also maintains that California Plaintiffs' claims for reimbursement of business expenses under Section 2802 of the California Labor Code fails because the Campaign provided California Plaintiffs with a "lump sum stipend" that "was more than sufficient to cover their expenses."  (Def. MSJ Mem. at 33.)  Because Plaintiffs "do not contest the portion of the Campaign's motion seeking summary judgment on their claims for

---

"Plaintiff's uncorroborated subjective beliefs about his former employer's break policies are insufficient to create a material dispute of fact as to whether the employer's actual policy is to discourage breaks"); Drenckhahn v. Costco Wholesale Corp., No. 2:08-CV-01408-JHN, 2011 WL 3754659, at *3 (C.D. Cal. Aug. 24, 2011) ("Based on Plaintiff's own testimony, he was completely in control of his own schedule, and [his employer] did not deprive him of the ability to take his meal breaks."); Dailey v. Sears, Roebuck & Co., 214 Cal. App. 4th 974, 1001 (Cal. 2013), as modified (Mar. 27, 2013) ("[Plaintiffs] do not aver that they are not free to take such breaks or that [their employer] requires them to be available for work during those periods." (emphasis in original)).

unreimbursed business expenses under California law[,]" (Def. MSJ Reply at 20 n. 32), the Campaign's motion is granted as to that claim.

Lastly, the Campaign moves for summary judgment on California Plaintiffs' claims under the UCL and PAGA—which are derived from their other claims under California law—"[t]o the extent the underlying claims fail[.]"  (Def. MSJ Mem. at 34.)  Because California Plaintiffs' state law claims related to unpaid overtime work and meal and rest breaks survive summary judgment (see supra pp. 26-30, 32-33), the Campaign's motion is denied with respect to the UCL and PAGA claims.

<u>CONCLUSION</u>

For the foregoing reasons, (1) the Campaign's letter motion to file a reply 56.1 statement is denied, (2) the Campaign's motion to exclude the opinions and testimony of Jonathan Jaffe is denied, (3) Plaintiffs' motion for partial summary judgment is denied in its entirety, and (4) the Campaign's motion for partial summary judgment is granted in part and denied in part.  Specifically, the Campaign's motion for partial summary judgment is granted to the extent, and the Court holds, that:

- The Campaign is not a covered enterprise under the FLSA;

- Summary judgment is granted in favor of the Campaign as to the Twelfth Cause of Action because the Wisconsin labor law does not apply to the Campaign;

- Summary judgment is granted in favor of the Campaign as to the Third, Fourth, Sixth, and Ninth Causes of Action because Mr. Goldstein and the California Plaintiffs do not have standing to assert their wage notice and wage statement claims under their respective state laws; and

- Summary judgment is granted in favor of the Campaign as to the Eighth Cause of Action because the California Plaintiffs cannot sustain a claim for unreimbursed business expenses under California law.

The Campaign's motion is denied in all other respects.  This Memorandum Order and Opinion resolves docket entries no. 444, 455, 479, and 491.

This case remains referred to Magistrate Judge Gabriel W. Gorenstein for general pretrial management.  The parties must promptly contact Judge Gorenstein's chambers to request a settlement conference and to address what, if any, pretrial matters remain outstanding if settlement of all outstanding issues cannot be achieved.  The parties are further directed to file a joint status report by **May 12, 2025**, stating whether and to what extent they expect to proceed to trial.  The stay of pretrial deadlines is hereby lifted, and the parties are directed to confer and make submissions in advance of the final pretrial conference, which is scheduled for **June 27, 2025, at 11:00 a.m.** in Courtroom 17C, in accordance with the schedule and requirements as set forth in the scheduling order at docket entry no. 431.

SO ORDERED.

Dated: March 31, 2025
        New York, New York

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge