UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONNA WOOD, et al., individually and on behalf of
all others similarly situated,

                Plaintiffs,

     v.

MIKE BLOOMBERG 2020, INC.,

                Defendant.

20 Civ. 2489 (LTS) (GWG)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S RENEWED MOTION
TO DECERTIFY THE COLLECTIVE AND DECERTIFY THE SIX CLASSES**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ..............................................................................................................3

    A.    Plaintiffs' Proposed Trial Plan Is Incapable of Establishing Liability on a Class-Wide or Collective Basis. ..........................................................................................3

        1.    Plaintiffs' Trial Plan Does Not Include Sufficient Representative Evidence to Establish Liability for Non-Testifying Field Organizers. ............................4

        2.    Plaintiffs' Trial Plan Demonstrates That They Cannot Prove Non-Testifying Field Organizers Worked Overtime. ....................................................15

CONCLUSION ..........................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946)................................................................................................16

*Black v. P.F. Chang's China Bistro, Inc.*,
   No. 16-CV-3958, 2017 WL 2080408 (N.D. Ill. May 15, 2017)................................................4

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013).................................................................................................3

*Cruz v. Dollar Tree Stores, Inc.*,
   Nos. 07-2050 SC, 07-4012 SC, 2011 U.S. Dist. LEXIS 73938 (N.D. Cal. July
   8, 2011) ..........................................................................................................11

*Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*,
   27 F. Supp. 3d 313 (E.D.N.Y. 2014) .............................................................................3

*Espenscheid v. DirectSat USA, LLC*,
   No. 09-cv-625, 2011 WL 2009967 (W.D. Wis. May 23, 2011), *aff'd*, 705 F.3d
   770 (7th Cir. 2013)...............................................................................................3, 7

*Ferreras v. Am. Airlines, Inc.*,
   946 F.3d 178 (3d Cir. 2019)......................................................................................16

*Glatt v. Fox Searchlight Pictures, Inc.*,
   811 F.3d 528 (2d Cir. 2016)......................................................................................15

*Grochowski v. Phoenix Constr.*,
   318 F.3d 80 (2d Cir. 2003).......................................................................................16

*Jin v. Shanghai Original, Inc.*,
   990 F.3d 251 (2d Cir. 2021)........................................................................................1

*Johnson v. Big Lots Stores, Inc.*,
   561 F. Supp. 2d 567 (E.D. La. 2008) ..............................................................................1

*McLean v. Garage Mgmt. Corp.*,
   819 F. Supp. 2d 332 (S.D.N.Y. 2011)............................................................................15

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010).......................................................................................4

*Osborn v. JAB Mgmt. Srvs., Inc.*,
   126 F.4th 1250 (7th Cir. 2025) ..................................................................................16

*Packard v. City of New York,*
    No. 15CIV7130ATSDA, 2020 WL 1467127 (S.D.N.Y. Mar. 25, 2020) .................................3

*Reich v. S. Md. Hosp., Inc.,*
    43 F.3d 949 (4th Cir. 1995) ...............................................................................................10

*Scott v. Chipotle Mexican Grill, Inc.,*
    954 F.3d 502 (2d Cir. 2020)...............................................................................................3

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016)..........................................................................................................18

Now that Plaintiffs have finally produced their long-delayed trial plan, it has become clear that they have no feasible way to prove either liability or damages on a class-wide or collective basis.  Defendant Mike Bloomberg 2020, Inc. (the "Campaign") accordingly respectfully moves this Court for an order decertifying, in its entirety, the collective certified by the Court on September 3, 2020 (Dkt. 148), and decertifying, in their entirety, the California, New York, Illinois, North Carolina, Michigan, and Minnesota state law classes, certified by the Court on August 27, 2024 (Dkt. 506).  The Court previously held that Plaintiffs appeared able to resolve class- and collective-wide issues using common evidence, but it is now clear that the trial Plaintiffs envision cannot satisfy their Rule 23 or collective obligations to provide evidence on which a jury could extrapolate a reliable conclusion for the nearly one thousand individuals who are not before the Court.

## PRELIMINARY STATEMENT

Under Rule 23, "[a] district court is required to monitor class proceedings and reassess its class rulings as the case develops" and "must ensure that a certified class satisfies Rule 23 throughout the litigation."  *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021) (affirming district court's *sua sponte* decertification of class).  The same is true of collectives. *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 572 (E.D. La. 2008) (decertifying collective after seven-day bench trial but before judgment on the merits).  Merely because the classes or collective were certified at earlier stages in the case does not mean they are then impervious to decertification later—even, and especially, as the case nears trial and it becomes clearer that Plaintiffs' proposed representative evidence is insufficient to establish liability across the classes or collective.

For years, Plaintiffs resisted the Campaign's effort to find out how Plaintiffs could try this

case on common evidence.  The Campaign first sought a trial plan by interrogatory in April 2023, but Plaintiffs persistently refused.  In particular, the trial plan was not available during prior briefing on class certification.  As trial nears, and Plaintiffs finally have disclosed their plan, it has become even clearer that Plaintiffs' supposedly representative evidence will be insufficient to prove either liability or damages.  In their pre-trial filings, Plaintiffs acknowledge that to establish liability, they must prove—on a collective and class-wide basis—that field organizers ("FOs") actually worked overtime hours, and that the Campaign's affirmative defense that the FOs were exempt must also be subject to resolution on a class-wide basis.  (Indeed, the Court relied on the question of exempt status in finding commonality and granting class certification, Dkt. 506).  Despite this apparent recognition, Plaintiffs' intended trial plan involves only calling a single or select few witnesses from each state class and a shockingly low number of witnesses from the 400+ opt-ins across 26 states within the collective that do not overlap with the six state classes.  Such a small number of testifying Plaintiffs is wholly insufficient where the evidence demonstrates that actual job duties and hours worked at different field offices and turfs varied within and across states.  The exhibits Plaintiffs propose do not solve these significant shortcomings—as Plaintiffs intend to introduce a very small number of documents, many of which do not involve any of the states that have been certified as classes or that make up the collective.  Just because a class or collective has been certified does not mean Plaintiffs can avoid the requirement that they prove their case for the classes and collective as a whole.  Plaintiffs' trial plan has revealed that they cannot establish on a representative basis that FOs across the six state classes and collective did or did not exercise discretion in performing their job duties to qualify for the administrative exemption nor establish that they actually worked overtime hours as necessary to establish liability on a representative basis with no expert.  Therefore, the motion to decertify the collective and six

state law classes should be granted.

## ARGUMENT

### A. Plaintiffs' Proposed Trial Plan Is Incapable of Establishing Liability on a Class-Wide or Collective Basis.

Plaintiffs must be able to show that liability and damages are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013) (decertifying class where plaintiffs' damages extrapolation model was infeasible as trial proof). And where plaintiffs' plans for trial were not able to demonstrate such a capability, courts have decertified classes and collectives ahead of trial. *See Espenscheid v. DirectSat USA, LLC*, No. 09-cv-625, 2011 WL 2009967, at *6 (W.D. Wis. May 23, 2011), *aff'd*, 705 F.3d 770 (7th Cir. 2013) (affirming district court's decertification of Rule 23 class and collective in a wage action where class counsel was "incapable of proposing a feasible litigation plan"); *see also Packard v. City of New York*, No. 15CIV7130ATSDA, 2020 WL 1467127, at *3 (S.D.N.Y. Mar. 25, 2020) (adopting magistrate judge's report and recommendation to decertify based on inadequacies of proposed plan for trial); *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 319 (E.D.N.Y. 2014) (decertifying collective and denying certification of class in part because Court found Plaintiffs' trial plan unworkable). Now that plaintiffs have provided their proposed trial plan, witness list, and exhibit list, attached hereto as Bloom Decl. Exs. A through C, the shortcomings of their approach make it clear they cannot establish liability either on a class or collective-wide basis.

Plaintiffs' proposed plan to prove liability at trial for each class is wholly insufficient to meet the requirements of Rule 23. And for the collective, FLSA representatives may pursue an action in a representative action only if they are "similarly situated" to the employees they represent. *See Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d Cir. 2020) ("the

[similarly situated] standard is met" only "when there is similarity with respect to 'an issue of law or fact material to the disposition of [plaintiffs'] FLSA claim.'"). Plaintiffs state they "intend to try these issues with common evidence" and "representative evidence." However, the minimal witnesses and exhibits they have identified cannot meet the standards required to rely on "representative evidence" where, as here, individual FOs varied as to the extent of discretion they performed in their job duties and how many hours they worked a week based on the particular field office in which they were based, the directions they received from their individual supervisors, the characteristics of the particular "turf" they managed, and their own commitments outside the Campaign.

1. Plaintiffs' Trial Plan Does Not Include Sufficient Representative Evidence to Establish Liability for Non-Testifying Field Organizers.

To prove liability, Plaintiffs must be able to overcome the Campaign's defense of exemption. *See Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010) (the question of whether employees are overtime-exempt must be "resolved by examining the employees' actual job characteristics and duties"). A common job description is not enough. *See id.* When relying on representative evidence, it is not enough that FOs had the same written job duties or instructions where they were stationed across different locations and reported to different supervisors without evidence that the job performance was similar across those locations and individuals—this trial plan cannot establish that. *See id.* at 549 (affirming the denial of class certification under NYLL where Plaintiffs did not "submit any evidence to the district court relating to [employees at locations] other than Long Island" even though they sought to bring the claim "on behalf of a class of Hertz station managers in New York State."); *see also Black v. P.F. Chang's China Bistro, Inc.*, No. 16-CV-3958, 2017 WL 2080408, at *10-11 (N.D. Ill. May 15, 2017) (no certification where plaintiffs each worked at only one restaurant and "seek to extrapolate all of their FLSA allegations

to [the] other restaurants merely on the basis that Defendant is a centrally run company").

Here, the job duties FOs actually performed differed on multiple levels. There is no dispute that the Campaign primarily functioned through separate state organizations, typically led by a State Director and an Organizing Director, and then each of those state organizations was in turn subdivided into numerous regional field offices. (*See* Dkt. 446 at ¶¶ 16-17.) FOs were assigned to a particular field office—or in some cases more than one field office—and reported to Regional Organizing Directors ("RODs") there. (*See id.* at ¶¶ 18-19.) And each FO was responsible for their own separate "turf," typically comprised of a set of towns or neighborhoods. (*See id.* at ¶ 20.) The nature of each turf differed based on the unique geography, demographics, and priorities of that local area, which, in turn, directly affected how each FO engaged with voters and volunteers. Each FO was expected to use any prior experience, knowledge, or familiarity they had with their turf and exercise their discretion and independent judgment to determine the most effective way to persuade voters there to support the Campaign. *See id.* Some FOs worked in urban territories while others in quite rural ones—impacting what job duties they actually performed in terms of planning and holding events, canvassing, phone banking, and recruiting and overseeing volunteers. For example, door to door canvassing and events would necessarily look quite different in a turf in Manhattan than in a turf in the rural surroundings of Plattsburgh, New York or rural North Carolina. And indeed, discovery revealed that the job duties FOs actually performed differed depending on the state, regional office, and turf in which they worked. Plaintiffs' testifying FO from New York—Putative Representative Max Goldstein—stated he never did door to door canvassing but made approximately 500 calls per day, while FOs in other parts of the state testified that they canvassed in neighborhoods and only made 500-1,000 calls *across an entire week.* (See Dkt. 403-6 at 114:4-14 (500 calls daily); Dkt. 384-84 (600 calls per

week); Dkt. 384-89 (1,000 calls per week); Dkt. 384-95 (600 calls per week).)  And evidence (that Plaintiffs intend to introduce at trial) revealed that FOs in the Brooklyn field office—a different office from Goldstein's but *within the same city*—were organizing many more events as opposed to the heavy phone banking and canvassing FOs in other locations were conducting.  *See* MB2020_Wood_00158352, attached hereto as Bloom Decl. Ex. D.  And even within the same field offices, discovery revealed that in terms of exercising discretion—a key issue in establishing liability—some FOs merely read from a script when speaking to prospective voters while others determined how to speak and connect with voters utilizing their own personal stories and knowledge of Bloomberg's policies.  (*See* Dkt. 403-3 at 98:3-21 (followed script); Dkt. 403-4 at 59:4-13 (followed script); Dkt. 403-15 at 89:13-19 (followed script); Dkt. 403-10 at 50:25-51:13 (followed script); Dkt. 403-11 at 44:16-20, 88:14-89:3 (followed script); Dkt. 403-16 at 123:13-124:4, 145:25-146:22 (personalized); Dkt. 403-23 at ¶ 27 (personalized); Dkt. 403-06 at 74:12-75:7 (personalized).)  For example, Michigan Plaintiffs' sole testifying witness Lakeisha Watson-Moore testified that she always stuck to the script provided by the Campaign when speaking to potential voters, while an FO *within the same field office* as Watson-Moore stated she did the exact opposite and tailored her communications to her personal experiences and the particular voter to whom she was speaking.  (*See* Dkt. 403-15 at 89:13-19; Dkt. 403-23 at ¶ 27.)  These differences multiply when more states and field offices are considered.  Whether or not FOs in fact did exercise such discretion and independent judgment in their position is what must be determined at trial for Plaintiffs to prove liability.

Yet Plaintiffs only intend to call a mere single Plaintiff from many of the state law classes— or none at all for the vast majority of the 26 states contained within the collective.  Nothing in Plaintiffs' proposed trial plan explains why or how these witnesses were chosen or how such a

miniscule sampling (and in some cases, no sampling at all) of the different classes or states across the classes and collective could represent the experiences of such a large number of plaintiffs across such a varied geography. In fact, of the few Plaintiffs they identify as testifying witnesses, several conceded they had no knowledge of what other FOs said to voters when they canvassed or how many events others initiated or coordinated.[1]

*Espencheid* is instructive here. There, the plaintiffs' trial plan included 42 technicians out of approximately 2,300 non-testifying class and collective members (1.82%). The Court decertified the classes and collective ahead of trial because it found the trial plan incapable of proving liability. "The proof of plaintiffs' claims depends on how individual [class or collective members] responded to the numerous policies and practices." *See* 2011 WL 2009967, at *5. Here, as in *Espencheid*, "in terms of individual experiences, the evidence shows that opt-in plaintiffs and class members have different work experiences and were affected by defendants' policies in different ways." *See id.*

The figures here are even starker than what was found to be insufficient in *Espencheid*:

| State | Number of Class Members | Number of FO's Pls intend to call from each class | Sample Size Ratio | Number of Different Offices Within the State |
|---|---|---|---|---|
| California | 204 | 3 | 1.47% | Across 25 offices |
| Illinois | 76 | 1 | 1.32% | Across 13 offices |
| Michigan | 63 | 1 | 1.59% | Across 9 offices |
| Minnesota | 31 | 1 | 3.22% | Across 5 offices |
| New York | 101 | 1 | 0.99% | Across 13 offices |
| North Carolina | 81 | 2 | 2.47% | Across 11 offices |

***CALIFORNIA***: The 204 class members in California worked across 25 different field

---

[1] For this very reason, the Campaign has further moved *in limine* to preclude the admission of state-related evidence for purposes of establishing state-class claims for different states, and to preclude Plaintiffs from referring to themselves and other FOs as being "similarly situated," testifying about FOs in other states, or making improper generalizations. *See* pages 10 to 12 of the Campaign's motion *in limine* for a discussion regarding the FOs lack of knowledge of how other FOs performed their job duties.

offices. Plaintiffs intend to call just 3 FOs (Ceppos, Coker, and Wheatley-Diaz) (1.47%) who worked across only 6 of the 25 field offices in the state. One of those "representative" witnesses (Ceppos) conceded that she was unable to testify as to the experiences of any other FOs unless she was "with them," including with respect to any other FOs in California outside her offices in Los Angeles and Pasadena, and even if she canvassed with other FOs, they would split up the houses and go to a prospective voter's door alone. (*See* Dkt. 403-3 at 79:21-80:2, 121:7-22.) Wheatley-Diaz similarly testified that even if she canvassed with another FO, she would go to a prospective voter's door alone. (*See* Dkt. 403-16 at 142:21-144:6.) And all three—Ceppos, Coker, Wheatley-Diaz—differed in the amount of discretion they utilized when engaging with voters. Wheatley-Diaz used her judgment as to how to speak to each voter, including sharing her personal stories and focusing on what issues the voters expressed interest in, Coker used his judgment as to when to use the talking points, while Ceppos testified she had the discretion to do the same but chose to never do so and instead followed the script provided by the Campaign. (*See* Dkt. 403-16 at 123:13-124:4, 145:25-146:22 (Wheatley-Diaz); Dkt. 403-4 at 57:22-58:25 (Coker); Dkt. 403-3 at 97:21-98:21, 102:9-16 and Dkt. 447-3 at 93:17-94:4 (Ceppos).) This is the disparity among just the three witnesses Plaintiffs intend to call—1.47% of the California class. That conflicting testimony cannot be extrapolated to the other 201 members across 25 field offices.

**NORTH CAROLINA**: Similarly, Plaintiffs intend to call only 2 FOs (Morton and Newman) from the North Carolina class (2.47%), who worked in only 2 of the 11 field offices in the state. But even these two FOs differed in how they chose to engage with voters; Newman used his judgment as to how to engage with each voter while Morton testified he never tailored communications to a voter. (*See* Dkt. 403-11 at 44:16-20, 88:14-89:3 (Newman); Dkt. 403-10 at 50:25-51:13 (Morton).) Further still, Newman planned no events for the Campaign while another

8

North Carolina opt-in planned and coordinated watch parties, round table discussions, and house parties. (*See* Dkt. 403-11 at 145:14-19 (Newman); Dkt. 403-34 (MB2020_Wood_ 00187958) (Julian Calabro).) Plaintiffs apparently contend that Newman and Morton are sufficient to represent the entire North Carolina class at trial, but discovery reveals the opposite.

**NEW YORK**: For New York, Plaintiffs will call a single FO (Goldstein) (0.99%) who only worked out of the Manhattan field office. As described above, Goldstein's experience with regards to phone banking and canvassing vastly differed from other FOs in different parts of the state. (*See supra* 6.) Goldstein also testified he managed and instructed volunteers on best practices as to how to spread the Campaign's message, while other New York FOs said they just set volunteers up with equipment. (*See* Dkt. 403-6 at 98:18-102:2.)

**MICHIGAN**: For Michigan, Plaintiffs have only identified one class member (Watson-Moore) to represent the 63 class members (1.59%) across nine offices. However, discovery revealed that even within Watson-Moore's own Oakland County field office, her performance of the FO position greatly differed from another FO. Specifically, Watson-Moore testified she stuck to the Campaign script when speaking with voters while FO Susan Gallaway stated she did the opposite. Gallaway also recruited approximately two dozen volunteers and trained and managed them at large scale events while other Michigan declarants denied any responsibility for directing the work of volunteers. (*See* Dkt. 403-23 at ¶¶ 15, 28-30; Dkt. 403-15 at 95:7-21, 102:11-105:17; Dkt. 384-80 at ¶ 19; Dkt. 384-82 at ¶ 18; Dkt. 384-85 at ¶ 18; Dkt. 384-92 at ¶ 18; Dkt. 384-94 at ¶ 18.) Further still, Watson-Moore and Gallaway both attended events for the Campaign and even gave speeches at these events while other Michigan FOs claimed to spend only "minimal" time at events each week. (*See* Dkt. 403-23 at ¶¶ 11-22; Dkt. 384-102 at ¶ 7; Dkt. 403-15 at 79:12-81:21; Dkt. 384-80 at ¶ 15; Dkt. 384-82 at ¶ 14.) One lone class member is insufficient to represent the

entire class considering the varied exercise of job duties performed.

*MINNESOTA*: Minnesota is a smaller class of 31 and Plaintiffs' single witness, Bridget Logan, constitutes the largest representative percentage (3.22%), but even there, discovery revealed that Logan performed her position differently from others in the class.  While Logan neither hosted nor planned to host any events on behalf of the Campaign, Minnesota opt-in Angelo Jaramillo testified about planning and executing a coffee meet-up event in which he was charged with "tak[ing] ownership of and tak[ing] some level of responsibility…."  (*See* Dkt. 403-9 at 93:7-18; Dkt. 403-7 at 130:2-132:24.)  Logan cannot sufficiently represent the other 30 members in her class with evidence showing her own experiences differed from others.

*ILLINOIS*: Plaintiffs again identify a single testifying witness (Doherty) to represent the Illinois state law class despite the 76 class members (1.32%) across 13 field offices contained within the class.  But Doherty testified differently than another Illinois opt-in as to the level of oversight they provided to volunteers.  Doherty testified that she would supervise volunteers on door-to-door canvassing until they gained experience and would decide when they were ready to canvass on their own (*See* Dkt. 403-5 at 109:2-17), whereas a non-testifying opt-in stated that she was "not responsible for directing the work of any volunteers…" (Dkt. 384-73 at ¶ 19.)  These differences in how their job was performed do not support Logan's experience being utilized so broadly on behalf of others.

These percentages are simply far too small to constitute sufficiently representative evidence.  *See Reich v. S. Md. Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995) (reversing trial verdict in a Department of Labor enforcement action based on a witness sample constituting only 1.6% of the total employee population: "There are no reported cases where such a small ratio of representative (testifying) employees has been used to justify an award to non-testifying

employees"); *Cruz v. Dollar Tree Stores, Inc.*, Nos. 07-2050 SC, 07-4012 SC, 2011 U.S. Dist.

LEXIS 73938, at *24-25 (N.D. Cal. July 8, 2011) (decertifying overtime exemption class action

based on plaintiffs' intention to offer testimony from only 5 representative plaintiffs in a class of

718 members or 0.69%: "Courts in this district have repeatedly decertified classes in overtime

exemption cases where Plaintiffs have provided no reliable means of extrapolating from the

testimony of a few exemplar class members to the class as a whole").

The figures are even worse for the representative evidence to be relied on for the collective:

| State | Number of Opt-Ins (outside the six state classes) | Number of Opt-Ins Pls Intend to Call | Number of Different Field Offices Across the State |
|---|---|---|---|
| **Total** | **448 Opt-Ins** | **1 Opt-in** | **Across 132 Field Offices** |
| Alabama | 7 | 0 | Across 3 offices: Birmingham HQ (4); AL Mobile Field Office (1); AL Huntsville Field Office (2) |
| Arizona | 16 | 0 | Across 6 offices: Arizona HQ (1); Phoenix Field Office (5); Flagstaff Field Office (1); Tolleson Field Office (2); Tempe Field Office (3); Tucson Field Office Replacement (4) |
| Colorado | 13 | 0 | Across 7 offices: Denver Field Office (4); Aurora Field Office (2); Fort Collins Field Office (1); Colorado Springs Field Office (1); Pueblo Field Office (1); Boulder Staging Office (2); Colorado New HQ (2) |
| Connecticut | 3 | 0 | Across 2 offices: Connecticut HQ (2); CT – Milford (1) |
| Florida | 81 | 1 | Across 16 offices: Florida HQ (2); Wildon Manors Field Office (1); Boca Field Office (3); Florida HQ2 North Miami (5); Little Havana |

| State | Number of Opt-Ins (outside the six state classes) | Number of Opt-Ins Pls Intend to Call | Number of Different Field Offices Across the State |
|---|---|---|---|
| | | | Field Office (5); Miami (1); Jacksonville Field Office (7); Sanford Field Office (5); St. Pete Field Office (7); West Palm Beach Field Office (6); Orlando Field Office (8); Parkland Field Office (2); East Tampa Field Office (8); Tallahassee Field Office (12); Gainesville Field Office (3); Sarasota Field Office (6) |
| Georgia | 36 | 0 | Across 8 offices: Georgia HQ (21); Albany (2); Columbus (2); Atlanta (2); Lawrenceville Field Office (4); Decatur Field Office (3); Savannah Field Office (1); Athens Field Office (1) |
| Idaho | 6 | 0 | Across 4 offices: Idaho HQ (2); Coeur d'Alene (1); Pocatello Field Office (2); Lewiston Field Office (1) |
| Kentucky | 1 | 0 | Across 1 office: Kentucky HQ (1) |
| Louisiana | 5 | 0 | Across 2 offices: Louisiana HQ (4); Monrow Field Office (1) |
| Maine | 6 | 0 | Across 3 offices: Maine HQ (3); Bangor (1); Lewistown Field Office (2) |
| Maryland | 2 | 0 | Across 2 offices:[2] Rockville Field Office (1) |
| Massachusetts | 18 | 0 | Across 6 offices: Massachusetts HQ (7); Quincy MA (1); Springfield Field Office (4); Lowell Field Office (1); Medford Field Office (2); Fall River Field Office (3 |
| Mississippi | 11 | 0 | Across 3 offices: Jackson – |

---

[2] Office location of 1 opt-in unknown.

| State | Number of Opt-Ins (outside the six state classes) | Number of Opt-Ins Pls Intend to Call | Number of Different Field Offices Across the State |
|---|---|---|---|
| | | | Mississippi HQ (5); Oxford Field Office (3); Gulfport MS Field Office (3) |
| Missouri | 11 | 0 | Across 4 offices: St Louis Field Office (4); Bridgeton Field Office (5); KC Westport Rd Field Office (1); KC N Cosby Field Office (1) |
| New Hampshire | 1 | 0 | Across 1 office: Concord (1) |
| New Jersey | 1 | 0 | Across 1 office: NJ HQ – Marlton (1) |
| Ohio | 47 | 0 | Across 13 offices: North Carolina HQ (1); Columbus Field Office (17); Westerville Field Office (2); Cleveland Field Office (4); Cleveland (West) Field Office (1); Cincinnati Field Office (2); Toledo Field Office (3); Dayton Field Office (1); Youngstown Field Office (1); Athens Field Office (1); Lima Field Office (1); Akron Field Office (3) |
| Oklahoma | 9 | 0 | Across 3 offices: Oklahoma HQ (5); Lawton Field Office (2); Tulsa Field Office (2) |
| Pennsylvania | 16 | 0 | Across 5 offices: Philadelphia Field Office (6); Pennsylvania HQ (2); Pittsburgh Large Field Office (6); Montgomery County Office (1); Langhorne Field Office (1) |
| Tennessee | 15 | 0 | Across 6 offices: Tennessee HQ (3); Memphis Field Office (3); Knoxville Field Office (3); Chattanooga Field Office (3); Murfreesboro Field Office (2); Johnson City Field Office (1) |

13

| State | Number of Opt-Ins (outside the six state classes) | Number of Opt-Ins Pls Intend to Call | Number of Different Field Offices Across the State |
|---|---|---|---|
| Texas | 53 | 0 | Across 14 offices: Dallas Field Office/HQ (4); Plano Field Office (4); El Paso Field Office (5); Laredo Field Office (2); Houston Central Field Office (14); Beaumont Field Office (2); Corpus Christi Field Office (1); San Marcos Field Office (2); Tyler (1); San Antonio Field Office (6); Fort Worth Downton Field Office (4); North Austin Field Office (3); McAllen Field Office (3); Houston West – Lg Field (2) |
| Utah | 7 | 0 | Across 1 office: Utah HQ (7) |
| Virginia | 31 | 0 | Across 9 offices: Richmond Field Office (8); Arlington Large Field Site (5); Hampton Field Office (4); Virginia Beach Field Office (2); Roanoke Field Office (2); Charlottesville Field Office (1); Danville Field Office (3); Manassas Field Office (5); Remote (1) |
| Washington | 23 | 0 | Across 6 offices: Washington State/Seattle HQ (6); Everett Field Office (4); Tacoma Field Office (6); Yakima Field Office (1); Vancouver Field Office (2); Kent Field Office (4) |
| Wisconsin | 28 | 0 | Across 5 offices: Milwaukee Field Office (13); Wisconsin (1); Wisconsin HQ (Milwaukee) (10); Madison Field Office (3); La Crosse Field Office (1) |
| Wyoming | 1 | 0 | Across 1 office: Cheyenne (1) |

Outside the Plaintiffs who also fall within the six classes, the collective consists of 448

14

Plaintiffs who worked in 26 different states—none of which are certified classes.  Most of those 26 states had FOs working in multiple field offices.  Discovery revealed differences both across states and even within field offices within those states.  For example, two FOs in the same Wisconsin field office differed on how they chose to engage with voters (*see* Dkt. 403-2 at 104:13-22 (Angulo); Dkt. 403-12 at 70:21-72:24 (Robinson)) and differed still from another Wisconsin opt-in in how they engaged with and trained volunteers (*see* Dkt. 403-2 at 102:13-18 (Angulo); Dkt 403-12 at 53:17-54:15 (Robinson); Dkt. 403-30 (MB2020_Wood_00187762) (Opt-in Xiong)).  Additional differences arise among other opt-ins in other states with respect to their involvement in planning and coordinating events.  For example, Florida opt-in Wright testified that he hosted multiple events, developed event themes, and collaborated with an artist to create promotional flyers (*see* Dkt. 434-21 at 80:11-85:7); whereas California opt-in Summers and Oklahoma opt-in Ruiz testified that they had little involvement with events (Dkt. 434-16 at 101:23-25, Dkt. 434-14 at 149:6-11).  Of the 448 opt-ins—who are not class members—who worked across 132 field offices in 26 states around the country, Plaintiffs' witness and exhibit lists include merely a <u>single plaintiff from Florida</u> (Wood) (0.22%) and a <u>total of 3 documents</u> pertaining to only two (Florida and Ohio) of the 26 non-class states.  Such a small percentage simply cannot be fairly extrapolated to the vast and varied non-testifying members.  *See Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016) ("If anything, [plaintiffs'] proposed collective presents an even wider range of experience than her proposed class because it is nationwide in scope, rather than limited to just New York interns.").

### 2. Plaintiffs' Trial Plan Demonstrates That They Cannot Prove Non-Testifying Field Organizers Worked Overtime.

Plaintiffs separately must establish on a class and collective basis that they *<u>actually worked</u>* overtime hours.  *See McLean v. Garage Mgmt. Corp.*, 819 F. Supp. 2d 332, 340-41 (S.D.N.Y.

2011) ("…an employee bringing an FLSA action has the burden of proving that he performed work for which he was not compensated.") (citing *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 87 (2d Cir. 2003); *see also Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 186 (3d Cir. 2019) (reversing class certification where the "common evidence" did not actually show whether individuals actually worked overtime). And while Plaintiffs can establish the number of overtime hours worked by "just and reasonable inference" under *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), this more lenient test is not available to establish in the first instance *whether each class and collective member worked overtime at all*. *See, e.g.*, *Osborn v. JAB Mgmt. Srvs., Inc.*, 126 F.4th 1250 (7th Cir. 2025) (drawing this distinction). Plaintiffs are still required to prove that they worked uncompensated hours by competent class-wide evidence. In *Ferreras*, the court emphasized that even common evidence about a timekeeping system did not reveal anything about "actual common work habits" and that "plaintiffs will still need to go through the process of proving that each individual employee worked overtime." *See Ferreras*, 946 F.3d at 186. Nor did the fact that the record suggested that one subclass may have worked overtime "drive the resolution of the litigation on a class wide basis." *See id*.

The common evidence on which Plaintiffs say they will rely cannot solve this problem because it does not demonstrate that individual Plaintiffs actually worked overtime. At summary judgment, the Court noted Daniel Kanninen's 30(b)(6) testimony that FOs were *expected* to work more than 40 hours per week, but that expectation does not establish that every individual FO actually did work over 40 hours. *See Ferreras*, 946 F.3d at 186 (reversing class certification where common evidence about timekeeping system did not reflect whether individual employees worked overtime). Similar to the plaintiffs in *Espencheid*, here, the quantity of work available varied across the different field offices within a state. Deposition testimony and documents have

16

demonstrated that the number of hours an FO worked per week depended on the specific field office in which they were located, their specific Regional Operating Director, and their own commitments outside the Campaign.  Putting forth a single field organizer from only one of the 26 states that does not overlap with the class states is far from sufficient.

The failure of Plaintiffs' proposed trial evidence is particularly evident when considering that even the witnesses Plaintiffs identified have not testified to any knowledge as to how many hours other FOs worked.  Even within the same field office, many FOs did not canvass with others so could not attest to how many hours other FOs were actually working versus attending to their own personal matters or even taking coffee breaks.  As the Campaign was such a decentralized and varied system across the country, these few witnesses cannot serve as representative to whether FOs across classes or the entire collective worked over 40 hours a week.

For example, the lone Minnesota class representative (Logan) was required to complete a schedule template reflecting a 40-hour workweek, and for one of her four weeks on the Campaign she scheduled herself for only 25 hours.  (*See* Dkt. 403-9 at 75:8-76:4; Dkt. 403-37 (MB2020_Wood_00015000).)  She further testified that she was not required to perform any extra work if she met her goals within a 40-hour week.  (*See* Dkt. 403-9 at 92:16-93:2.)  Similar variations were seen in California—with evidence demonstrating that FOs in the Orange County field office purportedly "didn't work the long hours" that some other FOs claim to have worked.  (See Dkt. 403-39 (P001635).)  And not one of the three witnesses Plaintiffs intend to call from California worked within that Orange County field office, nor do any of them have any knowledge of how many hours FOs from other field offices worked.  In fact, one of those California witnesses (Wheatley-Diaz) was working a separate 50-70 hour per week job at the same time she was purportedly working over 40 hours for the Campaign.  (*See* Dkt. 403-16 at 151:2-13, 239:4-21 and

17

Dkt. 447-22 at 31:24-32:5, 33:9-13, 34:9-24, 191:11-22.)  Similarly, the one Illinois class witness (Doherty) was a full-time student while working for the Campaign (*see* Dkt. 403-5 at 66:9-68:21, 78:17-23; Dkt. 447-5 at 73:23-74:23), seriously undermining her claims of working more than 40 hours a week for the Campaign.  Such a small and non-representative sample of witnesses cannot serve as exemplars of the larger non-testifying classes and collective.

Even if Plaintiffs could somehow prove overtime hours were worked on a class and collective basis, with such wide disparities in the evidence, such minimal representation could not establish an average of actual overtime hours worked to permit a "just and reasonable inference" as to damages.  "Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked."  *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456-459 (2016) (representative evidence based on an expert witness's estimation of average time performing particular task at issue could be utilized to establish liability where employees worked in the same facility, did similar work, and were paid under the same policy).  This is particularly the case where Plaintiffs have proffered no expert to even calculate such a figure as existed in *Tyson Foods*, and the standard that Court applied—whether the common evidence would be admissible in an action by each individual class member, *see id.* at 1046-47—does not apply to the disparate and individual testimony Plaintiffs will offer at trial here.

## CONCLUSION

For the foregoing reasons, the Campaign respectfully requests that the Court grant its Motion to Decertify the Collective and Six Classes in their entirety.

Dated: New York, New York
August 26, 2025

PROSKAUER ROSE LLP

By: */s/ Elise M. Bloom*
Elise M. Bloom
Noa M. Baddish
Eleven Times Square
New York, New York 10036
(t) 212-969-3000
(f) 212-969-2900
ebloom@proskauer.com
nbaddish@proskauer.com

Mark W. Batten (admitted *pro hac vice*)
One International Place
Boston, Massachusetts 02110
(t) 617-526-9850
(f) 617-526-9899
mbatten@proskauer.com

*Attorneys for Defendant*
*Mike Bloomberg2020, Inc.*

**<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned hereby certifies, pursuant to Local Civil Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York that the foregoing brief contains no more than 8,750 words.

Specifically, the Microsoft Word "Word Count" tool indicates that the brief contains 5,446 words.  That word count excludes the "caption, any index, table of contents, table of authorities, signature blocks, or any required certificates," but does include "material contained in footnote or endnotes."  Local Civil Rule 7.1.

*/s/ Elise M. Bloom*
Elise M. Bloom